UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

              Plaintiff,

    - v. -

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; KEVIN MAXWELL,

              Defendants.

**COMPLAINT**

Civil Action No.

Plaintiff, the UNITED STATES OF AMERICA, by and through the undersigned attorneys,

hereby alleges as follows:

## INTRODUCTION

1.      Gun violence is an epidemic in the United States.  According to provisional data

from the Centers for Disease Control, over 47,000 people were killed by firearms in 2021—an

increase of eight percent from the previous record high in 2020.[1]  Firearm-related injuries are the

most common cause of death from injury for children in the United States.[2]  Between 2018 and

---

[1] *See, e.g.,* Thomas R. Simon, Ph. D; *et al.*, *Notes from the Field: Increases in Firearm Homicide and Suicide Rates - United States, 2020-2021.* MORBIDITY AND MORTALITY WEEKLY REPORT, Oct. 7, 2022, https://www.cdc.gov/mmwr/volumes/71/wr/mm7140a4.htm?s_cid=mm7140a4_w, Roni Caryn Rabin, *Gun-Related Suicides and Killings Continued to Rise in 2021, C.D.C. Reports*; THE NEW YORK TIMES, October 6, 2022, available at https://www.nytimes.com/2022/10/06/health/guns-homicides-suicides-cdc.html.
[2] *See* Lois K. Lee, M.D., M.P.H., Katherine Douglas, M.D., and David Hemenway, Ph.D., *Crossing Lines — A Change in the Leading Cause of Death among U.S. Children,* THE NEW ENGLAND JOURNAL OF MEDICINE, April 21, 2022, available at https://www.nejm.org/doi/pdf/10.1056/NEJMp2200169.

2021, firearm deaths doubled among Black children and rose by 50 percent among Hispanic children.[3]

2.      AR-15-style semiautomatic firearms are increasingly used in mass shootings across the United States, including in the recent shooting deaths of the 21 people at Robb Elementary School in Uvalde, Texas (including 19 children); 10 people killed in Buffalo, New York; 17 people killed at Stoneman Douglas High School in Florida (including 14 children); 5 people killed at an LGBTQ+ nightclub in Colorado Springs, Colorado; 58 people killed at a concert in Las Vegas, Nevada; 26 people killed at Sutherland Springs, Texas; 49 people killed at the Pulse nightclub in Orlando, Florida; 14 people killed in San Bernadino, California; and the 27 people killed at Sandy Hook Elementary School in Connecticut (including 20 children).[4]

3.      Against this tragic backdrop, Defendants are illegally selling machinegun conversion devices they style as the FRT-15 to be installed in AR-15 type weapons.  People all over the nation, including in New York City and on Long Island, have purchased FRT-15s.

4.      The FRT-15 is a trigger assembly designed to be fitted into an AR-15 style firearm. It replaces the standard trigger assembly for such a firearm.

---

[3] *See* Nirmita Panchal, *The Impact of Gun Violence on Children and Adolescents*, KAISER FAMILY FOUNDATION, Oct. 14, 2022, available at https://www.kff.org/other/issue-brief/the-impact-of-gun-violence-on-children-and-adolescents/; Robert Gebeoff, Danielle Ivory, Bill Marsh, Allison McCann, and Albert Sun, *Childhood's Greatest Danger: The Data on Kids and Gun Violence*, THE NEW YORK TIMES, December 14, 2022, available at https://www.nytimes.com/interactive/2022/12/14/magazine/gun-violence-children-data-statistics.html ; Hurubie Meko, *149 Shot, 16 Dead: Gunfire's Rising Toll on New York City's Youngest*; THE NEW YORK TIMES, December 27, 2022, available at https://www.nytimes.com/2022/12/27/nyregion/new-york-teen-shootings.html.

[4] *See, e.g.,* Jonathan Franklin, *Where AR-15-style rifles fit in America's tragic history of mass shootings*, NPR, May 26, 2022, available at https://www.npr.org/2022/05/26/1101274322/uvalde-ar-15-style-rifle-history-shooter-mass-shooting; Ashley R. Williams, *More mass shooters are using semi-automatic rifles – often bought legally,* USA TODAY, July 14, 2022, available at https://www.usatoday.com/story/news/nation/2022/07/12/mass-shootings-weapons-legal-what-to-know/7814081001/.

5.      A Wide Open Trigger (WOT) is also a trigger assembly designed to be fitted into an AR-15 style firearm.  It is a copy of the FRT-15.

6.      When an FRT-15 or WOT is fitted into a firearm, the firearm will fire multiple rounds—without manual reloading—automatically by a single function of the trigger.  Such a converted firearm can have a rate of fire that meets or exceeds an originally manufactured military specification M-16-type machinegun, which can have a rate of fire ranging from 700 to 970 rounds per minute depending on the configuration.

7.      The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has repeatedly informed Defendants that, because the FRT-15 is a combination of parts designed and intended for use in converting a weapon into a machinegun, the FRT-15 is itself a machinegun under federal law.

8.      With limited exceptions not applicable to Defendants' sale of FRT-15s and WOTs, Federal law prohibits the manufacture, possession, transfer, and importation of machineguns manufactured after May 19, 1986.  *See* 18 U.S.C. § 922(o) and 27 C.F.R. § 479.105.

9.      ATF has therefore demanded that Defendants cease-and-desist in the manufacture and transfer of FRT-15s.

10.     ATF similarly demanded that sales of the WOT cease.

11.     Defendants have refused to comply with ATF's demand, and instead  sought to evade ATF and obstruct ATF's mandate to enforce laws prohibiting the sale of machineguns and to ensure public safety.

12.     Indeed, Defendants' disdain for law is such that, upon receiving a cease-and-desist letter from ATF, Defendant DeMonico said, "Fuck them."  In another instance, a caller from the

office of Defendant Maxwell threatened to march down to the ATF offices. "We are bringing the rocket launcher," he warned.

13.    Since 2020, Defendants have, among other things:

a.   purposely possessed, transferred, and transported FRT-15s and WOTs in violation of the National Firearms Act (NFA) and the Gun Control Act of 1968 (GCA), and engaged in the business of a dealer and/or manufacturer of NFA firearms without being licensed to do so;

b.   purposely refused to obtain ATF approval to manufacture, import, or transfer firearms and effectuate registration with the ATF regarding the sale of their FRT-15s and WOTs;

c.   consciously withheld information from ATF so as to frustrate its ability to carry out its statutory duties;

d.   deliberately avoided paying special occupational tax, transfer tax, and making tax, exceeding an estimated amount of $32 million dollars in taxes combined, plus penalties and interest, to the United States for the illegal manufacture, making, sale or other disposition of machineguns;

e.   created a byzantine corporate structure for the company that sells the machineguns in furtherance of a business strategy designed to conceal who owns and controls the company, and to conceal the source and flow of proceeds from the illegal sales of FRT-15s;

f.   trespassed into a manufacturing facility that was storing illegal machineguns and parts subject to a federal search warrant, and stole those weapons and components;

g. misled its customers by failing to inform them of critical decisions ATF had made about trigger assemblies that were precursors to the FRT-15;

h. mislabeled packages to prevent the United States Postal Service (USPS) from learning that the packages contained illegal machineguns; and

i. improperly used the USPS to distribute their illegal machineguns to the American public.

