UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    Plaintiff,

 - v. -

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DeMONICO; KEVIN MAXWELL,

    Defendants.

Civil Action No.

## THE UNITED STATES OF AMERICA'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
## A TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East, 7th Floor
Brooklyn, New York 11201

January 19, 2023

Michael Blume
Joseph Marutollo
Paulina Stamatelos
Assistant United States Attorneys
(Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF THE CASE.................................................................................................... 2

    I.     Statutory and Regulatory Background................................................................... 2

    A.    ATF Regulates the Firearms Industry.................................................................. 2

    B.    Definition of a Machinegun ................................................................................. 2

    C.    Regulations Applicable to Machineguns Permitted to Enter Commerce .............. 5

    II.    Relevant Factual Background ............................................................................... 7

    A.    Defendants Decided to Sell Machineguns ............................................................ 7

    B.    ATF Classified the FRT-15 as a Machinegun under the NFA and GCA ............. 10

    C.    RBT Disregarded ATF and Continues to Sell the FRT-15.................................. 12

        1.    RBT Sold Thousands of Machineguns ..................................................... 12

        2.    ATF Again Warned RBT and RBT Again Aimed to Thwart ATF .......... 13

        3.    ATF Tried to Stop the Manufacture of the FRT-15.................................. 14

        4.    RBT Undermined a Federal Search Warrant ............................................ 14

        5.    RBT Sued Other Companies Selling Forced Reset Triggers.................... 15

        6.    RBT Secured an Inventory of Wide-Open Triggers and Sells Them ....... 16

        7.    RBT Hid its Sale of WOTs by Deceitfully Mis-Labeling Packages ........ 16

    D.    ATF's Efforts to Recover FRT-15s ..................................................................... 17

ARGUMENT ........................................................................................................................... 17

    I.    Section 1345 Authorizes this Court to Issue Injunctive Relief to Quickly Stop
        Ongoing Frauds................................................................................................. 17

    A.    This Court Regularly Grants Section 1345 Injunctive Relief to Stop Ongoing
        Frauds............................................................................................................... 17

    B.    The United States Need Only Show Probable Cause that Defendants Are
        Committing or Are About to Engage in a Conspiracy or Scheme to Obtain  § 1345
        Relief................................................................................................................ 18

C.      The United States Need Not Show Irreparable Harm to Obtain Injunctive Relief 19

II.     Probable Cause Exists to Believe that Defendants are Knowingly and Intentionally Conspiring to Defraud the United States in Violation of 18 U.S.C. § 371 ................................................................................................... 20

A.      A *Klein* Conspiracy ............................................................................... 20

B.      Probable Cause Exists to Believe that Defendants Are Engaged in a *Klein* Conspiracy ............................................................................................ 23

III.    Probable Cause Exists to Believe that Defendants Have Engaged in Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343 .............................. 27

A.      There is Probable Cause to Believe that Defendants Knowingly Engaged in a Scheme to Defraud ............................................................................... 28

        1.      The Evidence Establishes the Existence of a Scheme to Defraud ........... 28

        2.      Defendants Possess the Requisite Fraudulent Intent ................................ 30

        3.      The Misrepresentations are Material ......................................... 32

B.      There is Probable Cause to Believe that the Purpose of Defendants' Scheme is to Obtain Money ....................................................................................... 33

C.      There is Probable Cause to Believe that Defendants are Using U.S. Mail and Wires to Conduct their Schemes ........................................................... 34

IV.     Probable Cause Exists to Believe that Defendants Are Conspiring to Commit Mail and Wire Fraud in Violation of 18 U.S.C. § 1349 ................................................. 35

V.      The United States Proposed Preliminary Injunctive Relief is an Appropriate Remedy Under Section 1345 ............................................................................... 36

CONCLUSION ....................................................................................... 40

## PRELIMINARY STATEMENT

Defendants are in the business of illegally selling machineguns.  Specifically, Defendants sell a trigger assembly, which they call the FRT-15, that is designed to be fitted into a semiautomatic AR-15 type firearm—so that a shooter can fire multiple rounds automatically by a *single* pull of the trigger.  Because the FRT-15 operates as a combination of parts designed and intended for use in converting a firearm into a machinegun, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has classified the FRT-15 as a machinegun.

ATF has explicitly—and repeatedly—informed Defendants that the FRT-15 is a machinegun under the law.  And because federal law prohibits the possession, transfer, and importation of machineguns manufactured after May 19, 1986, with limited exceptions, *see* 18 U.S.C. § 922(o), 27 C.F.R. § 479.105, ATF has informed Defendants to cease-and-desist all manufacture and transfer of the FRT-15.  Defendants, however, have chosen not to comply with ATF's instruction or federal law.  Instead, they have schemed to try to thwart ATF's mandate to protect the public from machineguns.

As set forth in the Complaint, the Declaration of ATF Special Agent Daniel Koneschusky, and as demonstrated below, probable cause exists to believe that Defendants' actions amount to a *Klein* conspiracy.  Named after the seminal decision by the United States Court of Appeals for the Second Circuit in *United States v. Klein*, 247 F.2d 908, 920-921 (2d Cir. 1957), a *Klein* conspiracy charge focuses on the "to defraud the United States" prong of 18 U.S.C. § 371.  Here, there is probable cause to believe that Defendants have, in violation of 18 U.S.C. § 371, knowingly and intentionally conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of ATF in their regulation of machineguns under the National Firearms Act of 1934 (NFA) and the Gun Control Act of 1968 (GCA).  Additionally,

probable cause exists to believe that Defendants have engaged in the ongoing commission of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343, as well as conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, in connection with their sale of the illegal FRT-15s.

Accordingly, the Court should issue immediate injunctive relief pursuant to 18 U.S.C. § 1345 in order to protect the United States from further fraud.

## STATEMENT OF THE CASE

I.   **Statutory and Regulatory Background**

A.   **ATF Regulates the Firearms Industry**

ATF administers and enforces federal firearms laws, including laws related to machineguns.  Specifically, Title 28, Section 599A(b)(1) of the United States Code provides ATF with the authority to investigate violations of federal firearms law at the direction of the Attorney General.  Under the corresponding federal regulation at 28 C.F.R. § 0.130, the Attorney General provides ATF with the authority to investigate, administer, and enforce the laws related to firearms under the GCA, 18 U.S.C. Chapter 44, and the NFA, 26 U.S.C. Chapter 53.  ATF maintains a central registry of NFA firearms in the National Firearms Registration and Transfer Record (NFRTR) and collects special occupational taxes, transfer taxes, and making taxes on NFA firearms.  *See* 26 U.S.C. §§ 5801, 5811, 5821, 5841.  Any transfer, unlicensed making or manufacture, or importation of a machinegun must be approved by ATF.

B.   **Definition of a Machinegun**

Machineguns have long been regulated under the NFA.  Congress enacted the NFA in 1934 to regulate dangerous and unusual weapons, particularly machineguns and sawed-off firearms, through the tax on the sale or other disposal of those type of firearms.  Since passage of the Firearm Owners Protection Act of 1986, the sale of new machineguns to members of the public has been

2

prohibited. *See* 18 U.S.C. § 922(o)(1) (stating that "[e]xcept as provided in paragraph (2) [referring to government entities or transfers and possession prior to the enactment of section 922(o)[1]], it shall be unlawful for any person to transfer or possess a machinegun.").   Congress defined a machinegun as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, *by a single function of the trigger*.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or *combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added), *see also* 18 U.S.C. § 922(a)(4), (b)(4) (incorporating this definition into the criminal statute).

Implementing regulations, 27 C.F.R. § 479.11, make clear that "automatically" in the NFA definition of machinegun means "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds though a single function of the trigger."  The regulation goes on to state that a "single function of the trigger" means a "single pull of the trigger." Legislative history for the NFA, going back nearly 100 years, indicates that the drafters equated a "single function of the trigger" with a "single pull of the trigger."  *See* National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066, 73rd Cong., at 40 (1934).  At the time of the NFA's enactment in 1934, the phrase "single function of the trigger" would have been understood to mean single *pull* of the trigger.

Prior to enacting the NFA, Congress received testimony from the then-president of the

---

[1] Under 18 U.S.C. § 922 (o)(2), 18 U.S.C. § 922 (o)(1) does not apply to "(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or  (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect [May 19, 1986]."

National Rifle Association that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun," whereas "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machine guns." *See* Firearms Act: Hearings Before the Committee on Ways and Means, H.R. 9066, 73rd Cong., 2nd Sess., at 40 (1934).  Indeed, the phrase "pull the trigger" is the ordinary, accepted terminology in common use for how to discharge a firearm today, as it was in the era when the NFA was enacted.  *See, e.g.*, Webster's New World Dictionary 1177 (3d ed. 1988) (defining "Russian roulette" as involving "aim[ing] a gun . . . and pull[ing] the trigger"); Dwight D. Eisenhower, Address to the American Society of Newspaper Editors (Apr. 17, 1958), in Public Papers of the Presidents of the United States (1958) ("It is far more important to be able to hit the target than it is to haggle over who makes a weapon or who pulls a trigger").

