UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

      - v. -

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; KEVIN MAXWELL,

                    Defendants.

Civil Action No.

## **DECLARATION OF DANIEL KONESCHUSKY**

I, Daniel Koneschusky, have personal knowledge of the following facts set forth below,
and if called as a witness I would testify as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF), and am currently assigned to the New York Field Division's Joint Firearms
Task Force, where I investigate violations of federal firearms law relating to firearm trafficking,
violent crime, and the illegal use, possession, shipment, and transportation of firearms.

2.      The facts set forth in this declaration are based on my personal knowledge;
knowledge obtained during my participation in this investigation; information from other
individuals, including other law enforcement officers conducting investigations into defendants,
confidential informants, and other parties; witness interviews; and my review of documents, public
records, ATF records, and other sources.  Because this declaration is submitted for the limited
purpose of establishing probable cause in support of the United States' application for a temporary
restraining order and preliminary injunction pursuant to 18 U.S.C. § 1345 and in support of the

United States' motion for the temporary sealing of the docket, it does not set forth each and every fact that I learned during the course of this investigation.

3.        This investigation involves the Rare Breed Triggers model FRT-15, manufactured, marketed and sold by defendants Rare Breed Triggers, LLC and Rare Breed Firearms, LLC (collectively RBT), Kevin Maxwell (Maxwell), and Lawrence DeMonico (DeMonico) (collectively, Defendants).  The investigation also involves Defendants' sale of  the Wide Open Trigger (WOT).

### ATF'S MISSION

4.        ATF is a law enforcement agency in the United States Department of Justice charged with, among other things, protecting the American public from the illegal use and trafficking of firearms.

5.        The ATF regulates lawful commerce in firearms and administers and enforces federal firearms laws.

6.        Pursuant to statutory and regulatory authority, ATF's Firearms and Ammunition Technology Division (FATD) provides expert technical support on firearms and ammunition to the firearms industry, federal, state, and local law enforcement agencies regarding the Gun Control Act and the National Firearms Act.

7.        FATD is responsible for technical classifications and determinations concerning firearms intended for lawful commerce within the United States as well as for suspected illegal firearms identified during the course of criminal or regulatory investigations.  FATD provides technical guidance on firearms and their classification within Federal law to law enforcement partners, U.S. Attorney's offices, state and local prosecutors,  congressional staff, and members of the public.  FATD maintains an extensive firearms reference collection, as well as technical

firearms reference files and library and firearms databases. *See generally* https://www.atf.gov/resource-center/docs/undefined/fatd-fact-sheet-june-2020/download (last visited January 17, 2023).

8.      Certain trigger assemblies meant for use in AR-style firearms, referred to as "forced reset triggers" or "FRTs," do not require the trigger to be released before a second shot is fired. These types of FRTs allow a firearm to automatically expel more than one shot by a single, continuous pull of the trigger. *See* Exhibit A, ATF's Open Letter to All Federal Firearms Licensees, March 22, 2022 (ATF's 2022 Open Letter). One such FRT is the FRT-15 manufactured and sold by RBT. Another is the WOT, which is a copy of the FRT-15, also sold by RBT.

## RBT'S ORGANIZATIONAL STRUCTURE

9.      RBT was incorporated in Florida in April 2020 as a limited liability company. *See* Exhibit B, RBT Articles of Organization of Florida LLC filed May 4, 2020.

10.      Defendants formed RBT for the sole purpose of selling the FRT-15. *See* Exhibit C, Excerpts of Lawrence DeMonico Deposition Transcript, ECF No. 44-3: Tr. 25 docketed in *Rare Breed Triggers, LLC et al. v. Big Daddy Enterprises, Inc. et al.*, 21-cv-00149-RH-GR (M.D. Fl.). At the time of RBT's incorporation, four individuals held ownership interests in RBT. Those individuals include Defendants and co-conspirators Lawrence DeMonico and Kevin Maxwell. "On advice of counsel," DeMonico and the two RBT owners other than Maxwell  surrendered their ownership interest by December 14, 2020. *See* Exhibit C at 13; *see* Exhibit D, Florida Articles of Amendment to Articles of Organization of Rare Breed Triggers, LLC filed December 9, 2020.

