# Exhibit C

Case 1:21-cv-00149-RH-GRJ   Document 44-3   Filed 12/06/21   Page 2 of 26 PageID #: 126

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF FLORIDA
 2                 GAINESVILLE DIVISION

 3

 4   RARE BREED TRIGGERS, LLC, a Florida
     Limited Liability Company, and ABC IP
 5   LLC, a Delaware Limited Liability Company,
 6        Plaintiffs,
                          No. 1:21-cv-00149-RH-GRJ
 7   vs.
 8   BIG DADDY ENTERPRISES, INC., a Florida
     Corporation, d/b/a BIG DADDY
 9   UNLIMITED, INC., and WIDE OPEN
     ENTERPRISES, LLC, a New Mexico Limited
10   Liability Company d/b/a WIDE OPEN TRIGGERS,
11
          Defendants.
12   _____/
13
14        VIDEOTAPED
          DEPOSITION OF:  LAWRENCE DEMONICO
15         (Conducted via videoconference)
16        DATE:          October 13, 2021
17        TIME:          9:05 a.m. to 2:38 p.m.
18
19        PURSUANT TO:    Notice by counsel for
                          Defendants for purposes of
20                        discovery, use at trial or
                          such other purposes as are
21                        permitted under the Florida
                          Rules of Civil Procedure
22
23        BEFORE:         KATHLEEN K. OHMAN, RMR
                          Notary Public, State of
24                        Florida
25                        Pages 1 - 167
```

Page 2

```
 1    APPEARANCES:
 2          GLENN D. BELLAMY, ESQUIRE
            Wood Herron & Evans, LLP
 3          2700 Carew Tower
            441 Vine Street
 4          Cincinnati, Ohio 45202
                          Attorney for Plaintiffs
 5
            DANIEL C. JOHNSON, ESQUIRE
 6          ELEANOR M. YOST, ESQUIRE
            Carlton Fields, P.A.
 7          4221 West Boy Scout Boulevard
            Suite 1000
 8          Tampa, Florida 33607
                          Attorneys for Defendants
 9
10        ALSO PRESENT:
11               Alex Montalvo, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3

4

5

6

7                    LAWRENCE DEMONICO,

8    the witness herein, being first duly sworn on oath,

9    was examined and deposed remotely as follows:

10                   DIRECT EXAMINATION

11   BY MR. JOHNSON:

12       Q.   Good morning, Mr. Demonico.  My name is

13   Dan Johnson.  As you heard a moment ago, I represent

14   the plaintiffs -- excuse me, the defendants in this

15   case, along with my colleague Eleanor Yost.

16            Your deposition is being taken in this

17   matter electronically, which is a little bit

18   different for all of us and so I'll go through some

19   instructions in a minute, but before we get started

20   would you please state your full name for the

21   record?

22       A.   Lawrence Alexander Demonico.

23

24

25

Page 8

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20        Q.   So you told us a minute ago that you are
21   in your house in Austin, Texas.  Are you a full-time
22   resident in Austin?
23        A.   Yes.
24        Q.   Have you ever lived in Florida?
25        A.   No.
```

1      Q.   Have you ever had a business office in

2   Florida?

3      A.   Can you elaborate?  Do I personally have a

4   business office in Florida or do we have a business

5   office in Florida related to this business?

6      Q.   So let's start with you personally, and I

7   appreciate the clarification.  Do you personally

8   have a business office in Florida?

9      A.   No, I do not.

10      Q.   And does Rare Breed have a business office

11   in Florida?

12      A.   Yes.

13      Q.   And where is that, sir?

14      A.   255 Primera Boulevard in Lake Mary,

15   Florida.

16      Q.   Is that Mr. Maxwell's -- the address of

17   his law firm as well?

18      A.   It is.

19      Q.   Is anyone at that location a full- or

20   part-time employee of Rare Breed?

21      A.   Kevin is an employee of Rare Breed as

22   well.

23      Q.   What type of -- and, I'm sorry, I should

24   have made this clear.  When I say "Rare Breed," I

25   will be referring to the plaintiff in this case,

1    Rare Breed Triggers, LLC, unless I say something

2    different, okay?

3         A.    Okay.

4

5

6

7

8

9         Q.    You signed a declaration in this case that

10   was attached to the plaintiff's motion for

11   preliminary injunction.  Do you recall that?

12        A.    I do.

13        Q.    In that declaration you state that you are

14   the president of Rare Breed.  Do you currently hold

15   that office?

16        A.    I currently hold that office, yes.

17        Q.    And how long have you been the president

18   of Rare Breed?

19        A.    Since we started Rare Breed.

20        Q.    And Rare Breed is a Florida limited

21   liability company; is that right?

22        A.    That is correct.

23        Q.    Who are the other current officers of Rare

24   Breed?

25        A.    Just me.

1      Q.   Have there ever been any other officers

2  other than yourself?

3      A.   Yes.

4      Q.   And who would that be and when did he or

5  she hold an office?

6      A.   When the company was formed there were

7  four -- four owners: ██████████████████

    ████████████████.

9      Q.   And did those other three individuals that

10  you mentioned, they were officers of Rare Breed at

11  some time, in addition to having an ownership

12  interest?

13      A.   No, sir, just ownership interest.

14      Q.   Do you understand what it means to be a

15  member of a Florida limited liability company?

16      A.   Will you explain that to me?

17      Q.   Sure.  Do you own any interest in Rare

18  Breed?

19      A.   I no longer own any interest in Rare Breed

20  Triggers.

21      Q.   At any time did you own an interest in

22  Rare Breed Triggers?

23      A.   Yes.

24      Q.   And what interest and for what period of

25  time?

