1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        : 23-CV-369(NRM)
                                 :
                                 :
                                 :
       -against-                 : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 :
RARE BREED TRIGGERS, LLC, ET     : Tuesday, January 24, 2023
AL.,                             : 2:30 p.m.
                                 :
       Defendants.               :
                                 :

- - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR EX PARTE HEARING
BEFORE THE HONORABLE NINA R. MORRISON
UNITED STATES DISTRICT COURT JUDGE


A P P E A R A N C E S :


For the Government: BREON S. PEACE, U.S. ATTORNEY
                    EASTERN DISTRICT OF NEW YORK
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                    BY:  MICHAEL BLUME
                         JOSEPH A. MARUTOLLO
                         Assistant United States Attorney




Court Reporter:     LINDA A. MARINO, OFFICIAL COURT REPORTER
                    225 Cadman Plaza East/Brooklyn, NY 11201
                    lindacsr@aol.com



Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

Proceedings                                        2

1        THE COURTROOM DEPUTY:  Civil cause for an ex parte

2   hearing for Case No. 23-CV-369, USA v. Rare Breed Triggers,

3   LLC, et al.

4        Will the Government state their appearance for the

5   record.

6        MR. BLUME:  Good afternoon, your Honor.  My name is

7   Michael Blume for the United States.

8        MR. MARUTOLLO:  Good afternoon, your Honor.  Joseph

9   Marutollo, Assistant United States Attorney, for the United

10  States.

11       THE COURT:  Good afternoon, gentlemen.  Be seated.

12       We are here for an ex parte hearing in this case.  I

13  note that it's a closed courtroom, although there are some

14  additional individuals in the gallery who I believe are

15  representatives of the Government as well as one of my law

16  student interns.

17       MR. BLUME:  That's correct.

18       THE COURT:  Thank you.  So, I've reviewed your

19  application for a temporary restraining order and an order to

20  show cause as well as your accompanying submissions that are

21  related both to the TRO request as well as your request for a

22  preliminary injunction.  I have some clarifying questions for

23  you on a number of matters.

24       So, first question I have for you is I understand

25  from your submissions that the Defendants are still actively

1  marketing these devices, the FRT-15s to their prospective

2  customers, as well as the allegation in your complaint that

3  many of these devices are being resold by third parties to

4  other individuals.

5          But it's also my understanding, and this came later

6  in your submission, that the FRT-15 is not currently for sale

7  on the Defendants' website as of today, either on the website

8  or through any other place the Defendants control; is that

9  correct?

10          MR. BLUME:  Yes, your Honor, it's our understanding

11  that they're out of stock.  You can still purchase an FRT-15.

12  You would have to go through -- and, in fact, we've purchased

13  them recently -- you would have to go through a third-party

14  dealer.  That's correct.

15          Now, they will take -- by "they" I mean Rare Breed

16  Triggers, on their website, they will put you on a mailing

17  list, or waiting list is a better way to put it, so that as

18  soon as they get stock they will provide it to you.

19          THE COURT:  So that as of today -- you can be

20  seated.  Just speak into the microphone.

21          MR. BLUME:  Okay.

22          THE COURT:  As of today, of course, if I granted

23  your request for a TRO, it would be in effect for at most 14

24  days, potentially less, the only individuals to whom it's

25  directed don't actually have the ability to sell the weapons

Proceedings                                          4

1   right now.  I realize that could change if they get it back in

2   stock tomorrow or next week, but I wanted to clarify that

3   fact.

4           MR. BLUME:  Yes, that is our understanding.

5           There is one other fact.  They continue to actively,

6   as we understand it, try to get additional product, whether

7   through looking for an additional manufacturer or -- I'll stop

8   there, but the short answer to your question is that's

9   correct.

10          THE COURT:  And I did see, because I looked at this

11  section of the website that you had directed me to, that they

12  are still taking names for people who want to buy it, they

13  could get them in stock tomorrow and get additional product,

14  and the people on their waiting list can get shipments as

15  early as this week.

16          MR. BLUME:  Yes.

17          THE COURT:  So, it looks from your submission as

18  though at this time the FRT-15 is the Defendants' only product

19  that they're selling.  So, if I were to grant your request for

20  an ex parte TRO, am I right that it would effectively shut

21  down their business all together?

22          I'm not saying that's outside the scope of the *Fraud*

23  *Injunction Act* or what I can do, but I just want to clarify

24  what the potential impact is.

25          MR. BLUME:  Our understanding is that this is the

Proceedings                                                     5

1   only product that they sell.  Currently.  I'll qualify that

2   with a "currently."  That is our understanding.

3           THE COURT:  Thank you.  So, my next question is

4   about what I can legally consider in terms of the scope of the

5   potential harm, particularly the immediate harm.

6           So, obviously, as is very clear in your papers,

7   you're bringing this case under Section 1345, the *Fraud*

8   *Injunction Act*, which is, of course, a civil statute.  But you

9   begin your complaint by talking about not fraud but really

10  the, as you cite, the plague of injuries from gun violence and

11  particularly from semiautomatic weapons, which are by and

12  large legal in some cases, but the additional potential harm

13  that could happen if these devices that, as you allege,

14  transform an AR-15 into a machine gun are on the market.

15          I'm not in any way disputing that these are

16  legitimate public safety concerns and they go to what the *NFA*

17  and *Gun Control Act* are designed to regulate and also what the

18  ATF is empowered to regulate.  I just wasn't sure, and I'd

19  love you to address that, whether I can consider that as a

20  particular harm since the *Fraud Injunction Act* is really

21  enjoining the fraud.

22          And I think to be more specific, whether I can

23  consider the threat of additional deaths or injuries that

24  might result from the sale, as opposed to the specific harm,

25  and it's still potentially a harm, to consumers who purchase

Proceedings                                    6

1  the weapons under what you allege are false pretenses because

2  that seems to be the harm, the latter, that the *Fraud*

3  *Injunction Act* is designed to address.

4        MR. BLUME:  Well, consider that both in our -- the

5  *Fraud Injunction Act* covers a number of predicates.  Included

6  among them, of course, as you identified, are fraud statutes.

7        In addition, one of the predicates is the straight

8  conspiracy statute, 371, but only the Klein conspiracy part of

9  it.  That covers interference with government operations,

10  which here -- I hope we got across which here we believe

11  includes protecting the public from the harms that are caused

12  by or could be caused by this product.

13        The ATF can't track these.  They can't follow where

14  these are going.  That is part of their mission.  And that, we

15  believe, and that is what we're presenting to you, we believe

16  that is part of what the Defendants are impeding.  And that

17  too is covered by 1345, although I recognize it's in the fraud

18  title --fraud --

19        THE COURT:  Chapter.

20        MR. BLUME:  In the fraud chapter, it's called the

21  *Anti-Fraud Injunction Act*, but it does cover this.  And it

22  specifically covers the ability of the Government really to do

23  its job.  And here, the relevant government agency is ATF, and

24  part of the job is to keep people safe.

25        So, yes, we believe you can consider that.

Proceedings                                              7

1        THE COURT:  Do you have any cases or authority in

2   which a Court has actually considered a nonconsumer,

3   nonpurchaser harm, particularly in the public safety realm

4   under the *Fraud Injunction Act*?

5        Because I didn't look specifically, but I didn't see

6   one in your papers.  And it seems as though typically, the

7   protective groups are victims of telemarketing schemes, bank

8   fraud, that sort of thing.

9        MR. BLUME:  I don't have anything to present to you

10  today.  I know you're taxing my memory a bit, but I am certain

11  that we looked at for the very reason you are suggesting.  And

12  if we had something like that, we would present it.

13       Perhaps this goes without saying, it's still covered

14  under the statute.  Even if it hasn't been considered before,

15  we think it's fully within the scope of what the statute is

16  trying to address.

