| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:23-cv-00369-NRM-RML |
| Plaintiff, | |
| -against- | **MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND SUPPORTING MEMORANDUM OF LAW** |
| RARE BREED TRIGGERS, LLC; RARE BREED FIREARMS, LLC; LAWRENCE DEMONICO; KEVIN MAXWELL, | |
| Defendants. | |

Defendants, Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, Lawrence DeMonico, and Kevin Maxwell, through undersigned counsel, hereby move to dismiss this action for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). Plaintiff, United States of America, has failed to demonstrate a *prima facie* case that this Court has personal jurisdiction over any of the defendants. First, the Government has failed to show a statutory basis for jurisdiction, under either federal law or New York's jurisdictional statute. Second, even if statutory basis existed, the exercise of personal jurisdiction would violate due process, as none of the defendants have sufficient contacts with this forum to comport with fundamental fairness. This Court should dismiss the complaint with prejudice. In the alternative, if this Court concludes that disputed facts could establish jurisdiction, it should set this matter for an evidentiary hearing.

## FACTS

Defendants, Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, Lawrence DeMonico, and Kevin Maxwell, are not residents of New York. None operate or direct any activity to the state.

Rare Breed Triggers, LLC (RBT) was incorporated in Florida as a limited liability company in April 2020. It has since reformed as a North Dakota, LLC. Rare Breed Firearms, LLC

(RBF), is a Texas limited liability company. Lawrence DeMonico is the President of RBT and resides in Texas. Kevin Maxwell is the owner of RBT and resides in Florida.

RBF is registered in Texas and operates in Texas. Attachment A, Declaration of Cole Leleux, at ¶ 4. RBF does not manufacture or sell firearms. Rather, RBF creates unique designs by incorporating 3D elements into the magazine well of AR-15 lower receivers. *Id.* These designs include a Spartan helmet, Crusader helmet, and Samurai helmet. *Id.* RBF licenses its designs to third-party firearm manufacturers. *Id.* RBF also sells swag and apparel products such as stickers and t-shirts through its website, rarebreedfirearms.com. *Id.*

RBT, on the other hand, aimed to manufacture and sell firearms accessories and related merchandise. One of its products was to be the FRT-15. *Id.* at ¶ 7.

The FRT-15 was designed and manufactured based on a patented "forced-reset trigger," which was originally patented by a separate company. *Id.* The Wide Open Trigger (WOT) is modeled after the FRT-15. *Id.* Both the FRT-15 and WOT are forced-reset triggers. *Id.* Such triggers are aftermarket parts for semi-automatic firearms that allow a shooter to rapidly re-engage the trigger mechanism to allow rapid manual firing. *Id.*

In 2013 the ATF had reviewed and classified one such device and determined that it was "not a part or combination of parts that will convert a semiautomatic firearm into a machinegun," because the device "allows the trigger to reset" between each round fired. *See* Letter from Earl Griffith, Chief, Firearms Technology Branch, ATF, *Re: 3MR trigger* (Oct. 31, 2013). ATF's conclusion was based on the statutory definition of "machine gun," which includes "any weapon which shoots … automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(23). Because forced-reset triggers allow the trigger to *reset* between shots, it does not fall under the definition of machinegun. RBT

also subsequently designed and sold a related product—a WOT, which has the same essential function as an FRT-15.

In 2018, however, responding to "tremendous" "public pressure" in the aftermath of a mass shooting in Las Vegas, *Cargill v. Garland*, 57 F.4th 447, 451 (5th Cir. 2023) (*en banc*), ATF issued 27 C.F.R. § 479.11 which purported to redefine "machinegun," so that it encompassed items that were not prohibited by statute. *See Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018). The regulatory definition included the following language:

> 'single function of the trigger' means a *single pull of the trigger and analogous motions*. The term 'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed *so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter*.

*Cargill*, 57 F.4th at 456 (quoting 27 C.F.R. § 479.11, emphasis added).

In light of the regulation, and believing that it was legally invalid, RBT took the extraordinary step of confirming that the FRT-15 (and later the WOT) should be properly classified as a firearm accessory, *not a machinegun*, under the statutory definition. Prior to selling the FRT-15 or WOT, RBT obtained opinion letters from two former ATF Special Agents, Kevin McCann and Daniel O'Kelly. Attachment A at ¶ 9. Mr. McCann was also a practicing attorney. *Id.* In each case, the former agents conducted their own examination of the FRT-15 and determined that the device was not a machinegun because the trigger mechanism reset between each shot fired, and Mr. McCann provided RBT with a legal opinion to that effect. *Id.*

After the FRT-15 went into manufacturing, RBT sought two additional examinations and opinions from two national firearms experts to ensure that the production model did not fall under the definition of a machinegun. *Id.* at ¶ 10. In particular, RBT wanted to ensure that any changes made to the FRT-15 to aid in manufacturing did not alter the device's function. *Id.* In February

2021, RBT received an opinion letter from Rick Vasquez, former Branch Chief of the ATF's Firearms Training Branch. *Id.* Mr. Vasquez also analyzed the functions of the FRT-15 against the definition of a "machinegun" under federal law and concluded that the manufactured version of the FRT-15 does not meet the definition of a "machinegun." *Id.*

In May 2021, RBT received an opinion letter from Firearms Training and Interstate Nexus Consulting, LLC in Grand Rapids, Michigan, via the company's owner, Brian Luettke. *Id.* at ¶ 11. Mr. Luettke is another former ATF Special Agent. *Id.* Mr. Luettke provided RBT with yet another opinion letter analyzing the functions of the manufactured version of the FRT-15 and comparing it against the definition of a "machinegun" under federal law. *Id.* Mr. Luettke also concluded that the manufactured version of the FRT-15 does not meet the definition of a "machinegun." *Id.*

Opinions in hand, RBT began selling its device through two channels, its website and sales to dealers. *Id.* at ¶ 12. RBT initially operated primarily from Florida, where its owner, Kevin Maxwell, resided, although RBT's management decisions were made primarily out of Texas, where Mr. DeMonico resided. *Id.*

