UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

   - v. -

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; KEVIN MAXWELL,

              Defendants.

1:23-CV-00369
(NRM) (RML)

## THE UNITED STATES OF AMERICA'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East, 7th Floor
Brooklyn, New York 11201

February 23, 2023

Michael Blume
Joseph Marutollo
Paulina Stamatelos
Assistant United States Attorneys
(Of Counsel)

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

PROCEDURAL BACKGROUND ......................................................................................... 2

FACTUAL BACKGROUND ................................................................................................. 3

     I.     Defendants advertised and sold their products in New York ................................. 3

     II.    Defendants worked with firearms dealers that sold their products to New York ............................................................................................................... 3

     III.   Defendants direct firearms dealers to wire payments through New York to pay RBT for the sale of FRT-15s ................................................................ 4

     IV.   Defendants made purchases in New York ............................................................ 6

     V.    Defendant RBF is intertwined with the other Defendants .................................... 7

ARGUMENT ........................................................................................................................ 8

     I.     Standard of review ............................................................................................... 8

     II.    Section 1345 allows the United States to bring actions in "any Federal court," thereby providing this Court with personal jurisdiction over Defendants ......................................................................................................... 9

     III.   This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4 and New York's Long-Arm Statute .................................................. 13

          A.    Defendants transact business in New York ............................................... 13

          B.    Defendants have committed torts outside of New York that have effects in New York ................................................................................. 17

     IV.   Exercising personal jurisdiction over Defendants comports with Due Process ............................................................................................................... 20

     V.    As a co-conspirator, Defendant RBF is subject to this Court's jurisdiction ........................................................................................................ 25

CONCLUSION ................................................................................................................... 26

## **TABLE OF AUTHORITIES**

Federal Cases

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d Cir. 2002) ................18

*Berkshire Bank v. Lloyds Banking Group plc,* No. 20-1987,
2022 WL 569819 (2d Cir. Feb. 25, 2022), *cert. denied* 143 S. Ct. 286 (U.S., 2022) ......................25

*Broumand v. Joseph*, 522 F. Supp. 3d 8 (S.D.N.Y. 2021) ........................................................8, 21, 24

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023).................................................................................23

*Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018)................................25

*Chirag v. MT Marida Marguerite Schiffahrts*, 604 Fed. Appx. 16 (2d Cir. 2015) ............................9

*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F. 3d 158 (2d Cir. 2010) ........................................14

*City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296 (E.D.N.Y. 2007).....................18, 23

*City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369 (E.D.N.Y. 2007)...................23

*City of New York v. Bob Moates' Sport Shop, Inc.*, 253 F.R.D. 237 (E.D.N.Y. 2008)....................17

*Daou v. BLC Bank, S.A.L.*, 42 F.4th 120 (2d Cir. 2022) ....................................................................15

*Ehrenfeld v. Mahfouz*, 489 F.3d 542 (2d Cir. 2007) .........................................................................18

*In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279 (7th Cir. 1992)...................................................21

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) ........................15

*Mapfre Peru Compania de Seguros y Reaseguros S.A. v. M/V AS Fortuna,*
No. 20-CV-5606 (Carter, J.), 2022 WL 976827 (S.D.N.Y. Mar. 31, 2022) ........................................3

*Marine Midland Bank v. Miller*, 664 F.2d 899 (2d Cir. 1981)...........................................................9

*Pearson Educ., Inc. v. Shi*, 525 F. Supp. 2d 551 (S.D.N.Y. 2007) ...................................................14

*PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65 (2d Cir. 1998)....................................12

*Rare Breed Triggers, LLC v. Big Daddy Enterprises, Inc.,* No. 21-cv-149 (N.D. Fl.) ....................24

*Rare Breed Triggers, LLC v. Big Daddy Unlimited, Inc.,* No. 22-cv-61 (N.D. Fl.) ........................24

*Rare Breed Triggers, LLC v. Crawford*, 23-cv-21 (N.D. OK.)..........................................................24

*Rare Breed Triggers, LLC v. Garland,* No. 21-cv-1245 (M.D. Fl.)...................................................24

*Rare Breed Triggers, LLC v. Garland,* No. 22-cv-85,
2022 WL 17175089 (Nov. 4, 2022) ....................................................................................................24

*Rare Breed Triggers, LLC v. Graves,* No. 22-cv-107 (N.D. Ok.) ......................................24

*Rare Breed Triggers, LLC v. Strbac,* No. 22-cv-280 (N.D. Ohio) ...................................24

*S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123 (2d Cir. 2010) ...................3, 8

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC,*
22 F. 4th 103 (2d Cir. 2021) ...............................................................................8, 20

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG,*
277 F. Supp. 3d 521 (S.D.N.Y. 2017) ...........................................................................14

*Topps Co. v. Gerrit J. Verburg Co.*, 961 F. Supp. 88 (S.D.N.Y. 1997) .............................24

*United States v. Levy*, No. 16-CR-270, 2017 WL 4381398 (E.D.N.Y. Aug. 9, 2017),
*aff'd as modified*, 738 F. App'x 724 (2d Cir. 2018)...........................................................18

*United States v. Rare Breed Triggers, LLC*, No. 23-CV-00369,
2023 WL 504992 (E.D.N.Y. Jan. 25, 2023)...............................................................1, 2

*Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016)..................20

### State Cases

*Deutsche Bank Securities, Inc. v. Montana Bd. Of Investments,*
850 N.E.2d 1140, 818 N.Y.S. 2d 164 (N.Y. 2006) ...........................................................14

*LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 735 N.E.2d 883 (2000) .....................19, 20

*Williams v. Beemiller, Inc.*, 33 N.Y.3d 523, 130 N.E.3d 833 (2019) ...............................22

### Federal Statutes

15 U.S.C. § 22 ...............................................................................................................11

15 U.S.C. § 53(b) ...........................................................................................................11

15 U.S.C. § 77v(a) ..........................................................................................................11

18 U.S.C. § 371 ..........................................................................................................2, 18

18 U.S.C. § 1341 ........................................................................................................2, 18

18 U.S.C. § 1343 ........................................................................................................2, 18

18 U.S.C. § 1345 .......................................................................................................*passim*

18 U.S.C. § 1349 ........................................................................................................2, 18

18 U.S.C. § 1965(a) .........................................................................................................11

18 U.S.C. § 1965(b) .........................................................................................................12

28 U.S.C. § 1331 ................................................................................................12

31 U.S.C. § 3732(a) ...........................................................................................11

39 U.S.C. § 3007(a)(1) .......................................................................................10

## Federal Rules

Fed. R. Civ. P. 4 ................................................................................................13

Fed. R. Civ. P. 4(k)(1)(A) .................................................................................13

Fed. R. Civ. P. 4(k)(1)(C) ..............................................................................9, 12

## State Rules

N.Y. C.P.L.R. § 302 ...........................................................................................13

N.Y. C.P.L.R. § 302(a) .......................................................................................25

N.Y. C.P.L.R. § 302(a)(1) ...........................................................................1, 13, 14

N.Y. C.P.L.R. § 302(a)(3) .....................................................................1, 17, 18, 19

## Congressional Materials

Pub. L. No. 98-473, § 1205(a), 98 Stat. 2151 (1984) ....................................9, 10

Pub. L. No. 101-647, § 2521(b)(2), 104 Stat. 4865 (1990) ................................10

Pub. L. No. 104-191, § 247, 110 Stat. 2018 (1996) ............................................10

Sen. Rep. No. 98-225 at 401-02 (1983) ..............................................................10

## PRELIMINARY STATEMENT

On January 19, 2023, the United States filed this action against Defendants Rare Breed Triggers, LLC (RBT), Rare Breed Firearms, LLC (RBF), Lawrence DeMonico, and Kevin Maxwell seeking a temporary restraining order (TRO), preliminary and permanent injunctions, and other equitable relief pursuant to 18 U.S.C. § 1345 because, in short, Defendants illegally sell machinegun conversion devices deemed to be machineguns under the law.   Following the United States' application and an *ex parte* hearing, the Court granted the TRO on January 25, 2023.  *See United States v. Rare Breed Triggers, LLC*, No. 23-CV-00369, Dkt. 11, 2023 WL 504992 (E.D.N.Y. Jan. 25, 2023) (Morrison, J.).  Defendants now move to dismiss this action for lack of personal jurisdiction.

