**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

Plaintiff,

-against-

RARE BREED TRIGGERS, LLC; RARE BREED FIREARMS, LLC; LAWRENCE DEMONICO; KEVIN MAXWELL,

Defendants.

Case No. 1:23-cv-00369-NRM-RML

**REPLY IN SUPPORT OF MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

In their opening brief, Defendants showed that this Court lacks personal jurisdiction over them because (1) 18 U.S.C. § 1345 does not authorize nationwide service of process; (2) Defendant Rare Breed Triggers (RBT)—which makes the triggers at issue in this case—transacts no relevant business in New York; and (3) RBT committed no alleged torts with effects in New York. Those essential points establish that no statute authorizes this Court to exercise jurisdiction over Defendants and that such jurisdiction would not comport with due process. The Government's response is an exercise in obfuscation and hand-waving. First, relying on vague legislative history, the Government contends that Congress intended in § 1345 to authorize nationwide service of process simply by saying the Attorney General can bring suit "in any Federal Court." Government's Opposition Br. at 9-10. The Government cites no cases for this proposition, and attempts to distinguish statutes, such as RICO, that explicitly authorize nationwide service of process, by stating that those laws evolved differently than § 1345. Gov't Opp. Br. at 11-12. But the relevant question under Fed. R. Civ. P. 4(k)(1) is whether service of process is "authorized under a federal statute." As the U.S. Supreme Court has said, "Congress knows how to authorize nationwide service of process when it wants to provide for it." *Omni Capital Intern., Ltd. v. Rudolf*

*Wolff & Co., Ltd.*, 484 U.S. 97, 106 (1987) (referring to statute that expressly allowed service "anywhere in the United States"). It did not do so in § 1345.

Second, in a breathtaking example of misdirection, the Government claims that RBT transacts sufficient business in New York to support jurisdiction because it allegedly made millions of dollars in transactions through JPM Chase in New York. *See* Gov't Opp. Br. at 17. However, as the Government knows, Defendant RBT used a bank account with JPM Chase in *Orlando, Florida*. *See, e.g.*, Attachment A to Declaration of Melissa Rodriguez at USA JPM 00004 (1/6/21 bank statement for account No. 693581008), USA JPM 00196-00197 (Business Signature Card and Business Depository Certificate listing branch as "Bayhill-741672," which, according to Chase's website, (https://locator.chase.com/fl/orlando/7674-dr-phillips-blvd), is located in Orlando). The Government nonetheless claims that Defendants transacted business in New York because wire transfers to RBT's account in Florida were "facilitated" by JPM Chase in New York. Gov't Opp. Brief at 5. But this is no different from saying that RBT used a bank in Florida whose corporate headquarters are in New York, for, as the Government admits, *all* wire transfers done with JPM Chase are "facilitated" through its New York headquarters. *See id.* at 15. The Government thus advances the incredible proposition that anyone who does business with JPM Chase anywhere in the nation can be sued in New York on a claim involving the transfer of funds, because, due to internal processes beyond their control, such transfers are "facilitated" by JPM in New York. But that is not the law. Personal jurisdiction requires intentional conduct aimed at the forum state. Thus, as one federal court in New York has observed, "[t]he vast majority of cases in which the issue is whether the use of a correspondent bank account constitutes the transaction of business under Section 302(a)(1) involve a non-domiciliary *bank defendant's* use of a correspondent account, not an individual's wiring of funds that incidentally pass through a New

York-based correspondent account." *Berdeaux v. OneCoin Ltd.*, 561 F.Supp.3d 379, 403 (S.D.N.Y. 2021) (emphasis added). RBT did not use a correspondent account at all, in New York or anywhere else. It simply instructed dealers to wire funds to its account in Florida. *See* Declaration of Cole Leleux in Support of Defendant's Reply Brief at ¶¶ 4-5. (Hereinafter, "Leleux Reply Decl."). That "contact" with New York is insufficient to support personal jurisdiction.

Third, the Government contends that Defendants committed torts that caused injury in New York based primarily on its claim that FRT-15s and WOTs have been found in New York, and RBT allegedly knew its dealers would resell them in New York. Gov't Opp. Br. at 19. The second claim is simply false. The first, even if true, is irrelevant, as RBT refused to sell its triggers in New York or to dealers who expressed an intent to do so. *See* Defendants' Opening Brief at 4-5. Any triggers that made their way to New York could have done so only because of the independent actions of third parties, which cannot be a basis for personal jurisdiction. *See id.* at 16-17.

