```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

--------------------------------X Docket#
UNITED STATES OF AMERICA,        : 23-cv-369(NRM)(RML)
                                 :
              Plaintiff,         :
                                 :
      - versus -                 : U.S. Courthouse
                                 : Brooklyn, New York
RARE BREED TRIGGERS, LLC, ET AL, :
                                 : March 8, 2023
              Defendants         : 2:00 p.m.
--------------------------------X
```

         TRANSCRIPT OF CIVIL CAUSE FOR VIDEO CONFERENCE
           BEFORE THE HONORABLE NINA R. MORRISON
              UNITED STATES DISTRICT JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**
**(VIA VIDEO/AUDIO)**


**For the Plaintiff:**      **Michael S. Blume, Esq.**
                            **Paulina Stamatelos, Esq.**
                            **Joseph A. Marutollo, Esq.**
                            U.S. Attorney's Office
                            271 Cadman Plaza East
                            Brooklyn, NY 11201


**For the Defendant:**      **Steven Simpson, Esq.**
                            **Jonathan M. Houghton, Esq.**
                            Pacific Legal Foundation
                            3100 Clarendon Blvd., Ste 1000
                            Arlington, VA 22201


**Transcription Service:**  **Transcriptions Plus II, Inc.**
                            61 Beatrice Avenue
                            West Islip, New York 11795
                            RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1        THE CLERK:  Civil Cause for Video Conference

2   for case number 23-cv-369, *United States of America v.*

3   *Rare Breed Triggers, LLC, et al.*

4        Counsel, please state your appearance for the

5   record starting with the government.

6        MR. BLUME:  Good afternoon.  Michael Blume.

7        MS. STAMATELOS:  Good afternoon.  Paulina

8   Stamatelos.

9        THE COURT:  Mr. Marutollo, I think you're muted

10   but I see you and I'll --

11        MR. MARUTOLLO:  Yeah, good afternoon, your

12   Honor.

13        MR. SIMPSON:  Good afternoon, your Honor.

14   Steve Simpson for the defendants.

15        MR. HOUGHTON:  And good afternoon, your Honor.

16   Jonathan Houghton with Pacific Legal Foundation for the

17   defendants.

18        THE COURT:  All right.  Welcome, everyone.

19        Okay.  So I wanted to get you all on the line

20   to talk a little bit about the government's motion for

21   leave to conduct expedited discovery but also about the

22   sequencing and where we stand on the motion to dismiss

23   for lack of personal jurisdiction.  Let me just start

24   with that one.  I know that the defendants have requested

25   or indicated it might be necessary to have an evidentiary

Proceedings

1  hearing on their motion to dismiss for lack of personal

2  jurisdiction and I know there is some case law that says

3  where there is disputed facts you're entitled to have a

4  hearing.  So I wanted to get a sense from you so that we

5  can try and schedule that if necessary what the issues

6  are that you think you would want to address through an

7  evidentiary hearing as opposed to oral argument, roughly

8  how long it would take, kind of what form it would take,

9  and when you might want to do that.

10      So let me hear from you on those issues in

11  whatever order you would like to take them.

12      MR. SIMPSON:  Sure, your Honor.  Let me just

13  start by saying that it's not entirely clear to us that

14  we need an evidentiary hearing.  I think it to some

15  extent depends on what the Court views as material in

16  terms of the disputes.  There are factual disputes.

17      As I think we've mentioned in our reply brief

18  on the motion to dismiss, we don't really believe those

19  factual disputes are material or they can be resolved by

20  the Court based upon what the parties have filed.  To

21  some extent I think it depends on how your Honor views

22  those disputes.  I don't mean to put the point back on

23  you.

24      THE COURT:  Yes.

25      MR. SIMPSON:  I can go through and I can list

4

Proceedings

1   briefly the types of things I'm talking about.  I don't

2   want to take up the Court's time on a whole lot of

3   detail, but in general that's our position.  I don't

4   think that an evidentiary hearing would take terribly

5   long.  I think it would maybe, depending on what the

6   Court believes about these disputes we can probably put

7   witnesses on to clarify some of these issues, maybe a

8   morning, if that.

9             To some extent, I think it depends on what the

10  government would need to put on to -- let me just put it

11  to prove some of the points or claims that they're

12  making.  I think to some extent this depends on what they

13  are in fact saying.  Let me put it this way, whether

14  these are really factual disputes or whether they are

15  issues of how facts that the parties really don't dispute

16  are characterized to some extent I think.

17            So I'll just throw out as an example the wire

18  transfers.  I think as far as I can tell, everybody

19  agrees that in some sense JPM Chase in New York was

20  involved in those, the government has used the term

21  facilitated, that seems like a sensible description from

22  our standpoint, unless the government is claiming that

23  the defendants actively used a New York account and

24  deposited money into a New York account, and I don't

25  really think there's a dispute.  I think it's a matter of

Proceedings

1    characterization and the legal meaning of or the legal

2    significance of facilitated through New York.  But I

3    think that's kind of a question for the defendants.  I

4    can elaborate on that point, your Honor.  I don't want to

5    belabor the point.

6           THE COURT:  Yes, just go a little further into

7    that.  So tell me what you think the significance or lack

8    of significance is that, I wouldn't even say fact, but

9    that issue.

