

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 1, 2023

**By ECF**
Honorable Nina R. Morrison
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

    Re: *United States v. Rare Breed Triggers, LLC, et al.*,
      No. 23-cv-369 (Morrison, J.) (Levy, M.J.)

Dear Judge Morrison:

  Pursuant to the Court's March 22, 2023 Order to Show Cause (Dkt. 36) directing the parties to show cause why this action should not be transferred to another district, the United States respectfully submits this letter brief in response to Defendants' March 29, 2023 letter brief addressing the Order to Show Cause (Dkt. 38) and to the March 31, 2023 letter brief filed by Defendants (Dkt. 42). As discussed below, the Eastern District of New York remains the proper venue for this action.

  As the United States continues its investigation into Defendants' conduct, there is more and more evidence that *all* Defendants sold FRT-15s or components of FRT-15s directly to consumers in New York. In the process, it is becoming clear that Defendants' submissions on jurisdiction and venue, and their responses to associated discovery requests, do not fairly address the full scope of their contacts with New York and the Eastern District of New York in particular.

**I. Evidence about Defendants' sales in New York further establishes personal jurisdiction and venue in the Eastern District of New York.**

  As the United States set forth in its Complaint (Dkt. 1), its Opposition to Defendants' Motion to Dismiss (Dkt. 24), and its letter brief regarding venue (Dkt. 40), there are many reasons why personal jurisdiction lies in this district and why venue is proper here. First, the plain text of 18 U.S.C. § 1345 authorizes the United States to bring an action in this district. Next, there is personal jurisdiction over Defendants under New York's Long-Arm statute, N.Y. C.P.L.R. § 302(a)(1) and (3); Defendants transact business in New York and Defendants have committed torts outside of New York that have caused injuries inside New York and have intentionally and repeatedly directed firearms dealers to use the New York financial system for wire transfers to pay RBT over $6.2 million in connection with the sale of FRT-15s. Additionally, Defendants have advertised their FRT-15s in New York, and sold replacement parts for their FRT-15s in New York. They have also worked with dealers that they knew sold the illegal devices to New York customers.

On top of these reasons, there is now evidence that – contrary to Defendants' misleading and false statements – Defendants have sold FRT-15s directly into New York. And what is more, there is uncontroverted evidence that Defendant Rare Breed Firearms (RBF) sold replacement parts for the FRT-15 machinegun conversion device directly to New York consumers and shipped those parts directly to New York addresses. *See* Dkt. 25 at ¶¶ 9-11; Dkt. 40-1 at ¶¶ 7-39; *see* Declaration of Dean Conigliaro, dated April 1, 2023, annexed hereto as Exhibit A. Those transactions are more than enough, under New York's Long-Arm statute, to establish personal jurisdiction and venue. *See* Dkt. 24 at 13-14 (setting forth the standard for New York's Long-Arm Statute).[1]

Put simply, there can no longer be any reasonable dispute that Defendant RBF transacted business in New York given that RBF sold parts for the FRT-15 to New Yorkers. Defendant DeMonico, the self-described president of RBF (*see* Dkt. 25-3 p. 136), thus transacted business here in New York. And it is also beyond dispute that the close connection between RBF and Defendant Rare Breed Triggers (RBT) (*see* Dkt. 24 at 7-8) is even closer than previously known. RBF supported RBT's business, presumably all over the country and demonstrably in New York, by selling FRT-15 replacement parts.[2] All of which means that there is jurisdiction over RBF and DeMonico as well as RBT and its owner, Defendant Kevin Maxwell. *See* Dkt. 24 at 25-26.

RBF's sales of FRT-15 replacement parts in New York emphasize the importance of RBT's dealer network and reveal inaccuracies in the narrative that Defendants have been pushing about that network. As the record shows, RBT sold FRT-15s to dealers, at first to an exclusive dealer – Big Daddy Unlimited – and then to others. *See* Dkt. 24 at 3-4. These dealers sold FRT-15s in New York. *See id.; see also* Dkt. 25-1, Declaration of Lawrence DeMonico, dated September 21, 2021, ¶ 14 ("[Big Daddy Unlimited] sold the FRT-15™ trigger directly to customers across the United States"). Defendants have been trying to distance themselves from those sales, claiming that they never sold devices to "dealers who had stated an intent to sell to New York" and that they are "not aware of any instance where a dealer sent an FRT-15 or WOT to any person or address in New York." Declaration of Cole Leleux (Dkt. 23-1) at ¶¶ 14-17. And Defendants have represented that, "so as far as [Defendants are] concerned, they were never aware that this had happened, it would happen, and as we know they actually made specific efforts to stop it." *See* Transcript of Oral Argument of March 17, 2023, annexed hereto as Exhibit B at 37. But Defendants have in fact never made "specific efforts to stop" dealer sales into New York. To the contrary, as Defendants admitted, "there is no formal policy, there's no agreement" between Defendants and their dealers pertaining to where FRT-15s would be resold. *Id.* at 47-48. Nor did Defendants "follow[] these devices to see where they could possibly end up." *Id.* at 48-49.

