# Exhibit B

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,              :   23-CV-00369(NRM)
                                       :
         Plaintiffs,                   :
                                       :
      -against-                        :   United States Courthouse
                                       :   Brooklyn, New York
                                       :
                                       :
                                       :
                                       :
RARE BREED TRIGGERS, LLC,              :   Friday, March 17, 2023
ET AL.,                                :   10:00 a.m.
                                       :
         Defendants.                   :
- - - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE NINA R. MORRISON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Plaintiff:       UNITED STATES ATTORNEY'S OFFICE
                         EASTERN DISTRICT OF NEW YORK
                         For the Plaintiff -
                         United States of America
                             271 Cadman Plaza East
                             Brooklyn, New York 11201
                         BY: MICHAEL S. BLUME, ESQ.
                             JOSEPH A. MARUTOLLO, ESQ.
                             PAULINA STAMATELOS, ESQ.

For the Defendants:      PACIFIC LEGAL FOUNDATION
                         For the Defendants -
                         Rare Breed Triggers, LLC, et al.
                             3100 Clarendon Boulevard
                             Suite 1000
                             Arlington, Virginia 20036
                         BY: CALEB KRUCKENBERG, ESQ.
                             STEVEN SIMPSON, ESQ.

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

```
Court Reporter:    Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                   Official Court Reporter
                   Telephone: (718) 613-2487
                   Facsimile: (718) 613-2694
                   E-mail: Anthony_Frisolone@nyed.uscourts.gov
```

Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

1  states, where I think you would have had certainly an easier
2  argument about personal jurisdiction than here, especially
3  given -- and I do recognize when I'm asking this question
4  that the U.S. Government has different offices with
5  different priorities among their U.S. attorneys, different
6  resources in those offices, different allocations of those
7  resources.  Eastern District is a very well staffed and
8  larger one with a big civil division.  But that said, you
9  have impressed upon me repeatedly what you see as the real
10 urgency of getting to the merits and getting, in your words,
11 what you view as very dangerous devices out of circulation.
12 Clearly, as we've seen, this litigation over jurisdiction is
13 going to delay things.  It also could, if I deny the motion
14 but the Second Circuit or the U.S. Supreme Court potentially
15 disagrees with me, upend whatever injunctive relief you
16 might be able to convince me to award.  So why did you come
17 here?
18         MR. BLUME:  Guns are a problem.  And they're a
19 problem here.  And that's -- we see it in our office
20 repeatedly and we are trying to use whatever tools we can to
21 ensure that the gun regulations are, gun statutes and gun
22 regulations are enforced appropriately.  It's simply a big
23 priority for our office, for this district, for this state
24 and the country as well, and then I'll stop there because
25 much of the other reasons are things that I'm not in a

1      MR. KRUCKENBERG:  And I think the most relevant
2  information comes from Mr. Leleux in the his reply
3  declaration because this is something he addresses and he
4  says very clearly that we are not aware of any instance
5  where we sold to a dealer that resold in New York.  None of
6  the dealers we sold to expressed any intention or plan or
7  said that they had ever resold in New York.  That's the
8  knowledge that my clients had, and so as far as they're
9  concerned, they were never aware that this had happened, it
10 would happen, and as we know they actually made specific
11 efforts to try to stop it.  You could not buy one these
12 devices if you were located in New York.
13     THE COURT:  Should I draw anything from the fact
14 that you submitted that declaration from Mr. Leleux but I
15 didn't receive a similar unequivocal assurance from
16 Mr. Maxwell or Mr. DeMonico who are the named defendants or
17 principals in the business.
18     MR. KRUCKENBERG:  I don't think -- and I'll point
19 out we certainly could have had evidentiary hearing.  I
20 don't think that there is a material dispute about what
21 happened or that these dealers had said, you know, told RBT
22 or my clients what their plans were.
23     And I think just to address Mr. DeMonico's
24 testimony in the other case.  I mean, I think, reading it
25 sort of the most aggressively, we could say he was saying,

