UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,                       MEMORANDUM & ORDER
                                                23-cv-369 (NRM) (RML)

         -against-

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; and KEVIN MAXWELL,

                Defendants.
-------------------------------------------------------x

Pending before the Court is Defendants' motion to transfer venue to the Western District of Texas.  The Court has considered the parties' briefs on Defendants' motion to transfer, as well as, when relevant, the parties' briefs on Defendants' motion to dismiss for lack of personal jurisdiction and statements made at oral argument on that motion on March 17, 2023.  For the reasons outlined herein, Defendants' motion to transfer this action to the Western District of Texas is DENIED.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Rare Breed Triggers LLC ("RBT") is a corporate entity which was formed in Florida in April 2020, re-incorporated in North Dakota, and currently operates out of Texas.  ECF No. 23 at 1; ECF No. 23-1 ¶ 5; ECF No. 39 ¶¶ 3-11.[1]

---

[1]  The facts relevant to Defendants' motion for a change of venue are largely undisputed and are taken from the Government's complaint and attached exhibits, as well as the parties' other briefs and exhibits submitted before this Court to date. Any disputes as to material facts are noted herein.  Certain exhibits attached to the Government's complaint were too voluminous for the Government to submit to the

Defendant Lawrence DeMonico, who lives in Texas, serves as RBT's president, and Defendant Kevin Maxwell, who lives in Florida, is RBT's owner.  ECF No. 23 at 1-2; ECF No. 23-1 ¶ 6; ECF No. 39 ¶¶ 1, 12.  Defendant DeMonico is also the president of defendant Rare Breed Firearms ("RBF").  ECF No. 25-3 at 6.

RBT's flagship product is the FRT-15, a "forced reset trigger" that gun owners can install on AR-15-style rifles to replace the gun's original trigger.  ECF No. 25-1 ¶¶ 4, 6.  RBT also sells the Wide Open Trigger ("WOT"), a mechanism very similar to the FRT-15 which RBT acquired in a patent dispute against Big Daddy Enterprises, a company which formerly served as RBT's exclusive distributer of the FRT-15 and which launched the WOT in an apparent attempt to compete with its one-time business ally.[2]  ECF No. 1, Ex. R at 1; ECF No. 25-1 ¶¶ 12-13, 16-19, 23. The Government alleges that, since selling its first FRT-15 in December 2020, RBT has made roughly $30 million in revenue from both retail sales to individual gun owners and wholesale sales to third-party distributors.  ECF No. 7 ¶ 85.  According to defendant Maxwell, RBT sells 1,000 to 3,000 FRT-15s every week when the product is in stock.  ECF No. 1, Ex. Q ¶ 11.  In addition, Defendants have brought

---

Court electronically and are available to the Court only in hard copy.  *See* ECF No. 7 Text Entry.  Therefore, some exhibits that are referenced by letter (i.e., "Exhibit Q") rather than number are not available to view on ECF as of the time of this writing.

[2]  Because the FRT-15 and the WOT are very similar devices, the Court will, for ease of reference, refer only to "FRT-15s" in this opinion.

multiple lawsuits in various federal district courts since 2021 in an attempt to protect RBT's exclusive patent over the FRT-15 design.  ECF No. 24 at 24 n.17.

Although the parties disagree over how the FRT-15 should be legally categorized, all parties agree that, once installed, the FRT-15 increases the speed at which a gun can fire successive rounds.  ECF No. 1 ¶ 6; ECF No. 25-1 ¶ 5. Defendants describe the FRT-15 as a "fun and entertaining" device that allows gun owners to rapidly "'plink[]' targets at a shooting range."  ECF 25-1 ¶ 5.  Plaintiff United States ("the Government"), however, describes the FRT-15 as a device that converts legal rifles into illegal machineguns and dramatically increases the lethality of these weapons once installed.  ECF No. 1 ¶¶ 3, 6, 87.  The Bureau of Alcohol, Tobacco, and Firearms ("ATF") classified the FRT-15 as a "machinegun" on July 15, 2021, ECF No. 1, Ex. F, and reaffirmed its conclusion on October 20, 2021.[3] ECF No. 1, Ex. M.  The ATF similarly classified the WOT as a "machinegun" on October 21, 2021.  ECF No. 1, Ex. P.

In the wake of these classifications, the Government served Defendants with a series of letters ordering them to cease and desist from manufacturing and selling FRT-15s.  *See* ECF No. 1, Exs. L; N.  Defendants, believing the ATF's classification of the FRT-15 as a machinegun to be legally erroneous, sued the ATF in the United States District Court for the Middle District of Florida.  *See Rare Breed Triggers, LLC v. Garland*, No. 21-cv-1245, 2021 WL 4750081 (M.D. Fla. Oct. 12, 2021).  That

---

[3]  The Government argues that because the National Firearms Act's definition of a "machinegun" includes any device that can "convert[] a weapon into a machinegun," the FRT-15 is itself a machinegun.  ECF No. 1 ¶¶ 38-40.

Court denied Defendants' request for a preliminary injunction and thereafter dismissed the case. *Id.*

Defendants disagree with the Government's classification of the FRT-15—so much so, according to the Government, that Defendants have repeatedly told their customers that the FRT-15 is *not* a machinegun, and that purchasers of an FRT-15 need not be concerned about the legality of possessing one. For example, the Government alleges that, as of January 17, 2023, Defendants informed their customers on the RBT website that "'in spite of what you may have heard, seen, or understood,' the FRT-15 'is not a machinegun'" under relevant law, ECF No. 1 ¶ 168; that ATF's cease-and-desist letters have "zero relevance to anyone that may have purchased and currently possesses an FRT-15," *id.* ¶ 172; that ATF lacks the authority to "address FRTs that are currently in circulation," *id.* ¶ 174; and that customers should still purchase Defendants' products because Defendants will in turn use that revenue to fund litigation against ATF, *see id.* ¶ 178. The Government further alleges that Defendants took a series of steps to evade detection of their FRT-15 sales by the United States, for example by labeling their packages with the false company name "Red Beard Treasures," rather than "Rare Breed Triggers," in an alleged attempt to conceal the packages' contents from the United States Postal Service. *Id.* ¶ 182.

