## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

-against-

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; KEVIN MAXWELL,

Defendants.

Case No. 1:23-cv-00369-NRM-RML

**RESPONSE IN OPPOSITION TO THE
UNITED STATES' MOTION FOR A
PRELIMINARY INJUNCTION**

Defendants Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, Lawrence DeMonico, and Kevin Maxwell, through undersigned counsel, respond in opposition to Plaintiff United States of America's, request for a preliminary injunction. The Government has failed to carry its burden of demonstrating it is entitled to the extraordinary relief it has requested. Most notably, the Government has made no attempt to demonstrate irreparable harm absent the injunction, which is fatal to its request. On the merits, moreover, the Government's premise is simply false. Defendants' triggers—the FRT-15 and Wide Open Trigger (WOT)—are not restricted machineguns and thus they could not have committed fraud when they truthfully represented them as such to their customers. Finally, even if the Government was entitled to an injunction, a lawful injunction could do no more than stop future sales, and not impose the punitive measures requested by the Government.

1

# FACTS[1]

Rare Breed Triggers, LLC (RBT) is a North Dakota limited liability company. Rare Breed Firearms, LLC (RBF), is a Texas limited liability company. Lawrence DeMonico is the President of RBT and resides in Texas. Kevin Maxwell is the owner and General Counsel of RBT and resides in Florida.

RBT's business involves the manufacture and sale of firearms accessories and related merchandise. One of its products was the FRT-15.

The FRT-15 was designed and manufactured based on a patented "forced-reset trigger," which was originally patented by a separate company. The Wide Open Trigger (WOT) is modeled after the FRT-15. Both the FRT-15 and WOT are forced-reset triggers. Such triggers are aftermarket parts for semi-automatic firearms that allow a shooter to rapidly reengage the trigger mechanism to allow rapid manual firing.

In 2013, the ATF had reviewed and classified one such device and determined that it was "not a part or combination of parts that will convert a semiautomatic firearm into a machinegun," because the device "allows the trigger to reset" between each round fired. *See* Letter from Earl Griffith, Chief, Firearms Technology Branch, ATF, *Re: 3MR trigger* (Oct. 31, 2013). ATF's conclusion was based on the statutory definition of "machine gun," which includes "any weapon which shoots … automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(23). Because forced-reset triggers *force* the trigger to *reset* between shots, it does not fall under the definition of machinegun. RBT also subsequently sold a related product—WOTs which have the same function as FRT-15s.

---

[1] Defendants intend to prove these facts at the scheduled hearing on the motion for a preliminary injunction.

In 2018, however, responding to "tremendous" "public pressure" in the aftermath of a mass shooting in Las Vegas, *Cargill v. Garland*, 57 F.4th 447, 451 (5th Cir. 2023) (en banc), ATF issued 27 C.F.R. § 479.11 which purported to redefine "machinegun," so that it encompassed items that were not prohibited by statute. *See Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018). The regulatory definition included the following language:

> '[S]ingle function of the trigger' means a *single pull of the trigger and analogous motions*. The term 'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed *so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter*.

*Id.* at 456 (quoting 27 C.F.R. § 479.11, emphasis added).

In light of the regulation, and believing that it was legally invalid, RBT took the extraordinary step of confirming that the FRT-15 should be properly classified as a firearm accessory, *not a machinegun*, under the statutory definition. Prior to selling the FRT-15 or WOT, RBT obtained opinion letters from two former ATF Special Agents, Kevin McCann and Daniel O'Kelly. Mr. McCann was also a practicing attorney. In each case, the former agents conducted their own examination of the FRT-15 and determined that the device was not a machinegun because the trigger mechanism reset between each shot fired, and Mr. McCann provided RBT with a legal opinion to that effect.

RBT began selling the FRT-15 in late 2020, only after it received the opinion letters from Mr. McCann and Mr. O'Kelly.

After the FRT-15 went into manufacturing, RBT sought two additional examinations and opinions from two national firearms experts to ensure that the production model did not fall under the definition of a machinegun. In particular, RBT wanted to ensure that any changes made to the FRT-15 to aid in manufacturing did not alter the device's function. In February 2021, RBT

received an opinion letter from Rick Vasquez, another former ATF Special Agent and former firearms examiner for the agency who had served as the Acting Chief of the ATF's Firearms Technology Branch. Mr. Vasquez also analyzed the functions of the FRT-15 against the definition of a "machinegun" under federal law and concluded that the manufactured version of the FRT-15 does not meet the definition of a "machinegun."

In May 2021, RBT received an opinion letter from Firearms Training and Interstate Nexus Consulting, LLC, in Grand Rapids, Michigan, via the company's owner, Brian Luettke. Mr. Luettke is another former ATF Special Agent. Mr. Luettke provided RBT with yet another opinion letter analyzing the functions of the manufactured version of the FRT-15 and comparing it against the definition of a "machinegun" under federal law. Mr. Luettke also concluded that the manufactured version of the FRT-15 does not meet the definition of a "machinegun."

Opinions in hand, RBT sold its device through two channels, its website and sales to dealers. The vast majority of sales occurred through RBT's website, rarebreedtriggers.com.

To help educate consumers and to preempt any concerns of ATF, RBT posted on its website animations showing the mechanical operation of the FRT-15 and videotaped interviews with experts that establish the FRT-15 is not a "machinegun." The animations and videos were on RBT's website for months prior to ATF's issuance of any cease-and-desist letters to RBT.

Despite these earlier opinions, on July 15, 2021, the ATF issued a letter concluding that the device was a machinegun. Letter from David A. Smith, Firearms Enforcement Officer, Firearms Technology Branch (July 15, 2021). Relying on 27 C.F.R. § 479.11 and its revised definition of machinegun, the letter stated that the FRT-15 was a machinegun because it required only a "single pull of the trigger [or] analogous motion[]" and does not require a "subsequent pull

3

by the shooter to fire a second projectile." ATF Report of Technical Examination of RBT's Forced Reset Trigger Device, Model FRT-15. *Id.* at 3−4.

Consistent with this conclusion, on July 26, 2021, the ATF's field office in Tampa, Florida, directed RBT by letter to cease-and-desist selling the FRT-15. Relying again on the new language in 27 C.F.R. § 479.11, the letter asserted that the device was a machinegun because it "allows a firearm to expel more than one shot, without manual reloading, with a single, *continuous pull* of the trigger." Letter from Craig Saier, Special Agent in Charge, Tampa Field Division, ATF, at 2 (July 26, 2021) (emphasis added).[2]

Notably, the cease-and-desist letter did not include a copy of the July 15th classification. Moreover, while the letter was dated July 26th, RBT did not become aware of it until Mr. Maxwell met with a representative from ATF on July 27, 2021. During the meeting, Mr. Maxwell disputed the assertion that the FRT-15 was a machinegun and asked the agency to consider additional evidence.

