UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

              Plaintiff,

  - v. -

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DeMONICO; KEVIN MAXWELL,

             Defendants.

Civil Action No. 23-cv-369
(Morrison, J.)
(Levy, M.J.)

 

**THE UNITED STATES OF AMERICA'S
REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR
A PRELIMINARY INJUNCTION**

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East, 7th Floor
Brooklyn, New York 11201

May 8, 2023

Michael S. Blume
Joseph A. Marutollo
Paulina Stamatelos
Assistant United States Attorneys
(Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ..................................................................................................................... 3

    I.       While the United States Need Not Show Irreparable Harm, the United States
            Will Suffer Irreparable Injury Absent the PI ................................................. 3

    II.     The United States Need Only Show Probable Cause to Obtain the PI, and
            Irreparable Harm is Presumed ...................................................................... 6

    III.   While Not Required, the United States Has Already Demonstrated a
            Likelihood of Success .................................................................................. 8

    A.    The FRT-15 is Illegal ................................................................................... 8

    B.    Defendants are Engaged in a *Klein* Conspiracy ............................................. 10

    C.    Defendants are Engaged in a Conspiracy to Commit Mail and Wire Fraud ... 13

    IV.   The Proposed PI is the Proper Form of Equitable Relief and No Jury Trial is
            Necessary .................................................................................................... 13

CONCLUSION ................................................................................................................. 15

## **TABLE OF AUTHORITIES**

## **CASES**

*AMG Capital Management, LLC* v. *FTC*, 141 S. Ct. 1341 (2021) ....................................15

*Aposhian v. Barr*, 958 F. 3d 969 (10th Cir.) *vacated on reh'g,* 973 F. 3d 1151 (10th Cir. 2020)
   *reinstated,* 989 F. 3d 890 (10th Cir. 2021)..........................................................................9

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023)............................................................8, 9, 10

*City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115 (2d Cir. 2010)...........................7

*Coronel v. Decker*, 449 F. Supp. 3d 274 (S.D.N.Y. 2020) (Nathan, J.)...............................3, 4

*Department of Revenue of Montana v. Ranch*, 511 U.S. 767 (1994)....................................12

*eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006).......................................................6, 7

*FTC v. Bronson Partners, LLC*, No. 3:04-CV-1866 (SRU), 2006 WL 197357
   (D. Conn. Jan. 25, 2006) ..................................................................................................15

*FTC v. Think All Publ'g L.L.C.*, 564 F. Supp. 2d 663 (E.D. Tex. 2008) ............................15

*Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014) ..............................................14

*Guedes v. ATF,* 920 F. 3d. 1 (D.C. Cir. 2019) .....................................................................9

*Gun Owners of Am., Inc. v. Garland,* 19 F.4th 890 (6th Cir. 2022) ....................................10

*Harden v. ATF*, ____ F.4th ____, 2023 WL 3065807 (6th Cir. 2023) ...............................9

*Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181 (E.D.N.Y. 2000) (Johnson, J.),
   *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003).........................3

*Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936 (2020)....................................................14, 15

*Luis v. United States*, 578 U.S. 5 (2016)..............................................................................6

*Rare Breed Triggers, LLC v. Garland*, No. 21-1245 (M.D. Fla.)........................................11

*Shamrock Power Sales, LLC v. Scherer*, 2016 WL 6102370 (S.D.N.Y. Oct. 18, 2016)....................14

*United States v. Ardoin*, 19 F.3d 177 (5th Cir. 1994) ..........................................................12

*United States v. Connolly*, 2019 WL 2125044 (S.D.N.Y. 2019) .........................................13

*United States v. Dalton*, 960 F.2d 1212 (10th Cir. 1992) ...................................................12

*United States v. Fang,* 937 F. Supp. 1186 (D. Md. 1996) ...................................................................7

*United States v. Gresham*, 118 F.3d 258 (5th Cir. 1997)..........................................................12, 13

*United States v. Grier*, 354 F.3d 210 (3rd Cir. 2003)......................................................................12

*United States v. Jones*, 976 F.2d 176 (4th Cir. 1992) .....................................................................12

*United States v. Miscellaneous Firearms and Related Parts and Equipment,*
    No. 23-CV-17 (D. Utah) ..........................................................................................................12

*United States v. Monsanto*, 491 U.S. 600 (1989)...............................................................................7

*United States v. Narco Freedom, Inc.,* 95 F. Supp. 3d 747 (S.D.N.Y. 2015)..................................7, 14

*United States v. Palumbo*, 448 F. Supp. 3d 257 (E.D.N.Y. 2020) (Komitee, J.) ...............3, 14

