# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-against-<br><br>RARE BREED TRIGGERS, LLC; RARE BREED FIREARMS, LLC; LAWRENCE DEMONICO; KEVIN MAXWELL,<br><br>Defendants. | Case No. 1:23-cv-00369-NRM-RML |

## SUR-REPLY IN OPPOSITION TO THE UNITED STATES OF AMERICA'S MOTION FOR A PRELIMINARY INJUNCTION

DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION
50 Park Place, Suite 1105
Newark, NJ 07102
David A. Warrington (*pro hac vice*)
Michael A. Columbo (EDNY admission forthcoming)
Josiah Contarino

This Sur-Reply addresses: (1) the technical and legal issues with the Government's and ATF's characterization of the FRT-15 as a machinegun; (2) further evidence of Defendants' lack of intent to commit fraud or conspiracy; and (3) the Government's inability to demonstrate irreparable harm if Defendants are allowed to continue selling FRT-15s.

**I.     The Government Is Not Likely to Succeed on the Merits Because the FRT-15 Is Not A Machinegun.**

The Government argues that the FRT-15 is a machine gun because "one continuous pull of the FRT-15 trigger allows the firearm to shoot more than one shot," ECF No. 1, ¶ 46, and that the FRT-15 allows a user to "fire multiple rounds automatically by a *single* pull of the trigger" and, referring to the ATF's classification, that "the FRT-15 . . . allows a firearm to automatically expel more than one shot with a single continuous pull of the trigger." ECF No. 5 at 4, 10.

This argument fundamentally misunderstands and obfuscates what the FRT-15 does. The FRT-15 does not allow a user to fire multiple rounds with a single function of the trigger. When using an FRT-15, the *trigger* must still be depressed (function) and reset (function) for every round fired. What the FRT-15 does is reduce the time needed to reset and depress the trigger (causing it to function) after the first round is fired. This is mechanically similar to every other semi-automatic weapon. Simply depressing the trigger once and holding it back does not result in multiple rounds being fired—the trigger has to move every time.

The Government obfuscates this fact by focusing on movement of a user's finger, rather than on movement of the firearm's trigger. But Congress unambiguously mandated the latter. Congress defined a machinegun as a firearm that fires repeatedly with "a single function of the *trigger*," 26 U.S.C. § 5845(b) (emphasis added), not of the user's trigger finger. A weapon with a trigger that must be depressed and reset (that is, must "function") each time it shoots a round does not meet that definition. The FRT-15 is not a machinegun under the statutory definition

1

because, after each round is fired, the trigger returns to a non-firing (reset) position and then must function again to fire another shot. In other words, one function *of the trigger* produces one, and only one, shot.

### A. The Definition of a Machinegun is Based on Trigger Function.

#### 1. The Statutory Definition of Machinegun Unambiguously Refers Only to Movement of the Trigger and Not Any Other Factor.

The definition of a machinegun under both the National Firearms Act and Gun Control Act is simple and mechanically focused:

> The term "machinegun" means **any weapon which shoots,** is designed to shoot, or can be readily restored to shoot, **automatically more than one shot,** without manual reloading, **by a single function of the trigger.** The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added); *see* 18 U.S.C. § 921(a)(24). The phrase "by a single function of the trigger" provides unambiguously that the only question to be asked under the statute to determine if a weapon is a machinegun is whether a single function of the trigger results in more than one round firing.

The Fifth Circuit in its recent opinion *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) addressed this very point, holding that the ATF's bump-stock ban, 83 Fed. Reg. 66514 (Dec. 26, 2018), was invalid because it conflicted with § 5845(b).

Bump-stocks function by using the recoil of a semi-automatic weapon to allow a user to fire the weapon faster.  A skilled bump-stock user can pull the trigger once, then hold his or her trigger finger still while the recoil of the weapon moves the trigger back and forth, firing a new round each time the trigger contacts the user's finger and is depressed. In other words, the trigger

2

moves (functions) for every round, while the user's finger does not.

