UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  -against-<br><br>RARE BREED TRIGGERS, LLC; RARE BREED FIREARMS, LLC; LAWRENCE DEMONICO; KEVIN MAXWELL,<br><br>        Defendants. | Case No. 1:23-cv-00369-NRM-RML<br><br>**DECLARATION OF DANIEL O'KELLY** |

I, Daniel O'Kelly, have personal knowledge of the following facts set forth below, and if called as a witness I would testify as follows:

1. I am the owner and director of International Firearm Specialist Academy.

2. The facts set forth in this declaration are based on my personal knowledge; knowledge obtained in my role as owner and director of International Firearm Specialist Academy; knowledge obtained in my 23 years of service as a Special Agent with the ATF; knowledge obtained in my 46 years of professionally handling and analyzing firearms; knowledge obtained from handling and reviewing the FRT-15 directly and from reviewing its patent and design specifications; and knowledge obtained from reviewing the ATF's reports on the FRT-15, including its report from July 15, 2021. This declaration is for the purpose of explaining the function of the FRT-15 and the issues with the ATF's analysis of the FRT-15, including its analysis in the July 15, 2021, report.

### The FRT-15 is a Semiautomatic Trigger System

3. The primary distinction between a semiautomatic firearm and an automatic firearm is that a semiautomatic firearm requires the shooter to depress the trigger separately

**Exhibit A**

for each round it fires, whereas an automatic firearm allow the shooter to depress the trigger once and hold it down to fire multiple shots.

4. With a semiautomatic trigger, one depression results in one shot fired. After each shot, the trigger must reset by moving forwards toward its original position. Both the depression of the trigger and its reset are functions of the trigger necessary for the semiautomatic firearm to operate. A semiautomatic firearm cannot fire more than one shot from a single depression of the trigger.

5. The FRT-15 is a semiautomatic trigger and thus requires the shooter to depress the trigger separately for each shot he fires. As with any other semiautomatic trigger, the FRT-15 also requires the trigger to reset by moving forward toward its original position after each shot.

6. In a typical AR-15 type firearm, and the vast majority of modern firearms generally, the trigger resets toward its original position due to forward pressure from a trigger-return spring. This spring puts constant pressure on the trigger. To depress the trigger and fire a shot, the shooter must overcome this spring's pressure by the rearward pull of his trigger finger.

7. To reset the trigger after firing, a shooter can either break contact with the trigger to allow the trigger-return spring to push it forward or lessen his rearward pressure on the trigger. By lessening his rearward pressure on the trigger, a shooter can maintain continuous contact and rearward pressure on the trigger while it resets, so long as he lessens the pressure enough for the spring to work. Thus, a shooter can maintain contact and continuous rearward pressure on a standard semiautomatic trigger while firing shot after shot.

8. The only difference between the FRT-15 and a traditional semiautomatic AR-15 trigger is how the trigger reset is accomplished. While the traditional semiautomatic trigger uses the trigger-return spring, the FRT-15 uses the weapon's hammer to strike the top of the trigger mechanism and mechanically force the trigger back to its original position. This results in a more forceful push moving the trigger forward to reset compared to a traditional trigger-return spring. This pressure is usually enough to force the trigger forward and reset it even if the shooter does not lessen his rearward pressure on the trigger.

9. The advantage provided by the FRT-15's design is that the trigger resets rapidly after each shot. This allows the shooter to depress the trigger again more quickly for a subsequent shot. The shooter does not need to worry about the fine motor control and dexterity required by a traditional semiautomatic trigger to cycle between increasing and decreasing pressure on the trigger to fire multiple shots.

10. For any AR-15 type firearm, the only limiting factors preventing a shooter from achieving fire-rates with its semiautomatic trigger comparable to automatic fire are his reflexes and fine motor skills. AR-15 type firearms use a self-loading type of mechanical action. They accomplish the eight steps of the cycle of operation for firing a shot and preparing another shot to fire extremely quickly – within less than 1/5 of a second. It is possible for a shooter to fire a second shot using a traditional semiautomatic trigger within 1/5 of a second after firing the first. The shooter only needs to have the dexterity to react and act within 1/5 of a second.

