UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

           Plaintiff,

- v. -

RARE BREED TRIGGERS, LLC; RARE BREED FIREARMS, LLC; LAWRENCE DEMONICO; KEVIN MAXWELL,

           Defendants.

Civil Action No. 23-cv-369
(Morrison, J.)
(Levy, M.J.)

## DECLARATION OF JONATHAN ROBINSON

I, Jonathon Robinson, have personal knowledge of the following facts set forth below, and if called as a witness I would testify as follows:

1. I was formerly the General Manager of 3rd Gen Machine. I served in that role for much of 2022, until I left the company in August 2022.

2. Among other things, 3rd Gen Machine manufactured parts for use in firearms. One such part was the FRT-15.

3. 3rd Gen Machine manufactured the FRT-15 pursuant to an agreement with and for Rare Breed Triggers (RBT).

4. Prior to 3rd Gen Machine's producing the FRT-15, RBT provided 3rd Gen Machine with information about the legality of the FRT-15. RBT provided the company with letters that retired officials of the Bureau of Alcoholo, Tobacco, Firearms and Explosives (ATF) had written about the product. In communications with 3rd Gen, RBT did reference a "binary trigger" and a "Graves trigger." RBT did not reference an "AR1."

5. In January 2022, ATF served a cease and desist letter on 3rd Gen Machine. Among other things, the letter stated that the the FRT-15 was an unlawful product.

6. After the company received the letter from ATF, 3rd Gen Machine had discussions with Kevin Maxwell and Lawrence DeMonico of RBT. I was a part of several of those discussions.

7. Among other things, Mr. Maxwell and Mr. DeMonico told us that they were involved in litigation with the ATF over the FRT-15. Mr. Maxwell and Mr. DeMonico told us that the judge in the litigation had shut the case down, in favor of RBT, because the ATF had not allowed RBT to submit documents to it concerning the FRT-15.

8. 3rd Gen Machine continued to produce the FRT-15.

9. In March 2022, the ATF conducted a search of one of 3rd Gen Machine's locations (there were two) and seized, among other things, products and inventory associated with the FRT-15.

10. 3rd Gen Machine recognized that, at its second location (the one that ATF had not searched), it possessed products and inventory associated with the FRT-15. Rather than risk a second search and seizure, this time at the second location, 3rd Gen Machine chose to pack up those products and inventory and move them to 3rd Gen Machine's first location (the site of the search and seizure). The products and inventory were in boxes, labeled for ATF, and wrapped in plastic. They were located on a lot at 3rd Gen Machine's facility. The lot is enclosed by a fence.

11. After the March 2022 search and seizure of 3rd Gen Machine's location, 3rd Gen Machine had discussions with Mr. Maxwell and Mr. DeMonico. I was part of several of those discussions.

12. During those discussions, Mr. Maxwell and Mr. DeMonico were made aware that there were products and inventory associated with the FRT-15 that 3rd Gen Machine was holding.

Mr. Maxwell and Mr. DeMonico demanded that 3rd Gen Machine give those products and inventory to RBT. 3rd Gen Machine refused, telling Mr. Maxwell and Mr. DeMonico that 3rd Gen Machine was going to turn the products and inventory over to ATF. 3rd Gen Machine further told Mr. Maxwell and Mr. DeMonico that products and inventory were contraband.

13. On April 14, 2022, Mr. DeMonico walked into my office 3rd Gen Machine, which was located at the company's first location.

14. I was surprised, and a little taken aback, as I had never before seen Mr. DeMonico at a 3rd Gen Machine facility. I asked him how he found our offices, and he said, "Google Maps."

15. I also asked Mr. DeMonico why he was there. He responded, "I am here to get my shit."

16. I told Mr. Mr. DeMonico not to do that. The products and inventory belonged to ATF; ATF was schedule to pick them up the next day; and they were contraband.

17. I asked Mr. DeMonico to leave. I told him that, if he began to take the products and inventory, I would call ATF. Mr. DeMonico said that the did not care. He also asked that I wait to call ATF, saying something like, "give me a head start."

18. I instructed 3rd Gen Machine employes to lock the doors and to not assist Mr. DeMonico. I also asked a 3rd Gen employee to video-record Mr. DeMonico.

19. Mr. DeMonico packed the products and inventory that had been set aside for ATF into a van and drove off.

20. After Mr. DeMonico left 3rd Gen Machine, I contacted the ATF. I provided ATF with a description of Mr. DeMonico's van and with a phone number for Mr. DeMonico.

21. Sometime later, I provided ATF offcials with a more detailed description of the events of April 14, 2022.

3

22.     Prior to the search and seizure of 3rd Gen Machine's facility, 3rd Gen Machine was working with RBT on a new design for a trigger. The design was for a three-position trigger. The three positions were a safe mode, and FRT mode, and a third mode, the name of which I do not recall. My understanding of the purpose of the third mode was to allow the shooter to fire one single round at a time.

23.     After the ATF search and seizure, other companies ceased doing business with 3rd Gen Machine. And 3rd Gen Machine was subject to lawsuits from its sub-contractors who had been making parts for the FRT-15. 3rd Gen Machine could no longer pay those sub-contractors, largely because those parts were contraband.

24.     I left 3rd Gen Machine in August 2022. I had started at the company right after college as a maintenance manager and rose to become the general manager.

25.     I now work as a rancher where I raise sheep and elk for meat, which we distribute all over the country.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 25, 2023.

By: _____
Jonathan Robinson