UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>    - v. -<br><br>RARE BREED TRIGGERS, LLC; RARE BREED FIREARMS, LLC; LAWRENCE DEMONICO; KEVIN MAXWELL,<br><br>                 Defendants. | 1:23-CV-00369<br>(NRM) (RML) |

**THE UNITED STATES OF AMERICA'S
RESPONSE TO
DEFENDANTS' JULY 20, 2023 MOTIONS *IN LIMINE***

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East, 7th Floor
Brooklyn, New York 11201

July 27, 2023

Michael Blume
David Cooper
Paulina Stamatelos
Assistant United States Attorneys
(Of Counsel)

The United States respectfully submits this response to Defendants' July 20, 2023 motions *in limine*, in which they seek to (1) exclude evidence concerning prior ATF classifications of firearms other than the FRT-15; and (2) exclude evidence about the rate of fire of a rifle fitted with an FRT-15.  *See* Dkt. Nos. 92-93.[1]

Defendants themselves put both of those issues in play, by way of the experts that they chose to employ and by way of their own marketing.

First, Defendants' experts rely on prior ATF classifications, both public and private, in their opinions.  Indeed, their opinions are riddled with statements about how ATF has classified products that work much the same way as the FRT-15.  They explicitly offer to the Court a purported insider view of ATF's thinking about machineguns, embodied by prior classifications, and purport to characterize that thinking for the Court.  Given that all of these individuals are former ATF officials of one sort or another, they were privy to all of these prior classifications.  In fact, one of Defendants' experts actually wrote several of the classifications.

The United States is therefore entitled to use these prior classifications, in large part, to show that Defendants' characterizations about ATF's thinking is wrong.  The United States also is entitled to use these classifications to directly contradict statements that Defendants' experts make in their written opinions.

Second, as to the rate of fire of a rifle fitted with an FRT-15, Defendants have touted that rate of fire as part of their marketing.  For example, several of the promotional videos they posted on their

---

[1] The issues underlying Defendants' motions *in limine* at Docket Numbers 92 and 93 are identical; indeed, apart from the motion in limine number, their titles are the same.  The United States therefore responds to both motions *in limine* this one memorandum.  Moreover, the United States notes that as Defendants' motion references *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) and expert testimony, Defendants' motion is subject to dismissal because it is untimely, as the Court has previously ordered that "[a]ny motion in limine regarding expert testimony must be filed on or before July 10, 2023.  *See* Dkt. Order dated June 1, 2023.

website open with a montage of two men (one of whom is Defendant Lawrence DeMonico) using rifles fitted with FRT-15s, including a video explaining how the FRT-15 works. *See, e.g.*, Plaintiff's Ex. 25. One purpose of such a video is to inform customers that they can buy a trigger that gives them a machinegun rate-of-fire without the need for any special skill. That is, unlike other *legal* triggers on the market that require extraordinary dexterity or long experience with firearms to increase rate of fire, the FRT-15 allows anyone to shoot with the rate of fire of a machinegun. Discussion of the rate of fire associated with an FRT-15 thus goes directly to the irreparable harm caused by the sale of these devices and is clearly relevant for purposes of the preliminary injunction hearing.

I. **Prior ATF Classifications of Machineguns Contradict the Opinions of Defendants' Experts**

A. **Movement of the Trigger is Irrelevant**

Defendants' experts make much of the fact that the trigger in an FRT-15 moves backward and forward as the rifle fires repeatedly. For these experts, that movement is all but dispositive; for them, a movement of the trigger is a function of the trigger. (Not so, for reasons that are laid out in the reports of Anthony Ciravolo, the United States' expert. *See* Plaintiff's Ex. 27-28.)

The United States intends to use the prior classifications to show that the experts' arguments in this regard are wrong and that they know that they are wrong.

Drawing on and explicitly referring to their purported understanding of the allegedly non-public views of the ATF, Defendants' experts state, again and again, that a movement of the trigger is a function of the trigger. Daniel O'Kelly, for instance, references an internal, non-public, and clearly privileged ATF email from 2009 in which one ATF employee states that the single movement of a trigger is a single function. *See* Defendants' Ex. A1 at pp. 14, 41.[2] He adds, in several places in his

---

[2] Query why Mr. O'Kelly possesses such an email, as he has not been an ATF employee since 2011, let alone why he believes that he is authorized to release privileged information.

