```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2
      ------------------------------x
 3                                          23-CV-369(NRM)
      UNITED STATES OF AMERICA,
 4                                          United States Courthouse
                 Plaintiff,                 Brooklyn, New York
 5
                 -versus-                   June 23, 2023
 6                                          11:45 a.m.
      RARE BREED TRIGGERS, LLC
 7    ET AL.,

 8               Defendants.

 9    ------------------------------x

10               TRANSCRIPT OF CIVIL CAUSE FOR HEARING
                  BEFORE THE HONORABLE NINA MORRISON
11                         DISTRICT JUDGE

12
      APPEARANCES
13

14    For the Plaintiff:      U.S. ATTORNEY'S OFFICE
                               EASTERN DISTRICT OF NEW YORK
15                             BY:  MICHAEL BLUME, ESQ.
                                    PAULINA STAMATELOS, ESQ.
16

17    For the Defendant:      DHILLON LAW GROUP
                               50 Park Place
18                             Newark, New Jersey 07102
                               BY:  JOSIAH CONTARINO, ESQ.
19                                  DAVID WARRINGTON, ESQ.

20
      Court Reporter:         Rivka Teich, CSR, RPR, RMR, FCRR
21                            Phone:  718-613-2268
                              Email:  RivkaTeich@gmail.com
22
      Proceedings recorded by mechanical stenography.  Transcript
23    produced by computer-aided transcription.

24

25
```

PROCEEDINGS

1          (Video conference.)

2          THE COURTROOM DEPUTY:  All Rise.  Civil cause for a

3    video status conference, case 23-CV-369, United States of

4    America vs. Rare Breed Triggers LLC, et al.

5          Counsel state your appearance for the record.

6          MR. BLUME:  Good morning everyone.  Mike Blume for

7    the United States.

8          MS. STAMATELOS:  Good morning.  Paulina Stamatelos

9    for the plaintiff.

10          MR. CONTARINO:  Josiah Contarino from the Dhillon

11    Law Group on behalf of defendants.

12          MR. WARRINGTON:  David Warrington, also from the

13    Dhillon Law Group, on behalf of the defendants.

14          THE COURT:  Good morning.  Any other counsel here?

15    I see Mr. DeMonico here and Mr. Maxwell.  Any other counsel

16    appearing?

17          MR. WARRINGTON:  Our colleague, Mike Columbo is on

18    the line but his admission to EDNY has not been finalized

19    yesterday.

20          THE COURT:  Welcome.

21          We are here to address the defendant's motion for a

22    protective order and motion to quash a subpoena.  And I also

23    was alerted by letter from both sides to some other

24    outstanding discovery issues, that I may or may not want to

25    address today.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS

1          Let's start with what I think is the easiest one.

2   It looks like from the latest submission that maybe the motion

3   to quash regarding the production related to Mr. Vasquez is

4   moot or needs a little bow-tieing before we can proceed.

5          Why don't I hear from defense counsel,

6   Mr. Contarino, if you want to address this given it was your

7   motion.

8          MR. CONTARINO:  Thank you, your Honor.

9          I think that's right.  The date, January 18, 2021

10  onward, obtained as an expert; and documents before that time

11  would not fall into that category.

12         THE COURT:  Okay.  Does the Government have any

13  issue with limiting its production at this point to

14  January 18, 2021?

15         MS. STAMATELOS:  No, your Honor.

16         THE COURT:  Okay.  I think technically I'm just

17  going to dismiss it as moot.  To the extent there is another

18  issue you want me to raise it differently, you can let me

19  know.  I appreciate you all working that one out.

20         Let me now address what I suspect will be a slightly

21  more complicated one, the motion for a protective order

22  related to the materials on Chase Paymentech -- I may be

23  pronouncing that wrong -- and UPS.

24         Before I do that, though, let me say one thing.  I

25  want to address one issue that came up in those briefs that

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

4

PROCEEDINGS

1  had to do with the representation regarding whether the UPS

2  subpoena was or was not copied to all of defense counsel; that

3  is, prior counsel, Mr. Kruckenberg specifically who was

4  appearing primarily as lead counsel in conjunction with

5  Mr. Houghton.  As you all know, I was a litigator far longer

6  than a judge, I know mistakes happen.  I'm not going to come

7  down too hard on defense counsel on this.  But I want to

8  underscore the importance of making sure if you're going to

9  make a factual representation to me of something that was or

10 was not provided to someone, particularly in conjunction with

11 a motion that you want me to rely on that and act under the

12 equities, I need you all to make sure that you check that

13 first.  In this case, having looked at the subpoena and the

14 emails, given particularly that Mr. Kruckenberg's name was on

15 the subpoena even if Mr. Houghton's email was on there, it

16 would have taken a quick phone call or note to him to ask him

17 to check the emails from that date to see if he was copied.

18 Frankly, I don't know if it would have been an issue even if

19 he wasn't given that not only was Mr. Houghton appearing

20 counsel, but they worked at the same office.

