Page 1

1

2    UNITED STATES DISTRICT COURT

3    EASTERN DISTRICT OF NEW YORK

4    ---------------------------------------X

5    UNITED STATES OF AMERICA,

6                          Plaintiff,

7        - against -

8    RARE BREED TRIGGERS, LLC; RARE BREED

9    FIREARMS, LLC; LAWRENCE DEMONICO,

10   KEVIN MAXWELL,

11                        Defendants.

12   CASE NO.: 1:23-cv-00369-NRM-RML

     ---------------------------------------X

13

14              ZOOM VIDEOCONFERENCE

15                 July 25, 2023

                   10:04 a.m.

16

17           DEPOSITION of DAVID SMITH, before

18   Melissa Gilmore, a Stenographic Reporter and

19   Notary Public of the State of New York.

20

21

22

23

24

25   Job No.:  NJ6018951

1

2   A P P E A R A N C E S:

3   BREON S. PEACE

4   UNITED STATES ATTORNEY

5   EASTERN DISTRICT OF NEW YORK

6   Attorneys for Plaintiff

7        225 Cadman Plaza East

8        Brooklyn, New York 11201

9   BY:  MICHAEL BLUME, ESQ.

10        DAVID COOPER, ESQ.

11        E-MAIL michael.blume@usdoj.gov

12             david.cooper@usdoj.gov

13

14

15   DHILLON LAW GROUP INC.

16   Attorneys for Defendants

17        177 Post Street, Suite 700

18        San Francisco, California 94108

19   BY:  MICHAEL COLUMBO, ESQ.

20        E-MAIL mcolumbo@dhillonlaw.com

21

22

23

24

25

1

2    A P P E A R A N C E S:   (Cont'd)

3    DHILLON LAW GROUP INC.

4    Attorneys for Defendants

5         50 Park Place, Suite 1105

6         Newark, New Jersey 07102

7    BY:   JOSIAH CONTARINO, ESQ.

8         E-MAIL jcontarino@dhillonlaw.com

9

10

11   DHILLON LAW GROUP INC.

12   Attorneys for Defendants

13        1601 Forum Place, Suite 403

14        West Palm Beach, Florida 33401

15   BY:   JACOB ROTH, ESQ.

16        E-MAIL jroth@dhillonlaw.com

17

18

19   ALSO PRESENT:

20        JONATHAN JACOBS, Division Counsel, ATF

21        KEVIN MAXWELL

22

23

24

25

Page 4

1

2

3            FEDERAL STIPULATIONS

4

5                IT IS STIPULATED AND AGREED by

6    and between the attorneys for the respective

7    parties herein, that the filing, sealing,

8    and certification of the within deposition

9    be waived.

10                IT IS FURTHER STIPULATED AND

11   AGREED that all objections, except as to the

12   form of the question, shall be reserved to

13   the time of the trial.

14                IT IS FURTHER STIPULATED AND

15   AGREED that the within deposition may be

16   sworn to and signed before any officer

17   authorized to administer an oath, with the

18   same force and effect as if signed to before

19   the Court.

20

21

22                - oOo -

23

24

25

Page 5

1                    SMITH

2    D A V I D    S M I T H,    called as a

3         witness, having been duly placed under

4         oath by a Notary Public, was examined and

5         testified as follows:





Page 7











Page 12











Page 17

13        Q.    Have you completed classification

14   reports when you were an FEO, firearms

15   enforcement officer?

16        A.    Yes, sir, I did.

17        Q.    And about how many of those have you

18   done?

19        A.    As I previously mentioned, I don't

20   know the exact number.  Somewhere around five

21   to 600.

22        Q.    Okay.  The five to 600 encompasses

23   both technical examination reports and

24   classification reports?

25        A.    It encompasses both reports for

1                         SMITH

2     industry and individuals and criminal

3     examinations, yes, sir.

4          Q.    I'm sorry if I missed the

5     distinction, but is there a distinction between

6     a technical examination report and a

7     classification report?

8          A.    They're in different formats, sir.

9          Q.    Different formats.  But the -- so

10    different formats, but are you saying they

11    basically do the same thing?

12         A.    Yes, sir.

13         Q.    And is your responsibilities as an

14    FEO, a firearms enforcement officer, the same

15    regardless of which format it comes in?

16         A.    Yes, sir.











Page 24

14          Q.    When you're conducting your

15   examination to classify a device, are you

16   required to take input from others about the

17   device?

18          A.    In general, yes.

19          Q.    And who are you supposed to consult?

20          A.    Other FEOs, the managers and usually

21   we have a technical review.

22          Q.    And what's a technical review?

23          A.    When you finish your draft of your

24   report, whether it be criminal or industry, it

25   goes to a technical and writing review prior to

Page 25

1                    SMITH
2    being submitted to the chief for their review
3    and signature.
4         Q.    And so does the technical review, do
5    they provide edits to the report, potentially?
6         A.    Yes, they do.
7         Q.    And that would be what I call style,
8    like punctuation, right?
9         A.    That would be one type of edit, yes,
10   sir.
11        Q.    Would they also perhaps suggest
12   changes to the analysis itself in terms of how
13   it's described?
14        A.    They may do that, sir.
15        Q.    And, ultimately, the chief has to
16   sign off on any report as well?
17        A.    Yes, sir.
18        Q.    Can the chief recommend changes?
19        A.    Yes, sir.
20        Q.    If there was going to be
21   disagreements within the agency over the
22   classification of a device, could that
23   disagreement come from the technical review,
24   disagreeing with the examinations officer?
25        A.    Yes, sir, it could.