14. Thus, Defendants have, in violation of 18 U.S.C. § 371, knowingly and intentionally conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of ATF in its regulation of machineguns under the NFA and GCA.

15. Defendants have engaged in the ongoing commission of mail fraud in violation of 18 U.S.C. § 1341. They have also conspired to commit mail fraud in violation of 18 U.S.C. § 1349.

16. Defendants have engaged in the ongoing commission of wire fraud in violation of 18 U.S.C. § 1343.

17. They have also conspired to commit wire fraud in violation of 18 U.S.C. § 1349.

18. For the reasons stated herein, the United States brings this action for a temporary restraining order, preliminary and permanent injunctions, and other equitable relief pursuant to 18 U.S.C. § 1345, in order to enjoin the ongoing conspiracy to defraud the United States in violation of 18 U.S.C. § 371, the ongoing scheme to commit mail fraud in violation of 18 U.S.C. § 1341, the ongoing scheme to commit wire fraud in violation of 18 U.S.C. § 1343, and the ongoing conspiracy to commit mail and/or wire fraud in violation of 18 U.S.C. § 1349.

## JURISDICTION AND VENUE

19. The Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1345, and 28 U.S.C. §§ 1331 and 1345.

20.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

21.     Plaintiff is the United States of America.  ATF is a law enforcement agency within the United States Department of Justice charged with, among other things, protecting the American public from the illegal use and trafficking of firearms.

22.     Defendant Rare Breed Triggers, LLC, is a company that has a principal place of business in Florida. Originally formed in Florida, the company later organized in North Dakota as Rare Breed Triggers, LLC. The Florida and North Dakota LLCs merged; the Florida LLC dissolved. Defendant Rare Breed Firearms, LLC, is a sister company of Rare Breed Trigger, LLC and is incorporated in Texas.  They are collectively referred to herein as RBT.

23.     Defendant Lawrence DeMonico, also known as Larry R. Lee, Jr., represents himself to be the President of RBT.  He has been an owner of RBT.

24.     Defendant Kevin Maxwell has been an owner and general counsel of Defendant RBT.

## LEGAL BACKGROUND

A.     **The NFA and the GCA**

25.     Congress enacted the NFA in 1934 to regulate dangerous and unusual weapons, particularly machineguns and sawed-off firearms, through the tax on the manufacture, importation, sale or other disposal of those type of firearms.  The definition of "firearms" under the NFA includes, in relevant part, "a machinegun."  26 U.S.C. § 5845(a).

26.     Congress enacted the GCA, *as amended*, 18 U.S.C. § 921 *et seq*., after finding that "existing Federal controls over [widespread traffic in firearms moving in interstate commerce] do

not adequately enable the States to control this traffic within their own borders."  Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. 197, 225 (1968).

27.     Congress specifically determined that "only through adequate Federal control . . . over all persons engaging in the businesses of importing, manufacturing, or dealing in [these weapons], can this grave problem be properly dealt with."  *Id*. § 901(a)(3), 82 Stat. at 225. Accordingly, Congress enacted requirements for persons engaging in the business of importing, manufacturing, or dealing in "firearms."  *See generally* 18 U.S.C. §§ 922-923.

28.     Congress thus required individuals and entities engaged in the business of importing, manufacturing, or dealing in firearms to obtain a federal firearms license, *id*. § 923(a), to maintain records of firearm acquisition and transfer as prescribed by regulation, *id*. § 923(g)(1)(A), and to conduct background checks before transferring firearms to a non-licensee, *id*. § 922(t).  Congress thus required licensed importers and manufacturers to identify each firearm that they import or manufacture by means of a unique serial number on the receiver or frame of the weapon and other markings as prescribed by Federal regulation.  *Id*. § 923(i).

29.     Firearms regulated by the NFA are subject to stricter controls than those regulated only by the GCA.  NFA firearms are subject to a transfer and making tax, 26 U.S.C. §§ 5811 and 5822, and are subject to transfer and registration requirements, *id.* §§ 5812 and 5841, which include the submission of an application, fingerprints, and a photograph, *id.* 5812(a)(3) and 27 C.F.R. § 479.85.

30.     All firearms, whether regulated by the NFA, GCA, or both, are subject to marking requirements.  18 U.S.C. § 923(i) and 26 U.S.C. § 5842.

B.     **The ATF**

31.     The ATF regulates lawful commerce in firearms and administers and enforces federal firearms laws.

32.     Title 28 Section 599A(b)(1) of the United States Code provides ATF with the authority to investigate violations of federal firearms law at the direction of the Attorney General. Under the corresponding federal regulation at 28 C.F.R. § 0.130, the Attorney General provides ATF with the authority to investigate, administer, and enforce the laws related to firearms, including under the GCA, 18 U.S.C. Chapter 44, and the NFA, 26 U.S.C. Chapter 53.

33.     Congress has also vested in ATF the authority to promulgate regulations necessary to administer and enforce the GCA and the NFA.   18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2), 7805(a).

34.     Pursuant to statutory and regulatory authority, the ATF Firearms Ammunition and Technology Division (FATD) provides expert technical support on firearms and ammunition to the firearms industry, federal, state, and local law enforcement agencies regarding the GCA and the NFA.

35.     The NFA requires the Attorney General[5] to maintain a central registry of all items regulated under the NFA, including firearms, in the National Firearms Registration and Transfer Record (NFRTR).

---

[5]The NFA is part of the Internal Revenue Code of 1986.  The Internal Revenue Code, with the exception of the NFA, is administered and enforced by the Secretary of the Treasury. When ATF was established as a separate component within the Department of Justice under the Homeland Security Act of 2002, all its authorities, including the authority to administer and enforce the NFA, were transferred to the Attorney General.

36. Additionally, the Attorney General shall collect the special occupational tax, transfer tax, and making tax on items regulated under the NFA. *See* 26 U.S.C. §§ 5801, 5811, 5822.

37. The Internal Revenue Code (IRC) provides that the Attorney General shall administer the NFA. 26 U.S.C. § 7801(b). Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. 28 U.S.C. § 599A(b)(1), (c)(1); 28 CFR § 0.130(a)(1)-(2).

**C.     Definition of a Machinegun**

38. The definition of "firearm" under the NFA includes, in relevant part, "a machinegun." 26 U.S.C. § 5845(a)(6).

39. The NFA defines a "machinegun", in relevant part, as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

40. Pursuant to the NFA, a "machinegun" also includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun." *Id.*

41. The GCA defines the term "machinegun" as "the meaning given such term in section 5845(b) of the [NFA], 26 U.S.C. 5845(b))." 18 U.S.C. § 921(a)(24).

42. Implementing regulations, 27 C.F.R. § 479.11, make clear that the term "automatically" used in the NFA definition of a machinegun means "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single

function of the trigger." The regulation goes on to state that a "single function of the trigger" means a "single pull of the trigger and analogous motions."

43. In 2006, ATF issued Ruling 2006-2, which interpreted the phrase "single function of the trigger" in § 5845(b) to mean "single pull of the trigger and analogous motions." ATF Ruling 2006-2, at 2 (Dec. 13, 2006).[6] Under Ruling 2006-2, any device that "fire[s] repeatedly" when "the shooter maintains finger pressure against the stock" (*e.g.*, because an internal coiled spring pushes the shooter's finger forward) is deemed a machinegun. *Id.* A device that "initiate[s] an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted" is a machinegun. *Id.*

44. Certain trigger assemblies referred to as "forced reset triggers" or "FRTs" do not require the shooter to pull and then subsequently release the trigger before a second shot is fired. Thus, some FRTs allow a firearm to automatically expel more than one shot by a single, continuous pull of the trigger. *See* ATF's Open Letter to All Federal Firearms Licensees, March 22, 2022, available at https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download (ATF's 2022 Open Letter).

45. One such FRT is the FRT-15 manufactured and transferred by RBT.

46. The FRT-15 incorporates parts that are novel to the operation of a typical AR-type semiautomatic firearm, like the AR-15. The unique parts (hammer, trigger and locking bar) within the FRT-15 trigger mechanism are specifically designed to incorporate the standard rearward and forward movement of the AR-type bolt carrier assembly, when modified as described below, in its cycle of operations allowing the weapon to function as a self-acting, or self-regulating, mechanism.

---

[6]   *See*   https://www.atf.gov/firearms/docs/ruling/2006-2-classification-devices-exclusively-designed-increase-rate-fire/download.

To function as intended, the FRT-15 device must be installed into an AR-type weapon that includes an M16-type machinegun bolt carrier.  In a typical AR-type firearm, the rearward movement of the bolt carrier assembly extracts, then ejects a cartridge case, and cocks the hammer which is held by the disconnector.  The disconnector interrupts the weapon's operating cycle, forcing the shooter to release the trigger and pull it again to fire the next round.   The FRT-15 has no disconnector, which eliminates the need for the shooter to release their pull of the trigger.  In a typical AR-type firearm, the forward movement of the bolt carrier assembly loads a subsequent cartridge, and locks the bolt.  With the FRT-15, the forward movement automatically releases the trigger and hammer, as the M-16-type bolt carrier assembly strikes a locking bar in the same way that such a bolt carrier strikes an auto-sear in a military specification weapon like the M16, thereby allowing the weapon to expel a second projectile without a separate pull of the trigger.  Thus, one continuous pull of the FRT-15 trigger allows the firearm to shoot more than one shot.

47.     Defendants are marketing FRT-15s (and WOTs) as replacement triggers for AR-type firearms.  Unlike standard semi-automatic triggers, the FRT-15 does not require shooters to pull and then subsequently release the trigger to fire a second shot.  Instead, the FRT-15 uses the firing cycle to eliminate the need for the shooter to release the trigger before a second shot is fired.

## D.     Prohibitions on the Possession, Transfer, and Transport of Machineguns

48.     Federal law restricts the transfer and possession of machineguns imported or manufactured on or after May 19, 1986, except to the United States or any department or agency thereof, or a State or department, agency, or political subdivision thereof.  18 U.S.C. § 922(o).

49.     Additionally, the NFA and the GCA, along with their implementing regulations, set out a number of requirements associated with the manufacture and sale of firearms, including machineguns.  In order to either manufacture or deal in machineguns pursuant to 18 U.S.C. §

922(o), an entity would first have to obtain either a Federal firearms license to be a dealer and/or manufacturer in firearms. *See generally* 18 U.S.C. § 923. Next, the licensed manufacturer or dealer would have to be "qualified under []part [479]" to deal, manufacturer, and/or import machineguns. 27 C.F.R. § 479.105. A "qualified" licensed dealer or manufacturer is one who has paid a Special Occupational Tax (SOT) pursuant to 26 U.S.C. § 5801 and 27 C.F.R. § 478.31..

50. Since machineguns are subject to the registration, transfer, taxation, and possession restrictions under the NFA, there are criminal penalties relating to the illegal transfer and possession of said firearms. *See* 26 U.S.C., Chapter 53; *see also* 26 U.S.C. § 5871 (any person who violates or fails to comply with the provisions of the NFA shall be fined $10,000 per violation and is subject to imprisonment for a term of up to ten years).

51. Any firearm made, imported, transferred, transported, delivered, received or possessed in violation of the NFA is subject to seizure and forfeiture. *See* 26 U.S.C. §§ 5861, 5872.

52. Under the GCA, machineguns, as defined in 18 U.S.C. § 921(a)(23), are subject to prohibitions regarding the possession, transfer, or transport of such items as set forth in 18 U.S.C. §§ 922 (a)(4) and (o).

**E.    Registration of NFA Firearms**

53. The NFA specifically enumerates the means to register NFA firearms, including machineguns, in the NFRTR.

54. The NFA, 26 U.S.C. §5841(b), provides that "[e]ach manufacturer, importer, and maker shall register each firearm he manufactures, imports, or makes. Each firearm transferred shall be registered to the transferee by the transferor."

55.     Persons possessing machineguns that were not registered by the manufacturer, importer, or maker, and lawfully transferred to the possessor, cannot later register the machineguns pursuant to the NFA unless the possessor is a government entity, as such possession would constitute a violation of 26 U.S.C. § 5861(c), (e).  Further, with limited exceptions not applicable to Defendants' sale of FRT-15s and WOTs, Federal law prohibits the manufacture, possession, transfer, and importation of machineguns manufactured after May 19, 1986. *See* 18 U.S.C. § 922(o) and 27 C.F.R. § 479.105.

56.     To register, "[e]ach manufacturer shall notify the [Attorney General] of the manufacture of a firearm in such manner as may by regulations be prescribed and such notification shall effect the registration of the firearm required by this section.  Each importer, maker, and transferor of a firearm shall, prior to importing, making, or transferring a firearm, obtain authorization in such manner as required by this chapter or regulations issued thereunder to import, make, or transfer the firearm, and such authorization shall effect the registration of the firearm required by this section."  26 U.S.C. §5841 (c).

57.     If a firearm is not registered in the NFRTR, ATF is deprived of the ability to ensure that the NFA firearm may be lawfully possessed by the transferee prior to the transfer taking place.  Failure to register in the NFRTR allows for the uncontrolled distribution of dangerous weapons to individuals whose possession may be unlawful under Federal, State, or local law, either because of the nature of the weapon or because of the intended transferee's inclusion in a category of prohibited individuals, such as convicted felons.  Further, in the event the unregistered NFA firearm is recovered by law enforcement in connection with criminal activity, ATF would be unable to quickly ascertain the identity of the possessor through the use of the NFRTR.  This may cause critical delays in identifying an individual involved in serious violations of Federal or State

law, which, in the case of dangerous weapons, may include incidents such as homicides, mass shootings, or terrorist events, among other categories of violent crime.

58.     Machineguns must also be identified with a serial number.  *See* 26 U.S.C. § 5842(a).

59.     As a "machinegun," an FRT like the FRT-15 or the WOT must be registered in the NFRTR by the qualified licensed manufacturer.  Each firearm transferred shall be registered to the transferee by the transferor.  If a firearm is not registered in the NFRTR, ATF would be unable to track it should that become necessary.

**F.     Tax Requirements Associated with Machineguns**

60.     It is unlawful to make or sell an NFA firearm without having paid the required taxes.  *See* 26 U.S.C. § 5861.  Such a violation carries criminal penalties. *See* 26 U.S.C. § 5871.

61.     The IRC provides that the Attorney General shall administer and enforce the NFA. 26 U.S.C. § 7801(b).  Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General.  28 U.S.C. § 599A(b)(1), (c)(1); 28 CFR § 0.130(a)(1)-(2).

62.     The NFA imposes a special occupational tax on individuals who engage in the business of importing, manufacturing, and dealing firearms, including machineguns. *See* 26 U.S.C. § 5801 and 27 C.F.R. § 479.31.

63.     While the NFA does not define the term, "engag[ed] in business," the GCA defines the term "engaged in the business" as dealing, manufacturing, or importing firearms. *See* 18 U.S.C. § 921(a)(21).

64.     Every person engaged in the business of manufacturing, importing, or dealing in firearms under the NFA must pay a Special Occupation Tax (SOT).  26 U.S.C. § 5851 and 27 C.F.R § 479.31.  By operation of law, any person so engaged must also be licensed as a dealer, manufacturer, or importer under the GCA.

65.     Title 27 of the Code of Federal Regulation (CFR) Part 479, Subpart D provides for penalties and interest for failure to pay the special occupational tax and failure to file tax returns.

66.     Anyone who deals in, manufactures, or imports an FRT-15 thus must pay an occupational tax.

67.     In addition to the special occupational tax, the NFA imposes taxes on the manufacture and transfer of NFA firearms, including machineguns.

68.     Under 26 U.S.C. § 5821, with exceptions not applicable here, a transferor of firearms must pay a $200 tax on each firearm transferred.

69.     Similarly, with exceptions not applicable here, 26 U.S.C. § 5821 imposes a $200 tax on the manufacturer of firearms for each firearm made.

70.     The manufacturer of the FRT-15 would thus be subject to a $200 tax for each FRT-15 manufactured.  Similarly, the transferor of the FRT-15 would be subject to a $200 transfer tax for each FRT-15 transferred.  Where the FRT-15 was associated with one or more intermediary transfers—for instance, from RBT to a dealer who then transferred to a consumer—there would be an additional $200 applicable transfer tax.

### DEFENDANTS' ONGOING CONSPIRACY AND MAIL AND WIRE FRAUD SCHEMES

71.     Defendants have chosen to disregard federal law regulating their manufacture of FRT-15s, and sale of  FRT-15s (and WOTs), and have refused to adhere to demands by ATF that they cease-and-desist in their manufacture and sale.

72.     Defendants have thus intentionally disregarded the statutorily required registration, transfer, taxation, and possession restrictions that apply to FRT-15s and WOTs—all of which serve to protect the public from machineguns illegally entering the consumer market..

73.     Defendants have therefore interfered with—indeed obstructed—the ability of the United States government to enforce laws prohibiting the sale of machineguns.  And they have engaged in mail and wire fraud in furtherance of their schemes.

A.     **The Organizational Structure of Rare Breed Triggers**

74.     RBT was incorporated in Florida in April 2020 as a limited liability company.

75.     At the time of RBT's formation/incorporation, four individuals held ownership interests in RBT.  Those individuals include Lawrence DeMonico, Kevin Maxwell, and two others. "On advice of counsel" and as collectively agreed upon by these four individuals, Defendant DeMonico and these two other individuals surrendered/divested their ownership interest by December 14, 2020.

76.     By November 2021, RBT re-incorporated as a North Dakota limited liability company.  On December 7, 2021, Rare Breed Triggers, LLC filed a form to change the address of its principal executive office to Fargo, North Dakota.

77.     The original owners of RBT had decided to reorganize the company from a simple corporate structure to a complex set of interlocking companies.

78.     The flow of funds through RBT illuminates the structure of these interlocking companies.

79.     Based upon information and belief, when an RBT customer pays for an RBT product—including an FRT-15—by credit card, RBT uses Chase Paymentech, a payment processing business of JP Morgan Chase, a company with headquarters in New York City.  If an

RBT customer chooses to pay for an RBT product by way of wire transfer, RBT instructed the customer to wire the funds to JP Morgan Chase in New York.  RBT sold the FRT-15 both to consumers as well as to dealers who would then resell them to consumers.  RBT directed its dealers to make payment to RBT by way of wire transfer.

80.   Money that comes into RBT flows out in three streams.  Based upon information and belief, one stream is to an individual who handles customer support for the company.  A second stream is to a company that provides marketing services to RBT.

81.   The third stream of money from RBT flows to XYZ Distribution LLC (XYZ).  XYZ is also known as XYZ Distrubution [*sic*].  It is also known as RB Trig LLC.  Based upon information and belief, "XYZ Distrubution" was purposely misspelled in order to mislead possible investigations.

82.   From XYZ, the flow of funds splits into three more streams.  One stream flows (or flowed) to 3rd Gen Machine, a  company that manufactured the FRT-15.

83.   A second stream flows to ABC IP, LLC, and a third stream flows to DEF Consulting LLC.  But for a small amount of money that flows to a company for a royalty payment, the two streams through ABC IP and DEF Consulting all end up at the same four places: (1) LAD, LLC, owned by Defendant DeMonico; (2) Leleux, LLC (Leleux), owned by a former owner of RBT; (3) An 1861 LLC, owned by Defendant Maxwell; and (4) Spider Hole, LLC (Spider Hole), owned by a former owner of RBT.

84.   The payments to these companies are made to appear to be for consulting services.  They are not.  Invoices for "consulting"—even invoices for reimbursement for "mileage"—obscure the fact that Defendants DeMonico, Maxwell, and the owners of Leleux and Spider Hole own or otherwise control RBT.

85.     Defendants DeMonico, Maxwell, and the owners of Leleux and Spider Hole agreed to create the system through which they control RBT and through which money from sales of FRT-15s and WOTS flows to RBT and them.

**B.      The RBT FRT-15**

86.     Defendants formed RBT with the specific purpose of manufacturing and selling the FRT-15.

87.     The FRT-15 is a trigger assembly that turns the AR-15 semi-automatic firearm—used in over half a dozen mass shootings in the last decade—into an even deadlier firearm.

88.     A firearm equipped with an FRT-15 will automatically fire multiple rounds with the single pull of the trigger.

89.     The path RBT took to sell the FRT-15—a path hidden from the ATF and RBT's own customers—began with the AR1 trigger system, a product of Company A.

90.     Defendants had been looking for such a trigger to sell; they found it in the AR1. Defendant DeMonico stated that "along the way we kind of happened across this technology."

91.     In 2017, Company A submitted the AR1 to ATF for classification. The AR1 is a forced reset trigger meant for use in AR-15 type firearms. The AR1 is a set of components that, once assembled, are meant to replace the traditional trigger in an AR-15 type firearm.

92.     On August 28, 2018, ATF sent a letter to Company A. In the letter, ATF stated that the AR1 forced reset trigger was a machinegun. That is, as designed, the AR1 would convert an AR-15 style firearm into a machinegun.

93.     Additional refinements were made to the forced reset trigger, and Company A obtained a patent for the design, U.S. Patent #10,514,223 (the '223 patent). The '223 patent provided a "drop-in" solution for its forced reset trigger concept and is solely intended for use in

AR-15-style firearms.  The '223 patent was otherwise designed to function no differently from the AR1, which ATF had classified as a machinegun.  The '223 patent represents a modular forced reset trigger assembly (i.e., the AR1 already assembled with slightly different parts), ready to drop into an AR-15-style firearm.  The "drop-in" nature of the design allowed for easy and rapid installation into an AR-type firearm by a person with ordinary skills utilizing commonly available tools.  Further, while the AR1 was designed to function with a modified bolt, the '223 was designed to function with an off-the-shelf bolt carrier designed for fully automatic M16-type firearms.  Such bolts are widely available and are generally marketed as "M-16 bolts," Mil Spec bolts," "machinegun cut bolts," and/or "full auto bolts."[7]

94.     In May 2020, just after RBT was formed, Company A assigned the '223 patent to RBT.

95.     Defendant DeMonico "handled the acquisition" of the '223 patent.  RBT then assigned/sold the '223 patent to ABC IP LLC, a Delaware limited liability company, after which RBT would pay ABC IP LLC a royalty or licensing for each trigger sold.

96.     The FRT-15 is the commercial embodiment of the '223 patent.  And the FRT-15 functions the same way as the AR1.  Just like the AR1, the FRT-15 allows the firearm to fire automatically, with a single constant rearward pull, until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply.

97.     Prior to beginning its sales for the FRT-15, RBT followed an unusual path.

98.     As Defendant DeMonico has acknowledged publicly, it would be customary for a seller of a product like the FRT-15 to submit the product to ATF and ask that ATF analyze and

---

[7] The M-16 is the U.S. Military designation for a series of machineguns based on the ArmaLite AR-15 machinegun.

classify the product.  In other words, it would be customary for a seller of a product like the FRT-15 to ask ATF whether the product is a machinegun under the relevant law.  That is what Company A did with the AR1.

99.     But Defendants chose not to submit the FRT-15 to ATF for classification prior to initiating sales of the FRT-15.  Instead, RBT sought opinions on the matter from former ATF employees who had gone to the private sector, one of whom had submitted the AR1 to ATF for classification.  These individuals asserted that the FRT-15 was not a machinegun.

100.     Defendants have touted these opinions in an effort to convince wary customers that the FRT-15 is legal.  In doing so, Defendants have deliberately failed to disclose critical facts to customers concerning the illegality of RBT's sale of the FRT-15.

101.     For instance, RBT did not tell its customers the fact that ATF had determined that the FRT-15's predecessor product was a machinegun.  Nor did RBT share with its customers the fact that it had not sought an ATF classification of the FRT-15 prior to offering it for sale.  But RBT went ahead with selling the FRT-15s to its customers anyway.

102.     According to Defendant DeMonico, RBT was the only company that had the "balls" to sell the FRT-15.  He went on to say that "when the shit hits the fan . . . like how many people are going to turn tail and run or hide?  Well, that wasn't me."

103.     RBT claimed that it was the first company to bring a forced reset trigger of a type like the FRT-15 to the market.  In or about December 2020, RBT started selling the FRT-15 nationwide through its website (www.rarebreedtriggers.com), the websites of third-party vendors, and in third-party vendors' brick-and-mortar stores.

104.     RBT's website was, and remains, accessible in New York and nationwide.

20

105.    RBT customers are, and have been able to, place orders with RBT from New York. For instance, on November 29, 2022, ATF Special Agents, while physically located in the Eastern District of New York, placed orders for WOTs directly from RBT's website.  The orders were shipped from RBT in North Dakota by way of the USPS.  ATF received the WOTs on December 6, 2022, in Pennsylvania.

106.    Defendants have claimed that they do not ship their products directly to certain states, including to New York. But Defendants know that that they transact with and supply FRT-15s to dealers that choose to sell in those states.

107.    Third-parties—including dealers—have sold and shipped FRT-15s to customers in New York.

108.    On the RBT website, RBT states, in the "description" for the FRT-15, that "[t]he FRT-15 is exclusively manufactured and sold by Rare Breed Triggers."   Underneath the description and the product details, RBT notes "US Pat. 10514223."

109.    RBT sold at least 10,000 FRT-15s within the first three months of selling the FRT-15.  RBT maintains records showing the daily sales of its FRT-15.

110.    In 2021, RBT sold the FRT-15 on its website for $380.00.

111.    RBT does not permit refunds on its website of the FRT-15.

112.    ATF estimates that in excess of 80,000 FRT-15s are in circulation today.  ATF further estimates that RBT sales generated in excess of $29,000,000 in revenue.

113.    According to Defendant Maxwell, in the last three months of 2021, RBT was selling FRT-15s at the rate of 1000 to 3000 per week.

21

C.    **ATF Determined that the RBT FRT-15 is a Machinegun**

114.    On or about April 1, 2021, ATF's Internet Investigations Center initiated a referral to make an undercover purchase of an FRT-15 from RBT.

115.    ATF was not able to obtain a FRT-15 until late May 2021.  The delay was due to the FRT-15 being sold out on RBT's website.  ATF ultimately purchased the FRT-15 from a third-party seller.

116.    Upon receipt of the FRT-15—which was imprinted with "Rare Breed – Triggers – US Pat. 10514223" but which did not contain a serial number—ATF sent it to FATD for examination.

117.    FATD determined that the FRT-15 is a combination of parts designed and intended for use in converting a weapon into a machinegun.  Thus, on July 15, 2021, ATF classified the FRT-15 as a machinegun as defined by the NFA and the GCA.[8]

118.    The examination report noted that the FRT-15 trigger is forced forward and held in its forward position by the locking bar, and as the "bolt carrier continues to move forward, it strikes the rear surface of the locking bar releasing the trigger."

119.    In reaching its conclusion that the FRT-15 was a machinegun, ATF explained that in a typical semiautomatic firearm, the shooter must release and pull the trigger to fire additional rounds.  ATF determined that for a firearm assembled with the FRT-15, no such release and subsequent pull by the shooter is necessary to fire multiple rounds.  Instead, the shooter using an FRT-15 may fire multiple rounds merely by maintaining the initial trigger pull and allowing the self-acting internal mechanism to complete its automatic cycle of operation.

---

[8] ATF conducted a similar examination of the WOT and, in October 2021, classified the WOT as a machinegun.

120.    Notably, a part of ATF's testing of an FRT-15, a firearm equipped with an FRT-15 fired multiple rounds automatically utilizing a simple zip-tie to simulate the act of pulling the trigger and retaining it in its rearmost position. Upon loading the firearm, the bolt was released to initiate the test-firing sequence and the firearm fired multiple rounds automatically until its ammunition supply was exhausted without any additional human interaction. ATF repeated that test utilizing a locking galvanized steel aircraft cable seal. Again, the weapon fired multiple rounds automatically until its ammunition supply was exhausted.  It could be said that, with the FRT-15, a weapon can run "wide open" all on its own.

121.    In addition, ATF testing revealed that a firearm equipped with an FRT-15  can fire more quickly—that is, more rounds per minute—than an originally-manufactured military specification M-16 machinegun.

122.    Because the FRT-15 is a machinegun, it is subject to the GCA prohibitions regarding the possession, transfer, and transport of machineguns.  It is also subject to registration, transfer, taxation, and possession restrictions under the NFA.  Under 26 U.S.C. § 5871, any person who violates or fails to comply with the provisions of the NFA shall be fined $10,000 per violation and is subject to imprisonment for a term of up to 10 years.  Further, pursuant to 26 U.S.C. § 5872, any machinegun possessed or transferred in violation of the NFA is subject to seizure and forfeiture.

**D.    In Accordance With  Law, ATF Classified   the FRT-15 as a Machinegun and Gave Notice to the Defendants**

123.    On July 27, 2021, ATF met with and hand delivered a cease-and-desist letter to Defendant Maxwell addressed to RBT (the July 26, 2021 Letter).  The meeting was at ATF's Orlando III Field Office located at 135 West Central Blvd, Suite 740, Orlando, Florida 32801.

124.    As set forth in the July 26, 2021 Letter, ATF informed RBT that the FRT-15 is a machinegun.

125.    The July 26, 2021 Letter further informed RBT that "[b]ecause the FRT-15 is properly classified as a 'machinegun' [RBT] must immediately take the following actions: (1) Cease and desist all manufacture and transfer of the Rare Breed Trigger FRT-15 [and] (2) contact ATF within 5 days of receipt of this letter to develop a plan for addressing those machineguns already distributed."

126.    ATF noted that the NFA levies a $200 tax on each firearm made and an additional $200 tax on each firearm transferred pursuant to 26 U.S.C. §§ 5811, 5821.  ATF further noted that RBT may be liable for a $200 making tax and a $200 transfer tax on each FRT-15 made and transferred.

127.    ATF concluded the July 26, 2021 Letter by stating that "[f]or public safety reasons, [RBT's] cooperation in this matter is essential."  The July 26, 2021 Letter stated that RBT's failure to cease-and-desist "may result in (1) law enforcement action by ATF, including a referral of this matter to the United States Attorney's Office for criminal prosecution; (2) tax assessment and collection; and/or (3) seizure and forfeiture of the firearms and property involved in violations of Federal law."

128.    During the July 27, 2021 meeting, ATF officials reiterated to Defendant Maxwell that the FRT-15 is a machinegun and again directed RBT to cease-and-desist activities related to the distribution of the FRT-15.

129.    Also during the meeting, Defendant Maxwell said that he was not surprised by the ATF determination.  He added that he believed that the ATF would have tried to stop RBT from selling the FRT-15 sooner than it had.

**E.    Defendants Have Continued to Sell the FRT-15 Despite Failed Legal Challenge to the Classification that it is a Machinegun**

130.    RBT brought suit against the ATF on August 2, 2021.

131.    Docketed as *Rare Breed Triggers, LLC v. Garland*, No. 21-1245 in the Middle District of Florida (the Florida Litigation), the lawsuit challenged the classification of the FRT-15 as a machinegun and sought a temporary restraining order (TRO) and a preliminary injunction (PI) to stop the ATF from classifying the FRT-15 as a machinegun.

132.    The Florida Litigation failed.  The U.S. District Court denied the TRO on August 5, 2021, denied the PI on October 12, 2021, and dismissed the case altogether on October 28, 2021, as the parties failed to follow certain local procedural rules.  RBT did not appeal the ruling.

133.    During the course of the Florida Litigation, there were threats against the ATF and the Court itself.

134.    On August 27, 2021, the ATF received a phone call.  The caller stated "It's treasonous . . . When are you going to stop trampling on our Second Amendment rights? We're coming down . . .  Coming down to ATF, your office.  We are going to assemble. Going to assemble and protest at the office.  We are bringing the rocket launcher."

135.    The August 27, 2021 phone call, including the reference to a "rocket launcher," originated from a phone number associated with Defendant Maxwell's law office.

136.    At the start of a hearing in the Florida Litigation, the court stated that it had been receiving threats concerning the litigation.  Without accusing any of the litigants before him, the district court judge called the harassment "inappropriate" and added that such activity "impugns this process."

137.    During the time of the failed Florida Litigation, the individual Defendants nonetheless made clear that they had no intention of complying with the ATF.

138.     In a September 29, 2021, video interview, Defendant DeMonico stated that his RBT colleagues met to discuss how to respond to ATF.   They decided that the proper response to ATF's cease-and-desist letter was "Fuck them."

139.     Similarly, an original former owner of RBT who is still actively involved with the company, openly stated that he would not comply with the ATF cease and desist letter, or a court for that matter, and would continue to illegally sell the FRT-15.  He further stated that he would go to jail if he had to, rather than stop selling the FRT-15.

**F.     ATF Gave Further Notice to Defendants**

140.     At the same time as the Florida Litigation, ATF purchased an additional FRT-15 from the RBT website.

141.     ATF examined the additional FRT-15 it purchased.  Again, in October 2021, it confirmed its original determination that the FRT-15 is a machinegun.

142.     Given RBT's express refusal to stop selling the FRT-15, as confirmed by its position in the dismissed Florida Litigation, ATF sent another letter to RBT.

143.     In that letter, dated November 15, 2021, and addressed to Defendant Maxwell, the ATF again  gave notice that the FRT-15 is a machinegun.  It reiterated to Defendants Maxwell and RBT that a machinegun like the FRT-15 is subject to registration, taxation, and possession restrictions under the NFA.

144.     The letter further noted that a machinegun like the FRT-15 is subject to the GCA, and is subject to prohibitions regarding the possession, transfer, and transport of such weapons.

145.     The letter concluded by reminding Defendants Maxwell and RBT that ATF had provided them with a cease-and-desist letter in July 2021, and that the continued manufacture and

transfer of FRT-15s exposed them to criminal prosecution, tax assessments and collections, and the seizure and forfeiture of firearms and property.

146.    Still, RBT continued to sell the FRT-15.

**G.    ATF Attempted to Stop the Sale of FRT-15s by Focusing on the Manufacturer**

147.    ATF learned that a company called 3rd Gen Machine, Inc., located in Utah, manufactured and distributed the FRT-15 for RBT.

148.    3rd Gen Machine was also  a drop shipper for RBT.  That is, when a customer placed an order for an FRT-15 from RBT, RBT communicated that order to 3rd Gen Machine, which would then ship the product via the common carrier to the customer.

149.    ATF visited 3rd Gen Machine in January 2022.  It informed the company that the FRT-15 is a machinegun.  It also provided the company with a cease-and-desist letter.

150.    Like RBT, 3rd Gen Machine ignored ATF's cease-and-desist letter, and chose to continue to manufacture and distribute the FRT-15.

151.    ATF thus obtained a warrant to search 3rd Gen Machine in Utah concerning the FRT-15.  ATF executed the warrant in March 2022.  Among other things, ATF seized parts and components that were intended to be used to manufacture FRT-15s.

**H.    RBT Continued to Sell the FRT-15 Despite the Court Ordered 3rd Gen Machine Warrant**

152.    Despite the fact that its manufacturer and shipper had just been the subject of a court authorized search and seizure, RBT continued to take steps to sell FRT-15s.

153.    Defendant DeMonico traveled to 3rd Gen Machine to grab what he could for RBT. On April 14, 2022, he stormed into the 3rd Gen facility without authorization. Defendant DeMonico told the General Manager of 3rd Gen, "I'm here to take my shit [FRT-15s]."  The

General Manager told him not to take the items and advised him that ATF was coming to take them.  Defendant DeMonico scoffed, "I don't care."

154.    The 3rd Gen general manager told DeMonico that he planned to call ATF. Defendant DeMonico told the general manager not to do so until after Defendant DeMonico had left 3rd Gen.

155.    Defendant DeMonico proceeded to load boxes that contained FRT-15s and component parts—products that 3rd Gen had set aside to hand over to ATF—into a U-Haul van, and drove off.

156.    Defendant DeMonico got as far as New Mexico, where he was stopped by ATF and local authorities on April 15, 2022.  During that interdiction, ATF seized from Defendant DeMonico just under 1,000 FRT-15s and over 15,000 parts and components meant to assemble even more FRT-15s.

I.    **RBT's Additional Litigation**

157.    In May 2022, RBT sued ATF a second time, this time in the District of North Dakota.

158.    RBT had filed articles of incorporation in North Dakota less than two weeks after the court dismissed its Florida litigation.

159.    The North Dakota litigation, docketed as *Rare Breed Triggers, LLC v. Garland*, No. 22-85, fared no better than RBT's Florida litigation.  The court dismissed the case in November 2022 as having been filed in an improper venue.  RBT did not appeal the ruling.

160.    In addition to its lawsuit against ATF, RBT also sued a series of companies, in several jurisdictions, claiming that these companies had violated one or more patents for the FRT-15, including against the importer and distributor of the WOT.

161.    The WOT functions in the same way as the FRT-15 and has also been  classified as a machinegun.

162.    RBT resolved most, if not all, of these patent suits.  The resolutions—reached in October 2022—prohibit RBT's competitors from selling certain products.  It is not apparent from the litigation what did or would happen to the inventory of products that these competing companies held or controlled, though shortly thereafter, RBT began distributing the WOT.

**J.    RBT's Sales Continue**

163.    Despite ATF's determinations, Defendants have continued to sell and advertise the FRT-15, on its website, the websites of third-party vendors, and in third-party vendors' brick-and-mortar stores.  It has continued to sell and advertise the WOT on its website.

164.    Defendants know that FRT-15s and WOTs are being sold to customers in every state, including in New York.

165.    Defendants expect, or should reasonably expect, that their sale of the FRT-15 and WOTs has legal consequences in New York City and on Long Island, especially given that machineguns are generally prohibited.

166.    Defendants receive substantial revenue from interstate commerce from the sales of FRT-15s and WOTs

167.    Sales of the FRT-15 and WOT have been made via telephone and internet, and through the mails.

168.    As of January 17, 2023, RBT states on its website that "in spite of what you may have heard, seen, or understood," the FRT-15 "is not a machinegun under the [NFA] or the [GCA]."

169.    On RBT's website, a former ATF official claims in a video that the FRT-15 is "absolutely not" a machinegun.

170.    Defendant DeMonico concedes in a video that RBT distributed that RBT was "brazen in [its] noncompliance" with ATF's cease-and-desist requests, as he was certain that the FRT-15 was not a machinegun.

171.    On that same video, Defendant DeMonico states that there are a "handful of 'gun tubers' and other 'henny pennies' that have been screaming that the sky is falling" after learning about ATF's cease-and-desist requests.

172.    Defendant DeMonico also states that the cease-and-desist letter served on RBT has "zero relevance to anyone that may have purchased and currently possesses an FRT-15."

173.    Defendant DeMonico falsely states on RBT's website that no one who has purchased an FRT-15 is affected by ATF's cease-and-desist request served on RBT.

174.    Defendant DeMonico falsely states on RBT's website that ATF has no authority to "address FRTs that are currently in circulation" until RBT's now-defunct lawsuit is fully litigated.

175.    Indeed, upon information and belief, purchasers of the FRT-15 were under the misimpression that the FRT-15 was legal.

176.    The Defendants knew that their customers were concerned about the legality of the FRT-15.  For instance, in text messages between and among two or more conspirators, RBT employees discussed how to respond to customer questions about whether the FRT-15 was a legal product.

177.    As recently as November 22, 2022, RBT sent out a marketing email.  It stated that "As crazy as it might sound, we have WOTs for sale.  And you assuredly have questions but unfortunately, we can't really answer them. We can't tell you where these came from and . . .  we

can't tell you why we can't tell you but rest assured, these are real WOTs.  Notwithstanding the cloak and dagger, these WOTs are the property of RBT and they are available now at a ridiculously huge discount."

178.    The email further stated that "[t]he money raised by the sales of these WOTs will be used to fund litigation in the following order, based on availability of funds and the evaluation on a case by case basis: 1. Litigation by RBT against the DOJ/ATF, 2. to assist individuals who have been wrongfully accused of a crime for possession of an FRT-15; 3. and to seek the return of property (FRT-15s) wrongfully taken from individuals by the ATF."

179.    The RBT email noted that they were selling the WOT for $199.00, a steep $150.00 discount from the regular price of $349.00.  RBT called it a "FIRE SALE."

180.    The same day that RBT sent out the email, Defendant DeMonico opened a postage meter with the USPS.

181.    RBT then used the postal meter to prepare shipping labels, which RBT affixed to the packages containing the WOTs it shipped to its customers.

182.    The shipping labels indicated that the package was coming from "Red Beard Treasures."  The address listed for "Red Beard Treasures" was RBT's office in North Dakota, 3523 45th Street South, Suite 100 Fargo, North Dakota 58104.

183.    Nowhere on the outside of the packages containing WOTs was there any indication that the package was from RBT or "Rare Breed Triggers" or that the package contained a machinegun.

184.    Inside the package, there was a disclaimer titled "Waiver and Release" that indicates that Florida law applies to any dispute.

185.    Nowhere, however, was there any indication that ATF has classified this device as a machinegun.

186.    With respect to the sale of the WOTs, on or about November 25, 2022, Defendant DeMonico posted information in a Facebook group "Fostech Echo, BFS Binary, & Rare Breed FRT Trigger Group" informing the purchasers that their orders were being processed.

187.    As of January 17, 2023, RBT's website listed the FRT-15 as being "out of stock" but noted that customers can "join the waitlist to be emailed when this product becomes available."

188.    Third-party vendors and re-sellers continue to advertise FRT-15s and WOTs for sale.

**K.    ATF's Efforts to Recover FRT-15s**

189.    Given ATF's classification of "machineguns" under the NFA and GCA, ATF has sought to take appropriate remedial action with respect to sellers and possessors of FRT-15s.

190.    In ATF's 2022 Open Letter, ATF stated that "[c]urrent possessors of [forced reset triggers] are encouraged to contact ATF for further guidance on how they may divest possession." ATF added that if customers were "uncertain whether the device [they] possess is a machinegun as defined by the GCA and NFA, please contact [their] local ATF Field Office."

191.    Consistent with ATF's 2022 Open Letter, ATF has sought, on a nationwide basis, to recover FRT-15s and WOTs as part of its mandate to administer and enforce federal firearms laws, including laws related to machineguns.

192.    Upon learning that the FRT-15 is illegal, multiple customers have agreed to abandon their purchased FRT-15 property to ATF.  Some of these customers are in the Eastern District of New York.

193.   Some dealers stopped selling FRT-15s after learning that ATF had classified the FRT-15 as machineguns.

194.   Notwithstanding the ATF efforts, there are tens of thousands of FRT-15s and WOTs in the public domain, presenting a continuing threat to public safety.

**FIRST CLAIM FOR RELIEF**
**(Injunction to Stop Conspiracy to Defraud the United States – 18 U.S.C. § 371)**

195.   The United States realleges and incorporates by reference paragraphs 1 through 194 of this Complaint as though fully set forth herein.

196.   The United States seeks to prevent continuing and substantial injury to the United States due to Defendants' actions, to wit: from 2020 through the present, Defendants have knowingly and intentionally conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of the ATF in their regulation of machineguns under the NFA and the GCA.

197.   By reason of the conduct described herein, Defendants violated, are violating, and are about to violate 18 U.S.C. § 371 by conspiring to defraud the United States, or any agency thereof and have done or are doing acts to effect the object of the conspiracy.

198.   Upon a showing that Defendants are committing or about to commit conspiracy to defraud the United States, the United States is entitled, under 18 U.S.C. § 1345, to a temporary restraining order, a preliminary injunction, and a permanent injunction restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to the United States.

199.   As a result of the foregoing, Defendants' conduct should be enjoined pursuant to 18 U.S.C. § 1345.

## SECOND CLAIM FOR RELIEF
### (Injunction to Stop Mail Fraud – 18 U.S.C. §§ 1341)

200. The United States realleges and incorporates by reference paragraphs 1 through 199 of this Complaint as though fully set forth herein.

201. By reason of the conduct described herein, Defendants violated, are violating, and are about to violate 18 U.S.C. § 1341 by executing schemes or artifices to defraud, or for obtaining money or property by means of false or fraudulent pretenses with the intent to defraud, and in so doing, transmitting or causing to be transmitted by means of the United States mail.

202. Upon a showing that Defendants are committing or about to commit mail fraud, the United States is entitled, under 18 U.S.C. § 1345, to a temporary restraining order, a preliminary injunction, and a permanent injunction restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to the United States.

203. As a result of the foregoing, Defendants' conduct should be enjoined pursuant to 18 U.S.C. § 1345.

## THIRD CLAIM FOR RELIEF
### (Injunction to Stop Wire Fraud – 18 U.S.C. § 1343)

204. The United States realleges an incorporates by reference paragraphs 1 through 203 of this Complaint as though fully set forth herein.

205. By reason of the conduct described herein, Defendants violated, are violating, and are about to violate 18 U.S.C. § 1343 by executing or conspiring to execute schemes or artifices to defraud, or for obtaining money or property by means of false or fraudulent pretenses with the intent to defraud, and in so doing, transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such schemes or artifices.

34

206.    Upon a showing that Defendants are committing or about to commit wire fraud, the United States is entitled, under 18 U.S.C. § 1345, to a temporary restraining order, a preliminary injunction, and a permanent injunction restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to the United States.

207.    As a result of the foregoing, Defendants' conduct should be enjoined pursuant to 18 U.S.C. § 1345.

## FOURTH CLAIM FOR RELIEF
### (Injunction to Stop Conspiracy to Commit Mail Fraud – 18 U.S.C. § 1349)

208.    The United States realleges an incorporates by reference paragraphs 1 through 207 of this Complaint as though fully set forth herein.

209.    By reason of the conduct described herein, Defendants violated, are violating, and are about to violate 18 U.S.C. § 1349 by conspiring to execute schemes or artifices to defraud, or for obtaining money or property by means of false or fraudulent pretenses with the intent to defraud, and in so doing, transmitting or causing to be transmitted by means of the United States mail.

210.    Upon a showing that Defendants are committing or about to commit conspiracy to commit mail fraud, the United States is entitled, under 18 U.S.C. § 1345, to a temporary restraining order, a preliminary injunction, and a permanent injunction restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to the United States.

211.    As a result of the foregoing, Defendants' conduct should be enjoined pursuant to 18 U.S.C. § 1345.

**FIFTH CLAIM FOR RELIEF**
**(Injunction to Stop Conspiracy to Commit Wire Fraud – 18 U.S.C. § 1349)**

212.    The United States realleges an incorporates by reference paragraphs 1 through 211 of this Complaint as though fully set forth herein.

213.    By reason of the conduct described herein, Defendants violated, are violating, and are about to violate 18 U.S.C. § 1349 by conspiring to execute schemes or artifices to defraud, or for obtaining money or property by means of false or fraudulent pretenses with the intent to defraud, and in so doing, transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such schemes or artifices.

214.    Upon a showing that Defendants are committing or about to commit conspiracy to commit wire fraud, the United States is entitled, under 18 U.S.C. § 1345, to a temporary restraining order, a preliminary injunction, and a permanent injunction restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to the United States.

215.    As a result of the foregoing, Defendants' conduct should be enjoined pursuant to 18 U.S.C. § 1345.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff United States of America requests the following relief:

A.    That the Court issue a temporary restraining order, pursuant to 18 U.S.C. § 1345, pending a hearing and determination on the United States' application for a preliminary injunction, that Defendants, their agents, officers and employees, and all other persons and entities in active concert or participation with them are temporarily restrained from:

i.    conspiring to defraud the United States, as defined by 18 U.S.C. § 371;

ii.   committing mail fraud, as defined by 18 U.S.C. § 1341;

iii.   committing wire fraud, as defined by 18 U.S.C. § 1343;

iv.   conspiring to commit mail fraud, as defined by 18 U.S.C. § 1349;

v.   conspiring to commit wire fraud, as defined by 18 U.S.C. § 1349;

vi.   engaging in any sales of the FRT-15, the Wide Open Trigger, and/or any forced reset trigger or other machinegun conversion device until and unless otherwise ordered by this Court; and

vii.   be required to preserve all documents related to the manufacture, possession, receipt, transfer, and/or sale of the FRT-15s, Wide Open Triggers, forced reset triggers, and/or machinegun conversion devices and components thereof.

B.   That the Court issue a preliminary injunction on the same basis and to the same effect as the temporary restraining order, and also order the following:

i.   permit expedited discovery, in advance of a preliminary injunction hearing, related to Defendants' manufacture, possession, receipt, transfer, and/or sale of FRT-15s, Wide Open Triggers, forced reset triggers, and/or machinegun conversion devices;

ii.   require that Defendants assist in identifying, locating, and recovering all FRT-15s and Wide Open Triggers that have not yet been recovered;

iii.   require that Defendants pay restitution to any person who purchased an FRT-15 or Wide Open Trigger; and

iv.   require an accounting by an independent entity—paid for by Defendants—concerning Defendants' manufacture, possession, receipt, transfer, and/or sale of FRT-15s, Wide Open Triggers, forced reset triggers, and/or machinegun conversion devices, and components thereof to assist in determining the amount of

unpaid taxes owed to the Government and money owed to individual consumers for all FRT-15s, Wide Open Triggers, forced reset triggers, and/or machinegun conversion devices sold by Defendants.

C.     That the Court issue a permanent injunction on the same basis and to the same effect.

D.     That the Court order such other and further relief as the Court shall deem just and proper.

Dated:     Brooklyn, New York
           January 19, 2023

> BREON PEACE
> United States Attorney
> Eastern District of New York
> 271 Cadman Plaza East
> Brooklyn, New York 11201
>
> By:     _____/s/_____
> Michael Blume
> Joseph Marutollo
> Paulina Stamatelos
> Assistant United States Attorneys
> Eastern District of New York
> Tel. (718) 254-7000