The Supreme Court also has noted that the term "automatically" means that the weapon "fires repeatedly with a single pull of the trigger." *Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994).  "That is, once its trigger is depressed, the weapon will automatically continue to fire *until its trigger is released* or the ammunition is exhausted." *Id.* (emphasis added); *cf. United States v. Gravel*, 645 F.3d 549 (2d Cir. 2011) (affirming that a firearm designed to fire automatically, but modified to fire semi-automatically, was a machinegun).

Courts have routinely held that a "'machinegun' is a statutory term of art that includes 'any weapon which shoots . . . automatically more than one shot, without manual reloading, by a single function of the trigger.'" *See, e.g., Mayes v. United States*, No. 12-CR-0385 (ARR), 2019 WL 1332885, at *1 (E.D.N.Y. Mar. 25, 2019) (citing 26 U.S.C. § 5845(b)); *Aposhian v. Barr*, 958 F.3d 969, 988 (10th Cir. 2020) (single pull of the trigger was a permissible interpretation), *opinion reinstated*, 989 F.3d 890, 891 (10th Cir. 2021) (*en banc*), *cert. denied sub nom, Aposhian v.*

*Garland,* 143 S.Ct. 84 (2022); *Gun Owners of Am. v. Barr,* 363 F. Supp. 3d 823, 832 (W.D. Mich. 2019) (single pull of the trigger was a permissible interpretation), *aff'd by equally divided court sub nom. Gun Owners of Am. v. Garland,* 19 F.4th 890 (6th Cir. 2021) (*en banc*), *cert. denied*143 S.Ct. 83 (2022); *Guedes v. ATF,* 920 F.3d 1, 31 (D.C. Cir. 2019) ("[ATF's] interpretation of 'single function of the trigger' to mean 'single pull of the trigger' is a permissible reading of the statute. [The ATF] is better equipped than we are to make the pivotal policy choice between a mechanism-focused and shooter-focused understanding of 'function of the trigger.'"), *cert. denied,* 140 S. Ct. 789 (2020); *Akins v. United States,* 312 F. App'x 197 (11th Cir. 2009) (finding that the "single function of the trigger" was appropriately interpreted to mean the single pull of the trigger, not the single movement of the trigger itself); *but see Cargill v. Garland,* No. 20-51016 (5th Cir. Jan. 6, 2023) (non-mechanical bump stocks do not operate by a single function, or movement, of the trigger).

### C.    Regulations Applicable to Machineguns Permitted to Enter Commerce

While federal law generally prohibits the possession, transfer, and importation of machineguns manufactured after May 19, 1986, except to government entities, *see* 18 U.S.C. § 922(o)(2) and 27 C.F.R. § 479.105, machineguns that are permitted to be circulated remain subject to the registration, transfer, taxation, and possession restrictions applicable to these regulated weapons, which include criminal penalties relating to the illegal transfer and possession of said weapons. *See* 26 U.S.C., Chapter 53; *see also* 26 U.S.C. § 5871 (any person who violates or fails to comply with the provisions of the NFA shall be fined $10,000 per violation and is subject to imprisonment for a term of up to ten years); 18 U.S.C. § 921(a)(23) (machineguns are subject to prohibitions regarding the possession, transfer, and transport of such items as set forth in 18 U.S.C. §§ 922(o) and 922(a)(4)).   Any firearm—including machineguns—manufactured and/or

transferred in violation of the NFA, and/or subject to the NFA, and possessed by a person to whom it is not registered, is a violation of the NFA and subject to seizure and forfeiture. *See* 26 U.S.C. §§ 5861, 5872.

A person federally licensed by ATF to engage in the business of manufacturing NFA firearms, must notify the Attorney General to register firearms; a manufacturer, importer, or transferor must receive approval to manufacture, import, or transfer firearms and effectuate registration in the NFRTR. *See* 26 U.S.C. §5822(e); 26 U.S.C. § 5841. Machineguns must be registered in the NFRTR by the qualified manufacturer. A qualified manufacturer is a federally licensed manufacturer that has paid the special occupational tax (SOT) to engage in the business of manufacturing firearms, or a qualified importer pursuant to 26 U.S.C. § 5841. Machineguns must also contain a serial number. *See* 26 U.S.C. § 5842(a).

With respect to taxation, it is unlawful to make or sell a firearm without having paid the required taxes. *See* 26 U.S.C. § 5861.[2] The NFA imposes a special occupational tax on individuals who engage in the business of importing, dealing, and manufacturing NFA firearms, including machineguns. *See* 26 U.S.C. § 5801. Under 27 C.F.R. Part 479, Subpart D, regulations provide for penalties and interest for failure to pay the special occupational tax and failure to file tax returns. Section 479.48 generally provides that any person that engages in a business taxable under the NFA is liable for that tax, plus penalties and interest under the Internal Revenue Code, 26 U.S.C. §§ 6601, 6651.

The NFA also imposes taxes on the manufacture or making of NFA firearms. Under 26 U.S.C. § 5811, a $200 tax is imposed on the transferor of each firearm transferred, except in the

---

[2] While the NFA does not define the term, "engag[ed] in business" the GCA defines the term as dealing, manufacturing, or importing firearms. *See* 18 U.S.C. §921(a)(21)(C).

case of a $5 tax for an "any other weapon" as defined under the NFA.  Similarly, 26 U.S.C. § 5821 imposes a $200 tax on the maker of firearms for each firearm made and a $5 tax for "any other weapon."  However, with respect to machineguns, because of the interaction between the NFA and 18 U.S.C. § 922(o), ATF will only authorize the manufacture or making of machineguns if the machineguns are intended for an authorized use under § 922(o), and will only authorize the transfer of machineguns to an authorized entity, or to a private individual or entity if machinegun was lawfully registered and possessed at the time § 922(o) became effective.  Notwithstanding § 922(o), an individual or entity who makes, manufactures, and transfers machineguns in non-compliance with the NFA would nonetheless be subject to assessment for the associated taxes imposed under 26 U.S.C. §§ 5811 and 5821.

## II.   Relevant Factual Background

### A.   Defendants Decided to Sell Machineguns

According to Defendant DeMonico, Defendants created RBT in April 2020 specifically to sell a forced reset trigger.  *See* Declaration of ATF Special Agent Daniel Koneschusky (Decl.) ¶ 9-10, 22.  To simplify, certain forced reset triggers allow a firearm to automatically expel more than one shot with a single function of the trigger—or a single continuous pull of the trigger.  Decl. ¶ 23.  Defendants had been looking for such a trigger to sell; they found it in the AR1, a product owned by Company A.  Decl. ¶ 24.

In 2017, Company A submitted the AR1, a forced reset trigger meant for use in an AR-15-type firearm, to ATF for classification.  Decl. ¶ 25. On August 28, 2018, ATF sent a letter to Company A stating that the AR1 forced reset trigger, as designed, was a machinegun.  Decl. ¶ 26.

Additional refinements were made to the forced reset trigger, and Company A obtained a patent for the design, U.S. Patent #10,514,223 (the '223 patent).  The '223 patent provided a "drop-

in" solution for its forced reset trigger concept.  The '223 patent was otherwise designed to function no differently from the AR1, which ATF had classified as a machinegun.  The '223 patent represents a modular forced reset trigger assembly (i.e., the AR1 already assembled with slightly different parts), ready to drop into an AR15-style firearm.  The "drop-in" nature of the design allowed for its easy and rapid installation into an AR-type firearm by a person with limited skills utilizing common hard tools.  Further, while the AR1 was designed to function with a modified bolt, the '223 was designed to function with an off-the-shelf bolt carrier designed for fully automatic M16-type firearms.  Decl. ¶ 27.

The FRT-15 is the commercial embodiment of the '223 patent.  And the FRT-15 functions the same way as the AR1.  Just like the AR1, the FRT-15 allows the firearm to fire automatically, with a single constant rearward pull, until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply.  Decl. ¶ 31.

Prior to beginning its sales for the FRT-15, RBT decided *not* to send its FRT-15 to ATF for classification, as Company A did.  Decl. ¶ 34. Instead, RBT sought the opinions of private individuals who were not, and currently are not, affiliated with ATF to claim that the FRT-15 was not a machinegun.  Decl. ¶ 35.  RBT has touted the opinions of these private individuals in their marketing materials, going so far as to use these opinions to convince wary customers that the FRT-15 is "legal."  Decl. ¶ 36.

RBT did not tell its customers the fact that ATF had determined that the FRT-15's predecessor product was a machinegun.  Nor did RBT share with its customers the fact that it had not sought an ATF classification of the FRT-15 prior to offering it for sale.  Decl. ¶ 38.  But RBT went ahead with selling the FRT-15s anyway.  Decl. ¶ 44.

In or about December 2020, RBT started selling the FRT-15 nationwide through its website (www.rarebreedtriggers.com), the websites of third-party vendors—including dealers, and in third-party vendors' brick-and-mortar stores.  Decl. ¶ 37.

Defendants re-organized RBT's corporate structure.  As set forth in the Complaint, a complex set of interlocking companies, themselves owned in whole or in part by the individually-named Defendants and two other individuals, operates RBT.  Decl. ¶ 14. That complexity is a deliberate choice meant to obscure the actual ownership, management and decision-making structure of RBT—precisely because, as discussed above, RBT knew that they were engaged in the illegal sale of machineguns.  *See* Decl.¶¶ 15-20.

Proceeds from the sale of the FRT-15 flows out of RBT's coffers and into various recipients.  Based upon information and belief, one such stream is to an individual who handles customer support for the company.  A second such stream is to a company that provides marketing services to RBT.  The third stream of money from RBT flows to XYZ Distribution LLC (XYZ). XYZ is also known as the intentionally misspelled XYZ Distrubution [*sic*] and is also known as RB Trig LLC.  From XYZ, the flow of funds further splits into three more streams.  One stream flows to 3rd Gen Machine, a manufacturing company that, in addition to making the FRT-15, distributed the FRT-15 to RBT's buyers.  A second stream flows to ABC IP, LLC, and a third stream flows to DEF Consulting, LLC.  But for a small amount of money that flows to a company for a royalty payment, the two streams through ABC IP, LLC, and DEF Consulting, LLC, all end up at the same four places: (1) LAD, LLC, owned by Defendant DeMonico; (2) Leleux, LLC, owned by an original owner of RBT; (3) An 1861 LLC, owned by Defendant Maxwell; and (4) Spider Hole, LLC, owned by an original owner of RBT.  Decl.¶¶ 15-20

Ultimately, the individually-named Defendants deliberately created a convoluted system through which proceeds of sales from the FRT-15 and other funds coming into RBT. Decl. ¶ 21.

## B.     ATF Classified the FRT-15 as a Machinegun under the NFA and GCA

On or about April 1, 2021, a website selling Rare Breed Triggers, model FRT-15, first came to the attention of ATF. Decl. ¶ 47. ATF was not able to obtain an RBT model FRT-15 from RBT's website until late May 2021. The delay was due to the FRT-15 being sold out on RBT's website. Decl. ¶¶ 47-48. The company was selling them as fast as they could produce them. By May 2021, RBT had sold thousands, if not tens of thousands, of FRT-15s.

Upon receipt of the FRT-15—which was imprinted with "Rare Breed – Triggers – US Pat. 10514223" but which did not contain a serial number—ATF sent it to its Firearms Ammunition and Technology Division (FATD) for examination. Decl. ¶ 49. FATD is the division of ATF that is responsible for reviewing and classifying firearms. Decl. ¶ 7. Following FATD's examination, on July 15, 2021, ATF determined that the FRT-15 is a combination of parts designed and intended for use in converting a semiautomatic firearm into a machinegun. Thus, ATF classified the FRT-15 as a machinegun as defined by the NFA and the GCA. Put simply, the FRT-15 is a forced reset trigger that allows a firearm to automatically expel more than one shot with a single, continuous pull of the trigger. Decl. ¶¶ 50-51.

By contrast, in a typical (and legal) semiautomatic firearm, the shooter must release and pull the trigger to fire a second projectile. The shooter using an FRT-15, however, can fire a second projectile merely by maintaining the initial trigger pull and allowing the self-acting internal mechanism to complete its automatic cycle of operation. In fact, a firearm with an FRT-15 installed will continue to fire projectiles, in instantaneous succession, as long as the shooter maintains continuous pressure on the trigger. Such a converted firearm can have a rate of fire that

10

meets or exceeds an originally manufactured military specification M-16-type machinegun, which can have a rate of fire ranging from 700 to 970 rounds per minute depending on the configuration. Decl. ¶ 52.

On July 26, 2021, ATF signed a cease-and-desist letter to RBT (July 26, 2021 Letter). Decl. ¶ 26. As set forth in the July 26, 2021 Letter, ATF informed RBT that the FRT-15 is a machinegun. ATF further informed RBT that "[b]ecause the FRT-15 is properly classified as a 'machinegun' [RBT] must immediately take the following actions: (1) Cease and desist all manufacture and transfer of the Rare Breed Trigger FRT-15 [and] (2) contact ATF within 5 days of receipt of this letter to develop a plan for addressing those machineguns already distributed." Decl. ¶¶ 57,58.

ATF noted that the NFA levies a $200 tax on each firearm made and an additional $200 tax on each firearm transferred pursuant to 26 U.S.C. §§ 5811, 5821. ATF further noted that RBT may be liable for a $200 making tax and a $200 transfer tax on each FRT-15 made and transferred. ATF concluded the July 26, 2021 Letter by stating that "[f]or public safety reasons, [RBT's] cooperation in this matter is essential." The July 26, 2021 Letter stated that RBT's failure to cease-and-desist "may result in (1) law enforcement action by ATF, including a referral of this matter to the United States Attorney's Office for criminal prosecution; (2) tax assessment and collection; and/or (3) seizure and forfeiture of the firearms and property involved in violations of Federal law."

On July 27, 2021, ATF officials met with Defendant Maxwell and delivered the letter. Decl. ¶ 56. At that meeting, ATF reiterated to Defendant Maxwell that the FRT-15 is a machinegun. Decl. ¶ 57. ATF further directed RBT to cease-and-desist activities related to the distribution of the FRT-15. Decl. ¶ 58. Also during the meeting, Defendant Maxwell said that he

11

was not surprised by the ATF determination.  He added that he believed that the ATF would have tried to stop RBT from selling the FRT-15 sooner than it had.  Decl. ¶ 58.

### C.      RBT Disregarded ATF and Continues to Sell the FRT-15

#### 1.      RBT Sold Thousands of Machineguns

Rather than stop selling the FRT-15, RBT pressed ahead.  RBT boasted that it was engaged in "vigorous sales."[3]  RBT averred that it had distributed and sold "thousands" of its FRT-15s in the United States.  Decl. ¶¶ 60, 67.

As of January 18, 2023, on its website, and despite ATF's statements to the contrary, RBT states that the FRT-15 is "not a machinegun under the [NFA] or the [GCA]."  Decl. ¶  95.  On RBT's website, a former ATF employee claims that the FRT-15 is "absolutely not" a machinegun. Decl. ¶  96.  In a video that RBT produced, Defendant DeMonico concedes that RBT was "brazen in its noncompliance" with ATF's cease-and-desist requests, as he was certain that the FRT-15 was not a machinegun.  Decl. ¶ 97.  On that same video, Defendant DeMonico states that there are a "handful of 'gun tubers' and 'henny pennies' who have been screaming that the sky is falling" after learning about ATF's cease-and-desist requests.  Decl. ¶ 97.  Defendant DeMonico falsely states on RBT's website that no one who has purchased an FRT-15 is affected by ATF's cease-and-desist requests.  Decl ¶ 97.

In a September 29, 2021 online video interview, Defendant DeMonico stated that his RBT colleagues and he decided that the proper response to ATF's cease-and-desist letter was "Fuck them."  Decl. ¶ 66.  Similarly, an original owner of RBT, who is still actively involved with the company, openly stated that he would not comply with the ATF, or a court for that matter, and

---

[3] In 2021, RBT sold the FRT-15 on its website for $380.00.

would illicitly sell the FRT-15.  He further stated that he would go to jail if he had to, rather than stop selling the FRT-15.  Decl. ¶ 67.

In packaging for the FRT-15 itself, RBT includes a disclaimer titled "Waiver and Release" that indicates that Florida law applies to any dispute.  Decl. ¶ 109. Nowhere in the packaging or elsewhere, however, is there any indication that ATF has classified this device as a machinegun. Decl. ¶ 110.

RBT brought suit against the ATF on August 2, 2021.[4]  RBT challenged the cease-and-desist letter.  After the district court reject RBT's request for immediate injunctive relief, the court *sua sponte* dismissed the suit on procedural grounds.  Decl. ¶¶ 60-62.

## 2.    ATF Again Warned RBT and RBT Again Aimed to Thwart ATF

In October 2021, ATF again determined that that the FRT-15 is a machinegun.  Decl. ¶ 69. On November 15, 2021, ATF sent another letter to RBT, again making clear that the FRT-15 is a machinegun.  Decl. ¶ 70.  ATF reminded Defendants Maxwell and RBT that a machinegun like the FRT-15 is subject to registration, taxation, and possession restrictions under the NFA.  ATF further noted that a machinegun like the FRT-15 is subject to the GCA, and is subject to prohibitions regarding the possession, transfer, and transport of such firearms.  ATF concluded its November 15, 2021, letter by reminding defendants Maxwell and RBT that ATF had provided them with a cease-and-desist letter in July 2021, and that the continued manufacture and transfer of FRT-15s exposes them to criminal prosecution, tax assessments and collections, and the seizure and forfeiture of firearms and property.  Still, RBT continued to sell the FRT-15.

---

[4] RBT has sued ATF twice—in Middle District of Florida and in the District of North Dakota—claiming that ATF was wrong to classify the FRT-15 as a machinegun.  Both cases have been dismissed without prejudice.  Decl. ¶¶ 61-62, 87

### 3.     ATF Tried to Stop the Manufacture of the FRT-15

ATF learned that a company called 3rd Gen Machine, located in Utah, manufactured the FRT-15 for RBT.  Decl. ¶¶ 72-73.  3rd Gen Machine also served as a drop shipper for RBT.  That is, when a customer placed an order for an FRT-15 from RBT, RBT communicated that order to 3rd Gen Machine, which would then ship the product to the customer.  Decl. ¶ 75.  ATF visited 3rd Gen Machine in January 2022.  It advised the company that the FRT-15 is a machinegun.  It also provided the company with a cease-and-desist letter.  Like RBT, 3rd Gen Machine ignored ATF's cease-and-desist letter, and chose to continue to manufacture and distribute the FRT-15.  Decl. ¶ 76.  ATF thus obtained a warrant to search 3rd Gen Machine in Utah concerning the FRT-15.  ATF executed that search warrant in March 2022.  Among other things, ATF seized parts and components that were intended to be used to manufacture FRT-15s.  Decl. ¶ 77.

### 4.     RBT Undermined a Federal Search Warrant

Despite the fact that its manufacturer and shipper had just been the subject of a court authorized search and seizure, RBT continued to take steps to sell FRT-15s.  Defendant DeMonico traveled to 3rd Gen Machine to grab what he could for RBT.  On April 14, 2022, he stormed into the 3rd Gen facility without authorization.  Defendant DeMonico told the General Manager of 3rd Gen, "I'm here to take my shit [FRT-15s]."  The General Manager told him not to take the items and advised him that ATF was coming to take them.  Defendant DeMonico scoffed, "I don't care."  Decl. ¶¶ 78-79.

The 3rd Gen general manager told DeMonico that he planned to call ATF.  Defendant DeMonico told the general manager not to do so until after Defendant DeMonico had left 3RD Gen.

Defendant DeMonico proceeded to load boxes that contained FRT-15s and component parts—products that 3rd Gen had set aside to hand over to ATF—into a U-Haul van, and drove off.  Decl.¶ 79.

Defendant DeMonico got as far as New Mexico, where he was stopped by ATF and local authorities on April 15, 2022.  During that interdiction, ATF seized from Defendant DeMonico just under 1,000 FRT-15s and over 15,000 parts and components meant to assemble even more FRT-15s.  Decl. ¶ 80.

**5.    RBT Sued Other Companies Selling Forced Reset Triggers**

In addition to its lawsuits against ATF, RBT also sued a series of companies, in several jurisdictions, claiming that these companies had violated one or more patents for the FRT-15. Decl. ¶ 81.  RBT commenced these actions after ATF served its cease-and-desist letter directing RBT to stop selling the FRT-15.  One such product, the Wide Open Trigger (WOT) operates much like the FRT-15.  And just as it did for the FRT-15, the ATF had classified the WOT as a machinegun.  Decl. ¶¶ 82-83.  In its September 15, 2021 lawsuit against a number of defendants, including Big Daddy Enterprises, Inc. and Wide Open Enterprises, RBT alleged that these entities infringed RBT's patent by, *inter alia*, manufacturing and selling WOTs.  RBT sought damages and a permanent injunction against these defendants.  *See RBT v. Big Daddy Enterprises et al.*, 21-CV-149 (N.D. Fl.); and *RBT v. Big Daddy Unlimited, Inc., et al.*, 22-CV-61 (N.D. Fl.).  On October 19, 2022, RBT filed a Consent Judgment and Permanent Injunction in the aforementioned Florida patent cases that referenced a separate Confidential Settlement Agreement in which the parties had agreed to terms of compensation for the infringement.

### 6.    RBT Secured an Inventory of Wide-Open Triggers and Sells Them

Approximately one month later, on November 22, 2022, RBT sent out a marketing email. It stated that "[a]s crazy as it might sound, we have WOTs for sale. And you assuredly have questions but unfortunately, we can't really answer them. We can't tell you where these came from and . . . we can't tell you why we can't tell you but rest assured, these are real WOTs. Notwithstanding the cloak and dagger, these *WOTs are the property of RBT* and they are available now at a ridiculously huge discount." (emphasis added).  Decl. ¶ 103.  RBT's email further stated that "[t]he money raised by the sales of these WOTs will be used to fund litigation in the following order, based on availability of funds and the evaluation on a case by case basis: 1. Litigation by RBT against the DOJ/ATF, 2. to assist individuals who have been wrongfully accused of a crime for possession of an [FRT-15]; 3. and to seek the return of property [FRT-15s] wrongfully taken from individuals by the ATF."  Decl. ¶  104.

The RBT email noted that they were selling their WOTs for $199.00, a steep $150.00 discount from the regular price of $349.00.  RBT called it a "FIRE SALE" (capitalization in original).  Decl. ¶ 105.

### 7.    RBT Hid its Sale of WOTs by Deceitfully Mis-Labeling Packages

The same day that RBT sent out the email marketing its WOTs, Defendant DeMonico opened a postage meter with the USPS.  Decl. ¶ 106.  RBT then used the postal meter to prepare shipping labels, which RBT affixed to the packages containing the WOTs it shipped to its customers.  Decl. ¶  107  The shipping labels indicated that the package was coming from "Red Beard Treasures."  The address listed for "Red Beard Treasures" was RBT's office in North Dakota, 3523 45th Street South, Suite 100 Fargo, North Dakota 58104.  Decl. ¶ 108.  Nowhere on the outside of the packages containing WOTs was there any indication that the package was from

RBT or "Rare Breed Triggers" or that the package contained a machinegun.  Decl. ¶ 109.  RBT has sold approximately 3,460 shipments of WOTs between November 28, 2022 and December 5, 2022.  Decl. ¶ 93.

### D.  ATF's Efforts to Recover FRT-15s

Consistent with ATF's mandate to enforce federal firearms laws, ATF has sought to retrieve and recover FRT-15s.  Decl. ¶ 89.  Upon learning that the FRT-15 is illegal, multiple customers have agreed to abandon their purchased FRT-15 property to ATF.  Decl. ¶ 90.  Certain third-party sellers stopped selling FRT-15s after learning that ATF had classified FRT-15 as machineguns.  ATF's efforts are ongoing.  Decl. ¶ 91.

## ARGUMENT

### I.  Section 1345 Authorizes this Court to Issue Injunctive Relief to Quickly Stop Ongoing Frauds

#### A.  This Court Regularly Grants Section 1345 Injunctive Relief to Stop Ongoing Frauds

Title 18, Section 1345 authorizes the United States to "commence a civil action in any Federal court to enjoin" persons who are "violating or about to violate" the provisions of certain federal criminal statutes, including fraud statutes.  18 U.S.C. § 1345(a)(1)(A).  As discussed below with respect to the definition of a *Klein* conspiracy, 18 U.S.C. § 371 is a federal fraud statute which is a predicate offense for an injunction pursuant to 18 U.S.C. § 1345.  *See United States v. Buckner*, 108 F.2d 921 (2d Cir. 1940).  So too are the wire and mail fraud statutes, 18 U.S.C. §§ 1341, 1343, and conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349.

Section 1345 provides that a district court "may . . . enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States." 18 U.S.C. § 1345(b) (emphasis added).  Courts in this Circuit and district have granted temporary or preliminary injunctive relief under Section 1345 in a number of cases.

17

*See, e.g., United States v. Palumbo*, 448 F. Supp. 3d 257 (E.D.N.Y. 2020); *United States v. Kahen*, No. 20-CV-00474 (BMC), 2020 WL 1697974, (E.D.N.Y. Jan. 28, 2020); *United States v. Kafeiti*, No. 18-CV-6581 (JMA) (AYS), 2019 WL 5310128, at *1 (E.D.N.Y. Oct. 21, 2019); *United States v. Thomas*, No. 18-CV-1104 (PKC) (LB), 2019 WL 121678, at *2 (E.D.N.Y. Jan. 7, 2019); *United States v. Trends Service in Kommunikatie, B. V.,* No. 1:16-cv-02770 (ILG) (SMG), Dkt. Entry No. 5, Temporary Restraining Order and Order to Show Cause (E.D.N.Y. June 1, 2016); *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 755, 761 (S.D.N.Y. 2015); *United States v. CLGE, Inc.,* No. 2:14-cv-6792 (SJF)(GRB), Dkt. Entry No. 5, Temporary Restraining Order and Order to Show Cause (E.D.N.Y. Dec. 19, 2014); *United States v. Metro Data Mgmt.*, No. 2:14-cv-06791 (SJF) (GRB), Dkt. Entry No. 5, Temporary Restraining Order and Order to Show Cause (E.D.N.Y. Nov. 19, 2014); *United States v. Madison Home Equities*, No. 1:08-cv-04295-NGC-VVP, Dkt. Entry No. 4, Temporary Restraining Order (E.D.N.Y. Oct. 23, 2008); *cf. United States v. City of New York*, No. 20-MC-255 (ARR), 2020 WL 597363 (E.D.N.Y. Feb. 5, 2020).

> **B.    The United States Need Only Show Probable Cause that Defendants Are Committing or Are About to Engage in a Conspiracy or Scheme to Obtain § 1345 Relief**

This Court should issue Section 1345 relief—including a temporary restraining order and preliminary injunction—if the United States demonstrates that "probable cause" exists to believe "that Defendants are currently engaged or about to engage in a fraudulent scheme" violative of the conspiracy statute, 18 U.S.C. § 371, or of the wire or mail fraud statutes.  *See Palumbo,* 448 F. Supp. 2d at 260 (granting injunction and applying probably cause standard); *United States v. William Savran & Assocs.*, 755 F. Supp. 1165, 1177 (E.D.N.Y. 1991) (citations omitted); *United States v. Belden*, 714 F. Supp. 42, 44-45 (N.D.N.Y. 1987) ("issuance of a preliminary injunction under § 1345 must be supported by a showing that there is probable cause to believe that the

defendants are currently engaged or are about to engage in a fraudulent scheme violative of the federal mail[] fraud statutes"); *see also United States v. Weingold*, 844 F. Supp. 1560, 1573 (D.N.J. 1994) (applying probable cause standard in Section 1345 action).

To show probable cause, the United States need only establish "reasonable grounds, rising above the mere level of suspicion, to believe" that there is a violation of law. *United States v. 303 West 116th St.*, 901 F.2d 288, 291 (2d Cir. 1990) (internal quotations omitted); *accord Walczyk v. Rio*, 496 F.3d 139, 156-57 (2d Cir. 2007) ("probable cause does not demand any showing that that a good-faith belief be correct or more likely true than false"); *see also United States v. Bors*, No. CV 21-9441, 2021 WL 5909196, at *2 (D.N.J. Dec. 13, 2021).

The United States may establish probable cause by adducing direct or circumstantial evidence, and may use hearsay in support of its application. *See United States v. 4492 S . Livonia Rd.*, 889 F.2d 1258, 1267-69 (2d Cir. 1989), *reh'g denied*, 897 F.2d 659 ( 1990); *see also Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("hearsay evidence may be considered . . . in determining whether to grant a preliminary injunction"); *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (the United States may meet its burden of demonstrating a scheme to defraud though circumstantial evidence); *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (explaining that in deciding a motion for a preliminary injunction, a "court may consider the entire record[,] including affidavits and other hearsay evidence").

## C.     The United States Need Not Show Irreparable Harm to Obtain Injunctive Relief

"Unlike in the usual preliminary injunction case, proof of irreparable harm is presumed under Section 1345 where the statutory conditions are met." *Palumbo*, 448 F. Supp. 3d at 261. Courts in the Second Circuit have consistently held that the common law requirement of "irreparable harm" does not apply to an action brought under Section 1345. *See, e.g., Kahen*, 2020

WL 1697974 at *1; *Palumbo*, 448 F. Supp. 3d at 261; *Belden*, 714 F. Supp. at 45-46; *Savran*, 755 F. Supp. at 1179; *see also Weingold*, 844 F. Supp. at 1573 (Proof of irreparable harm is not necessary for the Government to obtain a preliminary injunction under Section 1345); *Bors*, 2021 WL 5909196, at *2; *United States v. Payment Processing Ctr.*, LLC, 435 F. Supp. 2d 462, 463-64 (E.D. Pa. 2006).  While "[c]oncerns about fairness do not drop entirely from the equation, [] where there is probable cause that fraud is occurring, the balance of hardships likely weighs in the Government's favor." *Palumbo*, 448 F. Supp. 3d at 261 (citations and quotation marks omitted).

Courts have interpreted Section 1345 to provide injunctive relief in instances where defendants are currently engaged in a fraudulent scheme or where there is a reasonable threat the fraudulent scheme will occur or resume in the future. *See, e.g., Savran*, 755 F. Supp. 1165 (1991); 18 U.S.C. § 1345; *United States v. Fed. Rec. Serv. Corp.*, No. 99-CV-3290 (BSJ), 1999 WL 335826 at *16, n.34 (S.D.N.Y. May 24, 1999) (injunctive relief is appropriate where the "offense is ongoing or is likely to be committed in the future"); *United States v. Fang*, 937 F. Supp. 1186, 1194–95 (D. Md. 1996) ("courts have held that the statute . . . authorizes injunctions against ongoing or likely to reoccur criminal acts").

## II.   Probable Cause Exists to Believe that Defendants are Knowingly and Intentionally Conspiring to Defraud the United States in Violation of 18 U.S.C. § 371

### A.   A *Klein* Conspiracy

A *Klein* conspiracy charge relies on the general conspiracy statute, which states:

> If two or more persons conspire either to commit any offense against the United States, *or to defraud the United States, or any agency thereof in any manner or for any purpose*, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371 (2013) (emphasis added).  Unlike a typical conspiracy charge, a *Klein* conspiracy focuses on the "to defraud the United States" element of § 371.  *See Klein*, 247 F.2d at 921

(affirming conviction for conspiracy to defraud in connection with tax evasion for whiskey sales where evidence showed concealment of income, including false statements on tax returns and in interrogatory responses).

Under the *Klein* theory of prosecution, a conspiracy to defraud the United States does not have to be "the cheating of the government out of property or money"; instead, a *Klein* conspiracy "also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.'" *Klein*, 247 F.2d at 916 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)); *see also United States v. Worthen*, No. 17-CR-00175-CRB-1, 2018 WL 1784071, at *1 (N.D. Cal. Apr. 13, 2018). The Supreme Court has noted that "[i]t is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention." *Hammerschmidt*, 265 U.S. at 188.

It is well established that the term "defraud" as used in section 371 "is interpreted much more broadly than when it is used in the mail and wire fraud statutes." *United States v. Ballistrea*, 101 F.3d 827, 831-32 (2d Cir. 1996) (citing *United States v. Rosengarten*, 857 F.2d 76, 78 (2d Cir. 1988)). Section 371 reaches beyond "schemes which deprive the government of money or property" to "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of Government." *United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987). The Second Circuit has held that "it is now well established that § 371 'is not confined to fraud as that term has been defined in the common law' but reaches 'any conspiracy for the purpose of . . . obstructing or defeating the lawful function of any department of Government.'" *United States v. Coplan*, 703 F.3d 46, 60-61 (2d Cir. 2012) (quoting *Dennis v. United States*, 384

U.S. 855, 861 (1966)).   A defendant may be found to have committed a *Klein* conspiracy even though "he did not contact agency personnel or submit documents to the agency." *Ballistrea*, 101 F.3d at 829-30.

"Moreover, so long as deceitful or dishonest means are employed to obstruct governmental functions, the impairment need not involve the violation of a separate statute." *Ballistrea*, 101 F.3d at 831-32 (citations omitted); *see also United States v. Liu*, No. 19-CR-804 (VEC), 2022 WL 443846, at *2 (S.D.N.Y. Feb. 14, 2022), *aff'd*, No. 22-1082, 2022 WL 14177192 (2d Cir. Oct. 25, 2022) ("A lawful function under 18 U.S.C. § 371 need not be established by a particular statute or regulation."); *Rosengarten*, 857 F.2d at 78   ("[C]onspiracies to defraud need not involve the violation of a separate statute.").   This is so "because there is no 'substantive' offense underlying a § 371 conspiracy to defraud" and thus the charge is independent of any substantive crime. *United States v. Khalife*, 106 F.3d 1300, 1303 (6th Cir. 1997).

Indeed, courts have long upheld *Klein* conspiracy charges based on agreements to obstruct broadly defined agency functions not characterized by reference to a particular statute or regulation.   *See, e.g., United States v. Bilzerian*, 926 F.2d 1285, 1302 (2d Cir. 1991) (lawful functions included SEC's general administration and enforcement of securities laws based on "accurate and truthful disclosure" and the general "function of the IRS in determining the legitimacy of a return"); *United States v. Peltz*, 433 F.2d 48, 49 (2d Cir. 1970) (SEC's general function to have its "business conducted impartially and according to law"); *United States v. Cueto*, 151 F.3d 620, 628 (7th Cir. 1998) (conspiracy to obstruct "the lawful function of the FBI, the grand jury, and the federal district court in connection with [an] investigation, indictment, and prosecution"); *United States v. Rankin*, 870 F.2d 109, 111 (3d Cir. 1989) (conspiracy "to defraud the United States by obstructing the lawful function of a district court through making false and

22

deceitful representations and statements"). The statute encompasses "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of the government," and "neither the conspiracy's goal nor the means used to achieve it need to be independently illegal." *Cueto*, 151 F.3d at 635 (citing *United States v. Jackson*, 33 F.3d 866, 870 (7th Cir. 1994)); *United States v. Sans*, 731 F.2d 1521, 1534 (11th Cir. 1984).

Thus, to prove a *Klein* conspiracy, the Government "need only show (1) [that defendant] entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." *Ballistrea*, 101 F.3d at 832. Additionally, the "agreement" need not be express and can be inferred from the conspirators' conduct in furtherance of their common objectives. *See Ianelli v. United States*, 420 U.S. 770, 777 & n.10 (1975); *see also United States v. Renzi*, 769 F.3d 731, 758 (9th Cir. 2014). If the Government's evidence demonstrates that the defendant conspired to impair the function of a federal agency, no other form of injury to the Federal Government is required to establish a conspiracy to defraud the Government. *See United States v. Dean*, 55 F.3d 640, 647 (D.C. Cir. 1995).

## B.   Probable Cause Exists to Believe that Defendants Are Engaged in a *Klein* Conspiracy

The evidence presented in the Complaint, supporting Declaration, and annexed exhibits establishes probable cause to believe that Defendants entered into an agreement to obstruct ATF's lawful regulation of machineguns by deceitful and dishonest means and via multiple overt acts in furtherance of the conspiracy. *See Ballistrea*, 101 F.3d at 832. The evidence shows that Defendants' actions were all part of a concerted effort concocted and furthered by all Defendants to achieve a common goal: frustrate any effort by the ATF to stop them from selling FRT-15s to the American public. *See United States v. Gurary*, 860 F.2d 521, 525 (2d Cir. 1988) (the intent to

"[i]mped[e] the IRS . . . was part and parcel of the [underlying] [§ 371] scheme."); *see also United States v. Meneilly*, 78 F. Supp. 2d 95, 106 (E.D.N.Y. 1999).

By entering into an agreement to sell machineguns in contravention of the GCA and the NFA, Defendants have obstructed ATF's regulation of machineguns, which is a lawful government function under § 371. *See, e.g., United States v. Rodman*, 776 F.3d 638 (9th Cir. 2015) (affirming § 371 conviction, ruling that ATF's regulation of firearm registration and transfer is a lawful government function for purposes of the statute); *see, e.g., United States v. Kelerchian,* 937 F.3d 895, 906 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 2825 (2020); *United States v. Rodman*, 776 F.3d 638 (9th Cir. 2015) (affirming § 371 conviction, ruling that ATF's regulation of firearm registration and transfer is a lawful government function for purposes of the statute); *Coluccio*, 313 F. Supp. 2d at 153 (under the "'common sense' approach to reading indictments . . . the allegation that the defendants conspired to defraud the IRS by issuing checks to fictitious individuals and entities makes out an act of 'dishonesty and deceit,' even without the ritualistic recitations of the words 'deceitful and dishonest.'") (citations omitted).

Knowing that the ATF would classify the FRT-15 as a machinegun, the Defendants took steps to sell as many as they could before the ATF would be able to stop them.  They deliberately chose to avoid tipping off the ATF to their activity by not submitting the product to ATF for classification prior to engaging in any sales.  In fact, as Defendant DeMonico has publicly acknowledged, it is customary for firearms manufacturers and sellers to do just that.  But doing so would have given the ATF the opportunity to do its job, which is exactly what RBT did not want

ATF to do.  So, Defendants sought advice from private citizens and then just started selling as many FRT-15s as quickly as it could.[5]

Nonetheless, ATF ultimately obtained an FRT-15, examined it, and concluded that it was a machinegun under the NFA and GCA.  Significantly, on July 26, 2021, ATF executed a cease-and-desist letter, in which it stated that the FRT-15 was a machinegun.  ATF requested that RBT cease and desist all manufacture and transfer of the FRT-15.  ATF noted that RBT may be liable for a $200 making tax and a $200 transfer tax on each FRT-15 made and transferred.  ATF leadership met with Defendant Maxwell on July 27, 2021, to personally deliver the letter and explain the contents.

But instead of pulling its product from the market upon conclusively learning from ATF that it was a machinegun, Defendants unapologetically continued to sell the FRT-15.  Indeed, Defendant DeMonico stated that RBT's response to the ATF's cease-and-desist letter was "Fuck them."

The United States subsequently obtained a search warrant to search a Utah manufacturing facility that served as the contract manufacturer and shipper for RBT.  The Government executed the search warrant in March 2022. Still, Defendants continued to sell the FRT-15.  In fact, to undermine that very search, Defendant DeMonico went into the facility that was storing

---

[5] Defendants may claim that they did not believe it necessary to submit the FRT-15 to ATF because they had obtained opinions from non-ATF evaluators that the FRT-15 was legal.  Such a claim, of course, is without merit.  Defendants could have simply provided these opinions to ATF in a submission prior to selling the FRT-15, confident that the ATF would, of course, agree with them. Defendants chose not to do that because they did not want ATF to know what they were selling; they wanted to rake in as much money as they could before ATF learned what had happened. Perhaps there is no better proof of that intent than Defendant Maxwell's reaction when the ATF met with him in July 2021 to deliver a cease-and-desist letter.  He said that he was not surprised by the ATF determination. He added that he believed that the ATF would have tried to stop RBT from selling the FRT-15 sooner than it had.

machineguns and parts seized during the execution of that federal search warrant and stole those machineguns and machinegun components. Explicitly and directly told that he would be interfering with the ATF's search—as the products he was about to steal were to be handed over to ATF—DeMonico said, "I don't care."

All told, even after ATF explicitly informed Defendants, on multiple occasions, that the FRT-15 was a machinegun, Defendants continued to sell thousands of these machineguns in furtherance of the *Klein* conspiracy. Defendants do not argue that they are subject to any exception to the general prohibition on the possession, transfer, and importation of machineguns under 27 C.F.R. § 479.105. Instead, Defendants falsely continue to state that the FRT-15 is "absolutely not" a machinegun on its website.[6]

Defendants also deliberately and unabashedly mislabeled packages to prevent USPS from learning its packages contained machineguns, thereby improperly using the USPS to distribute their illegal machineguns to the American public. Defendants used the false name "Red Beard Treasurers" in these packages, which also failed to indicate that the packages contained machineguns. Written materials that accompanied the FRT-15 only featured a passing reference to the law; namely, that Florida state law would govern any conflict-of-law disputes. Nothing even acknowledged ATF's classification of this device as a machinegun.

---

[6] While brazen in their methods, their overt actions here still amount to a conspiracy to continue to possess and sell these machineguns. *See Tanner v. United States*, 483 U.S. 107, 129 (1987) ("[T]he broad language of § 371, covering conspiracies to defraud 'in any manner for any purpose,' puts no limits based on the method used to defraud the United States."); *cf. United States v. Middendorf*, No. 18-CR-36 (JPO), 2018 WL 3443117, at *6-*7 (S.D.N.Y. July 17, 2018) (denying motion to dismiss indictment brought pursuant to § 371 where "Defendants conspired to cause the PCAOB's inspection results, although accurate, to paint a rosier picture of the integrity and quality of KPMG audits.").

Moreover, even assuming that Defendants could have lawfully permitted their FRT-15 to enter into commerce, Defendants still deliberately avoided paying the transfer tax, and making tax, thus resulting in more than $32 million in taxes, plus penalties and interest, owed to the United States on the sale or disposal of their machineguns. This conduct alone would be sufficient for purposes of establishing probable cause for a *Klein* conspiracy. *See United States v. Buck*, No. 13 CR. 0282 (VM), 2017 WL 4174931, at *6 (S.D.N.Y. Aug. 28, 2017) (finding an indictment brought pursuant to § 371 sufficient and noting that a conspiracy to avoid reporting overseas bank accounts and evade income tax obligations would plainly and unmistakably defraud the IRS, and thus the United States, of money to which the Government is entitled").

Accordingly, probable cause exists to demonstrate that Defendants are engaged in a *Klein* conspiracy.

### III.   Probable Cause Exists to Believe that Defendants Have Engaged in Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343

There is probable cause to believe that Defendants have engaged in ongoing schemes to commit mail and wire fraud. "The essential elements of mail and wire fraud offenses are '(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.'" *United States v. Almaleh*, No. 17-CR-25 (ER) 2022 WL 602069, at *5 (S.D.N.Y. Feb. 28, 2022) (citing *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)); *see also United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (describing mail fraud); *United States v. Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019) (describing wire fraud); *United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991) (noting that "the mail fraud and the wire fraud statutes use the same relevant language"). The mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, "are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose." *United States v. Autuori*, 212 F.3d at 118. "[I]t is just as

unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *Id.; see also Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2001 (2016) ("A statement that misleadingly omits critical facts is a misrepresentation ..."); *United States v. Weimert,* 819 F.3d 351, 355 (7th Cir. 2016) ("[T]he concept of a misrepresentation is also broad, reaching not only false statements of fact but also misleading half-truths and knowingly false promises . . . . It can also include the omission or concealment of material information, even absent an affirmative duty to disclose, if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim.").

## A.   There is Probable Cause to Believe that Defendants Knowingly Engaged in a Scheme to Defraud

To establish the "scheme to defraud" element for mail and wire fraud, the United States must demonstrate that there is probable cause to believe (i) the existence of a scheme to defraud, (ii) defendants' requisite scienter (or fraudulent intent), and (iii) the materiality of the misrepresentations. *Autuori*, 212 F.3d at 115 (2d Cir. 2000); *Allstate Inc. Co. v. Bogoraz*, 818 F. Supp. 2d 544, 551 (E.D.N.Y. 2011).

### 1.   The Evidence Establishes the Existence of a Scheme to Defraud

"The scheme-to-defraud element is construed broadly to encompass 'everything designed to defraud by representations as to past or present, or suggestions and promises as to the future.'" *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006) (quoting *United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995)). In other words, a scheme to defraud is "a plan to deprive a person 'of something of value by trick, deceit, chicane or overreaching.'" *Autuori*, 212 F.3d at 115 (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)); *State Farm Mut. Auto. Ins. Co. v. Grafman*, 655 F. Supp. 2d 212, 227 (E.D.N.Y. 2009) (same). "Although the government is not required to

prove actual injury, it must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).   In addition, "[w]hen the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself." *United States v. D'Amato*, 39 F.3d 1249, 1256-57 (2d Cir. 1994).

When they began to sell the FRT-15, Defendants obscured key facts from their customers. Consider what Defendants told their customers: namely, that they had obtained the opinions of former ATF officials that the FRT-15 was legal.   Now consider what they purposely chose not to tell their customers: namely, that one of those very same officials had earlier sought an ATF classification of the Company A AR-1; that ATF determined that the AR-1 is a machinegun; that Company A created a follow-on product that became the FRT-15; that RBT obtained the patent for the FRT-15 from Company A; that the AR-1 functions in the same way at the FRT-15; and that RBT did not seek an ATF classification for the FRT-15.   At best, RBT told their customers twenty percent of the story of the FRT-15, but it was the other eighty percent of the story that mattered. By obscuring those key facts, the Defendants misled their customers into believing that the FRT-15 was a brand-new product blessed by "experts."   That narrative was false.[7]

Even after the ATF determined the FRT-15 was a machinegun, Defendants kept pushing this false narrative.   Defendants have repeatedly, and, in Defendant DeMonico's words, "brazen[ly]," disregarded ATF's classification of FRT-15 as a machinegun.   Decl. ¶ 98.

Specifically, on RBT's website, Defendants stated that "in spite of what you may have heard, seen, or understood," the FRT-15 "is not a machinegun under the [NFA] or the [GCA]." On RBT's website, a former ATF official claims that the FRT-15 is "absolutely not" a machinegun.

---

[7] It is not RBT's misrepresentations of the law that form the basis of the fraud.   It is RBT's misrepresentations of the facts.   RBT misrepresented the factual history of the FRT-15.   While those facts do concern legal determinations, they are facts nonetheless.

On RBT's website, Defendant DeMonico stated that there are a "handful of 'gun tubers' and 'henny pennies' who have been screaming that the sky is falling" after learning about ATF's cease-and-desist requests, but then falsely states that no one who has purchased an FRT-15 is affected by ATF's cease-and-desist requests.  Defendant DeMonico falsely stated on RBT's website that ATF has no authority to "address any FRTs currently in circulation" until its now-defunct lawsuit is fully litigated.  Decl. ¶¶ 96-101.

Defendants contemplated the actual harm to their consumers, who are now stuck with having purchased illegal machineguns—machineguns that cannot, under RBT's current policies reflected on their website, be returned to RBT to enable these purchasers to get their money back. Decl. ¶ 46.

### 2.      Defendants Possess the Requisite Fraudulent Intent

The United States may establish the Defendants' fraudulent intent either by a showing of "intentional fraud" or "reckless indifference to the truth."  *O'Malley v. New York City Transit Authority*, 896 F.2d 704, 706 (2d Cir. 1990); *Palumbo*, 448 F. Supp. 2d at 260-61; *New York State Catholic Health Plan v. Academy O & P Assocs.*, 312 F.R.D. 278, 297 (E.D.N.Y. 2015) (a showing of "intentional fraud" or "reckless indifference to the truth" may satisfy the intent element of mail fraud).  The United States may establish Defendants' fraudulent intent by proving that "the defendant engaged or participated in a fraudulent scheme with an understanding of its fraudulent or deceptive character[ ], with an intention to be involved in the scheme, and to help it succeed with a purpose of causing actual financial harm to another." *United States v. Dupre*, 339 F. Supp. 2d 534, 539 (S.D.N.Y. 2004), *aff'd*, 462 F.3d 131 (2d Cir. 2006) (citing *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)).  Moreover, "a showing of an evil motive on the part of the defendant is not necessary and such intent may be inferred through circumstantial evidence."

*United States v. William Savran & Assoc., Inc.,* 755 F. Supp. 1165, 1181 (E.D.N.Y. 1991) (internal citations omitted).  Thus, specific intent to defraud can be reasonably inferred based on "a pattern of conduct or coordinated activities," *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984), or "when the necessary result of the . . . scheme is to injure others."  *Guadagna*, 183 F.3d at 130 (internal quotations omitted).

To show fraudulent intent, "it is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss—it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision."  *Binday*, 804 F.3d at 579; *see also Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (to plead fraudulent intent, a plaintiff need only plead "those events which give rise to a strong inference that the defendant[] had an intent to defraud, knowledge of the falsity, *or* a reckless disregard for the truth.") (citations omitted) (emphasis added).  This Circuit has recognized that intent to harm can be shown if the victim pays the defendant for the product deceptively sold.  *United States v. Walker*, 191 F.3d 326, 335-36 (2d Cir. 1999).  Even exposing the victim to a potential loss is enough.  *United States v. Karro*, 257 F.3d 112, 118 (2d Cir. 2001); *United States v. Chandler*, 98 F.3d 711, 716 (2d Cir 1996).

Here, Defendants knew that their customers would be concerned about purchasing firearms that ATF might classify as machineguns.. Yet they claimed on all of their marketing material that the FRT-15 was legal, even while they hid from their customers vital facts that undermined that very claim.  Indeed, Defendants explained, in great detail, why consumers should disregard ATF's classification and why consumers should believe that the FRT-15 was "absolutely not" a machinegun.  Mocking naysayers as "gun tubers" and "henny pennies," RBT stated on its website

that ATF has no authority to address any FRT-15s currently in circulation and that no one who has purchased an FRT-15 was affected by ATF's cease-and-desist letter.

Defendants' fraudulent intent can also be reasonably inferred based on their myriad attempts to evade ATF's efforts to regulate machineguns.  Time and again, Defendants were warned by ATF to cease selling machineguns.  Defendants decided, however, to ignore ATF and continued to sell machineguns.  Defendants refused to take any meaningful action to stop selling FRT-15s.  Instead, Defendants created a convoluted corporate structure to deliberately avoid a clear accounting of what was being sold.  Defendants even purposely misspelled one of the streams of money into RBT as "XYZ Distrubution" [*sic*] to mislead possible investigations.  Decl.  ¶ 17.  Defendants then sold these items using false, similar-sounding company names ("Red Beard Treasures") and in packages that failed to even acknowledge that the contents contained a machinegun.  Decl. ¶¶ 108-109.

### 3.   The Misrepresentations are Material

There is also probable cause to believe that Defendants' co-conspirators' misrepresentations are material.  "The fraud statutes are violated by affirmative misrepresentations or omission of material information that the defendant has a duty to disclose."  *Autuori*, 212 F.3d at 118 (citing *United States v. Altman*, 48 F .3d 96, 102 (2d Cir. 1995)).  "Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016) (internal quotations omitted).  Thus, to be "material," under the mail, bank, and fraud statutes, a misrepresentation must have a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.  *See Neder v. United States*, 527 U.S. 1, 16 (1999).; *Autuori*, 212 F.3d at 118 (to be "material," information "either must be of some

independent value or bear on the ultimate value of the transaction" (quoting *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994)).

A misrepresentation in a wire fraud case is material if it is capable "of influencing the intended victim." *United States v. Johnson*, 945 F.3d 606, 614 (2d Cir. 2019) (citing *Neder*, 527 U.S. at 24). "Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016) (internal quotations omitted).

Here, Defendants' misrepresentations are material. As demonstrated by ATF's extensive investigation, customers relied on Defendants' half-told story about the FRT-15. Decl. ¶¶ 94, 98, 100, 102, 102. *See Autuori*, 212 F.3d at 118, *see also United States v. Finazzo*, No. 10-CR-457 (RRM), 2011 WL 3794076, at *6 (E.D.N.Y. Aug. 24, 2011) ("it is just as unlawful to speak half truths or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading."). When customers learned that the FRT-15 was, in fact, a machinegun and therefore illegal, some customers voluntarily agreed to abandon their purchased FRT-15 to ATF. Decl. ¶ 90. Some licensed firearms sellers stopped selling FRT-15s after learning that ATF had classified these firearms as machineguns. Dec. ¶ 91. Thus, the evidence establishes that Defendants' misrepresentations had a direct effect on the behavior of its customers.

**B.    There is Probable Cause to Believe that the Purpose of Defendants' Scheme is to Obtain Money**

There is no question that the purpose of the schemes is to obtain money from recipients of the fraudulent solicitations to benefit defendants. Defendants are engaged in the business of selling machineguns, and they derive millions of dollars in proceeds from these schemes. Defendants

have repeatedly exalted their business savvy in creating these weapons and are seeking to obtain as much money as possible in their sale of these machineguns.

**C.     There is Probable Cause to Believe that Defendants are Using U.S. Mail and Wires to Conduct their Schemes**

There is also probable cause to believe that Defendants acted with knowledge that their conduct will result in the use of the United States mail and the interstate wires in furtherance of their schemes. Defendants sell their FRT-15s using, among other things, telephones, internet, and mail. The United States need not show that particular defendants personally mailed certain items. *United States v. Slevin*, 106 F .3d 1086, 1089 (2d Cir. 1996). Rather, where one "act[s] with knowledge that the use of the mails would follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States*, 347 U.S. 1, 8-9 (1954) (citing *United States v. Kenofskey*, 243 U.S. 440, 443 (1917)); *accord United States v. Bortnovsky*, 879 F.2d 30, 37-39 (2d Cir. 1989) ("[I]t is not significant for purposes of the mail fraud statute that a third-party, rather than the defendant, wrote and sent the letter at issue, providing . . . the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act."). "Moreover, to violate the statue, the defendant need not have completed or succeeded in his scheme to defraud, and the scheme need not have resulted in actual injury to the scheme's victims." *Reifler*, 446 F.3d at 96. "The crime of wire fraud is complete at the time [the defendant] sent the relevant communication with the intent to defraud." *United States v. Kenner*, 272 F. Supp. 3d 342, 412 (E.D.N.Y. 2017), *aff'd sub nom. United States v. Constantine*, No. 20-4278, 2022 WL 950954 (2d Cir. Mar. 30, 2022) (citations omitted).

The evidence clearly establishes that Defendants used U.S. mail and common carriers to transport their FRT-15s and WOTs to purchasers—recently using a fake name ("Red Beard

Treasures") and intentionally omitting any mention of the machinegun contained in the package. Decl. ¶¶ 107-111.  Defendants also used a bank headquartered in New York City in which customers—in particular, dealers—wire funds to pay for these machineguns.  Decl. ¶¶ 15, 21.

Accordingly, the Court should issue immediate injunctive relief pursuant to 18 U.S.C. § 1345 in order to protect the United States from further fraud.

## IV.  Probable Cause Exists to Believe that Defendants Are Conspiring to Commit Mail and Wire Fraud in Violation of 18 U.S.C. § 1349

To prove conspiracy under 18 U.S.C. § 1349, the government must show (1) the existence of a conspiracy, and (2) that the Defendants knowingly and intentionally became members of that conspiracy.  *United States v. Mahaffy*, 499 F. Supp. 2d 291, 294 (E.D.N.Y. 2007).  This may be accomplished through presentation of "some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."  *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004).  Circumstantial evidence is sufficient to sustain a criminal conviction beyond a reasonable doubt, *id.* at 544, and thus should suffice to establish probable cause.  *See, e.g., United States v. Santos*, 541 F.3d 63, 71-72 (2d Cir. 2008) (affirming conspiracy conviction and collecting cases).

Here, as discussed in detail in Parts II and III above, Defendants have engaged, and are engaging, in a wide-ranging conspiracy to defraud via mail and wire means.  And although proving conspiracy under 18 U.S.C. § 1349 does not require proof of an overt act, *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015), Defendants' knowing and long-standing facilitation of these fraud schemes provides more than ample proof of such acts.

## V. The United States Proposed Preliminary Injunctive Relief is an Appropriate Remedy Under Section 1345

Where, as here, there is a "cognizable danger of recurrent violations" or a "reasonable likelihood of future violations," an injunction should issue. *United States v. W.T. Grant Co*., 345 U.S. 629, 633 (1953). The existence of past illegal conduct is "highly suggestive" of future violations. *Management Dynamics*, 515 F.2d at 807; *see also Securities & Exchange Comm'n v. Koracorp Indust., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978) (an inference arises from a defendant's past violations that future violations are likely to occur); *Securities & Exchange Comm'n v. Private Equity Mngt. Grp*., No. CV 09-2901, 2009 WL 2019788, at *16 (C.D. Cal. July 2, 2009) (same). This is particularly true if the evidence suggests that the infraction may not have been an isolated occurrence. *Id*. Moreover, Defendants' persistence in illegal conduct even when challenged demonstrates a likelihood of future violations. *See City of New York v. Golden Feather Smoke Shop, Inc*., 08-cv-3966 (CBA), 2009 WL 2612345 at *42 (E.D.N.Y. Aug. 25, 2009) (citation omitted). Finally, where the fraudulent acts were not isolated instances, but spanned a number of years, and a number of different employees, as they do in this matter, a reasonable inference can be drawn that the wrongs will be repeated. *Private Equity Mngt. Grp*., 2009 WL 2019788, at *16.

As set forth above, the specific relief sought in the United States' proposed preliminary injunction is well within the expansive spectrum of remedies available under Section 1345. *See, Savran,* 755 F. Supp. at 1179; *see also Palumbo*, 448 F. Supp. 3d at 260-61; *Kahen*, 2020 WL 1697974; *Fed. Rec. Serv. Corp.*, 1999 WL 335826, at *16 n. 34 (S.D.N.Y. May 24, 1999) (injunctive relief is appropriate where the "offense is ongoing or is likely to be committed in the future"); *Fang*, 937 F. Supp. at 1194-95 (D. Md. 1996) ("courts have held that the statute . . . authorizes injunctions against ongoing or likely to reoccur criminal acts").

For the proposed temporary restraining order, the United States requests that Defendants, their agents, officers and employees, and all other persons and entities in active concert or participation with them, be temporarily restrained from:

     i.    conspiring to defraud the United States, as defined by 18 U.S.C. § 371;

    ii.    committing mail fraud, as defined by 18 U.S.C. § 1341;

   iii.    committing wire fraud, as defined by 18 U.S.C. § 1343;

   iv.    conspiring to commit mail fraud, as defined by 18 U.S.C. § 1349;

    v.    conspiring to commit wire fraud, as defined by 18 U.S.C. § 1349;

   vi.    engaging in any sales of the FRT-15, the Wide Open Trigger, and/or any forced reset trigger or other machinegun conversion device until and unless otherwise ordered by this Court; and

  vii.    be required to preserve all documents related to Defendants' possession, transfer, and/or sale of the FRT-15s, Wide Open Triggers, forced reset trigger, and/or machinegun conversion devices and components thereof.

For the proposed preliminary injunction, the United States requests that the Court issue a preliminary injunction on the same basis and to the same effect as the temporary restraining order, and also order the following:

     i.    permit expedited discovery, in advance of a preliminary injunction hearing, related to Defendants' manufacture, possession, receipt, transfer, and/or sale of FRT-15s, Wide Open Triggers, forced reset triggers, and/or machinegun conversion devices;

    ii.    require that Defendants assist in identifying, locating, and recovering all FRT-15s and Wide Open Triggers that have not yet been recovered;

iii.   require that Defendants pay restitution to any person who purchased an FRT-15 or Wide Open Trigger; and

iv.   require an accounting by an independent entity—paid for by Defendants— concerning Defendants' manufacture, possession, receipt, transfer, and/or sale of FRT-15s, Wide Open Triggers, forced reset triggers, and/or machinegun conversion devices, and components thereof to assist in determining the amount of unpaid taxes owed to the Government and money owed to individual consumers for all FRT-15s, Wide Open Triggers, forced reset triggers, and/or machinegun conversion devices sold by Defendants.

The injunctive relief proposed by the United States is necessary given Defendants' extensive history of failing to comply with ATF's notices, inquiries, and warnings. Defendants continue to maintain an active website; individuals are allowed to join a waitlist to purchase FRT-15s. Defendants shipped approximately 3,460 shipments of WOTs between November 28, 2022 and December 5, 2022. Indeed, Defendants' sales have led to thousands of FRT-15s and WOTs already in the hands of the public—triggers that cause weapons to fire faster than a military specification M-16 machinegun. Defendants continue to fail to pay taxes on their machineguns. In short, nothing short of immediate Court intervention will stop Defendants from selling machineguns and jeopardizing public safety.

To that end, the United States is seeking temporary relief *ex parte*. Pursuant to Federal Rule of Civil Procedure 65(b)(1)(A), a court may issue a temporary restraining order without notice to the adverse party if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition." *See Thomas*, 2019 WL 121678, at *2 (entering a "TRO *ex parte*,

38

based upon its review of the Complaint submitted by the United States that same day, finding that (1) there was probable cause to believe that Defendants were violating and would continue to violate 18 U.S.C. §§ 1341 and 1349, and (2) the statutory conditions for granting injunctive relief under 18 U.S.C. § 1345 had been met."); *Kafeiti*, 2018 WL 6605860, at *1 (E.D.N.Y. Dec. 17, 2018) (noting the entry of "an *ex parte* [TRO] upon a finding that (1) there was probable cause to believe that [Defendants] were violating and were about to violate 18 U.S.C. §§ 1341 and 1349, and that (2) the statutory conditions for granting injunctive relief under 18 U.S.C. § 1345 had therefore been met.").

The facts laid out in the Complaint here, along with the Declaration of ATF Special Agent Daniel Koneschusky, show that Defendants will go to great lengths to thwart the legal process. Among other things, Defendants have grabbed items meant to be delivered to law enforcement pursuant to a search warrant and hauled them away, and brazenly ignored repeated demands by the Government that they cease and desist illegal activity. Given this history, were they to be alerted to the possibility of a court order, there is the real possibility that they will take whatever steps they believe necessary—whether that might be destroying records, or selling off machinegun inventory immediately. The United States is also filing, concomitant with the present motion, a separate motion for a temporary seal of the docket given these public safety concerns.

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully requests that the Court grant the motion for a temporary restraining order and preliminary injunction and grant such other and further relief as the court deems appropriate, pursuant to 18 U.S.C. § 1345.  A proposed Temporary Restraining Order and Order to Show Cause is submitted herewith.

Dated:  Brooklyn, New York                   Respectfully submitted,
       January 19, 2023

                                                BREON PEACE
                                                United States Attorney
                                                *Counsel for Defendants*
                                                Eastern District of New York
                                                271 Cadman Plaza East, 7th Fl.
                                                Brooklyn, New York 11201

               By:            _____/s/_____
                                                Michael Blume
                                              Joseph Marutollo
                                              Paulina Stamatelos
                                              Assistant United States Attorneys
                                              (718) 254-7000