11.      Defendant Lawrence DeMonico, also known as Larry R. Lee, represents himself to be the President of RBT and Rare Breed Firearms LLC. He has been an owner of RBT. He is involved in the management of RBT. *See* Exhibit C at 10; 15.

12.     Defendant Kevin Maxwell is an owner and general counsel of Defendant RBT.  *See* Exhibits B, D.

13.     By March 2022, RBT re-incorporated as a North Dakota limited liability company. On March 29, 2022, Rare Breed Triggers, LLC filed a form to change the address of its principal executive office to Fargo, North Dakota.  *See* Exhibit E, RBT North Dakota Articles of Incorporation, dated November 9, 2021.

14.     The original owners of RBT had decided to reorganize the company from a simple corporate structure to a complex set of interlocking companies.

15.     The flow of funds through RBT illuminates the structure of those interlocking companies. When an RBT customer pays for an RBT product—including an FRT-15—by credit card, RBT uses Chase Paymentech, a payment processing business of JP Morgan Chase, a company with headquarters in New York City.  If an RBT customer chooses to pay for an RBT product by way of wire transfer, RBT instructs the customer to wire the funds to JP Morgan Chase in New York City.  RBT sold the FRT-15 both to consumers as well as to dealers who would then resell them to consumers.  RBT directed its dealers to make payment to RBT by way of wire transfer.

16.     Money that comes into RBT flows out in three streams.  Based upon information and belief, one such stream is to an individual who handles customer support for the company. A second such stream is to a company that provides marketing services to RBT.

17.     The third stream of money from RBT flows to XYZ Distribution LLC (XYZ).  XYZ is also known as XYZ Distrubution [*sic*].  It is also known as RB Trig LLC.  Based upon information and belief, "XYX Distrubution" was purposely misspelled in order to mislead possible investigations.

18.     From XYZ, the flow of funds splits into three more streams.  One stream flows (or flowed) to 3RD Gen Machine, a manufacturing company.

19.     A second stream flows to ABC IP, LLC, and a third stream flows to DEF Consulting LLC.  But for a small amount of money that flows to a company for a royalty payment, the two streams through ABC IP and DEF Consulting all end up at the same four places: (1) LAD, LLC, owned by Defendant DeMonico; (2) Leleux, LLC, owned by a former owner of RBT; (3) An 1861 LLC, owned by Defendant Maxwell; and (4) Spider Hole, LLC, owned by a former owner of RBT.

20.     The payments to these companies are made to appear to be for consulting services. They are not.  Invoices for "consulting"—even invoices for reimbursement for "mileage"—are created to obscure the fact that Defendants DeMonico, Maxwell, and two others have owned and controlled RBT.

21.     As an example, based on materials currently available to ATF, in less than two months, approximately $408,576.00 in RBT funds were wired to JP Morgan Chase in New York. The below figures establish that, during that one month, approximately 1,318 triggers, totaling $408,576.00 were sold through RBT's JP Morgan Chase account in New York City.

| WIRE TRANSFERS | | |
|---|---|---|
| DATE | Number of Triggers | AMOUNT |
| 8/18/2021 | 20 | $      6,430.00 |
| 8/19/2021 | 100 | $    32,130.00 |
| 8/20/2021 | 62 | $    19,920.00 |
| 8/23/2021 | 10 | $      3,215.00 |
| 8/24/2021 | 200 | $    61,225.00 |
| 8/25/2021 | 106 | $    33,806.00 |
| 8/26/2021 | 120 | $    37,545.00 |

| 8/27/2021 | 110 | $ 34,115.00 |
| 8/30/2021 | 200 | $ 61,215.00 |
| 9/1/2021 | 20 | $ 6,430.00 |
| 9/2/2021 | 40 | $ 12,850.00 |
| 9/9/2021 | 60 | $ 18,265.00 |
| 9/14/2021 | 250 | $ 75,000.00 |
| 9/21/2021 | 10 | $ 3,215.00 |
| 9/28/2021 | 10 | $ 3,215.00 |
| TOTAL | 1318 | $ 408,576.00 |

## CREATION OF THE FRT-15

22.     Defendants formed RBT with the specific purpose of manufacturing and selling the

FRT-15.  *See* Exhibit C at 25.

23.     A firearm equipped with an FRT-15 will automatically fire multiple rounds with

the single pull of the trigger. *See* Exhibit F, July 15, 2021, ATF Firearms Technology Criminal

Branch Report of Technical Examination of FRT-15, at 4-5.

24.     The path RBT took to sell the FRT-15 began with the AR1 trigger system, a product

of Company A LLC (Company A).

25.     In 2017, Company A submitted the AR1 to ATF for classification.  The AR1 is a

forced reset trigger meant for use in an AR-15 type firearms.

26.     On August 28, 2018, ATF sent a letter to Company A.  In the letter, ATF stated that

the AR1 forced reset trigger was a machinegun and could convert an AR-15 style firearm into a

machinegun.  *See* Exhibit G, ATF letter to Company A, dated August 28, 2018.

27.     Company A then pursued another forced reset trigger, obtaining a patent for the

design, U.S. Patent #10,514,223 (the '223 patent).  The '223 patent provided a "drop-in" solution

for its forced reset trigger concept and is solely intended for use in AR-15-style firearms.  The '223

patent was otherwise designed to function no differently from the AR1, which ATF had classified

as a machinegun.  The '223 patent represents a modular forced reset trigger assembly (i.e., the AR1 already assembled with slightly different parts), ready to drop into an AR-15-style firearm. The "drop-in" nature of the design allowed for easy and rapid installation into an AR-type firearm by a person with ordinary skills utilizing commonly available tools.  Further, while the AR1 was designed to function with a modified bolt, the '223 was designed to function with an off-the-shelf bolt carrier designed for fully automatic M16-type firearms.  Such bolts are widely available and are generally marketed as "M-16 bolts," "Mil Spec bolts," "machinegun cut bolts," and/or "full auto bolts."  The M-16 is the U.S. Military designation for a series of machineguns based on the ArmaLite AR-15 machinegun.  *See* Exhibit F at 2, 4-7.

28.     In May 2020, the same month RBT filed its articles of incorporation, Company A assigned the '223 patent to RBT.

29.     Defendant DeMonico "handled the acquisition."  RBT then sold the '223 patent to ABC LLC after which RBT would pay ABC LLC a royalty or licensing fee for each trigger sold. *See* Exhibit C at 22.

30.      In a video posted online, DeMonico stated that "along the way we kind of happened to cross this technology and nobody really had the balls to bring it to market, can I say that."  *See* Exhibit H "The FRT-15 Story: An Interview with Rare Breed's President, Lawrence DeMonico (provided to the Court in digital format and available at https://www.youtube.com/watch?v=NWIDxw9EtW4.  DeMonico said that it was "easy to bring" this to market but "when the shit hits the fan … like how many people are going turn tell and run or hide well that wasn't me."  *Id.*.

31.     The FRT-15 is the commercial embodiment of the '223 patent.  And the FRT-15 functions  the same way as the AR1.  Just like the AR1, the FRT-15 allows the firearm to fire

automatically, with a single constant rearward pull, until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply.

32.     Defendant DeMonico has acknowledged publicly that it would be customary for a seller of a product like the FRT-15 to submit the product to ATF and ask that ATF analyze and classify the product. That is what Company A did with the AR1.

33.     ATF had already determined that the Company AR1—the precursor to the FRT-15—was a machinegun. *See* Exhibit G.

34.     Defendants did not submit the FRT-15 to FATD for a determination prior to starting sales of the FRT-15 in December 2020.

35.     Instead, RBT sought the opinions of private individuals who are not currently affiliated with the ATF. These individuals, who had formerly worked for ATF and one of whom had submitted the AR1 to ATF for classification, asserted that the FRT-15 was not a machinegun.

36.     Defendants used these opinions to state to their customers that the FRT-15 is legal. But Defendants have failed to disclose to customers facts concerning the illegality of RBT's sale of the FRT-15. *See* Exhibit H.

37.     RBT claimed that it was the first company to bring a forced reset trigger of a type like the FRT-15 to the market. In or about December 2020, RBT started selling the FRT-15 nationwide through its website (www.rarebreedtriggers.com), the websites of third-party vendors, and in third-party vendors' brick-and-mortar stores. *See* Exhibit C at 65-66; 109-10; 148-49.

38.     RBT did not tell its customers the fact that ATF had determined that the FRT-15's predecessor product was a machinegun. Nor did RBT share with its customers the fact that it had not sought an ATF classification of the FRT-15 prior to offering it for sale.

39.     RBT's website has always been accessible in New York.

40. RBT customers could place orders from RBT while they were physically in New York. RBT customers are able, and have been able to, place orders with RBT from New York. For instance, on November 29, 2022, ATF Special Agents, while physically located in the Eastern District of New York, placed orders for WOTs directly from RBT's website.  The orders were shipped from RBT in North Dakota by way of the United States Postal Service (USPS).  ATF received the WOTs on December 6, 2022, in Pennsylvania.

41. Defendants have claimed that they do not ship their products directly to certain states, including to New York. But Defendants know that that they transact with and supply FRT-15s to dealers that choose to sell in those states.  *See* Exhibit I: Lawrence DeMonico Deposition Transcript, ECF No. 44-4: in Rare Breed Triggers, LLC et al. v. Big Daddy Enterprises, Inc. et al., 21-cv-00149-RH-GR (M.D. Fl.) at 29-30.

42. Third-parties, including dealers, sold and shipped FRT-15s to customers in New York

43. On the RBT website, RBT states, in the "description" for the FRT-15, that "[t]he FRT-15 is exclusively manufactured and sold by Rare Breed Triggers."  Underneath the description and the product details, RBT notes "US Pat. 10514223."

44. RBT sold at least 10,000 FRT-15s within the first three months of selling the FRT-15.  RBT maintains records showing the daily sales of its FRT-15.  *See* Exhibit C at 110.

45. In 2021, RBT sold the FRT-15 on its website for $380.00.

46. RBT does not offer refunds on purchases of the FRT-15 to its customers.

## ATF CLASSIFIED THE FRT-15 AS A MACHINEGUN

47. On April 1, 2021, ATF's Internet Investigations Center initiated a referral to make an undercover purchase of an FRT-15 from RBT.

48.     ATF was not able to obtain an FRT-15 until late May 2021.  The delay was due to the FRT-15 being sold out on RBT's website.  ATF ultimately purchased the FRT-15 from a third-party seller.

49.     Upon receipt of the FRT-15 which was imprinted with "Rare Breed – Triggers – US Pat. 10514223" but which did not contain a serial number—ATF sent it to FATD for examination.

50.     Following FATD's examination, on July 15, 2021, ATF determined that the FRT-15 is a combination of parts designed and intended for use in converting a weapon into a machinegun.  Thus, ATF classified the FRT-15 as a machinegun as defined by the National Firearms Act of 1934 (NFA) and the the Gun Control Act of 1968 (GCA).[1] *See* Exhibit. F.

51.     In reaching its conclusion that the FRT-15 was a machinegun, ATF explained that in a typical semiautomatic firearm, the shooter must release and pull the trigger to fire additional rounds.  ATF determined that for a firearm assembled with the FRT-15, no such release and subsequent pull by the shooter is necessary to fire multiple rounds.  Instead, the shooter using an FRT-15 may fire multiple rounds merely by maintaining the initial trigger pull and allowing the self-acting internal mechanism to complete its automatic cycle of operation.  *See* Exhibit F at 4.

52.     The FRT-15 device incorporates parts that are novel to the operation of a typical AR-type semiautomatic firearm.  The unique parts (hammer, trigger and locking bar) within the FRT-15 trigger mechanism are specifically designed to incorporate the standard rearward and forward movement of the AR-type bolt carrier assembly, when modified as described below, in its cycle of operations allowing the weapon to function as a self-acting, or self-regulating, mechanism.

---

[1] ATF conducted a similar examination of the WOT and, in October 2021, classified the WOT as a machinegun.

To function as intended, the FRT-15 device must be installed into an AR-type weapon that includes an M16-type machinegun bolt carrier.  In a typical AR-type firearm, the rearward movement of the bolt carrier assembly extracts, then ejects a cartridge case, and cocks the hammer which is held by the disconnector.  The disconnector interrupts the weapon's operating cycle, forcing the shooter to release the trigger and pull it again to fire the next round.   The FRT-15 has no disconnector, which eliminates the need for the shooter to release their pull of the trigger.  In a typical AR-type firearm, the forward movement of the bolt carrier assembly loads a subsequent cartridge, and locks the bolt.  With the FRT-15, the forward movement automatically releases the trigger and hammer, as the M16-type bolt carrier assembly strikes a locking bar in the same way that such a bolt carrier strikes an auto-sear in a military specification machinegun like the M16, thereby allowing the weapon to expel a second projectile without a separate pull of the trigger.  Thus, one continuous pull of the FRT-15 trigger allows the firearm to shoot more than one shot.

53.     FRT-15s and WOTs are being marketed as replacement triggers for AR-type firearms by Defendants.  Unlike standard semi-automatic traditional triggers and binary triggers, the FRT-15s and the WOT do not require shooters to pull and then subsequently release the trigger to fire a second shot.

54.     Defendant DeMonico published a video showing how a version of the FRT-15 operates in a firearm.  DeMonico states: "Pay attention to the reset."  DeMonico then refers to a "third position" where he will "rock[] this motherfucker."  DeMonico next states that "now we are going to the third position" during which he keeps pressure on the trigger resulting in the AR-15 firing multiple rounds of bullets with the single pull of the trigger.  DeMonico ends with: "How do you fucking like me now."  *See* Exhibit J,  Rare Breed Trigger  3rd Position Trigger video available at https://www.youtube.com/watch?v=Hd0Y5PFKDWg (last visited January 17, 2023).

55.     ATF testing revealed that a firearm converted with an FRT-15 or WOT can have a rate of fire that meets or exceeds an originally manufactured military specification M16-type machinegun, which can have a rate of fire ranging from 700 to 970 rounds per minute depending on the configuration.  *See* Exhibit K, January 13, 2023, ATF Firearms Technology Criminal Branch Report of Technical Examination of FRT-15/WOT at 9-10.

### ATF SERVED A CEASE-AND-DESIST LETTER ON RBT

56.     On July 27, 2021, a Special Agent with the ATF, accompanied by an ATF attorney, met with Defendant Maxwell and served him with ATF's cease-and-desist letter dated July 26, 2021 (July 26, 2021 Letter).  *See* Exhibit L, ATF July 26, 2021 Cease and Desist Letter to RBT. The meeting was conducted at ATF's Orlando III Field Office located at 135 West Central Blvd, Suite 740, Orlando, Florida 32801.

57.     As set forth in the July 26, 2021 Letter, ATF informed RBT that the FRT-15 is a machinegun. *Id.*

58.     During the July 27, 2021 meeting, ATF officials told Defendant Maxwell that the FRT-15 is a machinegun and directed RBT to cease-and-desist activities related to the distribution of the FRT-15.  During the meeting, Defendant Maxwell said that he was not surprised by the ATF determination.  He added that he believed that the ATF would have tried to stop RBT from selling the FRT-15 sooner than it had.  Defendant Maxwell inquired whether a zip tie was used during ATF testing, and stated that if an ATF employee came to Florida and conducted tests on the FRT-15 utilizing a zip tie, the employee would immediately be arrested for making an illegal machinegun.

59.     ATF had similarly demanded that sales of the WOT cease.

**DEFENDANTS' PUBLIC STATEMENTS THAT RBT WILL  NOT COMPLY
WITH ATF'S CEASE-AND-DESIST LETTER**

60.     Defendants publicly stated that they would not comply with ATF's demand. Instead, Defendants produced and disseminated videos showing that the FR-15 is a machinegun.

61.     On August 2, 2021, docketed as *Rare Breed Triggers, LLC v. Garland*, No. 21-1245 in the Middle District of Florida (the Florida Litigation), RBT challenged the classification of the FRT-15 as a machinegun and sought a temporary restraining order (TRO) and preliminary injunction (PI) to stop the ATF from classifying the FRT-15 as a machinegun.

62.     In the Florida Litigation, the U.S. District Court denied RBT's motion for a TRO on August 5, 2021, denied the PI on October 12, 2021, and dismissed the case altogether on October 28, 2021.

63.     During the Florida Litigation, the district court noted that it received a "harassing" call to chambers to tell the Court "how this [case] should turn out."

64.     On August 27, 2021, the ATF received a phone call.  The caller stated "It's treasonous . . . When are you going to stop trampling on our Second Amendment rights?  We're coming down . . .  Coming down to ATF, your office. We are going to assemble. Going to assemble and protest at the office.  We are bringing the rocket launcher."

65.     The August 27, 2021 phone call, including the reference to a "rocket launcher," originated from a phone number associated with Defendant Maxwell's law office.

66.     In a September 29, 2021, video-recorded interview, Defendant DeMonico stated that his RBT colleagues met to discuss how to respond to ATF.  They decided that the proper response to ATF's cease-and-desist letter was "Fuck them."  *See* Exhibit H.

67.     A former owner of RBT who remains involved with the company, openly stated that he would not comply with the ATF cease and desist letter and would continue to illegally sell

the FRT-15.  He further stated that he would go to jail if he had to, rather than stop selling the

FRT-15.

### ATF CONTINUED ITS EFFORTS TO STOP RBT FROM SELLING FRT-15s

68.     During the course of the Florida Litigation, ATF purchased an additional FRT-15

from the RBT website.

69.     ATF examined the additional FRT-15 it purchased. In October 2021, ATF

confirmed its original determination that that the FRT-15 is a machinegun.  *See* Exhibit M, October

10, 2021, ATF Firearms Technology Criminal Branch Report of Technical Examination of FRT-

15 Examination Report.

70.     One month later, in an ATF letter dated November 15, 2021, addressed to

Defendant Maxwell, the ATF again explained that the FRT-15 is a machinegun.  *See* Exhibit N,

ATF November 15, 2021 Letter to RBT.  ATF reminded Defendants Maxwell and RBT that a

machinegun like the FRT-15 is subject to registration, taxation, and possession restrictions under

the NFA.  ATF further noted that a machinegun like the FRT-15 is subject to the GCA, and is

subject to prohibitions regarding the possession, transfer, and transport of such firearms.  ATF

concluded its November 15, 2021, letter by reminding defendants Maxwell and RBT that ATF had

provided them with a cease-and-desist letter in July 2021, and that the continued manufacture and

transfer of FRT-15s exposes them to criminal prosecution, tax assessments and collections, and

the seizure and forfeiture of firearms and property.  Still, RBT continued to sell the FRT-15.

71.     RBT continued to sell the FRT-15.

### ATF EXECUTED A SEARCH WARRANT ON 3RD GEN MACHINE A COMPANY RETAINED BY DEFENDANTS TO MANUFACTURE THEIR FRT-15

72.     Through its investigation, ATF learned that a company named 3rd Gen Machine

Inc., ("3rd Gen Machine") located in Utah, manufactured and distributed the FRT-15 for RBT.

73.     3rd Gen Machine, located in Utah, manufactured and distributed the FRT-15 for RBT.

74.     3rd Gen Machine also served as a drop shipper for RBT.  That is, when a customer placed an order for an FRT-15 from RBT, RBT communicated that order to 3RD Gen Machine, which would then ship the product via the mails to the customer.

75.     ATF visited 3rd Gen Machine in January 2022. It informed the company that the FRT-15 is a machinegun.  It also provided the company with a cease-and-desist letter.  *See* Exhibit O, ATF January 2022 cease-and-desist letter to 3rd Gen Machine.  3rd Gen Machine did not comply with ATF's cease-and-desist letter, and continued to continue to manufacture and distribute the FRT-15.

76.     ATF obtained a warrant to search 3rd Gen Machine in Utah concerning the FRT-15.  ATF executed the warrant in March 2022.  Among other things, ATF seized parts and components that were intended to be used to manufacture FRT-15s.

77.     On April 14, 2022, Defendant DeMonico entered the 3rd Gen Machine facility and told the General Manager of 3rd Gen Machine, "I'm here to take my shit [FRT-15s]."  The General Manager told him not to take the items and advised him that ATF was coming to take them. Defendant DeMonico replied, "I don't care."  The 3rd Gen Machine general manager told DeMonico that he planned to call ATF. Defendant DeMonico told the general manager not to do so until after Defendant DeMonico had left 3RD Gen Machine.

78.     Defendant DeMonico loaded boxes that contained FRT-15s and component parts that 3rd Gen Machine had set aside to hand over to ATF into a U-Haul van and departed 3rd Gen Machine's premises.

79.     ATF and local authorities stopped Defendant DeMonico in New Mexico on April 15, 2022, at which point ATF seized from Defendant DeMonico just under 1000 FRT-15s and over 15,000 parts and components which could be used to assemble more FRT-15s.

**DEFENDANTS CONTINUED TO SELL THEIR MACHINEGUNS AFTER ATF SEIZED FRT-15s FROM 3RD GEN MACHINE**

80.     RBT sued a series of companies, in several jurisdictions, claiming that these companies had violated one or more patents for the FRT-15, including against the importer and distributor of a similar product, the WOT.

81.     The WOT functions in the same way as the FRT-15.

82.     The ATF also classified the WOT as a machinegun.  It did so in October 2021.  *See* Exhibit P, October 2021, Report, ATF Firearms Technology Criminal Branch Report of Technical Examination of Wide Open Trigger.

83.     RBT resolved most, if not all, of these patent suits. The resolutions prohibit RBT's competitors from selling certain products.  It is not apparent from the litigation what did or would happen to the inventory of products that these competing companies held or controlled, though RBT began distrusting WOTs within several month of the settlement with the distributor and importer of the WOT.

**ATF's NATIONAL RECALL AND RETRIEVAL EFFORTS CONTEMPORANEOUS WITH DEFENDANTS FAILURE TO COMPLY WITH CEASE-AND-DESIST LETTER**

84.     ATF has taken remedial actions with respect to sellers and possessors of FRT-15s.

85.     ATF estimates that in excess of 80,000 FRT-15s are in circulation today.  ATF further estimates that RBT sales generated in excess of $29,000,000 in revenue.

86.     By declaration filed on September 20, 2022 in RBT's North Dakota action against the Attorney General which was dismissed in November 2022, Defendant Maxwell averred that

in the last three months of 2021, RBT was selling FRT-15s at the rate of 1000 to 3000 per week. *See* Exhibit Q, Kevin Maxwell Declaration, ECF No. 30-1, *Rare Breed Triggers, LLC v. Garland*, No. 22-85 (D.N.D. 2022) at ¶ 11.

87.     In ATF's 2022 Open Letter, ATF stated that "[c]urrent possessors of [forced reset triggers] are encouraged to contact ATF for further guidance on how they may divest possession." ATF added that if customers were "uncertain whether the device [they] possess is a machinegun as defined by the GCA and NFA, please contact [their] local ATF Field Office."  *See* Exhibit A.

88.     Consistent with ATF's 2022 Open Letter, ATF has sought, on a nationwide basis, to recover FRT-15s as part of its mandate to administer and enforce federal firearms laws, including laws related to machineguns.

89.     Upon learning that the FRT-15 is illegal, multiple customers have agreed to abandon their purchased FRT-15 property to ATF.  Some of these customers are in the Eastern District of New York.

90.     Certain firearms sellers stopped selling FRT-15s after learning that ATF had classified the FRT-15 as machineguns.

91.     On November 29, 2022, ATF Special Agents in ATF's New York Field Division (NYFD), utilizing an undercover identity and credit card based in Pennsylvania, successfully purchased four (4) WOTs directly from RBT's website.  The ATF NYFD Special Agents made the purchases from locations in the Eastern and Southern Districts of New York.  On December 6, 2022, the WOTs purchased by the ATF NYFD Special Agents were delivered to an address in Pennsylvania by USPS.  The shipping labels showed the WOTs were shipped by "Red Beard Treasures," 3523 45th Street South, Suite 10D, Fargo, North Dakota 58104.  The packing slips

within the shipping boxes showed the WOTs were sold by Rare Breed Triggers, 3523 45th Street South, Suite 10D, Fargo, North Dakota 58104.

92.     RBT has sold approximately 3,460 shipments of WOTs between November 28, 2022 and December 5, 2022.

93.     Defendants continue to sell and advertise the FRT-15, on its website, the websites of third-party vendors, and in third-party vendors' brick-and-mortar stores.

94.     Sales of the FRT-15 have been made via telephone, internet, and through the mails.

95.     As of January 18, 2023, RBT states on its website that "in spite of what you may have heard, seen, or understood," the FRT-15 "is not a machinegun under the [NFA] or the [GCA]."

96.     On RBT's website, a former ATF official claims that the FRT-15 is "absolutely not" a machinegun.

97.     In a video distributed by RBT, Defendant DeMonico concedes that RBT was "brazen in its noncompliance" with ATF's cease-and-desist requests, as he was certain that the FRT-15 was not a machinegun.

98.     Defendant DeMonico states in a video distributed by RBT that there are a "handful of 'gun tubers' and 'henny pennies' who have been screaming that the sky is falling" after learning about ATF's cease-and-desist requests.

99.     In a video distributed by RBT, Defendant DeMonico states that the cease-and-desist letter served on RBT has "zero relevance to anyone who may have purchased and currently possesses an FRT-15."

18

100.    Defendant DeMonico states  in a video distributed by RBT that ATF has no authority to "address any FRTs currently in circulation" until its now-defunct lawsuit is fully litigated.

101.    Some purchasers of the FRT-15 were under the misimpression that the FRT-15 was legal.

102.    As recently as November 22, 2022, RBT sent out a marketing email. *See* Exhibit R, RBT "We Have WOTs For Sale" Marketing Email dated November 22, 2022.  It stated that, "[a]s crazy as it might sound, we have WOTs for sale.  And you assuredly have questions but unfortunately, we can't really answer them. We can't tell you where these came from and . . . we can't tell you why we can't tell you but rest assured, these are real WOTs.  Notwithstanding the cloak and dagger, these WOTs are the property of RBT and they are available now at a ridiculously huge discount."

103.    The email further stated that "[t]he money raised by the sales of these WOTs will be used to fund litigation in the following order, based on availability of funds and the evaluation on a case by case basis: 1. Litigation by RBT against the DOJ/ATF, 2. to assist individuals who have been wrongfully accused of a crime for possession of an FRT-15; 3. and to seek the return of property (FRT-15s) wrongfully taken from individuals by the ATF."  Exhibit R.

104.    The RBT email noted that they were selling the WOT for $199.00, a steep $150.00 discount from the regular price of $349.00. RBT called it a "FIRE SALE."  Exhibit R.

105.    The same day that RBT sent out the email, DeMonico opened a postage meter with the USPS.

106.    RBT had used the postage meter to prepare shipping labels, which RBT affixes to the packages containing the WOTs it ships to its customers.

107.    The shipping labels indicated that the package was coming from "Red Beard Treasures."  The address listed for "Red Beard Treasures" was RBT's office in North Dakota, 3523 45th Street South, Suite 100 Fargo, North Dakota 58104.  *See* Exhibit S, Red Beard Treasure Shipping Label.

108.    Nowhere on the outside of the packages containing WOTs was there any indication that the package was from RBT or "Rare Breed Triggers" or that the package contained a machinegun.

109.    Inside the package, there was a disclaimer titled "Waiver and Release" that indicated that Florida law applies to any dispute.  *See* Exhibit T, RBT's Waiver and Release included in FRT-15 shipping package.

110.    Nowhere was there any indication that ATF has classified this device as a machinegun.

111.    With respect to the sale of the WOTs, Defendant DeMonico posted information in a Facebook group "Fostech Echo, BFS Binary, & Rare Breed FRT Trigger Group" informing the purchasers that their orders were being processed.  As of January 17, 2023, RBT's website listed the FRT-15 as being "out of stock" but noted that customers can "join the waitlist to be emailed when this product becomes available."

112.    RBT has not paid special occupational tax, transfer tax, and making tax totaling more than an estimated $32 million dollars, exclusive of interest and penalties, to the United States for the illegal manufacture, making, sale or other disposition of machineguns.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on January ____, 2023.

By: _____

Daniel Koneschusky
Special Agent