```
 1        A.    I don't specifically remember the
 2   interest.  I cannot tell you the specific date that
 3   I resigned my ownership from Rare Breed Triggers.  I
 4   would have to look that up, but I can look that up
 5   for you if you would like me to look and find that
 6   date.
 7        Q.    We may talk about that a little bit later.
 8        A.    Okay.
 9        Q.    Who is the current owner of Rare Breed?
10        A.    Kevin Maxwell.
11        Q.    And does Mr. Maxwell own 100 percent of
12   Rare Breed?
13        A.    That is correct.
14        Q.    You mentioned a few individuals a moment
15   ago, including Mr. Register and another gentleman
16   who I believe his first name is ███?
17        A.    That is incorrect.
18        Q.    ███
19        A.    That is correct.
20        Q.    Did those two individuals ever own any
21   interest in Rare Breed?
22        A.    Yes.
23        Q.    And did they also divest themselves of
24   their ownership interest?
25        A.    That is correct.
```

1        Q.   And did that happen about the same time

2    you divested yourself of your ownership interest?

3        A.   Yes, it did.

4        Q.   Why did the three of you divest yourself

5    of your ownership interests?

6        A.   On advice of counsel.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     Q.   Article 4, which is on the second page of

2   Exhibit 2, has ██████████████████████

    ████████████████████████████ under the

4   individuals authorized to manage the company.  Do

5   you see that?

6     A.   I do.

7     Q.   And your address is listed as 733 West

8   Colonial Drive, Orlando Florida 32804.

9          Do you recognize that address?

10    A.   I do.

11    Q.   And what address is that?

12    A.   That is the company's previous address.

13    Q.   Before the Primera address?

14    A.   That is correct.

15    Q.   You said that Mr. Maxwell is current owner

16  of 100 percent of Rare Breed.  Of course you also

17  testified you are the president.

18         What are your duties as president?

19    A.   I have many duties:  Planning, a

20  way-forward.  Typical 50,000-foot view.  Future

21  development, future projects.  You know, potential

22  business agreements, partnerships.

23    Q.   Does ██████████ have any current

24  relationship with Rare Breed?

25    A.   He is not an owner or an officer, no.

1  than the FRT-15?

2      A.   I do not believe so.

3      Q.   Has Rare Breed ever obtained any revenue

4  of any kind other than for the sale of the FRT-15

5  trigger?

6      A.   I do not believe so.

7      Q.   Does Rare Breed provide any repair

8  services for any of its triggers for which it

9  charges customers money?

10      A.   I do not believe so.

11      Q.   We just referred to the 223 patent, which

12  is referred to in paragraph 22 of your declaration.

13  Are you generally familiar with that patent?

14      A.   As much as a layman would be.

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          Q.    The next question is, to get this chain

23    correct, Rare Breed obtained the 223 patent from

24    Wolf Tactical; is that right?

25          A.    That is correct.

```
 1        Q.   If I could ask you to look at Exhibit
 2   Number 5, please.
 3             (Defendants' Exhibit Number 5 was marked
 4   for purposes of identification.)
 5             THE WITNESS:  Okay.
 6   BY MR. JOHNSON:
 7        Q.   Do you recognize this document to be the
 8   assignment from Wolf Tactical to Rare Breed?
 9        A.   Not familiar with page one of this
10   document, but page two, the intellectual property
11   assignment of rights document, yes, I am familiar
12   with that.
13        Q.   And that document, below Mr. Rounds'
14   signature, is dated May 7, 2020; is that right?
15        A.   Yes, that is what it's dated.
16        Q.   Does that comport with your recollection
17   that Rare Breed obtained the 223 patent at
18   approximately May 2020?
19        A.   That makes sense, yes.
20        Q.   Were you involved in any way in the
21   acquisition of the patent from Wolf Tactical?
22        A.   Yes.
23        Q.   And in what fashion were you -- did you
24   participate in that acquisition?
25        A.   I handled the acquisition.  I dealt with
```

Page 23

```
 1    Jeffrey Cooper Rounds to purchase the patent.
 2         Q.    Mr. Rounds worked on behalf of Wolf
 3    Tactical and you worked on behalf of Rare Breed;
 4    fair enough?
 5         A.    Sure.
 6         Q.    Did Rare Breed pay Wolf Tactical anything
 7    for the 223 patent?
 8         A.    Yes.
 9         Q.    How much?
10         A.    ██████████
11         Q.    And how was the purchase price arrived at?
12         A.    Good question.  I don't recall.
13         Q.    Do you recall who made the first monetary
14    offer, so to speak?
15         A.    No, I don't.
16         Q.    Would there be documents or emails in
17    which that question might be answered?
18         A.    I do not know.
19         Q.    Was there anyone else on behalf of Rare
20    Breed that was involved in the negotiation or
21    acquisition of the 223 patent?
22         A.    Not that I recall.
23               But, you know, before I give that specific
24    answer, can you define "involved"?  Were there
25    conversations?  I'm sure there were conversations,
```

1    but I'm the only one that dealt with Jeffrey Cooper

2    Rounds.   I don't want to be misleading or not answer

3    you thoroughly.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 25

```
 1
 2
 3        Q.    Thank you.  So what I'm trying to
 4   understand is, was Rare Breed created with the idea
 5   that it would acquire the 223 patent?
 6        A.    Rare Breed was created to specifically
 7   enter this space and sell a trigger.  I don't --
 8
 9
10        Q.    Is it fair to understand that ███████
█   ████████████████████████████████████ all decided
12   that this was a business venture that the ████ of
13   you wanted to get into?
14        A.    It did begin that way, yes.
15        Q.    You said that Wolf Tactical was paid
16   ██████ for the 223 patent.  Was it -- is it
17   entitled to any other payments of any kind?  Any
18   royalties, or anything like that?
19        A.    No.
20        Q.    Who is the current owner of the 223
21   patent?
22        A.    ABC IP.
23        Q.    And that's the other plaintiff in this
24   matter, correct?
25        A.    It is.
```

1

2

3

4

5      Q.   Can you explain to us how ABC became the

6   owner of the 223 patent?

7      A.   The patent was transferred to ABC IP from

8   Rare Breed.

9      Q.   Who are the owners of ABC?

10          THE WITNESS:  Glenn?

11          MR. BELLAMY:  Well, I want to interject an

12      objection.

13          My issue here is the relevance of this to

14      the issues at hand of the preliminary

15      injunction motion.

16          ABC is a plaintiff.  As an LLC entity,

17      it's owner of the patent.  It's not -- on

18      selling the trigger, Rare Breed is -- can you

19      explain to me the relevance of the ownership of

20      ABC to the issues at hand?

21          MR. JOHNSON:  So, among other things,

22      there is an assertion in the declaration about

23      the Rare Trigger ABC business plan, so I'm

24      entitled to understand who was involved with

25      ABC, who runs ABC, who negotiated the purchase,

1     ███ ████████████████████

   █ ██████████████████████████████

   █ ██████████████

   █   ███ ████████████████████

   █ ██████████████████████

6       A.   We do not require dealers to sell at any

7   specific price.   We cannot -- we cannot dictate

8   that, and we have not pushed out, like, a paper --

9   actual official agreement on MAP pricing either, but

10   we, once again, did not have an official MAP price

11   agreement with BDU either.

12        It was, you know, a verbal understanding.

13       Q.   The dealers to which Rare Breed now sells

14   triggers, are those all independent, arm's length

15   relationships?   Rare Breed doesn't have any interest

16   in any of those dealers, does it?

17       A.   No.

18       Q.   Is Rare Breed -- let me take a step back.

19   I will tell you that I have gone to your website

20   several times in the past couple of weeks.   I've

21   clicked the "buy now" button and every time I do

22   that the "sold out" screen comes up.

23        Do you know if Rare Breed has sold any

24   triggers from its website in, say, the last 14 days?

25       A.   Of course we have.

1       Q.   And what do you base that on?

2       A.   I mean, what do you mean what do I base

3 that on?

4       Q.   How do you know that?

5       A.   I can tell you with 100 percent certainty

6 we have sold triggers on many days in the last 14

7 days.

8       Q.   So the fact that the "sold out" button --

9 "sold out" screen shows up doesn't necessarily mean

10 that Rare Breed is generally out of inventory.  It

11 just means at that moment it's out of inventory; is

12 that right?

13       A.   Right.

14       So if we listed triggers for sale at 8:00

15 a.m eastern, and they sold out in an hour, and you

16 checked at 9:05 eastern, it's going to say "sold

17 out."  We do not take back orders.  We don't sell a

18 product that we don't have ready to ship.

19       ███   ██████████████████████████

██████████████████████████████████████

██████████████████████████████

██      ████████████████████████████

███████████████████████████████████

███████████████████████████████

████████████████████████████████



Page 109

1

BY MR. JOHNSON:

Q.   Mr. Demonico, I think I know the answer to this question, and if I have asked it before, please forgive me, but you are selling directly off your

1    website every day since September 1st of 2021?

2         A.   No, we don't sell every single day.  No.

3              I mean, there's these -- I mean, people

4    take days off.  We have holidays.  There are

5    weekends.  No, we don't sell every day.  We sell

6    almost every day.

7         Q.   But -- I appreciate that clarification.

8    Does Rare Breed maintain its sales figures in some

9    sort of computer database?

10        A.   Of course we do.

11        Q.   And who controls that database?

12        A.   Me.

13        Q.   Do you know if -- and, I'm sorry.  Is

14   information maintained on a daily basis for sales?

15        A.   It is.

16        Q.   Do you know if Rare Breed sold any

17   triggers today?

18        A.   I don't know.  I've been on the phone with

19   you since 8:00 a.m, so prior to opening of business,

20   so I have not looked at or reviewed that information

21   today.

22        Q.   Would that be available at a break?

23        A.   It would be.

24

25

Page 112

1

2

3

4

5

6

7

8

9

10        Q.    Good afternoon, Mr. Demonico.  Prior to us

11    going back on the record, Mr. Bellamy advised me

12    that you have some additional information, things

13    you are now able to testify about, and the first of

14    those I wanted to ask you about was the royalty

15    between Rare Breed and ABC.

16        A.    ████████████████████████████████

    ██████████████████████████████████████████████

    ████████████████████████████████████████████

19        Q.    So, to be clear, that is a payment from

20    Rare Breed to ABC for each unit sold; is that right?

21        A.    That is a licensing fee for each unit

22    sold.

23        ██   ████████████████████████████████████

    ████████████████████████████████████████

    ██   ██   ███████████████████████████████

Page 113

1 ███████████████████████████████

███████████████████████████████████

███████████

    ███  ████████████████

    ████  ████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████

    ████  █████████████████████

██  ████  ████████

11          Q.   How was the royalty between Rare Breed and

12   ABC calculated or negotiated?

13          A.   I can't answer that question.  I don't

14   know.  It was math involved and it was definitely a

15   drawn-out process.  I could research that and get

16   back to you.

17               I'm not trying to avoid answering that.  I

18   just don't -- I don't remember how we came to that

19   figure.

20          Q.   Do you recall if Rare Breed thought it was

21   a fair royalty?

22          A.   I don't -- I don't remember having that

23   thought one way or the other.

24          Q.   Do you know if ABC thought it was a fair

25   royalty?

Page 148

1   is rumored to be coming to the market, which is -- I
2   believe it is called the Star Fire.  The Graves Star
3   Fire.  It's not on the market as of now.
4           And then there is the -- it's tough.
5   Like, I would also mention the 3MR, but the 3MR is
6   not -- like, it is partially reset.  It is not reset
7   the same way that ours is.  It has its own patents
8   on its technology and it is different than the
9   patent that we use in our technology.
10      Q.   When you said the Graves Star Fire, is
11  this Mr. Graves?  Thomas Allen Graves?
12      A.   That is.
13      Q.   And has Rare Breed sent Mr. Graves a cease
14  and desist letter with respect to the Star Fire
15  trigger?
16      A.   I have.
17      Q.   And what is the nature of that cease and
18  desist letter?
19      A.   That it uses our patent.  It would
20  infringe on our patent.
21      Q.   Has Rare Breed sent any other cease and
22  desist letters to any other third party about any
23  potential threatened or alleged actual infringement?
24      A.   Yes, I have sent a cease and desist to
25  GunBroker.  There are numerous companies reselling

1   the WOT on GunBroker, and I've sent GunBroker a

2   cease and desist in regards to all of those

3   companies selling WOTs on GunBroker.

4       Q.    Any other cease and desist letters?

5       A.    Well, I can tell you I would have used

6   counsel to do it, and before I give you an absolute

7   "no," I'd like to refer to counsel and say have we

8   sent any other ones that you can remember that I am

9   not remembering?

10          MR. BELLAMY:  I can remind you that I

11       believe we sent a letter to who we believed to

12       be the prospective manufacturer for Graves.

13          THE WITNESS:  That is correct.  I am

14       sorry.  Thank you for reminding me.

15          His name is ████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████

    ████████████████████████

19

20

21

22

23

24       Q.    We've been talking about triggers that

25   allow the AR-15 to shoot more quickly than with the