17       THE COURT:  Okay.  So, I have some more questions

18  for you, but let me just tell you at the outset kind of where

19  I'm leaning on this request.

20       So, I think your complaint and all the supporting

21  materials, which I reviewed very closely, make a strong case

22  that Defendants have violated and are continuing to violate

23  each of the fraud statutes and the conspiracy statutes that

24  you cite, both involving the lawful functions of ATF and

25  related agencies as well as the deceit or fraud that they seem

1   to be perpetrating from the allegations you submitted, which,

2   of course, they haven't responded to yet, on individuals.

3          I think that I had some questions about whether the

4   probable cause standard or the preponderance standard applies

5   either with respect to your TRO request or your motion for

6   preliminary injunction.  I think either way, based on what is

7   currently an unrebutted, albeit ex parte, record, you seem to

8   meet it.

9          And there are specific instances of the Defendants'

10  conduct you set forth, the most important of which seem to me

11  to be those that occurred after ATF publicly classified the

12  FRT-15 as a machine gun back in July of 2021 and gave the

13  Defendants notice via a cease and desist letter that same

14  month that this was an illegal product, essentially.

15         And I think among those facts, the Defendants

16  stating on their website that the device is, quote,

17  "absolutely not," unquote, a machine gun, Defendant DeMonico's

18  conduct in removing materials from the 3rd Gen facility which

19  he knew were subject to seizure, as well as the Defendants'

20  statements that the ATF has no authority to address any FRTs

21  currently in circulation.

22         And though I may want a bit of information on this,

23  I think the points you raise regarding their corporate

24  structure and governance during that time period, which,

25  combined with their alleged failure to pay taxes, seem to

1  raise a very strong inference and in my mind most likely a

2  preponderance of a Section 371 conspiracy due to fraud as well

3  as violations of the other statutes.

4          On the other hand, a TRO is, as you know, an

5  extraordinary remedy, to be granted ex parte only when in the

6  absence of a TRO immediate and irreparable harm will occur.  I

7  am aware of the District Court case law in this Circuit that

8  says that irreparable harm is presumed when the statutory

9  criteria under Section 1345 are satisfied.  I do think that

10 you've pled facts that suggest the Defendants have defrauded

11 both their prospective customers and are engaged in a

12 conspiracy to defraud the U.S. and, as I said, obstruct the

13 ATF's lawful functions.

14         But the real purpose of the *Fraud Injunction Act* is

15 to enjoin the ongoing frauds.  And even though there are still

16 these statements on their website, since no customer can as of

17 today be misled into immediately purchasing an FRT-15 from

18 them, I'm concerned that a TRO may not be necessary or

19 appropriate at this stage given that this is an ex parte

20 proceeding.  At most, it would be in effect for 14 days, maybe

21 less.  And I think I would have the discretion to grant it,

22 but this seems to warrant caution given the extraordinary

23 nature of the ex parte relief and the fact that these aren't

24 for sale right now.

25         I do note at least one of my colleagues,

Proceedings                                    10

1   Judge Komitee, in a case a couple of years ago in a different

2   1345 case declined initially to enter the Government's TRO as

3   written until the Defendants had been served.  That was in the

4   case *U.S. v. Palumbo*, 448 F. Supp. 3d 257, from 2020.  And

5   there, Judge Komitee declined to enter the TRO without notice

6   but took it up again very soon thereafter, after the

7   Defendants were served, and there was a more limited TRO he

8   entered with the consent of both parties.

9           I'm not anticipating, given the history, there would

10  necessarily be consent, but at this point I'd be more

11  comfortable entering injunctive relief after they've at least

12  been noticed and heard.  And I would be inclined to direct you

13  to serve them and schedule a very prompt PI hearing.  And we

14  could even have an initial status on video kind of to get a

15  sense of where things are.  In the meantime, if the Defendants

16  start to sell this device again in the way you describe, you

17  can renew your request, and this would, of course, be without

18  prejudice to renew.

19          So, I'd like to hear from you as to what you think

20  of that potential outcome.  I know it's not all that you are

21  seeking, but if you have any objections or things you think I

22  haven't considered.

23          MR. BLUME:  Well, give me a moment.  I have a few

24  thoughts that I'd like to share.

25          First, the product is -- Defendants are actively

1   seeking to get the product.  We don't know right now what

2   access they have to inventory.  And given their history, we

3   fear that should they get ahold of anything, they're going to

4   get rid of it.

5           We also have some --

6           THE COURT:  You feel they'll get rid of it.

7           MR. BLUME:  They'll sell it as soon as they get it.

8           We have some concerns about their maintaining

9   records, especially given what they have done in the past.

10  Many of the things that you have already identified that we

11  note in our papers, their corporate structure which implies

12  certain things, their taking materials from 3rd Gen that were

13  subject to seizure, those are things that we would have some

14  concerns about that prior to some Court order, that we would

15  lose the ability to ensure that they're still going to be

16  there, and in particular tracking some of the sales of the

17  products to people.  We don't know where these products are

18  going.

19          I recognize that the -- what I'm about to say

20  doesn't address their sales, but you can easily purchase this

21  product online from many, many dealers.  And we've had a

22  shipment come in as recently as this past Friday.  This, I

23  recognize, is not directly addressing Defendants, but it

24  certainly could be directed to the world, the larger consumer

25  base, that these are a problem, don't buy them.

1        And if nothing else, it will -- that kind of signal,

2    and I recognize it will be short lived and not definitive

3    Court order, the Court order as to the classification of this

4    product, it would go along way towards signaling to the

5    consuming public that the classification -- the ATF

6    classification is important, you have to heed it, you don't

7    just listen to what the Defendants say on their website about

8    whether this is legal or not legal.  That kind of thing sends

9    an important message.

10        Now, if there are -- if you would also consider

11    other aspects of the TRO that -- put aside whether stopping

12    the sale, which, by the way we don't agree with, but put that

13    aside for a moment.

14        THE COURT:  Meaning that you think something is

15    necessary to stop the sale because they could get back in

16    stock tomorrow.

17        MR. BLUME:  Yes.

18        Not conceding that point, you could also, and I

19    suggest that if you don't want to do that, we'd like you to

20    very much consider requiring that they hold on to records.

21    Perhaps, although it's not written in our proposed order,

22    perhaps having something on their website where they can't

23    take any more orders or maintain their mailing list anymore.

24    Something that will at least recognize if your concern is you

25    don't have products right now, so, therefore, the Court

1   doesn't have the authority to stop the sale, there are things

2   that you are still doing that we can stop and all within I

3   think the fair rubric of the statute.

4           One moment.

5           THE COURT:  Sure, take a moment.

6           MR. BLUME:  So, although --

7           THE COURT:  Not taking any more orders is in essence

8   enjoining the sale, but what are you thinking that's short of.

9           MR. BLUME:  Even maintaining a mailing list.

10          Anything short of that?  They're maintaining a

11  waiting list.  I don't know why they would -- that's an

12  ongoing marketing and sale product.

13          THE COURT:  I would have, I think, greater First

14  Amendment concerns about telling them what lists they can or

15  can't maintain or what information they can or can't possess

16  or share, even if they just want to send a blast to everyone

17  saying:  We disagree with this judge's order, but right now we

18  can't sell to you.

19          It does seem that if I were to agree with the thrust

20  of the argument you're making now the more straightforward and

21  less problematic approach would be to do what you originally

22  asked, which is to enjoin the sale.  But I guess my question

23  is short of that, with regard to the records, are there things

24  that would stop the harm in the short term?

25          I think with respect to the records, under the

1  Federal Rules, once they're served with your motion for

2  preliminary injunction, they're barred from destroying records

3  that relate to the subject matter of the litigation.  There's

4  also some criminal statutes that -- I don't see any reason why

5  if I scheduled an order to show cause hearing on your motion

6  for preliminary injunction I couldn't include in the order

7  that they are barred from destroying any records, electronic

8  or otherwise, of past or prospective customers, people on the

9  wait list, anything related to.

10         And we could look at the language you propose and

11  see if there's anything else that needs to be included, both

12  under the applicable criminal statutes and under the Federal

13  Rules.

14         But keep going.  I wanted to...

15         MR. BLUME:  I agree that the cleaner way of

16  addressing that is to stop the sales.  That's why, of course,

17  we suggest that you do that.  Perhaps it goes to the point you

18  were making earlier, which is if, in fact, they don't have any

19  sales and if there is a balance of the harm.  It seems to me

20  there isn't any harm on their end at this point.

21         And we are prepared to move as quickly as the Court

22  asks us to.  Folks can serve -- in fact, they're waiting to

23  serve the Defendants.  There's folks in place that can do

24  that, so we can get that done quickly.  I can't promise you

25  this afternoon, but it will happen fairly quickly.

 1          THE COURT:  Okay.

 2          MR. BLUME:  And our office is prepared to move

 3     forward on any schedule that you suggest.

 4          THE COURT:  All right.

 5          MR. BLUME:  Can you bear with me one second?

 6          THE COURT:  Absolutely, take your time.

 7          MR. BLUME:  Thank you for indulging us.

 8          (Pause in proceedings.)

 9          MR. BLUME:  If I may, a few things my colleague

10     shared that I'd like to share.

11          One is that it's our understanding -- I recognize

12     this is not in the declaration.  If we need the agent to

13     testify to that, that's fine.  His understanding of the way

14     the wait list works is that if you are a prior purchaser, you

15     will be notified separately.  So, although we see the

16     public-facing website, we are not sure whether they have some

17     inventory that they are selling that we're not seeing.  That's

18     possible.

19          THE COURT:  How does the order in which they sell

20     the product that they obtain in any way change what's on the

21     website?

22          Meaning they might have a private stash or inventory

23     that they're notifying individuals on?

24          MR. BLUME:  Exactly.

25          They may have -- imagine I'm a prior purchaser.  I

Proceedings                                                16

1    go on the site today or, better yet, I went on the site last

2    week.  I get on the mailing list.  It turns out, I'm a prior

3    purchaser.  They grab it, they have inventory, they notify me

4    immediately, and I purchase it, which we wouldn't necessarily

5    see on the public-facing website.  There would be some sort of

6    communication on the side.  That's our understanding.

7            So, we are not -- best as we can tell the website

8    says they are out of stock, but it's possible that there are

9    purchases happening that we don't know about.

10           There is an ongoing -- we would --

11           THE COURT:  Let me just say on that front, I think

12   it's possible and hard to know how likely it is, but given

13   that they are eagerly taking customers for the wait list and

14   promising folks that they will sell them as soon as they get

15   them in stock, if they had a separate supply that they were

16   separately selling, hard to see what their incentive would be

17   not to tell their customers that, but I agree with you, you

18   can't rule out that possibility if, indeed, there is some

19   information that they are selling it through another channel.

20           MR. BLUME:  Their history -- well, it would be the

21   same channel, it's just that we wouldn't necessarily see it so

22   quickly.

23           Their history is to sell until they run out of

24   inventory, put that out-of-stock on, and put it up again.  It

25   may happen in a way that's quicker.

1           THE COURT:  Right.

2           MR. BLUME:  We also want to highlight again the

3    ongoing obligation that we believe the company has both to

4    register all of the sales, to pay the taxes for all of the

5    sales, none of which is happening.  That is a continuing

6    violation and it's ongoing.  That obligation hasn't gone away.

7           THE COURT:  And is the concern with irreparable harm

8    even within a few days that those, because they are

9    essentially selling these on the black market and not paying

10   taxes and not recording the sales, or reporting them I should

11   say, to the Government that you may never learn if they're not

12   enjoined who they sold it to and, therefore, be able to give

13   those individuals an opportunity to divest or collect the

14   taxes?

15          I mean presumably, if in a week I were to hold a

16   hearing and direct them to turn over those records as part of

17   some expedited discovery, if they had just sent a package

18   today to a prospective customer you would be able to get those

19   records.

20          MR. BLUME:  It's a fair point.  We're really talking

21   about the ongoing nature of what they're doing and that is

22   their failure to pay and register and so forth.  Yes, post

23   hoc.  We can't disagree with what you suggest.

24          We do note a few things about Judge Komitee's case,

25   the *Palumbo* case.  It was ultimately a telemarketing fraud

Proceedings                                            18

1   case.  The company, as we recall it, the judge had some

2   concerns because the company itself may have been operating

3   both legally and illegally.  It wasn't just one -- a business

4   that all they did was engage in something illegal.  I believe

5   he may have had some concerns about the fact of shutting down

6   a business that, one, was partly operating legally, and had a

7   number of employees.

8           We don't believe that's true here, meaning to the

9   extent that there are employees there are very few, if any,

10  and they are either actively involved or in -- in what's

11  happening, these aren't -- I don't want to go too far in

12  characterizing defendants, the folks we have not named as

13  defendants, but it's a very small operation.

14          THE COURT:  And if they're not selling anything

15  currently anyway, their salaries are being paid whether the

16  sales are happening or not.  So, issuing an order tomorrow

17  doesn't put a lot of telemarketers or their device-selling

18  equivalents out of work because their business, what they're

19  currently employing people to do is take names for a list,

20  whatever else they're doing.

21          I don't think I could stop them from collecting

22  names of interested customers as long as those records are

23  maintained, but I hear your point that the impact on the

24  employees is not the same.

25          MR. BLUME:  And, finally, it's just the nature of

*Linda A. Marino, Official Court Reporter*

Proceedings                                    19

1   the product.  We do consumer fraud all the time.  It's very

2   important.  We don't like people having money stolen.  But

3   these are machine guns.  And we have an ongoing and real

4   concern about any single one of these ending up in the wrong

5   hands.  That's a fear we all have.

6           And that product makes it slightly -- not slightly,

7   it makes it, we think, significantly and materially different

8   from a telemarketing fraud kind of operation, and we do think

9   that should be considered.

10          THE COURT:  Okay.  Thank you.

11          Let me then ask you some additional questions about

12  some of the facts and the arguments that you raise in the

13  papers.

14          So Rule 65, both with respect to a TRO and a PI,

15  requires the injunction must be stated with specificity.  And

16  there's a fair amount of case law in the Circuit that

17  discourages district judges like me from entering injunctions

18  that simply order a defendant to obey the law on the grounds

19  that they're unconstitutionally vague, don't put them on

20  notice of what's prohibited.

21          I understand the portions of your proposed TRO,

22  points six and seven, that are more specifically directed to

23  acts, but I am concerned that points one through five, at

24  pages two and three of your proposed order, that simply direct

25  them not to commit these acts are both superfluous and

*Linda A. Marino, Official Court Reporter*

Proceedings                                    20

1   potentially unlawful.

2          So, how strongly do you feel about including those?

3          And is there a way to convey the message or the

4   prohibition I should say that you seek to convey just

5   including the latter two points or through some other means?

6          Feel free to take a moment to look at those.

7          MR. BLUME:  I know exactly the relief you're

8   referring to and I'm looking more at the findings.

9          THE COURT:  Right.

10         MR. BLUME:  And if you were inclined not to have, as

11  you put it, and I understand your concern, an obey-the-law

12  injunction, that there could be more specificity in the

13  findings, that instead of -- it could be mentions of facts in

14  the findings or -- yes, specific facts, I suppose, would be

15  the way to do it.

16         THE COURT:  So, I think we covered some of this

17  already, but I do think that under Rule 37(e) of the Civil

18  Procedure rules parties have to preserve electronically-stored

19  information that they reasonably should know should be

20  preserved in the anticipation of litigation.  And certainly

21  now that you've filed your complaint, litigation has begun.

22         There's also 18 U.S.C. Section 1519 which prohibits

23  the destruction of evidence if the party knows or has reason

24  to know that they may be the subject of a federal criminal

25  investigation, which I don't think is disputed here given the

Proceedings                               21

1   history with them and ATF.

2            But do you think there's sufficient notice to them

3   that they may be the subject of criminal proceedings?

4            MR. BLUME:  I don't know that there's been anything

5   specific.  I think it would be -- I frankly don't know all the

6   elements of the statute that you cite, so I'm not sure what

7   kind of notice they need.  But at the moment, it would seem to

8   me that if all they're served is our papers, it's in the

9   criminal titles, there are criminal penalties that we talk

10  about, they have been served with one cease and desist and one

11  follow-up letter which essentially says these are criminal

12  penalties.

13           THE COURT:  Right.  In the cease and desist letter

14  from way back in 2021, you said that essentially you're

15  breaking the law, the federal criminal law, by violating the

16  *National Firearms Act* and the *Gun Safety Act* that prohibits

17  the sale of these devices because of how ATF has classified

18  them.

19           MR. BLUME:  Perhaps I'm anticipating a question you

20  haven't asked me.

21           THE COURT:  Go ahead.

22           MR. BLUME:  They have shown so far little regard for

23  general principals of law.  By that I mean they clearly

24  understand that the ATF has said something, and they're

25  ignoring it; more than ignoring it, they're actually impeding

Proceedings                                22

1   it.   Their manufacturing company 3rd Gen was searched.   You

2   need a court order for that and you need probable cause that

3   there's a crime being committed, among other things.   And

4   still they have interfered with that.

5          So, the notion that they would comply with the sort

6   of general rules of discovery, requirements of discovery, we

7   have concerns about.   And they have shown that they haven't

8   done it in other similar context.   So, a court order we think

9   would be both justified and more likely to be complied with.

10         THE COURT:   Having reviewed the record, I understand

11   the basis for that concern.

12         All right.   So, let me ask you a question about the

13   core of the injunctive relief you're asking for.   This is your

14   point six, barring them from engaging in the sales.

15         You know, if you read Section 1345 literally, it

16   limits my authority to enjoin fraud specifically.   I realize

17   there's the conduct that is impeding the lawful government

18   function, but I am wondering, and there may be an answer to

19   this, that if the Defendants removed the allegedly misleading

20   statements from their website and their marking materials but

21   sold the product anyway, if somebody just called them up and

22   said, hey, I hear from one of the blogs I'm on or newsletters

23   I'm on that you're selling this RFT-15 and the Defendant

24   filled the order without marketing it in the way that had

25   these deceptive statements about it's legal, the ATF has no

Proceedings                                                    23

1   authority, it's perfectly fine, it's not a machine gun, but

2   simply placed the order, they might be in violation of the

3   criminal law, but why are they committing fraud?

4          MR. BLUME:  At that point, let's assume for

5   argument's sake they're not committing mail or wire fraud.

6   They are still not complying with any number of requirements

7   under the *National Firearms Act* and *Gun Control Act*, which

8   include, among other things, registering all these products,

9   registering the transfer of the products, putting serial

10  numbers on the products, paying taxes for the products, all of

11  those things that go towards not just revenue for the

12  government but really the safety aspect of this.

13         THE COURT:  I don't dispute that at all.

14         I guess the question is and it may just be that

15  there is some implicit or direct fraud in selling a product

16  that they have been specifically advised by the applicable

17  government agency is illegal to sell or a way in which the

18  actual sale is impeding the lawful function of the ATF because

19  it prevents the ATF and the IRS from doing its job do to both

20  track, regulate, and tax these items.

21         I just want to have you crystallize for me a little

22  bit why enjoining the sale per se rather than simply enjoining

23  the statements, the deceptive mailing, that sort of thing,

24  actually is covered by the statute.

25         MR. BLUME:  Let me start by saying I think the

Proceedings                                        24

1    statute is -- the language of 1345 is somewhat broad in

2    allowing for the Court to -- actually, I have it here.

3           It allows for any restraining order or prohibition

4    to prevent the continuing substantial injury to the United

5    States.  And that is broad language and Courts have used that

6    in a number of contexts to enter admittedly perhaps broad

7    injunctions.

8           And the injury here is beyond just fraud to

9    consumers, which we believe exists, and to the ATF.  These are

10   products that have been, specifically in our view,

11   specifically banned for anybody other than somebody in the

12   military or for local or federal law enforcement.  In our

13   view, this is -- in their records it's a trigger, but it's a

14   machine gun.  And you're not allowed to have it and let alone

15   sell it.

16          And for us, 1345 allows it.  That's an injury, to

17   have these products out there in the world.

18          THE COURT:  I would think within a little closer --

19   I hear you on that point, but even closer to the letter of the

20   statute is that each product that's in circulation without

21   your knowledge and done in a fashion that is illegal and not

22   reported to the government prevents the government from

23   contacting those individuals and providing them with an

24   opportunity to legally divest from them is one opportunity.

25          MR. BLUME:  Thank you, yes.

Proceedings                                          25

1      THE COURT:  So, the actual sale is, one, harm, but

2   more closely hued to the purpose of the fraud statute.

3          And I thought one thing that was quite compelling in

4   your papers, both as to the venue of the Eastern District as

5   well as to the overall harm from Defendants' fraud, was the

6   evidence you presented that individuals in New York and

7   elsewhere, when properly notified of the prohibition on these

8   items the ATF's classification of them, had voluntarily

9   availed themselves of the opportunity to divest because they

10  did not want to be in the possession of an illegal weapon,

11  many lawful gun owners have reason to be quite concerned about

12  that out of fear that if they commit a crime by possessing an

13  illegal weapon they might lose their right to possess a legal

14  one because those who commit firearm-related offenses can

15  lawfully have their Second Amendment rights restricted.

16         So, in some ways falsely marketing these illegal

17  products to those who want to purchase them under false

18  pretenses can actually harm the rights of those who are

19  seeking to possess weapons in compliance with the law.

20         Is that a fair statement?

21      MR. BLUME:  Yes.  Thank you.  We'll leave it at

22  that.  Thank you, your Honor.

23      THE COURT:  Let me ask you a little bit more about

24  this question of the standard of review under Section 1345.

25  Really, the standard of proof that I alluded to earlier.

Proceedings                                          26

1              So, you cited a few District Court cases that

2    suggest that all you need to demonstrate is probable cause.

3    But I haven't found any Second Circuit or Supreme Court case

4    law to support that proposition.  Most of the cases that we've

5    seen -- well, most of the cases in the civil context suggest

6    that both a TRO and a preliminary injunction should be granted

7    when a Court is satisfied by a preponderance of the evidence

8    that the government's met its burden.  And I think in the 1345

9    context, in the *Legro* case from the Fifth Circuit, 2008, that

10   you cited, it seems that that Court sort of set forth why this

11   is at best an open question.

12             So, what is the principal reason for why a probable

13   cause standard should apply in this context?

14             MR. BLUME:  It was Congressional intent.  The

15   legislative history of 1345 is laid out fairly well in one of

16   the cases we cite, but I'll give you the short of it.

17             1345 is actually a follow-on to an earlier statute

18   that allowed the Postal Service itself to stop the use of the

19   mails for frauds.  That statute was long held to allow them to

20   do that under a probable cause standard.

21             When 1345 was enacted back in the seventies, one of

22   the reasons --

23             THE COURT:  Sorry, what the was statute that was

24   long in effect before 1345?

25             Take a moment.

Proceedings                                27

1          MR. BLUME:  I'm pretty sure it's either

2    18 U.S.C. 3077 -- I'm sorry, your Honor, I don't have this at

3    my fingertips.

4          THE COURT:  Take a moment, that's fine.

5          MR. BLUME:  What I'll do, your Honor, perhaps after

6    the argument I can provide it to you.

7          But there was a predecessor statute, and that

8    statute had as a base the Postal Service could stop these kind

9    of frauds just under a probable cause standard.  In enacting

10   1345, Congress was trying to broaden the reach of that

11   original statute.  And given that history, given the knowledge

12   of what the standard was on the earlier statute, and the fact

13   that they wanted to expand its reach, Courts have held that it

14   must, of course, mean that Congress' intent under 1345 was to

15   allow an injunction under a probable cause standard.

16         If you think a little bit, I suppose, about the

17   reasons for the statutes in the first place, what the sort of

18   larger context of them are, they are to stop harm as quickly

19   as possible while the Government continues investigations into

20   the activity and that there's a recognition from Congress that

21   that may take some time, and in the meantime, under certain

22   circumstances, it makes good sense, good policy, sense to stop

23   the harm, whether it's the government or individuals, while

24   that investigation is going forward.

25         Beyond that, there's the recognition that the

Proceedings                                    28

1   continuing investigation means that the Government doesn't

2   have, perhaps, all of the evidence that they would otherwise

3   have access to given either time or other kind of resources.

4   So, to put the standard at the admittedly lower standard than

5   a preponderance also makes some sense as it recognizes that

6   the Government's still gathering facts about what's happening.

7            THE COURT:  All right.  I'll take a look at the

8   statute and the history.

9            There is a bit of a concern that when you combine it

10  with the presumption that in the context of fraud, there's a

11  presumption of irreparable harm without the Government having

12  to affirmatively demonstrate it combined with an even lower

13  probable cause standard, we're getting into an area of very

14  minimal standard of proof or minimal burden on the part of the

15  Government to get extraordinary ex parte relief.

16           So, let me ask you this:  Is there -- go ahead.

17           MR. BLUME:  Your Honor, I was just going to say on

18  Page 18 and 19 of our brief, we cite to the cases.  And the

19  case I think that would really -- is worth looking closely is

20  *US v. Belden*, which goes through the legislative history of

21  the statute.

22           THE COURT:  I'm sorry, I'm looking at 18 and 19 of

23  the complaint.  Is there a different --

24           MR. BLUME:  Oh, our brief, our brief.

25           THE COURT:  Yes.

Proceedings                                    29

1        MR. BLUME:  It's *United States v. Belden*, 714 F.

2   Supp. 32.

3        THE COURT:  Start from the beginning.

4        MR. BLUME:  *United States v. Belden*, B-E-L-D-E-N,

5   714 F. Supp. 42.  And it's from the Northern District of New

6   York and it goes through the legislative history.  You'll

7   probably find that I've miscited the initial statute, but it

8   should be in there.

9        THE COURT:  It's all right.

10        MR. BLUME:  And one other point to make is as far as

11   we're aware, this is the standard that's -- we have not seen

12   any other cases that says there's some other standard here,

13   that it's anything other than probable cause.

14        THE COURT:  Okay.  Thank you.

15        Are there any wrinkles to applying a preponderance

16   standard -- I take it your contention would be that you meet

17   the preponderance standard if I decide that's the one to

18   apply.

19        MR. BLUME:  Yes, we do.

20        THE COURT:  Are there any specific considerations

21   regarding application of a preponderance standard where only

22   one side has presented evidence, meaning in the ex parte

23   context?

24        That may be the reason why probable cause is the

25   standard, because that is typically one that's applied when

Proceedings                                  30

1    the Government is seeking relief from the Court in an ex parte

2    proceeding.

3              MR. BLUME:  Sure.  I suppose the concern would be we

4    don't think it's correct; that the statute itself, although it

5    doesn't specify the standard does -- conflate is the wrong

6    term, but use preliminary and temporary relief in the same

7    sense, it doesn't distinguish between the two, or permanent,

8    for that matter.  And we would have some...

9              I suppose it's an answer that applies in the broader

10   context, which is because we think it's not the right

11   standard, we certainly don't want a Court out there, someone,

12   you know, or a jurist say that if you have a decision, it's

13   probable -- a preponderance under certain circumstances.  We

14   wouldn't like that.

15             THE COURT:  Right.

16             MR. BLUME:  We do think we meet it.  But we also

17   think that the standard is probable cause.

18             THE COURT:  Let me ask you a few more factual

19   questions.

20             I did note one aspect of the history of the

21   Government's back-and-forth with Defendants about whether

22   these products are legal or not and can be sold.  If I

23   understand it correctly, some time before the Defendants began

24   to sell these devices in December of 2020, they hired some

25   private sector individuals, including one or more former ATF

Proceedings                                    31

1   agents, to give an opinion, allegedly, that their device

2   passed muster and was not a machine gun.  And then you noted

3   in your complaint that it's customary for a weapons

4   manufacturer to submit its product to ATF for approval.

5           Is that submission process required or simply

6   customary?

7           Is it something like the FDA, where before somebody

8   sells a food or drug they have to get it approved by the

9   relevant agency?

10          MR. BLUME:  No, it's not required.

11          I would perhaps give a little more color to that.

12  It is customary.  The Defendants acknowledge that, meaning

13  they in their own web publications, I guess is one way to put

14  it, they are clear that that is the custom.  They also

15  acknowledge that their customers recognize that as the normal

16  course.  But no, it isn't required.

17          It happens all the time.  It happened to the product

18  that was the predecessor to this.  So, although not required,

19  the customer base here would have expected it.

20          THE COURT:  I think whether or not it's required, I

21  understand your argument to be that even if they declined to

22  submit the product for approval to ATF, did their own private

23  classification in 2020, thereafter, in 2021, when ATF on its

24  own obtained some of these devices Defendants were selling,

25  tested it, made a determination that these were machine guns,

1    and put the Defendants on notice, whether they submitted it to

2    AFF or not, they can't just disregard ATF's determination and

3    falsely tell their customers that there's no question that

4    these are legal and ATF has no authority to classify them.

5              MR. BLUME:  That's correct.

6              THE COURT:  Let me just ask you about the mailing

7    issue and these mislabeled packages under the name Red Beard

8    Treasures, which in your papers you allege that the Defendants

9    deliberately mislabeled these packages under a false name to

10   avoid detection and conceal that they contained these FRT-15s.

11             I am aware that there are circumstances where

12   companies selling perfectly legal products might sell them on

13   their websites and then put them in the mail under a truncated

14   name, a different name, other than the name of the lawful

15   company to protect the privacy of the people they're selling

16   it to.  For example, a company selling hair regrowth products

17   might want to market them to men or women who are facing hair

18   loss and don't want everyone to know, want their neighbors to

19   know, that they're buying hair loss treatment, or certain

20   books or magazines that are perfectly legal to sell.

21             Why is RBT doing so here specifically evidence of

22   fraud or is it just an additional fact in combination with

23   everything else that is entitled to some consideration?

24             MR. BLUME:  It's our view that it's not because

25   they're concerned about their customers, that they -- at the

Proceedings                                    33

1    time that they did this, which is November and December of

2    this past year, the last few weeks, was already after several

3    cease and desist letters, the seizure at 3rd Gen, 3rd Gen's

4    decision not to continue -- as we understand, not to continue

5    to manufacture these products, and their awareness that

6    consumers, their consumers, some of them have been visited by

7    ATF or have even turned their product over.

8         In our view, they did this so that anybody who might

9    look on the package isn't going to be alerted to the fact that

10   this is an illegal product that could be seized.  Put it into

11   context, right, of the history.

12        And consider too that the e-mail that went out right

13   before these products, these particular products, were sold --

14   that was the November 22 e-mail -- talked about one of the

15   reasons -- well, in it, they mention that some of the money

16   we're going to use to challenge the ATF, we're going to use

17   some of this money to help people who have gotten product

18   taken from them.

19        So, they're telling people the ATF may come and take

20   your stuff and then they're putting the product in a box that

21   is mislabeled and, in our view, purposely mislabeled because

22   the whole -- at least as we understand it, they recognize that

23   the government knows what Rare Breed Triggers is and what's

24   being sold.  So, they're trying to protect themselves, really.

25        THE COURT:  Let me go into an area that wasn't

Proceedings                                            34

1    addressed in your brief but probably is at least back of mind

2    in any case involving an injunction or restriction on

3    possession of firearms, which is Second Amendment case law.

4             So, as the Government, of course, knows, this area

5    of the law has been subject to some significant developments

6    in recent years and there's considerable ongoing litigation in

7    this Circuit and elsewhere.  My reading of the relevant

8    precedent, particularly *Heller* and *Bruen*, is that despite

9    these recent cases, the federal government clearly retains the

10   authority to regulate or ban machine guns.

11            And indeed, in *Heller*, the Supreme Court strongly

12   implied and came pretty close to flat out stating that nothing

13   in its opinion called into question the *NFA*'s restrictions on

14   individual possession of machine guns.  And the Second Circuit

15   in the *Zaleski* case, 489 Fed. App. 474, Second Circuit, 2012,

16   cited *Heller* for that proposition that the Second Amendment

17   doesn't protect a defendant's or an individual's personal

18   possession of machine guns.

19            I haven't researched this extensively, though we did

20   do a preliminary look.

21            Is the Government aware of any case in any circuit

22   holding or suggesting that the *NFA*'s restriction on individual

23   possession of machine guns specifically is in any way a

24   violation of an individual's Second Amendment rights.

25            MR. BLUME:  No.  And we would have cited to you

Proceedings                                           35

1   *Zaleski.*

2           THE COURT:  You may not be aware of all of these,

3   but to your knowledge are there any ongoing challenges or

4   court cases pending addressing that question?

5           MR. BLUME:  About machine guns?  We're not aware of

6   any.

7           For what it's worth, your Honor, I don't want to put

8   words in the Defendants' mouths, but I don't think they would

9   suggest that -- I have not seen --

10          THE COURT:  Their position -- of course we haven't

11  heard from them directly, but they've made considerable public

12  statements and they filed at least two lawsuits challenging

13  ATF's authority to restrict their sale.  And as far as the

14  records you've provided and the public record from those

15  lawsuits, their challenge was based on the fact-based nature

16  of the classification and related conduct rather than the

17  ATF's authority to regulate or Congress' authority to ban

18  individual of machine guns generally.

19          MR. BLUME:  That's correct, and I haven't seen

20  anything in any of the websites or materials that we may not

21  have shown to you that suggest anything else.  That's correct.

22          THE COURT:  Thank you.  Let me ask you a little bit

23  about the process going forward.

24          So, there seem to be two possible paths I could take

25  here.  One is to grant the TRO by written order with some

Proceedings                                        36

1   modifications along the lines we've discussed directed

2   specifically at the sale and marketing or one or the other of

3   these FRT-15s by Defendants as well as to enjoin them from

4   destroying any records, and then set it for a hearing within

5   the next 14 days and probably sooner than that, within a week

6   or so.

7           The other possibility would be for me to deny the

8   TRO with leave to refile and then have you serve your motion

9   for preliminary injunction on them with an order from me for

10  the Defendants to enter an appearance and appear for at least

11  a preliminary conference if not full-on oral argument or an

12  evidentiary hearing on your motion for a preliminary

13  injunction.

14          Let's talk about both options and what the

15  Government thinks by way of additional evidence, witnesses,

16  argument you would need to proceed with more long-term relief

17  under either scenario.

18          And you did note in your papers something about

19  expedited discovery or additional discovery, so I'd like to

20  hear from you about the state of that record.

21          MR. BLUME:  That's really where I was going, which

22  is that for a preliminary injunction, although we would be

23  prepared to argue today on the record that we have, we would

24  like the opportunity to have some limited discovery of the

25  Defendants to get a little more information about the history

Proceedings                                          37

1    of the product and about some of the marketing so that we can

2    perhaps, for want of a better phrase, make as complete a

3    record as we can to meet whatever standard you apply.

4           So, we would want -- and we'd also want to know how

5    much they sold, in part because of the tax implications, and

6    where they sold.  If that's for preliminary injunction, I

7    think you -- I suspect you would want a little more in the

8    record about some of that.

9           So, we would, as I said before, we would go on

10   whatever schedule works for the Court.

11          THE COURT:  If I did enter a TRO, though, I suppose,

12   though I haven't looked into it, I might be able to do

13   successive ones.  But it would seem as though the Government

14   would take some risk that you would get what you want

15   initially, which is a TRO, we would set it for a hearing, they

16   might come in with all kinds of objections, need for

17   additional time, witnesses, the like, maybe additional

18   discovery on both sides, and then we might be in a position

19   where either I would hear argument on a preliminary injunction

20   on some kind of time-limited basis in anticipation of a

21   hearing on the merits or trial on the merits or the TRO might

22   dissolve and they would be back to the old state of affairs

23   but with additional notice that they cannot destroy any

24   records related to litigation.

25          So, what are the pros and cons from the Government's

1    perspective of doing it that way?

2         MR. BLUME:  Pros and cons, can I answer a slightly

3    different question?

4         THE COURT:  Sure.

5         MR. BLUME:  Which is that I suspect that what the

6    Defendants would want to do is present more evidence than we

7    think is necessary.  I suspect that what they would want to do

8    is to argue here that this product isn't a machine gun.  And

9    we're prepared to make you know to address that.  I suspect

10   that they will want the time to pull that together, and we're

11   prepared to give them that time provided they stop selling.

12        So if you're willing to put -- enter the TRO, we can

13   talk to the Defendants immediately about what time do you

14   really need, what do you want to do to defend this, and we'll

15   give you discovery as appropriate.  There may be discovery on

16   our side, there may not be.  There are reasons why they may

17   not be entitled to certain discovery on our side, which we can

18   get to.  But to give them the opportunity to challenge it as

19   much as you want and we'll take the time to do that, but in

20   the meantime you have to stop selling.

21        I think that may be a course that would be fair for

22   everybody.  And, frankly, again I'm not talking about six

23   months from now, I'm more talking about instead of five or six

24   days but a little more time to give everybody the opportunity

25   to present what they want to present.

Proceedings                                        39

1          THE COURT:  Any other considerations or issues that

2     we haven't addressed yet?

3          If you need a minute to confer with your team,

4     please feel free.

5          MR. BLUME:  Is it okay?

6          THE COURT:  Feel free.

7          (Pause in proceedings.)

8          MR. BLUME:  Your Honor, if I may.

9          THE COURT:  Yes.

10         MR. BLUME:  To give a little more color, little more

11    context, we have collectively been through this; not with this

12    product, but collectively 1345s.  And our anecdotal granted

13    experience is typically the defendants will work with the

14    Government, with the Court, for a schedule.  They'll agree to

15    a -- I don't know that that's what this group of Defendants

16    will do, but it is more often than not the parties work out

17    some schedule with agreed-upon extensions of these limited

18    TROs, even in circumstances where the TROs are much more

19    onerous.  We've been in circumstances where these TROs involve

20    things like freezes of assets, where you can't spend any money

21    unless the Court lets you.

22         So, it would not be unusual, in fact, I think it

23    would be very much the usual course to enter a TRO, to work

24    out a schedule where the Defendants agree on some timeline,

25    they agree to the TRO in the meantime, and then they have the

Proceedings                                      40

1    opportunity to defend it any way they want to.

2              THE COURT:  Thank you.  Let's take a ten-minute

3    recesses and then come back.

4              MR. BLUME:  Thank you.

5              (Recess taken.)

6              THE COURT:  Please be seated.

7              We're back on the record.  I decided that I would

8    like to take the Government up on its offer to have the agent

9    testify briefly as to this issue of off-website sales or

10   prioritized sales for prior customers.

11             Do you need a few minutes to confer with him before

12   he takes the stand if that will make it go more smoothly?

13             MR. BLUME:  A moment.

14             THE COURT:  Sure.

15             (Pause in proceedings.)

16             MR. BLUME:  We're going to have the special agent

17   come in, Dan Koneschusky.

18             THE COURT:  Take the stand and I'll have the deputy

19   swear you in.  Thank you.

20             THE COURTROOM DEPUTY:  Please raise your right hand.

21             Do you solemnly swear or affirm that the answers and

22   testimony you're about to give to the Court will be the truth,

23   the whole truth, and nothing but the truth?

24             THE WITNESS:  I do.

25             THE COURTROOM DEPUTY:  Please state and spell your

S E A L E D - Koneschusky                    41

1   name for the record.

2          THE WITNESS:  Special Agent Daniel Koneschusky,

3   D-A-N-I-E-L, last name K-O-N-E-S-C-H-U-S-K-Y.

4          THE COURT:  Good afternoon.

5          THE WITNESS:  Good afternoon.

6   **DANIEL KONESCHUSKY**,

7                called by the Government, having been

8                first duly sworn, was examined and testified

9                as follows:

10  DIRECT EXAMINATION

11  BY MR. BLUME:

12  Q    Special Agent Koneschusky, can you just tell us where you

13  work?

14  A    I work with ATF.

15  Q    What is your responsibilities there?

16  A    Primarily, to investigate crimes involving firearms,

17  firearms trafficking, and firearms offenses.

18  Q    Are you familiar with company called Rare Breed Triggers?

19  A    Yes, I am.

20  Q    And what is your involvement, if any, with Rare Breed

21  Triggers?

22  A    I have been one of the investigators who has been tasked

23  with investigating into Rare Breed Triggers FRT-15s and some

24  of their other products.

25  Q    As part of that investigation, do you monitor social

S E A L E D - Koneschusky                          42

1   media?

2   A    Yes.

3   Q    And can you tell us a little bit about what you do when

4   you monitor social media?

5   A    We look through social media groups and we look at

6   potentially chats or groups involving maybe firearms or

7   firearm sales may be taking place, and we kind of look through

8   that information.

9   Q    And you do this personally?

10        You, personally, do you look through the chats?

11  A    Yes.

12  Q    And you've done that recently.

13  A    Yes.

14  Q    As recently as when?

15  A    Throughout the course of the investigation over the last

16  few months.

17  Q    Well, did you do it yesterday, for instance?

18  A    For instance, for this particular thing, I did not do

19  this yesterday.

20  Q    You've been doing it as recently as when?

21  A    I've monitored -- most of the time when we monitor these

22  things, there are special investigation teams that do.  A lot

23  of times what I'm looking at is more historical context after

24  a search warrant is done and records are received back from

25  us.

S E A L E D - Koneschusky                    43

1   Q     I guess what I'm getting at is with respect to Rare Breed
2   Triggers -- let me start the question again.
3               Have you seen social media concerning Rare Breed
4   Triggers?
5   A     Yes.
6   Q     Have you seen social media concerning the sale of
7   FRT-15s?
8   A     Yes.
9   Q     And have you seen that discussion or discussions about
10  the sale of FRT-15s on social media?
11  A     Yes.
12  Q     Recently?
13  A     Yes.
14  Q     Do you want to give us a sense of how recently?
15  A     Are we talking about when I physically put my eyes on it
16  or when the conversions themselves took place?
17  Q     Tell us both?
18  A     When the conversations themselves took place, I can't
19  recall.
20              But I saw these files probably last week.
21  Q     Can you describe some of the discussion on social media
22  about the sale of FRT-15S that you saw?
23  A     Some of the conversations that I saw were between members
24  associated with Rare Breed Triggers.  And in the
25  conversations, my recollection is there was communications

1  where they stated people -- individuals could go on wait lists

2  and that they would be -- you know, when product became

3  available, they would be notified.

4          I can't recall specifically if it was they were sent

5  a link or they were given some -- they were given some

6  additional opportunity to purchase these before the general

7  public was notified, my interpretation was before it would be

8  released on their website or shown available on their website.

9  So, they were basically given the first opportunity to

10 purchase them.  That would be the FRT-15.

11 Q    Let me try to unpack some of that a little bit.  I don't

12 do social media.

13         These are discussions between what it looks like to

14 you folks who are either employed by Rare Breed Triggers or

15 working for them, those folks involved in the conversations?

16 A    Correct.

17 Q    With consumers?

18 A    No.

19 Q    No.  Who are they having conversations with?

20 A    Actually, if I may, I'm not sure if I can have a

21 conversation with you on the side or not, or no.

22 Q    Not now.

23         THE COURT:  You're on the stand.

24         The chat rooms that you're referencing, were there

25 prospective buyers or individuals who may have signed up to do

S E A L E D - Koneschusky                    45

1    it?

2             THE WITNESS:  Not that I'm aware of.

3             THE COURT:  Okay.

4             THE WITNESS:  I believe it was internal

5    communications.

6    Q    Internal communications among Rare Breed Triggers?

7    A    Associates.

8    Q    I see.  Am I getting a sense that some of this

9    conversation included undercover operations or no?

10   A    I don't believe there was undercover, but I'm not a

11   hundred percent on that.

12   Q    These are discussions among Rare Breed Triggers'

13   employees?

14   A    Yes.

15   Q    About the --

16   A    If I could maybe describe it different.

17   Q    Please.

18   A    Almost like a structure, an organizational way that they

19   want to sell the triggers, if I remember correctly.

20   Q    And among those discussions were discussions about people

21   who are on a wait list for the FRT-15?

22   A    Yes.  I recall that there were some members involved with

23   Rare Breed Triggers.  And I can't recall who everybody was

24   associated with this group.  There were several people.

25             But that's my best recollection of the

S E A L E D - Koneschusky                    46

1    conversations.

2    Q     But it was about the FRT-15.

3    A     About the sale of the triggers.

4    Q     And about the wait list of those?

5    A     Correct.

6    Q     The wait list to sell them?

7    A     Yes.

8    Q     And the discussion included a link or something like

9    that?

10   A     I'm sorry, could you repeat that?

11   Q     Sure.  The discussion included --

12   A     The discussions were just about the wait list and the

13   availability to purchase the triggers once they came back in

14   stock and that those people would be -- like I said, I can't

15   recall if they would be sent a separate e-mail or a private

16   link to purchase the firearms or just the first right to

17   purchase the firearms.  But to my recollection, they were

18   given some way to purchase them prior to the general public

19   being made available to purchase these triggers.

20   Q     Did they discuss at all what the Rare Breed Triggers

21   website would say about the sale?

22   A     I don't recall.

23             MR. BLUME:  Do you have any questions, your Honor?

24             THE COURT:  I do.

25             So, let me ask you this, Agent.  I did notice from

1    the RBT website as of this afternoon, around 3:53 p.m.,

2    there's a section of the website with some questions and

3    answers that the Defendants appear to have authored.

4            One question reads:  When will you have more FRT-15

5    triggers available?

6            And the answer posted below reads:  We continually

7    manufacture and package triggers daily, so it's never more

8    than a few days before we add more to the stock level on our

9    website.  If you catch us during a period when we're sold out,

10   please be sure to put your e-mail address on our wait list,

11   which can be found on the product page of our website.  When

12   adding stock to our website, we notify customers on our wait

13   list in the order they signed up.

14           Is what I just read here any different than the

15   procedure you have just described that these representatives

16   of RBT were discussing in their social media chats?

17           In other words, is there something additional in

18   those chats beyond what they're talking about on this website

19   in terms of how they will prioritize sales or conduct the

20   sales to third parties.

21           THE WITNESS:  I think that was the majority of what

22   the conversations were saying.  It think it was more like a,

23   like I said, maybe a structural conversation of how it works,

24   what they intended to do.  And I think that's a pretty fairly

25   accurate description of how it was and how it was going to go

S E A L E D - Koneschusky                    48

1    forward.  They would be alerted once they were made in stock.

2              My interpretation of that at the time when I read

3    through it.  And I could be missing something.  There could be

4    something additional that I read that's just not jogging my

5    memory right now.

6              THE COURT:  Do you recall sitting here today which

7    social media platform or platforms you were monitoring for

8    these communications?

9              THE WITNESS:  It wasn't necessarily that I was

10   monitoring them, like actively as it was going on.  It was a

11   historical conversations that I was reading.

12             And I believe it was a Facebook group chat.

13             THE COURT:  So, it wasn't something you obtained

14   through a warrant, it was a group chat that you --

15             THE WITNESS:  Not me personally, no.

16             THE COURT:  When you say "not you personally," was

17   it something that one of your other agents or employees either

18   downloaded or printed out for you to review?

19             THE WITNESS:  Yes.

20             THE COURT:  And when you say you don't recall the

21   exact date and these were historical, can you estimate even a

22   time frame for how far back they went?

23             Are we talking three months?  Six months?  Two

24   years?  Five years?

25             THE WITNESS:  I wish I could.  I, unfortunately,

S E A L E D                          49

1    don't recall the dates.

2         There was a lot of records throughout this

3    investigation, and I just -- I have a recollection where I was

4    reading through it and I remember seeing conversations about

5    wait list and when products would be available and how they'd

6    be notified and things like that.

7         THE COURT:  But to the extent these were older

8    conversations, more than a few months old, to the best of your

9    recollection what you observed in the Facebook group chats was

10   consistent with what's on the Defendants' website as I've just

11   read that to you today.

12        THE WITNESS:  Yes.

13        THE COURT:  Thank you.  I have nothing further.  You

14   can step down.

15        (Witness excused.)

16        THE COURT:  Thank you very much, Mr. Blume and

17   Mr. Marutollo, for your submissions and for appearing today.

18        After reviewing the submissions, hearing your

19   argument, hearing the agent's testimony, I am going to grant

20   the Government's application in part for a temporary

21   restraining order under 18 U.S.C. Section 1345.  I would like

22   to do so by written order with some modifications of the

23   proposed order that you've submitted.

24        I do find compelling your arguments both as to the

25   actual harm in the areas that the *Fraud Injunction Act* was

S E A L E D                50

1   designed to protect, both with respect to governmental

2   functions and the fraud on consumers that you've established.

3   Even apart from the presumption of irreparable harm in this

4   context, I find that you've established probable cause to

5   believe that there is specific and immediate and irreparable

6   harm from each day that these products are continuing to be

7   marketed and sold.

8            So, I will direct the TRO both to the sales, the

9   statements as to marketing, and I will further enjoin the

10  Defendants from destroying or altering any records of their

11  historical sales, their customer base, or their wait list.

12           I will not order a production of those at this time.

13  I think that's more appropriate to discovery and I'd like to

14  hear from them as to any privacy interests on behalf of any

15  individuals who've contacted them.  Particularly in light of

16  their history of seeking to evade ATF's enforcement efforts, I

17  agree with the Government that a specific directive is

18  appropriate at this juncture.

19           What I would ask you to do is, of course, refrain

20  from serving them until I've issued the order.  I would like

21  to set a video status in light of the fact that Defendants are

22  based out of state for next week.

23           Hold on one moment while I pull up my calendar.

24           How is Thursday, February 2, for the Government, or

25  Friday, February 3?

S E A L E D                        51

1          MR. BLUME:  I think the short answer is, your Honor,

2    we'll do anything that you want us to do.

3          THE COURT:  That said, I have relatively flexible

4    schedules both days.  I think we should aim for the afternoon

5    given that the Defendants may be on Central or Pacific time.

6          MR. BLUME:  Your Honor, whatever works for the

7    Court.

8          THE COURT:  Let's do Thursday, February 2, at

9    2:30 p.m. Eastern time for a hearing on Defendants' motion for

10   a preliminary injunction as well as for the Defendants to be

11   heard on whether the TRO should remain in effect.

12         And if you're able to confer with them after serving

13   them with both the TRO itself and the transcript of today's

14   proceeding regarding whether the parties believe they should

15   keep that date, which I'm inclined to keep even just to have a

16   discussion about how to proceed and whether there's any

17   agreement as to interim relief that the parties are amenable

18   to.

19         MR. BLUME:  Your Honor, just to clarify, there is in

20   place a sealing order.  The way it reads is we will serve --

21   the case will remain under seal until we serve at least one of

22   the Defendants.

23         THE COURT:  Yes.

24         MR. BLUME:  And then we will notify the Court they

25   have been served, and then the Court can --

S E A L E D                    52

1          THE COURT:  We'll unseal the record.  All right.

2          In that case, I'll make the transcript of today's

3    proceeding available on the docket once the --

4          MR. BLUME:  We're happy -- I think whatever works.

5    We're happy to serve it on them, that's easy.  I just wanted

6    to make sure --

7          THE COURT:  Why don't I ask you to work with the

8    court reporter to get an official transcript and review it for

9    typos and make sure it's accurate prior to service.  And if

10   you need to serve the order first and the transcript

11   thereafter, you can do so in case it takes the reporter a bit

12   of time to get it together.

13         MR. BLUME:  Thank you.  I would suggest that only to

14   be fair to the Defendants to give them whatever opportunity,

15   to give them more time.

16         THE COURT:  And also given the nature of the harm, I

17   don't want to delay service of the order.

18         What I would appreciate is if later today or this

19   evening you could modify your proposed order.  I would ask you

20   to take out the broader requests in subparts two through five

21   of your proposed order enjoining them from violating the

22   statutes listed.

23         If you'd like and you think it's appropriate, you

24   can add for my consideration some additional factual findings

25   related to the matters we discussed today that go to why the

1  Government has established probable cause for the violation of

2  those factors and the specific harms covered by the statute

3  that are resulting.  I may modify that as well, but why don't

4  you take a crack at including those?

5          In addition, I am not positive that the statute I

6  originally thought might cover the issue of destruction of

7  evidence in fact does, but I'd ask you to check and confer

8  with your colleagues as to whether 18 U.S.C. Section 1519,

9  which seems to contain a broad prohibition under the criminal

10  statute of destroying or tampering with any records or

11  information that may be the subject of a federal

12  investigation.

13          It says specifically an investigation under

14  Chapter -- Title 11 and not knowing the nature of the

15  Government's potential investigation and not having a

16  photographic memory for all that is included in Chapter 11, I

17  don't know that that is the applicable one, but certainly

18  under the Rules of Civil Procedure, now that a TRO is issued

19  and the Government has a duly-filed motion for preliminary

20  injunction, the Defendants are well advised under the Civil

21  Rules not to engage in such destruction or tampering.  But

22  given the history outlined by the Government, to the extent

23  there are any criminal prohibitions on such actions that the

24  Government believes should be included, I'm happy to have you

25  include those for my consideration.

**S E A L E D** 54

1      MR. BLUME:  And logistically, your Honor, we
2  anticipate sending -- because this case is under seal, we
3  anticipate sending a letter by e-mail.  That's the normal
4  course --
5      THE COURT:  Yes, to the chambers e-mail a copy of
6  the proposed order with a cover letter to my staff at the
7  chambers e-mail, and then I will modify it and provide it to
8  you also under seal or back by that method.
9      Anything further?
10     MR. BLUME:  No, your Honor.  Thank you.
11     THE COURT:  Thank you very much.  Have a good day.
12     (Matter concluded.)
13
14                  * * * * *
15
16              <u>I N D E X</u>
17
18 <u>WITNESS</u>                                      <u>PAGE</u>
19  DANIEL KONESCHUSKY
20     DIRECT EXAMINATION BY MR. BLUME            41
21
22                  * * * * *
23  *I (we) certify that the foregoing is a correct transcript*
    *from the record of proceedings in the above-entitled matter.*
24
25     */s/ Linda A. Marino*          *January 24, 2023*
        *LINDA A. MARINO*                *Date*

*Linda A. Marino, Official Court Reporter*