The vast majority of sales occurred through RBT's website, rarebreedtriggers.com. *Id.* at ¶ 13. As of November 9, 2020, prior to conducting any sales, RBT created a restricted shipping zone that would not allow the website to take orders from customers reporting addresses in or ship to addresses in California, Hawaii, New York, Puerto Rico, Washington, or Washington, DC. *Id.* These restrictions also prohibited purchases from credit cards or other payment methods associated with zip codes in those states and districts. *Id.*

For dealer sales, a dealer was required to contact RBT directly to initiate the sales. *Id.* at ¶ 14. Dealers were required to pay for purchases by direct wire transfers. RBT never sold devices to any dealers located in New York, or dealers who had stated an intent to sell to New York. *Id.* When

RBT initially set up its payment process for dealer wire transfers in August 2021, it was given a routing number and address from its bank, JP Morgan Chase, that routed transfers through New York. RBT initially sent that routing number to dealers. *Id.*

RBT was alerted almost immediately by dealers that the routing instructions had failed. *Id.* at ¶ 15. RBT then realized that the routing information was incorrect, and alerted its customers that they should instead use a routing number and address for a JP Morgan Chase account in Tampa, Florida. *Id.* RBT is not aware of any wire transfers that were successfully routed through New York, instead of the Florida address. *Id.* To the best of RBT's knowledge, none of these wire transfers were routed through New York. If, however, any transfers were routed through New York, that would have been against RBT's intent and contrary to its efforts to avoid using banking services in New York. *Id.*

RBT is not aware of any instance where it sold or shipped an FRT-15 or WOT to any person or address in New York, or processed payment from a buyer with an address in New York. *Id.* at ¶ 17. RBT is not aware of any instance where a dealer sent an FRT-15 or WOT to any person or address in New York. *Id.*

Despite these earlier opinions, on July 15, 2021, on its own initiative, the ATF classified the FRT-15 as a machinegun. Letter from David A. Smith, Firearms Enforcement Officer, Firearms Technology Branch (July 15, 2021). Relying on 27 C.F.R. § 479.11 and its revised definition of machinegun, the classification stated that the FRT-15 was a machinegun because it required only a "single pull of the trigger [or] analogous motion[]" and does not require a "subsequent pull by the shooter to fire a second projectile." ATF Report of Technical Examination of RBT's Forced Reset Trigger Device, Model FRT-15. *Id.* at 3-4.

On July 26, 2021, the ATF's field office in Tampa, Florida, directed RBT by letter to cease-and-desist selling the FRT-15. ATF did not, however, provide RBT with a copy of its classification. Relying again on the new language in 27 C.F.R. § 479.11, the letter asserted that the device was a machinegun because it "allows a firearm to expel more than one shot, without manual reloading, with a single, *continuous pull* of the trigger." Letter from Craig Saier, Special Agent in Charge, Tampa Field Division, ATF, at 2 (July 26, 2021) (emphasis added).[1]

In response, RBT sought judicial intervention. On August 2, 2021, RBT filed suit in the Middle District of Florida in *Rare Breed Triggers, LLC, et al. v. Garland, et al.*, No. 6:21-cv-01245-CEM-GJK. It sought to vacate ATF's classification decision, in part, because ATF had relied on 27 C.F.R. § 479.11, which RBT argued was legally invalid. *See id.* at ECF No. 1; ECF No. 2 (request for a temporary restraining order); ECF No. 32 (amended complaint). On October 28, 2021, however, the court *sua sponte* dismissed the matter without prejudice for failure to file a case management report consistent with local rules. *See id.* at ECF No. 75.

After the litigation concluded, RBT moved its operations to North Dakota, and registered as a North Dakota LLC. Thus, rather than refiling its suit in Florida, it filed suit in the District of North Dakota on May 16, 2022. *See Rare Breed Triggers, LLC, v. Garland, et al.*, No. 3:22-cv-85-ARS.[2] RBT argued that the classification of the triggers as "machineguns" was invalid because 27 C.F.R. § 479.11 was itself invalid. *See id.*, ECF No. 1. It also argued that ATF classifications have no independent legal significance beyond reflecting ATF's views about a device. *See id.*

ATF responded by seeking dismissal for improper venue, or alternatively seeking transfer of venue to the Middle District of Florida. *See Rare Breed Triggers, LLC, v. Garland, et al.*, No. 3:22-cv-85-ARS, ECF No. 21. ATF argued, alternatively, that venue would be proper in West

---

[1] ATF sent a similar letter concerning the WOT.
[2] RBT was represented by different counsel than undersigned in both earlier cases.

Virginia or Washington, DC, where it conducted its classification and where it was headquartered, respectively. *Id.* at 18. ATF never suggested that venue would be proper in New York. *See id.* On November 4, 2022, the court granted ATF's motion in part, dismissing the case without prejudice, but denying ATF's request to transfer "to [] the Middle District of Florida, where Maxwell appears to reside, [or] the District for the District of Columbia, where the defendants reside," and "allow[ing] Rare Breed to file in another district where venue is proper." *Id.*, ECF No. 45 at 14.

Meanwhile, in separate litigation a plaintiff challenged ATF's 2018 rule. On January 6, 2023, the Fifth Circuit, sitting *en banc*, held that the rule "promulgated by the ATF violates the APA," and ordered that it be set aside. *Cargill*, 57 F.4th at 473. Using the "plain language" of the statute, the court held that any device that still requires a manual reset of the trigger mechanism between shots is not a machinegun. *Id*. at 459–60. A "semi-automatic weapon utilizes a simple mechanical process: the trigger disengages the hammer from the sear, the hammer strikes the firing pin, the bullet fires, and the recoil pushes the hammer against the disconnector, which resets the trigger. This process happens every single time one bullet is fired. To be sure, a non-mechanical bump stock increases the rate at which the process occurs. But the fact remains that only one bullet is fired each time the shooter pulls the trigger." *Id*. at 459.

The regulation, however, attempted to define a "single function of the trigger" as a "single pull of the trigger and analogous movements," to require a deliberate pull between shots, which encompassed devices that allowed a shooter to repeatedly activate the trigger's function in order to shoot a succession of shots rapidly. *Id*. "The problem with that interpretation is that it is based on words that do not exist in the statute." *Id*. at 459–60. Under a simple reading of the law Congress wrote, the regulation is invalid—"To summarize, the definition of machinegun must turn on the action (or 'function') of the trigger because no other actor is mentioned or implied. This conclusion

is only strengthened by the fact that other definitions within the same statutory provision explicitly turn on the action of a shooter, showing that Congress knew how to write a definition that proceeds from a shooter's perspective, rather than a mechanical one, if it had wanted to. The notion that the definition turns on the action of an unnamed shooter is inconsistent with both the grammatical and statutory contexts." *Id*. at 461.[3]

Rather than follow the Court's direction in the *Cargill* decision, or allow RBT the opportunity of continuing to challenge the ATF's erroneous conclusion about the FRT-15 and the WOT, the U.S. Attorney for the Eastern District of New York filed this suit. On January 19, 2023, the Government filed a five-count complaint against the defendants under seal, alleging that the defendants committed various civil offenses by selling the FRT-15. ECF No. 1. Central to the Government's case is its contention that the FRT-15 and WOT are prohibited "machineguns" under the now-vacated rule—27 C.F.R. § 479.11. *See id*. at ¶ 42. The Government also sought, and obtained, an *ex parte* temporary restraining order stopping further sales of the FRT-15 and WOT and requiring the defendants to preserve sales records. *See* ECF No. 11. The defendants were served in their respective home jurisdictions—North Dakota, Texas, and Florida. *See* ECF No. 13.

The Government agrees that none of the defendants reside or operate in this district. *See* ECF No. 1 at ¶ 22. Instead, it argues, first, that "upon information and belief, when an RBT

---

[3] The *Cargill* decision is the most recent decision from the Courts of Appeals concerning the validity of the regulation, and has created a deep split between the circuits. A divided D.C. Circuit panel denied a preliminary injunction against the rule, concluding it was likely valid. *See Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019). Although the Supreme Court denied *certiorari*, 140 S. Ct. 789 (2020), Justice Gorsuch wrote separately to express doubt about the panel's decision. In another divided opinion, the Tenth Circuit reached the same conclusion as the D.C. Circuit. *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020). The court initially granted rehearing *en banc*, vacating the panel decision, 973 F.3d 1151 (10th Cir. 2020) (*en banc*), but later vacated the order as improvidently granted, reinstating the former opinion. *Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021) (*en banc*), *cert denied sub nom. Aposhian v. Garland*, 143 S. Ct. 84 (2022). Five of the eleven participating judges dissented. *See id*. at 891–903 (Tymkovich, C.J., dissenting); *id*. at 903–04 (Hartz, J., dissenting); *id*. at 904–06 (Eid, J., dissenting); *id*. at 906–08 (Carson, J., dissenting). Finally, in yet another divided opinion, a Sixth Circuit panel ruled against the Government, holding that the rule was likely invalid. *Gun Owners of Am., Inc. v. Garland*, 992 F.3d 446, 450 (6th Cir. 2021). The court granted rehearing *en banc*, 2 F.4th 576 (6th Cir. 2021) (*en banc*), and an evenly-divided court affirmed the district court's denial of the preliminary injunction. 19 F.4th 890 (6th Cir. 2021), *cert denied*, 143 S. Ct. 83 (2022).

customer pays for an RBT product … by credit card, RBT uses Chase Paymentech, a payment processing business of JP Morgan Chase, a company with headquarters in New York City." *Id*. at ¶ 79. It also claims that customers who pay for devices with wire transfers also requested payment to a JP Morgan Chase account located in New York. *Id*.

The Government next claims that RBT's website is "accessible in New York." *Id*. at ¶ 104. While it agrees that RBT does "not ship their products directly to certain states, including New York," the Government alleges that some FRT-15s and WOTs have ended up in New York despite RBT's best efforts. *Id*. at ¶ 106.

The Government also alleges that "on November 29, 2022, ATF Special Agents, while physically located in the Eastern District of New York, placed orders for WOTs directly from RBT's website. The orders were shipped from RBT in North Dakota by way of the USPS. ATF received the [devices] on December 6, 2022, in Pennsylvania. *Id*. at ¶ 105. The Government further claims that "[t]hird parties—including dealers—have sold and shipped FRT-15s to customers in New York," and thus the defendants "know that they transact with and supply FRT-15s to dealers that choose to sell" in New York. *Id*. at ¶¶ 105–07. Thus, the Government claims that "Defendants know that FRT-15s and WOTs are being sold to customers in every state, including in New York," and that they "expect, or should reasonably expect, that their sale of the FRT-15 and WOTs has legal consequences in New York City and on Long Island, especially given that machineguns are generally prohibited." *Id*. at ¶¶ 164–65. Finally, the Government asserts, cryptically, that "some" "customers" located "in the Eastern District of New York" "have agreed to abandon their purchased FRT-15 property to ATF." *Id*. at ¶ 192.

The defendants objected that this Court lacks personal jurisdiction over them in their first responsive filing. *See* ECF No. 15. They now move to dismiss for lack of personal jurisdiction.

**ARGUMENT**

Upon a motion, this Court must dismiss an action against any defendant over whom it lacks personal jurisdiction. Fed. R. Civ. P. 12(b)(2). On such a motion a plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *See Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted).

If a court rules on a Rule 12(b)(2) motion without discovery, it assesses whether the plaintiff has alleged facts that, if credited, would establish jurisdiction. *Id.* "After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). "If the defendant contests the plaintiff's factual allegations, then a hearing is required, at which the plaintiff must prove the existence of jurisdiction by a preponderance of the evidence." *Id.*

## I. THERE IS NO STATUTORY BASIS FOR PERSONAL JURISDICTION

The Government has brought suit under four *criminal* statutes—18 U.S.C. §§ 371 (conspiracy to defraud the U.S.), 1341(mail fraud), 1343 (wire fraud), and 1349 (mail and wire fraud conspiracy). *See* ECF No. 1. None allow civil causes of action. *See id.* Instead, the Government relies on 18 U.S.C. § 1345 to maintain this lawsuit.

Section 1345(a)(1) allows the Attorney General to "commence a civil action" to "enjoin" violations of Chapter 63 (related to mail and wire fraud) or Section 371. The Government must show the person "is violating or about to violate" those substantive provisions. *Id.* Relief is limited

solely to a "permanent or temporary injunction or restraining order," "as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." *Id.* at (a)(3), (b).

Section 1345 provides *subject matter jurisdiction* "in any Federal court." *Id.* at (a)(1). However, it also provides: "A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure." *Id.* at (b).

Rule 4(k) of the Federal Rules of Civil Procedure in turn sets out the "territorial limits of effective service" in all civil actions. Generally, "[s]erving a summons … establishes personal jurisdiction over a defendant" "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located" or "when authorized by a federal statute." *Id.* at 4(k)(1). Thus, "A federal statute or the law of the state in which the court is located can provide the statutory basis for personal jurisdiction." *Gucci Am., Inc. v. Weixing Li*, 135 F.Supp.3d 87, 93 (S.D.N.Y. 2015).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). "This is because a federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting Fed. R. Civ. P. 4(k)(1)(A)). However, under Rule 4(k)(1)(C), a federal statute *can* provide jurisdiction, but only when it clearly authorizes "nationwide service of process." *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 70 (2d Cir. 1998). Thus, "[i]n a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules

if the federal statute does not specifically provide for national service of process." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal quotation marks omitted).

**A. Section 1345 Does Not Allow Nationwide Service of Process**

Because this Court's subject matter jurisdiction arises under 18 U.S.C. § 1345, which, in turn, incorporates the territorial limits of Rule 4(k), the first question facing this Court is whether service was authorized under Rule 4 at all. But it does not appear that service of Defendants in Texas, Florida, and North Dakota was "authorized by a federal statute." The only possible source of authorization would be found in Section 1345, and its broad statement that "the Attorney General may commence a civil action in any Federal court to enjoin such violation." But that says nothing about *service* of process. And, in fact, it does not even suggest that the Government may commence an action in any federal court, *regardless* of where the alleged action has occurred.

The Second Circuit's analysis of an actual nationwide service statute is instructive. The Racketeer Influenced and Corrupt Organizations Act (RICO), allows civil actions "against any person … in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). In some circumstances, though, the Government can bring an action "in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States[.]" *Id.* at (b). "All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." *Id.* at (d).

The Second Circuit has held that the RICO statute "does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant

is found." *PT United*, 138 F.3d at 71. Instead, as a simple matter of statutory analysis, the RICO statute only authorizes nationwide service in limited circumstances where "the ends of justice require." *Id.* Moreover, as the Ninth Circuit had previously held in a decision relied on by the court in *PT United*, in all instances where nationwide service was not authorized, "the federal court must rely on the jurisdictional statute of the state in which the federal court is located to obtain jurisdiction," *and* the exercise of jurisdiction must comport with the constitutional limits of the "minimum contacts" test. *Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 538, 540 (9th Cir. 1986).

The language of the RICO statute came much closer to suggesting the possibility of nationwide service of process than Section 1345 does, but even that failed to meet Rule 4(k)'s requirement of jurisdiction "authorized by a federal statute." Section 1345 says nothing about service of process. It does not even contemplate actions brought in districts where the defendant is *not* found. Instead, it just says that an action can be brought "in any Federal court to enjoin such a violation," presumably *where* "such violation" has occurred. *See* 18 U.S.C. § 1345(a).

### B. New York Law Does Not Establish Statutory Personal Jurisdiction

Without a federal statute authorizing personal jurisdiction, this Court must look to "the law of the State of New York, in which the district court sits." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007). "The reach of New York's long-arm statute … does not coincide with the limits of the Due Process Clause. Analysis under it therefore may involve two separate inquiries, one statutory and one constitutional. If jurisdiction is statutorily impermissible, of course, we need not reach the question of its constitutionality." *Id.* at 244.

New York's long-arm statute allows personal jurisdiction "over any non-domiciliary, or his executor or administrator, who in person or through an agent:"

(1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or

(2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

(3) commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

(4) owns, uses or possesses any real property situated within the state.

35 N.Y.C.P.L.R. § 302(a).[4] None of the relevant parts of Section 302(a) apply here.

### 1. The Defendants Do Not Transact Business in New York

First, to establish jurisdiction under N.Y. C.P.L.R. § 302(a)(1), a plaintiff must allege that: (1) a defendant has "transacted business" in New York, and (2) the claim asserted arises from that business activity. *Eades v. Kennedy, PC L. Offs.*, 799 F.3d 161, 168 (2d Cir. 2015). "With respect to the first part of the test for jurisdiction under section 302(a)(1), New York courts define 'transact[ing] business' as purposeful activity—'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Best Van Lines*, 490 F.3d at 246–47 (quoting *McKee Elec. Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 382 (N.Y. 1967)).

---

[4] New York also has a general jurisdiction statute, 35 N.Y.C.P.L.R. § 301, but that statute applies only if a defendant is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence' in this jurisdiction." *Laufer v. Ostrow*, 55 N.Y.2d 305, 308 (N.Y. 1982). As this Court lacks specific jurisdiction over the defendants, it also clearly lacks the more substantial requirements for general jurisdiction.

The statute sets out a two-part test, so even if a defendant is transacting business in New York, the second half of the inquiry asks whether the cause of action "aris[es] from" that business transaction or transactions. *Id.* (citation omitted). "New York courts have held that a claim 'aris[es] from' a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citations omitted). "A connection that is merely coincidental is insufficient to support jurisdiction." *Id*. (citation omitted).

The Government argues that jurisdiction is proper because the defendants: (1) operate a website accessible in New York; (2) an ATF agent purchased a WOT while in New York, which the defendants shipped to *Pennsylvania*; (3) the defendants should have known that third-parties would eventually transfer FRT-15s and WOTs to New York; and (4) some of their sales might have been processed by JP Morgan Chase in New York. *See* ECF No. 1 at ¶¶ 79, 104–07, 164–65, 192. None of those claims, even if true, come close to meeting the required showing.

First, operating a website that is "accessible in New York," ECF No. 1 at ¶ 104, falls far short. Numerous courts have examined whether a defendant business meets the test by creating a website available to New York residents, and they invariably turn on whether the defendant intended to make money from New Yorkers. A Defendant's "national web presence" "standing alone, is insufficient to support the exercise of personal jurisdiction." *Guglielmo v. Neb. Furniture Mart, Inc.*, No. 19-cv-11197, 2020 WL 7480619, at *9 (S.D.N.Y. Dec. 18, 2020). Indeed, under Section 302(a)(1), jurisdiction arises when the defendant's website is directed at purposeful sales to *New York*, not just mere access to a website in the state. *See Girl Scouts of U.S. v. Steir*, 102 F. App'x 217, 219 (2d Cir. 2004) (unpublished) ("[Defendants' website] manifested no intent

specifically to target New York supporters or to avail themselves of the particular benefits of New York law," even if it "may reach New York residents"); *Weiss v. Barc, Inc.*, No. 12-cv-7571, 2013 WL 2355509, at *3 (S.D.N.Y. May 29, 2013) ("[W]here a website is directed at the entire United States with no evidence that defendants manifested the intent to specifically target New York or avail themselves of the benefits of New York law, there is no personal jurisdiction under C.P.L.R. § 302(a)(1)."); *Panacea Sols., Inc. v. Roll*, No. 05-cv-10089, 2006 WL 3096022, at *3 (S.D.N.Y. Oct. 31, 2006) ("Even advertisements that target New Yorkers are not sufficient unless supplemented by business transactions occurring in the state or accompanied by a fair measure of the defendant's permanence and continuity in New York which establishes a New York presence.") (citation omitted). But, as the Government recognizes, the defendants intentionally limited their sales and refused to accept orders from New York—refusing to ship their products to New York addresses or process payment tied to New York addresses. *See* ECF No. 1 at ¶ 106. Defendants, moreover, have explained the steps they took to ensure that orders couldn't go to New York. *See* Attachment A at ¶ 13. Thus, the website doesn't establish that they "transacted business" in this district.

Next, the ATF agent's purchase of a device, shipped to *Pennsylvania*, as well as the mere possibility (or even actual knowledge) that some of the devices could end up in New York, is insufficient. *See* ECF No. 1 at ¶¶ 105–06. Remember, Section 301(a)(1) requires "purposeful" action directed at New York, by the defendants themselves. *See Best Van Lines*, 490 F.3d at 246–47. This means that third-party conduct simply cannot meet the test. *See id.*

The New York Court of Appeals' decision in *Williams v. Beemiller, Inc.*, 33 N.Y.3d 523, (N.Y. 2019) ("*Williams II*"), essentially decides this case. There, a New York plaintiff sued a resident of Ohio who had sold guns that ended up in New York. *Id.* at 527. The defendant sold

firearms to another person (Bostic) who had "indicated that there was a chance that he may – at some undefined point in the future – transport the firearms to New York," who in turn, in fact, "brought the firearms to New York, illegally reselling one of the handguns to a Buffalo gang member. That gang member then used the handgun in a shooting that caused injury to plaintiff." *Id.* at 527, 530. As the decision affirmed by the Court of Appeals had recounted, the defendant "may have derived substantial revenue from the sale of guns in Ohio to Bostic and his associates that were then transported to and ultimately used or consumed in New York." *Williams v. Beemiller, Inc.*, 159 A.D.3d 148, 159 (N.Y. App. Div. 4th Dept. 2018) ("*Williams I*").

The Court of Appeals held that this was insufficient to establish personal jurisdiction, *even assuming* that the long-arm statute's requirements were met. This was because the defendant himself never intended to send the guns to New York. *Williams II*, 33 N.Y.3d at 528–29. "Put another way, 'the mere likelihood that a product will find its way into the forum' cannot establish the requisite connection between defendant and the forum 'such that defendant should reasonably anticipate being haled into court there.'" *Id.* at 528–29 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Indeed, "the relationship between defendant and the forum state must arise out of defendant's own contacts with the forum and not 'contacts between the plaintiff (or third parties) and the forum State.'" *Id.* at 529 (quoting *Walden*, 571 U.S. at 285).

Here, the Government alleges only that the defendants either knew or "should have known" that their products would end up in New York at the hands of third parties. ECF No. 1 at ¶¶ 164–65. Defendants deny such knowledge, and took great pains to make sure that this wouldn't happen by preventing sales to New York. *See* Attachment A at ¶ 13. But, regardless, jurisdiction *can't* turn on the actions of third parties—especially actions, such as those taken by the Government here— that are designed to *manufacture* jurisdiction. That is so even when a defendant has actual

knowledge that he will derive "substantial revenue" from products that will end up in New York. *See Williams I*, 159 A.D.3d at 159.

This leaves the Government's claim, "on information and belief," that some of RBT's sales might have used "a payment processing business," which in turn has headquarters in New York, or that they used wire transfers routed through Manhattan. ECF No. 1 at ¶ 79. But the Second Circuit has rejected a much stronger version of that same argument. In *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 131–32 (2d Cir. 2022), the court affirmed the lack of personal jurisdiction based on Section 302(a)(1) when a defendant had "purposefully use[d] New York correspondent accounts[5] on a regular basis." As a threshold, the court recognized that New York law wouldn't find that a defendant has "transacted business" in the state by merely having a correspondent bank account physically located in New York, or had used the account only sporadically. *See id.* at 131 (citing *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391, 396 (N.Y. 1976) ("[S]tanding by itself, a correspondent bank relationship … may not form the basis for long-arm jurisdiction under [§ 302(a)(1)].") and *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 338 (N.Y. 2012) ("*Licci I*") (using a correspondent account "once or twice by mistake" is insufficient)). Moreover, even if a defendant intentionally transacted business with a New York account, the plaintiff would still need to show a "specific transaction" using the account in New York, connected to the claims in the complaint. *Id.* at 130–31. Where the transactions were distinct from those underlying the claims, jurisdiction is lacking. *See id.*

Here, the defendants' use of JP Morgan's services *in general* isn't sufficient to establish jurisdiction. The Government doesn't claim that the defendants processed retail sales using credit cards through New York accounts, just that Paymentech, the company that provided services to

---

[5] Correspondent accounts are accounts maintained by foreign banks, "similar to a personal checking account used for deposits, payments and transfers of funds." *Int'l Hous. Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 9 (2d Cir. 1989).

RBT, was *in turn* owned by JP Morgan, which is headquartered in New York. ECF No. 1 at ¶ 79. Paymentech is headquartered in Texas, though, which makes this argument particularly specious. And while the Government alleges that some wire transfers were routed through Manhattan, even if such transfers did occur—which is not at all clear—none were intentional, and the Government fails to tie any such wire transfers to any of the legal claims at issue in this case. *See id.*

First, if any wire transfers were routed through New York, they were mistakes. RBT did not intend to route any through a New York account, and after initially sending out wire instructions with a New York address, it realized the error within hours, and directed dealers to instead use an address in Florida. *See* Attachment A at ¶¶ 14–15. RBT is not aware of any wire transfers actually being completed through the New York address, and, indeed, learned of the error after a customer reported that an attempted transfer had failed. *Id.* at ¶¶ 15–17. But *intent* to use banking services in New York is required for personal jurisdiction, and such intent is lacking here. *See Licci I*, 20 N.Y.3d at 338 (using an account "once or twice by mistake" is insufficient).

Second, even if one assumes that accidental wire transfers routed through New York established ongoing transaction of business, there was no connection to any of the Government's claimed harms in New York. *See* ECF No. 1 at ¶¶ 1–2 (citing a nationwide "epidemic" of gun violence based on the use of unrelated, completely lawful semi-automatic weapons, that the defendants never sold). Without evidence that "any defendant used an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated," there cannot be personal jurisdiction. *See Daou*, 42 F.4th at 132.

In prior filings, the Government has suggested otherwise, relying on *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169 (2d Cir. 2013) ("*Licci II*"). *See* ECF No. 18 at 2. But as the Second Circuit explained in *Daou*, the *Licci II* case specifically recognized that

jurisdiction was premised on the alleged transactions themselves being the basis for the claims against the defendants. *Daou*, 42 F.4th at 131. Indeed, the Second Circuit in *Licci II* found jurisdiction because "the defendant's allegedly culpable conduct stems from this use of the New York correspondent account[.]" 732 F.3d at 169. The "connection between those past transactions [in New York] and the claims in the" complaint must be more than "merely coincidental." *Daou*, 42 F.4th at 132 (citing *Johnson v. Ward*, 4 N.Y.3d 516, 520 (N.Y. 2005)). If "the alleged unlawful conduct underlying the [plaintiff's] claims does not involve a specific transaction through New York correspondent accounts," but instead "allege[s] that the [defendants] have used their New York correspondent accounts to handle the [the plaintiff's] and other investors' money *in the past*" and might do so in the future, that is insufficient to establish jurisdiction. *Id.* at 131.

Here the Government doesn't, and indeed can't, rely on a "specific transaction through New York correspondent accounts" that gives rise to the claimed harms. Its claims arise not from the transfer of funds, but from the commercial activity of selling the FRT-15 "all over the nation." ECF No. 1 at ¶ 3. Because any wire transfers that might have been routed through New York weren't the unlawful activities alleged in the complaint, they are merely coincidental and insufficient to establish jurisdiction.

### 2. No Defendant Committed an Alleged Tort While Present in New York

"As to section 302(a)(2), a Defendant's physical presence in New York is a prerequisite to jurisdiction." *Suber v. VVP Servs., LLC*, No. 21-2649, 2023 WL 115631, at *4 (2d Cir. Jan. 10, 2023) (citation omitted). Indeed, "C.P.L.R. § 302(a)(2) reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999). Section 302(a)(2) can't provide jurisdiction here because no defendant was ever physically present in New

York. The Government acknowledges as much in its complaint. *See* ECF No. 1 at ¶ 22. Thus, this section is no help to the Government either.

### 3. No Tortious Injury Occurred in New York and the Defendants Could Not Have Reasonably Anticipated Being Sued in New York

To establish jurisdiction under N.Y. C.P.L.R. § 302(a)(3), a plaintiff must allege that "(1) the defendant committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 302 (N.Y. 2011) (*see also* N.Y. C.P.L.R. § 302(a)(3)(i) (replacing the fourth and fifth elements with "[defendant] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state").

The Government can't meet Section 320(a)(3)'s requirements because it can't show an injury to a person or property in New York or that the substantial expectation prong has been met. As to section 302(a)(3), "courts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the original event which caused the injury." *Suber*, 2023 WL 115631, at *4 (citation omitted). This means that a plaintiff must identify a tort action allegedly committed by the defendant and then show it caused injury *in New York*. *Id*. And there must be a relation between the alleged conduct in New York and the injuries. *Id.*; *see also Wilson v. Danka Corp.*, No. 01-cv-10592, 2002 WL 31929120, at *3 (S.D.N.Y. Jan. 28, 2003) ("The fact that the consequences of these alleged acts may have continued in New York does not make New York the site of the tort."). "There must be some basis for considering the defendant's actions to be tortious, either under the

law of New York or some other pertinent jurisdiction." *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 551 (2d Cir. 2007).

Here the Government identified no specific tortious injury *in New York* arising from the defendants' alleged actions. Indeed, its claims aren't tort actions at all, alleging violations of criminal law incorporated through an equity statute that allows injunctive relief. *See* ECF No. 1, Claims I–V. And even then, it doesn't identify a harm occurring in New York that is in any way tied to RBT's alleged conduct. *See id.* at ¶¶ 1–2. Instead, it speaks broadly about the dangers of gun violence, nationally, and wholly unmoored from the products at issue in this case. *Id.*

Further, even ignoring that first fatal flaw, the Government also fails to meet the reasonable expectation requirements of Section 302(a)(3)(ii). Even where there is some evidence that a defendant "expected or should have expected" his conduct "to have consequences in New York, the evaluation of this prong implicates due process considerations under the circumstances of this case." *Williams I*, 159 A.D.3d at 156. And, as the Fourth Department held in *Williams*, selling guns to another person, even if one actually knows they will end up in New York, fails these due process considerations. *Id.* at 158. Indeed, the defendant's "knowledge that guns sold … might end up being resold in New York … is insufficient to establish the requisite minimum contacts with New York because such circumstances demonstrate, at most, [the defendant's] awareness of the mere possibility that the guns could be transported to and resold in New York." *Id.* But, as discussed, the Government alleges nothing more than a suggestion that the defendants "know that they transact with and supply FRT-15s to dealers that choose to sell" in New York. ECF No. 1. at ¶¶ 105–07. That's insufficient.

\* \* \*

There is no statutory basis for personal jurisdiction under either federal law or the laws of New York. As a result, this case must be dismissed without even asking whether the exercise of jurisdiction comports with due process.

## II. THE EXERCISE OF JURISDICTION DOES NOT COMPORT WITH DUE PROCESS

Of course, the rules of civil procedure, and even the acts of Congress establishing jurisdiction, must also comport with relevant constitutional limits. Finding a statutory basis for personal jurisdiction is only the first step. The due process clauses of the Fifth or Fourteenth Amendments also require proof that the exercise of jurisdiction comports with basic, historical, rules of fairness. *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014). "Since *International Shoe Co. v. Washington*, the touchstone due process principle has been that, before a court may exercise jurisdiction over a person or an organization, [] that person or entity must have sufficient 'minimum contacts' with the forum 'such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting 326 U.S. 310, 316 (1945) and *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

### A. The Defendants Have Not Had Minimum Contacts with New York

The due process analysis is, in some ways, even simpler than the statutory analysis, and definitively establishes that jurisdiction is improper here. "With respect to due process, a non-domiciliary tortfeasor has minimum contacts with the forum State if it purposefully avails itself of the privilege of conducting activities within the forum State 'thus invoking the benefits and protections of the forum state's laws." *Williams II*, 33 N.Y.3d at 528 (cleaned up, *quoting Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

"Where the claim arises out of, or relates to, the defendant's contacts with the forum—i.e., specific jurisdiction is asserted—minimum contacts necessary to support such jurisdiction exist

where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (cleaned up). "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal citation omitted). Relevant factors at this second step of the analysis may include: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and effective relief ...." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).

The Supreme Court has held that "unilateral activity of a third party [] cannot satisfy the requirement of contact with the forum State," even when a plaintiff knows that such contact might happen. *Walden*, 571 U.S. at 289, 291 (citation omitted). Instead, minimum contacts "envisions something more than the 'fortuitous circumstance' that a product sold in another state later makes its way into the forum jurisdiction through no marketing or other effort of defendant." *Williams II*, 33 N.Y.3d at 528 (quoting *World–Wide Volkswagen Corp.*, 444 U.S. at 295). Ultimately, "due process requires that [a defendant] be haled into court in a forum State based on a defendant's own affiliation with the State, not based on the random, fortuitous, or attenuated contacts [a defendant] makes by interacting with other persons affiliated with the State." *Walden*, 571 U.S. at 286 (cleaned up). If a "defendant's connection with the forum State resulted from decisions made by others," that is insufficient. *Williams II*, 33 N.Y.3d at 530.

None of the defendants' alleged contacts with New York can meet this test. As discussed, the Government's allegations about how the relevant products might have ended up in New York through the actions of third parties, *including the Government itself*, clearly does not suffice as those are nothing more than the consequences of "decisions made by others." *See Williams II*, 33 N.Y.3d at 530. Likewise, merely creating a website that is accessible from New York, is not *purposeful availment* of the benefits and protections of the forum. *See ISI Brands, Inc. v. KCC Int'l, Inc.*, 458 F.Supp.2d 81, 90 (E.D.N.Y. 2006) ("absent allegations that the defendant had actively sought to encourage New Yorkers to access its site, or that it conducted business in New York, defendant had insufficient contacts with the forum to satisfy due process") (cleaned up).

Finally, the fact that RBT uses a bank, which in turn is owned by a company headquartered in New York, or even might have accidentally made wire transfers routed through New York, lacks both the intentionality and the minimum interaction required by the constitution. *See Williams II*, 33 N.Y.3d at 528. To be sure, the Second Circuit in *Licci II* held that, in some cases, substantial use of a bank account in New York *can* satisfy minimum contacts, but the court was clear that "[i]n reaching this conclusion, we by no means suggest that a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support the constitutional exercise of personal jurisdiction over the account-holder in connection with any controversy." 732 F.3d at 171. Indeed, it can only do so when the "account at issue is alleged to have been used as an instrument to achieve the very wrong alleged." *Id.* This arises from the "effects test," which applies when "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Id.* at 173. Thus, the Second Circuit has also held that merely using "financial services" in this forum is "not enough for personal jurisdiction purposes"

when the alleged tortious acts weren't themselves intentionally directed at the forum state. *In re Terrorist Attacks on Sept. 11*, 2001, 714 F.3d 659, 676 (2d Cir. 2013); *see also Calder v. Jones*, 465 U.S. 783, 789 (1984) (finding the exercise of personal jurisdiction over Florida defendants in California state court "based on the 'effects' of their Florida conduct in California" to be consistent with due process because "their intentional, and allegedly tortious, actions were expressly aimed at California").

Here, as discussed, any wire transfers routed through New York were accidental. RBT sent dealers incorrect instructions initially, but corrected its mistake just hours later after a customer reported that the transfer failed. *See* Attachment A at ¶¶ 14–15. Its intent was only to route wire transfers through Florida. And, it is not aware of any wire transfers that were successfully routed through New York. *Id.* at ¶¶ 16-17. That lacks the intentional contact with New York required for personal jurisdiction.

But, even if one assumes that RBT made a substantial number of intentional wire transfers routed through New York, those transfers aren't the allegedly unlawful behavior at issue in this case. The Government's case is about RBT's sale of triggers to states *other* than New York. And it acknowledges that RBT refused to sell its devices to New York. *See* ECF No. 1 at ¶ 106. At most, RBT incidentally routed wire transfers for extraterritorial sales through New York's banking system. Because "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff," personal jurisdiction is lacking. *See Licci II*, 732 F.3d at 173.

### B. The Relevant Analysis Would be the Same if Statutory Jurisdiction Arose Under Section 1345

Both the Fifth Amendment and Fourteenth Amendment ensure identical "due process" limits on a court's exercise of personal jurisdiction. *See Waldman v. Palestine Liberation Org.*,

835 F.3d 317, 329–30 (2d Cir. 2016) ("This Court's precedents clearly establish the congruence of due process analysis under both the Fourteenth and Fifth Amendments."). In both instances, a court must ensure "minimum contacts" with the relevant forum. *Id.* Thus, because the minimum contacts are lacking to exercise jurisdiction even if authorized by New York statute, they are likewise lacking if jurisdiction existed under federal statute.

There is a dispute, however, concerning what is the relevant forum when dealing with a federal statute that authorizes nationwide service of process. As the Second Circuit has noted, some circuits have concluded that, "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014). The Second Circuit "has not yet decided that issue." *Id.* Moreover, even within those circuits, there is still internal debate about whether that analysis comports with constitutional limits. *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947 (11th Cir. 1997) ("A defendant's 'minimum contacts' with the United States do not, however, automatically satisfy the due process requirements of the Fifth Amendment.").

To the extent this Court believes it necessary to wade into this issue, recent guidance from the Supreme Court suggests that the minimum contacts must be with the *district* at issue to accord with due process, as the relevant test is premised on *notice to a defendant*, not relative squabbles over sovereignty. The idea that the entire United States could be considered one "forum" for due process purposes, seems to have arisen from the Seventh Circuit's decision in *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987). From there, other courts appear to have simply adopted its holding uncritically, with little analysis. *See, e.g., Laurel Gardens, LLC v. McKenna*, 948 F.3d 105, 122 (3d Cir. 2020) ("Unlike the traditional approach, this inquiry focuses less on

federalism concerns and more on the national interest in furthering the policies of the federal statute at issue."). The Seventh Circuit couched its analysis in terms of sovereignty—"The question is whether the polity, whose power the court wields, possesses a legitimate claim to exercise force over the defendant. A state court may lack such an entitlement to coerce, when the defendant has transacted no business within the state and has not otherwise taken advantage of that sovereign's protection. … A federal court in a federal question case is not implementing any state's policy; it exercises the power of the United States." *Lisak*, 834 F.2d at 671. Thus, it concluded that the minimum contacts analysis found in cases like *Burger King*, 471 U.S. 462, had nothing to say about the exercise of federal jurisdiction, and that a defendant "may not demand that the court applying the law of the United States be conveniently located." *Id.*

This theory is wrong because it takes a myopic view of why due process demands minimum contacts. The minimum contacts test is not about preserving competing sovereignty interests, or at least not primarily so. Instead, going back to *International Shoe* it has always recognized the lack of fair "notice" and unfairness to a defendant involved with dragging a party into a distant location. *See* 326 U.S. at 320. The Supreme Court's latest word on minimum contacts emphasizes that due process is concerned mostly about whether a defendant "has 'clear notice' that it will be subject to jurisdiction," and whether the "exercise of jurisdiction is so reasonable," as to be "predictable." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1030 (2021) (citation omitted). Those interests are just as strong when a far-flung federal court tries to exercise jurisdiction over a defendant with no ties to the district.

Meanwhile, as this case illustrates, there *are* competing sovereignty issues between the federal courts. The "federal system does not generally permit decisions of the circuit courts to have nationwide effect," but, in some cases, the repeal of administrative rules by one court is binding

on another. *Gorss Motels, Inc. v. Fed. Commc'ns Comm'n*, 20 F.4th 87, 97 (2d Cir. 2021). The competing interests of split circuit courts are complex, and go to their unique sovereignty within the federal system. *See id.* Here, moreover, the Fifth Circuit, which has geographical jurisdiction over some of the defendants, has already concluded that the regulatory basis of the Government's merits argument in this case is invalid. *See Cargill*, 57 F.4th at 473. The Government should not be rewarded for attempting to evade that decision by filing suit in this district.

Finally, while the Second Circuit has left this issue open, the biggest clue about its correct resolution arises in the court's discussion of the differences between the Fifth and Fourteenth Amendment's minimum contacts analyses in *Waldman*. In that case, despite substantial briefing from amici curiae that had urged the Second Circuit to adopt differing tests under the Fifth and Fourteenth Amendments, the court held firm to its long history of reading the two due process clauses identically. *See Waldman*, 835 F.3d at 329–30. In light of the Second Circuit's conclusion, it would make no sense to conclude that a federal court can exercise personal jurisdiction over a defendant lacking the requisite minimum contacts simply because jurisdiction arises from a federal statute. This would render the Supreme Court's focus on notice and fairness concerns under the due process clause meaningless. *See Ford Motor Co.*, 141 S. Ct. at 1030.

## III. RBF MUST BE DISMISSED FROM THIS CASE EVEN IF JURISDICTION EXISTS OVER RBT

Finally, even if this Court determines that personal jurisdiction arises based on the Government's allegations, then it should be careful to limit jurisdiction only to those defendants shown to have relevant contacts with New York. *See Berdeaux v. OneCoin Ltd.*, 561 F.Supp.3d 379, 397 (S.D.N.Y. 2021) ("[T]he Court is unable to exercise personal jurisdiction over a particular defendant based on allegations that fail to distinguish among the [] Defendants, leaving the Court no basis to discern who did what."). The Government's case names all four of the defendants, but

its jurisdictional arguments never mention RBF. *See* ECF No. 1 at ¶¶ 79, 104–07, 164–65, 192. In fact, aside from alleging that RBF is a "sister company" of RBT, the Government doesn't allege RBF did *anything* relevant to this case, and it wasn't even involved in sales of the FRT-15 or WOT. *See* ECF No. 1 at ¶ 22. As a result, if this Court finds personal jurisdiction over RBT, RBF should still be dismissed from this case.

## CONCLUSION

This Court should dismiss the complaint with prejudice. Alternatively, if it finds that the Government has alleged disputed facts that could support personal jurisdiction over one or more of the defendants it should order an evidentiary hearing.

Respectfully submitted this 16th day of February 2023.

 _s/  Caleb Kruckenberg_____
CALEB KRUCKENBERG*
D.C. Bar No. 1617890
*Admitted Pro Hac Vice*
STEVEN M. SIMPSON**
D.C. Bar No. 462553
**Pro Hac Vice Pending*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
CKruckenberg@pacificlegal.org
SSimpson@pacificlegal.org

JONATHAN M. HOUGHTON
E.D. N.Y. ID No. JH 5334
N.Y. Bar No. 2955326
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
JHoughton@pacificlegal.org

*Attorneys for Defendants*

**AFFIRMATION OF SERVICE**

I, Caleb Kruckenberg, declare under penalty of perjury that I filed the foregoing with the Clerk of the Court of the Eastern District of New York though the CM/ECF system, which will serve notice of said filing on all counsel of record.

  s/  Caleb Kruckenberg
CALEB KRUCKENBERG*
*Admitted Pro Hac Vice