Defendants' motion should be denied in its entirety.  Section 1345, by its very text, allows the United States to bring actions in "any Federal Court," thereby providing this Court with personal jurisdiction over Defendants.  The Court also has personal jurisdiction over Defendants under New York's Long-Arm statute, N.Y. C.P.L.R. § 302(a)(1) and (3), as Defendants transact business in New York and Defendants have committed torts outside of New York that have caused injuries inside New York.  Defendants have intentionally and repeatedly directed firearms dealers to use the New York financial system for wire transfers to pay RBT for its sale of FRT-15s.  As Defendants are well aware and pursuant to their direction, RBT's JPMorgan Chase bank statements document that between January 6, 2021 and December 30, 2022, at least 289 wire transfers – totaling over $6.2 million dollars – traveled through JPMorgan Chase bank in New York City.  Defendants also advertised and sold their FRT-15s in New York while working with dealers that sold the illegal devices to New York customers.

Exercising personal jurisdiction over Defendants clearly comports with Due Process.  Accordingly, the Court should deny Defendants' motion, order Defendants to promptly respond to the United States' pending motion for preliminary injunction, and permit the parties to proceed with expedited discovery on the merits in advance of the April 26, 2023 preliminary injunction hearing.

## PROCEDURAL BACKGROUND

In the TRO, the Court held, *inter alia*, that there is probable cause to believe that (1) Defendants have, in violation of 18 U.S.C. § 371, "knowingly and intentionally conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of the [Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)] in their regulation of machineguns under the National Firearms Act of 1934 (NFA) and the Gun Control Act of 1968 (GCA)"; (2) Defendants have, in violation of 18 U.S.C. § 1341, "engaged, and will continue to imminently engage, in the ongoing commission of mail fraud [] 'by obtaining money . . . by means of false or fraudulent pretenses, representations, or promises' through the use of the mail"; (3) Defendants have, in violation of 18 U.S.C. § 1343, "engaged, and will imminently engage, in the ongoing commission of wire fraud [] by 'obtaining money . . . by means of false or fraudulent pretenses, representations, or promises' through the use of wire transmission"; (4) "Defendants' fraudulent conduct is ongoing and imminent"; (5) Defendants have, in violation of 18 U.S.C. § 1349, "engaged in an ongoing conspiracy to commit mail fraud"; and (6) Defendants have, in violation of 18 U.S.C. § 1349, "engaged in an ongoing conspiracy to commit wire fraud." *Id.* at *1-3.

On February 3, 2023, the Court extended, on consent of the parties, the TRO currently in place until and including April 30, 2023, unless the Court dismisses the case for lack of personal jurisdiction before that date or the TRO is rendered moot before that date as a result of the Court's decision on the United States' motion for a preliminary injunction. Should the Court conclude that it has personal jurisdiction over Defendants, the Court scheduled a preliminary injunction hearing for April 26, 2023. On February 16, 2023, Defendants filed their motion to dismiss for lack of personal jurisdiction (Defendants' motion). Dkt. 23.

## FACTUAL BACKGROUND[1]

**I.   Defendants advertised and sold their products in New York**

Defendant RBT maintains a website through which it sells products, specifically the FRT-15 conversion device.  Defendants DeMonico and Maxwell, among others, formed RBT to sell the FRT-15.  *See* Declaration of Special Agent Daniel Koneschusky, Dkt. 7 (Koneschusky Declaration) at ¶ 91.  A consumer anywhere in the country – including in New York – can access the website, place an order for a product, and pay for that product.  *See id.*

Defendant RBT markets its machinegun conversion devices through its website. Defendant RBT also maintains marketing lists through which it sends targeted advertisements to potential customers.  *See id.* ¶¶ 102-04.  These advertisements are sent to potential customers throughout the country.  *See* Declaration of Special Agent Dean Conigliaro (Conigliaro Decl.) ¶ 7.

Defendant RBF operates in a similar way.  It too maintains a website through which it sells firearms and firearm parts.  *See* www.rarebreedfirearms.com (last visited February 23, 2023).  Defendant RBF has shipped products to customers in New York.  *See* Conigliaro Decl. ¶ 11.  Between July 1, 2021 and January 31, 2022, RBF shipped thirteen packages to addresses in the Eastern District of New York.  *See id.*

**II.   Defendants worked with firearms dealers that sold their products to New York**

Defendants also sold their products to consumers through dealers.  When Defendant RBT first began to sell FRT-15s, a company called Big Daddy Unlimited (Big Daddy) was its sole distributer except for direct sales from RBT's website.  Conigliaro Decl. ¶ 12, *see id*. Exhibit A (Declaration of Lawrence DeMonico in *Rare Breed Triggers, LLC v. Big Daddy Enterprises, Inc.,* No. 21-cv-149

---

[1] The United States incorporates herein the factual allegations in its Complaint and accompanying papers.  In evaluating a motion to dismiss for personal jurisdiction, the Court can also consider materials outside the pleadings, including declarations.  *See, e.g., S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010)*; Mapfre Peru Compania de Seguros y Reaseguros S.A. v. M/V AS Fortuna*, No. 20-CV-5606 (Carter, J.), 2022 WL 976827 at *2 (S.D.N.Y. Mar. 31, 2022).

N.D. Fl., Dkt. 10-2 at ¶¶ 12-14) (DeMonico Decl.). Big Daddy's sales included "direct consumer sales and all distribution to brick and mortar or online retailers." *Id.* at ¶ 12. Defendants RBT and DeMonico knew that Big Daddy "sold the FRT-15™ trigger directly to customers across the United States." *Id.* at ¶ 14. Later, with Defendant DeMonico leading the way, Defendant RBT opened up its dealer program to all interested dealers. *See* Conigliaro Decl. ¶ 16 ("we have decided to open our dealer programs [to] all interested dealers"). Defendants knew that these dealers sold and shipped their products all over the United States, including to New York. *See* Koneschusky Declaration, Dkt. 7 ¶ 41.[2] As just one example, a federal firearms licensee in Massachusetts purchased over 500 FRT-15s from Defendant RBT and from Big Daddy. *See* Conigliaro Decl. ¶ 14. At least 19 of these were then re-sold to New York customers, including to customers in the Eastern District of New York. *See* Conigliaro Decl. ¶ 14.

ATF has recovered several FRT-15s and WOTs (which are copies of FRT-15s and have been sold by the Defendants) in locations in the Eastern District of New York, including in Melville, Mineola, Ozone Park, and Wantagh. *See* Conigliaro Decl. ¶ 15. These FRT-15s were purchased by the possessors from a dealer in Texas. *See* Conigliaro Decl. ¶ 15.

## III.   Defendants direct firearms dealers to wire payments through New York to pay RBT for the sale of FRT-15s

Defendants directed that their dealers pay for their products by wire transfer. As Defendant DeMonico has succinctly put it, "That's our process. Sorry!" *See* Conigliaro Decl. ¶ 16. The wires are facilitated through JPMorgan Chase in New York, per the instructions that Defendant DeMonico drafted and sent to Defendant RBT's dealer customers. *See* Declaration of Melissa Rodriguez, ATF

---

[2] In his 2021 deposition in *Rare Breed Triggers, LLC et al. v. Big Daddy Enterprises, Inc. et al.*, 21-cv-00149-RH-GR (M.D. Fl.), Defendant DeMonico was asked "[w]hat state or states does [Rare Breed] not sell in . . ." He answered "California, Washington State, Hawaii, Maryland, and DC, " *see* Dkt. 7-6 (DeMonico Dep.), at 29-30, and then added, unprompted, that "[w]e *do have dealers* that choose to sell in those states." *Id.* (emphasis added).

4

Senior Forensic Auditor (Rodriguez Decl.) ¶ 12.[3]  Defendant Maxwell was well aware of this process. *See* Conigliaro Decl. ¶ 18.  After all, Defendants DeMonico and Maxwell jointly operated Defendant RBT, according to a declaration from Defendant Maxwell.  *See Rare Breed Triggers, LLC v. Garland*, No. 22-cv-85 (D. N.D.), Dkt. 30-1 at ¶ 4 ("I operated the company, before March 2022, with its President, Lawrence DeMonico.").

Defendants regularly and extensively used JPMorgan Chase in New York to facilitate Defendant RBT's incoming wire transfers.  *See* Rodriguez Decl., Exhibit A.  According to ATF's investigation, RBT instructed firearm dealers to pay RBT via wire transfer through JPMorgan Chase N.Y., at 270 Park Avenue, New York, New York, 10017.  *See* Rodriguez Decl. ¶ 11.  This information is corroborated by subpoenaed records from JPMorgan Chase, which show that, during the period from January 6, 2021 through December 30, 2022, RBT received wire payments through "Chase Nyc" on 289 occasions.  *See* Rodriguez Decl. ¶ 23.

At least $6,217,500.71 was wired through JPMorgan Chase in New York.  *See* Rodriguez Decl. ¶ 24.  RBT was more than aware that these funds were transferred through JPMorgan Chase in New York.  Indeed, as noted above, RBT received monthly bank statements documenting the transfers, using the reference "Chase Nyc" 289 times.  Rodriguez Decl. ¶ 23.  For instance, on February 22, 2021, Big Daddy wire transferred $427,500 to RBT's bank account through "Chase

---

[3] Federal Reserve banks provide Fedwire Funds Services (FedWire), which is a credit transfer service that permits the sending of money through the banking system.  *See* Rodriguez Decl. ¶ 16.  A bank may originate a wire transfer by telling a Federal Reserve Bank, such as the Federal Reserve Bank in New York, to debit funds from its account with the Federal Reserve Bank and to credit that money to another bank's account with the Federal Reserve Bank.  *Id.*  In the case of RBT, funds are being sent to JPMorgan Chase in New York City.  *Id.*  The Federal Reserve Bank in New York assigns a number to the transaction and sends the information to JPMorgan Chase.  *Id.*  JPMorgan Chase then withdraws the amount sent in the notification from the Federal Reserve Bank from a JPMorgan reserve account located at 270 Park Avenue, New York, New York, 10017.  *Id.*  JPMorgan then deposits the amount into the beneficiary account listed on the notification and sends a notification back to the Federal Reserve Bank.  *Id.*  Checks and balances are then completed at the Federal Reserve Bank.  *Id.*  After completion, the Federal Reserve Bank sends the funds to JPMorgan Chase, to replenish the JPMorgan Chase reserve account held at 270 Park Avenue, New York, New York, 10017.  *Id.*

Nyc." *See* Rodriguez Decl. ¶ 26.  Over a year later, on March 2, 2022, 11 separate dealers wire transferred a total of $77,348 through "Chase Nyc." *See* Rodriguez Decl. ¶ 27.

Any doubt that RBT received and reviewed the JPMorgan Chase statements is dispelled by the fact that RBT updated its contact information with JPMorgan Chase during this period, as follows: from January 6, 2021 through November 30, 2021, JPMorgan Chase sent the monthly JPMorgan Chase statements to RBT's Florida addresses; from December 1, 2021 through December 30, 2022, JPMorgan Chase sent the monthly statements to RBT's North Dakota address.  Rodriguez Decl. ¶ 29.

Defendants' own, albeit extremely limited, responses to the United States' requests for documents confirm, by way of internal records that they maintained, that a number of firearms companies wired thousands of dollars to RBT's through JPMorgan Chase at 270 Park Avenue in New York City.  *See, e.g.,* Rodriguez Decl. ¶ 34, Exhibit C, at RBT20 ($45,150 wire on August 23, 2021) RBT10 ($18,060 wire on August 27, 2021); RBT13 ($8,025 wire on August 19, 2021); RBT45 ($6,435 wire on September 2, 2021); RBT7 ($3,215 wire on August 24, 2021); RBT15 ($3,215 wire on August 18, 2021); RBT17 ($3,215 wire on August 24, 2021); RBT30 ($3,215 wire on August 19, 2021); RBT46 ($3,215 wire on August 19, 2021); RBT32 ($3,215 wire on August 19, 2021); RBT42 ($3,215 wire on August 25, 2021); and RBT44 ($3,215 wire on August 25, 2021).[4]

## IV.   Defendants made purchases in New York

According to their subpoenaed JPMorgan Chase records, in September 2021, RBT had three credit card transactions for purchases from the Lee Spring Company.   Rodriguez Decl. ¶ 30. According to its website,[5] "Lee Spring Company manufactures and distributes mechanical springs, wire forms, stampings and fourslide parts worldwide" and is located at "140 58th Street, Brooklyn,

---

[4] Note that the wires referenced in the text reflect only certain internal records that the Defendants turned over in discovery.  Other records – the JPMorgan Chase records – show that there were many more such transaction.

[5] *See* https://www.leespring.com/ (last visited February 23, 2023).

NY."  The Lee Spring Company was based in Brooklyn in 2021.[6]  RBF ordered a total of 10,000 compression springs, at .87 per unit, from Lee Spring Company, totaling $870 total.  *See* Conigliaro Decl. ¶ 25.  The products shipped to RBF.  Conigliaro Decl. ¶ 25.

**V.     Defendant RBF is intertwined with the other Defendants**

Defendant RBF sells firearms and firearms accessories.  Defendant DeMonico is the president of Defendant RBF.  *See* Conigliaro Decl., Exhibit A, DeMonico Dep. at 136.  Defendants RBT and RBF have a "a close relationship."  *Id*. at 137.  Prior to the formation of Defendant RBT, Defendant DeMonico, as president of Defendant RBF and through that company, was looking for an opportunity to sell a forced reset trigger.  *See id*. at 136-37.  Defendant DeMonico and Defendant RBF "had been working on . . . concepts and ideas and design for years before . . . Rare Breed Triggers was formed." *Id*. at 137.  The company that then devised the plan to acquire, market and sell the FRT-15 was Defendant RBF.

Defendants RBT and RBF cross-market.  Defendant RBT's website's home page includes a link to Defendant RBF's Instagram account; that Instagram account includes, among other things, videos of Defendant DeMonico promoting the FRT-15.  *See* Conigliaro Decl. ¶ 22.  In the most recent video on Defendant RBF's Instagram account, Defendant DeMonico discusses this very case.  *See* Conigliaro Decl. ¶ 22.  Other videos show Defendant DeMonico using firearms equipped with FRT-15s.  *See* Conigliaro Decl. ¶ 22.  In still another video, Defendant DeMonico notes that he is president of Defendant RBF and "our sister company" Defendant RBT.  *See* Conigliaro Decl. ¶ 22.

Another example of the cross-marketing between RBT and RBF concerns an animation about how the FRT-15 works. Defendant RBT produced the animation and posted it on RBT's website.  *See* Conigliaro Decl. ¶ . .  *See* Conigliaro Decl. ¶ 23.  Still images of that animation are reproduced in

---

[6] *See* https://www.leespring.com/ (last visited February 20, 2023).   ("Founded [] in 1918, Lee Spring began in Brooklyn New York and our Global Headquarters are still based in Brooklyn today.").

Exhibit M of the Koneschusky Declaration.  The animation shows the FRT-15 installed into an AR-15 lower receiver, which is the part of the firearm that houses the trigger assembly.  *See* Conigliaro Decl. ¶ . The lower receiver in the animation is a product made exclusively by Defendant RBF; it is the so-called "Crusader," which incorporates a replica of a medieval helmet into the lower itself.  *See* Conigliaro Decl. ¶ 23. The "Crusader" and the "Crusader Distressed Helmet" are available for purchase on Defendant RBF's website.  *See* Conigliaro Decl. ¶ 23.

Defendant RBF also used its social media platform to advocate for RBT's position that despite ATF's cease and desist letters, RBT could continue to market and sell illegal firearms.  For example, on RBF's Instagram account, RBF (controlled by Defendant DeMonico and often showing Defendant DeMonico speaking to the camera) posted a lengthy statement regarding ATF's cease and desist letters in which, *inter alia*, RBF stated that: "**Our** position has always been and continues to be that FRT-15 is a perfectly legal semi-automatic trigger….".  *See* Conigliaro Decl. ¶ 23 (emphasis added).

## ARGUMENT

### I.    Standard of review

On a motion to dismiss for lack of personal jurisdiction based on affidavits and other written materials, the plaintiff need only make a *prima facie* showing of jurisdiction. *See, e.g.*, *Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*, 22 F. 4th 103, 121 (2d Cir. 2021); *Broumand v. Joseph*, 522 F. Supp. 3d 8, 14 (S.D.N.Y. 2021) (Rakoff, J.).  The Court must view the pleadings and affidavits in the light most favorable to the United States and resolve all doubts in its favor.  *See Broumand*, 522 F. Supp. 3d at 14*; see also S. New England Tel. Co. v. Global NAPs, Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (explaining that the court may consider material outside the pleadings, and must construe such material "in the light most favorable to plaintiffs, resolving all doubts in their favor.") (citations omitted).

A *prima facie* showing requires (1) proper service of process, (2) that rests on a statutory basis, and (3) comports with Constitutional Due Process principles.  *See Schwab Short-Term Bond Market*

*Fund*, 22 F.4th at 121*; see also Chirag v. MT Marida Marguerite Schiffahrts*, 604 Fed. Appx. 16, 19 (2d Cir. 2015) ("A *prima facie* case [of personal jurisdiction] requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place."). District courts have "considerable procedural leeway" in deciding motions to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2). *See Marine Midland Bank v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).

There is no challenge to the actual service of process; so, the United States will address the statutory and constitutional bases for jurisdiction.

## II.   Section 1345 allows the United States to bring actions in "any Federal court," thereby providing this Court with personal jurisdiction over Defendants

Section 1345, by its very terms, provides this Court personal jurisdiction over Defendants. Pursuant to Federal Rule of Civil Procedure 4(k)(1)(C), then, this Court has personal jurisdiction over Defendants. *See* Fed. R. Civ. Pro. 4(k)(1)(C) ("Serving a summons . . . establishes personal jurisdiction over a defendant . . .when authorized by federal statute."). The relevant language of § 1345 states that "the Attorney General may commence a civil action in any Federal court to enjoin [a] violation" of the criminal conspiracy, mail fraud, or wire fraud statutes. An action under § 1345, then, is an action by the national sovereign – the United States – to enforce national law. Congress placed no limit on where such a case may be brought; "any" means just that, any.

Given that Congress intended for the government to bring a § 1345 case anywhere, it follows that Congress intended for government to be able to serve process for such a case anywhere. It would make little sense for Congress to enact a statute that allows for the government to bring a case before "any Federal court" but put some limit on the ability of particular federal courts to hear the case.

The legislative history of § 1345 confirms as much. That history is one of Congress progressively expanding the scope of the government's authority to bring an injunction to stop fraud. Congress first enacted § 1345 in 1984. *See* Act of Oct. 12, 1984, Pub. L. No. 98-473, § 1205(a), 98

Stat. 2151. Section 1345 was added to supplement an existing provision that allowed the United States Postal Service to apply for an injunction to stop mail that is used in furtherance of a fraud. *See* Sen. Rep. No. 98-225 at 401-02 (1983). That existing provision, however, limits where such an injunction may be brought. *See* 39 U.S.C. § 3007(a)(1) (allowing an injunction "in any district in which mail is sent or received . . . or in which the defendant is found"). Section 1345 went further. In its first iteration, § 1345 allowed for an injunction in "a district court," with no limitation. *See* Act of Oct. 12, 1984, Pub. L. No. 98-473, § 1205(a), 98 Stat. 2151. Congress later amended § 1345 to go further still; it changed "a district court" to "any Federal court." *See* Crime Control Act of 1990, Pub. L. No. 101-647, § 2521(b)(2), 104 Stat. 4865. At each step, then, Congress extended the reach of the government's authority to enjoin violations of the law.[7]

That § 1345 does not include explicit language that authorizes nationwide service of process is of no moment, for two reasons. First, to read § 1345 to mean that it does not authorize nationwide service of process would undermine the plain terms of the statute. Such a reading would mean that a jurisdictional analysis under § 1345 would require an examination of the reach of the long-arm statute of the state in which the district court hearing the case sits (as will be explained below). If that were so, then one must read § 1345 to mean that the phrase "the Attorney General may commence a civil action in any Federal court" really should be "the Attorney General may commence a civil action in any Federal court only if the state law in the particular state in which that court sits allows it." That reading is nonsensical; Congress did not give the government specific authority to act just to invite a state to take that authority away. Such a reading is inimical to the plain language of § 1345 and to its history.

---

[7] A similar progression is evident with respect to the underlying violations that § 1345 addresses. At first, § 1345 just addressed mail and wire fraud. *See* Act of Oct. 12, 1984, Pub. L. No. 98-473, § 1205(a), 98 Stat. 2151. Congress expanded § 1345 to include conspiracy and banking law violations. *See* Crime Control Act of 1990, Pub. L. No. 101-647, § 2521(b)(2), 104 Stat. 4865. Congress then expanded § 1345 again, to include health care offenses. *See* Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, § 247, 110 Stat. 2018.

Second, although the United States recognizes that there are civil enforcement statutes that specifically provide for nationwide services of process, the language of those statutes is different from the language in § 1345. In each such case, the statute limits where a case may be brought, but allows for nationwide service of process. The False Claims Act is a representative example.[8] The False Claims Act allows for nationwide service of process, but permits a case to be brought only where a "defendant can be found, resides, transacts business, or in which a [violation] occurred." See 31 U.S.C. § 3732(a). That the statute then authorizes nationwide process makes good sense, in context. If the statute were to say nothing about process, then a fair reading of the statute would be that service of process, and thereby jurisdiction, extends only as far as where a case can brought. To extend the scope of the service of process, then, the statute would have to specify as much. Here, there is no need to do that; the fact that the statute says that a case can be brought in "any Federal court" makes clear that service of process is nationwide. If it were otherwise, then "any" would mean something other than "any."

Section 1345 differs from other statues in another important way. The United States is the only entity that can enforce Section 1345. Every § 1345 case, then, is an instance in which a national sovereign is seeking to enforce a national law. Several of the other statutes include private rights of action; several allow federal commissions to commence an action; and several allow states or state agencies to bring a case. *See, e.g.,* Margaret H. Lemos, State Enforcement of Federal Law, 86 N.Y.U. L. Rev. 698, 710 (2011) (describing, *inter alia*, state attorneys general ability to enforce federal law).

---

[8] Other statutes include the Clayton Act, the Federal Trade Commission Act, the Racketeer Influenced and Corrupt Organizations Act (RICO), and the Securities Act. Each of these statutes has language similar to that in the False Claims Act in that each limits where a case may be brought. *See* Clayton Act, 15 U.S.C. § 22; Federal Trade Commission Act, 15 U.S.C. § 53(b) (suit can be brought only where defendant resides or transacts business or under general venue provisions); RICO 18 U.S.C. § 1965(a), (b) (case can be brought only where person resides, is found, or transacts business); Securities Act 15 U.S.C. § 77v(a) ("Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found").

None of these statutes are enforceable solely and exclusively by the United States as the United States. Limiting the reach of such statutes thus makes some sense.  Still, these statutes allow for nationwide service, and thus for nationwide personal jurisdiction.  It is hard to see why Congress would allow for the broad reach of such statutes – to the benefit of private parties and states, for instance – but not allow it for § 1345, which applies only to the United States.  In that regard, it is notable that the RICO case (discussed *infra*) on which Defendants rely is a private action brought by a private party.

In their brief, Defendants incorrectly interpret § 1345 and Fed. R. Civ. P. 4(k)(1)(C).  First, Defendants' argument that § 1345's language "any Federal Court" is what confers subject matter jurisdiction on this Court is simply wrong.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which confers subject matter jurisdiction on this Court for every civil action that arises under federal law.  This Court would therefore have subject matter jurisdiction whether § 1345 said "any Federal court," "a Federal court," or "a court."

Defendants appear to argue that § 1345 must include language that expressly authorizes service of process under Fed. R. Civ. P. 4(k)(1)(C) and rely exclusively on one case interpreting the RICO § 1965(b) to limit nationwide service of process except where the "ends of justice" requires it.  That case, *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65 (2d Cir. 1998), simply holds that that the RICO statute allows for nationwide service only in the interests of justice.  Of course, such a limitation makes sense, given that the RICO statute itself says on its face that process is permitted only when the "ends of justice" so require it.  18 U.S.C. § 1965(b).  No such limiting language, however, appears in § 1345 because Congress intended that "any Federal court" in the United States has jurisdiction over defendants, like the defendants in this case, that have perpetrated a multi-year fraud on the entire nation.  Citing no caselaw or statutory interpretation principles, Defendants also appear to argue that § 1345's language allowing the United States to bring an action "in any Federal court to enjoin such a violation" "presumably" means "*where*" the violation has

occurred. D. Br. 13.  Of course, § 1345 says no such thing, and Congress knows full well how to limit where a case may be brought; it did just that in the statutes the United States cites above.

In any event, even applying Defendants' incorrect interpretation – that the United States has personal jurisdiction over them "where" the violation, *i.e.,* the fraud has occurred – jurisdiction still exists.  Defendants unquestionably used New York's financial system to perpetrate its fraud on the United States; specifically, they directed the sale of, and receive the illegal proceeds from the sale of, machineguns.

**III.  This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4 and New York's Long-Arm Statute**

**A.  Defendants transact business in New York**

As an alternative to § 1345, New York's Long-Arm statute, *see* N.Y. C.P.L.R. § 302, provides this Court with personal jurisdiction over Defendants.[9]  Pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), then, this Court has personal jurisdiction over Defendants.  *See* Fed. R. Civ. Pro. 4(k)(1)(A) ("Serving a summons . . . establishes personal jurisdiction over a defendant … who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.").

Under New York's Long-Arm statute, New York courts have personal jurisdiction over a defendant when (1) it transacted business within the state and (2) the claims asserted arise from that business.  *See* N.Y. C.P.L.R. § 302(a)(1).  In applying the test for the "transacts business" prong of §302(a)(1), "New York decisions . . . tend to conflate the long arm statutory and constitutional analyses by focusing on the constitutional standard," *i.e.,* " a defendant need not be physically present in New York to transact business there within the meaning of [the first prong] so long as the defendant

---

[9] As set forth in the Court's February 15, 2023 Minute Entry and Order, Defendants conceded and "represented to the Court that, if the Court ultimately concludes that it has personal jurisdiction over Rare Breed Triggers LLC, then the Court would also have personal jurisdiction over the *individual defendants*" DeMonico and Maxwell.  In addition to this concession, and as discussed further in Part V below, Defendant Rare Breed Firearms, LLC is also subject to the jurisdiction of this Court.

as engaged in purposeful activity," for instance, "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its law." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F. 3d 158, 169-71 (2d Cir. 2010) (quotations omitted).   The second prong of § 302(a)(1) requires an "articulable nexus or a substantial relationship between the business transaction and the claim asserted," however, "a causal relationship between the business transaction and the claim asserted" is not required. *Gucci Am. Inc. v. Weixing Li¸* 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015) (Sullivan, J.) (citations omitted).

The Long-Arm Statute is, therefore, a "single act" statute, in that proof of one transaction in New York is sufficient to invoke jurisdiction, even if the defendant never steps foot in New York, provided that one transaction is purposeful and related to the claim asserted. *See, e.g., Deutsche Bank Securities, Inc. v. Montana Bd. Of Investments*, 850 N.E.2d 1140, 1142-1143, 818 N.Y.S. 2d 164, 166 (N.Y. 2006); *Pearson Educ., Inc. v. Shi*, 525 F. Supp. 2d 551, 555 (S.D.N.Y. 2007) ("CPLR § 302(a)(1) is a 'single act' statute, under which proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.") (citations omitted).

Banking in New York satisfies the Long-Arm Statute.  That is precisely what Defendants did here, deliberately and repeatedly.  Indeed, contrary to Defendants' motion, the evidence, including the United States' subpoenaed records to JPMorgan Chase, unequivocally show that Defendants extensively relied on wires through New York City.  In short, the New York-based activities of Defendants "provided the impetus for the very wrongdoing" at issue. *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*, 277 F. Supp. 3d 521, 593 (S.D.N.Y. 2017).

As part of their dealer program, they required that firearms dealers who wished to purchase FRT-15s (and WOTs) wire money to JPMorgan Chase in New York.  These are the very wire transactions at issue in this case.  Defendant DeMonico himself drafted the instruction sheet that

14

Defendants sent to their dealer customers.  *See* Rodriguez Decl. ¶¶ 12-15. And Defendant RBT benefitted from the sale of FRT-15s stemming from approximately 289 wires totaling $6,217,500.71. *See* Rodriguez Decl.  ¶ 23.  Defendants, in short, availed themselves of the services provided by a New-York based bank, JPMorgan Chase.  They did not need to do so; there are innumerable payment systems and financial institutions based outside of New York.  But Defendants chose to bank with JPMorgan Chase, a bank that facilitates all wire transfers through its headquarters in New York.

Defendants' choice to use a New York-based bank puts them squarely within the reach of the Long-Arm Statute in the same way that the defendant's conduct did in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013).  In that case, a foreign bank with no other ties to the United States used a bank account in New York to conduct wire transfers.  *See id.* at 165-66.  The bank executed dozens of wire transfers, thus establishing that its use of the financial system in New York was deliberate and not coincidental, and the result of the bank's desiring to use that system.  *See id.* at 168-69.  The Second Circuit held, after certifying the question to the New York Court of Appeals, that the defendant's conduct in the case satisfied the Long-Arm statute.  So, too, does Defendants' conduct here.[10]

Defendants claim that they did not intend to send wires through New York and, to the extent such wires did go through New York, there were only a few.  That claim is false.  It fails on the facts, as established by the very documents that Defendants attach to their motion.  As Defendants note, they prepared an instruction sheet to be given to their dealers.  That instruction sheet told the dealers to wire money to an account with a New York address.  *See* Defendants' Motion, Declaration of Cole

---

[10] Defendants cite to *Daou v. BLC Bank, S.A.L.,* 42 F.4th 120 (2d Cir. 2022) to assert that their use of the wires here is insufficient to invoke personal jurisdiction over them.  *Daou* is inapplicable here.  In that case, the wires were not associated with the transactions that gave rise to the plaintiffs' claims; the wires happened before those transactions.  And the court rejected the argument that, because the defendants may, in the future, use wires for some additional transactions, there is jurisdiction.  *See id.* at 131.  Defendants here used the wires for the very transactions that give rise to this suit; these wires were to pay for the illegal sale of FRT-15s and WOTs.

Leleux, Dkt. 23-1 (Leleux Declaration) at Exhibit F.  Those instructions did not work, because of an incorrect routing number.  So, they asked JPMorgan Chase for clarification.  *See* Leleux Declaration at Exhibit G.  That clarification told Defendants which routing number to use.  It also made clear that the "Receiving Branch Address" was in New York and that "Sender's bank may request Chase's address for incoming wires," which was also in New York.  *See id.*  Defendants followed those instructions exactly.  When they sent out a corrected instruction sheet to their dealers, that corrected sheet again included a New York address, as it should have; that is where the wires actually went.  *See* Rodriguez Decl. ¶ 12; *see also* Dkt. 18-1 Exhibit B (email from Defendant DeMonico titled "RBT – Wire Transfer Form – Final" attaching corrected form with New York address).

In addition to the wire instruction sheet that Defendants themselves prepared, their monthly bank statements show that every wire transfer traveled through New York.  *See* Rodriguez Decl.  Every incoming wire transfer included in Defendant RBT's monthly statements notes, among other things, what dealer sent the wire, from what bank, and to what bank.  Rodriguez Decl. And in every such instance, the monthly statement includes the notation "Chase Nyc" as the receiving bank.  Rodriguez Decl. ¶¶ 22-24.  There were 289 such instances on the monthly statements from January 6, 2021 through December 30, 2022.  *Id.*  Those wires totaled $6,217,500.71 during this time period.[11]  *Id.*

The only way Defendants accepted payment by wire transfer from firearms dealers with which it conducted business was through JPMorgan Chase in New York.  Defendants repeatedly instructed their firearms dealers to use JPMorgan Chase's New York address to wire money to RBT to illegally purchase FRT-15s.  In communications with dealers, RBT stated that "[p]ayments for dealer account

---

[11] Any claim that Defendants did not notice or should not be expected to notice the "Chase Nyc" notation is disingenuous.  If Defendants intended for their wires to go somewhere other than New York, then they surely would have checked their bank statements, where the notation appears every month, for two years, on every one of the 289 wires they received.

sales [to RBT] must be made via wire transfer ONLY, per the dealer program initial info sent out." Rodriguez Decl. ¶ 33, Exhibit C RBT 18 (emphasis in original). RBT informed their dealer customers that "ACH transfer payments will NOT be accepted." *Id.* (emphasis in original).

In addition, every wire transfer authorization or wire transfer request form provided by the Defendants informed Defendants that a bank with a New York address is involved in each and every transaction. JPMorgan Chase in New York consequently facilitated millions of dollars in wire transactions between Defendants' dealer customers and RBT for its illegal sales. Notably, banks are not required to process their wires through New York. Rodriguez Decl. ¶ 20. Other banks using FedWire use reserve accounts based in locations other than New York. *Id.* For example, a wire to Wells Fargo goes from the originating bank to the Federal Reserve, and then to Wells Fargo in San Francisco. *Id.* Other banks do not use FedWire or touch on New York at all; an example of such a bank is the Bank of North Dakota. *Id.*

To allege that transacting business with a New York bank for at least a two-year period has somehow been a "mistake" or "accidental" is incredulous. in light of the hundreds of pages of banking records establishing Defendants' use of a of JPMorgan Chase to process millions of dollars in wire transfers involving illegal sales of tens of thousands of FRT-15s.

**B.      Defendants have committed torts outside of New York that have effects in New York**

The Court also has personal jurisdiction over Defendants under N.Y. C.P.L.R. § 302(a)(3). Personal jurisdiction under N.Y. C.P.L.R. § 302(a)(3) requires that "(1) the defendant committed a tortious act outside New York; (2) defendant's tortious activity caused injury to person or property inside New York; (3) defendant should have reasonably expected the act to have consequences in the state; and (4) defendant derives substantial revenue from interstate commerce." *The City of New York v. Bob Moates' Sport Shop, Inc.*, 253 F.R.D. 237, 240 (E.D.N.Y. 2008). Defendants argue that no

tortious injury occurred in New York and that Defendants could not have reasonably anticipated being sued in New York.  *See* Defendants' brief at 21-23.  But Defendants' argument misses the mark.

First, the United States has *prima facie* established that Defendants have committed "a tortious act outside New York" based on their sale of illegal machineguns.  A plaintiff "need not actually prove that defendant committed a tort but rather need only state a colorable cause of action."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 125 (2d Cir. 2002).  As noted above, the Court has determined that probable cause exists to show that Defendants have violated 18 U.S.C. § 371, 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1349.  Violation of a statute is generally tortious conduct *per se*.  *See* Restatement (Second) of Torts §§ 282-288B (1965).  The Second Circuit has emphasized that the cause of action alleged need not be a tort, so long as the "acts" giving rise to personal jurisdiction are themselves "tortious":

> We recognize the possibility that the claim brought in New York need not be a tort under New York law to justify invocation of § 302(a)(3) to confer jurisdiction. [] Nonetheless, there must be some basis for considering the defendant's actions to be tortious, either under the law of New York or some other pertinent jurisdiction. In this case, plaintiff has shown no basis for considering defendant's actions to be tortious.

*Ehrenfeld v. Mahfouz*, 489 F.3d 542, 551 (2d Cir. 2007) (citations omitted).  Courts have held that the "alleged violation of federal gun law is a 'tortious act.'"  *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 309 (E.D.N.Y. 2007).  "Fraud by the seller, the formal purchaser and the actual purchaser constitutes a tortious act in the state in which the sale takes place."  *Id.* at 316.

Second, Defendants' tortious activity caused injury to person or property in New York.  The flow of illegal machineguns into New York, undoubtedly, causes serious injuries to New Yorkers.  *Cf. United States v. Levy*, No. 16-CR-270, 2017 WL 4381398, at *1 (E.D.N.Y. Aug. 9, 2017), *aff'd as modified*, 738 F. App'x 724 (2d Cir. 2018) (describing the need for a lengthy sentence for a firearm-

related crime in order to "help limit the scourge in New York City of illegal guns").[12]  Defendants' sales also create injuries to customers that relied on Defendants' representations when purchasing their products.  Indeed, upon learning that the FRT-15 is illegal, multiple Defendants' customers in New York – who were defrauded by Defendants into believing that FRT-15s were legal – have agreed to abandon their purchased FRT-15 to ATF.  *See* Koneschusky Decl. ¶ 89.

Third, Defendants have expected or should have reasonably expected their acts to have consequences in New York.  Defendants "need not foresee the specific event that produced the alleged injury" but instead need only reasonably foresee that some result of its conduct would have direct consequences within New York State.  *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 215, 735 N.E.2d 883, 886 (2000).  As shown in their JPMorgan Chase monthly statements, millions of dollars were routinely wired through JPMorgan Chase in New York City.  *See* Rodriguez Decl.  Defendants also made purchases from companies in New York City.  And Defendants sell and advertise on RBT's websites, the websites of third-party vendors, and in third-party vendors' brick-and-mortar stores and are aware that FRT-15s and WOTs are being sold to customers in every state, including in New York. See Koneschusky Decl. ¶ 93.  For example, as noted above, a federal firearms licensee in Massachusetts purchased over 500 FRT-15s from Defendant RBT and from Big Daddy.  *See* Conigliaro Decl. ¶ 14.  At least 19 of these were then re-sold to customers in New York.  *See* Conigliaro Decl. ¶ 14. ATF has also recovered several FRT-15s and WOTs in locations in the Eastern District of New York.  *See* Conigliaro Decl. ¶ 15.

Fourth, Defendants have derived substantial revenue from interstate commerce.  This element of § 302(a)(3) "is designed to narrow the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but whose business

---

[12]  *See also*  https://www.ny1.com/nyc/all-boroughs/news/2022/01/24/city-faces-uphill-battle-in-shutting-down--iron-pipeline--of-illegal-guns.

operations are of a local character." *LaMarca*, 95 N.Y.2d at 215 (internal quotations omitted).

Defendants are, unquestionably, deriving substantial revenue from interstate commerce.  As noted

above, Defendants' own bank records show that they routinely engaged in over $6.2 million in wire

transfers.  Rodriguez Decl. ¶¶ 22-24.  Defendant DeMonico believes that Big Daddy's sale of WOTs

results "in millions of dollars" in lost profits.  DeMonico Decl. ¶ 34.  Indeed, as set forth in the

Complaint, Defendants have deliberately avoided paying special occupational taxes, transfer taxes,

and making taxes, exceeding an estimated amount of $32 million dollars in taxes combined, plus

penalties and interest, to the United States for the illegal manufacture, making, sale or other

disposition of machineguns.

**IV.   Exercising personal jurisdiction over Defendants comports with Due Process**

Defendants' contacts with the forum are more than numerous and substantive enough to

satisfy the demands of Due Process.  The Supreme Court has long held that each defendant over

whom a court exercises jurisdiction should have minimum contacts with the forum such that the

maintenance of the suit does not offend traditional notions of fair play and substantial justice.  *See,*

*e.g., Schwab Short-Term Bond Market Fund*, 22 F.4th at 121.[13]  The analysis of traditional notions of

fair play and substantial justice turns on whether the exercise of jurisdiction is reasonable under the

circumstances.  *See, e.g.*, *Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 331 (2d Cir.

2016).

The forum here is the United States.  The claims here arise from a federal law, 18 U.S.C.

§ 1345, that is enforceable only by the United States.  In other terms, the national sovereign is

applying national law to Defendants.  Because the minimum contacts analysis is, at bottom, intended

to ensure that the sovereign possesses a legitimate claim to assert authority over a defendant, in such

---

[13] The Fifth Amendment provides the basis for the Due Process analysis here, as the claims at issue rest on federal law.  *See, e.g., Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 330-31 (2d Cir. 2016).  For personal jurisdictional purposes, the analysis under the Fifth Amendment is the same as that under the Fourteenth Amendment.  *See, e.g., id.*

cases the appropriate analysis is whether the defendant has sufficient contact with the sovereign's nation. *See, e.g., In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1294 (7th Cir. 1992) ("When the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation."); *see also Broumand*, 522 F. Supp. 3d at 18-20 (applying the national contacts test in the context of the Federal Arbitration Act). There can be no dispute that Defendants, all of whom reside in and do business in the United States, have minimum contacts with the United States.

Even if the United States were required to show that Defendants have minimum contacts with New York alone, such contacts are readily seen.[14] Defendants' contacts with New York are numerous and relate specifically to the claims at issue here. Defendant RBF, which sells firearms and firearms accessories, sells products to New Yorkers and ships them into New York. Conigliaro Decl. Defendant RBT maintains an interactive website from which New Yorkers can purchase – and have purchased – products from Defendant RBT. *See, e.g.,* Koneschusky Decl. ¶¶ 39-40, 102. Defendant RBT maintained a relationship with firearms dealers, to whom Defendant RBT sold FRT-15s and WOTs, knowing that those dealers re-sold Defendant RBT's products into every state in the nation.[15] *See* Conigliaro Decl. ¶¶ 5-18. Defendant RBT *required* that those very dealers wire money to them through a New York bank in order to purchase FRT-15s and WOTs -- JPMorgan Chase, located at 270 Park Avenue, New York New. *See* Conigliaro Decl. ¶ 17. Defendant DeMonico set up that

---

[14] Courts in the Second Circuit that have applied the "national contacts" test have thus far done so with respect to federal statutes that expressly provide for nationwide service of process. *See, e.g., Broumand*, 522 F.Supp.3d at 19-20. As explained above, § 1345 necessarily and without express limitation enables nationwide service of process. Thus, the "national contacts" test applies to § 1345 cases. As noted above, § 1345 can be enforced solely by the United States and can be enforced anywhere. That the "national contacts" test applies to these other statutes – which can be enforced privately or by a state, and are in fact more limited in their scope than § 1345 – only reinforces the conclusion that the national contacts test must also apply to § 1345.

[15] Defendants now claim that they "never sold to dealers who had stated an intent to sell to New York," Leleux Declaration at ¶ 14. But this claim is false. As noted above, they did sell to these dealers; Defendant DeMonico even twice provided testimony, under oath, that Defendants sell their products to dealers who sell to consumers in every state in the nation. *See* DeMonico Decl. ¶¶ 13-14 (Big Daddy "sold the FRT-15™ trigger directly to customers across the United States"); DeMonico Dep. at 29-30.

payment system, a system that Defendant Maxwell was well aware of.  *See* Conigliaro Decl. ¶ 18.
And Defendant RBT's products ended up in New York.  *See* Conigliaro Decl. ¶¶ 11-15.

Defendants disagree that the United States is the correct forum to conduct a minimum contacts
analysis, and that the United States must establish defendants' RBT's and RBF's minimum contacts
with New York.  In so doing, Defendants cite no caselaw that supports their arguments on the law or
the facts.  Instead, Defendants cite inapposite cases to argue that Defendants have not had minimum
contacts with New York under a due process analysis. D. Br. 23-26.  Defendants  incorrectly, rely on
*Williams v. Beemiller, Inc*., 33 N.Y.3d 523, 527, 130 N.E.3d 833 (2019) where the New York Court
of Appeals  held that New York had insufficient contacts with "an Ohio firearm merchant who sold
a gun to an Ohio resident in Ohio which was subsequently resold on the black market and used in a
shooting in New York" despite his conversation with the individual who later resold the gun during
which that individual stated that "he wouldn't mind having a shop in Buffalo."  *Williams*, 33 N.Y.3d
at 527, 530.   In the first instance, the *Williams* case has no applicability in this case where the United
States' action is brought under § 1345 and alleges a conspiracy to defraud the United States by the
Defendants.  But that conspiracy is not based on one FRT-15 located in New York.   In fact several
FRT-15s have been located in New York.  *See* Conigliaro Decl. ¶ 11-15.  As set forth in the
Government's pleadings, Defendants' conspiracy involves *inter alia* a deliberate decision, and well-
orchestrated plan by the Defendants to knowingly market and distribute an illegal weapon throughout
the United States, including New York, despite the ATF's cease-and-desist letters and multi-year
effort to stop Defendants from selling illegal weapons. And Defendants' citation to *Williams'*
statement that a "defendant's connection with the forum State resulted from decisions made by
others" is at best misleading the Court. D. Br. 24.  It was Defendants who chose  to sell to dealers
they knew would sell to the entire nation, including New York.  Nor is there anything "fortuitous"
about Defendants' conduct vis-à-vis its contacts with New York.  It was Defendants' decision, led by

Defendant DeMonico, to use the financial system in New York to transact millions of dollars in business with firearms dealers.[16]

Rather, Defendants' contacts with New York far exceed those of comparable defendants over whom federal courts in New York have exercised personal jurisdiction.  Take, for example, the defendants in *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296 (E.D.N.Y. 2007).  The defendants in that case were out-of-state firearms retailers that sold firearms that ultimately found their way into New York.  *See id.* at 304.  Like Defendants here, the defendants in *A-1 Jewelry & Pawn, Inc.* sold some products over the internet.  And like Defendants here, the defendants in *A-1 Jewelry & Pawn, Inc.* put their products into a national market for firearms.  That is where the similarities end.  Unlike Defendants here, the defendants in *A-1 Jewelry & Pawn, Inc.* did not sell directly to any New Yorker, did not maintain a dealer network that sold to New Yorkers, and did not use the New York financial system to transact any business.  Defendants here have more contacts with New York than the defendants in *A-1 Jewelry & Pawn, Inc.*  Just as the court did in *A-1 Jewelry & Pawn, Inc.*, this Court should exercise personal jurisdiction over Defendants.  *See A-1 Jewelry & Pawn, Inc.* 247 F.R.D. at 304; *cf. City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 429 (E.D.N.Y. 2007) (Weinstein, J.) (explaining that Due Process was not offended because New York, "[b]y enacting strong gun control laws to protect its citizens from gun-related crimes[,] New York has expressed a special public policy interest in the subject matter of this litigation . . . Their

---

[16] Defendants reference to *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) continues to be a red herring, and certainly has no relevance to the instant motion regarding personal jurisdiction.  Nonetheless, the United States reiterates, first, that *Cargill* is an outlier among Circuit Courts of Appeals.  *See* Dkt. 5 at 2-5. Second, even if the regulation at issue here and in *Cargill* is invalid (it is not), Defendants' products are illegal under the relevant statutes. Third, Cargill dealt with non-mechanical bump stocks used to modify firearms. These bump stocks do not in any way change the triggers on firearms, unlike the products at issue here, which are entirely new triggers that alter the mechanical functioning of the firearms into which they are installed. Fourth, Cargill goes to the merits of Defendants' anticipated argument, not to an issue involving a jurisdiction. The United States will address the case more fully should it be necessary and at the appropriate time.  The same is true of the Defendants' reference to a product called the 3MR trigger.

alleged illegal practices hinder the ability of New York and the federal government to regulate the sale and ownership of firearms in accordance with extant statutes.").

Given Defendants' contacts with New York and given the products that they sell, it is reasonable to exercise personal jurisdiction over them. *See Topps Co. v. Gerrit J. Verburg Co.*, 961 F. Supp. 88, 90 (S.D.N.Y. 1997) ("Ordinarily . . . if jurisdiction is proper under the CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits."). The party challenging jurisdiction must make a compelling showing of some factor that would render jurisdiction unreasonable. *See, e.g., Broumand*, 522 F. Supp. 3d at 20-21. That factor is typically the burden that the litigation would place on the party. *See, e.g. id*. But it would only be in the highly unusual case in which inconvenience of party rises to the level of constitutional concern. *See id*. This is not such a case. Even putting aside the fact that Defendants have significant contacts with New York already, it can hardly be said that Defendants would be burdened by litigating a matter outside of their home states. Defendants themselves are located in Florida, North Dakota, and Texas. They have actively litigated cases – involving the very products at issue here – in Florida, North Dakota, Oklahoma, and Ohio.[17] The witnesses that they likely will rely on in this litigation, and on whom they have already relied on in other litigation, are from Florida, Texas, Michigan, and Virginia.[18] To

---

[17] Since 2021, Defendant RBT has been the plaintiff in at least seven cases in five federal districts comprising four different states –Florida, North Dakota, Ohio, and Oklahoma. *See Rare Breed Triggers, LLC v. Big Daddy Enterprises, Inc.,* No. 21-cv-149 (N.D. Fl.); *Rare Breed Triggers, LLC v. Garland*, No. 21-cv-1245 (M.D. Fl.); *Rare Breed Triggers, LLC v. Big Daddy Unlimited, Inc.*, No. 22-cv-61 (N.D. Fl.); *Rare Breed Triggers, LLC v. Garland*, No. 22-cv-85 (D. N.D.); *Rare Breed Triggers, LLC v. Graves*, No. 22-cv-107 (N.D. Ok.); *Rare Breed Triggers, LLC v. Strbac*, No. 22-cv-280 (N.D. Ohio); *Rare Breed Triggers, LLC v. Crawford*, 23-cv-21 (N.D. OK.).

[18] To the extent that the Defendants intend to challenge ATF's classification of the FRT-15 (and the WOT) as a machinegun, they likely will again use one or more of the four individuals who provided them opinions about their product in earlier litigation. The individuals are from Florida, Michigan, Texas, and Virginia. *See Rare Breed Triggers, LLC v. Garland*, No. 21-cv-1245 (M.D. Fl.), Dkt Nos. 32-2 (Kevin McCann of Florida); 32-5 (Brian Luettke of Michigan); 32-3 (Daniel O'Kelly of Texas); and 32-4 (Rick Vasquez of Virginia). Two of those individuals, one from Texas and one from Michigan, appeared personally to testify at a proceeding in Florida. *See id.* Dkt. 66.

suggest that it is a burden litigate in New York, when they have already litigated in at least four other states, is disingenuous.

**V.      As a co-conspirator, Defendant RBF is subject to this Court's jurisdiction**

Defendant RBF is subject to this Court's jurisdiction.  First, and foremost, § 1345 provides jurisdiction over Defendant RBF, a company located in and doing business in the United States.  *See supra* Argument Section II.  Second, Defendant RBF transacts business in New York.  A seller of firearms and firearms accessories, Defendant RBF has shipped its products to customers in New York.  New York's Long-Arm Statute thus provides jurisdiction over the company.  *See supra* Argument Section III.A.

Third, as an alleged co-conspirator with the other Defendants, Defendant RBF falls within the jurisdiction that covers those other Defendants.  In a civil case, once there is personal jurisdiction over one member of a conspiracy, then there is personal jurisdiction over the other members of the conspiracy.  "The appropriate test for alleging a conspiracy theory of jurisdiction: the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 87 (2d Cir. 2018).  The conspiracy theory of jurisdiction squares with the New York Long-Arm Statute.  The statute extends jurisdiction to acts done by a particular person "or through an agent."  N.Y. C.P.L.R. § 302(a).  Under New York law, a co-conspirator can be considered an agent.  *See Berkshire Bank v. Lloyds Banking Group plc*, No. 20-1987, 2022 WL 569819, *3 (2d Cir. Feb. 25, 2022), *cert. denied* 143 S. Ct. 286 (U.S., 2022).  The party asserting jurisdiction under this theory must plausibly allege that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, *or* at the request of or on behalf of the out-of-state defendant."  *Id.*

All of Defendants, including Defendant RBF, worked together to bring the FRT-15 to market and then to sell it.  The genesis of the FRT-15 was the work that Defendant RBF and Defendant DeMonico, who controls Defendant RBF, did to find a design for a forced reset trigger.  Once Defendant RBT was formed, and along with Defendant Maxwell, Defendant RBF worked with Defendant RBT to market the FRT-15, through their websites and videos, among other things.  Their work together necessarily included the sale to dealers, which, as described throughout, rested entirely on transactions in New York.  Those transactions in New York, though carried out by Defendant RBT (and Defendants DeMonico and Maxwell), benefitted Defendant RBF and were done on its behalf.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion in its entirety, order Defendants to promptly respond to the United States' motion for preliminary injunction, and permit the parties to proceed with expedited discovery in advance of the April 26, 2023 preliminary injunction hearing.

Dated:  Brooklyn, New York
      February 23, 2023

<div style="margin-left:40%">

BREON PEACE
United States Attorney

By:        /s/
      Michael Blume
      Joseph Marutollo
      Paulina Stamatelos
      Assistant United States Attorneys
      (718) 254-7000

</div>

cc:   **BY ECF**
      Counsel of Record