Finally, the Government contends that due process is satisfied because the relevant contacts are with the United States, and because Defendants allegedly have multiple other contacts with New York. The first argument fails for the same reason that the Government's argument under § 1345 fails—because if contacts with the United States, alone, can ever satisfy due process (which is not at all clear), they can do so only where a federal statute authorizes national service of process. The second argument repeats the same invalid arguments the Government makes in service of its arguments under New York's long arm statutes. The fact is, Defendants did not purposely avail themselves of New York in any way that is connected to the Government's claims. Indeed, they actively *avoided* New York.

The Court should grant Defendants' motion in its entirety. It can do so, despite the factual disagreements between the parties, because those disagreements are either based on the

Government's misrepresentations, its mischaracterization of facts that are not actually in dispute, or disputes concerning facts that would not help the Government's arguments even if true. But if the Court believes these disputes are material, then it must conduct an evidentiary hearing. *See Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

## ARGUMENT

### I. THERE IS NO STATUTORY BASIS FOR PERSONAL JURISDICTION

#### A. Section 1345 Does Not Allow Nationwide Service of Process

The Government's argument that § 1345 authorizes nationwide service of process is based entirely on inferences from legislative history and other statutes that, unlike § 1345, explicitly authorize nationwide service of process. The argument amounts to saying that the *less* Congress says about whether nationwide service of process is authorized, the *more likely* it is that Congress intended to authorize nationwide service of process. But that defies logic, the rules of statutory interpretation, and Supreme Court precedent.

As the Supreme Court has made clear, service of process is more than a formality. It is integral to the exercise of personal jurisdiction over a defendant. "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital*, 484 U.S. at 104. That is because service of summons is the means "by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." *Id.* (citation omitted). "Thus, before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There also must be a basis for the defendant's amenability to service of summons." *Id.* That basis comes, in the first instance, from Rule 4 of the Federal Rules of Civil Procedure. *Id.*

Here, both parties recognize that the relevant provision of Rule 4 requires that service be "authorized by a federal statute." Fed. R. Civ. P. 4(k)(1). As Defendants have pointed out, however, § 1345 simply does not authorize nationwide service of process. It states only that the Attorney General may bring an action under that provision "in any Federal Court." This language is in sharp distinction to other statutes that explicitly authorize nationwide service of process. *See PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 70 (2d Cir. 1998) (analyzing RICO).

The Government's response is to rely on amendments to § 1345 that it claims "progressively expanded" the reach of the statute. Gov't Opp. Br. at 9-10. But none of that legislative history mentions nationwide service of process. And merely replacing language allowing an action to be brought in "a district court" to "any Federal Court" is not a meaningful change. If one can interpret "any Federal Court" to authorize nationwide service of process, one can interpret authorization to bring an action in "a district court" to mean the same thing. But the fact is that neither iteration permits nationwide service of process.

The Government recognizes that, unlike § 1345, many federal statutes explicitly authorize nationwide service, but simply avers that "those statutes [are] different." Gov't Opp. Br. at 11. Indeed, they are. In those statutes, Congress carefully delineated where cases could be brought and how service could be effected. *See id.* (citing statutes). The Government contends that those statutes require that level of specificity, but § 1345 does not, because it does not limit the places in which suit could be brought. But one could just as easily say that Congress's care in drafting provisions dealing with nationwide service of process shows that when it wanted to authorize it, Congress did so explicitly.

Indeed, that is what the Supreme Court did say in *Omni Capital*. That case involved a private suit under the Commodities Exchange Act in which the plaintiff argued that Congress

implicitly authorized nationwide service of process in private suits because it explicitly did so in other provisions of the law. *Id.* at 105-06. The Supreme Court disagreed, stating that the provision that authorizes private causes of action "is silent as to service of process" which "contrasts sharply with the other enforcement provisions of the CEA." *Id.* at 106. "It would appear that Congress knows how to authorize nationwide service of process when it wants to provide for it. That Congress failed to do so here argues forcefully that such authorization was not its intention." *Id.*

If Congress had intended to provide for nationwide service of process in § 1345, it could easily have done so by explicitly authorizing it, as Congress has done many times before. But that is not what Congress did, and this Court should not infer that it meant to do so simply by providing that suit can be brought under § 1345 in "any Federal Court." *See Omni Capital,* 484 U.S. at 110 n.12 ("Presumably acting on this widespread understanding that federal courts may serve process nationwide only when a federal statute authorizes such service, Congress has carefully provided for that kind of service of process when it so desired.").

**B. Jurisdiction is not Warranted Under CPLR 302(a)(1)**

The Government's sole argument for jurisdiction under N.Y. C.P.L.R. 302(a)(1) is the claim that RBT made millions of dollars in wire transfers "through" JPM Chase in New York. But this argument is a bait-and-switch. The Government capitalizes on the fact that all wire transfers using JPM Chase in some sense "go through" New York, due to the bank's internal processes and the nature of wire transfers. *See, e.g.*, Rodriguez Decl. (ECF No. 26) at ¶¶ 16-19. It then tries to parlay that fact into a scheme, by Defendants, to "use" the New York banking system. But Defendants did no such thing. RBT simply opened an account at JPM Chase in Florida. It was only due to the bank's internal processes—processes over which Defendants had no control—that the transfers were in any way connected to New York. But this connection to New York falls far short of the purposeful conduct that is required to justify this Court's exercise of jurisdiction under either

New York's long arm statute or due process. For jurisdiction to lie, the defendants must intentionally direct their activities to New York. *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 338 (2012) (*Licci I*). But that is not what happened.

The Government describes RBT's connection to the New York banking system in various ways. Most are vague—"The wires are *facilitated* through JPMorgan Chase in New York," Gov't Opp. Br. at 4; "Defendants extensively relied on wires *through* New York City," *id.* at 14; Defendants "monthly bank statements show that every wire transfer *traveled* through New York." *id.* at 16.; wire transfer forms "informed Defendants that a bank with a New York address is *involved* in each and every transaction," *id.* at 17. (Emphasis in all quotes supplied.). Some are false, or at least grossly misleading—"Defendants have intentionally and repeatedly directed firearms dealers to use the New York financial system for wire transfers," *id.* at 1; Defendants "required that firearms dealers who wished to purchase FRT-15s (and WOTs) wire money *to* JPMorgan Chase in New York;" *id.* at 14; Defendants prepared instructions that told the dealers to "wire money *to an account* with a New York address." *Id.* at 15. (Emphasis in all quotes supplied.).

But no amount of verbal gymnastics changes the fact that RBT did not choose to bank in New York *at all*. RBT opened a bank account in Florida. *See* Leleux Reply Decl. at ¶ 3; Attachment A to Rodriguez Decl. at USA JPM 00004 (1/6/21 bank statement for account No. 693581008), USA JPM 00196-00197 (Business Signature Card and Business Depository Certificate). When it sought instructions to give to dealers for wire transfers, it received a document that listed two routing numbers. Leleux Reply Decl. at ¶ 4, Attachment G; Attachment F to Declaration of Cole Leleux in support of Defendants Motion to Dismiss ("Customer Information for Incoming Wire Transfers," ECF No. 23-1 at 43). One was for Chase domestic transfers, but that, it turns out, was

the wrong routing number. The other, the correct number, was the routing number for Florida. RBT mistakenly picked the first and sent that number to dealers. The transfers failed, so RBT gave dealers the Florida routing number, which succeeded, and the funds for the sales of its triggers were deposited into RBT's Florida account. Leleux Decl. (ECF No. 23-1) at ¶¶ 14-15; Leleux Reply Decl. at ¶¶ 4-5; Attachment G. Simply put, RBT opened a Florida bank account (where the business was located at the time) and its transactions with dealers resulted in funds being deposited via a Florida routing number into that bank account.

The documents on which the Government relies confirm all this. The routing number listed on all the wire transfer orders and confirmations to which the Government cites is the Florida routing number, 267084131. *See* Exhibit C (ECF No. 26-2) to Rodriquez Decl. On many, the bank address is listed as JPM Chase in Manhattan. But some list no address at all, some list addresses from other states, many list the JPM Chase branch in Florida, and some list JPM Chase addresses in both Florida and New York. *See, e.g.*, Ex. C (ECF No. 26-2) at 6, 8, 9, 11, 17, 22, 26, 27, 29. And transaction confirmations all indicate that the funds were wired to RBT's Florida account via the Florida routing number. *See* Leleux Reply Decl. ¶ 5. Thus, it appears the address listed on wire transfer forms does not change anything about where the money ultimately goes, which is what RBT's bank representative told it. *See id.* Certainly, Defendants did not know the significance of the New York address listed on the wire instructions it received from JPM Chase. *Id.* at ¶ 4. Thus, it is grossly misleading for the Government to claim that RBT had money wired to a bank account *in New York*. It did not, for the simple reason that RBT never had a bank account in New York. *Id.* at ¶ 3.

What the Government is really arguing is that personal jurisdiction lies in New York because *all* wire transfers with any JPM Chase branch are "facilitated" by JPM Chase in New

York. *See* Gov't Opp. Br. at 15 (stating that Defendants chose JPMorgan Chase, "a bank that facilitates all wire transfers through its headquarters in New York"); *id.* at 5 n.3 (explaining wire transfer process). As ATF agent Melissa Rodriguez explains in her declaration, JPM Chase uses the FedWire system to facilitate wire transfers. Under that system, every wire transfer to a customer of the bank at any branch in the nation,

> ends up at the JPMorgan Chase reserve account at 270 Park Avenue, New York. JPMorgan Chase distributes funds from the reserve account at 270 Park Avenue, New York to other JPMorgan Chase accounts at its branches throughout the country. A wire transfer to JPMorgan Chase thus starts at the bank sending funds, goes to the Federal Reserve Bank in New York, then to JPMorgan Chase in New York, and then to a JPMorgan Chase branch.

Rodriguez Decl. at ¶¶ 16-19. This description is consistent with commonly available sources concerning the mechanics of wire transfers. *See* Financial Crimes Enforcement Network, U.S. Department of the Treasury, *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System under the Bank Secrecy Act*, 58-60, (Oct. 2006), https://www.fincen.gov/sites/default/files/shared/CBFTFS_Complete.pdf. It also confirms that the address listed on transfer instructions is immaterial. If every wire transfer using a JPM Chase account goes through JPM Chase at 270 Park Avenue, RBT listing a different address would have changed nothing, nor could RBT have affected how wire transfers functioned at JPM Chase. The only choice RBT had in the process was to ensure it used the correct account and routing numbers for its Florida account. After an initial mistake, which resulted in no funds being transferred, that is what RBT did. *See* Leleux Reply Decl. at ¶ 5.

The Government's argument fails for the simple reason that RBT did not purposely avail itself of New York's banking system. RBT purposely availed itself of a Florida branch of JPM Chase whose ultimate parent company is headquartered in New York. That wire transfers are "facilitated" through New York was due, not to RBT's choices, but to JPM Chase's internal

process. That "connection" is therefore fortuitous, not intentional. *See, e.g.*, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 168 (2013) (*Licci II*) (stating that use of a correspondent account in New York can support jurisdiction if such use is "purposeful"). The Government has cited no cases for the proposition that jurisdiction can be based on a defendant's use of a bank outside New York whose parent company uses internal wire transfer processes in or through New York. To the contrary, federal courts in New York have recognized that this sort of thin connection cannot form the basis for jurisdiction under New York's long arm statute. *See Berdeaux*, 561 F.Supp.3d at 403; *Universal Trading & Inv. Co., Inc. v. Tymoshenko*, No. 11 Civ. 7877, 2012 WL 6186471 at *3 (S.D.N.Y. 2012) (stating that the mere "passage of money 'through' New York banks" is not sufficient to confer jurisdiction over" defendant).

The Government's reliance on *Licci II* is thus misplaced. *Licci II* involved *foreign bank* defendants who had purposely established New York correspondent bank accounts to help them transfer money into the United States. 732 F.3d at 166, 168. The purpose of a correspondent account is to allow a foreign bank to move money into the United States. *Id.* at 166 n.3. The foreign bank's actions were therefore intentionally directed at New York. *Id.* at 171 (stating that "LCB deliberately chose to process the many Shahid wire transfers through AmEx in New York"). *See also Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 131-32 (2d Cir. 2022) (same). There is a big difference between a foreign bank's purposely opening a correspondent account in New York in order to move funds into the United States, and a small company's opening a business account outside New York with a bank that happens to use its New York headquarters to facilitate wire transfers. Banks are, of course, aware of how the financial system operates, so choosing to open a correspondent account in New York amounts to purposely transacting business there. Neither RBT, nor any similar defendant who simply chooses a branch of a bank headquartered in New

York can be said to have intentionally directed its business activities to New York. *See Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391, 396 (1976) ("[S]tanding by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under [§ 302(a)(1)]."). The Government's contention that RBT could have chosen a bank that does not use New York for wire transfers turns the analysis on its head. Personal jurisdiction, under both the long arm statute and due process, requires purposeful availment of the forum. Failing to use a bank whose internal processes have no connection to New York does not constitute directing one's activities to New York.

**C. Jurisdiction is not Warranted Under CPLR 302(a)(3)**

Even if the Government has alleged a tortious act outside of New York—which Defendants dispute—the Government's argument for jurisdiction under § 302(a)(3) fails because any alleged torts committed outside New York caused no injury in New York and it was not foreseeable that such acts would have consequences in the state. The Government argues otherwise, relying on (1) the claim that several of RBT's triggers ended up in New York; (2) the alleged flow of "machine guns" into New York; (3) that RBT's website can be viewed in New York; (4) that RBT bought some springs from a New York company; and (5) the wire transfers that were facilitated by JPM Chase in New York. Gov't Opp. Br. at 18-19. Defendants have already addressed the claim about wire transfers in New York. The Government's other points fare no better.

First, the Government's argument ignores the fact that RBT avoided selling its triggers in New York and refused to sell to dealers who expressed any intention to sell in New York. *See* Leleux Decl. (ECF No. 23-1) at ¶¶ 13-14; Leleux Reply Decl. at ¶ 9. Any devices that ended up in New York were therefore based entirely on the actions of third parties, which cannot form the basis of jurisdiction, as Defendants pointed out in their opening brief. Def's Op. Br. at 16-17. *See*

*also Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417 (1984) (stating that minimum contacts for due process purposes cannot be based on "the unilateral activity of ... a third person"). The Government's claim that Defendants "knew" their triggers would be sold nationwide, including in New York" is a half-truth and an irrelevant one at that. What RBT knew is that its triggers would be sold in the states where it allowed them to be sold. That did not include New York. Leleux Decl. (ECF No. 23-2) at ¶ 13. The Government cites deposition testimony by Mr. DeMonico in a Florida patent action in which he listed the states in which the FRT-15 were not sold but failed to mention New York. *See* Gov't Opp. Br. at 4 n.2. But this does not change the fact that RBT did not sell the triggers in New York and knows nothing about any Massachusetts dealers who allegedly did so. *See* Leleux Reply Decl. at ¶ 9. The Government offers no evidence of such knowledge save its conclusory allegations.

Second, even if the Court were to credit the Government's conclusory allegations about the alleged "flow" of machine guns interstate (which it should not), that cannot support jurisdiction because it has no connection to the alleged tort, which is fraud, not gun violence.

Third, many cases make clear that merely maintaining a website that can be viewed in New York cannot form the basis of personal jurisdiction there. *See* Def's Op. Br. at 15-16. That includes a case on which the Government itself relies. *See Pearson Educ., Inc. v. Shi*, 525 F.Supp.2d 551, 555 (S.D.N.Y. 2007) ("Simply maintaining a web site in a distant state that residents of New York visit does not, by itself, subject a defendant to jurisdiction in New York.").

Finally, the Government's reliance on RBT's purchase of some springs from Lee Spring, a company headquartered in New York, changes nothing. RBT dealt with Lee Spring in Arizona and did not even know the company was headquartered in New York. *See* Leleux Reply Decl. at

¶ 10. It therefore could not have foreseen that its purchases from the company would have effects in New York.

## II. THE EXERCISE OF JURISDICTION DOES NOT COMPORT WITH DUE PROCESS

### A. The Relevant Contacts Must be with New York, not the United States

As Defendants pointed out in their opening brief, the Second Circuit has not decided the question of whether minimum contacts for due process purposes can ever be with the United States, as opposed to the state or district in which a federal court sits. Def's Op. Br. at 27 (citing *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014)). But as the government recognizes, even if the relevant contacts could be with the nation, that would only apply where a federal statute authorized nationwide service of process. *See* Gov't Opp. Br. at 21 n.14; *Gucci*, 768 F.3d at 142 n.21. As Defendants have shown, § 1345 does not authorize nationwide service of process. Even if it did, however, basing jurisdiction on contacts with the United States would not comport with the Supreme Court's cases involving minimum contacts necessary to satisfy due process. *See* Def's Op. Br. at 27-29. The Government ignores this point entirely, simply asserting that the minimum contacts analysis reduces to a simple question of sovereignty. Gov't Opp. Br. at 27. But this is not so. As the Supreme Court has stated, "The requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause .... It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Omni Capital*, 484 U.S. at 104 (citation omitted).

### B. Defendants Lack Sufficient Contacts with New York to Satisfy Due Process

The Government's argument that Defendants have sufficient contacts with New York to satisfy due process largely tracks the arguments it made to support long arm jurisdiction. As Defendants have shown, the primary argument on which the Government relies—that RBT made

millions through wire transfers "facilitated" through New York—is misleading and does not establish that Defendants purposely availed themselves of New York. As the Supreme Court has made clear, the defendant's relationship with the forum state "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (citation omitted) (emphasis added/omitted?). As a result, such contacts cannot result from "the unilateral activity of ... a third person." *Helicopteros Nacionales de Colombia,* 466 U.S. at 417. But as Defendants have shown, the fact that JPM Chase in New York "facilitates" wire transfers has nothing to do with the actions or choices of Defendants. It resulted, instead, from the internal processes of JPM Chase. The same is true of any sales or movement of RBT's triggers into New York. Defendants did not sell their triggers in New York or to dealers who did so. Any that found their way into New York were therefore based on the independent actions of third parties.

The Government ignores these Supreme Court cases and instead attempts to distinguish *Williams v. Beemiller, Inc.*, 33 N.Y.3d 523, (N.Y. 2019), as somehow irrelevant or an outlier. But *Williams* is entirely consistent with the principles articulated in *Walden* and *Helicopteros*. Next, the Government relies on *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296 (E.D.N.Y. 2007), where the court held out-of-state gun retailers were subject to jurisdiction in New York. But the key allegation that supported jurisdiction in that case was that the retailers where knowingly selling to straw purchasers, which are individuals who buy guns for individuals living in other states. *Id.* at 312. There is no similar evidence here that RBT was knowingly selling to anyone who planned to sell to New York.

Beyond these arguments, the Government relies on conclusory allegations of a "conspiracy" among the Defendants, and it attempts to dump a number of random contacts with New York into the mix in the hope that they will satisfy due process. For example, the Government

claims that Defendant RBF "sells firearms and firearm accessories in New York." Gov't Opp. Br. at 21. But this is false. RBF creates designs for AR-15 rifle parts and then licenses those designs to another company, which makes and sells the actual parts and rifles. *See* Leleux Reply Decl. at ¶ 6. This is evident from RBF's website, which makes clear that the actual rifles must be purchased from "Spikes Tactical." *Id.* Indeed, RBF lacks a federal firearms license—which ATF undoubtedly knows—so it cannot sell firearms in New York or anywhere else. *Id.* And while RBF has made some sales to New York, these would be things like t-shirts and other swag. *Id.* In any event, RBF is a separate company from RBT, a point it has repeatedly made clear to individuals interested in buying triggers from RBT. *Id.* at ¶ 8. The activities of RBF cannot form the basis for jurisdiction over RBT. The Government's reliance on springs that Defendant RBT purchased from Lee Spring is similarly unavailing, as RBT dealt with Lee Spring in Arizona. *Id.* at ¶ 10. As the Supreme Court has said, "our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285.

**CONCLUSION**

This Court should dismiss the complaint with prejudice. Alternatively, if it finds that the Government has alleged disputed facts that could support personal jurisdiction over one or more of the defendants it should order an evidentiary hearing.

Respectfully submitted this 2nd day of March 2023.

s/ Caleb Kruckenberg
CALEB KRUCKENBERG*
D.C. No. 1617890
STEVEN M. SIMPSON**
D.C. Bar No. 462553
Pacific Legal Foundation
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881

                                Facsimile: (916) 419-7747
CKruckenberg@pacificlegal.org
SSimpson@pacificlegal.org

JONATHAN M. HOUGHTON
E.D. N.Y. ID No. JH 5334
N.Y Bar No. 2955326
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
JHoughton@pacificlegal.org

*Attorneys for Defendants*

*Admitted *Pro Hac Vice*
***Pro Hac Vice to be filed*

**AFFIRMATION OF SERVICE**

I, Steven M. Simpson, declare under penalty of perjury that I filed the foregoing with the Clerk of the Court of the Eastern District of New York though the CM/ECF system, which will serve notice of said filing on all counsel of record.

s/ Steven M. Simpson
STEVEN M. SIMPSON**