10          MR. SIMPSON:  Yeah.

11          THE COURT:  And then to the extent I thought it

12   was material, what kind of evidence you think we would

13   need to present.  Some of it could be done throughout the

14   day that are otherwise(indiscernible) --

15          MR. SIMPSON:  So the bottom line from

16   defendant's standpoint, we just think this is true,

17   defendants opened an account in Florida.  All the money

18   was routed into that account.  Anything that happened

19   through New York, and I'm oversimplifying a bit, your

20   Honor, but to the extent there is anything that happened

21   through New York, and I think this is clear, your Honor,

22   from the declaration of ATF Agent Rodriguez.  She

23   explains this pretty clearly when it gets down to sort of

24   brass tacks.  Any connection that JPM Chase in New York

25   had with the wire transfers was purely due to two things

6

Proceedings

1    I think.  The way wire transfers work in general and
2    secondly the fact that JPM Chase has a headquarters in
3    New York.  There are no accounts in New York.  When I say
4    that, what I mean is there is an account that they opened
5    in Florida.  I'm not an expert in banking transfers and
6    how things travel through electrons and the ether, but
7    the bottom line is that the clients, the defendants
8    opened a bank in Florida.  The routing number is a
9    Florida routing number.  There's only one account number.
10   We put all that in the reply brief that's in evidence.
11   Unless the government is suggesting that there was some
12   account we don't know about in New York, I think the only
13   thing we're talking about here is how JPM Chase, and it's
14   actually broader than that, how wire transfers work for
15   any bank in the United States.  When they're using
16   FedWire, my understanding based on my reading and based
17   on Agent Rodriguez's testimony, is that any time a bank
18   uses FedWire, there is some connection to the fed in New
19   York.  That is in our view entirely fortuitous.  It's
20   based on the conduct of JPM Chase.  It has nothing to do
21   with the defendants availing themselves of New York.  And
22   in their view they opened a bank --
23          Now, I suspect the government takes a different
24   view on all that.  But unless they're claiming that the
25   defendants knowingly opened an account in New York or

7

Proceedings

1   sort of tried to avail themselves of JPM Chase because it

2   was a New York bank, I don't believe that we have a

3   dispute, but again, I think that's it's up to the

4   government.

5          What we're saying is this is just how bank

6   transfers work in the same way that sometimes a FedEx

7   package will travel through a warehouse in some state but

8   that's entirely out of the control of the individual

9   sending the package.

10          THE COURT:  Right.  Okay.  I want to ask the

11   government a little about this but give me just another

12   example of the kind of thing that may or may not be an

13   issue to be addressed.

14          MR. SIMPSON:  Sure.  Certainly, your Honor.  I

15   mean I can give you two other examples that I think form

16   the nub of the government's contacts with New York.  One

17   is that the defendants -- RBT I should say.  This is the

18   relevant entity that we're talking about in our view,

19   although the government disagrees with us on that.  But

20   RBT purchased some springs from a company called Lee

21   Spring.  They dealt with Lee Spring in Arizona.  It's a

22   large company.  It apparently has a worldwide -- it has

23   offices throughout the world.  It's headquartered in New

24   York.  The defendants never knew they were dealing with a

25   company that was headquartered in New York.  They were

8

Proceedings

1   dealing with a company that they believe was in Arizona.

2   Again, this is very fortuitous that the government claims

3   that they talked on the phone with somebody who was in

4   New York.  I don't know if that's true.  The defendants

5   have no recollection of that.  But if it happened again,

6   it's pure happenstance.  That I think is on the record as

7   well.  I mean we don't dispute that there's headquarters,

8   a company in New York.  Again, it's very much like the

9   wire transfers.  They were dealing with a company they

10  thought was in Arizona.  They had no intention of dealing

11  with a company in New York.  So that's another -- the

12  defendant's claim -- I'm sorry, the plaintiff's claim,

13  the government's claim, that RBT, defendants RBT and Mr.

14  Demonico and the other individual defendants sold their

15  triggers nationally knowing that they would find their

16  way into New York via dealers that sold in New York.

17          Now this is based on, as far as I can tell, the

18  government's only evidence for this is deposition

19  testimony from a Florida case, a patent dispute, in which

20  Mr. Demonico essentially says he lists the states that

21  RBT does not do business with.  He left out New York.  I

22  think it was just a -- I mean I don't think it had any

23  significance.  It was a totally different context.  I

24  don't believe there's any other evidence that they claim

25  indicates that the defendants allegedly knew these

9

Proceedings

1  triggers would find a way in New York.

2         Now, that's one that I'm not sure there's any

3  real dispute.  It's just the testimony is what it is and

4  the question is what is the significance of that.

5  There's no other evidence that we know of that the

6  government is relying on to suggest that they

7  intentionally directed these triggers to New York.  In

8  fact, they did the opposite.

9         The final point, your Honor, is that they --

10 and there are number of things they say about defendant

11 RBF, Rare Breed Firearms, which is not Rare Breed

12 Triggers.  Rare Breed Firearms doesn't sell the triggers

13 at issue.  They claim that, the government claims that

14 RBF sells firearms in New York and some firearm

15 accessories in New York and elsewhere.

16        Your Honor, I'll just be blunt.  That's false.

17 RBF doesn't sell firearms at all.  It licenses designs to

18 another company that then makes and sells the firearms

19 which is basically a design company.  It also sells swag,

20 tee shirts, hats, that kind of thing.  And it is true

21 that some of those I think tee shirts and hats got sold

22 in New York at some point.  It's a separate company.

23        So the bottom line there, your Honor, our

24 argument is RBF is not relevant at all but the claim that

25 it sells firearms is just not true.  It doesn't sell

10

Proceedings

1    triggers.  We think this is obvious from the website.  I

2    mean your Honor, I figure this looking at the website.

3           Again, I think this is the kind of thing that

4    the Court could resolve on its own but that really

5    depends --

6           THE COURT:  I want to hear from the government

7    a little bit since some of these facts are ones they may

8    need to feel like they want to sure up themselves before

9    I decide the legal questions.  I mean based on what you

10   described, I'm not sure that resolving the particulars of

11   those disputes are going to be necessary, but I'm just

12   not sure because I'm not as far into your motion as I

13   would need to be to make that determination for sure.

14          MR. SIMPSON:  Understood.

15          THE COURT:  I guess one thing that just

16   occurred to me is there may be a way for the parties to

17   confer on whatever it is that RBT thinks is either a

18   misrepresentation or a less than complete representation

19   in the government's brief.  Right?  Even though you are

20   the movant, the government is the one claiming that there

21   are specific contacts.  So in a way, this motion

22   necessarily flips backwards.  You're saying we don't have

23   any and they say yes you do, here they are.

24          I am wondering, and I'm happy to hold a hearing

25   if necessary, but short of a hearing if there's a way

Proceedings

1   more quickly in writing you all can let me know through

2   some sort of joint filing or filing just from the

3   defendants about what facts there are that you think

4   either they're not fully accurate, false, not complete in

5   the government's brief.  And to the extent I think

6   those -- and you have a way that you think you would be

7   able to disprove them through testimony of someone, an

8   introduction of some exhibit, cross examination of the

9   agent, and then I can decide to the extent they matter.

10  That way I at least have given you an opportunity to be

11  heard on a fact that, you know, I may or may not rely

12  upon.  But (indiscernible).  It might just be better to

13  have a hearing and let you come in.  But again, I don't

14  want two hours of testimony about how FedWire works if

15  that's not going to matter.  That's my initial though.

16          MR. SIMPSON:  Yeah.  I mean we'd be amenable to

17  that, your Honor, if it was possible.  Again, I think we

18  can talk to the government see if we can work that out.

19          THE COURT:  So Mr. Blume, why don't I take it

20  to you then.  Is there anything now that you've read the

21  defendant's submissions on their motion to dismiss

22  anything that you think would be helpful for you to

23  develop further in an evidentiary hearing that you

24  weren't able to either sure up or include in your papers

25  including first the discovery you've gotten from Chase

12

Proceedings

1   and from the defendants.

2            MR. BLUME:  No.

3            THE COURT:  Okay.  All right.

4            MR. BLUME:  No.  I'm happy to expand on some of

5   the things that Mr. Simpson talked about as you wish.

6            THE COURT:  Sure.  Why don't you as long as

7   we're here.  It may save us argument on a point that's

8   not significant.  I don't need it in great detail but

9   just sort of the general level of detail Mr. Simpson

10  offered.  Why don't you give me your thoughts on this

11  issue.

12           MR. BLUME:  And as a general matter and broadly

13  speaking, I agree with Mr. Simpson.  I don't think these

14  are issues that need to be resolved at a hearing.

15           With respect to the -- I'll go in order.  With

16  respect to the account, the wire transfers, we are not

17  suggesting, nor do we I don't think, suggest that any of

18  the defendants opened an account in New York.  What

19  happens is money goes to the federal reserve.  Then in

20  the case of JPMorgan, it goes to JPMorgan itself in New

21  York and then it is distributed to accounts elsewhere.

22  So it's not -- and we can talk about this more as you

23  wish in oral argument which is probably the best place to

24  do it.  But where I disagree with what Mr. Simpson was

25  saying is that this is not -- we're not relying on how

Proceedings

1    wires generally work.  We're relying on how wires work

2    with JPMorgan and how in particular is, every JPMorgan

3    wire does go through New York.  That is not true of --

4    we're not relying for instance on the fact that wires go

5    to the Federal Reserve Bank in New York.  That's not what

6    we're talking about.  The money goes to JPMorgan and

7    JPMorgan actually takes money from its own reserve

8    accounts and fronts that money to the branch offices as

9    appropriate before the money gets sent from the

10   originating bank.

11          And that is, you know, in our view indicated on

12   all the wire instructions that were given by the company

13   to its dealers and by JPMorgan to the company that the

14   wires, it ends up, not because it's the headquarters,

15   it's because that's where it goes.

16          By contrast, other banks don't work that way.

17   Other banks, forgive me if I'm going to get the state

18   wrong, but Wells Fargo, for instance, the money ends up

19   in San Francisco somewhere and then gets distributed out.

20          So I don't think we have a -- again, I agree

21   with Mr. Simpson and that's really how you characterize

22   that under the law.  In our view it's pretty clear under

23   the law that that's more than enough for a particular

24   part of this analysis which is just that really the long

25   arm statute part.  And I'd be remiss if I didn't say that

14

Proceedings

1  you don't even have to get there.  I recognize I'm

2  getting into the merits but you don't have to get there

3  at all based on our view of what Section 1345 does.

4          THE COURT:  Yes.

5          MR. BLUME:  With respect to the springs, I also

6  think you don't necessarily have to resolve this

7  factually.  There are two aspects of the springs, one of

8  which Mr. Simpson mentioned, one of which he did not.

9  One of which is it is a company that's based in New York.

10  That's the evidence we have.  And they purchase springs

11  from this company based in New York.

12          The other significance to it is that the -- oh

13  I'm sorry, it looks like Mr. Simpson has been cut off.

14          THE COURT:  Oh.  Yes, I knew somebody dropped

15  and I couldn't --

16          MR. BLUME:  Yeah, I'll pause.

17          THE COURT:  Let's pause for just a moment.

18  Yes.

19              (Pause in proceedings)

20          THE COURT:  Mr. Houghton, do you want to try to

21  reach Mr. Simpson by phone?

22          MR. HOUGHTON:  Yeah.  I just sent him a couple

23  of messages, your Honor, but yes, I will do that as well.

24  I have his cell.  I'll give it a shot.

25          THE COURT:  Okay.

15

Proceedings

1          MR. HOUGHTON:  Thank you to the Court and to

2    the government for your indulgence for this.  Thank you.

3          THE COURT:  No problem.  I see somebody.

4          MR. SIMPSON:  Your Honor, I apologize for

5    interrupting.

6          THE COURT:  Oh, it's okay.

7          MR. SIMPSON:  I'm back on.  We've had some sort

8    of an outage here of internet so I'm calling in by my

9    cell phone.  Again, I'm very sorry.

10          THE COURT:  I'm sorry to hear that.  I think on

11    the Zoom all of us have been in your position at least

12    once if not more, so worries at all.

13          All right.  So Mr. Blume stopped when he

14    noticed that you were gone.  Why don't you pick up where

15    you were.

16          MR. BLUME:  I will.  I just want to make one

17    quick point, one addition point about the New York

18    accounts and the wires.  There is some suggestion that,

19    although I think this is really a legal issue and not a

20    factual one, about whether the subjective intent of a

21    party matters.  And it's our view on the law, and again,

22    it probably is best to deal with it at oral argument,

23    that purposeful availment and subjective intent are two

24    different things and need to be addressed differently.

25          As to the springs, the second part of the

16

Proceedings

1    springs that we raise is the fact that the springs were

2    purchased through an RBT account but for RBF and then

3    shipped to what it appears to be RBF.  So it's just an

4    example of relationship between RBT and RBF.  That's

5    another aspect of this spring issue.

6              And again, I don't know that there's a dispute

7    necessarily about that.  It's just, you know, what does

8    that mean?

9              With respect to the dealer sales, I agree with

10   Mr. Simpson the declaration evidence, sorry, the

11   deposition evidence from Mr. Demonico and the declaration

12   from Mr. Demonico, it's another piece of evidence about

13   the sales, that's what we're relying on in terms of where

14   the dealers sold their product and what the company, and

15   by that I mean RBT, knew about it.  And there is some

16   other evidence about the fact that the products do end up

17   in New York State.  We give an example, at least one,

18   where it was a dealer who purchased it directly from RBT

19   and then sold it to New York State.

20             And then finally, with respect to RBF selling

21   firearms, again, I don't know that that matters.  This

22   may just be, and I say this speaking for myself, may just

23   be my misunderstanding.  You go on their website and they

24   advertise fully assembled weapons that you can purchase.

25   Now, if that's just -- so again, I don't know that that

17

Proceedings

1   necessarily matters.  There are some sales into New York.

2   We don't know what they are because -- well, we don't

3   know exactly what they are into New York, but there are

4   sales into New York and shipping into New York.  But I

5   would agree for the most part what RBF does is sell

6   pieces, or at least design pieces and have somebody,

7   maybe somebody else makes them and somebody else sells

8   them, but you can certainly purchase them, as far as I

9   can tell, you purchase them off their site.

10          THE COURT:  When you say design pieces, do you

11   mean swag or do you mean pieces of things going to the

12   firearms?

13          MR. BLUME:  Both.

14          THE COURT:  Okay.

15          MR. BLUME:  You can buy like tee shirts, you

16   can also buy --

17          THE COURT:  There's fashion design and then

18   there's firearms design and they're different.  And I

19   guess there's fashion about firearms for those who are so

20   inclined.

21          MR. BLUME:  I think that's correct, yes.

22          THE COURT:  Okay.

23          MR. BLUME:  So in short, your Honor, I'll go

24   back to where I started, we don't see a need for an

25   evidentiary hearing.  We'd be pleased to have an oral

18

Proceedings

1   argument.  It makes sense.  It certainly seems logical.

2   We don't think we need that either.  But we will do

3   whatever.  We just don't think an evidentiary hearing is

4   necessary.  If it is, we would, as you point out and as I

5   think as Mr. Simpson was amenable, if there's going to be

6   one, we want to know exactly what the disputed issues are

7   so that we can prepare for it.  But we don't think there

8   are any disputed material.

9        THE COURT:  So let's come back to this.  It

10  sounds to me like -- I was inclined to hold an oral

11  argument anyway.  There's always a chance I may not need

12  it but I'd rather set a date and then if I tell you at

13  the last minute I don't think I need it, we can cancel

14  it.  But you know, given the complexity of the issues,

15  and I just want to make sure I understand everybody's

16  position and that probably will be all that I need.  You

17  know, that said I think between now and whenever that

18  argument date is, and it might be as soon as next week, I

19  think it would be helpful for you all to confer and just

20  see -- and this is really, you know, defendant's motion

21  and I want to give them the opportunity to contest any

22  facts that they think might need to be corrected through

23  evidence as opposed to simply clarifying for me what the

24  weight or significance is I should give those undisputed

25  facts.  But to the extent there are any facts that you

19

Proceedings

1   think you want to make sure I understand and you have

2   some sense of how to prove, why don't you all get

3   together in the next couple of days and let me know if

4   there's anything.  And then you can let me know in

5   general terms what it is so I can at least keep it in

6   mind as I'm preparing for argument and let you know if I

7   think we need a witness.  And if we get to argument and I

8   say you know what, at some point I think I'm going to

9   need something on this, we can pick another date and we

10  can do it virtually if we need to just to kind of hear

11  from you all.  And it could be done by affidavit.

12         But I will for now plan on not necessarily

13  having an evidentiary hearing unless circumstances

14  otherwise warrant it.

15         All right.  So let me turn to the discovery

16  motion and let me start with the government on this one.

17  So I was a little unclear, and I don't think I'm going to

18  decide the motion today, but I want to figure out in what

19  sequence I have to decide it and what that means for the

20  other dates that we've set because our schedule is pretty

21  tight, but I do want to get a sense of if I gave you

22  leave to conduct expedited discovery now, what you would

23  be seeking.  I mean the specifics in your letter seem to

24  go mostly to the issue of the customers and where the

25  firearms are currently, or the devices are specifically.

20

Proceedings

1   And even before I got the defendant's response, I had a

2   similar thought of what they voiced in their opposition

3   which is this really seems to go to how you would enforce

4   a preliminary injunction if I granted your request for

5   one and not to your likelihood of success on the merits

6   of your fraud claims.

7           It does occur to me that it could go to

8   irreparable harm because what is in circulation, and I

9   guess specifically who has been, because it's a fraud

10  claim, who has been defrauded or not defrauded and how,

11  if there is any fraud, that would be cured and whether

12  it's irreparable, or whether it's something they can just

13  get their money refunded at some point, you know, there's

14  something for me to consider.

15          But let me hear from you in general terms about

16  what discovery we are seeking and really why it goes to

17  what I need to consider at the preliminary injunction

18  stage as opposed to ultimately being able to swiftly

19  enforce any injunction (indiscernible).

20          MR. BLUME:  We would seek discovery on the

21  elements we need to prove.  I wish I could be more -- to

22  be more specific I think would belabor it.  What's listed

23  in our letter is just broad examples but we would be

24  seeking things like communications about the product,

25  communications between RBT and maybe perhaps their

Proceedings

1    suppliers, their banks, some of their consumers.  I think

2    the best way to put it is your normal discovery.  There

3    are also some third parties who we would want some

4    information from and we could serve those.  Those are

5    either the supplier or where the product initially came

6    from, the company called Wolf Tactical.  Without being

7    too specific, I think that what I -- perhaps the best way

8    to put it is what we really want to do is get this

9    started.  And if, given the timing, if we don't get it

10   started, we're really bumping up against a wall.

11         And if it turns out -- well, not if it turns

12   out.  We fully expect, given we're moving around the

13   block, that defendants will have something to say about

14   what we're asking for and then they may have objections

15   and want to limit it, rather do it at that stage where

16   they can object to things like they've said in their

17   letter.  But we really want to get it moving.  And we're

18   not saying they can't object by no means, and nor are we

19   suggesting that we're totally 100 percent right.  You

20   know, we think we are, but if they object and bring it to

21   you and you tell us we're off base, fine.  But it's

22   really a matter of timing.

23         I do want to mention something, your Honor,

24   just as a reminder.  Irreparable harm and likelihood of

25   success on the merits, I'm not sure that applies in this

22

Proceedings

1  statute but that's for another day.  I just don't want

2  you always thinking one way.

3         THE COURT:  I think I still have my brain in

4  our TRO proceedings, so yes.

5         MR. BLUME:  Understood.  I just didn't want

6  that to go unanswered.  But that's the sort of it that we

7  want to get it started and if --

8         THE COURT:  If I hear you correctly what you're

9  saying is given what you've put in your motion for

10 preliminary injunction the proper place to address their

11 objections to specifics is beyond the scope of what you

12 need to prove is in a motion to quash after it's been

13 served, not before I allow you to begin the process.

14        MR. BLUME:  Yes.  You said it better than I

15 did.  Thank you.  But that's exactly right, yes.  That's

16 exactly what --

17        THE COURT:  I have the burden of convincing

18 myself, so you know, I hear you.  Okay.

19        But you know, I still would like to just ask

20 you a little more specifically to give me just a -- I'm

21 not un-persuaded by that argument but before I decide

22 that you can begin that process, especially given that we

23 still have a live question about personal jurisdiction

24 that's a very serious one in my mind, I am really not

25 unsympathetic to, and not unaware of the potential harm

23

Proceedings

1    from requiring the defendants to engage in any discovery

2    or respond to discovery in a case where this Court may

3    not have jurisdiction over them to begin with.

4              That said, you know, it does feel like it's

5    very hard for me to address the specifics about scope and

6    burdens until the requests have been served and to see

7    what the government has to say about it.

8              So let me just ask the government then, give me

9    a sense beyond the names and addresses of the customers,

10   what are some of the things you are hoping to find and

11   why are they relevant to whatever it is you do need to

12   show to prevail in your request for a preliminary

13   injunction?

14             MR. BLUME:  I'll give an example.

15   Communications between -- well, part of the records

16   underlying the initial purchase of, if that's the right

17   term, purchase of the FRT-15 from Wolf Tactical, what was

18   known about the prototype for that or the product that

19   came before it, the AR-1, who communicated those things?

20   That's an example.  And that to us is proving knowledge

21   about what this product was, whether it was legal or not

22   legal.  Communications between the company and at least

23   one or more of their experts, not for expert discovery

24   per se, but in particular about what did you, given the

25   ATF determinations of prior really the prototype for

24

Proceedings

1  this, the -- I'm trying to think.  I'm thinking in my

2  head the stuff that we had drafted and give some

3  examples.  And that's even before -- maybe the way to do

4  this then is to say to you things like customer lists and

5  where the product is is it is not just about relief.  We

6  are making a claim about a scheme that misrepresents two

7  particular customers what happened or what this product

8  is.  And we have to prove a scheme so to speak.  Not so

9  to speak.  That's one of the elements.

10         And for us to do that it would be useful in

11  discovery to understand where the products went, who

12  bought them, and what they understood about them, what

13  was told to them about the product.

14         THE COURT:  When you say what was told to them,

15  that would be written communications preserved by the

16  defendant but not -- I mean are you getting the names and

17  the addresses so you can go out and contact these people

18  and interview them or what's the --

19         MR. BLUME:  Well, I don't know that we have

20  time for that but --

21         THE COURT:  I mean you have a lot of resources.

22  It is --

23         MR. BLUME:  I mean yeah, but there's only so

24  many resources on any case.  And in an ideal world would

25  we want to do that?  Yeah.  Yes.  I'm not going to sugar

25

Proceedings

1    coat that.  And we have some indication of that, not

2    through discovery here but otherwise.

3               If I may, your Honor, can I pause for one

4    second?

5               THE COURT:  Absolutely.

6               MS. STAMATELOS:  Your Honor, there are other

7    ways also (indiscernible) --

8               THE COURT:  Sorry, Ms. Stamatelos, your sound

9    went out for just a sec.  Now you're on mute.  She's

10   speaking.

11              MR. BLUME:  We're in the same -- we happen to

12   be in the same room.

13              THE COURT:  Oh, I'm sorry.

14              MR. BLUME:  We're traveling.  With that and I'm

15   trying to make it efficient because Ms. Stamatelos is

16   much more in depth in this.  And if you'll indulge us to

17   allow her to --

18              THE COURT:  Sure.

19              MR. BLUME:  But we're trying to get the volume

20   right.

21              THE COURT:  I think, Mr. Blume, if you mute

22   yourself, she can turn her sound on and then I won't hear

23   an echo.

24              MS. STAMATELOS:  Am I good now?

25              THE COURT:  I think you're good.

26

Proceedings

1          MS. STAMATELOS:  It's okay.  Okay now?

2          THE COURT:  I think it's better now.

3          MS. STAMATELOS:  Okay, great.  Sorry.  Just

4   very quickly, there's multiple ways in which consumers

5   speak to the corporation that they're purchasing a

6   product from.  For example, financial transactions.  If

7   they want, you know, if they want to dispute a financial,

8   if they want to dispute a charge because for example they

9   heard about the ATF letter but they nonetheless bought

10  the FRT-15 and they're concerned about how do I get --

11  you know, should I return this?  Should I go to my local

12  law enforcement officials?  So there's lots of ways short

13  of interviewing a consumer who may have been defrauded by

14  the defendants short of going to speak to them in their

15  homes.

16          And so this idea that we're trying to harass

17  people that the defendants are accusing us of is simply

18  not true.  We're just trying to figure out --

19          THE COURT:  Yes.  I'm not --

20          MS. STAMATELOS:  --

21  (indiscernible) discovery --

22          THE COURT:  It's not that I'm not --

23          MS. STAMATELOS:  -- getting direct evidence --

24          THE COURT:  -- (indiscernible) and that

25  includes how their customers viewed their purchases as to

Proceedings

1    facts of the FRT coming into commerce and then having the

2    ATF try to get it stopping in commerce.  So that's just

3    one aspect of what we're really trying to get out here.

4    It's really just discovery about the scheme to defraud.

5              And as your Honor stated, there will be overlap

6    between merits discovery and relief requested discovery.

7    And I think also as we put in our letter, a lot of this

8    information that we're seeking directly from the

9    defendants they should have in their possession and they

10   should at this point have it sequestered somewhere

11   because it's part of your Honor's preservation order.  So

12   that's just --

13             THE COURT:  Yes.  I mean I think I'll just tell

14   you my initial reaction to that is I understand better

15   what the relevance is.  It's also -- and I don't want to

16   say I'm not concerned about their harassment potential

17   but I am less concerned than I am about the fact that

18   it's over broad and as defendant said, there's a cart

19   before the horse issue, maybe two carts, because it's

20   personal jurisdiction as they said in their letter.  But

21   it does seem like some of that potentially could be

22   addressed in a motion to quash or in some agreement

23   between the parties on how to narrow it or some

24   redaction.

25             So it does seem to be a fairly complicated

Proceedings

1   issue which brings me to my next point which is, you

2   know, on the defendant's side I will tell you in an ideal

3   world I would absolutely hold off on authorizing

4   expedited discovery until I decided whether I have

5   jurisdiction over your clients to begin with.  That makes

6   logical sense, less burdens for everyone, much more fair

7   under the law.

8          The problem is we are running up against a very

9   hard stop of the end of April because that was, as of the

10  last time we all got together, the end date that your

11  clients gave to extend the TRO on consent.  If your

12  clients are not willing to extend it further, then I will

13  just have to make a decision relatively quickly about

14  whether I'll allow the government to begin the process of

15  conducting merits discovery or not, something I had not

16  decided but could do quickly if necessary.

17         But one of the things I wanted to ask you about

18  is whether it would be possible to bump all of this

19  another four to six weeks or so if needed.  So we might

20  even be able to complete this in time for the hearing in

21  late April as scheduled.  But if I decide that your

22  motion for personal jurisdiction is (indiscernible) than

23  I thought, I think I need a longer opinion rather than a

24  shorter order for the time being, however it works out.

25         If I were inclined to at least put that one

29

Proceedings

1   cart before the other discovery horse, whether we might

2   be able to build in some extra time on the back end,

3   which would also give me or the magistrate judge, whoever

4   decides the discovery disputes if I allow discovery, if I

5   find jurisdiction, a lot of ifs, more time to really

6   consider appropriate limits and narrow the scope and do

7   that all in a more thoughtful way so that your clients

8   aren't burdened.

9           So my proposal would be to extend it but, you

10  know, your clients certainly do not have to consent to a

11  restraint on their business if they don't want to and

12  then I'll make the best decisions I have in the time that

13  I have.

14          So let me hear from you all about that

15  possibility.

16          MR. SIMPSON:  Sure.  Your Honor, I can make

17  this very simple.  The answer is yes, the clients would

18  consent to extending the time.

19          THE COURT:  Oh, I didn't need a whole

20  persuasive speech.  This is the advocate in me coming

21  out.  Okay.  Tell me what kind of time we're looking at.

22          MR. SIMPSON:  I'm sorry for interrupting your

23  Honor but -- I mean I guess the -- I mean four to six

24  weeks is reasonable.  I think the shorter the better.

25  But we want the Court to be able to decide the motion and

Proceedings

1   we recognize that all of the issues that have been

2   discussed, you know, that we're pressing up against a

3   deadline on April 30th that it makes life easier for the

4   Court and the parties to extend that deadline.

5           So I mean I would put it as four to six works

6   for us.  If your Honor thinks it needs to be longer, you

7   know, I think we would be amenable to a little bit longer

8   as well.

9           THE COURT:  Okay.

10          MR. SIMPSON:  I have authority to make judgment

11  calls on this.  I'm kind of looking for your Honor to

12  take a lead and just to give a sense, but yes is the

13  simple answer.

14          THE COURT:  Okay.  That does make things a lot

15  easier.  So I have jury trials --

16          MR. BLUME:  Your Honor, may I?

17          THE COURT:  Oh, sure.  Yes, go ahead.

18          MR. BLUME:  We just want to press that we

19  really would like to move this.  These are, in our view,

20  I recognize the defendants have a different view, in our

21  view these products at issue turn weapons into very, very

22  dangerous items.  And there are thousands if not hundreds

23  of thousands of them out on the street.  You know, they

24  are in our view machine guns and illegal and they're

25  dangerous.  And so we really -- I just want to press that

31

Proceedings

1    point.  And of course we'll do whatever the Court think

2    is best.  We continue to want to press this forward.

3            THE COURT:  So I guess I hear you and I

4    appreciate you raising that.  So let me just say this.

5    I'm not yet in a position to know how much of your burden

6    you're already confident you'll be able to meet on the

7    merits if we get to that without the discovery you're

8    seeking.  If you think that you have what you need or

9    have close to what you need and you would rather have me

10   decide this sooner in the interest of actually carrying

11   out the injunction if you prevail both on the

12   jurisdiction motion and on the PI, I can have the hearing

13   at the end of April and get you a decision after that as

14   soon as reasonably practical.  And I don't know that I

15   would have a full-fledged ready for publication written

16   opinion by the time the stay expires, but I could

17   possibly give you a short order that would at least put

18   the injunction into effect and lay out some terms if you

19   get it.  You know, many ifs away.

20           But I do think that given that the defendants

21   are now offering to extend the stay I will not give you

22   expedited discovery before I decide the motion to dismiss

23   now that I have a little bit of time in which to do so

24   because I just don't think given that they have raised at

25   the very least serious issue about jurisdiction that it's

32

Proceedings

1   fair or appropriate for me to have them start complying

2   with discovery demands.

3           I do think you have a decent argument, pretty

4   strong one from what you've described, that at least some

5   expedited discovery would be appropriate before your

6   hearing if you wanted to take the time to do that.  And I

7   know you don't yet know when I'm going to rule on the

8   jurisdictional question but I don't think it'll be

9   terribly long after our argument.

10          So I guess I will leave it to you all to

11  confer.  And what we can do is set a date -- I think

12  there's two ways this could go.  We could set a date for

13  oral argument on the personal jurisdiction motion.  It

14  doesn't depend on when the PI hearing is held.  And I

15  think I can probably do that sometime next week.

16  Thinking about my calendar.  I don't know what I have.

17  But I did take a peek beforehand and I think depending on

18  when we do it, if we're really talking about argument and

19  I'm known for a slightly longer than anticipated argument

20  because I usually have a lot more questions than I think

21  I'm going to have, but if we allow a couple of hours I

22  could probably find time Wednesday, Thursday, or Friday

23  of next week, so the 15th, 16th, or 17th.  I think I'd

24  like to do it in person if you all can be here, or

25  whoever is arguing can be here.  We don't need to set

Proceedings

1   that today but I just wanted to let you know those three

2   dates are available and you can let my deputy know by

3   email after the conference if you have any conflicts on

4   any of those dates.  I trust we'll find one.

5            That the question is after that if the

6   government would like to keep the current timetable

7   recognizing there's a chance you may not get any

8   discovery or at least not get a decision on whether you

9   can serve those demands or have any time to make use of

10  it before our currently scheduled date of April 25th, we

11  can just keep the hearing on the 25th.  If not, I could

12  do it -- I didn't check this before we got together.  It

13  looks like I have a trial starting on May 8th and I'm

14  hoping we'll be done sometime the week of the 15th.  So

15  we can push the PI hearing a month to the week of the

16  22nd.  And you know, if I can build in another few weeks

17  to write an opinion, another trial in June, but sometime

18  in there I can get you a ruling on it certainly by the

19  end of June.

20           So that's really the question is, you know, I

21  will leave it to the government as to which option you

22  prefer and you can let me know after today or you can let

23  me know today.

24           Actually, do you want to take a few minutes or

25  do you feel like you need a little more time than that?

34

Proceedings

1   We can take a break for ten minutes and you can come back

2   and we can set the schedule or if you'd rather confer and

3   let me know later, that's fine too.  I don't know who

4   else you need to consult with.

5           MR. BLUME:  Sure.  We'd be happy to take a few

6   minutes.  It is --

7           THE COURT:  Okay.  Let's do that.  And let's

8   come back, it's ten to 3, let's come back at 3.  And why

9   doesn't everybody just check their schedules for next

10  week and I'll check mine and we can set a time for oral

11  argument as well and you can let me know what conflict,

12  if any, you have then.  All right?

13          MR. BLUME:  Logistically, your Honor, would you

14  like us to hang up or --

15          THE COURT:  No, everybody can just go on video

16  off and mute and I'll just come back in ten minutes and

17  we'll pause the proceedings.

18          MR. BLUME:  Okay.

19          THE COURT:  All right.  See you in a bit.

20                      (Off the record)

21          THE COURT:  All right.  We're back on the

22  record.  How would the government like to proceed.

23          MR. BLUME:  Your Honor, what we'd like to do,

24  and I'll explain why, is tell you next week at the

25  hearing and here's why.  We'd like to keep the date for

35

Proceedings

1  now if possible and tell you next week, and here's why.

2  We'd like a little bit of time given what I think you

3  made clear that there is -- we're bumping up against

4  something on the 26th, we may or may not get all the

5  discovery that we want, so we need a little time to think

6  about whether we should streamline what we're asking for

7  to keep the 26th.  And if that's possible, we would like

8  to do that.  It may be that it just doesn't work for us

9  and so what we'd like to do is just have a little

10  thought, give a little more thought to that if you're

11  amenable to that.  We'd then ask you or give you an

12  update when we have the oral argument next week.

13          THE COURT:  Okay.  I'm fine with that.  I mean

14  just with the understanding that I'm not going to grant

15  your motion for expedited discovery until after we decide

16  on the schedule so --

17          MR. BLUME:  Yes, your Honor.  That's why we're

18  asking you for this because we get it.

19          THE COURT:  Yes.

20          MR. BLUME:  And so we have to think a little

21  bit about streamlining it.  It's a little more than a ten

22  minute conversation.

23          THE COURT:  Okay.

24          MR. BLUME:  That's all.

25          THE COURT:  I think that's fine.  All right.  I

36

Proceedings

1   don't mind that at all.  And I appreciate the defendant's

2   offer to extend the stay.  I will give defense counsel a

3   little preview.  I may be asking you to give me a

4   courtesy extension for a little while longer even if we

5   hold the hearing in April just to give me time to write.

6   You know, I could write a short order in a few days with

7   our current stay expiring on April 30th, but it does

8   occur to me that given that if I deny the injunction it's

9   one thing, you know, that can be done.  A denial is a

10  denial.

11          If I do grant it, and again, many carts ahead

12  of our horse, but you know, the terms and the reasoning

13  may be important to give the public and your clients

14  notice about what is or is not prohibited.  And so I may

15  come back to you on that.  But let's keep the schedule we

16  have for now.

17          Let me just ask for clarification.  I'm looking

18  at a calendar that may be wrong.  I have a hearing down

19  for the 25th but a couple of people have said the 26th.

20  I have an automated calendaring system that sometimes is

21  less than perfect.  What do you all have as the date for

22  our currently scheduled PI hearing?

23          MR. SIMPSON:  April 26th, your Honor.

24          THE COURT:  Okay.  All right.  Calendar Robot

25  is fired.  And what time do you have?

37

Proceedings

1      MR. SIMPSON:  At 10:30 a.m.

2      THE COURT:  All right.  I will fix that.  And

3  for the record, the Calendar Robot is not my incredibly

4  able deputy who seems to always know things are right or

5  wrong and I could have just asked him.  Okay.

6      All right.  So next week how is Friday the 17th

7  for everyone?

8      MR. BLUME:  Your Honor, that's fine for the

9  government.

10     THE COURT:  Okay.  Defense counsel?

11     MR. SIMPSON:  Your Honor, that's fine for us as

12  well.

13     THE COURT:  Okay.  Great.  So why don't we do

14  Friday the 17th at 10:30 in the morning and I will see

15  you in my courtroom then.  And then I will -- so this is

16  for oral argument on the motion to dismiss for lack of

17  personal jurisdiction.  And you all can just let me know,

18  just confer.  I want to give you a hard and fast

19  timeline, but the sooner you let me know if there are any

20  material facts in dispute, even if you just want to note

21  what the disputes are in a letter and then I can decide

22  if I think I'll need you to bring in witnesses either

23  then or at another time.  It sounds like it's not going

24  to be necessary but even knowing what the issues are and

25  we'll have assertions of facts, to the extent they're

38

Proceedings

1   evidentiary ones rather than ones that just go to weight,

2   that would be helpful.  All right?  Terrific.

3           Okay.  Thank you all very much.

4           MR. SIMPSON:  Thank you, your Honor.

5           THE COURT:  I'm glad we got together.  Anything

6   else schedule wise or otherwise you want to raise with me

7   while you have me?

8           MR. BLUME:  No, your Honor.

9           MR. SIMPSON:  Not from defendants, your Honor.

10          THE COURT:  Okay.  All right.  Thanks very

11  much.  I'll see you all next week.  Have a great day.

12          MR. BLUME:  Thank you, your Honor.

13          THE COURT:  Bye.

14          MR. SIMPSON:  Thanks, your Honor.

15                  (Matter concluded)

16                      -oOo-

17

18

19

20

21

22

23

24

25

39

# C E R T I F I C A T E

        I, MARY GRECO, hereby certify that the
foregoing transcript of the said proceedings is a true
and accurate transcript from the electronic sound-
recording of the proceedings reduced to typewriting in
the above-entitled matter.

        I FURTHER CERTIFY that I am not a relative or
employee or attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
or financially interested directly or indirectly in
this action.

        IN WITNESS WHEREOF, I hereunto set my hand
this **10th** day of **March**, 2023.


                              _Mary Greco_
                              Transcriptions Plus II, Inc.