Defendants knew that dealers were selling FRT-15s into New York. Otherwise, why would RBF need to sell FRT-15 replacement parts to *New Yorkers*?

---

[1] This Court also has jurisdiction pursuant to 18 U.S.C. § 1345. *See* Dkt. 24 at 9-13.

[2] Recall that RBF purchased 10,000 springs from a company using RBT's account. *See* Dkt. 25 at ¶ 25. We do not know where all those springs went – or, for that matter, where any other parts that may have been purchased before or after went – as RBF and RBT continue to refuse to disclose their customer list or sales records.

Indeed, Defendants directed their dealers to use wire transfers, through New York, for the purchase of at least $6.2 million worth of FRT-15s. *See* Dkt. 24 at 4-6. Combine those transactions with the sale of replacement parts for FRT-15s and Defendants' intentions become clear. Giving them the benefit of all doubts, perhaps Defendants took limited steps to avoid selling FRT-15s directly to New Yorkers. But knowing that their dealers would and were in fact doing so, they were more than willing to allow their dealers to do so, and they used New York to provide support to their dealers as they did so, by setting up a payment system through New York and providing New York customers with replacement parts for the devices they purchased. This kind of support – RBF's sales, in New York, of replacement parts for RBT's products – is the kind of business activity that supports jurisdiction over both RBF and RBT because (1) it makes it easier for New Yorkers to own FRT-15s, *see, e.g., Ford Motor Co. v. Eighth Judicial Dist. Ct.*, 141 S.Ct. 1017, 1028 (2021) (discussing jurisdictional implications of the sale of replacement parts); (2) it promotes the sale of FRT-15s into New York, *see, e.g., Helicopter Transport Servs., LLC v. Sikorsky Aircraft Corp.*, 253 F. Supp. 3d 1115, 1129 (D. Oregon) (same); and (3) it encourages the continuation and expansion of the relationship of New Yorkers to FRT-15s, *see e.g., Knox v. Metalforming, Inc.*, 914 F.3d 685, 693 (1st Cir. 2019) (same).

This week, ATF special agents uncovered even more new evidence that contradicts Defendants' claims about their sales in New York. On March 29, 2023, ATF Special Agents contacted a recipient of a package from Defendant RBF. *See* Exhibit A at ¶¶ 7-10. That package was sent to Collins, New York. *See id.* The recipient of the package confirmed that he had purchased FRT-15 components – a locking bar and two springs – from Defendants. *See id.*[3] Significantly, the FRT-15 components were shipped directly to the recipient in New York and billed to his address in New York, as evidenced by a screen shot of the RBF purchase taken from the recipient's phone. *See id*. at Attachment 1. ATF special agents also learned, via U.S. Postal Service records, from an RBF confirmation email, and from speaking directly to a customer, that RBF shipped a package of anti-walk pins to Carmel, New York, in the Southern District of New York, in 2021. *See* Exhibit A at ¶¶ 11-14. Anti-walk pins are used in both semi-automatic and fully automatic firearm applications, including with FRT-15s. *See id.* Similarly, ATF special agents confirmed that RBF shipped packages to customers in Hopewell Junction, New York and Woodbridge, New York as well as Theresa, New York. *See id.* at ¶¶ 15-28. All told, in the last week, ATF has established that RBF has sold directly to New York customers on at least 13 occasions, with many of these sales involved parts for firearms – not just "swag." *See* Dkt. 40-1, *see also* Exhibit A.

**II.   Defendants' complaints regarding the newly discovered evidence are unavailing.**

Defendants' complaints about this newly discovered evidence are misplaced. *See* Dkt. No. 42. First, there is no bait nor is there is a switch. The United States was clear in its initial letter brief that a number of consumers in New York told ATF Special Agents that they purchased FRT-15s from Defendant RBT and that the FRT-15s were shipped directly to their addresses in New York. Second, to the extent that the Court wishes to explore this evidence at an evidentiary

---

[3] The recipient told ATF Special Agents that he did not purchase an FRT-15. *See* Exhibit A at ¶ 9.

hearing, the United States would, of course, be prepared to present it.[4] The government expects that Defendant DeMonico and Cole Leleux would be prepared to provide testimony at such a hearing, especially since they raise assertions that are contradicted by ATF, customer statements, and shipment records.

Third, to the extent that Defendants are bothered by the fact that the United States had earlier agreed that an evidentiary hearing was unnecessary, as there were no material facts at issue at that point, Defendants have only themselves to blame. The United States' agreement that no material facts were at issue stemmed from representations made by Defendants about what RBF sold and to whom. As was represented to the Court on March 8, 2023, Defendants stated as follows:

> [T]he government claims that RBF sells firearms in New York and some firearm accessories in New York and elsewhere. Your Honor, I'll just be blunt. That's false. RBF doesn't sell firearms at all. It licenses designs to another company that then makes and sells the firearms which is basically a design company. It also sells swag, tee shirts, hats, that kind of thing. And it is true that some of those I think tee shirts and hats got sold in New York at some point.

*See* Transcript of Oral Argument of March 8, 2023, annexed hereto as Exhibit C at 9. That statement was incomplete and thus misleading. As we now know, it was not just "tee shirts and hats" that RBF sold in New York, but it was also component parts for FRT-15s. Those components were shipped to addresses in New York. Relying on Defendants' representations, the United States did not, initially, seek to make contact with residents of those addresses. Only after the Court requested further briefing on the issue of venue did the government undertake what it believed was likely a fruitless exercise in light of Defendants' representations, on the off chance that it could uncover additional evidence. And, contrary to Defendants' assertions, the United States found that evidence, which the Defendants had not disclosed even when asked.

Fourth, Defendants have disputed the statements that New York consumers made to ATF Special Agents by referring to the very sales records and customer lists that Defendants have refused to provide to the United States in discovery. Given their assertions, Defendants have now unequivocally put these sales records in play, so to speak; they must turn them over forthwith, especially should an evidentiary hearing be deemed necessary.

---

[4] Defendants suggest that individual purchasers of Defendants' products will need to testify at an evidentiary hearing. *See* Dkt. No. 42. Should the Court deem a hearing necessary, the United States will reserve the right to subpoena the direct testimony of individual purchasers referenced in the United States' declarations. The United States cautions, however, that there may be a chilling effect of such testimony. As reflected in the declarations filed in this case, multiple New York purchasers of the FRT-15 have voluntarily met with ATF Special Agents and, upon learning that their purchased FRT-15 is, in fact, a machinegun, the purchaser has consented to the forfeiture or destruction of that FRT-15—thereby taking away the threat of another illegal and dangerous machinegun conversion device from the streets. But if purchasers assume that their voluntary statements to ATF will inevitably lead to them being subpoenaed to testify in federal court, purchasers may be less likely to voluntarily forfeit or destroy their FRT-15—thereby leaving countless machinegun conversion devices unaccounted for on the streets.

The best evidence showing where Defendants sold the FRT-15s and WOTs is maintained by the Defendants. Defendants have referred to these "records" and "customer lists," and have filed four declarations including statements about what these "records" purport to reflect. But they have yet to produce a single copy of these records or a single statement summarizing how these records are maintained and what information they include. Defendants have shielded this material information for the disclosure to the Court and the United States, but have repeatedly and selectively used this information as a sword to dispute other evidence. It is well past time for Defendants to produce these records and customer lists.

### III. Factors that the Court is to analyze as it evaluates whether to transfer venue favor the Eastern District of New York.

Given that the foundation for Defendants' challenge to this forum has crumbled, two factors in the transfer of venue analysis gain more prominence, namely, the practicalities of a transfer and the interest of judicial economy. Transferring this matter, which is scheduled for a hearing on the merits on May 23, 2023, and which has already consumed significant time of this Court, will only increase the delays and inefficiencies that Defendants themselves have caused. A transferee court would need to familiarize itself with the facts, not to mention would need to find time to re-schedule a hearing. There is no telling how long any of that will take.

This delay has been caused by the Defendants, not the United States. Defendants obscured critical facts about their sales into New York, facts that have come to light only now. Further, Defendants could have—but did not—challenge venue at the same time that they challenged jurisdiction. Defendants challenge venue only because the Court has raised the issue. Now that they have finally done so, Defendants must establish by clear and convincing evidence that "fairness" warrants transfer. *See United States v. Stamps*, No. 18-CV-1106 (BMC), 2018 WL 6031155, at *2 (E.D.N.Y. Nov. 16, 2018) ("To prevail on a motion under § 1404(a), the moving party carries the burden of making out a strong case for transfer by clear and convincing evidence.) (internal citations omitted). Defendants have not and cannot do so.

All of this delay then, boils down to Defendants' *preference* to litigate this matter in the Western District of Texas. Their preference, however, is not a factor in the venue analysis. As the United States noted in its initial letter brief, this case should be transferred not because of a party's preference but only if an "alternative forum would be significantly more convenient and better serve justice than the one chosen by the plaintiff, that the present forum imposes an undue burden." 14D Charles A. Wright, Arthur R. Miller, Edward H. Cooper, & Richard D. Freer, *Federal Practice and Procedure*, § 3828.2 (2013).

The declarations of Cole Leleux (Dkt. 23-1) and Defendant Lawrence DeMonico (Dkt. 39) are proof enough that litigating this matter somewhere other than the Western District of Texas would not impose the kind of inconvenience or burden that would justify a transfer. As Defendant DeMonico notes, he resided in Texas but managed the daily operations of RBT in Florida and North Dakota for nearly three years. *See* Dkt. 39 at ¶¶ 5-9. Mr. Leleux, a Florida resident, stated that he reviewed Defendants' business records – which are allegedly stored in Texas, *see id*. ¶ 11 – as part of this litigation. *See* Dkt. 23-1 at ¶¶ 1, 16-17. Defendants are adept at and comfortable with dealing with matters across state lines.

Defendants are similarly adept at litigating matters in various parts of the country, thereby undermining, by their own actions, any argument that fairness and convenience militates in favor of transfer. They have affirmatively chosen to commence, and actively pursue, federal lawsuits in Florida, North Dakota, Ohio, and Oklahoma primarily, as the Court noted, to "aggressively protect[] their patents." *See* Opposition Motion at 24 and n.17; *see* Exhibit B at 85. Defendants have the wherewithal to litigate across the country, as they have demonstrated time and again. Moreover, in this Court, the parties have secured experienced, competent representation from attorneys based in Virginia. Defendants' claims that they lack the "means" to litigate in New York strains credibility. The United States estimates that Defendants have profited from their illegal sales of machineguns to the tune of $32 million dollars. And it is by no means clear why litigating this matter in Texas – with witnesses, records, and attorneys spread all over the country – will be any more economical than doing so in New York.

It is hard to see how it would be unfair or inconvenient for Defendants to litigate outside of Texas when they have never opted to litigate inside of Texas. Indeed, even when Defendants challenged ATF's classification of the FRT-15 as a machinegun, Defendants brought suit outside of Texas.

There is no sufficient reason to upend the United States' choice of this forum. The case that Defendants cite to suggest that the Court should give little weight to that choice, *Stamps*, 2018 WL 603115, is inapt. First, the court in *Stamps* did, in fact, give weight to the United States' choice, it merely did not provide that choice with added deference. *See id.* at *2. Second, the court in *Stamps* downplays the fact that government resources are not available everywhere or at all times. As the Court recognizes, "the U.S. Government has different offices with different priorities among their U.S. attorneys, different resources in those offices, different allocations of those resources." *See* Exhibit B at 34. Underlying the reasoning in *Stamps* seems to be the view that a private litigant that brings suit in its home forum does so for resource reasons. Giving deference to that home state litigant's choice of forum, then, acknowledges that the litigant's choice was one of convenience that is to be prioritized over that of a defendant's convenience. The same should be true for the United States, especially when it is addressing a public crisis, as it is in this case. The United States has legal and investigative resources here, for this matter, in a way that it may not have elsewhere. Its choice to bring the case here, then, should be given at least the same deference that would be given to a private litigant. Third, the court in *Stamps* did not even address the added deference courts have afforded to the plaintiff's choice of forum in cases involving statutes with broad venue provisions. *See, e.g., Wellens v. Daiichi-Sankyo Co., Inc.* 2013 WL 3242294 at *3 (N.D. Cal. 2013).[5]

Finally, with respect to the location of relevant documents, that Defendant RBT purportedly keeps its records in Texas should be of little import. In this day and age, the physical location of records is almost irrelevant. *See, e.g., Stamps*, 2018 WL 6031155, at *3 (noting "that almost all discovery today is sent and received electronically"). And Defendants have already established the ease with which they can access and review their records from anywhere. Cole

---

[5] The United States recognizes that *Stamps* was a § 1345 case. But the court in *Stamps* did not discuss whether the venue provision in § 1345 impacted its analysis.

Leleux, in two declarations submitted to this Court, notes that he is a Florida resident, but has reviewed RBT and RBF records. *See* Dkt. 23-1, 29-1.

As the majority of the factors the Court must consider in a § 1404(a) analysis does not support transfer to Texas, the United States respectfully submits that venue should remain in the Eastern District of New York.

### IV. There is no justification to vacate the TRO.

Should the Court transfer this matter, there is no support for vacating the TRO, as Defendants' request. *See* Dkt. 38. Defendants cite no authority to justify that request. Nor could they. As Judge Learned Hand stated, "when an action is transferred, it remains what it was; all further proceedings in it are merely referred to another tribunal, leaving untouched whatever has been already done." *Magnetic Eng'g & Mfg. v. Dings Mfg. Co.*, 178 F.2d 866, 868 (2d. Cir. 1950) (Hand, C.J.). And there has been no change in the circumstances, factual or legal, that underly the TRO such that vacating the TRO is justifiable. *See, e.g., HM Compounding Servs., Inc. v. Express Scripts, Inc.,* 2015 WL 4162762 at *17 (E.D. Mo. 2015) (transferring venue but refusing to vacate TRO); *Earthbound Corp. v. MiTek USA, Inc.*, 2016 WL 9227684, at *5 (W.D. Wash. Sept. 22, 2016) (transferring case but noting that "[t]he Temporary Restraining Order shall remain in effect unless or until the U.S. District Court for the Central District of California dissolves it.). Further, Defendants' assertion that their consent to the extension of the TRO through June 30 was contingent on the jurisdictional dispute is inaccurate, at best. As the Court will recall, its discussion with Defendants about an extension for the TRO was all about the date on which the Court was to schedule a hearing on the merits of the preliminary injunction and the time the Court might need to rule on those merits. *See* Exhibit B at 103-08.

### V. The Eastern District of New York is a permissible venue.

Although it is not clear, it appears that Defendants are now arguing that, even if the Court could exercise personal jurisdiction over them, this forum is still not a permissible venue. Dkt. 42. Not so. As noted in the United States' initial letter brief, venue lies in this Court because of § 1345. As a general matter, venue is governed by 28 U.S.C. § 1391. By its very terms, however, § 1391 does not apply if a federal statute otherwise provides venue. *See id.* § 1391(a)(1) ("*Except as otherwise provided by law* … this section shall govern the venue of all civil actions brought in the district courts of the United States." (emphasis added)). Put another way, § 1391 only applies where a more specific venue provision does not exist. *See, e.g., Atlantic Marine Const. Co. v. U.S. Dist. Court for the Western Dist. of Tx.*, 571 U.S. 49, 55 n.2 (2013). Section 1345 has a more specific provision that covers venue. Section 1345 therefore displaces § 1391. *See* 14D Charles A. Wright, Arthur R. Miller, Edward H. Cooper, & Richard D. Freer, *Federal Practice and Procedure*, § 3803 (2013). The statute states that "the Attorney General may commence a civil action in *any* Federal court" to enforce its provisions. 18 U.S.C. § 1345(a)(1) (emphasis added). Therefore, venue is proper in this Court (as it would be in any other federal district court).

Even were § 1391 to apply, venue is proper in this Court. Under § 1391, venue lies in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). Venue is not restricted to where the most substantial events or omissions occurred. *See Daniel v. American Bd. Of Medicine*, 428 F.3d 408, 432 (2d Cir. 2005).

7

Rather, venue may be appropriate in more than one district, as a substantial part of those events or omissions may occur in several places. *See id*. An analysis of venue thus focuses on (1) the nature of the claims and what events or omissions gave rise to them and (2) whether a substantial part of those events or omissions occurred in the district. *See id.* Substantiality is a qualitative analysis, not a quantitative one. *See id.* at 432-33. As such, events or omissions will be substantial if they bear a close nexus to the claims. *See id.* at 433.

The claims here – which seek to enjoin Defendants from continuing to commit conspiracy and mail and wire fraud – rest, in large part, on the sales of illegal machinegun conversion devices using the mails and interstate wires. Much of that activity occurred in the Eastern District of New York, as has been described here and elsewhere. The Defendants consummated $6.2 million worth of sales of their products using wire transactions that traveled through the Eastern District of New York. They sold and shipped replacement parts for these products in the Eastern District of New York. They helped their dealers to sell products here in the Eastern District of New York. They advertised in the Eastern District of New York. There is thus a clear and close nexus between events in the Eastern District of New York and the claims. The events give rise to the claims.

That venue is proper in this case is buttressed by an examination of the way that courts look at venue in criminal cases alleging similar conduct. Given that the elements of the claims here are defined by criminal statutes, it is sensible to examine how the courts have treated venue in criminal prosecutions alleging conspiracy and fraud. Courts have repeatedly held, in circumstances such as those here, that venue is proper in New York. For example, a phone call from one district to another establishes venue in both districts for a conspiracy count. *See United States v. Smith*, 198 F.3d 377, 382 (2d Cir. 1999). Even a single phone call from New York initiated by a government cooperator can establish venue over a Texas defendant for wire fraud and conspiracy charges. *See United States v. Abdallah*, 528 Fed. App'x. 79, 81 (2d Cir. 2013). Venue was also proper with respect to defendants whose only contact with the Eastern District of New York was to use John F. Kennedy Airport to go to meetings elsewhere. *See United States v. Tzolov*, 642 F.3d 314, 317, 319-20 (2d Cir. 2011); *see also United States v. Schoor*, 597 F.2d 1303, 1308 (9th Cir. 1979) (finding that the defendant's connecting flights in San Francisco airport while traveling to pick up heroin in Miami was sufficient to constitute an overt act committed in the Northern District of California).

In addition to Kings, Nassau, Queens, Richmond, and Suffolk Counties, the Eastern District of New York comprises, "concurrently with the Southern District, the waters within the counties of Bronx and New York." 28 U.S.C. § 112(c). Thus, acts occurring in, over, and through the concurrent waters are sufficient to establish venue in the Eastern District. Those waters completely surround Manhattan (New York County).

That venue is proper in the Eastern District because wire transmissions traveled in, over, or through the waters surrounding Manhattan is exemplified in *United States v. Rutigliano*, 790 F.3d 389 (2d Cir. 2015). There, participants in a wire fraud scheme unlawfully obtained disability benefits. These participants were in the Eastern District, but the case was brought in the Southern District. To receive the benefits, money was wired to the participants. Those wires, of course, "traveled through or over the waters within the Eastern District." *Id.* at 398. Therefore, both the Southern District and the Eastern District properly had venue over the matter. *See id.* The same

is true here as the wires at issue here had to travel through or over the waters within the Southern District.[6] *See also United States v. Mackey*, No. 21-CR-80 (NGG), 2023 WL 363595, at *7 (E.D.N.Y. Jan. 23, 2023) ("[V]enue lies where a wire in furtherance of a scheme begins its course, continues or ends.") (citing *Rutigliano*, 790 F.3d at 397). Accordingly, given that Defendants engaged in wire transactions, sales of products, and advertisements in this district, the Eastern District of New York unequivocally has a material relation to the facts of this case.

\* \* \*

In sum, venue is proper and appropriate in the Eastern District of New York. Defendants sold products to customers in New York; they made liberal use of a bank in New York; they assisted their dealers in selling products in New York; they advertised in New York; the list goes on. The case should remain here. The United States thanks the Court for its consideration of this matter.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     */s/ Michael S. Blume*
Michael S. Blume
Joseph A. Marutollo
Paulina Stamatelos
Assistant U.S. Attorneys
(718) 254-6479 / 6288 / 6198
Michael.Blume@usdoj.gov
Joseph.Marutollo@usdoj.gov
Pauline.Stamatelos@usdoj.gov

Encl.

cc: All Counsel of Record (By ECF)

---

[6] This concept of venue based on concurrent waters extends to a number of factual contexts, all of which support the conclusion that venue properly lies in the Eastern District. For example, courts have found venue based on concurrent waters when a defendant drove over the Verrazzano-Narrows Bridge, *see United States v. Kirk Tang Yuk*, 885 F.3d 57, 66 (2d Cir. 2018), and when a defendant flew over the waters in airplane, *see United States v. Ramirez-Amaya*, 812 F.2d 815, 816 (2d Cir. 1987).