1  sell, took steps, so that they wouldn't sell directly to
2  certain states.
3          THE COURT:  Believing that that would defeat
4  jurisdiction in those states?  I know you can't get inside
5  their head.
6          MR. BLUME:  Since you're asking, presumption, I
7  think, it wouldn't be jurisdiction, it would be the law of
8  the state that they individually or they wouldn't because
9  they didn't directly sell.  But they didn't have a problem
10 with their dealers doing it.
11         THE COURT:  I see.  Just as a factual matter
12 Mr. Kruckenberg, do you agree that RBT placed limitations on
13 where its third-party dealers could resell the product?
14         MR. KRUCKENBERG:  Yes, Your Honor.
15         THE COURT:  Never even advised them, we prefer you
16 not sell here or the laws of this state could get us in
17 trouble or anything like that?  It was just, we're only
18 selling to individuals to third-party dealers in 45 or so
19 states for reasons that we're choosing to do as a business
20 matter.  And the third-party dealers can do what they want
21 to do, but we're not involved in that.
22         MR. KRUCKENBERG:  And, your Honor, what I can
23 represent because I don't know about every context, every
24 sale.  But what I can tell you is that there is no formal
25 policy, there's no agreement that they would not be

1  resolved.
2            And instead, I would just point to, again,
3  Mr. Leleux's declaration, not that we don't know that
4  sometimes these are resold in other states, it's that we're
5  just not aware of any instance that these were resold to
6  New York, and none of the dealers we sold to expressed an
7  intention to resell to New York.
8            THE COURT:  Right.  But did they track, I mean,
9  when they say we're not aware of any instance, like, did
10 they track their sales in any states in particular that were
11 from the dealers?
12           Like, they don't know if when they still had their
13 relationship with Big Daddy and they sold a thousand in a
14 given month, they didn't know where Big Daddy resold them
15 because nobody was reporting back to them.  So to say, we're
16 not aware of any in New York, it doesn't mean that New York
17 is different than any other states where Big Daddy might
18 have put them into the stream of commerce.
19           MR. KRUCKENBERG:  I think that's right to the
20 extent there's no normal tracking system.  There's no -- my
21 clients were not following these devices to see where they
22 could possibly end up.
23           THE COURT:  Right.
24           MR. KRUCKENBERG:  Instead, it was all on the front
25 end.  It was, we are only going to sell in these states.

1   We're are only going sell to dealers in these states.
2           THE COURT:  Okay.  So I guess my question for you
3   with respect to the sales that they know they made, that's
4   kind of a big picture matter not for me to decide here, and
5   there may be there defenses I'm not thinking of.
6           But just so I understand how you interpret the
7   transacting business prong of New York statute which is
8   quite similar to that in most other states at this point.  I
9   take it you would concede that your clients would be subject
10  to personal jurisdiction if this action were to have been
11  brought in North Dakota, Texas, or Florida that is where
12  they live or incorporated?
13          MR. KRUCKENBERG:  Certainly.
14          THE COURT:  And what about all of the states
15  where, during the relevant time period, they sold to
16  third-party dealers; that is, they made direct sales to
17  Big Daddy or their equivalent.  So essentially all of the
18  states that are in the Leleux declaration, or that
19  Mr. DeMonico said, absent a slip of the tongue, if it turned
20  out to be true, that they sold to 45 states other than the
21  ones he listed that any of those where they sold to a
22  third-party dealer:  Pennsylvania, New Jersey, Iowa,
23  wherever, that there would be personal jurisdiction there
24  over this specific action had the U.S. Government brought it
25  there because of the sales to the third-party dealers.

1  it or doesn't approve it, it's all coming from them.
2         THE COURT: So let me ask defense counsel.
3         Does the fact that your clients are the only ones
4  making this device coming kind of achieve a substantial
5  portion of what I need to get to for reasonableness. That
6  is, where else would they be getting this information from?
7  I threw a lot of things out there, but my questions kind of
8  overlook the big elephant which is that your clients very
9  aggressively protected their patent and they were the only
10 ones making this device. Presumably, if someone had a
11 question or concern about their legality, they go to the one
12 and only, whether they are getting dealer it from a dealer
13 or not, they go to the website or they rely on the
14 statements of these folks even if there's no specific
15 evidence of reliance because we haven't heard testimony from
16 individuals buyers yet.
17        MR. KRUCKENBERG: No, Your Honor.
18        And I would go farther. The evidence we have is
19 that my clients did not sell to New York. In some ways, the
20 Government is trying to have it both ways. They want to
21 say, well, downstream, these devices ended up in New York
22 not directly because of my clients, not because they -- my
23 clients didn't sell them here but because the dealers later
24 sold it there. But then they're saying but, but for my
25 clients selling it on the website, it wouldn't -- the people

1    THE COURT: Reserving any objections defendants
2 may have or anything you want to say about that that we'll
3 mark them.
4    MR. BLUME: They may be proprietary. Is there
5 something, any reason to put them under seal.
6    MR. KRUCKENBERG: And, your Honor, for the
7 purposes of the hearing, we don't have an objection to these
8 being introduced but we would ask that they be sealed.
9    MR. BLUME: We don't have an objection to that.
10    THE COURT: Okay. That's fine. I have to make an
11 independent review of that but I certainly won't remove the
12 seal without giving you some notice. At least for the time
13 being, they'll be placed under seal. And to the extent
14 either parties wishes to have redactions to the transcript
15 to reflect anything discussed therein, I'll entertain that
16 as well.
17    But, yes, please go ahead.
18    (Government's Exhibits 1, 2, and 3 were received
19 in evidence.)
20    MR. BLUME: It goes to the answer of your question
21 of what we want.
22    These are just further examples of RBF being
23 involved in the sale and production and design of the
24 product. These are documents from 3rd Gen, which was their
25 manufacturing company, or they used to be the manufacturing

*Oral Argument* 96

1 company.  And you'll see on Exhibit 1 that it's Rare Breed
2 Firearms that's purchasing the product, the locking bar,
3 it's a piece of the trigger.
4        You'll see on Exhibit 2, it's a schematic of the
5 trigger.  There's a sort of box at the bottom and it says
6 that the, the information here is the sole property of Rare
7 Breed Firearms.
8        THE COURT:  On Exhibit 2?
9        MR. BLUME:  Two.
10       THE COURT:  I'm seeing Rare Breed Triggers on the
11 bottom.
12       MR. BLUME:  You have to look below it.
13       THE COURT:  Written permission of Rare Breed
14 Firearms.
15       MR. BLUME:  Exhibit 3, it's the same marking.
16       THE COURT:  Okay.
17       MR. BLUME:  And these are just examples of the
18 point we've been pressing which is that Rare Breed Firearms
19 is a key part of the sale here of the product.  And what we
20 would want is to make sure, even if there is some relief
21 against Rare Breed Triggers and the defendants that Rare
22 Breed Firearms doesn't go ahead and instead sell the product
23 on its own given that it was involved in, we believe,
24 intimately involved in the sale and marketing of the
25 product.

*Oral Argument* 97

1  THE COURT: Okay. Let me give defense counsel a
2 moment to look at these and then just ask you what, if
3 anything, I should draw from these documents that might
4 impact my ultimate analysis of the jurisdictional question
5 really going to RBF's connection to the manufacture and sale
6 of the triggers as opposed to the non-firearms products that
7 they've been selling.
8  MR. KRUCKENBERG: So, your Honor, with respect
9 these specific documents, I can represent and I can sort of
10 make the proffer that we could present testimony that these
11 were simply just errors between the two companies.
12  I would just direct this court's attention to
13 Mr. Leleux's both of Mr. Leleux's declarations and he -- his
14 declarations make very clear that Rare Breed Firearms, as an
15 entity, never sold the FRT or the wide-open trigger. They
16 had no involvement in it and, in fact, their website says
17 very clearly, we're not the same thing. I think that's an
18 exhibit we attached to the reply declaration. They make it
19 clear to the customers, we're not the same entity, we don't
20 sell these devices, if you're interested in the devices, go
21 to the other website.
22  So I don't think that there's any evidence, and I
23 don't think -- I know that my clients, Rare Breed Firearms,
24 never sold these devices and I think these documents
25 don't --

1    THE COURT: Let me ask the Government.
2        What would be the practical, for purposes of the
3   ultimate injunctive relief you're seeking, what would be the
4   practical harm to the government's asserted interest from
5   having RBF dismissed from the case?
6        I mean, you have the individual defendants who
7   are, as you allege, very closely connected to both
8   companies, the sister company, any documents that the
9   individuals had in their possession or control that happened
10  to be held with RBF or any of the smaller subsidiary or, as
11  you put it, shell companies would be subject to the same
12  prohibitions.
13       They're also on notice, you know, that there's a
14  separate federal statute that criminalizes the destruction
15  of any materials that they have reason to know could be the
16  subject of any criminal litigation which I think they're now
17  all on notice could be the case.
18       So other than the fact that you may have some
19  information that indicates that they, RBF, as a company may
20  have had some role, what's the practical reason why they
21  should be in this case, I'm still not sure I understand that
22  fully.
23       MR. BLUME: It's the concern that there would be
24  some continuation of the marketing or development or sale of
25  the product.

1             THE COURT:  It's okay.  I'm happy to hear one but
2    I'm not asking for one.  Please feel free.
3             MR. BLUME:  The simple response is, of course, we
4    will consider that given that you asked us for it and we
5    will.
6             THE COURT:  Thank you.
7             MR. BLUME:  But beyond that, I obviously --
8    there's a lot of considerations --
9             THE COURT:  Yes.
10            MR. BLUME:  -- that attend to that.
11            THE COURT:  Okay.  Understood.  All right.
12            Anything further on the issues other than what's
13   already in your extensive briefs that we haven't covered
14   that either party wants to keep in mind as I chew over all
15   of this.
16            MR. KRUCKENBERG:  Your Honor, there's nothing
17   further.
18            THE COURT:  Anything from the Government.
19            MR. BLUME:  No, Your Honor.
20            THE COURT:  Okay.  Let's just talk briefly about
21   scheduling with the possible wrinkle of, I'm sorry.
22            (A brief pause in the proceedings was held.)
23            THE COURT:  Let's talk about scheduling.  I am
24   going to try to rule on this motion as quickly as I can but
25   I think I'm going to need to write on it.  And I think I owe

1  the parties some -- a detailed explanation and there's a
2  chance that I may just tell you what my ruling is so that
3  the case will either proceed or not proceed.  But I think
4  it's more likely that I'm just going to try to write
5  relative him quickly and I don't know what that is going to
6  look like, I have a trial coming up in a couple of weeks.
7           So I think what will I would like to do is take
8  the defendants up on their offer to extend the TRO on
9  consent if that offer still stands and move the date of the
10 possible merits hearing on the preliminary injunction
11 request to May 23rd and 24th.  Even if we don't end up
12 needing two days, I could reserve those two days if those
13 still work.  I think that would also, if we do proceed to
14 the merits, I am now the of the view that some additional
15 merits discovery would be a benefit to me.  It seems as
16 though both parties may have some things they wish to get
17 from the other in that time period and I think the time is
18 too compressed and I may decide to authorize you all to
19 serve each other with discovery before my ruling is done.
20 But until I have a better sense of where this is headed, I
21 don't want to make either party do that.  So do I still have
22 the defendant's consent to extend the TRO?
23          MR. KRUCKENBERG:  Yes, Your Honor.
24          THE COURT:  Now, that I have your blanket consent,
25 let me ask you about some specifics.  If I held the hearing

1  in late May, I think I would probably need until some time
2  in limit June or until July to issue a written ruling which
3  I think I would probably do.  I could also rule orally for
4  purposes of the broad purposes of the injunction.  But I
5  think with respect to an injunction the details matter and
6  the notice matters.  So my preference would be to do that in
7  writing as well.
8         So could we push this to, say, July 15th?  And if
9  not, what would be a better date?
10        MR. KRUCKENBERG:  Your Honor, I do have to sort of
11 qualify my earlier statement.  I have authority to consent
12 to the TRO through the end of May for my clients.  I
13 understand a decision this Court will have issue a decision.
14 I'm sort of in a spot.  I understand we would agree to the
15 hearing on the 23rd of May, we would agree to extend the TRO
16 through the end of that month.  I think beyond that, I don't
17 know that authority.
18        THE COURT:  So why don't we do this.  I will
19 continue to hold the end of April date as well as the end of
20 May date for you for the hearing with the TRO extended
21 through the end of May.  Why don't you check with your
22 clients and let me know in the next seven days if, assuming
23 the hearing is in May, and assuming -- and this is a big
24 assuming that I don't grant your motion to dismiss for lack
25 of personal jurisdiction before then, they would agree to

*Oral Argument* 106

1   give me, say, another month so until the end of June to
2   permit a ruling and writing after the hearing.
3           This is entirely their choice.  If they don't
4   agree, I might be inclined to hold the merits hearing
5   earlier and we would be on a pretty tight schedule for
6   discovery before then if I let it go forward and it might
7   also be that I would let it go forward even before I ruled
8   on the motion to dismiss.
9           So it seems like you understand the factors at
10  play and I don't do this to necessarily push you towards any
11  result, but from any perspective the additional 30 days
12  might be to your client's benefit as well.
13          MR. KRUCKENBERG:  I certainly understand.
14          THE COURT:  So why don't you advise me of that
15  within the next week or so.
16          So let's keep our late April date.  I believe it
17  was 26th as a placeholder but we will also hold May 23rd and
18  24th and the TRO on consent is now in effect until May 30th
19  of, sorry, you said end of May.  So I will give myself until
20  May 31st of 2023.
21          And I don't think at this point that I will need
22  supplemental briefing from any of you on jurisdictional
23  issues.  There maybe an additional issue or two I want to
24  you flush out in a letter but I'll try to let you know that
25  soon if I do.

*Oral Argument* 107

1  MR. BLUME: May I, your Honor?
2  Regardless of the date of the hearing, there will
3  be some other logistical things we'll have to handle. I
4  just want to put out there that things, like, when the
5  response to our papers is due, when the answer to the
6  complaint, if that's appropriate, is due. Witness lists,
7  you know, those kinds of things that -- and we totally
8  understand that the scheduling depending on the timing, we
9  may reach out to defendants to start that. And if they
10 don't, you know, they object, they object. But we know that
11 we need to move things regardless whether it's the end of
12 May or the end of April.
13 THE COURT: Okay. Understood.
14 MR. KRUCKENBERG: Your Honor, sorry to --
15 THE COURT: Yes.
16 MR. KRUCKENBERG: It's good news. I
17 misunderstood. I spoke to co-counsel and we do have
18 approval through the end of June.
19 THE COURT: Great. Okay.
20 MR. KRUCKENBERG: Through June 30th.
21 THE COURT: Okay.
22 MR. KRUCKENBERG: Hopefully that will --
23 THE COURT: That does.
24 MR. KRUCKENBERG: -- makes things easier.
25 THE COURT: That eases things a lot.

*Oral Argument* 108

1 Let's do this. Let's officially then adjourn the
2 merits hearing that had been scheduled for April 26th until
3 May 23rd and 24th. And we will note the defendant's consent
4 to keep the TRO in effect until June 30th of 2023 until the
5 action is dismissed for lack of personal jurisdiction before
6 then or unless I deny the motion for the PI on the merits
7 before then.
8 And I think with respect to the scheduling, you
9 know, you also are free to confer as to whether you wish to
10 serve one another with your initial discovery demands with
11 why no obligation to respond. You can certainly serve them.
12 I will give you that permission and that would at least give
13 you a jump on which ones, if discovery proceeds, or your
14 client's going to oppose or not oppose and what ground. And
15 if you would like to be referred to Magistrate Judge Levy
16 who is really terrific and far more experienced than me in
17 sorting these things out for our conference on that, I am
18 happy to do that while I am wrestling with your
19 jurisdictional questions.
20         MR. BLUME:  Thank you.
21         MR. KRUCKENBERG:  Thank you.
22         THE COURT:  I appreciate you being here and have
23 a great weekend.
24         All right. We're adjourned.
25         (WHEREUPON, this matter was adjourned.)