On January 19, 2023, the Government filed an *ex parte* motion with this Court seeking a temporary restraining order and preliminary injunction under 18 U.S.C. § 1345 and Rule 65(b) of the Federal Rules of Civil Procedure. *See* ECF No.

5-1.  The Government argued that Defendants' statements regarding the legality of the FRT-15 had induced, or would imminently induce, gun owners to purchase FRT-15s under the false impression that possession of this product was legal, thereby enriching Defendants while exposing their customers to the risk of criminal liability and fines.  ECF No. 5 at 5, 8, 12, 17, 28-34.  By way of example, the Government averred that multiple people who had purchased FRT-15s voluntarily divested when they learned that it was illegal to own one.  *Id.* at 17.  For this reason, the Government argued, there was probable cause[4] to believe that Defendants were engaging or would imminently engage in mail and wire fraud under 18 U.S.C. §§

---

[4]  Because 18 U.S.C. § 1345 is not frequently invoked, there exists some ambiguity as to whether the Government must demonstrate that there is "probable cause" to believe that a defendant is committing fraud or must instead prove "by a preponderance of the evidence" that the defendant is committing fraud.  *See, e.g.*, *United States v. Legro*, 284 F. App'x 143, 145 (5th Cir. 2008) (describing this ambiguity in 18 U.S.C. § 1345).  Because the Court concluded at the TRO hearing on January 24, 2023 that the Government had met its burden under either standard, ECF No. 14 at 8, it declined to reach the question of which standard applied, although it used the phrase "probable cause" in its temporary restraining order.  ECF No. 11 ¶¶ 1-6.

In the future, a court facing a closer call may find it necessary to closely engage with this question on a TRO posture.  Because 18 U.S.C. § 1345 is a "hybrid" statute, providing a civil cause of action to enjoin criminal activity, it is not entirely clear which standard should apply.  On the one hand, an *ex parte* application for a temporary restraining order bears some procedural similarities to a search warrant application, and in that context the probable cause standard applies.  On the other hand, preponderance of the evidence is the default standard of proof for most civil actions, and in light of the broad authority already given to the Government under 18 U.S.C. § 1345, there is certainly cause to question whether Congress intended for the Government to have the authority to, say, shut down a defendant's entire business based on *ex parte* allegations of fraud proven under such a low standard.  That is especially so in light of caselaw that holds that irreparable injury is presumed for purposes of Rule 65(b) of the Federal Rules of Civil Procedure if the statutory conditions of 18 U.S.C. § 1345 are met.  *See, e.g.*, *United States v. Palumbo*, 448 F. Supp. 3d 257, 261 (E.D.N.Y. 2020).

1341 and 1343, and conspiracy to commit mail and wire fraud under 18 U.S.C. §
1349.  ECF No. 5-1 ¶¶ 2-5, 8.  The Government further argued that Defendants'
repeated attempts to evade Government detection and regulation constituted fraud
against the United States under 18 U.S.C. § 371, and warranted the rare step of an
*ex parte* TRO to prevent Defendants from destroying the records of their alleged
fraud and causing other irreparable harm.  *Id.* ¶¶ 1, 8-vii.

After holding an expedited oral argument on January 24, 2023, this Court
granted the Government's motion in part and denied it in part.  *See* ECF No. 11.
The Court concluded that Defendants' statements and activities created significant
risk that legal gun owners have paid or would pay for an FRT-15 which they could
not legally own.[5]  *Id.* ¶ 9.  Although the RBT website listed the FRT-15 as "sold out"
on the date that the Court issued the temporary restraining order, a host of factors
alleged by the Government in its motion and the exhibits submitted along with its
motion supported the inference that Defendants' alleged fraud and the related
harms asserted by the Government could quickly resume once the FRT-15 was back
in stock.  These included the facts that Defendants maintained a waitlist to inform
their customers when the FRT-15 was once again available for purchase, ECF No.

_____

[5]  Although the Court reached this conclusion on a TRO posture, Defendants
argue in part that the FRT-15 is in fact *not* a machinegun under relevant statutes
and regulations, and that Defendants' statements about their products do not
constitute fraud.  The Court has not reached the merits of these claims, and it has
scheduled a hearing on the Government's motion for a preliminary injunction for
May 31 and June 1, 2023.  In the meantime, while merits discovery and briefing are
pending, Defendants have consented to an extension of this Court's temporary
restraining order until June 30, 2023, or until the Court rules on the Government's
motion for a preliminary injunction, whichever is sooner.

14 at 3-4, that defendant Maxwell stated that RBT sold 1,000 to 3,000 FRT-15s per week, ECF No. 1, Ex. Q ¶ 11, and that RBT's website assured customers that it would re-stock the FRT-15 in a matter of "days," ECF No. 11 ¶ 9.  The Court therefore issued an order temporarily prohibiting Defendants from selling forced reset triggers and requiring Defendants to preserve any and all documents related to the manufacture and sale of Defendants' force reset triggers.  *Id.* ¶ 10.  The Court denied the Government's request, however, to generally enjoin Defendants from engaging in mail fraud, wire fraud, and conspiracy, since such a vague "obey the law" injunction would not adequately put Defendants on notice of the specific activities in which they may not engage.  ECF No. 14 at 19-20, 52.  The Court scheduled a preliminary injunction hearing for February 2, 2023, at 2:30 p.m. EST. ECF No. 11 at 5.

On February 1, 2023, Defendants, through counsel, entered an appearance before this Court.  *See* ECF No. 15.  At the parties' joint request, the Court converted the February 2, 2023 preliminary injunction hearing into a status conference, *see* ECF Order dated February 1, 2023, at which Defendants informed the Court that they intended to file a motion to dismiss this action for lack of personal jurisdiction, and that they consented to an extension of the TRO while that motion remained pending.  ECF Minute Entry and Order dated February 3, 2023. The Court set an expedited briefing schedule for Defendants' motion to dismiss.  *Id.*

The Court also ordered jurisdictional discovery.  *Id.*  On February 9, 2023, Defendants filed a motion to quash the Government's subpoena of Defendants'

records with J.P. Morgan Chase ("Chase").  *See* ECF No. 17.  The Court heard argument on Defendants' motion on February 14, 2023.  At that conference and in its response brief to Defendants' motion, the Government argued that Defendants' communications with Chase may bear on the question of personal jurisdiction, since Chase is headquartered in New York and processes all wire transfers through New York.  ECF No. 18 at 1-2; ECF No. 22 at 12-13.  The Government also argued that Defendants used their Chase account to receive wire transfers from third-party distributors who went on to sell FRT-15s throughout the country, and information about those distributors' sales may also bear on the question of personal jurisdiction in New York.  ECF No. 22 at 9, 13-14.  Defendants argued that, if this Court concludes that it has personal jurisdiction over defendant RBT, it would logically also have personal jurisdiction over individual defendants Maxwell and DeMonico, so it was not necessary for the Government to receive discovery that relates solely to the individual defendants' relationship with Chase.  *Id.* at 23-24.  In light of Defendants' concession, the Court granted Defendants' motion to quash in part and denied in part, keeping the Government's subpoena largely intact but quashing the subpoena with respect to any Chase records that related solely to the individual defendants and not to defendant RBT.  ECF Minute Entry and Order dated February 15, 2023.

The parties completed briefing on Defendants' motion to dismiss for lack of personal jurisdiction on March 2, 2023.  On March 7, 2023, the Government moved for expedited merits discovery, which included a request for Defendants' customer

list.  *See* ECF No. 30.  Defendants opposed this motion, arguing that merits discovery was premature while the question of whether this Court has jurisdiction remained pending, and that in any event Defendants' customer list would, at most, be relevant only to the scope of the Court's injunctive relief if it grants the Government's motion for a preliminary injunction, not to the merits of the preliminary injunction itself.  *See* ECF No. 31.  The Court agreed with Defendants and denied the Government's motion for merits discovery, with leave to renew. ECF Minute Entry and Order dated March 9, 2023.

The Court heard oral argument on Defendants' motion to dismiss for lack of personal jurisdiction on March 17, 2023.  In its briefs and at oral argument, the Government asserted two principal theories of personal jurisdiction.  First, the Government argued that 18 U.S.C. § 1345 implicitly authorizes nationwide service of process and allows the Government to bring suit in this Court regardless of the defendants' contacts with the Eastern District of New York because it expressly permits the Government to seek an anti-fraud injunction "in any Federal court." ECF No. 24 at 9-10.  Under the Government's interpretation of §1345, personal jurisdiction would exist in this Court as a statutory matter under Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure, and personal jurisdiction would exist as a constitutional matter because Defendants easily have minimum contacts with the United States, which is the relevant sovereign for the Court's due process analysis when nationwide service of process is authorized by a federal statute.  *Id.* at 9-13. The parties cited no judicial opinion—and the Court has found none—that has ever

interpreted the phrase "in any Federal court" in 18 U.S.C. § 1345, making the Government's first theory of personal jurisdiction a question of first impression in this Court.

In the alternative, the Government argued that statutory personal jurisdiction exists under either or both of two different prongs of the New York long-arm statute. First, the Government asserted that Defendants have "transacted business" in New York under N.Y. C.P.L.R. § 302(a)(1) because the wire transfers that they received from third-party distributors to their bank account in Florida were processed by Chase through its New York headquarters, a fact which Defendants have known for years. *Id.* at 13-17. Second, the Government argued under N.Y. C.P.L.R. § 302(a)(3) that Defendants have committed "tortious conduct without the state" that has had effects within the state because the ATF has recovered FRT-15s in New York which—though the Government had no evidence at that time that these devices or any of their component parts were purchased directly from Defendants—customers were induced into buying through Defendants' fraudulent statements on their website and elsewhere. *Id.* at 17-20. The Government further argued that either theory of personal jurisdiction under the New York long-arm statute would also satisfy due process, because the requisite minimum contacts with New York existed and because due process would not otherwise be violated by requiring Defendants to litigate their case in the Eastern District of New York. *Id.* at 20-25.

Defendants opposed each of the Government's theories of personal jurisdiction. First, Defendants argued that the phrase "in any Federal court" in 18 U.S.C. § 1345 cannot implicitly authorize nationwide service of process, since the Supreme Court has held that if Congress wishes to authorize nationwide service of process in a statute, it must do so explicitly. ECF No. 23 at 12-13; ECF No. 29 at 4-6. Second, Defendants argued that their contacts with New York do not satisfy either prong of the New York long-arm statute. First, Defendants asserted that they never "transacted business" in New York through the use of their Chase account or otherwise: Defendants opened their Chase account through a branch in Florida; none of the third-party dealers from whom Defendants received wire transfers lived in New York; the fact that Chase happens to process wire transfers through its New York headquarters is essentially coincidental; and even if these transfers processed through New York constituted "transacting business" under the long-arm statute, they would not constitute minimum contacts with New York for purposes of due process. ECF No. 23 at 14-20; ECF No. 29 at 6-11. Second, Defendants argued that the record does not support the inference that Defendants' allegedly fraudulent statements had any reasonably foreseeable effects within the state, since any customers who purchased an FRT-15 in New York did so through third-party vendors, not directly from Defendants. ECF No. 23 at 21-22; ECF No. 29 at 11-13.

Throughout briefing and at the Court's March 17th oral argument, Defendants consistently represented that they never made any sales in any way

related to the FRT-15 devices to customers in New York.  First, they asserted that RBT's website and internal sales processes were set up in a manner that excluded customers with New York shipping or billing addresses from purchasing an FRT-15. ECF No. 23 at 4; ECF No. 23-1 ¶ 13.  Defendants similarly argued that they never sold FRT-15s to third-party vendors who stated any specific intention to sell in New York, and that they were unaware of any specific instance in which a third-party vendor did sell FRT-15s to customers in New York.  ECF No. 23 at 17; ECF No. 23-1 ¶ 17; ECF No. 29 at 3, 11, 12, 14; ECF No. 29-1 ¶ 9.  Defendants further averred that defendant RBF, whom the Government described at RBT's "sister company," ECF No. 1 ¶ 22, has even less to do with this action because it "wasn't . . . involved in sales of the FRT-15 or WOT" at all.  ECF No. 23 at 30.  Rather, although RBF is also run by defendant DeMonico, Defendants asserted that RBF is a separate design company that "licenses its designs to third party firearm manufacturers." ECF No. 23 at 2; ECF No. 23-1 ¶ 4.  Its direct sales to customers, Defendants then argued, consist only of "swag" such as "stickers and t-shirts," and although it "produces designs for parts of an AR-15 rifle known as 'lower receivers[,]' [i]t does not manufacture or sell these parts."  ECF No. 23-1 ¶ 4; ECF No. 29-1 ¶ 6.  For that reason, although RBF did send packages into New York, these packages "likely" would have contained "t-shirts and hats."  ECF No. 29 at 15; ECF No. 29-1 ¶ 7.

During oral argument, Defendants also clarified that they contested personal jurisdiction only in those few states in which Defendant RBT did not sell directly to any retail or wholesale customers, such as New York.  Indeed, Defendants stated

that they "would readily agree that the United States has personal jurisdiction" over this action "for any of those states where [RBT's] customers or dealers were located."

On March 22, 2023, the Court informed the parties that it was inclined to *sua sponte* transfer this action to another forum as a matter of judicial efficiency. ECF No. 36 at 1. The Court did not rule on Defendants' motion to dismiss for lack of personal jurisdiction. *Id.* at 3. However, in light of Defendants' acknowledgement that personal jurisdiction would exist in nearly every other federal judicial district in the country, the Court alerted the parties to its preliminary view that transfer would likely relieve both the parties and the courts from what could be extensive litigation (in both this Court and potentially the appellate courts) over the Government's two relatively novel theories of personal jurisdiction. *Id.* at 1-2. Given that both the Government and Defendants shared a compelling interest in an expeditious (and final) resolution of the merits, transfer of venue appeared, at that time, to be in the long-term interests of all concerned. *Id.* The Court therefore issued an Order to Show Cause as to why venue should not be transferred and invited supplemental briefing from the parties on the question of which venue(s) would be appropriate if the matter were indeed transferred. *Id.* at 3.

The parties submitted their initial round of supplemental letter briefs on March 29, 2023. *See* ECF No. 38; ECF No. 39; ECF No. 40. Defendants argued that dismissal of the action was more appropriate than transfer, ECF No. 38 at 2, but that, if the Court were inclined to transfer the action, the most appropriate forum

was the Western District of Texas, with the Middle District of Florida and the District of North Dakota as "permissible" alternative venues. *Id.* at 1, 2.  The Government argued that this action should remain in the Eastern District of New York, but that the Court should select the District of Connecticut if it elected to transfer venue.  ECF No. 40 at 1, 8. [6]

In its submission, however, the Government also offered additional evidence obtained during a renewed investigation to support its position that personal jurisdiction over all Defendants exists in New York.  Specifically, the Government filed a new affidavit summarizing information it had only recently obtained from the United States Postal Service ("USPS") and through interviews with Defendants' customers identified through those postal records.  *See* ECF No. 40-1.  The Government informed the Court that, after contacting USPS for its records related to packages that Defendants have sent to New York, ATF agents interviewed the packages' addressees, several of whom reportedly stated that they purchased FRT-15s or FRT-15 parts in New York directly from Defendants RBT and RBF.  *Id.* ¶¶ 5-22, 36.  Some of these customers stated that it was necessary to purchase certain replacement parts for the FRT-15 because "reviews online" suggested that those parts "were susceptible to breaking."  *Id.*  ¶ 36.

---

[6]  In response to the Court's Order to Show Cause, the State of New York also entered an appearance as an interested party and filed a letter in support of the Government's argument that this action should not be transferred.  *See* ECF No. 41.  The City of New York later filed a similar letter.  *See* ECF No. 46.

On March 31, 2023, Defendants responded to the Government's submission, arguing that they may wish to contest the Government's factual assertions at an evidentiary hearing, but that in any event transfer of this action to the Western District of Texas was most appropriate.  ECF No. 42 at 1, 5.  The next day, the Government submitted additional evidence that Defendants have sold FRT-15 parts directly into New York—including, most notably, a screen shot of a receipt emailed from defendant RBF to a customer in Collins, New York for several products including an "FRT-15 Locking Bar Spring."  ECF No. 43-1 at 9.  This information, the Government argued, not only provided strong evidence that Defendants were— contrary to their earlier representations—selling products related to the pending FRT-15 fraud claims directly to New York customers, but also provided new support for the Government's contention that sales of the FRT-15s to New Yorkers by RBT's third-party dealers were readily foreseeable and/or known to Defendants, since those customers had interfaced directly with RBT to service those devices.  ECF No. 43 at 1-3.

After receiving the Government's submissions, the Court held a status conference on April 4, 2023.  Defendants informed the Court that they had no reason at that time to dispute the accuracy of the Government's submissions, at least with respect to Defendants' shipment of replacement FRT-15 parts to customers in New York.  ECF No. 45 at 5.  The Court informed defense counsel that, while it was aware that they had accepted this case on short notice and under the pressure of a temporary restraining order, this admission seemed to contradict

many of the factual assertions that Defendants used to support their motion to dismiss for lack of personal jurisdiction: not only did this information appear to prove that defendant RBF sold more than just t-shirts and hats, but it also provided compelling grounds for the Court to find that all of the Defendants did in fact know that third-party vendors were selling FRT-15s into New York, and Defendants were supporting those sales by shipping replacement parts to those customers.[7] *Id.* at 4, 6-7. Defense counsel told the Court that they would confer with their clients as to whether they wished to proceed with their motion to dismiss for lack of personal jurisdiction in light of this new evidence. *Id.* at 9. Later that day, Defendants voluntarily withdrew their motion. ECF No. 44 at 1. However, Defendants moved the Court in the alternative to transfer this action to the Western District of Texas for the reasons they stated in their response to the Court's Order to Show Cause. *Id.*

---

[7]  The Court also notes that, in a deposition during RBT's patent dispute with Big Daddy Enterprises, defendant DeMonico was asked to list those states in which RBT does not sell the FRT-15, and he did not name New York. ECF No. 1, Ex. I at 29-30. At oral argument on Defendants' motion to dismiss, both parties considered this to likely be a "slip of the tongue," in light of the then-undisputed fact that Defendants never sold their products directly to customers in New York—but whether that remains the case in light of the Government's new submissions is unclear. Further, at that same deposition, defendant DeMonico volunteered that Defendants "have dealers that choose to sell in those states" where RBT does not sell directly, which would have included New York. *Id.* at 30. The inferences as to Defendants' knowledge of third-party sales to New York that the Government asked the Court to draw from this statement at oral argument certainly carry additional weight in light of the present record.

**Legal Standard**

A district court may, "[f]or the convenience of the parties and witnesses, in the interest of justice," transfer a civil action "to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).[8]  District courts in this circuit "appl[y] a two-part test to motions to transfer venue under § 1404(a)."  *Smart Skins LLC v. Microsoft Corp.*, 14-cv-10149, 2015 WL 1499843, at *4 (S.D.N.Y. Mar. 27, 2015).  "First, the court must determine whether the action could have been brought in the proposed transferee forum" as an original matter.  *Megna v. Biocomp Laboratories Inc.*, 220 F. Supp. 3d 496, 497 (S.D.N.Y. 2016).  This analysis requires the court to determine that both personal jurisdiction and venue would lie in the transferee district.  *Giuliani, S.p.A. v. Vickers, Inc.*, 997 F. Supp. 501, 502 (S.D.N.Y. 1998) ("[T]he court may transfer pursuant to § 1404(a) only if the transferee forum is one where, at the time the suit was brought, the defendants were subject to

---

[8]    Although transfer of venue is in some cases addressed under 28 U.S.C. § 1406(a) and 28 U.S.C. § 1631, those statutes do not provide the appropriate framework here.  28 U.S.C. § 1406(a) authorizes transfer of an action when venue is improper in the transferor court.  However, as this opinion makes clear, venue is proper in the Eastern District of New York pursuant to 18 U.S.C. § 1345, and, in any event, neither party has argued that this Court lacks venue.  *See Orb Factory Ltd. v. Design Science Toys, Ltd.*, 6 F. Supp. 2d 203, 207 (S.D.N.Y. 1998) ("Given that [the defendant] failed to interpose a timely objection to venue in that it did not file a motion under Rule 12(b) . . . any objection has been waived.  Once objections to venue are waived, any defect in venue is cured, and the benefits of a § 1406(a) transfer for lack of venue are no longer available." (citation omitted)).  28 U.S.C. § 1631 authorizes transfer to cure a "want of jurisdiction," but Defendants have at this point withdrawn their motion to dismiss for lack of personal jurisdiction.  Moreover, guidance from the Second Circuit suggests that 28 U.S.C. § 1631 "authorizes transfers only to cure lack of subject matter jurisdiction," not to cure a lack of personal jurisdiction.  *SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 179 n.9 (2d Cir. 2000).

jurisdiction and venue was proper."); *AEC One Stop Group, Inc. v. CD Listening Bar, Inc.*, 326 F. Supp. 2d 525, 528-29 (S.D.N.Y. 2004) (concluding in transfer analysis that defendant residents of California would be "subject to jurisdiction" in the Central District of California and that venue in that district was appropriate under special venue statute 28 U.S.C. § 1400(a)).

Second, "if the action could have been filed in the proposed transferee district, the court must then determine whether transfer is appropriate." *Megna*, 220 F. Supp. 3d at 497 (S.D.N.Y. 2016). To that end, the court may consider a host of equitable factors, including "(1) convenience of witnesses; (2) convenience of the parties; (3) location of relevant documents and the relative ease of access to sources of proof; (4) the locus of the operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the comparative familiarity of each district with the governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) judicial economy and the interests of justice." *Id.* at 498 (quoting *Frame v. Whole Foods Market, Inc.*, 06-cv-7058, 2007 WL 2815613, at *4 (S.D.N.Y. Sept. 24, 2007)). However, these factors are "non-exclusive," *Bank of America, N.A. v. Wilmington Trust FSB*, 943 F. Supp. 2d 417, 426 (S.D.N.Y. 2013), and the "relative weight of each factor depends on the particular circumstances of the case," *Smart Skins LLC*, 2015 WL 1499843, at *4. *See also In re Northwest Airlines Corp.*, 384 B.R. 51, 60 (S.D.N.Y. 2008) ("The decision to transfer venue is within the discretion of the court based on an individualized, case-by-case consideration of convenience and fairness." (citation

and quotation marks omitted)).  Finally, as a general matter, "[a] plaintiff's choice of forum generally is entitled considerable weight—particularly when the plaintiff is a resident of the forum district—and should not be disturbed unless the balance of several factors is strongly in favor of defendant." *Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 376 (S.D.N.Y. 2006).

## Application

Defendants' motion to transfer venue requires the Court to answer three questions: (1) whether personal jurisdiction exists in the Western District of Texas; (2) whether venue exists in that district; and (3) whether Defendants have demonstrated that the relevant equitable factors warrant the requested transfer. *See, e.g.*, *Megna,* 220 F. Supp. 3d at 497 (discussing equitable factors).

### i.    Personal Jurisdiction in the Transferee District

The Court readily concludes (and the Government has not disputed) that personal jurisdiction over this action exists in the Western District of Texas. Defendant RBT "currently[] operates out of Austin" in the Western District of Texas, ECF No. 38 at 2, which subjects it to general jurisdiction in that district.  *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (concluding that for entity defendants "the place of incorporation and principal place of business are paradigm bases for general jurisdiction"); *Monbo v. Nathan*, 18-cv-5930, 2022 WL 4591905, at *49 (E.D.N.Y. Aug. 26, 2022) (applying *Daimler* to defendant incorporated as a limited liability company).  Defendant RBF "is a Texas limited liability company that operates in Texas," ECF No. 38 at 2, and would therefore also be subject to

19

personal jurisdiction in the Western District of Texas for the same reason.  And Defendants conceded during the Court's February 14, 2023 status conference that a court with personal jurisdiction over defendant RBT would also have personal jurisdiction over individual defendants Maxwell and DeMonico.[9]  Personal jurisdiction over this action, therefore, would exist in the Western District of Texas.

## ii.   **Venue in the Transferee District**

For similar reasons, venue over this action would also exist in the Western District of Texas.  The fact that RBT operates from Austin, Texas would alone confer venue in the Western District of Texas, since a "substantial part of the events . . . giving rise to" this action took place in that district.  28 U.S.C. § 1391(b)(2).  *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) ("[F]or venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question." (emphasis in original)).

In addition—although the Court need not reach this question in light of the applicability of 28 U.S.C. § 1391(b)(2)—18 U.S.C. § 1345 likely also provides separate statutory basis for venue in the Western District of Texas.  While 28 U.S.C. § 1391 provides the "[g]eneral" venue provisions for civil actions, venue may be "otherwise provided" in a different statute.  28 U.S.C. § 1391(a).  Indeed, "special

---

[9]   Notwithstanding this representation from Defendants, numerous other connections to Texas would likely subject both individual defendants to personal jurisdiction there.  First, defendant DeMonico lives in Austin.  ECF No. 39 ¶ 7. Second, Defendants do not dispute that RBT (for which defendant DeMonico is president and defendant Maxwell is the owner, ECF No. 23 at 1-2), has engaged in high-volume direct sales of FRT-15 devices nationwide in all but a handful of states, and that Texas is not on the list of states that RBT intended to and/or has ever excluded from those sales.

venue statutes are scattered throughout the United States Code," 14D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 3814 n.1 (4th ed. 2023), and many of them offer plaintiffs venue options that are broader than the venue provisions codified in 28 U.S.C. § 1391(b).

By its plain terms, 18 U.S.C. § 1345 authorizes the United States to bring an action to enjoin certain frauds "in any Federal court." In its response to Defendants' motion to dismiss for lack of personal jurisdiction, the Government urged the Court to interpret this phrase as implicitly authorizing nationwide service of process, thereby conferring personal jurisdiction in this court as a statutory matter under Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure. This interpretation is questionable at best, however, in light of the Supreme Court's decision in *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987), decided just three years before Congress added the phrase "in any Federal court" to 18 U.S.C. § 1345. In that case, the Court concluded that "Congress knows how to authorize nationwide service of process when it wants to provide for it," and that a failure to do so in a statute demonstrates that "such authorization was not [Congress's] intention." *Omni Capital*, 484 U.S. at 106. *See also PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (noting that a court cannot look to a federal statute as a statutory basis for the exercise of personal jurisdiction "if the federal statute does not *specifically* provide for national service of process" (citation omitted) (emphasis added)). Indeed, insofar as this Court is aware, statutes which other courts have interpreted as authorizing nationwide service of process typically use the words

"serve" or "process."  *See, e.g.*, 18 U.S.C. § 1965(b); 31 U.S.C. § 3732(a); 15 U.S.C. § 22.

While the Government argued that any other interpretation would render the phrase "in any Federal court" meaningless, that is not so if the phrase confers venue.  Although a grant of venue in "any federal court" is broad, it is not without precedent among other venue-conferring statutes.  The Truth-in-Lending Act, for example, confers venue "in any United States district court, or in any other court of competent jurisdiction."  15 U.S.C. § 1640(e).  Similarly, the Employee Retirement Income Security Act ("ERISA") confers venue not only in the district "where the plan is administered" and the district "where the breach took place," but also in any district in which the defendant "resides or may be found," which is generally coextensive with those districts in which the defendant is subject to personal jurisdiction under a minimum contacts analysis—a broad grant of venue indeed.  29 U.S.C. § 1132(e)(2); *Seitz v. Bd. of Trs. of the Pension Plan of the N.Y. State Teamsters Conf. Pension and Ret. Fund*, 953 F. Supp. 100, 102 (S.D.N.Y. 1997) (citing *Varsic v. United States Dist. Court*, 607 F.2d 245, 248-49 (9th Cir. 1979)); *Paulson v. Guardian Life Ins. Co. of Am.*, 614 F. Supp. 3d 1, 7 (S.D.N.Y. 2022) ("[W]hen enacting ERISA, Congress purposefully made the venue provision broad.").  Special venue statutes also regularly seek to maximize convenience to the plaintiff, rather than the defendant: The Anti-Terrorism Act, for example, confers venue in, among other districts, "any district where any plaintiff resides."  18 U.S.C. § 2334(a).

In support of its argument that 18 U.S.C. § 1345 authorizes nationwide service of process, the Government highlights the legislative history of the statute, pointing to a 1990 amendment that changed the phrase "in a district court" to "in any Federal court."  ECF No. 24 at 10.  This too, however, supports the inference that this phrase does not authorize service of process, but instead confers venue.  There exist many "federal" courts that are not "district" courts.  Article I bankruptcy courts, for example, are "federal" courts but not "district" courts, and the expansion of 18 U.S.C. § 1345 could be read to permit the United States to seek an anti-fraud injunction in a bankruptcy proceeding, assuming other jurisdictional prerequisites are met.  *See Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995) (noting that "[t]he jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute," and concluding that bankruptcy courts, as a general matter, have the authority to issue injunctions within the scope of that jurisdiction).  This expansion of 18 U.S.C. § 1345 also likely encompasses Article IV territorial courts, which are "federal" courts but are frequently not considered "district" courts for statutory interpretation purposes.  *See Nguyen v. United States*, 539 U.S. 69, 76 (2003) (concluding that the phrase "district court" in a statute did not include "Article IV territorial courts, even when their jurisdiction is similar to that of a United States District Court created under Article III" (quoting *Mookini v. United States*, 303 U.S. 201, 205 (1938))); *Summers v. United States*, 231 U.S. 92, 101-102 (1913) ("[T]he courts of the Territories may have such jurisdiction of cases arising under the Constitution and laws of the United States as

is vested in the circuit and district courts, but this does not make them circuit and district courts of the United States.").

Finally, to the extent the phrase "in any Federal court" is ambiguous, the doctrine of constitutional avoidance cautions the Court to read the phrase as conferring venue rather than authorizing nationwide service of process. *See United States v. Magassouba*, 544 F.3d 387, 404 (2d Cir. 2008) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, a court should construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." (citation and internal quotation marks omitted)). Due process requires a defendant to have minimum contacts with the relevant sovereign before that sovereign can subject the defendant to personal jurisdiction in its courts. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). When a federal court sits in federal question jurisdiction pursuant to a statute that authorizes nationwide service of process, however, many courts have analyzed the defendant's contacts with the United States as a whole, rather than his contacts with the state in which the court sits. *In re Libor-Based Financial Instruments Antitrust Litigation*, 11-MDL-2262, 2015 WL 4634541, at *18 (S.D.N.Y. 2015); *see also Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998) ("The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered."). In addition, in any action

24

brought under 18 U.S.C. § 1345, the plaintiff that hales a defendant into its forum of choice will, by definition, always be the United States Government.

If 18 U.S.C. § 1345 implicitly authorizes nationwide service of process, vast changes to the traditional constitutional bounds of personal jurisdiction might well result. Under the Government's proposed interpretation, the United States could, say, bring an injunctive action in the United States District Court for the District of Alaska to shut down the operations of a local medical clinic, publishing entity, or other small business in New York whose alleged fraud was exclusively confined to New York and who had zero contacts with Alaska whatsoever. And the Government in a far-away state could also, as it did here, obtain an *ex parte* TRO shutting down some or all of the defendants' operations before they have any opportunity to be heard on the merits. Indeed, at oral argument on Defendants' motion to dismiss, the Government conceded that the statute would give it the authority to do exactly that, since any such defendant would have minimum contacts with the United States as a whole. While an out-of-state defendant in such a case could theoretically defeat jurisdiction despite a finding of minimum contacts by arguing that an exercise of personal jurisdiction would not comport with notions of fair play and substantial justice, this is a very high hurdle once a court concludes that the defendant has minimum contacts with the sovereign. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) ("Where a plaintiff makes the threshold showing of the minimum contacts required . . . a defendant must present a compelling case that the presence of some other

considerations would render jurisdiction unreasonable." (citation and internal quotations marks omitted)).  Indeed, some courts have even held that, under a national contacts analysis, "minimum contacts with the United States automatically satisfy due process." *Broumand v. Joseph*, 522 F. Supp. 3d 8, 20-21 (S.D.N.Y. 2021) (collecting cases).  And even defendants with meritorious due process claims would incur considerable time, effort, and expense to litigate a motion to dismiss in a district where they have no prior contacts whatsoever.

If Congress wishes to modify such foundational principles of personal jurisdiction, it must, at the very least, do it explicitly.  *See Omni Capital*, 484 U.S. at 104-05.  Indeed, some courts and commentators have questioned whether Congress's authority to establish a federal statutory basis for personal jurisdiction is as plenary as the Government argues in this case, given the vast due process implications that result.  *See Willingway Hosp., Inc. v. Blue Cross & Blue Shield of Ohio*, 870 F. Supp. 1102, 1106 (S.D. Ga. 1994) ("If due process is to have any application at all in federal cases—and the Fifth Amendment requires that it does— it seems impossible that Congress could empower a plaintiff to force a defendant to litigate any claim, no matter how trifling, in whatever forum the plaintiff chooses, regardless of the burden on the defendant."); 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1068.1 (4th ed. 2023)).

The Court therefore concludes that the phrase "in any Federal court" in 18 U.S.C. § 1345 likely does not authorize nationwide service of process, but instead is properly read as a provision conferring venue.  For that reason, the Western

District of Texas—like every district court in the country—would have venue over this action for purposes of this Court's 28 U.S.C. § 1404(a) transfer analysis.

### iii.    **Equitable Factors**

Although the Western District of Texas is a legally sufficient forum, very few of the equitable factors outlined in *Megna* and related cases support a transfer of this action from the Eastern District of New York to the Western District of Texas. *Cf. EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F. Supp. 2d 342, 347-48 (E.D.N.Y. 2012) ("The parties do not dispute that this action could have been brought in the [transferee court].  Instead, the parties focus on whether transfer would promote the interests of justice and the convenience of the parties.").

First, neither the convenience of the witnesses nor the convenience of the parties supports a transfer to the Western District of Texas.  In their motion to transfer venue, Defendants argue only that one witness, and one individual defendant, live in that district: defendant DeMonico.  *See* ECF No. 39.  The Government, on the other hand, asserts that while it is possible that multiple witnesses may live in Texas, anticipated witnesses for both sides will also come from New York, Florida, Michigan, Texas, Utah, Virginia, and West Virginia.  ECF No. 40 at 6.  Indeed, it is not clear that the Western District of Texas would be more convenient than the Eastern District of New York even for every *defendant*, since defendant Maxwell lives in Florida and is not involved in the daily affairs of RBT in Texas.  ECF No. 39 ¶ 13.  These factors therefore counsel the Court against transferring this action.

Second, it is true that, in light of RBT and RBF's status as Texas LLCs, the "locus of operative facts" may exist in the Western District of Texas, and "relevant documents" and other evidence may exist there as well (though Florida and North Dakota are other possibilities).  However, "access to documents and other proof is not a persuasive factor in favor of transfer without proof that documents are particularly bulky or difficult to transport, or proof that it is somehow a greater imposition for defendant to bring its evidence to New York than for plaintiff to bring its evidence to" Texas.  *Const. Reinsurance Corp. v. Stonewall Ins. Co.*, 872 F. Supp. 1247, 1251 (S.D.N.Y. 1995) (quoting *Sunshine Cellular v. Vanguard Cellular Sys., Inc.*, 810 F. Supp. 486, 500 (S.D.N.Y. 1992)).  And of course, the foregoing cases weighing the burdens of "transport[ing]" documents were decided nearly three decades ago, before the process of creating, preserving, and transferring documents electronically with rapid speed and at minimal cost became not the exception but the general rule in modern civil litigation.  *See United States v. Stamps*, 18-cv-1106, 2018 WL 6031155, at *3 (E.D.N.Y. Nov. 16, 2018) (concluding that this factor is now less important to a court's transfer analysis "[g]iven that almost all discovery today is sent and received electronically").  Defendants do not argue in their motion that evidence that exists in the Western District of Texas would be bulky or difficult to transfer electronically; however, some of the Government's *own* records may pose at least some undue burden on the Government and potentially the transferee court if venue were transferred to Texas.  *See* ECF No. 7 Text Entry (noting that many exhibits were "voluminous" and therefore were filed with the Court "in hard copy").

Thus, although the "locus of operative facts" factor perhaps favors transfer of this action to the Western District of Texas, the "location of relevant documents" factor does not.

Third, Defendants point to no potential witnesses who would fall outside this Court's subpoena power (other than, perhaps, experts retained by both parties who would appear without need for a subpoena). *See generally* ECF No. 38; ECF No. 42. This factor, therefore, counsels against transfer.

Fourth, Defendants argue that the relative means of the parties supports transfer, since Defendants have "not generated any significant income since" this Court's imposition of a temporary restraining order and Defendants' consent to extend that order, whereas the United States "maintains offices, staff, and regularly litigates" in the Western District of Texas. ECF No. 38 at 3. Although it is true that the United States is a well-resourced adversary, Defendants are far from impoverished: indeed, the Government has alleged, and Defendants have not disputed, that RBT alone has made roughly $30 million from the sale of the FRT-15 in less than three years. ECF No. 7 ¶ 85. Defendants' position is further undermined by the fact that Defendants have brought FRT-15-related lawsuits of their own in jurisdictions outside the Western District of Texas, including in the Northern District of Ohio and the Northern District of Oklahoma. ECF No. 24 at 24 n.17. To the extent that this factor favors Defendants, the tilt is very slight.

Fifth, this action will turn exclusively on questions of federal law as codified in 18 U.S.C. § 1345, the federal criminal provisions incorporated into that statute by

reference, and certain federal firearm statutes and regulations.  The Western District of Texas is no more familiar with federal law than the Eastern District of New York.  Indeed, "no litigant has a right to have the interpretation of one federal court rather than that of another determine his case." *H. L. Green Co. v. MacMahon*, 312 F.2d 650, 652 (2d Cir. 1962).  This factor, therefore, counsels against transfer.

Sixth, there are many reasons for this Court to give significant weight to the Government's choice of forum.  As a default matter, "a plaintiff's choice of forum is presumptively entitled to substantial deference." *Gross v. British Broadcasting Corp.*, 386 F.3d 224, 230 (2d Cir. 2004).  In addition, Congress expressed its intention to give the Government broad leeway to pick its forum by authorizing it to seek anti-fraud injunctions "in any Federal court."  18 U.S.C. § 1345.  *Cf. Tritt v. Automatic Data Processing, Inc. Long Term Disability Plan Adm'r*, 06-cv-2065, 2008 WL 2228841, at *2 (D. Conn. May 27, 2008) (concluding that the court must give "significant deference" to plaintiff's choice of forum "because Congress purposefully enacted a broad venue provision for ERISA cases").  And while it is true that the United States Government, unlike many private plaintiffs, does not "reside" in the Eastern District of New York, it is clear from the submissions to date that the United States Attorney for the Eastern District of New York and his staff devoted considerable time and resources over many months to investigating, researching, and preparing this complex and first-of-its kind civil fraud action against these well-resourced Defendants, which this Court finds to be an additional factor

weighing in favor of plaintiff's chosen forum.  This factor, therefore, strongly counsels the Court against transferring the action.

Finally, on the current posture, judicial economy counsels the Court against transferring this action to another district.  Defendants' motion to transfer is not the parties' first motion in this action.  Indeed, the Court has presided over the Government's motion for a temporary restraining order, Defendants' motion to dismiss for lack of personal jurisdiction, and two motions related to discovery.  The Court has held oral argument on each of those motions, one of which lasted for over three hours.  The Court has also scheduled a preliminary injunction hearing to take place just six weeks from now.  Although transfer may have promoted judicial economy if the Court received Defendants' transfer motion earlier in these proceedings, this Court has now become very familiar with many of the underlying facts and legal issues in this case.  It makes little sense to transfer this action to another district in which a new judge must either postpone the parties' preliminary injunction hearing or familiarize herself with the record on a highly expedited timetable.  The federal judiciary's limited resources, therefore, are best preserved by keeping the action in this Court.

## Conclusion

For the reasons outlined above, Defendants have failed to demonstrate that the balance of relevant equitable factors warrants disturbing the Government's choice of forum.  Defendants' motion to transfer venue is denied.

SO ORDERED.

_/s/ NRM_
NINA R. MORRISON
United States District Judge

Dated: April 18, 2023
       Brooklyn, New York