In response, RBT sought judicial intervention. On August 2, 2021, RBT filed suit in the Middle District of Florida in *Rare Breed Triggers, LLC v. Garland*, Case No. 6:21-cv-01245-CEM-GJK. It sought to vacate ATF's classification decision, in part, because ATF had relied on 27 C.F.R. § 479.11, which RBT argued was legally invalid. *See id.* at ECF No. 1; ECF No. 2 (request for a temporary restraining order); ECF No. 32 (amended complaint).

During that litigation, on August 12, 2021, ATF first made its July 2021 examination report available to RBT.

On August 21, 2021, Mr. McCann issued a second opinion letter, again concluding the FRT-15 was not a machinegun. In reaching this conclusion, Mr. McCann reviewed ATF's

---

[2] ATF sent a similar letter concerning the WOT.

examination report, but noted that it did "not persuade [him] to alter [his] original legal opinion that the FRT-15 is not a 'machinegun' since it does not fire more than one shot with a single function of the trigger."

On August 26, 2021, Mr. Luettke issued a second opinion letter, also concluding that the FRT-15 was not a machinegun, and rebutting the assertions contained in the ATF's examination report. With respect to the function of the FRT-15, Mr. Luettke also concluded that the examining officer "could have done a more complete and thorough evaluation" of the device, and "left out the key factors as to why the FRT-15 is and should be classified as a semi-automatic trigger."

That same day Mr. O'Kelly likewise provided RBT with a rebuttal of ATF's examination report. He too agreed that the FRT-15 was not a machinegun and criticized the ATF's examination as not having taken proper account of the mechanical operation of the device.

Finally, also on August 26th, Mr. Vasquez issued a report refuting the ATF's classification. He likewise agreed that the ATF's examination was technically and legally erroneous.

While the litigation was ongoing, RBT continued to sell the FRT-15 on its website. During that time, Mr. DeMonico spoke publicly in news interviews and YouTube videos about the litigation and the four rebuttal reports. Defendants also made these reports available to customers upon request.

On October 28, 2021, the court in the Florida litigation *sua sponte* dismissed the matter without prejudice for failure to file a case management report consistent with local rules. *See id.* at ECF No. 75.

After the litigation in Florida concluded, RBT moved its operations to North Dakota and registered as a North Dakota LLC. Thus, rather than refiling its suit in Florida, it filed suit in the District of North Dakota on May 16, 2022. *See Rare Breed Triggers, LLC v. Garland*, Case No.

3:22-cv-85-ARS.[3] RBT argued that the classification of the triggers as "machineguns" was invalid because 27 C.F.R. § 479.11 was itself invalid. *See id.*, ECF No. 1. It also argued that ATF classifications have no independent legal significance beyond reflecting ATF's views about a device. *See id.*

ATF responded by seeking dismissal for improper venue or alternatively seeking transfer of venue to the Middle District of Florida. *See id.*, ECF No. 21. ATF argued, alternatively, that venue would be proper in West Virginia or Washington, DC, where it conducted its classification and where it was headquartered, respectively. *Id.* at 18. ATF never suggested that venue would be proper in New York. *See id.* On November 4, 2022, the court granted ATF's motion in part, dismissing the case without prejudice, but denying ATF's request to transfer "to [] the Middle District of Florida, where Maxwell appears to reside, [or] the District for the District of Columbia, where the defendants reside," and "allow[ing] Rare Breed to file in another district where venue is proper." *Id.*, ECF No. 45 at 14.

Meanwhile, in separate litigation, a plaintiff challenged ATF's 2018 rule. On January 6, 2023, the Fifth Circuit, sitting en banc, held that the rule "promulgated by the ATF violates the APA," and ordered that it be set aside. *Cargill*, 57 F.4th at 473. Using the "plain language" of the statute, the court held that any device that still requires a manual reset of the trigger mechanism between shots is not a machinegun. *Id.* at 459−60. A "semi-automatic weapon utilizes a simple mechanical process: the trigger disengages the hammer from the sear, the hammer strikes the firing pin, the bullet fires, and the recoil pushes the hammer against the disconnector, which resets the trigger. This process happens every single time one bullet is fired. To be sure, a non-mechanical

---

[3] RBT was represented by different counsel than undersigned in both earlier cases.

bump stock increases the rate at which the process occurs. But the fact remains that only one bullet is fired each time the shooter pulls the trigger." *Id*. at 459.

The regulation, however, attempted to define a "single function of the trigger" as a "single pull of the trigger and analogous movements," to require a deliberate pull between shots, which encompassed devices that allowed a shooter to repeatedly activate the trigger's function in order to shoot a succession of shots rapidly. *Id*. "The problem with that interpretation is that it is based on words that do not exist in the statute." *Id*. at 459−60. Under a simple reading of the law Congress wrote, the regulation is invalid—"To summarize, the definition of machinegun must turn on the action (or 'function') of the trigger because no other actor is mentioned or implied. This conclusion is only strengthened by the fact that other definitions within the same statutory provision explicitly turn on the action of a shooter, showing that Congress knew how to write a definition that proceeds from a shooter's perspective, rather than a mechanical one if it had wanted to. The notion that the definition turns on the action of an unnamed shooter is inconsistent with both the grammatical and statutory contexts." *Id*. at 461.[4]

---

[4] Recently, a panel of the Sixth Circuit followed the *Cargill* decision, deepening a profound split in authority on the validity of the regulation. *See Hardin v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 20-6380, --- F.4th ----, 2023 WL 3065807, at *2 (6th Cir. Apr. 25, 2023) (reviewing the "total of 22 opinions … which fully explore all aspects of the issue in nearly 350 pages of text," and concurring with the *Cargill* majority). A divided D.C. Circuit panel denied a preliminary injunction against the rule, concluding it was likely valid. *See Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019). Although the Supreme Court denied certiorari, 140 S. Ct. 789 (2020), Justice Gorsuch wrote separately to express doubt about the panel's decision. In another divided opinion, the Tenth Circuit reached the same conclusion as the D.C. Circuit. *Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020). The court initially granted rehearing en banc, vacating the panel decision, 973 F.3d 1151 (10th Cir. 2020) (en banc), but later vacated the order as improvidently granted, reinstating the former opinion. *Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021) (en banc), *cert. denied sub nom.*, *Aposhian v. Garland*, 143 S. Ct. 84 (2022). Five of the eleven participating judges dissented. *See id.* at 891–903 (Tymkovich, C.J., dissenting); *id.* at 903–04 (Hartz, J., dissenting); *id.* at 904–06 (Eid, J., dissenting); *id.* at 906–08 (Carson, J., dissenting). Finally, in yet another divided opinion, a Sixth Circuit panel ruled against the Government, holding that the rule was likely invalid. *Gun Owners of America, Inc. v. Garland*, 992 F.3d 446, 450 (6th Cir. 2021). The court granted rehearing en banc, 2 F.4th 576 (6th Cir. 2021) (en banc), and an evenly-divided court affirmed the district court's denial of the preliminary injunction. 19 F.4th 890 (6th Cir. 2021), *cert. denied*, 143 S. Ct. 83 (2022). And now, because that decision left things unsettled in the Sixth Circuit, the Circuit has, once again, concluded the rule is invalid. *See Hardin*, 2023 WL 3065807, at *5.

Rather than follow the court's direction in the *Cargill* decision or allow RBT the opportunity of continuing to challenge the ATF's erroneous conclusion about the FRT-15 and the WOT, the U.S. Attorney for the Eastern District of New York filed this suit. On January 19, 2023, the Government filed a five-count complaint against the defendants under seal, alleging that the defendants committed various civil offenses by selling the FRT-15. ECF No. 1. Central to the Government's case is its contention that the FRT-15 and WOT are prohibited "machineguns" under the now-vacated rule—27 C.F.R. § 479.11. *See id.* at ¶ 42. The Government also sought, and obtained, an ex parte temporary restraining order stopping further sales of the FRT-15 and WOT and requiring the defendants to preserve sales records. *See* ECF No. 11.

The Government now seeks a preliminary injunction and additional relief from this Court. *See* ECF No. 5.

## ARGUMENT

The Government has brought suit under four *criminal* statutes—18 U.S.C. §§ 371 (conspiracy to defraud the U.S.), 1341(mail fraud), 1343 (wire fraud), 1349 (mail and wire fraud conspiracy). *See* ECF No. 1. None allow civil causes of action. *See id.* Thus 18 U.S.C. § 1345 is the only basis for this action.

18 U.S.C. Section 1345(a)(1)(A) provides that if a person "is violating or about to violate" certain criminal statutes, the government "may commence a civil action in any Federal court to enjoin such violation." Upon proper proof, a court "may … enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure[.]" *Id*. at § 1345(b). Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction.

*See also Sampson v. Murray*, 415 U.S. 61, 86 (1974) (noting that rule 65 injunctions must comport with traditional equitable standards).

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations omitted, emphasis added). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id*.

## I.   THE STANDARD FOR A PRELIMINARY INJUNCTION IS THE SAME NO MATTER THE IDENTITY OF THE PLAINTIFF

The *Winter* factors are based on "well-established principles of equity." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). And courts are not free to depart from this standard, because "traditional equitable principles do not permit" the adoption of lesser burdens for certain litigants or presumptions of harm. *Id.* at 393. Indeed, it is reversible error for a court to issue an injunction if it departs from these "traditional principles of equity." *Id.* at 394.

As the Second Circuit has explained, while *eBay* involved an injunction concerning patents, the court's decision "strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context." *Salinger v. Colting*, 607 F.3d 68, 78 (2d Cir. 2010). "*eBay*'s central lesson is that, unless Congress intended a 'major departure from the long tradition of equity practice,' a court deciding whether to issue an injunction must not adopt 'categorical' or 'general' rules or presume that a party has met an element of the injunction

standard." *Id.* at 78. n.7 (quoting 547 U.S. at 391−94). There is simply no reason why "*eBay* would not apply with equal force to an injunction in *any* type of case." *Id.* (emphasis in original).

Thus, "in any context," a court must employ the *Winter* factors. *Id.* at 78, 80. "The court must not adopt a categorical or general rule or presume that the plaintiff will suffer irreparable harm (unless such a departure from the long tradition of equity practice was intended by Congress)." *Id.* at 80 (citation omitted). "Instead, the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits[.]" *Id.* Following *eBay*, the court again emphasized that applying a presumption that an injunction is warranted to stop an alleged violation of law, "invert[s] the proper mode of analysis." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). "It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test[.]" *Id.* (emphasis in original).

These principles apply the same even when the government is the party seeking an injunction. The Supreme Court has long refused to grant any special solicitude to the government in such contexts. For instance, in *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944), the Court referred to the "requirements of equity practice with a background of several hundred years of history," before applying the traditional test to review an injunction requested by the Office of Price administration. *See also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (refusing to depart from traditional test where Commonwealth of Puerto Rico sought injunction).

"Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles." *Id*. at 313; *see also Hecht*, 321 U.S. at 330 ("We do not believe that such a major

departure from that long tradition as is here proposed should be lightly implied."). "The great principles of equity … should not be yielded to light inferences, or doubtful construction." *Romero-Barcelo*, 456 U.S. at 313 (citation omitted). And where a statute provides some other "means of ensuring compliance," beyond an injunction, this demonstrates that Congress did not intend to depart from traditional notions of equity. *See id.* at 316.

Despite these well-established rules, the Government insists here that it is entitled to a preliminary injunction without establishing two of the four traditional criteria. It says that it need not show a likelihood of success on the merits, but merely "probable cause," supported only by "reasonable grounds" to suspect that it might succeed. ECF No. 5 at 19. It also insists that it need not prove any harm at all and is instead relieved entirely of its burden to prove irreparable harm. *Id.* at 19−20.

The Government's assertions are wrong. "The propriety of injunctive relief must be evaluated on a case-by-case basis in accord with traditional equitable principles and without the aid of presumptions or a 'thumb on the scale' in favor of issuing such relief." *Hooks for & on Behalf of Nat'l Lab. Rels. Bd. v. Nexstar Broad., Inc.*, 54 F.4th 1101, 1114–15 (9th Cir. 2022) (cleaned up, quoting *Monsanto*, 561 U.S. at 157). This Court "must not adopt 'categorical' or 'general' rules or presume that a party has met an element of the injunction standard" "in *any context*." *Salinger*, 607 F.3d at 78 n.7, 80 (emphasis added); *accord Hooks*, 54 F.4th at 1114-15 (collecting cases).

To support its "reasonable grounds" for success standard, the government relies on four cases applying a "probable cause" standard for an injunction under Section 1345, *United States v. Palumbo*, 448 F.Supp.3d 257, 260 (E.D. N.Y. 2020), *United States v. Savran & Assocs.*, 755 F.Supp. 1165, 1177 (E.D. N.Y. 1991), *United States v. Belden*, 714 F.Supp. 42, 44−45 (N.D. N.Y.

1987), and *United States v. Weingold*, 844 F.Supp. 1560, 1573 (D. N.J. 1994). ECF No. 5 at 18−19. And then to support its claim to be relieved entirely from its burden of proving harm, the government cites those cases and adds *United States v. Kahen*, No. CV 20-00474, 2020 WL 1697974 (E.D. N.Y. 2020), *United States v. Bors*, No. 21-9441, 2021 WL 5909196 (D. N.J. 2021) and *United States v. Payment Processing Ctr., LLC*, 435 F.Supp.2d 462 (E.D. Pa. 2006). *See id.*

These cases do not withstand scrutiny. Only two of them were decided in this Circuit following *Salinger*, which should be a red flag in itself. But those cases, *Palumbo* and *Kahen*, which were both decided in 2020, fail to mention that binding precedent. *Palumbo* simply says, "Unlike in the usual preliminary injunction case," the relevant standard is merely "probable cause," and "proof of irreparable harm is presumed under Section 1345 where the statutory conditions are met." 448 F.Supp.3d at 260. In support, the court relied primarily on *Savran*, 755 F.Supp. at 1177, which will be discussed in short order. *See id.* Meanwhile, *Kahen* was an opinion supporting an *ex parte* restraining order, which also referred solely to *Savran* and *not* the Second Circuit's opinion in *Salinger*. *See* 2020 WL 1697974 at *1. One suspects that had the court been adequately briefed on the issue in an adversarial proceeding, it would have addressed the Second Circuit's binding decision.[5]

The only meaningful analysis presented by any of these authorities is set out in *Savran* and *Belden*, but, notably, those cases apply the precise analysis subsequently rejected by the Second Circuit (and Supreme Court). Finding no support in the text of Section 1345 for a relaxed burden of proof, both decisions rested on the "legislative history" of Section 1345, as set out in the Senate Committee Report of the 1983 enactment. *See Savran*, 755 F.Supp. at 1177; *Belden*, 714 F.Supp.

---

[5] The Government's reliance on the out-of-circuit decision in *Bors* suffers the same defect. *See* 2021 WL 590916 at *1 (unopposed motion for default injunction). So too does its reliance on *United States v. Thomas*, No. 18-cv-1104, 2019 WL 121678, at *6 (E.D.N.Y. Jan. 7, 2019), a case the Government mentions only in passing.

at 44-45. Notably, the court in *Belden* actually found that an injunction was not warranted, even under this standard, and also noted that the "language of the statute itself and the legislative history underlying it is not crystal clear." 714 F.Supp. at 45. Still, the court in *Savran* later adopted *Belden*'s analysis in full, and, as we have seen, set out the standard parroted by later decisions. 755 F.Supp. at 1178–79.

It should go without saying that vague statements of legislative history cannot trump statutory text. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) ("uncertainties [in legislative history] illustrate the difficulty of relying on legislative history here and the advantage of our determination to rest our holding on the statutory text"). And the *text* does not support the courts' conclusions. Section 1345 does not refer to "probable cause," it instead refers to the Attorney General's decision to "commence a civil action" when a person "is violating or about to violate" the fraud statutes, "to enjoin such violation." 18 U.S.C. § 1345(a). That does not apply to a *court's* evaluation of such an action, though, just the government's decision to bring one. The standard to "enter such a restraining order or prohibition, or take such other action," "is governed by the Federal Rules of Civil Procedure." *Id.* at § 1345(b). And, in any event, may only be entered "as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." *Id.* Thus, the only provision that contemplates the burden of showing likely success appears to be the provision incorporating the ordinary standard from Rule 65. And, in fact, where the equitable standard requires only "irreparable injury," Congress took pains to demand "a continuing and substantial injury" that warrants an injunction. *See id.* This suggests a *more demanding* inquiry than what is traditionally required, not a presumption of harm.

13

Neither *Savran* nor *Belden* address this language but pointed instead to statements in a Senate Committee Report. *See* 755 F.Supp. at 1178−79; 714 F.Supp. at 45. Still, the court in *Savran* later adopted *Belden*'s analysis in full, and, as we have seen, set out the standard parroted by later decisions. 755 F.Supp. at 1178−79.

Even if it was relevant, that report hardly suggests the standard that the courts applied. In a massive report on the Comprehensive Crime Control Act of 1983, the Senate Committee on the Judiciary noted that, traditionally, "Congress has not, as a general practice, provided injunctive relief for the prevention of crimes about to take place." *Senate Judiciary Committee Report on the Comprehensive Crime Control Act of 1983*, S.Rep. 225, 98th Cong., 2d Sess. at 401 (1983). Under traditional equity practice, in "its early history, the English court of chancery issued injunctions to restrain the commission of certain criminal acts," but "diminished" that practice by the 15th Century, before it revived it in some circumstances "if an act endangered property rights or was inimical to public health or safety[.]" *Id.* The Committee understood the statute to therefore clarify that *traditional rules of equity* could still be applied to enjoin violations of certain *criminal statutes*. *See id.* This was not a clear rejection of traditional notions of equity; instead, it was a recognition that the statute applied the normal rules in a new context.

The *Savran* court also justified its decision by noting, "In other areas where Congress has provided for Governmental enforcement of a statute by way of an injunction, the courts have consistently held that irreparable harm need not be demonstrated and that so long as the statutory conditions are met, irreparable harm to the public is presumed." 755 F. Supp. at 1179. But *Salinger* and the Supreme Court authority underlying it, expressly refute that very notion and called into question old presumptions of harm. That is precisely *why* the *Salinger* court discarded the Second Circuit's past presumption of irreparable harm analysis "in any context." 607 F.3d at 78; *see also*

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 212 (3d Cir. 2014) (rejecting "a presumption of irreparable harm" for alleged violations of the Lanham Act, because the "Supreme Court revisited the analytical framework governing injunctions in two significant cases from the last decade: *eBay* and *Winter*"). As the Ninth Circuit recently explained, "the Supreme Court decisions (*Winter*, *eBay*, and *Monsanto*) rejecting presumptions abrogated our prior decisions that had adopted a presumption of irreparable harm," across a variety of statutory areas. *Hooks*, 54 F.4th at 1115. And Section 1345 is no exception to that trend. "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Romero-Barcelo*, 456 U.S. at 313. After all, Section 1345 "is not the only means of ensuring compliance," with the substantive fraud statutes, as violators still face "fines and criminal penalties." *See id.* at 314. This strongly suggests that there is no basis to depart from the traditional notions of equity. *Id.*

In the end, this Court must simply apply the ordinary standard to evaluate the Government's request for an injunction. But because the Government has not met its burden, this Court should deny the request entirely.

## II. THE GOVERNMENT HAS NOT PROVED ANY HARM, MUCH LESS IRREPARABLE HARM ABSENT AN INJUNCTION

Content with its argument that it has no burden of proof on this element, the Government does not argue that it will suffer irreparable injury absent an injunction. *See* ECF no. 5 at 19–20. Moreover, it makes no attempt whatsoever to offer proof that immediate action is necessary "to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought," as Section 1345 requires. *See id.* Its failures are fatal to its demand for an injunction.

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson*, 415 U.S. at 88 (cleaned up) "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted). "Thus, if a party fails to show irreparable harm, a court need not even address the remaining elements of the test." *Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-CV-8028, 2018 WL 2089342, at *1 (S.D.N.Y. May 3, 2018). "To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quotations omitted). Additionally, "irreparable harm must be shown to be actual and imminent, not remote or speculative." *Id*. If the alleged harm could "be fully compensable by money damages," there is no basis for finding irreparable harm. *Faiveley*, 559 F.3d at 119 (citation omitted).

The Government offers no proof, or even argument, that it will suffer irreparable harm absent a preliminary injunction, much less that an injunction is necessary "to prevent a continuing and substantial injury." *See* ECF No. 5 at 19−20. It is therefore not entitled to a preliminary injunction, and this Court "need not even address the remaining elements of the test." *See Monowise*, 2018 WL 2089342, at *1.

Going even further, though, if one tries to come up with an argument on the Government's behalf it becomes clear that it *cannot* offer any genuine threat of irreparable harm, because it could redress any possible harms. If the Government believed that Defendants violated the underlying criminal statutes, the Government could presumably criminally prosecute them, and seek prison terms, fines, and restitution. *See* 18 U.S.C. §§ 371 (violators "shall be fined under this title or

imprisoned"); 1341 (same); 1343 (same); 1349 ("Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense[.]"); 3663A(c)(1)(A)(ii) (mandatory restitution for offenses involving "fraud or deceit"). Indeed, it appears that the Government is primarily concerned with its claim that Defendants will defraud future purchasers concerning the status of the triggers, or, theoretically, fail to pay relevant taxes. *See* ECF No. 5 at 27, 29. But that is what restitution is for. *See* 18 U.S.C. § 3663A. That means any harm related to direct violations of the statutes can be redressed by later proceedings. Thus, any harm would not be *irreparable*, and a preliminary injunction is inappropriate. *See Romero-Barcelo*, 456 U.S. at 314 (no irreparable harm from mere violations of a statute when it "provides for fines and criminal penalties"); *Sampson*, 415 U.S. at 90 ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.") (cleaned up).[6]

## III. THE GOVERNMENT CANNOT SHOW A LIKELIHOOD OF SUCCESS AS THE TRIGGERS ARE NOT MACHINEGUNS, AND, AT MINIMUM, DEFENDANTS HAD A GOOD FAITH BELIEF THAT THEY WERE LAWFULLY SELLING THE DEVICES

On the merits of its claims, the Government has not shown a likelihood of success in proving violations of the underlying criminal statutes. Styled as fraud claims, they all share one essential feature—the Government's insistence that the FRT-15 and WOT are "machineguns." ECF No. 5 at 23, 29, 35. But that claim fails as a matter of law, and with that failure, the Government cannot succeed in any of its claims. Of course, since each statute also requires specific

---

[6] The Government has also presented soaring rhetoric about the epidemic of gun violence in America in some of its filings, but that has nothing to do with this case. The triggers at issue are aftermarket firearm parts, and the Government has never suggested, much less proved, that any of Defendants' triggers have ever been involved in a single misdeed. And even then, the unlawful acts of consumers shouldn't be imputed to a manufacturer. Indeed, the manufacturers and distributers of the actual firearms used in gun crimes are generally immune from liability. *See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 389 (2d Cir. 2008).

intent, even if they were ultimately *wrong*, Defendants' good faith belief that the triggers were lawful devices defeats these charges.

## A. The Government Cannot Prove a *Klein* Conspiracy

To prove a *Klein* conspiracy under 18 U.S.C. § 371, the Government must allege criminal objectives of the conspiracy. *See United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). And it must further prove that "the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Id.* (citation omitted). Indeed, because "First Amendment protections require that the government produce more than evidence of association to impose liability for conspiracy," this requires proof of intent to commit an illegal act. *United States v. McKee*, 506 F.3d 225, 239 (3d Cir. 2007). "The Supreme Court has instructed that, '[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.'" *Id.* (quoting *NAACP v. Claiborne Hardware*, 458 U.S. 886, 920 (1982)). "Moreover, evidence of intent must be judged 'according to the strictest law.'" *Id*. (quoting *Claiborne Hardware*, 458 U.S. at 919).

The Government has alleged two criminal objectives here: (1) illegal sales of machineguns; and (2) failing to pay taxes on the sale of machineguns. Each theory fails.

## 1. Defendants Did Not Conspire to Illegally Sell Machineguns

According to the Government, Defendants entered "a conspiracy to continue to possess and sell [] machineguns," in violation of 18 U.S.C. § 922(o). ECF No. 5 at 26 n.6. Indeed, while the Government is a bit evasive as to the precise substantive crime, it claims that Defendants sales of the FRT-15 were not permitted under 27 C.F.R. § 479.105. *Id.* at 26. That regulation discusses certain exemptions to the application of the criminal prohibition in 18 U.S.C. § 922(o). And, as it

says elsewhere, the Government's theory is that "[b]y entering into an agreement to sell machineguns in contravention of the [Gun Control Act] and the [National Firearms Act], Defendants have obstructed ATF's regulation of machineguns, which is a lawful government function under § 371." *Id.* at 24. This claim fails though because the devices are not machineguns and Defendants lacked criminal intent.

### i. The FRT-15 and WOT Are Not Machineguns

The Government's theory fails because the triggers are not machineguns. Under the National Firearms Act (NFA), 26 U.S.C. §§ 5812(a), 5861, Congress criminalized the possession or transfer of an unregistered firearm, while also prohibiting the registration of firearms otherwise banned by law. Similarly, in 26 U.S.C. § 5801, Congress required those engaged in the business of selling firearms to pay certain taxes. In 1968, Congress passed the Gun Control Act (GCA), criminalizing possession of firearms for certain classes of people. *See* 18 U.S.C. § 921, *et seq*. In 1986, Congress amended the GCA, codified at 18 U.S.C. § 922(o), to outlaw most machineguns and simultaneously make it unlawful for any person to register those weapons. Paying the required taxes thus became impossible as well. Today it is a federal felony, punishable by up to 10 years in prison for first-time offenders, for any person to "transfer or possess a machinegun." 18 U.S.C. §§ 922(o), 924(a)(2).

Under both the GCA and NFA, the term "machinegun" means "any weapon which shoots … automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(23).

The Supreme Court has explained that the current definition of a machinegun

refer[s] to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the Act. We use the term 'semiautomatic' to

19

> designate a weapon that fires *only one shot with each pull of the trigger*, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.

*Staples v. United States*, 511 U.S. 600, 602 n.1 (1994) (emphasis added).

A weapon functions "automatically" when it "discharge[s] multiple rounds" "as the result of a self-acting mechanism" "that is set in motion by a single function of the trigger and is accomplished without manual reloading." *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009). A weapon equipped with forced reset trigger, however, "fires only one shot with each pull of the trigger"—just like every other semiautomatic firearm. *See Staples*, 511 U.S. at 602 n.1.

The en banc Fifth Circuit's decision in *Cargill* explained exactly what Congress meant by the phrase, "by a single function of the trigger." 57 F.4th at 459. "At the time the statute was passed, 'function' meant 'action,'" and "the relevant question is whether [a device] fires more than one shot each time the trigger 'acts.'" *Id.* (citations omitted). Thus, if an aftermarket device does not alter a semi-automatic weapon's action, it does not convert it into a machinegun. *Id.* That is because "a semi-automatic weapon utilizes a simple mechanical process: the trigger disengages the hammer from the sear, the hammer strikes the firing pin, the bullet fires, and the recoil pushes the hammer against the disconnector, which resets the trigger. This process happens every single time one bullet is fired." *Id.* As long as the "fact remains that only one bullet is fired each time the shooter pulls the trigger," a weapon is not a machinegun. *Id.*

Forced reset triggers, like the FRT-15 and WOT, do not alter the basic mechanical operation of any firearm, and thus cannot be machineguns. Indeed, they are specifically designed so that each time a shooter pulls the trigger it fires only once, and then the trigger mechanism *forcibly* resets so that the shooter can yet again pull the trigger and fire again. The trigger must still be pulled by the user each time a round is fired. Thus, the "fact remains that only one bullet is fired

each time the shooter pulls the trigger," and the FRT-15 is not a machinegun. *See Cargill*, 57 F.4th at 459.

The Government thus cannot win its argument relying only on the statutory definition of a machinegun. Instead, it is left with a regulatory expansion of that definition, which has now been invalidated by the Fifth Circuit. As discussed, ATF issued a rule to change the statutory definition of a "machinegun" by amending three regulations: 27 C.F.R. §§ 447.11, 478.11, and 479.11. *See Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,516. According to the new rule, the "'single function of the trigger' *means a single pull of the trigger and analogous motions*. The term 'machinegun' includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed *so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*" *Id.* (emphasis added).

The rule was aimed at "bump fire"—a shooting technique where a user of a firearm quickly engages the trigger of a semiautomatic weapon multiple times, resulting in rapid fire. *Id.* at 66,516 Sometimes it involves an aftermarket device, although it can also be accomplished merely by holding a firearm loosely and engaging the trigger rapidly. *See id.* "[B]ump-stock-type devices" are aftermarket devices that allow the firearm to slide back-and-forth freely in the shooter's hands and facilitate bump firing. *Id*. In all instances, the shooter depresses the trigger normally and uses the gun's recoil to force the trigger back into his hand while the trigger manually resets, a shooter thus "re-engages by 'bumping' the shooter's stationary finger" into the trigger. *Id*. As the Fifth Circuit explained, "To be sure, [a bump stock] makes the process faster and easier. But the mechanics remain exactly the same: the firing of each and every round requires an intervening function of the trigger." *Cargill*, 57 F.4th at 454.

The Fifth Circuit struck down that rule, however, so the Government's reliance on it here must fail. Indeed, the court concluded that the regulatory expansion of the statute, such that "'single function of the trigger' means 'a single pull of the trigger and analogous movements,'" "fails on its face because a shooter still pulls the trigger of a semi-automatic weapon … each time he or she fires a bullet." *Id.* at 459. Thus, the court held that the rule "promulgated by the ATF violates the APA." *Id.* at 473.

The court also held that "even if the statute were ambiguous—which it is not—the rule of lenity would require that we interpret the statute" against the government. *Id*. Likewise, just days ago the Sixth Circuit echoed that conclusion, applying the rule of lenity to void the regulation, "because the relevant statutory scheme does not clearly and unambiguously prohibit bump stocks[.]" *Hardin*, at 2023 WL 3065807, at *5.

"The critical point is that criminal laws are for courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014). Lenity is just one of the "traditional tools of statutory construction," that a court must apply in considering a regulatory enactment. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984). But "lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality op.). And "[w]here, as here, the canons [of construction] supply an answer, *Chevron* leaves the stage." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018).

"We must not apply *Chevron* where, as here, the Government seeks to define the scope of activities that subject the public to criminal penalties." *Cargill*, 57 F.4th at 467. This is a position "confirmed by" "proximate" "Supreme Court precedent." *Id*. at 468; *see also Hardin*, 2023 WL 3065807, at *5 ("Therefore, when *Chevron* deference is not warranted and standard principles of

statutory interpretation 'fail to establish that the Government's position is unambiguously correct[,] we apply the rule of lenity and resolve the ambiguity in [the criminal defendant's] favor.'") (quoting *United States v. Granderson*, 511 U.S. 39, 54 (1994)). Thus, when a statute "does not clearly and unambiguously" criminalize the conduct later deemed unlawful by a regulation, a court must apply the rule of lenity and reject the punitive construction in the rule. *Hardin*, 2023 WL 3065801, at *5.

Because FRT-15s and WOTs are not machineguns, the Government cannot succeed in its claim that Defendants conspired to unlawfully sell them.

### ii. Defendants Had No Fraudulent Indent

Moreover, the Government cannot demonstrate the requisite intent even if Defendants were wrong about the triggers' status. As mentioned, in every case a *Klein* conspiracy requires proof of "specific intent" to commit fraud. *McKee*, 506 F.3d at 239. And where the conspiracy is based on an underlying criminal act, "in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola*, 420 U.S. 671, 686 (1975). The prohibitions on the sales and transfer of machineguns, require proof that a person "knew of the features" of the device "that brought it within the scope of the Act." *Staples*, 511 U.S. at 619; *accord United States v. Kuzma*, 967 F.3d 959, 977 (9th Cir. 2020) (both 18 U.S.C. §§ 922(o) and 924(a)(2) require proof of possession of "an item that qualifies as a machinegun with knowledge of the essential characteristics that make that item a machinegun").

The Government cannot establish specific intent to defraud the ATF of the effect of the prohibition on machineguns, as Defendants consistently received ample reassurances that their trigger devices were lawful. ATF itself concluded that forced reset triggers were not machineguns

as early as 2013. And prior to selling the FRT-15, Defendants hired a series of experts to review the device and opine about its status. It obtained two expert opinions from former ATF Special Agents, one of whom was an attorney prior to selling any of the devices. It supplemented these with two more opinions after it went into production, one from another ATF Special Agent, and another from the former Acting Chief of the ATF's Firearms Technology Branch. And even after it received ATF's classification of the FRT-15, it obtained four *rebuttal* opinions from these experts. All the while, moreover, Defendants sought judicial review from a court about the status of their devices, which plainly suggests that they sought to dispel any kind of doubt. That is not proof of intent to *defraud*. Instead, this demonstrates the extensive efforts Defendants undertook to make sure they complied with the law.

### 2. The Government's Tax Evasion Theory Also Fails

The Government also briefly suggests that Defendant's conspired to avoid tax liability. ECF No. 5 at 27. As an aside, the Government insists that even if the FRT-15 was not a machinegun, "Defendants still deliberately avoiding paying the transfer tax, and making tax, that resulted in more than $32 million in taxes, plus penalties and interest, owed to the United States on the sale or disposal of their machineguns." *Id.* This is a specious argument, as the relevant tax can only be due if, in fact, the devices were machineguns. *See* 26 U.S.C. § 5801. As just discussed, the triggers were not machineguns, so no tax was owed.

Moreover, the Government's underlying tax evasion claim is likely premised on an unconstitutional theory. As the Tenth Circuit has held, because "the government will not permit the registration of machineguns covered by section 922(o), and will not accept the tax which would otherwise be required by the registration requirements of the National Firearms Act," "due process bars [any] conviction under a statute which punishes [the] failure to register when that registration

is precluded by law." *United States v. Dalton*, 960 F.2d 121, 122 (10th Cir. 1992). In other words, because one simply cannot pay the relevant tax, the crime "thus have as an essential element [one's] failure to do an act that he is incapable of performing." *Id.* at 124. Moreover, the underlying taxation requirement found in 26 U.S.C. § 5801 is itself unlawful because it is an exercise only of federal tax power, but "a provision which is passed as an exercise of the taxing power no longer has that constitutional basis when Congress decrees that the subject of that provision can no longer be taxed." *Id*. at 125; *cf. United States v. Shepardson*, 167 F.3d 120, 123 (2d Cir. 1999) ("We need not consider whether *Dalton* was correctly decided, however, because Dalton's rationale is inapplicable to a § 5861(d) prosecution for receiving or possessing a sawed-off shotgun, as the Tenth Circuit itself has held.").

Even if it was cognizable, the Government cannot prove that Defendants deliberately avoided paying a *known* tax obligation. The namesake decision for *Klein* conspiracies dealt with a conspiracy to avoid paying taxes, but the Second Circuit noted an important limit on this theory: "Mere failure to disclose income would not be sufficient to show the crime charged of defrauding the United States under 18 U.S.C. § 371." *United States v. Klein*, 247 F.2d 908, 916 (2d Cir. 1957). This is because tax evasion requires willfulness, and "the element of willfulness protects the average citizen from criminal prosecution for innocent mistakes in filing tax forms that may result from nothing more than negligence or the complexity of the tax laws. Willfulness requires the voluntary, intentional violation of a known legal duty as a condition precedent to criminal liability." *McKee*, 506 F.3d at 236. Indeed, "[w]illfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201–02 (1991). Thus, the Government must prove "that the

defendant was aware of the duty at issue, which cannot be true if the jury credits a good-faith misunderstanding and belief submission, whether or not the claimed belief or misunderstanding is objectively reasonable." *Id.* at 202.

As discussed, Defendants clearly established their good faith conclusion that their triggers weren't machineguns, with their multiple expert reports and efforts to seek a judicial determination of the issue. They didn't refuse to pay taxes they believed to have owed. Instead, they didn't pay taxes, which the government wouldn't have accepted anyway, because they genuinely and reasonably believed they were inapplicable.

**B. The Government's Allegations of Mail and Wire Fraud Also Fail**

The Government's arguments concerning wire and mail fraud follow again from its central premise that the FRT-15 was a machinegun. Indeed, the Government says that "Defendants knew that their customers would be concerned about purchasing firearms that ATF might classify as machineguns," and defrauded them by insisting that the "FRT-15 was 'absolutely not' a machinegun." ECF No. 5 at 31. It goes without saying that it is not fraud to say something that is *true. See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993) ("Allegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, and where and when they took place, and should explain why they were fraudulent.") (cleaned up). And, as discussed, the FRT-15 was not a machinegun, so the Government's theory simply cannot stand.

Sensing this outcome, the Government refrains from saying that Defendants actually lied to anyone, it instead says that "Defendants obscured key facts from their customers," because they "misrepresented the factual history of the FRT-15." ECF No. 5 at 29. In a roundabout fashion, the Government says that Defendants "misled their customers" by not informing them that a different

product had been classified as a machinegun, and that, in the Government's opinion now, that product "functions in the same way a[s] the FRT-15, and that RBT did not seek an ATF classification for the FRT-15." *Id.*

This is a curious argument as Defendants had absolutely no obligation to disclose such information, and, even if they had, Defendants were unequivocal that they were not providing legal advice about the device's status. "[A]n omission can violate the fraud statute only in the context of a duty to disclose[.]" *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000). "A nondisclosure [ ] can support a [wire] fraud charge only when there exists an independent duty that has been breached by the person so charged." *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015) (internal quotation marks omitted); *see also Chiarella v. United States*, 445 U.S. 222, 230 (1980) (holding, in a securities fraud case, that "a relationship of trust and confidence" is required to create a duty to disclose).

Defendants did not have any duty to provide legal advice about the lawfulness of their products. Indeed, it would be patently unreasonable to expect every commercial actor to provide legal assurances about their products. Without such a duty, RBT cannot have committed fraud by not dispensing such legal advice.

Regardless, RBT was remarkably transparent with its customers about the FRT-15's status. As the Government acknowledges, "Defendants explained, in great detail, why consumers should disregard ATF's classification and why consumers should believe that the FRT-15 was 'absolutely not' a machinegun." ECF No. 5 at 31. That of course, is a concession that Defendants *acknowledged* the classification. But Defendants also presented the conclusions made by their experts, and made those reports available to the public, while it also alerted customers to the ongoing litigation. It is hardly fraud for Defendants to explain why it thought ATF was wrong.

Moreover, none of the classifications had any independent legal significance anyway. As discussed, ATF classification is not a legal requirement for *anything*, and it does not result in any binding legal determination. That is why ATF seems keen on flip-flopping on classifications, as it did with its rejection of its own 2013 analysis concluding that forced reset triggers are not machineguns. It is extremely bizarre for the Government to complain that Defendants have not told the whole story to their customers when the Government does not ever acknowledge that ATF previously thought forced reset triggers were not machineguns.

But even if RBT's acts could be considered misleading, they plainly lacked the intent to defraud. *See United States v. Starr*, 816 F.2d 94, 100 (2d Cir. 1987) ("Fraudulent intent is a basic element of mail fraud."). Defendants fully apprised their customers of the ATF's position, explained why they believed the ATF was wrong, and explained in detail how the device worked and why it should be properly classified outside the relevant prohibition. They did so to let their customers make informed choices. That was not meant to defraud them—it was precisely the opposite. Thus, the Government also failed to prove requisite intent to commit fraud.

### C. The Government Cannot Show a Conspiracy to Commit Mail or Wire Fraud

The Government's arguments concerning conspiracy to commit mail or wire fraud fail for reasons already discussed. The Government simply alleges that Defendants also committed conspiracy because they agreed to commit the substantive fraud offenses discussed above. ECF No. 5 at 35. Since the Government's theory cannot establish those substantive offenses, Defendants could not have conspired to commit those crimes for the same reasons.

## IV. THE HARDSHIP TO DEFENDANTS' COUNSELS AGAINST AN INJUNCTION

When confronted with a motion for a preliminary injunction, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or

28

withholding of the requested relief." *Winter*, 555 U.S. at 24. Plaintiffs must establish that the "balance of hardships tips in their favor regardless of the likelihood of success." *Salinger*, 607 F.3d at 79–80.

As discussed, the Government makes no effort to show any harm if this Court denies an injunction. But Defendants will suffer real and irreparable losses if the injunction issues. Indeed, Defendants have been temporarily restrained from selling their trigger devices, even though they have every right to do so. They also face significant reputational harm as the Government has emphatically and publicly accused them of committing a variety of criminal offenses. If this Court were to continue to enjoin them, they would continue to suffer these losses, but have no recourse against the Government should they ultimately prevail in this litigation. These harms are irreparable and counsel against a preliminary injunction. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("loss of reputation, good will, and business opportunities" was irreparable harm).

## V. THE PUBLIC INTEREST COUNSELS AGAINST AN INJUNCTION

The Government also ignores the public interest, apparently assuming that it must favor its actions here. But as the Supreme Court recently noted, a court does not "weigh [] tradeoffs" between putative benefits of invalid government action and harms faced by a party challenging that action. *NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022). Put another way, it is in the public interest to require the Government to follow the law. *See Valle del Sol Inc. v. Whiting,* 732 F.3d 1006, 1029 (9th Cir. 2013*)* ("it is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available") (cleaned up). As discussed, Defendants have adhered to the law, and sold a lawful product after taking significant measures to make certain that the triggers they sold were not

machineguns. The public interest is not served, however, by granting the ATF unbridled discretion to deem a product unlawful *despite* the law written by Congress.

## VI. THE REMEDIES SOUGHT BY THE GOVERNMENT ARE IMPROPER

Finally, even if this Court entered an injunction, it must not accept the Government's invitation to enter a punitive order beyond its equitable powers. Without any analysis, the government says that its "proposed preliminary injunction is well within the expansive spectrum of remedies available under Section 1345." ECF No. 5 at 36. It then requests an injunction that, among other things, "requires that Defendants assist in identifying, locating, and recovering all FRT-15s and Wide Open Triggers that have not yet been recovered;" "require that Defendants pay restitution to any person who purchased an FRT-15 or Wide Open Trigger; and" "require an accounting by an independent entity—paid for by Defendants—concerning Defendants' manufacture, possession, receipt, transfer, and/or sale of FRT-15s, Wide Open Triggers, forced reset triggers, and/or machinegun conversion devices, and components thereof to assist in determining the amount of unpaid taxes owed to the Government and money owed to individual consumers[.]" *Id.* at 37. None of these proposed remedies are permitted, even after a full adjudication on the merits.

As discussed, an injunction is a traditional equitable form of relief. But as such, it is limited in scope by traditional practice. *Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549, 556 (3d Cir. 2019) ("unless Congress clearly states an intention to the contrary, statutory injunctions are governed by the same established principles of equity that have developed over centuries of practice"). "The historic injunctive process was designed to deter, not to punish." *Hecht*, 321 U.S. at 329. A "court may not by injunction interfere for purposes of punishment, or compel persons to do right but may only prevent them from doing wrong." *Gentile*, 939 F.3d at 556 (cleaned up).

Injunctions may only be forward looking and cannot aim to punish past conduct. *Id.* Indeed, when a statute allows preliminary injunctions for alleged violations, "the exercise of a court's equitable discretion … [is] to order relief that will achieve *compliance* with the Act," not unconnected relief. *See Romero-Barcelo*, 456 U.S. at 318. As the Supreme Court recently said, "An 'injunction' is not the same as an award of equitable monetary relief." *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1347 (2021). Injunctions offer "prospective relief against ongoing or future harm," which is distinct from "restitution," which "offers retrospective relief to redress past harm." *Id.* (citations omitted). "The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured." *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952).

Further, "in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972) (citing *Hecht*, 321 U.S. at 328–30). The "harsh effects," of an "injunction demand that it not be imposed lightly or as a matter of course, that it be imposed only upon a meaningful showing of necessity, and when it is imposed, that it be as short and narrow as reasonably possible." *Gentile*, 939 F.3d at 559. An injunction should also "not be obtained against one acting in good faith." *Id.* (citation omitted). "A preventive injunction must be justified by a substantial showing of threatened harm, assuring the court that the opprobrium and other collateral consequences that accompany it are outweighed by a demonstrated public need; retribution is not a proper consideration to support this showing." *Id.*

If this Court were to conclude that an injunction was necessary, it must be carefully tailored to forbid only future conduct at issue—selling the FRT-15 or WOT. The government's additional demands for "restitution," "an accounting by an independent entity—paid for by Defendants," and even the affirmative obligation to "assist in identifying, locating, and recovering all FRT-15s and Wide Open Triggers that have not yet been recovered," go well beyond the bounds of permissible equity practice related to an injunction. They should be rejected out of hand.

Of course, if the Government were able to obtain these additional penalties against Defendants beyond a forward-looking injunction, then Defendants would be entitled to a jury trial concerning the allegations against them under the Seventh Amendment. *See Tull v. United States*, 481 U.S. 412, 421, 424−25 (1987) (penalty offenses brought by the government must be tried before a jury); *Fed. Trade Comm'n v. Quincy Bioscience Holding Co.*, No. 17 CIV. 124 (LLS), 2021 WL 1608953, at *2 (S.D.N.Y. Apr. 26, 2021) (the defendants had Seventh Amendment right to a jury trial to defend action seeking "restitution" and "civil penalties"). Such remedies could not be imposed by this Court, sitting in equity, at a preliminary stage of this case. *See id.* Rather than threaten the Seventh Amendment protections and flout the rules of equity practice, this Court should deny the Government's expansive request for relief.

## CONCLUSION

This Court should deny the request for a preliminary injunction entirely.


Respectfully submitted this 28th day of April 2023.

  s/  Caleb Kruckenberg
CALEB KRUCKENBERG
D.C. No. 1617890
*Admitted Pro Hac Vice*
Pacific Legal Foundation
3100 Clarendon Blvd.

Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
CKruckenberg@pacificlegal.org

 s/  Jonathan M. Houghton
JONATHAN M. HOUGHTON
E.D. N.Y. ID No. JH 5334
N.Y Bar No. 2955326
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA  22201
Telephone:  (916) 419-7111
Facsimile:  (916) 419-7747
JHoughton@pacificlegal.org

STEVEN M. SIMPSON*
D.C. Bar No. 462553
Pacific Legal Foundation
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
CKruckenberg@pacificlegal.org
SSimpson@pacificlegal.org

*Attorneys for Defendant Rare Breed Triggers, LLC*

## AFFIRMATION OF SERVICE

I, Caleb Kruckenberg, declare under penalty of perjury that I filed the foregoing with the

Clerk of the Court of the Eastern District of New York though the CM/ECF system, which will

serve notice of said filing on all counsel of record.

  s/  Caleb Kruckenberg
CALEB KRUCKENBERG*