*United States v. Savran*, 755 F. Supp. 1165 (E.D.N.Y. 1991)........................................................3, 14

*U.S. v. Shepardson*, 167 F.3d 120 (2d Cir. 1999) ...........................................................................12

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008) ..............................................................6, 7

## <u>STATUTES</u>

18 U.S.C. § 371 ...................................................................................................................................1

18 U.S.C. § 922(o) .........................................................................................................................2, 12

18 U.S.C. § 1341 .................................................................................................................................2

18 U.S.C. § 1343 .................................................................................................................................2

18 U.S.C. § 1344 ...............................................................................................................................15

18 U.S.C. § 1345........................................................................................... 1, 2, 3, 6, 7, 13, 14, 15

18 U.S.C. § 1345(b) ..........................................................................................................................14

18 U.S.C. § 1349 .................................................................................................................................2

26 U.S.C. § 5801 ...............................................................................................................................12

26 U.S.C. § 5821 ...............................................................................................................................12

26 U.S.C. § 5841(b) ..........................................................................................................................12

26 U.S.C. § 5845(b) ............................................................................................................................9

## <u>REGULATIONS</u>

27 CFR § 478.11 ........................................................................................................... 9

27 CFR § 479.11 ........................................................................................................... 9

## <u>MISCELLANEOUS</u>

https://apnews.com/article/gun-violence-science-health-covid-mental-
20f5e2cb5fb50ff747fe316fdc4db5c4 ......................................................................... 4

https://apnews.com/article/mass-shooting-san-jacinto-county-texas-
395d6d7501f6a3f53aeccbb00ec5fbaf ......................................................................... 1

https://www.cnn.com/us/live-news/allen-texas-mall-shooting-news-05-07-23/index.html .......... 1

https://www.gunviolencearchive.org/reports/mass-shooting ......................................... 1

## PRELIMINARY STATEMENT

Make no mistake: immediate and irreparable harm will result to the United States and to the public at large absent a preliminary injunction (PI). Should the Court not issue a PI, Defendants will resume flooding the marketplace with *thousands* more machinegun conversion devices—to anyone, anywhere, without the ability of any government agency to keep track of them—at a time when gun violence continues to be an epidemic across the nation. The United States need not establish such harm to obtain a PI under the Anti-Fraud Injunction Act, 18 U.S.C. § 1345, but it has done so nonetheless to show the impact that the Defendants' sale of illegal products has on public safety. Notably, in the 110 days since the United States filed its Complaint and Motion for a temporary restraining order (TRO) and PI on January 19, 2023, there have been at least *150* mass shootings across the United States.[1] Recently, on Friday, April 28, 2023, an individual used an AR-15-style rifle to kill five of his neighbors, including an eight-year old child.[2] Only days later, on Saturday, May 6, 2023, another individual used an AR-15-style rifle to kill at least eight people and wound sever more in a massacre at a mall; victims ranged in age from 5 to 61 years old.[3] Defendants' FRT-15 render AR-15 style rifles even more lethal, and pose a still greater risk to the life, health, and safety of countless Americans.

The United States brought this action because Defendants have conspired to defraud the United States by illegally selling machinegun conversion devices in violation of 18 U.S.C. § 371.

---

[1] *See* https://www.gunviolencearchive.org/reports/mass-shooting. The Gun Violence Archive uses a purely statistical threshold to define mass shooting based only on the numeric value of four or more people that were shot or killed, not including the shooter.

[2] *See Texas mass shooting suspect could be anywhere, sheriff says*. Juan A. Lozano and Paul J. Weber, Associated Press, April 30, 2023, at https://apnews.com/article/mass-shooting-san-jacinto-county-texas-395d6d7501f6a3f53aeccbb00ec5fbaf.

[3] *See At least 8 killed, 7 wounded in shooting at Texas outlet mall*, Maureen Chowdhury, Mike Hayes and Matt Meyer, CNN, May 7, 2023, at https://www.cnn.com/us/live-news/allen-texas-mall-shooting-news-05-07-23/index.html.

Defendants have also defrauded, and conspired to defraud, purchasers of these devices in violation of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343 and 1349.  On January 25, 2023, following an *ex parte* hearing, the Court issued a TRO.  *See* Dkt. 11.  The PI hearing is currently scheduled for July 18, 2023.

In their April 28, 2023 opposition to the United States' PI motion, Defendants argue that the United States misstates the standard for a PI; in their view, the United States must also show a likelihood of success on the merits and proof of irreparable harm.  Next, Defendants argue that the United States has not proven that it will suffer any irreparable injury absent a PI.  Defendants also argue that the United States cannot establish a likelihood of success on the merits since, in Defendants' view, their devices are not machineguns and, alternatively, they believed that their sale of these devices was lawful.  Finally, Defendants argue that the hardship to Defendants and the public interest counsels against a PI, and that the United States' proposed remedies are improper.  *See* Dkt. 50.

None of Defendants' arguments is persuasive.  Contrary to Defendants' arguments, recent caselaw in the Supreme Court and the Second Circuit make clear that, because § 1345 authorizes a statutory injunction sought by a government enforcement body, a PI pursuant to its terms can be entered based on probable cause and without a separate showing of irreparable harm.

Further, even if the Court determines that the United States needs to show a likelihood of success on the merits, the United States has more than done so.  The FRT-15 is a machinegun.[4] Debates about bump stocks and the ATF's regulatory authority do not change the basic fact that a shooter who initiates the firing cycle of a weapon equipped with an FRT-15 by applying rearward

---

[4] The Defendants sold both FRT-15s and Wide Open Triggers (WOTs).  They are, for all purposes, the same product. Both are illegal.  *See* 18 U.S.C. § 922(o).  For ease of reference, throughout this brief, the United States will identify them as "FRT-15s."

pressure on the trigger will ensure that the cycle continues so long as he maintains rearward pressure on the trigger.  That is the very statutory definition of a machinegun.

Nor do such debates change the facts that the Defendants hid their products from the ATF, threatened the ATF when it tried to stop the sale of the products, obstructed an ATF search warrant, or misled their customers about the legality of those products.

Finally, Defendants fail to show that the proposed PI is inappropriate, as neither hardship to Defendants nor the public interest counsels against the PI.  Further, the proposed remedies are proper and can be issued by this Court.

## **ARGUMENT**

### I.   **While the United States Need Not Show Irreparable Harm, the United States Will Suffer Irreparable Injury Absent the PI**

As set forth in the United States' January 19, 2023 Motion and further below, the United States does not need to show irreparable harm to obtain a PI under § 1345.  *See e.g.*, *United States v. Palumbo*, 448 F. Supp. 3d 257, 261 (E.D.N.Y. 2020) (Komitee, J.) ("Unlike in the usual preliminary injunction case, proof of irreparable harm is presumed under Section 1345 where the statutory conditions are met.").

Nonetheless, such harm will indeed result to the public at large absent the PI.  *See, e.g., United States v. Savran*, 755 F. Supp. 1165, 1180 (E.D.N.Y. 1991) (holding that even though irreparable harm is not required, it had been shown, and weighed in favor of issuance of the preliminary injunction).  Irreparable harm exists where, as here, the general public faces "imminent risk to their health, safety, and lives." *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 214 (E.D.N.Y. 2000) (Johnson, J.) (citation omitted), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003); *see also Coronel v. Decker*, 449 F. Supp. 3d 274, 281-82 (S.D.N.Y. 2020) (Nathan, J.)

(explaining that imminent risk to life, health or safety is an irreparable harm).  In short, without a PI, Defendants will be able to resume their sales of illegal and dangerous machinegun conversion devices at a time when gun violence remains a nationwide epidemic.[5]

Defendants argue that "any harm would *not* be irreparable" because the United States can seek redress later in this litigation, including via restitution.  *See* Dkt. 50 at 17.  But Defendants continue to fundamentally ignore the danger inherent in the product at issue.  When an FRT-15 is fitted into a firearm, the firearm can fire at a rate that meets or exceeds an originally manufactured military specification M-16-type machinegun, which can fire 700 to 970 rounds per minute depending on the configuration.  Allowing these machinegun conversion devices to flood the streets will put additional human lives at risk.

What is more, Defendants have said that they *have no idea* where the FRT-15s go after they are sold, including via third-party sellers.  *See* March 17, 2023 Transcript at 48 (Defendants' attorney states that there is "no normal tracking system" once the FRT-15s are placed into the "stream of commerce.").[6]  Records from Defendants' payment processing company tell an even more disconcerting story.  For instance, RBT customers have told Defendants that their FRT-15 purchases were "lost" or "stolen."  *See* Exhibit A.  When an FRT-15 customer asked to return FRT-15s, Defendants encouraged him to re-sell them on gunbroker.com.  *See* Exhibit B.

Now in the marketplace, unregistered and untracked, there is no feasible way to retrieve most, certainly not all, of the FRT-15s that Defendants sold.  ATF is actively attempting to retrieve

---

[5] In 2021, the U.S. gun death rate hit its highest mark in nearly three decades.  *See, e.g. Study: U.S. gun death rates hit highest levels in decades*, Mike Stobbe, Associated Press, November 29, 2022, at https://apnews.com/article/gun-violence-science-health-covid-mental-20f5e2cb5fb50ff747fe316fdc4db5c4.

[6] Indeed, FRT-15s are not in the National Firearms Registration and Transfer Record (NFRTR).  Thus, if an unregistered firearm using an FRT-15 is involved in a crime, it will be difficult for ATF to quickly ascertain the identity of the possessor using the NFRTR.  *See* Government's Compl. Dkt. 1 at ¶ 34.

more than 8,000 FRT-15s sold by Defendants and a customer of Defendants.  *See* Exhibit C, Declaration of ATF Special Agent Cheryl Harrell, at ¶¶ 6-10.  Defendant's shipments just from November 28, 2022, though January 16, 2023, involved customers in 47 U.S. states and territories.  *Id.* at 2.  Such efforts are Herculean in scope, requiring the expenditure of thousands of working hours across all 25 ATF Field Divisions.  *Id.* at ¶¶ 15-17.  Indeed, ATF's Tampa Field Division alone has expended over 4,500 working hours on the effort, which represents the recovery of only a fraction of the devices sold by Defendants.  *Id.* at ¶¶ 6, 15.  These retrieval efforts are not simple.  ATF must first a conduct risk-based assessments of each identified potential recipient to prioritize ATF's efforts, mitigate risk to the public, and ensure the safety of ATF personnel tasked with conducting the retrievals.  *Id.* at ¶¶ 12-13.  The results so far have been alarming.  ATF has identified 164 recipients who required prioritized retrievals, including individuals who have been convicted of one or more felonies.  *Id.* at 14.  These retrieval efforts also expose ATF personnel to significant danger.  ATF Special Agents must recover FRT-15s from individuals who may now be armed with illegally converted fully automatic machineguns that are only in the marketplace because Defendants illicitly distributed them.  *Id.* at ¶ 20.  ATF has also observed multiple abhorrent threats against ATF Special Agents related to these efforts.  *Id.* at ¶¶ 21-24.

The public interest here makes clear, as well, that any balancing of the harms will weigh in favor of the Government, and not the Defendants.

Ultimately, Defendants sold the FRT-15s without any regard to where they were going or who was going to use them.  No amount of monetary relief can reverse that harm.  The Defendants cannot, and must not, be permitted to inundate the marketplace with these dangerous machinegun conversion devices.

II.     **The United States Need Only Show Probable Cause to Obtain the PI, and Irreparable Harm is Presumed**

Defendants' argument that *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008) and *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006) alter the elements that the Government must satisfy to obtain injunctive relief under § 1345 is incorrect.  While *Winter* and *eBay* set what might be called a default rule for injunctive relief, that rule is not all encompassing and does not include statutory injunctions obtained by a government enforcement body.  As the Government here is seeking a § 1345, neither *Winter* nor *eBay* set the standard for obtaining an injunction.

That the probable cause standard remains appropriate in a § 1345 injunction can be seen in the Supreme Court's decision in *Luis v. United States*, 578 U.S. 5 (2016), a case decided after *Winter* and *eBay*.  There, the Supreme Court reviewed a § 1345 injunction that restrained a defendant's ability to use assets not traceable to an underlying crime to pay for an attorney.  The district court had granted the injunction based on probable cause.  Although the Supreme Court held that the injunction violated the defendant's Sixth Amendment right to counsel of her choice, nowhere did the Court exhibit any disagreement with the district court's use of a probable cause standard to impose the restraint in the first place.  To the contrary, the Court noted that district courts crafting § 1345 injunctions that restrained assets would thereafter need to distinguish between tainted funds and innocent funds and that, in so doing, the courts could employ a probable cause standard.  *See id*. at 22-23.

It is no wonder that a probable cause standard governs § 1345 restraints.  Section 1345 rests on criminal statutes.  An individual defendant can be restrained based on a finding of probable cause that he has committed a crime.  Thus, as the Supreme Court stated, "it would be odd to conclude that the Government may not restrain property, such as the home and apartment in

respondent's possession, based on a finding of probable cause, when we have held that (under appropriate circumstances), the Government may restrain *persons* where there is a finding of probable cause to believe that he accused has committed a serious offense." *United States v. Monsanto*, 491 U.S. 600, 615-16 (1989) (addressing forfeiture statutes) (emphasis in original).[7]

Nor do *Winter* and *eBay* require that the Government make a showing of irreparable harm in support of a § 1345 injunction. The Second Circuit made that clear in *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115 (2d Cir. 2010), a case decided subsequent to *Winter* and *eBay*. There, the Second Circuit addressed state and federal statutes that authorized injunctive relief for the violation of statutes governing the sale of cigarettes. It noted that, by making certain conduct unlawful, Congress and the state legislature had already determined that such conduct was harmful to the public. *See id*. at 121. The court held that "[r]equiring a party seeking a statutorily-sanctioned injunction to make an additional showing of irreparable harm, therefore, is not required." *Id*. A district court in the Southern District of New York came to the same conclusion when dealing with a § 1345 injunction. *See United States v. Narco Freedom, Inc.,* 95 F. Supp. 3d 747, 754-55 (S.D.N.Y. 2015). After citing *Winter*, the court went on to say that "when, as here, a statute authorizes the government to seek preliminary injunctive relief but does not specifically require proof of irreparable harm, no such showing is required." *Id*. at 754.

---

[7] At the preliminary injunction stage at least, the difference between a probable cause standard and a traditional preliminary injunction standard "may be more apparent that real." *United States v. Fang*, 937 F. Supp. 1186, 1196 (D. Md. 1996). There may not be a functional difference between a showing of a likelihood of success on the merits and a showing of probable cause. *See id*. at 1196-97.

7

III.    **While Not Required, the United States Has Already Demonstrated a Likelihood of Success**

A.    **The FRT-15 is Illegal**

The Defendants' discussion of bump stocks and *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) is a red herring.  The FRT-15 is not a bump stock.  Bump stocks are different products that function differently.  To better understand how they work, one can start by comparing a bump stock to a semi-automatic weapon.  In a semi-automatic weapon, when a shooter pulls the trigger, the trigger initiates a firing cycle.  That cycle ceases after a single round has been expelled from the weapon.  It ceases even if the shooter maintains constant rearward pressure on the trigger itself.  That is because of the design of a semi-automatic trigger itself; it will remain locked until the shooter fully releases rearward pressure on it.  Only then can the shooter re-initiate the firing cycle.

A bump stock modifies the weapon by replacing that part of the weapon that rests against a shooter's body.  The modification enables the shooter to initiate a continuous firing cycle in response to a single pull of the trigger.  A bump stock, however, makes no change to the trigger itself.  A bump stock will enable a continuous firing cycle in a weapon equipped with a standard semi-automatic trigger.

Therein lies the difference between a bump stock and the FRT-15.  The FRT-15 completely replaces the standard semi-automatic trigger; it changes the trigger itself to allow a continuous firing cycle once the shooter initiates that cycle.  Whether a bump stock is a machinegun conversion device thus has no bearing whatsoever on whether an FRT-15 is such a device.

As described in the Government's Complaint, *see* Dkt. 1 at ¶¶ 46-47, 117-21; the Declaration of Special Agent Daniel Koneschusky, *see* Dkt. 7 at ¶¶ 50-52 and Exhibits F, J, M, and P; and the Expert Report of Firearms Enforcement Officer, *see* Exhibit D, in a weapon equipped with an FRT-15, once the trigger has performed its single function of initiating the firing

8

cycle, an FRT-15 ensures that the cycle will continue as long as the shooter maintains rearward pressure on the trigger.  Put in statutory terms, the FRT-15 turns a weapon into one that shoots "automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).[8]  Although designed differently, the FRT-15 acts just as a trigger in an originally manufactured military specification M-16 machinegun acts.  That is, in both cases, a shooter who initiates the firing cycle—just once—by applying rearward pressure on the trigger will ensure that the cycle continues so long as he maintains rearward pressure on the trigger.  In both cases, the firing cycle will cease only if the shooter ceases such rearward pressure (or the weapon runs out of ammunition or malfunctions).

For these reasons, *Cargill* is inapplicable here.  First, as noted, *Cargill* dealt with bump stocks, not the FRT-15.  Second, much of *Cargill* addressed the validity of the regulation that defines "single function of the trigger" as a single pull of the trigger and analogous motions.  See 27 C.F.R. §§ 478.11, 479.11.  There is no need for this Court to address that issue, as it need only look to the statute itself to see that an FRT-15 is a machinegun conversion device.  In any event, the regulation adopts the natural, plain English interpretation of the statutory language; nothing about the regulation suggests that ATF stepped outside of its proper administrative role or that this Court can only apply the rule if it accords ATF some deference.  *See* Dkt. 5 at pp. 2-5.[9]  Third and

---

[8] At the preliminary injunction hearing in this matter, the United States intends to present testimony from an ATF representative that will detail how the FRT-15 works and why it is a machinegun conversion device. The United States will welcome the opportunity to arrange for the Court to a fire a weapon modified with an FRT-15, a weapon equipped with a standard semi-automatic trigger, and a weapon equipped with a standard military specification machinegun trigger.

[9] Two federal circuits have upheld the regulation that *Cargill* invalidated.  *See Aposhian v. Barr*, 958 F.3d 969, 984-89 (10th Cir.), vacated on reh'g, 973 F.3d 1151 (10th Cir. 2020), reinstated, 989 F.3d 890 (10th Cir. 2021); *Guedes v. ATF*, 920 F.3d 1, 28-32 (D.C. Cir. 2019).  One other federal circuit held that the statutory definition of "machinegun" did not encompass bump stocks, per the rule of lenity, but it did no go so far as to invalidate the regulation.  *See Hardin v. ATF*, ___ F. 4th ___, 2023 WL 3065807 (6th Cir. 2023).  The Sixth Circuit panel decision was subsequent to an *en banc* decision of the circuit in which the

9

finally, the rule of lenity, much discussed in *Cargill*, has no role to play here because the traditional tools of statutory interpretation demonstrate that the FRT-15 is a "machinegun" under the best reading of the statutory definition. *See id.*[10]

### B. Defendants are Engaged in a *Klein* Conspiracy

What is notable about Defendants' responsive brief is not what they say, but what they do not say. Defendants do not dispute that they knew that ATF had classified the AR1 – the forerunner to the FRT-15, which was designed by the same company that designed the FRT-15 – as a machinegun. They do not dispute that, even with their knowledge of the AR1, they did not submit the FRT-15 for classification but chose, instead, to sell as many FRT-15s as they could. They do not dispute that a phone call from Defendant Maxwell's office threatened ATF with a "rocket launcher." They do not dispute that Defendant DeMonico interfered with the ATF's investigation of FRT-15s by storming onto the 3rd Gen facility to take FRT-15s that 3rd Gen had set aside to hand over to ATF pursuant to a search warrant. And they do not dispute that they shipped WOTs in packages labeled "Red Beard Treasures" to prevent ATF and other government agencies from learning that they were continuing to sell illegal products.

---

court was equally divided between those judges who would have upheld the regulation and those who would have invalidated it. *See Gun Owners of Am., Inc. v. Garland*, 19 F. 4th 890 (6th Cir. 2022).

[10] The ATF has not changed its position on forced reset triggers, as the Defendants claim. They point to the 3MR Trigger as singular support for that claim. But as the Government will show at the preliminary injunction hearing, the 3MR does not act like the FRT-15. In a weapon equipped with a 3MR, and unlike one equipped with an FRT-15, after a shooter initiates a firing cycle, that cycle will cease once the weapon expels a single round, *even if the shooter maintains rearward pressure on the trigger*. Continuous rearward pressure on a 3MR will not create a continuous cycle of firing. The weapon stops firing. Tellingly, none of the expert reports that the Defendants claim to have relied on as they sold the FRT-15 mentions the 3MR, let alone asserts that the ATF's classification of the 3MR has any bearing at all on the legality of the FRT-15. *See* Dkt. 23-1 Attachments B-E. Put another way, not all forced reset triggers are the same. And, since at least 1975, in every single instance in which the ATF classified a forced reset trigger that acted like the FRT-15, it classified the trigger as a "machinegun" under the relevant law.

Taken singly or as a whole, that conduct frustrated the ATF's ability to carry out its lawful government functions.  It frustrated any effort by the ATF to learn that the Defendants were selling FRT-15s to the American public and to stop them from doing so.  That is precisely what constitutes a *Klein* conspiracy.

That Defendants solicited the opinions of outside experts about the legality of the FRT-15 does not negate their intent to engage in a *Klein* conspiracy.  The primary issue in Defendants' *Klein* conspiracy is their intent to interfere with the ATF.  Regardless of whether Defendants believed that the FRT-15 was legal, they still intentionally undertook steps to stop the ATF from doing its job.

Nor do Defendants' lawsuits concerning the FRT-15 negate their intent.  To the contrary – their lawsuits show that the Defendants had no real intention of obtaining judicial review of the legality of the FRT-15; rather, they wanted to sell as many FRT-15s as they could without the ATF getting in the way.  Their lawsuits began with an effort, in Florida, to overturn ATF's classification of the FRT-15 as a machinegun.  *See Rare Breed Triggers, LLC v. Garland*, No. 21-1245 (M.D. Fla.).  When the court made it clear that the case was not going their way, the Defendants abandoned it.  They initiated a similar suit in North Dakota.  *See Rare Breed Triggers, LLC v. Garland*, No. 22-85 (D. N. Dak.).  That case was dismissed as having been filed in an improper venue.  Defendants have not re-filed any similar suit.

Compare Defendants' half-hearted attempts to have a court rule on the legality of the FRT-15 with their enthusiastic and aggressive litigation to stop competitors from selling FRT-15 knockoffs, like the WOTs.  The Defendants wanted the lucrative market for their products all to themselves, and they have litigated at least five cases in three states to achieve it.  Their priority

was selling, whether a court ruled on their product or not.  Those are not the actions – or the intent – of parties who wanted to comply with the law.[11]

Defendants' reliance on *United States v. Dalton*, 960 F.2d 1212 (10th Cir. 1992) to argue that they are not subject to the registration and taxation requirements of the National Firearms Act and the Gun Control Act is inapt, both because its reasoning has been rejected by the majority of Circuits to have considered it, and because it is factually inapposite to Defendants' conduct.  *See e.g.*, *United States v. Grier*, 354 F.3d 210, 215 (3rd Cir. 2003) ("The six circuits that have rejected *Dalton*'s view on the FOPA's implicit repeal of the NFA have also rejected *Dalton's* position that the NFA lacks a constitutional basis for the enactment of § 922(o)); *United States v. Gresham*, 118 F.3d 258, 262-264 (5th Cir. 1997) (disagreeing with *Dalton*); *United States v. Ardoin*, 19 F.3d 177, 179-180 (5th Cir. 1994) (same); *United States v. Jones*, 976 F.2d 176, 182-184 (4th Cir. 1992) (same); *see also U.S. v. Shepardson*, 167 F.3d 120, 123-124 (2d Cir. 1999) (recognizing the disagreement with *Dalton* is several circuits)  Here, unlike the defendant in *Dalton*, the Defendants do not receive firearms; they make firearms.  As such, they can—and must—pay a special occupation tax, *see* 26 U.S.C. § 5801, register any firearm that they make, *see* 26 U.S.C. § 5841(b), and pay a tax on each firearm they manufacture, *see* 26 U.S.C. § 5821.  Further, the Supreme Court has long recognized that the unlawfulness of an activity does not prevent its taxation.  *See e.g.*, *Department of Revenue of Montana v. Ranch*, 511 U.S. 767, 778 (1994).  And, as the Court in *Gresham* points out, "[if] the registration of [a] weapon is legally impossible … the defendant can comply with the registration requirement by not taking unlawful possession of an illegal weapon."

---

[11] In fact, as recently as April 10, 2023, Defendant Rare Breed Triggers filed papers in a forfeiture case seeking the return of the FRT-15s and components parts seized by ATF during its search of 3rd Gen Machine.  *See United States v. Miscellaneous Firearms and Related Parts and Equipment*, No. 23-CV-17 (D. Utah).  The Government has no doubt that, if they obtain these items, Defendants will sell them the minute that they are able.

*Gresham*, 118 F.3d at 263.  Here, Defendants could have complied with the law, by not illicitly manufacturing, possessing, and distributing machinegun conversion devices.

### C.    Defendants are Engaged in a Conspiracy to Commit Mail and Wire Fraud

Defendants misled their customers.  As Defendants seem to acknowledge, when they began selling the FRT-15, they did not tell their customers about the AR1; they did not tell their customers that the ATF had classified the AR1 as a machinegun; and they did not tell their customers that they had not sought an ATF classification for the FRT-15.[12]  Omitting these critical facts—but touting the views of outside consultants—left the Defendants' customers with the impression that the FRT-15 was legal.  That is a misleading half-truth.  At bottom, Defendants engaged in a misrepresentation under the mail and wire fraud statutes. *See, e.g., United States v. Connolly*, 2019 WL 2125044 at *7 (S.D.N.Y. 2019).

### IV.    The Proposed PI is the Proper Form of Equitable Relief and No Jury Trial is Necessary

Defendants argue they should not face any consequences for their illegal conduct beyond a prohibition against future sales of FRT-15s as any additional remedies would "punish" Defendants for past conduct, which is not permissible in an equity court. *See* Dkt. 50 at 32, 31. But under longstanding precedent and § 1345's expansive grant of equitable authority, this Court has the power to order the injunctive relief sought by the Government.[13]

By its terms, § 1345 provides the Court with broad equitable authority to "enter such a restraining order or prohibition, *or take such other action*, as is warranted to prevent a continuing

---

[12] After the ATF had served a cease-and-desist letter on them, the Defendants finally acknowledged that they had never sought an ATF classification of the FRT-15.   And as far as the Government is aware, they still have not revealed to their customers the relationship between the AR1 and the FRT-15.

[13] Indeed, much of the relief sought by the United States is forward looking – the recovery of FRT-15s and Defendants' assistance in aiding that recovery.

and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." *See* 18 U.S.C. § 1345(b) (emphasis supplied). Courts have uniformly recognized that authority in fashioning § 1345 injunctions. *See, e.g., United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 761 (S.D.N.Y. 2015) ("Section 1345 affords the Court broad equitable authority."); *United States v. Palumbo*, 448 F. Supp. 3d 257, 265 (E.D.N.Y. 2020) (Komitee, J.) (accord); *United States v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1182 (E.D.N.Y. 1991) (accord).

Courts exercising their equity powers have long entered injunctions that are both forward- and backward-looking. Relevant here, for instance, is the centuries-old practice in equity of requiring an accounting of ill-gotten gains and restitution or disgorgement of those gains in favor of a perpetrator's victims. *See, e.g., Shamrock Power Sales, LLC v. Scherer*, 2016 WL 6102370, at *6 (S.D.N.Y. Oct. 18, 2016) (citing *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 131 (2d Cir. 2014) ("the ancient remedies of accounting, constructive trust, and restitution have compelled wrongdoers to 'disgorge'—*i.e.,* account for and surrender—their ill-gotten gains for centuries")).

It is a practice that the Supreme Court specifically endorsed in *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936 (2020). There, the Court held that the equitable relief of disgorgement of profits, a decidedly backward-looking remedy, is permissible under the Securities Exchange Act. The Court reached this conclusion after conducting the very analysis that the Defendants urge the Court to conduct, specifically, "whether a particular remedy falls into 'those categories of relief that were *typically* available in equity.'" *Liu*, 140 S. Ct. at 1942. The Court unequivocally concluded that "equity practice long authorized courts to strip wrongdoers of their ill-gotten gains." *Id.* Given that the relevant statute allowed the Securities and Exchange Commission to seek "equitable relief," disgorgement was appropriate.

14

Defendants' reliance on *AMG Capital Management, LLC* v. *FTC*, 141 S. Ct. 1341 (2021) is misplaced. Nowhere does the Supreme Court in *AMG* suggest that, as a categorical matter, monetary relief or backward-looking remedies are forbidden in equity. Rather, the Court examination was limited to the particular remedial scheme set out in the Federal Trade Commission Act. It held only that Section 13(b) of the Act did not authorize court-ordered equitable monetary relief because the Act's multiple provisions, read together, required that monetary relief be sought *first* in the agency's administrative proceedings, and not in a district court. *See id.* at 1344. Put another way, *AMG* was a case about statutory interpretation, and the relevant statutory provision did not permit the equitable relief that the FTC sought. By contrast, § 1345 allows the full measure of equitable relief that a court could traditionally give; *Liu* applies here, not *AMG*.

Lastly, because the relief that the Government is seeking is equitable, the Defendants have no right to a jury trial. *See, e.g., FTC v. Think All Publ'g L.L.C.*, 564 F. Supp. 2d 663, 665 (E.D. Tex. 2008) (granting motion to strike jury demand and explaining that although "Defendants may ultimately be liable in terms of money," that "does not convert the matter into a suit at law."); *FTC v. Bronson Partners, LLC*, No. 3:04-CV-1866 (SRU), 2006 WL 197357, at *4-5 (D. Conn. Jan. 25, 2006) (rejecting the argument that the possibility of monetary relief in itself renders a remedy equitable).

## **CONCLUSION**

For the foregoing reasons, and for the reasons set forth in its January 19, 2023 Motion, the United States respectfully requests that the Court grant its motion for a preliminary injunction and grant such other and further relief as the court deems appropriate. Should it be necessary, the United States is prepared to present additional evidence at the PI Hearing.

Dated: Brooklyn, New York    Respectfully submitted,
   May 8, 2023

            BREON PEACE
            United States Attorney
            *Counsel for Defendants*
            Eastern District of New York
            271 Cadman Plaza East, 7th Fl.
            Brooklyn, New York 11201

By:     /s/
            Michael S. Blume
            Joseph A. Marutollo
            Paulina Stamatelos
            Assistant United States Attorneys
            (718) 254-7000