As in this case, the ATF argued in *Cargill* that "a single pull of the trigger from the perspective of the shooter" was sufficient to classify bump-stocks as a machinegun. *Id*. at 459 (citation omitted). As the Fifth Circuit held: "The problem with [ATF's] interpretation is that it is based on words that do not exist in the statute. The statute uses single function of the trigger, not a single function of the shooter's trigger finger." *Id*. (citation and internal quotation marks omitted). The Navy-Marine Corps Court of Appeals reasoned similarly in holding that "'by a single function' cannot be read to mean 'by a single pull'":

> The best read [of the statute] implies that the shooter initiates the trigger function by some action, such as pulling the trigger—or it could be by just pushing a button—and it is the follow-on action where the trigger acts out its mechanical design or purpose that speaks to the "function of the trigger." The statute does not say "by a single function of the trigger finger" nor does it say "by a single pull of the trigger in addition to external pressure from the shooter's non-firing hand." .... Had Congress wanted to use the phrase "by a single pull of the trigger" for machine guns, it could have. But it did not.

*United States v. Alkazahg*, 81 M.J. 764, 780-81 (N-M. Ct. Crim. App. 2021) (*cited by Cargill*, 57 F.4th at 460).

The grammar of the statute's sentence defining machinegun clearly supports this reading. Within the sentence, the phrase "by a single function of the trigger" modifies the manner in which the weapon itself shoots. *See Cargill*, 57 F.4th at 461 (analyzing the sentence structure and grammar of the statute). Notably absent from the text is any reference to the weapon's user, his actions, or the actions of his trigger finger. The universe of the definition is closed, focusing only on the mechanisms of the weapon and the trigger itself.

Congress could have used alternative language referring to the user's finger if it desired. Indeed, within the very subsection of the same statute, Congress defined the terms "rifle" and "shotgun" based on the projectiles they fire "for each single pull of the trigger." 26 U.S.C

§ 5845I-(d); *see Cargill*, 57 F.4th at 461 (analyzing how this context shows the specificity of Congress's intent in using "single function of the trigger."). "[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." *Id*. (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)). Here, Congress defined machineguns solely with regard to whether the trigger functions once for each round that is fired. Congress chose not to refer to the user's actions at all, despite doing so elsewhere within the same statute.

> ii. The Supreme Court Has Understood "Single Function of the Trigger" to Refer to only the Trigger Itself.

In *Staples v. U.S.*, 511 U.S. 600, 603 n.1 (1973), the Supreme Court, when faced with an actual machinegun, clarified that it understood a weapon firing automatically by a "single function of the trigger" to mean that "once its *trigger* is *depressed*, the weapon will automatically continue to fire until its trigger *is released* or the ammunition is exhausted." (emphasis added). The Court did not refer to the pressure applied by the user's finger on the trigger, or the user's actions with regard to releasing the trigger, as the Government now argues. Instead, the Court specifically referred to the *depressed* state of the trigger, *i.e.*, that the trigger had moved backwards and was held there (functioning only one time) while the weapon fired multiple rounds automatically. Similarly, the Court defined automatic fire as continuing until the trigger *is released*. The Court did not refer to the user's actions, intent, or experience for either the trigger's activation or its release. The Court's only consideration was whether the trigger remained in its depressed state while multiple rounds fired automatically and whether the trigger was released at all between shots.

4

### B. The FRT-15 Is Not a Machinegun Because It Requires a Separate Function of the Trigger for Each Round Fired.

The simplest understanding of the FRT-15 is as a device that makes repeated trigger pulls easier and faster—but still relies on one pull and function of the trigger to fire each round. *See* Declaration of former ATF Special Agent Daniel O'Kelly ¶ 11 (attached as Exhibit A). It accomplishes this by resetting the trigger back to its ready condition for a subsequent pull more effectively than traditional triggers. *Id*.

All semiautomatic guns have triggers that reset themselves after they are fired. *Id*. ¶ 6. When the user pulls the trigger to its depressed state and the weapon fires, the trigger does not simply stay rearward until the user takes his finger off. *See id*. Springs within the trigger system constantly act upon the trigger to push it toward its ready position. *Id*. A user overcomes these springs when he pulls the trigger back to fire the weapon, and he allows the springs to reset the trigger to its ready position by either reducing the pressure he applies on the trigger so that the springs move both the trigger and his finger back, or by taking his finger off the trigger. *Id*. ¶¶ 6-7. For any semiautomatic firearm, the user can keep his finger on the trigger and maintain continuous pressure on it while firing repeated rounds so long as he lightens his finger pressure enough between shots to allow the springs to reset the trigger. *See id*. ¶ 7.

With traditional semiautomatic triggers, the user's ability to fire a follow up shot by activating the trigger again is limited by his reflexes and fine motor skills, which he relies on to register that the firearm has fired, lighten or remove pressure on the trigger so its springs can reset it, and then depress the trigger again for a follow up shot. *Id*. ¶ 10. The only limiting factor preventing a user from shooting his semiautomatic rifle at the same speed as if it operated automatically is skill and dexterity. *Id*. Professional shooters can and have demonstrated the

5

ability to fire semiautomatic rifles at speeds rivaling automatic fire rates.[1]

The FRT-15's innovation is simply that it resets the trigger to its ready position more forcefully than a traditional semiautomatic trigger, so the trigger is in position for the user to pull/depress it again causing it to function more rapidly. *Id*. ¶ 11. As with all other semiautomatic triggers, the FRT-15 trigger must function for each round fired and must reset back to its ready position before it can shoot again. *Id*. There is no other difference between the user's operation of a traditional semiautomatic trigger and the FRT-15 trigger.[2] *See id*. ¶ 8.

For this reason, the FRT-15 is not a machinegun under § 5845(b). The user of the FRT-15 can only fire one round each time the trigger functions, and the trigger must reset between each depression. This in no way resembles the mechanical function of an automatic trigger, which allows the user to depress the trigger and keep it depressed (but functioning only one time) while the weapon automatically loads and fires round after round. As with any other semiautomatic trigger, one depression or action that causes a rearward function of the FRT-15 trigger results in one round being fired.

### C. The ATF's Analysis Misreads the Law and Mischaracterizes the FRT-15.

In reliance on the ATF's analysis, the Government essentially argues for a "continuous finger pressure" interpretation of "a single function of the trigger." In the Government's Complaint, it refers to the FRT-15 as a machinegun because "one continuous pull of the FRT-15 trigger allows the firearm to shoot more than one shot." ECF No. 1, ¶ 46. In the Government's

---

[1] *AR-15 5 Shots in 1 second with fastest shooter ever, Jerry Miculek (Shoot Fast!)*, Jerry Miculek – Pro Shooter (Jun. 20, 2013), https://www.youtube.com/watch?v=v3gf_5MR4tE&ab_channel=JerryMiculek-ProShooter. Professional shooter Jerry Miculek demonstrates his ability to rapid-fire a semiautomatic AR-15 at speeds nearing automatic fire-rates; *see also* Exhibit B (Video of Jerry Miculek testing the FRT-15 and showing that he can shoot comparably with both a traditional semiautomatic trigger and an FRT-15 trigger).

[2] Defendants have produced numerous videos demonstrating that the FRT-15 requires individual movements of the trigger rearward for each shot. *See* Exhibit C (Video demonstration of FRT-15 being fired in slow motion with lines imposed on the screen to show how both the trigger and the user's finger must move for *each* shot taken).

motion for a preliminary injunction, it likewise states that the FRT-15 allows a user to "fire multiple rounds automatically by a *single* pull of the trigger" and that, per the ATF's classification, "the FRT-15 . . . allows a firearm to automatically expel more than one shot with a single continuous pull of the trigger." ECF No. 5 at 4, 10.

To support these claims, the Government cites a declaration by ATF Special Agent Daniel Koneschusky (ECF No. 7). In his declaration, Agent Koneschusky states that "the FRT-15 allows the firearm to fire automatically, with a single constant rearward pull, until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply." ECF No. 7 ¶ 31. Koneschusky does not explain the basis for this claim in his declaration, instead he cites to the ATF's July 15, 2021 technical examination of the FRT-15 (the "Report") (excerpted report attached as Exhibit D). The Report's analysis is the basis for the Government's claim that the FRT-15 is a machinegun: Koneschusky relies on the Report in his declaration, and the Government relies on Koneschusky's declaration in its motion for a preliminary injunction. Unfortunately for the Government and the ATF, the Report is fundamentally flawed and contains numerous inaccuracies and contradictions.

The Report contains a technically inaccurate and misleading explanation of the FRT-15's basic function:

> When the trigger is pulled (rearward pressure applied to the trigger), the hammer is released and strikes the firing pin, igniting the cartridge primer, and starting the cycle of operations. As the bolt carrier moves to the rear, the hammer is driven into the top of the trigger *forcing it forward*. The bolt carrier then strikes the locking bar moving, [sic] it *to lock the trigger in the forward position*. As the bolt carrier moves forward, the trigger is held in the forward position by the locking bar and the hammer engages the sear surface on the front of the trigger. As the bolt carrier continues to move forward, it strikes the rear surface of the locking bar releasing the trigger.

Report at 4 (emphasis added) (citations omitted). The statement that the bolt carrier "strikes the

7

locking bar" and moves it to lock the trigger forward is incorrect. Exhibit A ¶ 13. The bolt carrier's rearward movement drives the hammer into the top of the trigger, forcing it forward. *Id*. As the trigger is forced into the forward (reset) position, the locking bar pivots into place and mechanically locks the trigger. *Id*. Furthermore, the Report states that the bolt carrier strikes the locking bar "releasing the trigger." Report at 4. The Report uses similar language elsewhere, stating that FRT-15 "utilizes [the] forward movement [of the bolt carrier] to automatically release the trigger and hammer, allowing the weapon to expel a second projectile without a separate pull of the trigger." *Id*. at 5. This is completely incorrect. The bolt carrier's "release" of the trigger does not cause it to move in any direction. Exhibit A ¶ 13. All that this "release" does is unlock the trigger so the user can function the trigger again if he chooses to. *Id*. All movement of the trigger from its reset position after it unlocks is initiated solely by the user's finger. *Id*. This error is important because it evidences a gross and deliberate mischaracterization of the FRT-15's operation and undermines the credibility of the ATF's analysis and conclusions about the FRT-15.

Dispositively, this technical description directly acknowledges that the trigger resets after each shot because it is forced forward as a direct consequence of the FRT-15's design. The Report also acknowledges that the design requires the hammer and trigger to reset and remains locked between each shot. *See* Report at 4. Despite these acknowledgments, which mean that the FRT-15 requires the trigger to make separate functions for each and every round fired, the Report inaccurately characterizes the FRT-15 as a machinegun in the next sentences:

> If the shooter maintains constant rearward pressure to the trigger, that single constant pull will continue the cycle of operation and fire a subsequent projectile. This differs from a cycle of oeprations [sic] in a typical AR-type semiautomatic firearm in which a *shooter* must release and pull the trigger to fire a second projectile. As stated . . . the FRT-15 requires no such release and subsequent pull by the shooter to fire a second projectile. Instead, the shooter may fire a second

8

projectile merely by maintaining the initial trigger pull and allowing the self-acting internal mechanism to complete its automatic cycle of operation.

*Id.* (citations omitted) (emphasis added).

This paragraph reveals that the ATF's determination that the FRT-15 is a machinegun is based on conflating two distinct concepts: continuous *pressure on* the trigger (which the FRT-15 allows and is not regulated under § 5845(b)) and continuous *pull of* the trigger to its rearward/depressed position, which would suggest that it only functions once (which the FRT-15 does not allow and would cause it to malfunction if achieved). Exhibit A ¶ 21.

The Report uses verbal sleight of hand to equate mere pressure on the trigger with pulling the trigger to its depressed state. It does so by referring to "continuous pressure on the trigger" and a "continuous pull of the trigger" in a manner that would, at best, confuse a reader into thinking the phrases mean the trigger is actually moved rearward to its firing position and held there. Report at 4. (As discussed above, the statute's definition of a machinegun depends on the trigger only functioning once for multiple shots.). Similarly, the Report inaccurately states that the shooter does not need to "release their pull of the trigger" between shots, which implies that the trigger is never reset to its forward position and remains pulled back while the weapon continues to fire. *Id.* In reality, the "continuous pressure" on the trigger described in the Report refers to the user maintaining pressure against the trigger as it resets, allowing him to depress it again once it is finished resetting. Exhibit A ¶ 15. Likewise, the user is able to fire multiple rounds without reducing rearward pressure on the trigger because the FRT-15 resets the trigger for him and does so forcefully enough that the pressure from his finger does not prevent the trigger's forward movement. *Id.* ¶ 17.

By focusing on the constant pressure the user can exert with his finger because the FRT-15 forces the trigger reset, the Report judges the FRT-15 by a standard that does not exist under

9

the law. The Report impresses that the FRT-15 is a machinegun because a user can initiate a single pull on the FRT-15 trigger and maintain that pressure to fire multiple rounds. This is legally wrong and obscures the primary difference between an FRT-15 and a machinegun. Under the text of § 5845(b), the question is neither whether the user can maintain finger pressure on the trigger between shots, nor how the trigger releases and resets. The question is whether a single function (*i.e.*, movement or action) of the trigger results in one round firing or multiple. Regardless of the Report's word games, the FRT-15 requires a separate function of the trigger for each round fired.

The ATF made its deceptive language use even clearer in a more recent report on the FRT-15. The ATF's Expert Report from April 27, 2023 (Exhibit E) directly conflates rearward pressure from the user's finger (colloquially "pulling" the trigger) with actual movement of the trigger rearward: "With both an FRT-15 . . . and an M16-type machinegun . . . the shooter maintains a constant rearward pull of the trigger to fire subsequent shots with a single function (pull) of the trigger." Exhibit E at 5. This report, like the Report previously, attempts to deceive the reader by failing to note the difference between movement of the trigger and pressure from the user's finger, referring to both interchangeably as a "pull" despite the vital semantic and legal difference between the two usages.

The rebuttals to the Report that Defendants obtained from several former ATF Special Agents provide further insight into the various errors made by the ATF. These include explanations of how the Report's technical description of the FRT-15's operation is deliberately obtuse and misleading (*see* Rebuttal Statement from former ATF Special Agent Luettke at 2) (attached as Exhibit F), how the ATF "takes liberty in blurring the lines between 'pull,' 'pressure,' and 'function'" to mislead the reader (*see* Rebuttal Statement from former ATF

10

Special Agent O'Kelly at 4) (attached as Exhibit G), and how the Report mischaracterizes the locking bar, which *prevents* the trigger from moving rearward after it resets until the hammer is also reset, differentiating the FRT-15 from an automatic sear trip (the part directly responsible for an M-16's automatic fire) (*see* Rebuttal Statement from former ATF Special Agent Vasquez at 3) (attached as Exhibit H).

As the ATF's reports show, the entire basis for the Government and the ATF's characterization of the FRT-15 as a machinegun is that the user can maintain continuous pressure on the trigger while it resets between shots. The ATF's "continuous pressure" standard ignores whether the weapon fires based on repeated functions of the trigger, which is the only question to be answered under the text of § 5845(b). Under the statutory text, the FRT-15 is not a machinegun because each round fired requires a separate movement of the trigger (one function) and a separate reset of the trigger (a second function). Whether the trigger is reset by the user changing the pressure he exerts with his finger or by the hammer forcing the trigger to its original position is irrelevant under the statute. As demonstrated by the ATF's own reports and the expert reports obtained by Defendants, it is indisputable that the FRT-15 requires a separate function of the trigger for each round fired and therefore cannot be a machinegun.

II. **Defendants Lawrence DeMonico and Kevin Maxwell's Actions Demonstrated Their Belief that the FRT-15 Is Legal and Did Not Interfere with the ATF Performing Its Job.**

Defendants Lawrence DeMonico and Kevin Maxwell believed at all times during their promotion and sale of the FRT-15 that it was not an illegal machinegun. This belief is evident in their course of conduct. Schemes to defraud or conspiracies to commit illegal action are marked by subterfuge, shell-games, and attempts by fraudsters to hide their identities and keep their names and reputations separate from their fraud. Frauds are not run like legitimate businesses

11

with long-term capital investments and deep roots put down with the intention they will be a going concern. Mr. DeMonico and Mr. Maxwell's actions in selling FRT-15s are consistent with men who believed they were selling a legal product as part of a legitimate business rather than engaging in a fraud for which they might need to pull up the stakes to make a quick get-away.

Attached is a declaration from Mr. DeMonico attesting to his and Mr. Maxwell's significant work and investment to get their business established. *See* Declaration of Lawrence DeMonico (attached as Exhibit I). This included investing large amounts of money in obtaining the FRT-15 patent, developing it to a market-ready product, developing new technologies and product designs for the FRT-15 and additional forced reset triggers, and defending their product patent against infringers. Exhibit I ¶ 5. Regardless of whether the FRT-15 is ultimately determined to be a machinegun, it is uncharacteristic of a fraud scheme knowingly selling illegal goods for the fraudster to invest significant resources in a patent for a product he knows to be illegal. In addition to the investments in the product, both Mr. DeMonico and Mr. Maxwell personally promoted the FRT-15 and associated their names, faces, and reputations with the FRT-15 in the public square. *Id*. ¶¶ 8-10. Contrary to the cloak and dagger of a fraud scheme, both Mr. DeMonico and Mr. Maxwell tied their fates to the FRT-15 personally and professionally in public as much as they could. They approached the FRT-15 thoughtfully, relying on experts, technical and legal, and the current state of the law. *Id*. ¶¶ 6-7.

The Government's claims that Defendants intended to prevent the ATF or any other government officials from doing their jobs is false. *Id*. ¶ 16. Mr. DeMonico did not take property subject to a warrant when retrieving Rare Breed Triggers' materials from 3rd Gen. Machine, Inc. *Id*. ¶ 17. The items in question were not at 3rd Gen when the ATF executed its warrant but were later brought there after the warrant was executed. *Id*. Indeed, the warrant was dated and issued

March 24, 2022, and required the execution of the warrant "on or before April 7, 2022." March 24, 2022, Warrant (attached as Exhibit K). Apparently, the materials the Government identified in paragraph 156 of the Complaint (ECF No. 1) were not at 3rd Gen when the ATF "executed the warrant [o]n March [26,] 2022," (ECF No. 1 ¶ 151), and Mr. DeMonico did not travel to pick up the materials until April 14, 2022, well after the warrant expired (ECF No. 1 ¶ 153). Exhibit I ¶ 17.

When Mr. DeMonico went to pick up Rare Breed Triggers' property and was pulled over by ATF agents and other law enforcement thereafter, he was told by ATF agents while in handcuffs that they were not authorized to arrest him and that they were only there to take the property. *Id*. ¶ 18. Apparently, even after the ATF learned there were additional FRT-15s in the unsecured parking lot at 3rd Gen, they let them sit there for weeks. *Id* ¶ *17*.

In addition, the ATF did not comply with its own seizure procedures: it did not properly notice Rare Breed Triggers of the property seizure or bring a claim for that seized property. *Id*. ¶ 19. The ATF only started to comply with these procedures after Rare Breed Triggers sued them for not doing their job properly. *Id.*

To create an atmosphere of illegality, the Government concocts wild accusations out of thin air. At no point did Kevin Maxwell threaten the ATF with a rocket launcher. *See* Declaration of Kevin Maxwell ¶ 2 (attached as Exhibit K). Moreover, it strains credulity for the Government to suggest that he (or someone associated with his office) did and the ATF took no further action on the "threat."

Regarding the controversy over the FRT-15's legal status, Mr. DeMonico and Mr. Maxwell did not run from it or attempt to hide it. They embraced it. They did countless interviews and videos explaining their position that the FRT-15 is legal. Exhibit I ¶¶ 8-11. Far

13

from failing to publicly address the ATF's claims that the FRT-15 is illegal, they were at the forefront of pushing back against the ATF's actions and explaining to the public why they believed the ATF to be wrong. *Id*. Consistent with their actions in this litigation, Defendants sought to protect customer privacy, which included shipping some USPS packages labeled as Red Beard Treasures. *Id*. ¶ 12. In addition, before this time period, Defendants used UPS, which Defendants understood to be more secure and on which Defendants had insurance, and did not use Red Beard Treasures. *Id*. Instead of trying to run away with the loot once their "scheme" was uncovered by the ATF, Mr. DeMonico and Mr. Maxwell stood and fought for the legality of their business. They initiated two different lawsuits seeking a declaration that the FRT-15 is legal. *Id*. ¶ 15. They boldly took the initiative to litigate the issue, putting large sums of money on the line, opening themselves and their business up to the expansive sweep of civil discovery, and risking a potentially unfavorable court ruling because they were confident in their belief that the FRT-15 is legal. *Id*. Contrary to the Government's assertions, they did not abandon these lawsuits: one was dismissed on procedural grounds and the other in response to a venue motion filed by the ATF. *Id*.

This consistent pattern of conduct over multiple years demonstrates that Defendants genuinely believed that the FRT-15 was legal and they were investing extraordinary effort and capital in a legitimate business they intended to run for years to come.

### III. There is No Irreparable Harm from Allowing FRT-15s to Be Sold

The Government argues that irreparable harm will result if a preliminary injunction is not issued because of the inherent danger posed to the public by the FRT-15. The Government claims that the "general public faces 'imminent risk to their health safety, and lives" (ECF No. 56 at 3) from Defendants' sales "of illegal and dangerous machinegun conversion devices at a time when

14

gun violence remains a nationwide epidemic" (ECF No. 56 at 4). The Government supports its notion that the FRT-15 is a danger to the public by citing statistics showing that there have been 150 mass shootings across the United States since the Complaint was filed and that the 2021 U.S. gun death rate was the highest in nearly three decades. *Id*. at 1, 4.

This argument is specious and meritless because the Government fails to note *any* crime committed with an FRT-15. These citations to general gun violence statistics are the only evidence of harm the Government presents. Because the Government is incapable of showing any harm actually caused by an FRT-15, it instead invokes the bogeyman of general gun crime without establishing any connection to the FRT-15. This is akin to the Government arguing that irreparable harm exists from allowing a given car model on the road, not because the model has caused any harm or been involved in any crashes, but because car crashes exist generally.

Likewise, the Government demonstrates no connection between the FRT-15's sales, which the Government noted already exceeded 80,000 units (ECF No. 1 ¶ 112), and any harm suffered by a single person. It is telling that the Government cannot cite a single instance of harm or crime involving an FRT-15 despite the supposedly immediate threat it represents to the public.

Every shooting the Government references in its reply as examples of the threat to public safety—*i.e.*, a irreparable harm—would still be possible even if a preliminary injunction was issued by this Court. As the Government cannot point to any harm caused by an FRT-15, and its arguments about gun crime relate only to firearms as a general category instead of the FRT-15 specifically, the Government has failed to demonstrate how Defendants' continued sales of the FRT-15 would cause irreparable harm.

15

## IV. Conclusion

For the foregoing reasons and those offered in Defendants' opposition brief, the Court should deny the request for a preliminary injunction entirely.

Dated: June 16, 2023

DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION

*/s/ Josiah Contarino*
JOSIAH CONTARINO
50 Park Place, Suite 1105
Newark, NJ 07102
jcontarino@dhillonlaw.com

DAVID A. WARRINGTON
(*pro hac vice*)
2121 Eisenhower Avenue
Suite 608
Alexandria, VA 22314
dwarrington@dhillonlaw.com

MICHAEL A. COLUMBO
(E.D.N.Y. application forthcoming)
177 Post St., Suite 700
San Francisco, CA 94108
415.433.1700
mcolumbo@dhillonlaw.com

*Attorneys for Defendants*