11. The FRT-15 facilitates higher rates of semiautomatic fire compared to a traditional semiautomatic trigger by resetting the trigger between shots more quickly and reliably than a trigger-return spring. This makes it easier for the shooter to depress the trigger again rapidly

without needing exceptional dexterity. As with all semiautomatic triggers, the FRT-15 still requires the user to depress the trigger for each shot fired and to allow it to reset to its ready position before shooting an additional shot.

### The ATF's Report from July 15, 2021, is Misleading and Inaccurate

12. The ATF's report from July 15, 2021 (attached as Exhibit 1), analyzing the FRT-15 and classifying it as a machinegun is misleading and inaccurate. It is riddled with technical flaws and misuses of language.

13. The report misleadingly states that a shooter using an FRT-15 can fire multiple shots through "constant rearward pressure to the trigger," "one continuous pull of the trigger," or a "single constant [trigger] pull." Exhibit 1 at 4. This language leads the reader to think that a shooter can depress an FRT-15 trigger once and hold it down while firing multiple shots. This is physically impossible given the FRT-15's design. The report acknowledges as much in its technical description of how the FRT-15 operates, which recognizes that "the hammer is driven into the top of the trigger forcing it forward" after each shot and that the trigger is locked in its forward position between shots until the hammer and bolt are finished resetting. *Id.*

14. What the report refers to as "one continuous pull of the trigger" is simply the pressure the shooter is able to maintain with his trigger finger against the trigger while it resets after each shot. Because the trigger is forcefully reset by the hammer, the shooter can keep pulling *on* the trigger between shots, but the trigger itself is not pulled and held back from the shooter doing so. The FRT-15 trigger *must* depress and reset separately for each shot fired, like any other semiautomatic trigger.

15. Constant pressure on the FRT-15 trigger accomplishes nothing. Unlike with an automatic trigger where constant pressure after depressing the trigger once causes the weapon to automatically fire multiple shots, constant pressure on the FRT-15 does nothing. It does not cause the trigger to fire multiple shots from the initial depression and it does not prevent the trigger from resetting after the first shot fired.

16. Similarly, the report misleadingly states that the shooter does not need to release the trigger between shots. *Id.* This is a gross misrepresentation that would lead the reader to think the trigger does need not to release or reset *at all* between shots — *i.e.*, that the trigger can be depressed and held down while multiple shots fire. The reality is that the shooter does not need to release or reset an FRT-15 trigger because the FRT-15 uses the hammer to do so instead. It is simply unnecessary for the shooter to initiate the trigger reset by breaking contact with the trigger or lessening his pressure on it.

17. It is also misleading for the report to imply that a traditional semiautomatic trigger requires the shooter to release it before depressing it again for another shot. Because of the trigger-return spring, a shooter never needs to break contact and physically release a traditional trigger for it to reset. He only needs to lighten his pressure enough for it to move the trigger forwards against his resistance. As previously described, a shooter can fire any standard AR-15 type semiautomatic weapon repeatedly without breaking contact with the trigger or ceasing constant rearward pressure on it.

18. Additionally, the report's description of the FRT-15's mechanical operation is obtuse and misleading. The report fails to note that when the FRT-15's locking bar releases the trigger after the hammer resets, it releases the trigger from a locked position. This omission is misleading because it is important to identify that the trigger is locked in the

forward position after each round is fired and that a separate function of the trigger (a pull to the rear) is required after the trigger unlocks to fire the next shot. At all times, the FRT-15 requires separate functions of the trigger to fire each shot. Despite the FRT-15 automatically forcing the trigger to reset, it requires a second manual and intentional function of the trigger by the shooter to fire each shot.

19. The report mischaracterizes the locking bar (which *prevents* the trigger from being depressed after it is reset until the hammer and bolt-carrier group also reset) as a form of automatic sear trip (the part directly responsible for an M-16's automatic fire). *Id.* at 5. This is a gross error. It is akin to describing a car's brake pedal as equivalent to its accelerator.

20. The report also omits the crucial point that if the shooter exerts enough rearward pressure pulling the trigger back, the FRT-15 malfunctions and the cycle of operation is interrupted. If the shooter pulls too hard on the trigger and prevents it from resetting, the weapon malfunctions and ceases to operate.

21. Finally, it is worth noting that the ATF has previously used a trigger-movement based standard for determining whether a firearm fires multiple rounds automatically "by a single function of the trigger." In 2009, when I was an ATF Special Agent, the ATF Firearm Technology Branch promulgated an email to me and hundreds of other ATF personnel, stating that "[t]he ATF-counsel-approved interpretation of 'single function of the trigger' is a single movement of the trigger."

## Conclusion

22. For the forgoing reasons, my expert opinion is that the FRT-15 is a semiautomatic trigger and is in no way a machinegun. This is because the FRT-15 requires separate

functions of the trigger for each shot fired and it ceases to function if the trigger does not reset after each shot. The ATF's report from July 15, 2021, analyzing the FRT-15 and classifying it as a machinegun is inaccurate and misleadingly worded. It gives a false impression that the FRT-15 functions like a traditional automatic trigger — which it does not.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 15, 2023.

By: _____
Daniel O'Kelly

.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms Technology Criminal Branch**
**Report of Technical Examination**

| | |
|---|---|
| | 244 Needy Road #1600<br>Martinsburg, WV 25405<br><br>Phone: 304-616-4300<br>Fax: 304-616-4301 |
| To:<br>Special Agent Michael T. Nuttall<br>Bureau of Alcohol, Tobacco, Firearms and Explosives<br>99 New York Avenue NE<br>MS: 90K-250<br>Washington, DC 20026 | Date:<br><br>UI#: 163080-21-0006<br><br>RE: Rarebreed Firearms FRT-15<br>FTCB#: 2021-595-DAS 317066 |
| Date Exhibit Received: 06/04/2021<br><br>Delivered By: FedEx# 7738 9219 6853 | Type of Examination Requested:<br><br>Examination, Test, Classification |

**Exhibit:**

1. Rare Breed Triggers, model FRT-15, no serial number (suspected machinegun).

**Pertinent Authority:**

Title 28 of the United States Code (U.S.C.) provides the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) the authority to investigate criminal and regulatory violations of Federal firearms law at the direction of the Attorney General. Under the corresponding Federal regulation at 28 CFR. 0.130 the Attorney General provides ATF with the authority to investigate, administer, and enforce the laws related to firearms, in relevant part, under 18 U.S.C. Chapter 44 (Gun Control Act) and 26 U.S.C. Chapter 53 (National Firearms Act). Pursuant to the aforementioned statutory and regulatory authority, the ATF Firearms Ammunition and Technology Division (FATD) provides expert technical support on firearms and ammunition to federal, state, and local law enforcement agencies regarding the Gun Control Act and National Firearms Act.

The amended Gun Control Act of 1968 (GCA), defines the term **"machinegun"** has *"the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))."* (See 18 U.S.C. § 921(a)(23).)

The National Firearms Act of 1934 (NFA) **Identification of firearms other than destructive devices**. *"Each manufacturer and importer and anyone making a firearm shall identify each firearm, other than a destructive device, manufactured, imported, or made by a serial number which may not be readily removed, obliterated, or altered, the name of the manufacturer, importer, or maker, and such other identification as the Secretary may by regulations prescribe."* (See 26 U.S.C. § 5842(a).)

The NFA, defines **"firearm"** to mean, in part: *"…(6) a machinegun…."* (See 26 U.S.C. § 5845(a).)

Exhibit 1

ATF Form    3311.2
Revised September 2014

Special Agent Michael T. Nuttall

163080-21-0006
2021-595-DAS
Page 2

The NFA, defines the term "**machinegun**" as follows: "...*any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*" (See 26 U.S.C. § 5845(b).)

27 CFR § 479.11 defines the term "**machinegun**" and includes, in part: "...*For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger and analogous motions. The term "machinegun" includes a bump-stock-type device, i.e., a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.*" (See 27 CFR § 479.11.)

**Findings:**

*Note: FTISB previously examine a similar "forced reset trigger" from* ▮▮▮▮▮▮▮▮ *(holder of U.S. Patent 10514223) and determined it to be a combination of parts, designed and intended for use in converting a weapon into a machinegun; and therefore, a "**machinegun**" as defined in the GCA and NFA (see FTISB letter 307385, dated August 28, 2018 attached).*

**Exhibit** 1 is a Rare Breed Triggers, model FRT-15, AR15-type drop-in fire-control group, manufactured by Rare Breed Triggers in Orlando, Florida. I observed that the Exhibit has no serial number in accordance with 26 U.S.C. § 5842.

I examined Exhibit 1 and found it to be an AR15-type drop-in fire-control group with the following features and characteristics:

- ¼ inch wide hammer, trigger, and locking bar
- Aluminum housing
- Two (2) tubular pins
- One (1) solid pin
- Three (3) springs
- Two (2) pins with interior threads at both ends
- Four (4) hex head screws with exterior threads

During my examination, I observed the following markings on Exhibit 1:

    Aluminum housing (right side):    **RARE BREED**
                                                           **-TRIGGERS-**
                                                           **US PAT. 10514223**

Special Agent Michael T. Nuttall

163080-21-0006
2021-595-DAS
Page 3

**Findings (Cont.):**

Exhibit 1 is identifiable from U.S. Patent #10,514,223 B1 and functions on the same mechanical principle as U.S. Patent #10,254,067 B2.

U.S. Patent #10,514,223 B1 specifically states that this is a device which *"causes the trigger to be forcibly reset,"* and *"once reset, movement of the trigger is blocked by a locking bar and cannot be pulled until the bolt has returned to battery, thus preventing "hammer follow" behind the bolt or bolt carrier."* My examination determined Exhibit 1 does not function by "hammer follow."

As explanation, FATD has also evaluated devices which prevented the trigger from positively resetting and resulted in a "hammer-follow" scenario. A device designed to prevent the hammer from positively resetting could cause a firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, and would also be classified as a combination of parts designed and intended, for use in converting a weapon into a machinegun; thus a "**machinegun**" as defined in 26 U.S.C. § 5845(b).

However, the incorporation of a positive disconnecting or trigger resetting feature alone, does not preclude or remove such a weapon or device from the definition of a "**machinegun**" as defined in the NFA, 26 U.S.C. § 5845(b). Although the presence of hammer follow may require classification of a firearm as a machinegun, this is just one way in which a firearm may satisfy the "machinegun" definition. Therefore, the mere absence of "hammer-follow" in an AR-type firearm does not exclude such a firearm from being classified as a machinegun. Machinegun classifications are based on the examination of the device and whether the device converts a weapon to shoot automatically.

Federal regulation, 27 CFR § 479.11, states that the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger. Indeed, Federal courts have long held that automatically means that the weapon "fires repeatedly with a single pull of the trigger." *Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994). "That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." Id.

Further, Federal regulation 27 CFR § 479.11, states that "single function of the trigger" means a single pull of the trigger and analogous motions. Courts have specifically affirmed ATF's interpretation that a single act of the shooter to initiate the firing sequence is a single function of the trigger. *Atkins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009); *Freedom Ordnance Mfg., Inc. v. Brandon*, 2018 U.S. Dist. LEXIS 243000 (S.D. Ind. Mar. 27, 2018). *United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002)(in which electronic switch was the trigger when it served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted). In *Freedom Ordnance* case, the United States District Court of Indiana confirmed that ATF was not arbitrary and capricious in the classification of an "electronic reset assist device" as a machinegun even though the firearm's trigger reset before each shot by pushing the shooter's finger forward. *Freedom Ordnance Mfg., Inc,* No. 3:16-cv-00243-RLY-MPB. In these cases, a firearm is a machinegun when an internal mechanism or operation automatically forces the individual's finger forward instead of requiring that the shooter release the trigger.

Special Agent Michael T. Nuttall

163080-21-0006
2021-595-DAS
Page 4

**Findings (Cont.):**

If a device is designed to assist in preventing the hammer from positively resetting or which utilizes *a spring, electric motor or non-manual source of energy which assists in the automatic resetting of the hammer and causes a firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger*, such an item or device would be classified as a combination of parts designed and intended, for use in converting a weapon into a machinegun; thus a "machinegun" as defined in 26 U.S.C. § 5845(b).

Below is a description of how the Rare Breed Trigger, FRT-15 device operates with attached diagrams found on the Rare Breed Trigger website.

First, the FRT-15 device must be installed into an AR15-type weapon which includes a H3 weight buffer and M16-type bolt carrier. These components are necessary because the specific design of the FRT-15 requires these to function as designed.

The picture on page 4 of the attached, shows the position of the hammer (orange), trigger (red), and locking bar (green) in the FRT-15 device once the weapon is charged and the selector is placed in the fire position. In this configuration, the hammer is held in place with its sear surface against the front of the trigger.

When the trigger is pulled (rearward pressure applied to the trigger), the hammer is released and strikes the firing pin, igniting the cartridge primer, and starting the cycle of operations (See attachment page 5 picture 7).

As the bolt carrier moves to the rear, the hammer is driven into the top of the trigger forcing it forward. The bolt carrier then strikes the locking bar moving, it to lock the trigger in the forward position (See attachment page 6 picture 8).

As the bolt carrier moves forward, the trigger is held in the forward position by the locking bar and the hammer engages the sear surface on the front of the trigger (See attachment page 7 picture 9).

As the bolt carrier continues to move forward, it strikes the rear surface of the locking bar releasing the trigger. If the shooter maintains constant rearward pressure to the trigger, that single constant pull will continue the cycle of operation and fire a subsequent projectile. (See attachment page 8, 9 picture 10, 11). This differs from a cycle of oeprations in a typical AR-type semiautomatic firearm in which a shooter must release and pull the trigger to fire a second projecile. As stated, a firearm assembled with the FRT-15 requires no such release and subsequent pull by the shooter to fire a second projectile. Instead, the shooter may fire a second projectile merely by maintaining the initial trigger pull and allowing the self-acting internal mechanism to complete its automatic cycle of operation.

To confirm this, I assembled an AR15-type firearm from the National Firearms Collection (NFC) using a Bushmaster AR15-type receiver, H3 buffer, M16-type upper assembly, and the FRT-15 device (See attachment pages 10, 11 pictures 12, 13, 14, 15).

I test-fired Exhibit 1 on June 7, 2021, at the ATF test range, Martinsburg, West Virginia, using commercially available, Federal brand, 5.56x45mm caliber ammunition and a magazine from the NFC.

ATF Form   3311.2
Revised September 2014

Special Agent Michael T. Nuttall

163080-21-0006
2021-595-DAS
Page 5

### Findings (Cont.):

First, I inserted a one-round ammunition load, charged the weapon, and with the selector in the "FIRE" position, pulled the trigger. The NFC weapon, with Exhibit 1 installed, successfully expelled a single projectile by the action of an explosive. I repeated this method of test-fire one additional time, obtaining the same result.

Next, I inserted a two-round ammunition load, charged the weapon, and with the selector in the "FIRE" position pulled the trigger and held it to the rear, the NFC weapon, with Exhibit 1 installed, fired two (2) rounds automatically by a single pull/function of the trigger. I repeated this method of test-fire one additional time, obtaining the same result.

Finnaly, I inserted a five-round ammunition load, charged the weapon, and with the selector in the "FIRE" position, pulled the trigger and held it to the rear, the NFC weapon, with Exhibit 1 installed, fired five (5) rounds automatically by a single pull/function of the trigger. I repeated this method of test-fire one additional time, obtaining the same result.

The FRT-15 device incorporates parts that are novel to the operation of a typical AR-type semiautomatic firearm. These unique parts (hammer, trigger and locking bar) within the FRT-15 trigger mechanism are specifically designed to incorporate the standard rearward and forward movement of the AR-type bolt carrier in its cycle of operations allowing the weapon to function as a self-acting, or self-regulating, mechanism. Whereas in a typical AR-type firearm, the rearward movement of the bolt carrier extracts, then ejects a cartridge case, and cocks the hammer. However, in the FRT-15, the rearward movement is also utilized to eliminate the necessity for the shooter to release their pull of the trigger. In a typical AR-type firearm, the forward movement of the bolt carrier loads a subsequent cartridge, and locks the bolt, while the FRT-15 also utilizes this forward movement to automatically release the trigger and hammer, allowing the weapon to expel a second projectile without a separate pull of the trigger. In this way, one continuous pull of the trigger allows a semiautomatic firearm to shoot more than one shot. This mechanical action and principle is explained in U.S. Pat. #10,514,223 and U.S. Patent # 10,254,067 B2, and demonstrated in the test-fires above.

As received, Exhibit 1 is a combination of parts, designed and intended for use in converting a weapon (AR15-type) into a machinegun; therefore, it is a **"machinegun"** as defined in the GCA and NFA.

### Conclusions:

**Exhibit 1** is a combination of parts, designed and intended for use in converting a weapon into a machinegun; therefore, it is a **"machinegun"** as defined in 26 U.S.C. § 5845(b).

**Exhibit 1** is a **"machinegun"** as defined in 18 U.S.C. § 921(a)(23).

**Exhibit 1**, being a machinegun, is also a **"firearm"** as defined in 26 U.S.C. § 5845(a)(6).

**Exhibit 1** is not marked in accordance with 26 U.S.C. § 5842(a).

ATF Form    3311.2
Revised September 2014

Special Agent Michael T. Nuttall

163080-21-0006
2021-595-DAS
Page 6

Examined By:

*David A. Smith* (signature)

Digitally signed by David A. Smith1
Date: 2021.07.15 15:43:05 -04'00'

David A. Smith
Firearms Enforcement Officer

Approved By:

**GREGORY STIMMEL**

Digitally signed by GREGORY STIMMEL
Date: 2021.07.15 15:50:02 -04'00'

Gregory Stimmel, Chief
Firearms Technology Criminal Branch

Attachment: 11 pages bearing a total of 15 photographs, U.S. Patents #10,254,067 B2; 10,514,223 B1, and ATF letter # 307385.

**Enclosed is a Firearms Technology Criminal Branch report provided in response to your request for assistance. Please be aware that these documents constitute "taxpayer return information" that is subject to the strict disclosure limitations provided in 26 U.S.C. § 6103. Exceptions to the non-disclosure provisions that permit the disclosure internally within ATF are set forth in 26 U.S.C. §§ 6103(h)(2)(C) and (o)(1). Any further disclosure of these reports is strictly limited and must be reviewed and approved by the Office of Chief Counsel prior to any information dissemination. Failure to adhere to the disclosure limitations provided in 26 U.S.C. § 6103 could result in civil and/or criminal liability.**

ATF Form    3311.2
Revised September 2014