2

report, that trigger movement is what matters when it comes to classification. *See, e.g.,* Defendants' Ex. A1 at p. 6 ("It is extremely important to note that every time the trigger is forced forward into the reset position, the shooter's finger is forced forward also."). Rick Vasquez tries to argue the same point. *See, e.g.*, Defendants' Ex. B1 at p. 3 ("The crucial point to understand is that the FRT-15 trigger must still function rearward to fire and then function forward into the reset position for each round fired."); *see also id.* at p. 26 ("Accordingly, since ATF interprets the term "single function of the trigger" in the NFA definition of machinegun to mean a single movement of the trigger. Each "pull" of a trigger constitutes a single movement.").[3]

The fundamental problem with these statements is that they are false, which the prior ATF classifications – some of which Mr. Vasquez himself wrote – make clear. Take the Blakley trigger. Mr. Vasquez wrote the 2004 ATF classification for the Blakley trigger. *See* Plaintiff's Ex. 119.[4] The Blakley trigger works remarkably like the FRT-15. After the rifle fires the first round, the Blakley trigger uses the movement of the bolt to "reset" the trigger and then it holds the trigger and hammer in place momentarily with a pivoting "cam," which is akin to the FRT-15's "locking bar," to properly time the firing of the next round. *See id.* In a rifle fitted with a Blakley trigger, "from the moment of the application of trigger pressure – and as long as rearward pressure is applied to the trigger – the firearm continues to fire until the firing finger is removed;" these are Mr. Vasquez's very own words. *Id*. at pp. 1-2. The trigger, therefore, is a machinegun. It is a machinegun even though "this firing

---

[3] Note that Mr. Vasquez states in his report that he "additionally reviewed previous ATF Firearms Technology Branch rulings on machineguns and rate of fire increasing triggers …." Defendants' Ex. B1 at p. 25. Rulings on machineguns are not public. That is, Mr. Vasquez is stating that his opinions are based in part on his analysis of prior, non-public ATF classifications. In addition, in a declaration filed on July 25, Mr. Vasquez refers to an internal, ATF memorandum from 1989 in which an ATF attorney offers a legal view of the meaning of a single function of trigger. Again, query why Mr. Vasquez possesses such memo, as he has not been an ATF employee since 2014, let alone why he believes that he is authorized to release privileged information.

[4] Defendants now own the patent for the Blakley trigger. A company in which they have an ownership interest – ABC IP, LLC – purchased the patent in 2022.

3

takes place regardless of the cam's pushing the trigger forward;" again, these are Mr. Vasquez's own words.  *Id*. at p. 2.  That is, according to Mr. Vasquez, the Blakley trigger is a machinegun even though the trigger moves back and forth as the rifle continues to fire.

>   **B. Constant Rearward Pressure on the Trigger Causes the FRT-15 to Fire Repeatedly, A Fact that ATF Has Long Considered Key In Classifying Machineguns**

Again and again, Defendants' experts seek to downplay, even disregard, the importance of the fact that constant rearward pressure on the FRT-15 causes a rifle to fire repeatedly.  Mr. O'Kelly goes so far as to say that the use of the phrase "continuous pull of the trigger" is "false and misleading."  Defendants' Ex. A1 at p. 11.  He claims, too, that the classification of the FRT-15 "is the first time that ATF acknowledges the "pull" of a trigger as a function."  *Id*. at p. 52.  That is, Mr. O'Kelly seeks to undermine the opinion of Mr. Ciravolo by arguing that ATF introduced a brand new, but false and misleading, concept into their analysis of the FRT-15.

Again, the fundamental problem with Mr. O'Kelly's argument here is that it is simply wrong, as borne out by prior ATF classifications.  One such example is an ATF classification from 2017.  *See* Plaintiff's Ex. 114.  In that classification, the ATF examined a "trigger reset device," which operates similarly to the FRT-15.  *See id.*  The ATF determined that the product was a machinegun and, in so doing, stated that "ATF has long held that a single pull of the trigger is the same as a "single function" of the trigger."  *Id*. at p. 7.  It then stated that "[w]ith *constant pressure* or a single pull of the firearm trigger, the host AR-type firearm shoots automatically more than one shot, without manual reloading, by a single function of the trigger."  *Id*. (emphasis added); *see also id.* at p. 5 ("A second shot is then fired because the shooter has retained a *single, constant pull* that again releases the hammer once the

4

trigger reset lever stops pushing downward.") (emphasis added).[5]

### C. The ATF Has Long, and Consistently, Determined That Products That Work Like the FRT-15 are Machineguns.

In various ways, Defendants' experts assert that ATF's classifications of products that work like the FRT-15 have been inconsistent, random, or arbitrary. They do so, presumably, to try to establish that Mr. Ciravolo's expert opinion cannot be trusted because ATF's position is ever-changing and without basis. Mr. Vasquez broadly states that "there is no verifiable history of ATF opinions to support this trigger being classified as a machinegun, both in general and specifically pertaining to the underlying design." Defendants' Ex. B1 at p. 27. Mr. Vasquez puts it this way, "they [Ciravolo and the FEOs that classified the FRT] pick and choose the items they intend to approve, seemingly based on personal choice or orders from their superiors." *Id*. at p. 6.[6] He claims that "[h]aving reviewed many of these devices and knowing how they operate, it appears to me that the [prior] classifications are not made in a scientific or otherwise consistent manner." *Id*. at p. 5.[7] When it suits him, however, Mr. Vasquez contends that there is a certain consistency to ATF's prior classifications. Indeed, he says that "it has long been ATF's position (dating back to the late 2000) that semi-automatic rifles that did not use electronics, springs or hydraulics to reset the trigger were not machineguns." *Id*. at p. 26.

None of what Mr. Vasquez says is true, as the prior classifications show. As far back as 1975, the ATF determined that a product that worked like the FRT-15 was a machinegun. *See* Plaintiff's Ex. 116 (examining a trigger that, after firing one round, is forced forward again to allow for

---

[5] Note, too, that the trigger evaluated in this classification moves back and forth as the rifle fires repeatedly. *See* Plaintiff's Ex. 114 at pp. 4-5. ATF still determined that the trigger was a machinegun.

[6] Mr. O'Kelly makes a similar claim. *See* Defendants' Ex. A1 at pp. 46-47.

[7] Do note that some of the classifications Mr. Vasquez now claims are unscientific or inconsistent were either written by him or reviewed by him.

5

subsequent firings and finding that "while continuous finger pressure is maintained on the trigger the weapon will fire continuously"). The ATF made similar findings in the reports identified as Plaintiff's Exhibits 29-33, 114, 116, and 118-19. In addition, the ATF did so even though the rifles did not use electronics, springs, or hydraulics to reset the triggers, a fact that Mr. Vasquez well knows, as he either personally reviewed or personally wrote the reports identified as Exhibits 29-33 and 119.

## II. The FRT-15's Rate of Fire Was a Key Part of Defendants' Marketing

At bottom, the allure of the FRT-15 for Defendants' customers is that it allows a shooter to fire a rifle as fast as an M16 without any special skill. Anyone could do it. Other triggers on the market – whether they were standard semi-automatic triggers, semi-automatic "forced reset triggers" like the 3MR, or binary triggers like the Fostech Echo AR II – can achieve rates-of-fire that are comparable to an M16.[8] But achieving such a rate of fire with these other triggers demands a skill and dexterity that most people simply do not have. As Mr. O'Kelly states, "[t]he advantage of the Rare Breed LLC FRT trigger system is that when a shooter holds pressure against the locked trigger during the cycle of operation, he is able to pull (function) it again immediately after the cycle of operation ends, and avoid the normally much slower reaction time need when using a traditional trigger." Defendants' Ex. A1 at p. 44. Thus, as Mr. O'Kelly also states, "[t]he shooter does not need to worry about the fine motor control and dexterity required by a traditional semiautomatic trigger to cycle between increasing and decreasing pressure on the trigger to fire multiple shots." *Id*. at p. 4. So, to achieve the rate-of-fire of a machinegun, a shooter can either (1) buy a machinegun; (2) master the skill of reacting every 1/5 of a second as the rifle cycles through its operations; or (3) use an FRT-

---

[8] Defendants are correct in stating that the rate of fire of a weapon is not a factor in determining whether that weapon is a machinegun. The are also correct in stating that Mr. Ciravolo did not rely on any rate-of-fire analysis in concluding that the FRT-15 is a machinegun.

15.[9]  Because option (1) is illegal and option (2) is beyond the capability of most people, option (3) becomes attractive and is thus the main selling point Defendants' used to market the FRT-15.[10]

The FRT-15's rate of fire is relevant because Defendants have made it so. Much of this case is about how Defendants have marketed and sold the FRT-15 to their consumers. Its rate of fire is a big part of that marketing. Plaintiff's Exhibit 25, which came directly from the RBT website, opens with a montage highlighting the FRT-15's rate of fire. It is relevant to how Defendants sold the FRT-15.

The flip side to the advantage of the FRT-15's rate of fire is that a rifle fitted with an FRT-15 is difficult to control. Put simply, an ordinary shooter cannot fire just one round at a time with an FRT-15.[11]  There will be times, however, when a shooter wants to do just that. Enter RBT's three position trigger. RBT's three position trigger, which was still in development when this litigation began, allows the shooter to set the trigger to three different positions: (1) safe, which prevents the weapon from firing; (2) standard semi-automatic, which operates just as any standard semi-automatic trigger operates; and (3) forced reset, which operates as the FRT-15. Plaintiff's Exhibit 24 is a video of Defendant DeMonico demonstrating a prototype of the three position trigger. The video shows how the two firing positions differ; the video thus shows how the FRT-15 and a semi-automatic

---

[9] Mr. O'Kelly describes in his report how "[i]t is possible for a shooter to fire a second shot using a traditional semiautomatic trigger within 1/5 of a second after firing the first. The shooter only needs to have the dexterity to react and act within 1/5 of a second." Defendants' Ex. A1.

[10] Defendants' Exhibit M is a good example of this point. The Exhibit is a video of a highly skilled individual named Jerry Miculek. Mr. Miculek, it seems, can fire a standard semi-automatic trigger to achieve a rate of fire comparable to a machinegun. Mr. Miculek is well and widely known among just about anyone who has more than a passing interest in firearms. In the video, which is sponsored by Big Daddy Unlimited, the company that was RBT's sole distributor for FRT-15s in 2021, Mr. Miculek compares how fast he can fire a weapon using a standard trigger to how fast the FRT-15 can fire. An obvious point of the video is to show consumers that they, too, can fire as fast Mr. Miculek without really trying so long as they are using an FRT-15.

[11] Skilled shooters may be able to fire one round at a time using an FRT-15, just as skilled shooters may be able to fire one round at a time using a standard fully automatic trigger. But, to do so, requires the reflexes and dexterity that are beyond many (if not most) people.

trigger differ, and it is therefore relevant.

Just as telling, the development of RBT's three position trigger is an acknowledgement that Defendants recognize that the FRT-15 is a machinegun, in that the everyday shooter using the FRT-15 is going to fire more than one round, automatically, each time the shooter shoots the rifle whether he wants to or not. If customers could readily fire only one shot at a time using the FRT-15, there would be no need for a third position. With the three position trigger, then, Defendants can attract even more customers.

### III. Prior Classifications go to Defendants' Intent

Defendants are wrong to state that the prior ATF classifications cannot be used to establish their intent. Plaintiff's Exhibits 29-33 do just that. To understand why, begin with Plaintiff's Exhibit 102. Plaintiff's Exhibit 102 is an email from a customer to RBT. It was sent to an email account that was monitored by Defendant DeMonico. RBT received the email on January 8, 2021, just a few weeks after the company first began selling FRT-15s. In the email, the consumer opened by saying, "[t]his is a warning given to you." Plaintiff's Ex. 102. He then went on to describe how he had "developed a trigger system for a Ruger 10-22 that had the same forced reset function as your Rare Breed FRT-15 system." *Id*. He submitted his product to ATF several times. *See id.* ATF ultimately determined that his product was a machinegun. The email writer stated that "[s]ince your FRT-15 works the same principals [sic] as my system design a BATFE review would most likely provide the same result." *Id*. He ended his email by saying that, if RBT had any questions, just ask.

The ATF classification letters associated with the warning email are Plaintiff's Exhibits 29-33. Those letters were either written by or reviewed by Mr. Vasquez. Within a week of receiving the warning email, Defendants hired Mr. Vasquez.

Given the warning email, the ATF letters associated with the warning email, Mr. Vasquez's

8

involvement with those ATF letters, and the timing of Defendants' hiring Mr. Vasquez, there is a strong suggestion that the warning email prompted Defendants to look into the product at issue and into the ATF letters that classified the product as a machinegun. They thus would have known – within weeks of their beginning to sell FRT-15s – that ATF had classified a product just like theirs as a machinegun.

Perhaps Defendants simply disregarded the warning email. If so, that too goes to their intent. It establishes that either that they did not care what ATF thought of their product as they were going to sell it no matter what, that they already knew what ATF was going to think about their product and they were going to sell it no matter what, or both.[12]

---

[12] In addition, just like the ATF classification letters described in Section I, above, the ATF classification letters of this product are further evidence that movement of the trigger is irrelevant, that continuous rearward pressure on the trigger matters, and that ATF has been consistent in classifying products like the FRT-15 as machineguns. For example, in Plaintiff's Exhibit 33, a classification reviewed by Mr. Vasquez, the ATF found the product to be a machinegun "because it is evident that from the moment of the application of trigger pressure – and as long as rearward pressure is applied to the trigger – the firearm continues to fire until the firing finger is removed; this firing takes place regardless of the rearward bolt travel that pushes the trigger forward into the cocked position." Plaintiff's Ex. 33 at p. 2. For all the reasons noted in Section I, Plaintiff's Exhibits 29-33 are relevant.

9

For the foregoing reasons, the Court should deny Defendants' motions.

Dated: Brooklyn, New York

July 27, 2023

                BREON PEACE
                United States Attorney

         By:   /s/
                Michael Blume
                David Cooper
                Paulina Stamatelos
                Assistant United States Attorneys
                (718) 254-7000

**cc:** **BY ECF**
   Counsel of Record