21      Nevertheless, there was a representation that there

22 was some sort of sneaky behavior, for lack of a better word,

23 on the part of the Government in intentionally not copying

24 Mr. Kruckenberg, which appears to not be the case.  And while

25 not ultimately material to my decision, particularly in light

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS

1    of the fact that we had a much more serious problem with it,

2    best incomplete facts on the personal jurisdiction stage on

3    defendants' side, I really want to caution you and your

4    clients that if this happens again, and there is not a good

5    explanation, I won't be so forgiving.

6            All of that, knowing you just came on the case a few

7    weeks ago, are trying to deal with a lot of balls in the air

8    on an expedited schedule.  Nothing from me beyond that, I just

9    wanted you all to be aware of my views on that.

10           MR. CONTARINO:  Yes, your Honor.

11           THE COURT:  I have a couple of threshold questions.

12   I will confess it took me a couple of read-throughs of your

13   letters and some of the documents to make sure I understood

14   what exactly the relief was that was being requested with

15   respect to these UPS records and the Chase Paymentech records,

16   and where things actually stood.  I think I understood them,

17   but I may not be entirely clear.

18           Am I right that the only relief you're seeking with

19   respect to those records relate to information that has

20   already been disclosed to the Government's trial team; that

21   is, there is nothing still outstanding from either of the

22   third-parties involved, and none of these are currently being

23   held just with the firewall AUSA that we set up for this

24   purpose, and they already have they been turned over to the

25   trial team.

PROCEEDINGS

1          MR. CONTARINO:  Yes, your Honor.  They were before

2     the firewall was in place.

3          THE COURT:  Okay, all right.

4          Let me just start by telling you, to make things a

5     little faster and easier a little bit of my thinking having

6     looed at the letters and some of the record and authorities

7     you cited.

8          I appreciate that new counsel on board may have a

9     different take on some concessions that prior counsel, made

10    some of where they spent their time and energy, but given that

11    this has already been disclosed and it wasn't any advertent

12    disclosure, it was a negotiated disclosure.  And even though

13    the law does give me the authority to walk that back if the

14    circumstances so warrant, I think defense counsel have a

15    fairly high bar in convincing me to do so.  I think that's

16    particularly so given what I understood from the hearing on

17    the motion to withdraw about the circumstances of the

18    withdrawal and what I learned, is this is not a case where

19    counsel were fired for cause or some sort of lapse in

20    diligence.  To the contrary, there seemed to be no dispute

21    that Mr.  Kirk and his colleagues were exceptionally diligent

22    and vigorously advocated for their clients' rights to limit

23    discovery to the reasonable scope I dictated.  Having new

24    counsel doesn't provide an opportunity, especially when we're

25    on a time table this tight to have me revisit things that have

PROCEEDINGS

1    been produced.

2         That said, I do have some concerns that had they

3    been brought to me in the first instance before it was

4    produced, I might have more specifically limited discovery.  I

5    do want to hear argument about why I should, in essence, issue

6    an order that would in someway limit what the Government can

7    do with the information, or whether they should redact and not

8    use things that have already been provided.

9         I will say up front that I do agree with the

10   Government that there are serious difficulties in me directing

11   them to not do something specifically with respect to other

12   agencies that they work with or represent.  So having them

13   specify uses to other agencies that this information can or

14   cannot be put, I think it does raise some separation of powers

15   concerns, writ large.  And even though there may be some

16   things that I can do to limit it, at this point I want to be

17   very careful in how I do it.  To the extent I end up granting

18   any portion of the defendants' request, I'm going to do so in

19   a way that doesn't infringe on that.

20        Neither side really cited much authority in that

21   regard, I think because it's so unusual, other than in the

22   case where something is inadvertently disclose and you give

23   back, there is not a lot out there in this regard.

24        But I also don't think that there is much to the

25   defendants' argument that there is a third-party privacy

PROCEEDINGS

1    interest involved.  Meaning, I haven't seen any evidence of a

2    contractual obligation with RBT's clients that would require

3    me to essentially prevent relevant information from being

4    disclosed in this litigation.  In fact, UPS seems to put their

5    clients on notice that it could be subject to disclosure.  I

6    think the cases cited tend to go much more towards sharing

7    customer information for purposes of not giving up a

8    competitive advantage or customer base between the two

9    commercial entities.  That's obviously not the case here.

10          That said, I think what does give me some pause is

11    that, number one, the UPS subpoena was served at a time when I

12    clearly limited this just to jurisdictional discovery on the

13    personal jurisdiction issue, and not to merits discovery.  And

14    had limited already some of what could be sought and obtained

15    in merits discovery.

16          As well as with respect to the Chase records, some

17    of, I wouldn't say affirmative representations that there

18    would be no customer names and addresses ultimately obtained,

19    but at least some assurance from the Government's part that's

20    not what they were seeking at that time through the credit

21    card information.  Now, one could say, what else did they

22    think the credit card information would be for, if not to

23    identify and use them.  But given that there was some good

24    faith back and forth for the purpose of which it was sought, I

25    think there are some merits.

PROCEEDINGS

1          The biggest question in my mind I think is the

2    significance of the potential criminal exposure, criminal

3    liability, on the part of RBT's customers, whether knowing or

4    unknowing, it's my understanding that Government's position is

5    that tens of thousands of people may currently, whether known

6    to them or not, possess devices that in the Government's view

7    are illegal; and thus could potentially subject to criminal

8    prosecution if they don't surrender them.  While that is

9    something that those individuals may have to reckon with if

10   and when the injunction is granted, depending on the scope and

11   depending on whether that is necessary to carry out any terms

12   I may agree to down the road, at this stage where we are

13   approaching a PI hearing, I do need to hear more about the

14   relevancy of these customers' names and identifying

15   information, and really understand that so I can engage in a

16   proportionality inquiry here.

17          That is an overview of where I am.  Let me hear from

18   the Government first as the proponent of the information

19   specifically on the criminal liability question and the

20   relevancy question, which I trust given the recent filings

21   you've come prepared to address.

22          MS. STAMATELOS:  With respect to the significance of

23   the criminal liability, what we can represent is that the UPS

24   records are not being used by ATF right now.  Whether or not

25   they will be used in the future is not known to us right now.

PROCEEDINGS

1          And I think that answering that question right now,

2     even if I had that information, would infringe on law

3     enforcement privilege and the inter-agency relationship.

4          THE COURT:  Well, let me ask you this.  If the

5     defendants had inadvertently disclosed privileged information

6     and you had given it to UPS because you gave them copy of

7     everything you received in discovery, I could order that

8     returned especially if they hadn't done anything with it at

9     that point.

10          If you're saying they haven't and they haven't done

11     anything with it, why is this any different if I can conclude

12     that they weren't entitled to have it in the first place,

13     where they couldn't jus t give it back to you and not take any

14     action; unless and until an injunction is granted and they are

15     provided with it?

16          MS. STAMATELOS:  Is your Honor's question that we

17     can use this information in the civil litigation in the sense

18     that we can use it to establish mail fraud.  We can use it to

19     establish the scope of the defendants' fraud in the sense

20     there are thousands of individuals that were defrauded under

21     our theory, that they are all over the country.  That there

22     will be irreparable harm, or a lot of harm, to the ATF.  And

23     even seeking to retrieve these FRT-15s.  Also the relevance

24     is, I think the Court did acknowledge this in one of the

25     hearings, is that we do, and we may, want to reach out to

11

PROCEEDINGS

1    individuals that are that have been identified in the shipping

2    records so that we can establish to the extent they want to

3    speak to us voluntarily, that we want to present some sort of

4    evidence at the PI hearing as to whether or not these

5    customers thought they were defrauded.  I think that is really

6    the relevance of the UPS documents in the civil litigation.

7            THE COURT:  Let me ask you to break that down a

8    little.  At a basic level, with respect to both the UPS and

9    Chase credit card information, which could now be used to find

10   out who the purchasers were.  Why at this stage for the

11   preliminary injunction hearing do you need that information?

12   That is, what are you hoping it will produce for you?  It's

13   just names and addresses at this point, or potential names and

14   addresses.  What are you hoping it will yield through further

15   investigation that will produce relevant evidence for me to

16   decide the question of whether the defendants should be

17   enjoined in the first instance from continuing to sell these

18   devices at all?  Why is it relevant and what are you hoping to

19   get?

20           MS. STAMATELOS:  As we mentioned, we are hoping to

21   get -- this is not easy -- hoping to get individuals who will

22   agree to either testify or provide some sort of affidavits or

23   declaration that they were not told, that they did not know,

24   they wouldn't have bought this FRT-15 but for the actions that

25   the defendants.  That is not easy to do, your Honor.

PROCEEDINGS

1          But I will say, that we have had individuals

2    voluntarily give up their FRT-15s and speak with the

3    Government with regards to the issues relating to fraud.  I

4    think this goes really to the scope of the fraud and this goes

5    to the individual fraud, which I think that is something that

6    we do want to focus on at the preliminary injunction hearing.

7          THE COURT:  Without getting into unnecessarily

8    infringing on your work product, can you tell me what are the

9    sources of information thus far from which you have found

10   those individuals who are willing to be interviewed in

11   connection with that question, whether they knew the device

12   was legal or in any way misled by, as you contend, defendants'

13   advertising statements, omissions, that sort of thing.

14         MS. STAMATELOS:  I do have to be careful here.

15         THE COURT:  Yes.

16         MS. STAMATELOS:  Two things.  One is, as your Honor

17   knows, ATF during the pendency of the personal jurisdiction

18   motion were able to locate individuals who voluntarily gave up

19   the FRT-15s.  And again I don't want to give up our strategy,

20   but what we're hoping to present is enough evidence that these

21   individuals felt defrauded.  What I want to do is also talk

22   about --

23         THE COURT:  One source was ATF.  It looked like from

24   what I read, that some the discovery you got already which

25   related to individuals who were customers who requested

PROCEEDINGS

1    charge-backs or complained about their purchase that they

2    provided as well.  I saw one of the very colorful emails in

3    one of your submissions, seemed to specifically go to the

4    point you were trying to make about a lack of knowledge.

5        MS. STAMATELOS:  If I may, your Honor.  The Chase

6    Paymentech records, we served that subpoena for two reasons.

7    We know that Chase Paymentech was the credit card that RBT

8    used to accept payment from consumers.  One of the reasons why

9    we sought that information in of itself is for financial

10   records.  And part of our theory is -- not part of our

11   theory -- what we're trying to also prove, just how much money

12   was made in a very short amount of time, where that money

13   went.  And we're putting together that presentation, the

14   financial aspect of this.  That's why we sought the Chase

15   Paymentech monthly records for that point.

16       However, what the defendants, and this is in our

17   papers, there is a lot in our papers in the complaint, what

18   the defendants did is that they had a no-refund policy.  What

19   that meant is that tens of thousands of people could not ask

20   to refunded, could not ask for -- were actively preventing

21   from asking for a refunded for whatever reason.  But we do

22   know that part of that reason is ATF's actions, and the

23   Government's allegations in cease and desist letter that this

24   was an illegal weapon.

25       The Chase Paymentech records, notwithstanding the

PROCEEDINGS

1  no-refund policy, the Chase payment tech charge-back records,

2  which prior counsel agreed was relevant, agreed we could get

3  the personal identifying information, includes communications

4  from RBT customers that said despite your no-refund policy, I

5  do not want to pay for a weapon that I have learned, or fear,

6  is illegal.

7       And so that is that's what we're trying to do here.

8  We're trying to get that kind of information.  It's not easy.

9  That is why the charge back information is relevant, is

10  something that we are entitled to.  And that argument has been

11  waived by prior counsel.  Prior counsel and us, we met and

12  conferred.  They specifically said we concede that the

13  charge-back information and the personal identifying

14  information is well within your rights.

15       THE COURT:  Is the Chase payment tech info that was

16  turned over limited to charge backs?  Or is it every single

17  transaction that Chase payment tech processed whether or not

18  the individuals complained?  How many people are we talking

19  about on each side?

20       MS. STAMATELOS:  The Chase payment tech records,

21  they are just monthly statements, financial transactions.

22  It's how much money did you make every month off your credit

23  card processing.  It's just money.  That's why we sought --

24  that's the first part -- there are two reasons why we sought

25  the Chase payment tech.  One is about your money, how much

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS

1    money you were making every month.  Then we want to know who

2    complained, who wanted their money back, and what was your

3    response to these individuals despite the no-refund policy.

4           So we think that these records could not be more

5    relevant to the prosecution of our case.

6           And one more thing with respect to the credit card

7    numbers, we did not -- under no circumstances did we, are we

8    looking to reverse engineer.  This phrase comes up in the

9    defendants' papers.  It's not something that we're interested

10   in doing, we'll make that concession.  We have no interest

11   whatsoever in any reverse engineering, we don't even know what

12   that means.

13          I think that, just to be clear, on the monthly --

14   I'm having issues with zoom.

15          On the statements there are no names, just credit

16   card numbers, literally a bunch of numbers.  All we want from

17   that is monthly statements.  That's what we're using the

18   records for.

19          THE COURT:  So even though it came up in your

20   discussions that it may theoretically be possible for you to

21   obtain the names and addresses of individuals whose credit

22   cards are on those monthly statements, it's your

23   representation now that you do not intend to, and will not,

24   use those numbers to try to locate potential witnesses,

25   meaning RBT customers, for purposes of this hearing at this

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS

1    point.

2         MS. STAMATELOS:  No, your Honor.  I can't even

3    imagine -- we do not care about credit card numbers, your

4    Honor.  We just don't.  We want the information that is in the

5    records that is useful to us.

6         THE COURT:  Let me specific here, though.  I have a

7    motion to quash on one theory and if it's not something you're

8    going to do, it may be moot in that respect.

9         When you're saying we have no interest in credit

10   card numbers, do you have any interest -- and you don't have

11   unlimited resources, but you are the U.S. Government and have

12   a lot of resources -- in taking the credit card numbers and

13   using them to locate potential witnesses for the purpose, what

14   you contend is a highly relevant purpose for the hearing;

15   namely, to figure out if credit card number 1234 traces to a

16   specific individual and having one of your investigators

17   contact that individual about the purchase.

18        MS. STAMATELOS:  I'm going to answer the question

19   this way.  When I spoke with the Chase Paymentech subpoena

20   specialist assigned to this case, I asked them:  Are these

21   records, the monthly statements going, to give me the name and

22   address of the purchasers?  She said no.

23        I appreciate that people think that the Government

24   has resources, but they are not endless.  And I will tell you,

25   the credit card numbers at no point factored into our efforts

PROCEEDINGS

1    to get customer personal identifying information.

2           THE COURT:  So they haven't yet, but let me get real

3    specific here --

4           MS. STAMATELOS:  We can redact, if they want us to

5    redact credit card numbers on hundreds of pages we're on an

6    expedited schedule --

7           THE COURT:  I'm not even talking about redactions.

8    All I'm saying is if I were to enter an order at conclusion of

9    this conference that based on what you represented to me the

10   Government has agreed that it does not intend to, and will

11   not, search for customer names and addresses by attempting to

12   trace them through those credit card numbers.  And keeping the

13   unredacted documents means you will still voluntarily, or

14   voluntarily with the Court's so ordered endorsement, restrict

15   the usage in that way.  That will save us the trouble of

16   redacting as long as you can represent that you're not going

17   to do it for that purpose.

18          MS. STAMATELOS:  Yes.  I also want to represent that

19   we did not serve the subpoena for that purpose.

20          THE COURT:  I understand that.

21          MS. STAMATELOS:  I want to make that clear for the

22   record.

23          THE COURT:  It seems as though the subpoena was

24   served for one purpose and then emerged that this other thing

25   was, at least theoretically possible, the defendants are

PROCEEDINGS

1    concerned that within the scope of their prior agreement it

2    could be used for a purpose that at that time they did not

3    believe they were agreeing to.  And to the extent you thought

4    that was perfectly okay, and you plan to use it and that was

5    part of the meet and confer, I would have heard you out that.

6              At least as to Chase, I know UPS is different, your

7    representation is you don't intend to use them for that

8    purpose.

9              Before I turn to UPS, which is another matter, let

10   me ask defense counsel.  Given the Government's representation

11   that until further order of this Court they will not under any

12   circumstances use those credit card numbers to try to contact

13   individuals associated with those numbers, is your motion to

14   quash with respect to the Chase Paymentech records moot at

15   this point?

16             MR. CONTARINO:  Yes.  We could have a stipulation

17   regarding that.

18             Then we did say that the Government -- we didn't

19   assume and make clear to say that the Government's intent

20   purpose was not that.  We weren't claiming that that was the

21   intent purpose.  At this point, it's realized it could happen.

22   We just want to make sure it doesn't.

23             THE COURT:  Okay it looks like we're two for three

24   now.

25             Let me move on.  We'll have the minute entry so

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS

1    reflect, or if you want to privately stipulate and submit it

2    to me so it has the language, you're welcome to do so.  That

3    takes care of that.

4          Let's talk about UPS.  I understand that the

5    Government's position is that you think these individuals have

6    highly relevant evidence.  How many people are we talking

7    about in the UPS records?  How many names and addresses were

8    disclosed?

9          MS. STAMATELOS:  Thousands, 471 pages of multiple

10    lines of individuals; it's a lot.

11          I do think for purposes of the record we do have to

12    focus on the fact that there are indisputable facts with

13    regards to some of the -- there are indisputable facts.  There

14    is a four-month delay coming to court.  There was notice and

15    opportunity, and we know that --

16          THE COURT:  I'm not debating that at all.

17          At this point I'm hearing you out on a clean slate.

18    But as I said earlier, that the defendants really do carry a

19    very heavy burden getting me to restrict something that has

20    been provided to you after negotiations, in which as I saw

21    from the records, were also provided to counsel by email and

22    then you specifically notify Mr. Kruckenberg -- granted a week

23    before he withdrew, but still in a timely fashion -- that you

24    received something that might not have been anticipated.  The

25    question now is, should I enter an order essentially having

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS

1    those names and addresses redacted, of tens of thousands of

2    individuals, that the defendants did not believe they were

3    agreeing to, you weren't necessarily expecting to get, but now

4    you have received.

5            Let me ask you this.  Given that we're talking about

6    so many people, why do you need all of those names?  And would

7    a much smaller representative sample accomplish your goals

8    without exposing those tens of thousands of people to having

9    their names discovered?  Why do you need so many?

10           MS. STAMATELOS:  A few points.  First, their names

11   are not publicly disclosed.

12           THE COURT:  I understand that.

13           MS. STAMATELOS:  Also, these records will -- the

14   protective order says, any and all records that have been

15   marked confidential at the reasonable end of litigation, will

16   be sent back to UPS or destroyed.  These records are going to

17   destroyed at one point.  That's the protective order that we

18   entered, standard protective order for all the confidential

19   information.

20           I think that, what I mentioned before, is we want to

21   be able to use this information for multiple purposes.  We

22   want to show that there are tens of thousands of these items

23   out there.  We want to show where they are, all the states, we

24   want to show the mail fraud element.  We want to show the

25   conspiracy element.  We want to show that -- we want to

PROCEEDINGS

1    reserve the right to reach out to individuals.  And we don't

2    know if a -- we can't know whether or not a random sampling or

3    a thousand here or there is going to help us.  What we know is

4    that we got these records legitimately.  And I've already made

5    a representation that right now ATF is not using this

6    information.

7         THE COURT:  So let me really try to focus this

8    inquiry here.  I understand, I think now, the history of how

9    you came to came them.  I would say, yes legitimate; also,

10   somewhat fortuitous given neither side was expecting that the

11   records produced by UPS would contain tens of thousands of

12   names of these customers.  I think that's a fair assumption,

13   both given what you've each told me about the history, as well

14   as the fact that at the time you served the subpoena you were

15   only doing jurisdictional discovery.

16        You now have this for purposes of your merits

17   investigation.  And I need to decide if it's fair that you

18   have it, if it should be limited in some way, especially since

19   the agents haven't acted on it yet.

20        Let me ask you this, it does require you to tell me

21   a little about your strategy and approach, but this is a civil

22   litigation and we're all a little more transparent about the

23   purposes to which discoverable information is to be put so a

24   judge can decide whether it should in fact be disclosed.  What

25   do you intend to do with those tens of thousands of names at

PROCEEDINGS

1   this point?  Why do you need so many of them?  How in the

2   limited time before the hearing are you going to figure out

3   who among those people are going to be potential witnesses?

4   And let's start with that, then I'll have more questions.

5        MS. STAMATELOS:  Well, I think that we are still in

6   the stage of putting together our litigation strategy.  Part

7   of the reason why we put the letter, the status report, into

8   the record about the deficiencies, serious deficiencies in the

9   document production from the defense attorneys, is that

10  frankly we're running out of time.  We're not going to concede

11  to any more extensions.  And we have to work with the

12  information that we have, and right now we have very little

13  information from the defendants.  So we have to rely on what

14  we have.

15       And if and when it gets to the point where we're

16  going to need these records, it will be a deliberate decision

17  based on information that defendants produced.  I'll be

18  candid, your Honor, it's barely 1500 pages.  I'm not going to

19  get into -- I think our letter is specific enough with regards

20  to the problems that we're having.

21       Ultimately, I'm being constrained in a way.  On one

22  hand I'm dealing with having to explain what my strategy is

23  before I have any really meaningful discovery from the

24  defendants.  That puts me in a position where I have to prove

25  a negative.  I don't care about disclosing litigation

PROCEEDINGS

1   strategy, I think it's fairly obvious what we're trying to do

2   here, but I don't what to constrain myself or ourselves to

3   presenting the evidence that we have.  Because we might get to

4   a point where we have --

5           THE COURT:  So let me clear.  I'm not talking about

6   what your evidence -- limiting what you're going to present.

7           My concern is, you've got tens of thousands of

8   people who may knowingly or unknowingly be facing criminal

9   liability.  An ATF agent or someone else working for the

10  Government may show up on the door of some untold numbers of

11  those people and say, we'd like to talk to you about how you

12  got this device, what did you know, how did you know.  Maybe

13  somebody gives you favorable information that would help your

14  case in the civil litigation.  And then you say, we'd like to

15  have come testify.  And they are outside of the subpoena power

16  of Eastern District of New York.  They say, no, thank you, I'd

17  rather not.  Is it inconceivable that the subject of their

18  potential criminal liability, if they don't cooperate with the

19  Government, comes up?  What if they ask you, am I facing

20  potential criminal charges?  Someone would have to be honest

21  and explain it.

22          This is not your ordinary civil discovery.  Even if

23  the Government has no intent to prosecuting these people at

24  this time, it is something that carries potentially

25  significant consequences for the individuals that you said you

PROCEEDINGS

1    intend to contact.

2           So, I've not made up my mind about what I'm going to

3    do about this.  But I am somewhat concerned that that is

4    disproportional to your needs, especially given that you can't

5    contact 10,000 people or more at this point.

6           What I'd like to know is, maybe you need a little

7    time to confer, what is the use to which you would put this?

8    One thing you said that seems to carry some weight is you want

9    to show the scope and breadth of their sales.  There doesn't

10   seem to be any real dispute about some of those aspects.  I

11   don't think you'll be deposing principals and get that, to the

12   extent there are records and that's part of the record,

13   redacting the names and addresses or at least the names and

14   street addresses, will still give you that geographic reach.

15   Really I would like you to engage with this question about

16   what happens when these individuals are contacted, and how you

17   are going to do it, and why do you need all of these names at

18   this juncture?

19           MR. BLUME:  May I, your Honor.

20           THE COURT:  Yes, please.

21           MR. BLUME:  You're raising a practical question, and

22   I think given that we going to answer -- (audio interruption).

23   The size of the records are such that between now and the

24   merits hearing there is no way for us to use those records in

25   a way that would -- the ATF is a small agency.  We're not

PROCEEDINGS

1    going to send out every agent they have out to 100,000 people

2    or so.  There are retrieval efforts.  This isn't private.  And

3    there are efforts in our litigation that talk to people, that

4    is much more targeted based on other sources of information;

5    which if I may, I won't disclose.  But we have other sources

6    of information.  We may use these records -- between now and

7    the merits hearing, I think the only way we're going to use

8    the names and addresses of these particular records is perhaps

9    to double check that people we may try to reach out to, based

10   on other sources, in fact may have gotten stuff from the

11   defendants.

12            Because we do have limited time and limited

13   resources, we have to be very targeted as to who we may reach

14   out to and that may be one way we would use it.

15            In a much broader sense, you're right, we can't as a

16   practical matter use all these records.  And I can represent

17   to you, that's what we're going to do.

18            What it does raise, though, is something that you

19   mentioned raised earlier in the discussion; and that is, what

20   role the Court has to limit -- beyond what I'm telling what

21   you our intentions are, to order us, or the agency, not to do

22   more than what I'm suggesting.  That's what it gives us some

23   pause.

24            I do want to answer, that as a practical matter,

25   that is likely how we're going to use the UPS records as we

PROCEEDINGS

1   sit here today, between now and the merits.  Beyond that I

2   can't --

3              THE COURT:  I appreciate, thank you for that, that

4   answers a good chunk of my question.

5              I think putting aside the question of whether I

6   could or couldn't order your agents to do or not do certain

7   things, I could order you to just give them all back or to

8   surrender them as fortuitously disclosed and not something

9   that was properly the subject of jurisdictional discovery when

10  they were subpoenaed.

11             So in lieu of that, I want to give this more

12  thought.  One possibility would be for you to put into a more

13  specific writing what you have just represented to me about

14  the purpose that you voluntarily agreed to limit them in lieu

15  of me saying give them all back, or some equivalent.  I wonder

16  if the parties might be able to confer and come to some

17  agreement as to that.  And if it's a cross-check with

18  information that you received, you would of course be on your

19  honor as officers of the court to fulfill that and make sure

20  that if a name is checked on that list it's one you got from

21  other sources.  That does not seem particularly unreasonable.

22             My concern with you having such vast information is

23  that one way to narrow it is down to find people who have been

24  in trouble with the law before and may have some reason to

25  feel under some pressure to talk to the Government, or may

PROCEEDINGS

1    have some other vulnerability, or who knows what else.  As

2    long as the list itself is not used to generate your interview

3    targets in the first instance, that would seem to address some

4    of my concerns.

5            But let me ask Mr. Blume, what is your reaction to

6    that.  And then I'll hear from defendants as to whether that

7    will alleviate their concerns.

8            MR. BLUME:  Initial reaction is we could likely do

9    that.  We could write a letter or email to the defendants and

10   say this is what we're doing.

11           Just one point, your Honor, one of the reasons that

12   this was served initially was for jurisdictional purposes.  We

13   wanted to know where the products were being shipped.  Given

14   the history that you noted earlier, it made perfect sense for

15   us to go to a third-party and not rely on the defendants as to

16   where products were being shipped.

17           THE COURT:  I understand that.  I did look at the

18   email correspondence, and I appreciate that the Government

19   realized pretty quickly when the subpoena was complied with

20   that you had gotten something of a bonanza that you were not

21   anticipating that you would get and immediately notified

22   Mr. Kruckenberg at that time saying it does include names and

23   addresses, let us know if you want to discuss.  You were not

24   just taking it and running with it, you did disclose it.  It

25   happened to come at a time there was a lot going on.  And

28

PROCEEDINGS

1  defense counsel found it may not have been addressed in a

2  timely fashion.

3          Be that as it may, I think given that it was outside

4  the scope of what was contemplated with jurisdictional

5  discovery and given the other issues I raised I do have

6  concerns about the Government having this information prior to

7  any ruling on the merits on the request of injunction.  And

8  particularly given -- I don't know what you intend to present,

9  I know every litigant always wants to over-present evidence in

10  case the judge thinks it's not enough -- but if the question

11  is related to a showing that there was fraud, you may have

12  enough from a small number of examples and not the quantity

13  that you may think you need.  And I don't know that I need

14  hear from more than a handful of people who support your case

15  in that regard.

16          Mr. Contarino, is there anything about the question

17  of names and addresses in the UPS records that you would like

18  to address, putting aside the history, just about where we go

19  from here and the current use to which that information could

20  be put at this point?

21          MR. CONTARINO:  I think it's a reasonable solution

22  especially if the background is that this was negotiated and

23  it wasn't the intent to seek the names and addresses.  I want

24  to spend one second on that, if I could.

25          We weren't here, but everything that we've seen I

PROCEEDINGS

1    don't believe that this -- Chase was negotiated.  I don't

2    believe this UPS subpoena was negotiated.  I'm not blaming the

3    Government for that.  I'm just saying, I don't think it was

4    negotiated.  In the request it does ask, in the subpoena

5    request, it does ask for the name, address, telephone number,

6    and email addresses of recipients.  So I think that really did

7    run counter to your Honor's statement before.

8         THE COURT:  I think, if anything, you're at risk of

9    snatching defeat from the jaws of victory on this one.  If

10   that was in the subpoena, which you just reminded that it was,

11   then your counsel was on notice from mid-February onward that

12   that was a possibility.  I think the Government went the extra

13   mile to alert you it was there.  We have to go from here.

14        The other thing that is I think a possible solution

15   to accommodate my proportionality concern would be to give the

16   Government some representative sample, it could be a

17   randomly-generated series names, it could be pages of those

18   individuals if they did want to contact them.  I think that

19   causes some problems of its own.  Given the Government doesn't

20   think they need at this point, and my consideration of the

21   evidence they are able to present -- I will say -- let me say

22   this.  To the extent that the defendants intend to argue later

23   that the Government has not shown significant number of

24   individuals are impacted by the alleged fraud, if we get

25   there, or if they haven't proven fraud because they haven't

PROCEEDINGS

1  shown enough witnesses who personally came in and attested to

2  it, I think the Government would have a fair counter-argument

3  that their access to that information on the investigative end

4  was limited by the defendants' motion to quash.  I want to

5  note that for the record.

6         I don't currently -- you know all the case better

7  than I do at this point -- see that is one of the many

8  difficult issues I will have to decide.  But I did just want

9  to say that I am proceeding on the assumption that neither

10 side is going to claim a significant number of customers are

11 needed to testify as to their experiences with RBT.  The

12 Government can provide them on a representative basis, given

13 the time constraints and given where we are in discovery.

14        Let's do this, it looks as though we have a

15 stipulation on how both the Chase and the UPS records will be

16 used.  In terms of identifying on the Chase side, or not

17 identifying on the Chase side.  And in terms of not contacting

18 the individuals on the UPS list unless information about their

19 potential relevance as a witness is already established from

20 another source that the Government obtained outside of the of

21 UPS subpoena.

22        Let me ask you all to confer and generate a short

23 stipulation in writing over the weekend over early next week,

24 get that back to me.  Given the concerns I raised, I would be

25 more comfortable having that so ordered as part of the record,

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS

1    rather than simply exchanged in an email between the parties.

2            To the extent you identify any other concerns, I

3    think we need to hash out the details, you may come up with

4    other issues you need to address, I'm hoping none of them will

5    need my sign off other than just to approve it.  If you need

6    to speak to me again, we can try to do that.

7            MS. STAMATELOS:  Your Honor, at the risk of being a

8    complete nuisance, I want to make sure that -- I would like to

9    do, something we have not done, is with respect to the UPS

10   records, the last thing I want to do is go through 471 pages

11   of a lot of lines of customers; I want to be able to count

12   them.  So I don't want them to be destroyed.  That's sort of

13   an issue was raised in the motion that the defendants raised.

14   It seemed to me --

15           THE COURT:  No one is ordering their destruction.

16   We are keeping them exactly as you received them.  We're just

17   entering into a stipulation about prior to any ruling from me

18   on the merits of your request for preliminary injunction,

19   absent some further order by me where I decide there is a

20   reason you get to use them, the limited purpose for which

21   you'll be using them, you can count the states, you can look

22   where they come from.  This has to do with the defendants'

23   concern about them not being contacted by agents at this

24   juncture of the litigation and using that list to

25   independently identify them as potential witnesses.

PROCEEDINGS

1          But for all other purposes, unless you all agree

2     otherwise, I'm trying to minimize the burden of going through

3     the document.

4          MS. STAMATELOS:  Okay.  Thank you, your Honor.

5          THE COURT:  Let's turn now to where you all stand

6     with the rest of discovery.  I'm starting to already rethink

7     my decision to be in charge of resolving discovery dispute.

8     Let's see if we can deal with this expeditiously before I send

9     you to Judge Levy, who not be as patient and kind as I am.

10          What do you -- I appreciate everyone notifying me.

11     I know there was an issue with the cellphone of Mr. Maxwell or

12     Mr. DeMonico.

13          MS. STAMATELOS:  DeMonico's.

14          THE COURT:  I know there was an issue with the

15     cellphone and potential forensic search.  What have you not

16     been able to work with one another that you need to address

17     with me today?

18          MR. BLUME:  I think the short answer, your Honor, is

19     nothing yet.  We are exchanging some -- we're in the process

20     of responding to Mr. Contarino's letter.  I suspect, I presume

21     they are responding to ours.

22          I may be mistaken, we have a call scheduled for

23     later this afternoon.  We're working through this.  I don't

24     think there is an ask at the moment, as we sit here today, but

25     there may be.  As we speak today, I think we're -- I wouldn't

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

PROCEEDINGS

1    say we're good, but we're not asking you to do anything.

2              THE COURT:  All right.  You're comfortable with the

3    discomfort at this juncture in trying to work things out.

4              Mr. Contarino, anything on your end?

5              MR. CONTARINO:  I echo what was said.

6              THE COURT:  Wonderful.  Let me end this conference

7    right now then before anything else comes up -- I say that

8    with a smile on my face.

9              If you need something, feel free to raise it.  I

10   appreciate you continuing to work this out.  I'll enter a

11   short minute entry from today noting the parties are going to

12   work on a stipulation regarding the Government's use of

13   certain information in the Chase and UPS productions, and will

14   present it to the Court sometime next week.

15             Hearing nothing further from anyone, we stand

16   adjourned.  I'll see you soon.

17             (Whereupon, the matter was concluded.)

18                  *    *    *    *    *

19   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
20

21   /s/ Rivka Teich
     _____
     Rivka Teich, CSR RPR RMR FCRR
22   Official Court Reporter
     Eastern District of New York

23

24

25