25      Q.      Does the -- does the FATD have

1            SMITH

2   meetings where they may discuss and even vote

3   on a determination or classification?

4        A.    FATD has held meetings about

5   different classifications.  I have never seen a

6   vote on any classification.







Page 31



Page 32



Page 33



Page 34

11      Q.     Have you had any communications with

12   other firearms examination officers that also

13   examined the FRT-15?

14      A.     Yes, I have.

15      Q.     And could you identify those

16   persons?

17      A.     I could identify some of those

18   people.  Ron Davis, Cody Toy, Anthony Ciravolo.

19   There may be others.  I couldn't guarantee who

20   all has examined them.  That's not my purview

21   or under my job.



Page 36

14          Q.    Where two or more FEOs gathered to

15   discuss how the FRT-15 should be classified.

16          A.    There were review meetings of FRT-15

17   classification.

18          Q.    Is that review meeting -- does that

19   relate to what we discussed earlier about the

20   technical review of a classification?

21          A.    Yes, sir.

22          Q.    Okay.  So these are meetings where a

23   classification had been drafted and people were

24   meeting to discuss the draft classification?

25          A.    Yes, sir.

Page 37



2      Q.     Could you identify any firearms

3    examination officer, if any, who was of the

4    opinion that the FRT-15 was not a machinegun?

5      A.     I cannot.

6      Q.     And same question to anyone who is

7    not a firearms examination officer, maybe a

8    manager or someone else at the agency.

9      A.     Not within ATF that I have met.

10     Q.     Okay.  I'm now going to ask you some

11   specific questions about -- more specific

12   questions about your examination.

13            Do you know what date you started

14   your first examination for an FRT-15?

15     A.     It would have been in the beginning

16   of June.  I would have to look at the report as

17   to exactly what day I received it.

18     Q.     Okay.  And I will give that to you

19   in a moment.

20            Do you know about how long it was

21   from when you started your examination to when

22   you completed your report, roughly?

23     A.     If I remember, it was roughly a

24   month.

25     Q.     Was there -- did anyone disagree

```
 1                    SMITH
 2    with your analysis in the technical review?
 3         A.    No, sir.
 4         Q.    Did the chief disagree with your
 5    analysis?
 6              MR. BLUME:  Let me --
 7         A.    No, sir.
 8              MR. BLUME:  You already answered.
 9              Go ahead.  Keep going, Mike.
10              MR. COLUMBO:  I won't do anything
11    more there.
12              MR. BLUME:  Okay.
```



Page 41





Page 43



Page 44



Page 45



Page 46



Page 47



Page 48







Page 51





Page 53





Page 55



Page 56



Page 57





Page 59





Page 61



Page 62



Page 63



Page 64





12      Q.     Does -- does a firearms examination

13   officer typically conduct the examination of a

14   device that he referred to the agency's

15   attention?

16      A.     Sometimes, sometimes not.  It's all

17   up to who the chief assigns that case.

Page 66



Page 67









Page 71

10     Q.     Circling back to your description of

11   the movement of the bolt carrier.

12            You wrote that -- is it fair to say

13   that you're saying that, by the action of the

14   FRT-15, there comes a point when the trigger --

15   I'm sorry -- when the trigger is forced forward

16   and locked in the forward position; is that

17   right?

18     A.     Yes, sir.  There is a point at which

19   the trigger is forced forward and the fire

20   control group is locked out of manipulation by

21   the shooter, similar to any other machinegun

22   fire control group that's hammer fired.

Page 72



Page 73



Page 74











Page 79







Page 82



Page 83









Page 87



Page 88



Page 89



Page 90







Page 93



Page 94



Page  95



Page 96



Page 97





Page 99







Page 102





Page 104



Page 105









Page 109









Page 113



Page 114







Page 117







Page 120



25



83



Page 123



Page 124

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK )

                                :ss

5    COUNTY OF RICHMOND)

6

7              I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify:

10             That DAVID SMITH, the witness whose

11   deposition is hereinbefore set forth, was duly

12   placed under oath by me and that such

13   deposition is a true record of the testimony

14   given by such witness.

15             I further certify that I am not

16   related to any of the parties to this action by

17   blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19             IN WITNESS WHEREOF, I have hereunto

20   set my hand this 25th day of July, 2023.

21

22                        *Melissa Gilmore*

                        MELISSA GILMORE

23

24

25

Page 125

1                          ERRATA SHEET
                    VERITEXT/NEW YORK REPORTING, LLC
2        CASE NAME: UNITED STATES OF AMERICA v. RARE BREED
         TRIGGERS, LLC; ET AL
3        DATE OF DEPOSITION: 7/25/2023
         WITNESSES' NAME: David Smith
4
5         PAGE   LINE (S)        CHANGE                REASON
          ____|_____|_____|_____
6
          ____|_____|_____|_____
7
          ____|_____|_____|_____
8
          ____|_____|_____|_____
9
          ____|_____|_____|_____
10
          ____|_____|_____|_____
11
          ____|_____|_____|_____
12
          ____|_____|_____|_____
13
          ____|_____|_____|_____
14
          ____|_____|_____|_____
15
          ____|_____|_____|_____
16
          ____|_____|_____|_____
17
          ____|_____|_____|_____
18
          ____|_____|_____|_____
19
          ____|_____|_____|_____
20
21                                   _____
                                     David Smith
22       SUBSCRIBED AND SWORN TO BEFORE ME
         THIS _____ DAY OF _____, 20__.
23
24
         _____          _____
25       (NOTARY PUBLIC)                    MY COMMISSION EXPIRES: