UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

|                              | Plaintiff, | Civil Action No. 23-cv-369 |
|------------------------------|------------|----------------------------|

- against -

(Morrison, J.)
(Levy, M.J.)

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; KEVIN MAXWELL,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE UNITED STATES OF AMERICA'S
## PROPOSED FINDINGS OF FACT

BREON PEACE
United States Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 1201

August 13, 2023

MICHAEL S. BLUME
PAULINA STAMATELOS
DAVID A. COOPER
Assistant United States Attorneys

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ............................................................................... 1

I.      Defendants Formed Rare Breed Triggers, LLC to Sell a Machinegun Conversion Device 1

II.     Defendants Created Multiple LLCs ...................................................................... 2

III.    The FRT-15 Is a Machinegun Conversion Device ............................................ 3

        A.      There Is No Real Dispute as to How the FRT-15 Operates ....................... 3

        B.      Defendants' Testifying Experts Have No Experience Performing
                Classifications for the ATF ................................................................. 9

IV.     J. Cooper Rounds Developed the FRT-15 ........................................................ 10

V.      The FRT-15's Ease of Use Means Any Novice Shooter Can Achieve a Rate of Fire
        Comparable to a Machinegun ............................................................................ 11

VI.     RBT Purchased the '223 Patent (i.e., the FRT-15) From Rounds ................... 11

VII.    Rounds Warned DeMonico and Leleux That ATF Would Have a Problem with the '223
        Patent .............................................................................................................. 12

VIII.   The AR-1 and the FRT-15 Are Functionally Equivalent Machinegun Conversion Devices
        ......................................................................................................................... 13

IX.     Defendants Have Chosen Not to Seek ATF Classification of the FRT-15 ...... 13

X.      Defendants Chose Not to Seek Classification Because They Did Not Want to Miss Out
        on Big Money ................................................................................................... 16

XI.     RBT Began to Sell the FRT-15 in December 2020 .......................................... 18

        A.      Defendants' Marketing Materials Consisted of False Characterizations of
                the Legality of the FRT and WOTs by Purported "Experts" ................... 18

        B.      Defendants' Marketing Between December 2020 to August 2021 Did Not
                Disclose Whether They Sought ATF Classification or Received an ATF
                Approval Letter .................................................................................... 19

XII.    Defendants Engaged in a Campaign to Obstruct ATF by Selling As Many FRT-15s As
        Possible Before ATF Could Act ....................................................................... 20

        A.      RBT Implemented a No-Refund Policy .................................................. 20

        B.      To Facilitate More Sales, Defendants' Stock Responses to Customers'
                Questions Regarding the Legality of the FRT-15 Did Not Disclose
                Defendants' Decision to Forgo ATF's Classification Process ................. 21

        C.      Defendants Thwart ATF Retrieval Efforts – and Promote FRT-15 Sales –
                by Maintaining a "Digital Shredding Policy" ........................................ 22

        D.      RBT Encouraged Its Customer Base to Purchase Weapons from Third-
                Parties' Sites Selling FRT-15s Into All Fifty States .............................. 23

        E.      Defendants' Actions Obstruct ATF's Legitimate Law Enforcement Efforts

.................................................................................................24

XIII.   RBT Was Warned Again that ATF Would Deem the FRT-15 a Machinegun as Soon as It Hit the Market ............................................................................................ 25

XIV.   RBT Knew of ATF's Classification of the AR-1, But Still Did Not Seek a Classification of the FRT-15 From ATF ...................................................................................... 26

XV.   ATF Determined – Consistent With Longstanding Internal Precedent – That the FRT-15 Is a Machinegun ............................................................................................ 27

XVI.   RBT Received a Cease and Desist Letter From ATF ............................................ 29

A.   ATF Uses Cease and Desist Letters to Stop Illegal Conduct....................29

B.   ATF Served a Cease and Desist Letter on RBT .......................................30

XVII.   RBT Continued to Sell the FRT-15 After ATF's Cease and Desist Letter ................... 31

XVIII.   Defendants Filed (and Abandoned) Two Lawsuits Against ATF ................................... 32

A.   Defendants Abandoned Their First Lawsuit Against ATF .......................32

B.   Defendants Abandoned Their Second Lawsuit Against ATF....................34

XIX.   Focused Exclusively On More Profits, Defendants Devoted Their Resources To Filing (and Pursuing) Five Patent Infringement Actions Against Their Competition ............... 35

A.   Defendants Sued to Protect the '223 Patent..............................................35

B.   Defendants Sued Again to Protect the '223 Patent Again ........................36

C.   Defendants Sued to Protect the '223 Patent Once More............................36

D.   Defendants Sued to Protect the '223 Patent Yet Again .............................37

E.   Defendants Are Still Protecting Their Interest in the '223 Patent to This Day............................................................................................................38

XX.   DeMonico Traveled to 3rd Gen and Took FRT-15s Belonging to the ATF..................... 39

XXI.   Defendants Were Still Selling Machineguns (i.e., WOTs) Over a Year After Receiving the Cease and Desist Letter......................................................................................... 42

XXII.   RBT Misled Its Customers About the Availability of WOTs............................................ 43

XXIII.   RBT's Prototype Three-Position Trigger Shows That They Knew the FRT-15 Was a Machinegun............................................................................................................ 43

XXIV.   Defendants Did Not Pay the Requisite National Firearms Act Taxes for the Sale of the FRT-15............................................................................................................... 44

XXV.   Defendants Mislead the Court ........................................................................... 45

## PROPOSED FINDINGS OF FACT

I.    **Defendants Formed Rare Breed Triggers, LLC to Sell a Machinegun Conversion Device**

1.    Defendants Lawrence DeMonico ("DeMonico") and Kevin Maxwell ("Maxwell"), along with Cole Leleux ("Leleux") and Michael Register ("Register"), formed Defendant Rare Breed Triggers ("RBT") as a limited liability company ("LLC") to sell the FRT-15, which they marketed as a forced reset trigger. Prelim. Inj. Hr'g Tr. 420:3-25; *see also* Pl.'s Ex. 47. In December 2020, the registration was changed. Pl.'s Ex. 49. All the previous individuals were removed except for Maxwell. *Id.*

2.    In 2020, RBT was incorporated in Florida, but the company later re-organized in North Dakota. *Compare* Pl.'s Ex. 47 *with* Pl.'s Ex. 50.

3.    Defendant Rare Breed Firearms ("RBF"), another LLC, is RBT's "sister company." Pl.'s Ex. 12. DeMonico owns RBF. Prelim. Inj. Hr'g Tr. 485:17-18. Among other things, RBF sold spare parts for firearms, such as replacement locking bar springs to be used for the FRT-15. Prelim. Inj. Hr'g Tr. 511:23-512:7; 526:13-527:9.

4.    DeMonico is the president of RBT. Tr. of Dep. of Lawrence DeMonico, dated July 7, 2023 ("DeMonico Dep.")[1] 12:11-16. As the president, DeMonico "ran the company, [made] the large majority of decisions for [RBT] when it comes to business, marketing, day-to-day operations . . . [including any] photographs . . . [and] advertisement" used to promote the sale of the FRT-15 and Wide Open Trigger ("WOT"). DeMonico Dep. 13:6-16

---

[1]  The designated portions of this deposition transcript can be found on the docket sheet in this action at 124-1.

5.     Maxwell is the current owner and general counsel of RBT. Maxwell retained multiple purported experts to provide opinions relating to the legality of the FRT-15 during Defendants' launch of the FRT-15. *See* Defs.' Ex. A.

6.     The Bureau of Alcohol, Firearms, Tobacco and Explosives ("ATF") has determined that the FRT-15 and the WOT are illegal machinegun conversion devices. *See, e.g.,* Pl.'s Exs. 1, 4 & 6-8.

## II.    Defendants Created Multiple LLCs

7.     Approximately $39,388,838 in proceeds from the sales of the FRT-15 were deposited into RBT's account with JPMorgan Chase Bank, N.A. ("Chase Bank") from January 1, 2021 to December 1, 2022. *See* Decl. of Melissa Rodriguez ("Rodriguez Decl.")[2]  ¶ 18.

8.     Subsequent to its incorporation, RBT was reorganized into seven interlocking companies benefiting all four original owners. *See generally* Pl.'s Ex. 136; Rodriguez Decl. ¶¶ 10-17.

9.     RBT made $35,628,260 in payments to XYZ Distribution LLC d/b/a RB Trig LLC ("XYZ Distribution") from its Chase Bank account. Rodriguez Decl. ¶ 19.

10.    XYZ Distribution distributed $28,150,030 to ABC IP LLC ("ABC IP"). Rodriguez Decl. ¶ 21. ABC IP was registered in Delaware on November 25, 2020. Rodriguez Decl., ¶ 12. This business is owned by four other businesses. *Id.* The businesses are Leleux LLC, Spider Hole LLC ("Spider Hole"), AN 1861 LLC ("1861 LLC"), and LAD LLC ("LAD"). *Id.*

11.    ABC IP distributed millions of FRT-15 derived funds into several RBT-related companies. Rodriguez Decl. ¶ 23. Those limited liability companies include: LAD; Leleux LLC; Spider Hole; and 1861 LLC. *Id.*

---

[2]  This declaration can be found on the docket sheet in this action at ECF No. 105-1.

12.     Leleux LLC was registered in Florida on November 14, 2020; this business is owned solely by Leleux. Rodriguez Decl. ¶ 14.

13.     Spider Hole was registered in Florida; this business is owned solely by Register. Rodriguez Decl. ¶ 15.

14.     1861 LLC was registered in Florida; this business is owned solely by Maxwell. Rodriguez Decl. ¶ 16.

15.     LAD was registered in Florida; this business is owned solely by DeMonico. Rodriguez Decl. ¶ 17.

16.     DEF Consulting LLC ("DEF Consulting") was registered in Delaware. Rodriguez Decl. ¶ 13. This business is owned by four other businesses. *Id*. The businesses are Leleux LLC, Spider Hole, 1861 LLC, and LAD. *Id*.

**III.    The FRT-15 Is a Machinegun Conversion Device**

**A.    There Is No Real Dispute as to How the FRT-15 Operates**

17.     The FRT-15 is a drop-in trigger assembly designed to be used in an AR-15 type rifle.

18.     The parties do not disagree, in any material way, as to how the FRT-15 operates mechanically.

19.     Discussion of the mechanical operation of the FRT-15 can therefore be based on the extensive testimony of Plaintiff's expert witness, Firearms Enforcement Officer ("FEO") Anthony Ciravolo, Prelim. Inj. Hr'g Tr. 20:9-207:11, and on FEO Ciravolo's expert report, found at Plaintiff's Exhibit 27.

20.     Additional material that describes the mechanical operation of the FRT-15 includes Plaintiff's Exhibit 21 (video of cable tie test for FRT-15), Plaintiff's Exhibit 23 (video demonstration, by DeMonico, of the FRT-15 and a Geissele SSA semi-automatic trigger),

3

Defendant's Exhibit C (video animation of the operation of the FRT-15), Defendant's Exhibit Y (expert report of Brian Luettke ("Luettke")), Defendant's Exhibit A1 (expert report of Daniel O'Kelly ("O'Kelly")), and Defendant's Exhibit B1 (expert report of Rick Vasquez ("Vasquez")). In addition, FEO Ciravolo employed several demonstratives – three cutaway AR-15 style receivers, which were respectively fitted with a standard "mil-spec" semi-automatic trigger, and M16-type machinegun trigger group, and an FRT-15 – to describe the mechanical operation of each system.

21.     The FRT-15 comprises three key parts. First is a trigger component.

22.     As a general matter, a trigger is the mechanism that initiates a rifle's firing sequence. Prelim. Inj. Hr'g Tr. 29:5-7; 354:4-6 ("Q. [. . .] And really, what a trigger is, is whatever initiates the cycle, right. A. Correct"). In the AR-15 style rifles described above and shown at the hearing, the user (shooter) causes this function to happen by pulling the trigger to the rear. A trigger component may, however, complete more than one function in a cycle of operations. Prelim. Inj. Hr'g Tr. 351:8-353:23. A trigger may do more than just initiate the cycle of operations. Prelim. Inj. Hr. Tr. 353: 4-354:2.

23.     The second key part of the FRT-15 is the hammer. A hammer is that piece in the trigger assembly that strikes the firing pin, igniting the primer, and thus causing a round to be fired from the rifle.    Prelim. Inj. Hr'g Tr. 29: 8-11.

24.     The third key part of the FRT-15 is the locking bar. As described more fully below – and in the materials cited in paragraphs 24-25 – in the FRT-15, the locking bar is an element that pivots back and forth, during the cycle of operations, to engage and then disengage with the trigger component. When the locking bar is engaged with the trigger component, the trigger component will not move rearward; when the locking bar is not engaged with the trigger component, the trigger component is will move rearward if sufficient pressure is continually applied to it.

4

25.     The three key elements of the FRT-15 interact with each other, the rifle's bolt carrier, and the shooter to cause the rifle to fire rounds.

26.     The following description of the mechanical operation of the FRT-15 is taken from the materials cited in paragraphs 24 and 25, above.

27.     In an AR-15 style rifle fitted with an FRT-15, when the FRT-15 is in the ready-to-fire position, the hammer is retained by the trigger component by way of the contact between a sear surface located at the front of the trigger component and a sear surface at the lower part of the hammer.

28.     To begin the cycle of operations, a shooter must initiate the firing sequence by pulling the trigger component rearward. In so doing, the hammer will become disengaged from the trigger component. The hammer will rotate forward, striking the firing pin and causing the rifle to fire a round.

29.     When a round is ignited, the explosion generates high pressure gas. Release of the gases puts pressure on the bolt carrier, forcing it to the rear of the rifle.

30.     As the bolt carrier travels rearward, it contacts the hammer in the FRT-15, thereby rotating it and pushing it down.

31.     The hammer in the FRT-15, as it rotates, will come into contact with a protrusion at the top of the trigger component. The force of the hammer's doing so will cause the trigger component to pivot forward. The trigger component will move forward even against the rearward pressure of the shooter's finger on the trigger shoe.

32.     The backward movement of the bolt carrier will allow the locking bar, which is located at the rear of the FRT-15 assembly, to pivot into a vertical orientation. As the locking bar does so, it will engage with a sear surface at the top rear of the trigger component.

33.     When the locking bar is oriented vertically, and thus engaged with the trigger component, it will prevent the trigger from moving rearward, even against pressure from the shooter's finger on the trigger shoe.

34.     The bolt carrier will continue to move rearward until a spring – called the buffer spring – will force it forward.

35.     As the bolt carrier moves forward, it will lose contact with the hammer. The hammer will then pivot slightly forward until the sear surface at the lower part of the hammer will re-engage with the sear surface located at the front of the trigger component.

36.     As the bolt carrier continues to move forward, it will eventually return to battery. Prior to that instant, the rifle is unsafe to fire. Among other things, firing before that instant may cause an out-of-battery detonation, which could severely injure the shooter.

37.     At the same instant that the bolt carrier returns to battery, a trip surface on the lower part of the bolt carrier will contact the locking bar. In so doing, the bolt carrier will pivot the top of the locking forward and the bottom of the locking bar rearward. When the locking bar pivots in that way, it will disengage from the trigger component, thus freeing the trigger component to move rearward.

38.     If rearward pressure is maintained on the trigger shoe as the locking bar pivots away from the trigger component, the trigger component will move rearward. That rearward movement will cause the trigger component to be disengaged from the hammer, thus allowing the hammer to move forward again. The hammer will then strike the firing pin, causing the rifle to fire another round thereby continuing the firing sequence.

39.     The actions that are described in paragraphs 32 through 43 take approximately one-fourteenth to one-tenth of a second. Prelim. Inj. Hr'g Tr. 87:16-21.

6

40.     As FEO Ciravolo testified, several times, because of the mechanical operation of the FRT-15, if a shooter pulls the trigger towards the rear and simply maintains that constant rearward pressure on the trigger, a rifle fitted with an FRT-15 will continue to fire rounds automatically. *See, e.g.*, Prelim. Inj. Hr'g Tr.151: 16-152:3. That is, the firing sequence need only be initiated by the shooter once. From there, the mechanical action of the firearm fitted with the FRT-15 will automatically continue to fire as long as the shooter maintains that pressure on the trigger.

41.     O'Kelly testified to the same effect. *See* Prelim. Inj. Hr'g Tr. 348: 22-349: 2 ("Q: I guess, in sum, all you have to do is maintain some pressure on the trigger and the FRT-15's going to keep firing, right? A: If you maintain pressure and as long as you maintain pressure, it will repeat – it will allow you to repeat the action, but you are repeating the action; not the gun."); *see also* Prelim. Inj. Hr'g Tr. 281: 7-8 (to shoot a rifle fitted with an FRT-15 repeatedly "[a]ll you have to do is maintain some pressure on the trigger"). Luettke testified similarly. Luettke replied "Yes" to the Court's questioning: "[s]o as long as the shooter is holding [the trigger shoe] and making a decision to keep a degree of pressure on [the trigger shoe] that lets it keep firing. They don't have to keep making decisions to release and pull back, and release and pull back again." Prelim. Inj. Hr'g Tr. 407:22-408:1.

42.     FEO Ciravolo also testified that, in his expert opinion, the purpose of the locking bar in the FRT-15 is to time the rifle so that, after the rifle fires a round, the hammer is prevented from causing the weapon to fire again until it is safe to do so. Prelim. Inj. Hr'g Tr. 76: 7-79: 20. And, once it is safe to do so, the movement of the locking bar will allow the weapon to fire again instantaneously.  *Id.*   FEO Ciravolo's testimony was, in part, a summary of the patent for the FRT-15 itself and how the inventor of the FRT-15 himself described the locking bar.  *Id.*

43.     As FEO Ciravolo testified, several times, in an M16 rifle (or similar machinegun), which is the machinegun version of the AR-15, if a shooter pulls the trigger to the rear to initiate the firing sequence and maintains constant rearward pressure on the trigger, the rifle will continue to fire rounds automatically, just as with the FRT-15. *See, e.g.*, Prelim. Inj. Hr'g Tr. 60:19-61:2. O'Kelly agrees. Prelim. Inj. Hr'g Tr. 349: 6-17.

44.     FEO Ciravolo also testified that, in his expert opinion, the purpose of a piece in an M16 rifle (or similar machinegun) called an auto sear is to time the rifle so that, after the rifle fires a round, the hammer is prevented from causing the weapon to fire again until it is safe to do so. Prelim. Inj. Hr'g Tr. 79:23-81:11. And, once it is safe to do so, the movement of the auto sear will allow the weapon to fire again instantaneously. *Id*.

45.     As FEO Ciravolo testified, several times, with a rifle fitted with a standard (and legal) semi-automatic trigger, if a shooter pulls the trigger to the rear to initiate the firing sequence and maintains constant rearward pressure on the trigger, the rifle will fire one round and then stop. *See, e.g.*, Prelim. Inj. Hr'g Tr. 44:24-46:18. To fire the rifle again, the shooter must release (decrease) pressure on the trigger allowing it to move forward by way of a spring thereby disengaging the hammer from a piece called the disconnector. *Id*. The shooter must then increase pressure on the trigger, pulling it to the rear, to initiate a subsequent firing sequence and fire the rifle again. *Id*.

46.     FEO Ciravolo also testified that, in his expert opinion, the purpose of the disconnector in a standard semi-automatic trigger is not to time the rifle, but to stop the cycle of operations altogether. Prelim. Inj. Hr'g Tr. 81:15-82:20.

B.      **Defendants' Testifying Experts Have No Experience Performing Classifications for the ATF**

47.      While at the ATF, Defendants' proffered expert O'Kelly held multiple positions, none of which involved his classifying a weapon or device as a machinegun. Prelim. Inj. Hr'g Tr. 255:20-259:6.

48.      Unlike FEO Ciravolo, O'Kelly confirmed that he never performed a classification of a weapon while at the ATF. Prelim. Inj. Hr'g Tr. 258:9-23. O'Kelly played no role in the classification of any devices submitted by the public or law enforcement to ATF for classification. Prelim. Inj. Hr'g Tr. 259:2-6; 337:9-19.

49.      Prior to this action, O'Kelly had never provided testimony regarding whether a weapon was a machinegun based on how it operated.    Prelim. Inj. Hr'g Tr. 338:22-24.

50.      O'Kelly never worked in the Firearm Technology Branch[3] and if he recovered weapons as part of his duties at ATF, he would send them to the "Firearm Technology Branch as per agency regulation" to have them examined; he himself would not do such an examination.[4] Prelim. Inj. Hr'g Tr. 258:18-25-259:1.

51.      O'Kelly did not prepare any videos showing the function of the FRT-15; Defendants had provided to him all videos pertaining to the FRT-15.    Prelim. Inj. Hr'g Tr. 293:20-294:3.

52.      Like O'Kelly, Defendants' expert Luettke did not perform any classifications of devices submitted by the public or law enforcement to ATF during his employment with ATF. Prelim. Inj. Hr'g Tr. 392: 4-9.

---

[3] The former Firearms and Technology Branch is now called the Firearms and Ammunition Technology Division.

[4] See *infra* Point IX for a description of the classification process.

53.     Despite testifying in court for ATF "29 times," Luettke, only testified twice with respect to "machine guns," as he put it. Prelim. Inj. Hr'g Tr. 379: 11-24. In each of those instances, Luettke testified only how he (or another ATF employee) "test fired" a firearm. To "test fire" a firearm means that he would load the weapon with several bullets and "pull the trigger." Prelim. Inj. Hr'g Tr. 381:1-9. And based on his test-firing he would identify (not classify) the firearm as a machinegun. *Id.*

54.     Unlike FEO Ciravolo, Luettke did not work in the section of FATD that classified weapons or devices. Prelim. Inj. Hr'g Tr. 392: 2-9. Luettke's exposure to FATD's classification process was so limited that he could only recall "talking about" one report; in fact, he had never read a classification report while at ATF. Prelim. Inj. Hr'g Tr. 395:11-13.

## IV.     J. Cooper Rounds Developed the FRT-15

55.     J. Cooper Rounds ("Rounds") is an inventor. Prelim. Inj. Hr'g Tr. 428:16-18; 538:22-539:3.

56.     Among the items Rounds worked on was a trigger for an AR-15 style firearm. Prelim. Inj. Hr'g Tr. 488:20-22.

57.     Over the course of a few years, Rounds told both DeMonico and Leleux about his work on a trigger that would force a reset. Prelim. Inj. Hr'g Tr. 428:21-429:3; 488:20-22; 562:6-21. Leleux thought that such a design was a good idea. Prelim. Inj. Hr'g Tr. 562:22-23.

58.     The first iteration of this trigger project – called the AR-1 – was a trigger assembly that required a user to modify a standard AR-15 platform. Prelim. Inj. Hr'g Tr. 563:12-564:4. In particular, the AR-1 required that a user modify the bolt carrier for the AR-1 to work as designed. Prelim. Inj. Hr'g Tr. 563:12-564:4.

59.     Because the original trigger design required such modifications, DeMonico and Leleux told Rounds that the design was not marketable. Prelim. Inj. Hr'g Tr. 563:12-564:4. A drop-in trigger would be preferable. Prelim. Inj. Hr'g Tr. 564:5-17.

60.     Rounds, sometime later, told DeMonico and Leleux that he had made some changes to his original trigger design. Prelim. Inj. Hr'g Tr. 564:18-20. Now a drop-in design, the design did not require a user to modify an AR-15 platform.

61.     DeMonico afterwards saw that Rounds' trigger design was marketable. DeMonico Dep. 136:1-2 ("So I told [Rounds] – I said, Man this is worth so much more than 10 Grand."); *see also* Prelim. Inj. Hr'g Tr. 493:1-9.

## V.     The FRT-15's Ease of Use Means Any Novice Shooter Can Achieve a Rate of Fire Comparable to a Machinegun

62.     A shooter can fire a rifle fitted with an FRT-15 repeatedly and very quickly with little to no skill. Prelim. Inj. Hr'g Tr. 280:22-281:22; 345:15-19.

63.     While it is true that other trigger assemblies for AR-15 style rifles allow shooters to fire a weapon at a high rate of fire, doing so requires a skill that novice shooters simply do not have. Prelim. Inj. Hr'g Tr. 289:3-13.

## VI.     RBT Purchased the '223 Patent (i.e., the FRT-15) From Rounds

64.     Rounds patented his trigger design. The patent is U.S. Patent No. 10,514,223 ("the '223 Patent"). Rounds is listed as the inventor on the '223 Patent; Wolf Tactical – Rounds' company – is listed as the applicant. *See* Pl.'s Ex. 27, at USA_20290. The FRT-15 is the commercial embodiment of the '223 Patent. Prelim. Inj. Hr'g Tr. 492:16-18.

65.     DeMonico decided to purchase the '223 Patent from Rounds and Wolf Tactical. Prelim. Inj. Hr'g Tr. 567:8-16.

66.     The arrangement between DeMonico comprises a written agreement and a verbal agreement. In writing, DeMonico agreed to pay Rounds $10,000. Prelim. Inj. Hr'g Tr. 492:22-24; 539:4-12; 567:17-22. Verbally, DeMonico promised to pay Rounds $25 for each trigger sold. Prelim. Inj. Hr'g Tr. 492:25-493:9; 539:4-12; 567:23-568:5.

67.     Rounds was paid the $25-per-trigger royalty by check. Prelim. Inj. Hr'g Tr. 568:4-5. Leleux wrote the checks. Prelim. Inj. Hr'g Tr. 568:8-20. The checks were not written to Rounds or to Wolf Tactical. Prelim. Inj. Hr'g Tr. 568:21-569:9. Rather, the checks were written to other companies – Wizard Labs and CRDB – associated with Rounds. *Id*. From December 2020 through April 2023, Wizard Labs and CRDB were paid over $2.4 million. *See* Rodriguez Decl. ¶ 23(e)-(f).

**VII.    Rounds Warned DeMonico and Leleux That ATF Would Have a Problem with the '223 Patent**

68.     At the time he sold the '223 Patent to DeMonico, Rounds did not want to deal with ATF. Prelim. Inj. Hr'g Tr. 493:18-23. Rounds just wanted to walk away from the project. Prelim. Inj. Hr'g Tr. 493:18-23.

69.     Rounds advised DeMonico and Leleux that he had submitted his earlier design (known as the AR-1) to ATF, and that ATF had determined it to be a machinegun. Prelim. Inj. Hr'g Tr. 539:19-25; 565:13-20; 566:6-11.

70.     Rounds also told DeMonico that he was concerned that ATF would have a problem with the '223 Patent (that is, the FRT-15). Prelim. Inj. Hr'g Tr. 566:21-567:7. Rounds' concerns led him to want to be rid of the '223 Patent. *Id*. He did not want to invest any more into the '223 Patent out of fear that ATF would deem it to be illegal. *Id*.

71.     DeMonico had no such fear. Instead, as he put it, he had the "balls" to sell the FRT-15. Pl.'s Ex. 19 (video clip, at 2:41-3:12, of TFB interview of Defendant DeMonico).

## VIII.   The AR-1 and the FRT-15 Are Functionally Equivalent Machinegun Conversion Devices

72.     The AR-1 is the functional equivalent of the FRT-15. Prelim. Inj. Hr'g Tr. 104:2-115:23.

73.     As with the FRT-15, the AR-1 uses the mechanical action of the firearm – in particular the movement of the bolt carrier – to alternatively engage and disengage with the hammer. Prelim. Inj. Hr'g Tr. 112:17-23;113:7-114:1. In so doing, the AR-1 allows for the proper timing of the weapon so that it can fire repeated rounds safely. Prelim. Inj. Hr'g Tr, 113:7-114:1. The AR-1 allows a shooter, who pulls the trigger and maintains constant rearward pressure on it, to fire repeated rounds from the weapon automatically. Prelim. Inj. Hr'g Tr. 112:4-7.

74.     Although the particular components of the AR-1 differ a bit from the components of the FRT-15, the operating principle of the two devices are the same. Prelim. Inj. Hr'g Tr. 112:4-114:1.

75.     In a 2018 classification, ATF determined that the AR-1 was a machinegun. Pl.'s Ex. 134. The basis for its classification is that "a single constant rearward pull will cause the firearm to fire until the trigger is released, the firearm malfunctions, or the firearm exhausts its ammunition supply." Pl.'s Ex. 134, at USA_12731; Prelim. Inj. Hr'g Tr. 111:6-13.

76.     The classification letter did mention "hammer follow" as an occasional problem with the AR-1, but ATF's determination that the AR-1 was a machinegun was not based on "hammer follow." Prelim. Inj. Hr'g Tr. 114:11-25.

77.     Vasquez submitted the AR-1 to ATF for classification on behalf of Wolf Tactical. Pl.'s Ex. 134, at USA_12739; Prelim. Inj. Hr'g Tr. 115:12-23.

## IX.   Defendants Have Chosen Not to Seek ATF Classification of the FRT-15

78.     To date, Defendants have not submitted the FRT-15 to ATF for classification.

79.    ATF's Firearms and Ammunition Technology Division ("FATD") is headquartered in Martinsburg, West Virginia. Decl. of William Ryan ("Ryan Decl.")[5]  ¶ 1. FATD provides expert technical support in connection with firearms and ammunition matters to ATF, fellow law enforcement agencies, the firearms and ammunition industry, and the public. *Id*. at ¶ 2. In the course of its operations, FATD maintains an extensive firearms reference collection, firearms technical reference files, a reference library, and firearms and ammunition resources. *Id*. at ¶ 3.

80.    FEOs who work at FATD are trained as experts in identifying and classifying firearms. Ryan Decl. at ¶ 5. Among their duties are evaluating firearms and ammunition, providing technical information regarding firearms identification, assisting law enforcement in the implementation of the GCA and NFA, examining and testing firearms evidence in criminal cases, and preparing official responses to written inquiries from firearms industry representatives and the general public. *Id*. at ¶ 5.

81.    Many of the FEOs employed by ATF have backgrounds in law enforcement or the military, or have worked in the firearms industry as gunsmiths (or both). Ryan Decl. at ¶ 6. FEOs receive training that consists of instruction on firearms operation and design, firearm identification, and classification of firearms and ammunition under federal law. *Id*. at ¶ 6.

82.    FATD provides assistance to members of the public and the firearms industry by, among other things, providing examinations and classifications of firearms and ammunition for industry members. Ryan Decl. at ¶ 9. One purpose of classification is to assess whether a firearm is regulated under the GCA and the NFA. *Id*. at ¶ 11.

83.    A party interested in receiving a classification may submit a firearm sample to ATF. Ryan Decl. at ¶ 10. Upon submission, the firearm sample is assigned to an FEO who examines the

---

[5]  This declaration can be found on the docket sheet in this action at ECF No. 105-2.

firearm; such examination may also include photographing, recording, disassembling, or test firing the sample. *Id.* at ¶ 10. The assigned FEO then submits a written classification which is peer-reviewed for substantive and grammatical edits. *Id.* at ¶ 10. Once peer review is complete, the written classification goes to the relevant Branch Chief for signature, and the Branch Chief signs the written classification if the Branch Chief concurs with the FEO's analysis. *Id.* at ¶ 10.

84.     ATF has a public website that provides additional instructions for those who wish to submit a firearm to FATD for classification. *How Do I Send in a Firearm or Ammunition to FATD for Classification?*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, https://www.atf.gov/firearms/qa/how-do-i-send-firearm-or-ammunition-fatd-classification (last reviewed August 12, 2023). The website says: "Please be aware that FATD does not make determinations based on drawings, photographs, written descriptions, or diagrams." *Id.* It also clarifies that "[i]n order to render an appropriate classification, please ship the **physical item** and any supporting information to" FATD's address in Martinsburg. *Id.* (emphasis in original).[6]

85.     FATD also performs classifications in connection with law enforcement investigations, so that law enforcement officers can determine whether a firearm may be lawfully possessed or distributed, and to evaluate the relevant statutes that govern the firearm in question. Dkt. No. 105-2, Ryan Decl. at ¶ 14. A classification done for law enforcement investigations is styled a Report of Technical Examination ("RTE"), but is otherwise virtually identical to that

---

[6] The United States offers this website into evidence for the purpose of showing that ATF's classification instructions were generally available to the public, and the Court may take judicial notice of the website under Federal Rule of Evidence 201. *See, e.g.*, *Force v. Facebook, Inc.*, 934 F.3d 53, 59 n.5 (2d Cir. 2019) (taking judicial notice of Facebook's publicly available terms of service "for the limited purpose of setting forth Facebook's stated representations about its policies and practices and to provide context for plaintiffs' allegations"); *Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 148 (S.D.N.Y. 2022) ("A court may . . . consider matters of which judicial notice may be taken under Fed. R. Evid. 201. This includes information on a party's publicly available website, as long as the authenticity of the site is not in dispute, but such information may be considered only for the fact that it was said, not for its truth.").

performed for firearms samples submitted by the firearms industry. *Id*. at ¶ 14. The RTE is then forwarded to the submitting law enforcement officer. *Id*. at ¶ 14.

86.     RBT did not participate in FATD's voluntary classification process to assess the legality of the FRT-15. Prelim. Inj. Hr'g Tr. 590:11-19. Nevertheless, FATD obtained a sample of an FRT-15 in connection with a law enforcement investigation, and generated an RTE that was signed by a Branch Chief on July 15, 2021. Pl.'s Ex. 1; Dkt. No. 105-2, Ryan Decl. at ¶ 16. That RTE classified the FRT-15 as a machinegun. Pl.'s Ex. 1.

87.     DeMonico knew that seeking a voluntary classification of the FRT-15 was the customary process.   Prelim. Inj. Hr'g Tr. 504:3-6; Pl.'s Ex. 11 (transcript of Mr. DeMonico interview with Colion Noir) 7:27-8:4; Pl.'s Ex. 10 (video clip of interview). DeMonico conducted an interview sometime after that classification and told approximately 300,000 listeners that he knew it was customary to seek a voluntary classification of the FRT-15 prior to bringing a device to market. Prelim. Inj. Hr. Tr. 502:10-12; Pl.'s Ex. 101 (video clip of interview). DeMonico also stated that "a lot of people are hating on us for not seeking an ATF approval letter." Pl.'s Ex. 11 at 7:23; Pl.'s Ex. 10_1.

## X.     Defendants Chose Not to Seek Classification Because They Did Not Want to Miss Out on Big Money

88.     Over the course of two years, Defendants earned at least $39 million in proceeds from the sale of the FRT-15 and the WOT. Pl.'s Ex. 139.

89.     Leleux testified that the reason that RBT did not want to seek ATF classification of the FRT-15 was because they feared missing the opportunity for big money. Prelim. Inj. Hr'g Tr. 556:6-559:18.

90.     Leleux, as chief executive officer of a company called Spike's Tactical, had experience seeking ATF classification of products. Prelim. Inj. Hr'g Tr. 555:23-556:8 One such

experience involved a suppressor. Prelim. Inj. Hr'g Tr. 556:9-557:8. Spike's Tactical had sought ATF classification of the product. Prelim. Inj. Hr'g Tr. 556:23-24. ATF advised Spike's Tactical that the suppressor would be illegal. Prelim. Inj. Hr'g Tr. 556:24-557:5. So Spike's Tactical did not go forward with the product. Prelim. Inj. Hr'g Tr. 557:6-8. Later, Spike's Tactical learned that other companies had been selling a similar product. Prelim. Inj. Hr'g Tr. 557:9-14. By going to ATF, Spike's Tactical had missed out on a huge money-making opportunity. Prelim. Inj. Hr'g Tr. 557:15-560:14.

91.   Leleux's experience with the suppressor informed the decision-making process that the owners of RBT undertook when they considered whether to seek ATF classification of the FRT-15. Prelim. Inj. Hr'g Tr. 559:19-560:14.

92.   Leleux also testified that one of the reasons that RBT did not seek ATF classification was the concern that ATF often changed its mind as to whether a particular product was legal. Prelim. Inj. Hr'g Tr. 559:19-560:14.

93.   Leleux's testimony is undermined in that regard, however, by DeMonico, Maxwell, and Leleux's understanding of a product called the 3MR. DeMonico and Leleux were well aware of the 3MR prior to RBT's going to market with the FRT-15. Prelim. Inj. Hr'g Tr. 435:25-436:19; 540:1-4. As Maxwell put it, the 3MR trigger is every bit as fast as the FRT-15. Prelim. Inj. Hr'g Tr. 591:25-592:7. And any trigger that shoots that fast was going to come to ATF's attention. *Id.*

94.   ATF approved the 3MR in 2013. Defs.' Ex. P. ATF has never changed its mind as to the legality of the 3MR – a product that Defendants invoke as similar to the FRT-15 – and it remains on the market to this day.

**XI.    RBT Began to Sell the FRT-15 in December 2020**

**A.    Defendants' Marketing Materials Consisted of False Characterizations of the Legality of the FRT and WOTs by Purported "Experts"**

95.    Defendants begin to sell the FRT-15 in December 2020. The FRT-15 was an immediate success.  Defendants maintained waiting lists. By January 2021, approximately one month into RBT's sales, RBT had a weeks-long waiting list. *See* Pl.'s Ex. 99 (RBT customer email dated January 22, 2021).

96.    To sell their illegal machinegun conversion device, Defendants advertised the purported expert opinions of former ATF employees to Defendants' customers. Prelim. Inj. Hr'g Tr. 15:2-21.

97.    The purpose of using the opinions of former ATF employees was to imply that ATF could not or would not oppose Defendants' sale of the FRT-15. *See* Defs.' Ex. 1. Defendants referred to the former ATF employees as "subject matter experts." *See* Defs.' Ex. D (January 23, 2021 O'Kelly video interview by DeMonico, at 1:00-1:10).

98.    RBT's website included a video by Maxwell addressing the legality of the FRT-15. Defs.' Ex. 1. Maxwell testified that the goal of these videos was for "anyone who purchased an FRT to be aware of its function and the controversial nature of what it was going to be. A trigger that would cycle as fast as the FRT does, is going to bring the attention of the ATF." Prelim. Inj. Hr'g Tr. 592:1-4. In this video, Defendants did not disclose that they did not seek ATF classification of the FRT-15. Prelim. Inj. Hr'g Tr. 512:19-24.

99.    None of Defendants' marketing materials used to promote and sell the FRT-15, between December 2020 and the July 26, 2021 cease and desist letter ("July 2021 Cease and Desist

Letter"), disclosed that Defendants did not submit the FRT-15 for ATF's review and classification. Tr. of Dep. of Cole Leleux, dated June 30, 2023 ("Leleux Dep.")[7] 85:6-20.

100.    Prior to Defendants selling the FRT-15, O'Kelly warned Defendants that "I guarantee you, or . . . do not be surprised if ATF calls" the FRT-15 a machinegun. Prelim. Inj. Hr'g Tr. 369:24-370:1-3. O'Kelly testified that he believed anyone marketing a machinegun would be at grave risk of swift enforcement action from ATF. Prelim. Inj. Hr'g Tr. 331:15-332:24; 368:17-369:1. Defendants did not comment on their expert's warning after he made it. Prelim. Inj. Hr'g Tr. 370:17-23. Nor did Defendants disclose O'Kelly's warning on any of their marketing materials.

**B.    Defendants' Marketing Between December 2020 to August 2021 Did Not Disclose Whether They Sought ATF Classification or Received an ATF Approval Letter**

101.    At no point did Defendants' website disclose Defendants' deliberate decision not to submit the FRT-15 to the ATF for classification and an approval letter prior to selling it. Leleux Dep. 85:6-20.

102.    At no point did Defendants' website disclose that they purchased the '223 Patent from Rounds and that ATF had classified the AR-1 as a machinegun. Leleux Dep. 85:6-20.

103.    Despite the fact that customers often emailed RBT to ask whether the FRT-15 had been submitted to ATF for classification, RBT never included any information on its website acknowledging that it had not done so. Prelim. Inj. Hr'g Tr. 483:10-484:14. DeMonico testified that RBT did not do so because of difficulties using its website platform. Prelim. Inj. Hr'g Tr. 519:4-521:6. That testimony should not be credited as it contradicts RBT's actions in other respects. A number of customers emailed RBT with questions about why their FRT-15s were not

---

[7] The designated portions of this deposition transcript can be found on the docket sheet in this action at 124-3.

functioning. RBT provided stock answers with detailed descriptions of common fixes to potential problems. Pl.'s Ex. 108, at RTF_0006882-83 (email making suggestions about how to fix common problems). In response to such questions, RBT posted videos on its website about how to properly install the FRT-15 and how to properly "tune" a rifle so that the FRT-15 will operate as designed. Defs.' Ex. O1 (screen shots of RBT website as of May 27, 2021). These videos did not appear on RBT's website when it first began selling the FRT-15s. Defs.' Ex. N1 (screen shots of RBT website as of December 31, 2020).   Thus, it is clear that RBT could, and did, change its website when it suited its interests.

## XII.  Defendants Engaged in a Campaign to Obstruct ATF by Selling As Many FRT-15s As Possible Before ATF Could Act

### A.  RBT Implemented a No-Refund Policy

104.    From the outset, RBT sold FRT-15s with a no-refund policy. Prelim. Inj. Hr'g Tr. 446:15-1; Tr. of Dep. of Jennifer Pierson, dated June 29, 2023 ("Pierson Dep.")[8] 83:8-11.

105.    RBT understood, from the very beginning, that its product would be controversial. Leleux Dep. 89:23-90:8. The stated purpose of the policy was that RBT needed money to challenge the ATF determination that the FRT-15 was a machinegun. Pierson Dep. 110:18-112:3. RBT wanted its customers to support them in that effort, and would state that "[i]t is our sincere hope that you stand your ground." Pl.'s Ex. 89. Otherwise, RBT would treat a refund request as a breach of contract. *Id*. (Customers did not necessarily do so.   As one put it, "[y]our company had better hope that this trigger is finally determined to NOT be a machinegun, or I may need to take legal action against you for having some me one.   How is that for standing my ground?"   *Id*.)

---

[8]  The designated portions of this deposition transcript can be found on the docket sheet in this action at 124-2.

106.    RBT strengthened its no-refund policy with respect to dealer sales. RBT only accepted wire transactions from dealers – not credit cards or automated clearing house ("ACH transfers"). Leleux Dep. 177:16-178:11. That way, RBT had total control over whether to issue a refund, without the interference of a credit card company or bank. *Id*.

**B.    To Facilitate More Sales, Defendants' Stock Responses to Customers' Questions Regarding the Legality of the FRT-15 Did Not Disclose Defendants' Decision to Forgo ATF's Classification Process**

107.    Defendants employed a customer service representative named Jennifer Pierson. Her employment began approximately one month after Defendants began to sell the FRT-15. Pierson Dep. 18:15-17.

108.    Pierson corresponded with RBT's customers by email through an account by the name of "customerservice@rarebreedtriggers.com." Pierson Dep. 29:19-21. Prior to Pierson's employment, Leleux responded to customer emails. Prelim. Inj. Hr'g Tr. 569:15-570:9. DeMonico also communicated with customers. *Id*.

109.    DeMonico supervised Pierson. Pierson Dep. Tr. 42:9-11.

110.    DeMonico supplied Pierson with stock responses, or standard replies, for common questions asked by customers or potential customers. Pierson Dep. 79:12-22; Prelim. Inj. Hr'g Tr. 478:6-10.

111.    On numerous occasions, customers emailed RBT and asked whether the FRT-15 was legal. The boilerplate, standard response was that the product was legal. As an example, when a customer asked "[W]ill I get in trouble later down the line for owning this trigger?," DeMonico answered:

> the law that defines a machine gun (26 USC § 5845(b)) is very clear. The FRT was conceptualized, designed, and developed specially to meet the legal requirements of a semi-automatic trigger and NOT be classified as a machine gun as defined by the law. Further, we did our due diligence by consulting numerous attorneys and subject matter experts to ensure the FRT complied with the law. Have we created

> something innovative? Yes! Have we done anything illegal? No! We've found a
> way to bring a new semi-automatic trigger to market while staying within the
> parameters as set forth by the law.

Pl.'s Ex. 103 (Jan. 9, 2021 customer email to RBT). Other examples, with substantially similar

language, can be found at Plaintiff's Exhibits 104, 105, 111, and 128.

112.    By contrast, if – but only if – a customer asked RBT whether ATF had approved

the FRT-15, then RBT would provide a slightly different response. Pl.'s Ex. 112 (December 18,

2020 customer email to RBT). RBT would simply state that it had not sought an ATF approval

letter, and then repeat its other, boilerplate, standard language. Pl.'s Ex. 112 (December 18, 2020

customer email to RBT). For instance, when a customer asked "Do you have plans to send this to

ATF to get a "letter?"" Mr. DeMonico responded:

> Thank you for reaching out. To answer your question …We didn't ask ATF for an
> approval letter for the FRT (Forced Reset Trigger) for several reasons.   First, semi-
> automatic triggers are NOT a regulated item under the NFA or ATF.   Second, the
> law that defines a machine gun (26 USC § 5845(b)) is very clear. The FRT was
> conceptualized, designed, and developed specially to meet the legal requirements
> of a semi-automatic trigger and NOT be classified as a machine gun as defined by
> the law. Further, we did our due diligence by consulting numerous attorneys and
> subject matter experts to ensure the FRT complied with tl1e law. Have we created
> something innovative? Yes! Have we done anything illegal? No! We've found a
> way to bring a new semi-automatic trigger to market while staying within the
> parameters as set forth by the law.

Pl.'s Ex. 112 (December 18, 2020 customer email to RBT).

### C.    Defendants Thwart ATF Retrieval Efforts – and Promote FRT-15 Sales – by Maintaining a "Digital Shredding Policy"

113.    A stock response, or standard reply, that Pierson used was in response to questions

regarding RBT's retention of customer information. Either RBT customers, or potential customers,

would email RBT and inquire whether ATF would access to their identifying information. Pl.'s

Exs. 87, 88, 107 (customer emails). Often, the inquiries would be clear that the customer wanted

to hide from ATF. Pl.'s Ex. 87 ("I would rather not have a visit from my local gestapo for

exercising my Americanism. Also do you shred/burn the dox? I know a few places that get of the sale info to protect their customers.").

114.     A standard reply from RBT consists of: "We have not turned over a customer list to the ATF—we don't even have one to turn over, as we have a digital shredding policy." Pl. Ex. 88.   RBT would go on to say that "[d]oing business online in the digital age, it's almost impossible to remove any and all traces of a transaction, but we've put a great deal of thought into this."   Pl.'s Ex. 87 (customer email dated September 20, 2022). RBT would assure its customers that it would not turn over any information voluntarily and, in any event, because of the "digital shredding policy," RBT "can't turn over what we don't have." *Id*.

115.     Pierson testified that she did not understand the "digital shredding policy" but that DeMonico told her to use the phrase with RBT customers or potential customers who had concerns. Pierson Dep. 80:6-13.

116.     Without customer data, any effort by ATF to retrieve illegal firearms – like the FRT-15 – from the public is exceedingly difficult. Prelim. Inj. Hr'g Tr. 225:5-230:8 (describing ATF retrieval efforts and the difficulties associated with those efforts).

**D.     RBT Encouraged Its Customer Base to Purchase Weapons from Third-Parties' Sites Selling FRT-15s Into All Fifty States**

117.     Pierson testified that she would inform potential customers that although RBT would not sell FRT-15s into certain states, these customers could purchase an FRT-15 from gunbroker.com. Pierson Dep. 118:21- 119:2.

118.     Leleux also informed RBT's customer base by email that although RBT did not sell into certain states, RBT's exclusive distributor Big Daddy Unlimited ("BDU") did sell FRT-15s in all fifty states. Prelim. Inj. Hr'g Tr. 574-575; Pl.'s Exs. 100, 101.

119.    In January 2021, DeMonico also directed a customer to purchase an FRT-15 from BDU because it sold FRT-15s to states RBT would not, such as California. Pl.'s Ex. 97 (Jan. 3, 2021 customer email to RBT); Pl.'s Ex. 100 (Jan. 22, 2021 customer email to RBT responded to by Leleux).

120.    Pierson testified that after the ATF issued the July 2021 Cease and Desist Letter, she was "bombarded with emails from customers" asking about the ATF's letter. Pierson Dep. 81:23 -82:10.

### E.    Defendants' Actions Obstruct ATF's Legitimate Law Enforcement Efforts

121.    Among other law enforcement responsibilities, ATF retrieves illegal firearms and machinegun devices like the FRT-15 and WOT that has entered the stream of commerce and been purchased by the public. Prelim. Inj. Hr'g Tr. 225:6-16.

122.    To retrieve illegal weapons in the hands of the public, ATF relies on the cooperation of individuals and companies. Prelim. Inj. Hr'g Tr. 228:3-229:21. This cooperation consists of companies and individuals providing their customer lists to ATF and engaging with their customers to retrieve illegal weapons. Prelim. Inj. Hr'g Tr. 228:7:11 ("We've had companies that worked with ATF . . . where they contacted their customers, told their customers they would pay for return shipping, and that company provided regular reports to ATF."). Retrieval processes take years; here the Defendants are responsible for thousands of illegal devices owned by individuals throughout the United States. Prelim. Inj. Hr'g Tr. 227:9-14.

123.    One of the ways ATF retrieves illegal weapons is by going out in the field and knocking on individuals' doors, termed the "knock -and-talk." Prelim. Inj. Hr'g Tr. 228:5-229:1-12. In recent years, threats to ATF agents attempting to retrieve illegal weapons have increased and ATF monitors these threats to ATF agents. Prelim. Inj. Hr'g Tr. 229:24-230: 9.

124.     Defendants' defiance of the July 2021 Cease and Desist Letter includes a social media campaign. Decl. of James Judge ("Judge Decl.").[9]  Online social messaging on how to avoid ATF's efforts in retrieving illegal weapons and devices, and arguing that such devices are not illegal, has further undermined ATF's retrieval efforts. Prelim. Inj. Hr'g Tr. 229:1-21; *see also* Judge Decl. at ¶ 3, 4 (testifying that RBT "hired my firm to create and disseminate a press release explaining to the public that the ATF was coming after them, claiming the FRT-15 was a machinegun, and they would be refusing to comply with the ATF's cease and desist based on their firm belief that the FRT-15 is a legal semi-automatic trigger.").

125.     ATF agents have been videotaped while attempting to retrieve illegal devices and these videos have been posted online, further threatening the safety of these ATF agents. Prelim. Inj. Hr'g Tr. 229:14-230:5.

## XIII.   RBT Was Warned Again that ATF Would Deem the FRT-15 a Machinegun as Soon as It Hit the Market

126.     On January 8, 2021, RBT received an email from a customer who had, years before, developed a trigger much like the FRT-15. Pl.'s Ex. 102.

127.     The customer stated that "[t]his is a warning given to you with the best of intentions to protect you, from an engineer and firearms enthusiast that went down a similar design road with the same conclusion in 2004 through 2006."    Pl.'s Ex. 102. The customer went on to say that he had developed a trigger system "that had the same forced reset function as your Rare Breed FRT-15 system." *Id*. ATF deemed that the product was a machinegun and the customer said that "[s]ince your FRT-15 works with the same principals [*sic*] as my system design a BATFE review would most likely provide the same result." *Id*.

---

[9]  This declaration can be found on the docket sheet in this action at ECF No. 107-4.

128.    The customer ended the email by saying "I hope this information is useful and helps keep you and your customers out of trouble. If you have question[s], please ask." Pl.'s Ex. 102.

129.    The system at issue in this email was designed by Hunter Kinetics. Pl.'s Exs. 29, 31, 33; Prelim. Inj. Hr'g Tr. 129:18-143:10. Over the course of three evaluations, ATF determined that the trigger was a machinegun. *Id*. ATF stated that, "because it is evident that from the moment of the application of trigger pressure – and as long as rearward pressure is applied to the trigger – the firearm continues to fire until the firing finger is removed; this firing takes place regardless of the rearward bolt travel that pushes the trigger forward into the cocked position." Pl.'s Ex. 33, at USA_20347.

130.    The Hunter Kinetics trigger worked on the same principles on which the FRT-15 works. Prelim. Inj. Hr'g Tr. 129:18-143:10.

131.    Still, RBT did not seek a classification of the FRT-15 from ATF.

132.    Instead, within two weeks of receiving the warning email – on January 18, 2021 – RBT contacted Vasquez, a former ATF official. *See* June 23, 2023 Status Conf. Tr., United States v. Rare Breed Triggers, LLC, et al., No. 23-cv-369 (E.D.N.Y. 2023), at 2:20-3:19. When he was with ATF, Vasquez was directly and personally involved in evaluating the Hunter Kinetics trigger. Prelim. Inj. Hr'g Tr. 129:18-143:10.

**XIV.   RBT Knew of ATF's Classification of the AR-1, But Still Did Not Seek a Classification of the FRT-15 From ATF**

133.    By January or February 2021, RBT obtained the ATF classification of the AR-1. Prelim. Inj. Hr'g Tr. 579:9-580:3. That classification states that the AR-1 is a machinegun because "a single constant rearward pull will cause the firearm to fire until the trigger is release, the firearm malfunctions, or the firearm exhausts its ammunition supply." Pl.'s Ex. 1, at USA_00046.

134.   RBT obtained the AR-1 classification as part of a discussion with Rounds. Prelim. Inj. Hr'g Tr. 544:10-546:19; 579:9-580:3. Thomas Graves, a person who had worked with Rounds, claimed that the FRT-15 was a copy of a product he had earlier developed. *Id*. That product was called the Flex Fire. *Id*.

135.   The Flex Fire is not the AR-1. A look at diagrams of the AR-1 and at diagrams of the Flex Fire makes that clear. *Compare* Pl.'s Ex. 3, at USA_00119-USA_00125 (description of AR1) to Plaintiff's Ex. 3 at USA_00127-00134 (Flex Fire patent). Unlike the FRT-15, the Flex Fire is not a trigger for the AR-15; it is its own gun. Prelim. Inj. Hr'g Tr. 562:3-5.

136.   Any claim that the Flex Fire is the AR-1, and that the AR-1 is unlike the FRT-15, is not accurate.

137.   Still, RBT did not seek a classification of the FRT-15 from ATF.

138.   Instead, RBT hired yet another expert to examine the FRT-15. In March 2021, RBT hired Luettke. Prelim. Inj. Hr'g Tr. 386:12-387:2.

## XV.   ATF Determined – Consistent With Longstanding Internal Precedent – That the FRT-15 Is a Machinegun

139.   By way of a RTE, ATF's Firearms Technology Criminal Branch classified the FRT-15 as a machinegun. Pl.'s Ex. 1. The report, written by FEO David Smith, is dated July 15, 2021. *Id*.

140.   In short summary, ATF determined that the FRT-15 was a machinegun because "one continuous pull of the trigger allows a semiautomatic firearm to shoot more than one shot." Pl.'s Ex. 1, at USA_00005.

141.   Prior to being finalized, FEO Smith's report underwent internal review. Dep. of David Smith 37:14-25. No one within ATF was of the opinion that the FRT-15 was not a

machinegun. Tr. of Dep. of David Smith, dated July 25, 2023 ("Smith Dep.")[10] 38:2-9. That is, all ATF officials were of the opinion that the FRT-15 was a machinegun. *Id*.

142.   As far back as 1975, ATF has classified products like the FRT-15 as machineguns. Pl.'s Ex. 116, at USA_20483. In a November 14, 1975 letter, ATF examined a product very much like the FRT-15 and determined that it was a machinegun because "while continuous finger pressure is maintained on the trigger the weapon will fire continuously." *Id*.

143.   ATF made a similar finding with respect to the Blakley trigger. Pl.'s Ex. 119.   That trigger worked just like the FRT-15 and just like the FRT-15 the ATF classified it as a machinegun "because it is evident that from the moment of the application of trigger pressure – and as long as rearward pressure is applied to the trigger – the firearm continues to fire until the firing finger is removed; this firing takes place regardless of the cam's pushing the trigger forward." *Id*.; Prelim. Inj. Hr'g Tr. 118:9-127:7. Vasquez, when he worked at ATF, wrote the classification for the Blakley trigger. Prelim. Inj. Hr'g Tr. 127:6-7. RBT now owns the patent for the Blakley trigger. Pl.'s Ex. 79.

144.   ATF made similar findings as to the Hunter Kinetics product and the AR1, as noted above.

145.   ATF made a similar finding with respect to a product called the 3MR. In 2013, ATF determined that the 3MR was not a machinegun. Defs.' Ex. P. The 3MR operates differently from the FRT-15. Prelim. Inj. Hr'g Tr. 145:18-150:17. Although both are so-called forced reset triggers, in a rifle fitted with an FRT-15, if a shooter maintains constant rearward pressure on the trigger, the rifle will fire repeatedly. *Id*. In a rifle fitted with a 3MR if a shooter maintains constant rearward pressure on the trigger, the rifle will fire one round and then stop. *Id*. That is because the 3MR

---

[10]  The designated portions of this deposition transcript can be found on the docket sheet in this action at 124-4.

employs a disconnector.   *Id.*   To fire a second round, a shooter must release pressure on the trigger, disengaging it from the disconnector, and then must increase pressure on the trigger.   *Id.*

146.   Defendants' claims, by way of expert witness O'Kelly, that the 3MR operates the same way that the FRT-15 operates cannot be credited. First, O'Kelly makes no mention of the 3MR in his initial letter to RBT – in 2020 – opining that the FRT-15 is not a machinegun, even though the 3MR had been on the market for more than six years. Defs.' Ex. A1 at RTF_0026640-44; Prelim. Inj. Hr'g Tr. 356:16-359:24. (He does, though, mention binary triggers. Defs.' Ex. A1, at RTF_0026642.)   Second, O'Kelly has never shot a rifle fitted with a 3MR. Prelim. Inj. Hr'g Tr. 360:2-3. Third, he's never handled a 3MR, let alone taken it apart or looked at it. Prelim. Inj. Hr'g Tr. 360:4-8. Fourth, in opining on the operation of the 3MR, O'Kelly did not look at any photographs, diagrams, or animations of the 3MR. Prelim. Inj. Hr'g Tr. 360:13-361:5. (He did claim that he may have seen some videos about the 3MR on the internet, but could not recall, let alone describe, what he saw.   Prelim. Inj. Hr'g Tr. 365:18-366:13.) Fifth, in describing the 3MR in his expert report, he skips altogether the fact that a shooter who wants to fire more than one round from a rifle fitted with a 3MR must alternate between increasing and decreasing pressure on the trigger – something a shooter need not do with the FRT-15. Prelim. Inj. Hr'g Tr. 361:19-365:23.

## XVI.   RBT Received a Cease and Desist Letter From ATF

### A.   ATF Uses Cease and Desist Letters to Stop Illegal Conduct

147.   Assistant Director Craig Saier has worked for ATF for over twenty-three years. Prelim. Inj. Hr'g Tr. 208:10-14. He is currently the Assistant Director for the Office of Strategic Intelligence and Information. Prelim. Inj. Hr'g Tr. 209:5-9. In that capacity, he oversees collection, analysis, and dissemination of intelligence pertaining to firearms offenses. Prelim. Inj. Hr'g Tr. 209:8-9.

148.    In 2021, he was the Special Agent in Charge ("SAIC") at the Tampa Field Division. Prelim. Inj. Hr'g Tr. 209:18-22. The Tampa Field Division covers the Northern and Middle Districts of Florida. Prelim. Inj. Hr'g Tr. 209:22-210:5, 210:14-18. As SAIC, he was responsible for criminal enforcement and regulatory enforcement activities carried out by ATF, specifically with regard to violations of federal firearms and explosives laws and regulation of federal firearms and explosives licensees. Prelim. Inj. Hr'g Tr. 210:6-13

149.    Assistant Director Saier testified that cease and desist letters are used by ATF to apprise individuals or entities that they are engaged in activity that ATF believes violates the law. Their purpose is to implore subject persons or entities to stop activities that have drawn ATF's attention. Prelim. Inj. Hr'g Tr. 212:6-11.

150.    A subject can comply with a cease and desist letter by following instructions contained in the letter, which typically entails stopping illegal activity and working with ATF to develop plans to retrieve illegally distributed or transferred contraband. Prelim. Inj. Hr'g Tr. 213:2-10. This is meant to be a collaborative process through which ATF solicits feedback in an attempt to find a solution that both ATF and the subject can agree upon. Prelim. Inj. Hr'g Tr. 213:11-17.

### B.    ATF Served a Cease and Desist Letter on RBT

151.    On July 27, 2021, SAIC Saier met with Maxwell at ATF's Orlando Field Office. Prelim. Inj. Hr'g Tr. 214:11-19, 215:4-11. The purpose of this meeting was to hand deliver a cease and desist letter to RBT. Prelim. Inj. Hr'g Tr. 216:12-13, 218:19-23.

152.    SAIC Saier handed Maxwell the cease and desist letter at this meeting. Prelim. Inj. Hr'g Tr. 216:7-13, 593:8-11.

153.    The cease and desist letter informed RBT that ATF had examined the FRT-15 and determined that it was a machinegun prohibited by the NFA. Pl.'s Ex. 2, at USA_00248. It also notified RBT that the FRT-15, by virtue of being a machinegun, is subject to registration, transfer,

taxation, and possession restrictions applicable to regulated weapons under the NFA. *Id.* Moreover, RBT was notified that the FRT-15 is subject to the GCA, which imposes further restrictions regarding the possession, transfer, and transport of machineguns. *Id.* Accordingly, the cease and desist letter directed RBT to refrain from manufacturing and selling the FRT-15, and to contact ATF within five days to develop a plan to retrieve any FRT-15s that had already been distributed. *Id.* at USA_00249; *see also* Prelim. Inj. Hr'g Tr. 215:24-216:4.

154.    Maxwell read the letter and said that he would not comply with it. Prelim. Inj. Hr'g Tr. 593:12-13; 594:1-2; *see also* Prelim. Inj. Hr'g Tr. 216:12-17, 219:3-5.

155.    Maxwell also told SAIC Saier that he had been expecting such a letter from ATF, and that he needed that letter in order to file a lawsuit against ATF, for which he had already prepared pleadings. Prelim. Inj. Hr'g Tr. 217:8-10.

**XVII.  RBT Continued to Sell the FRT-15 After ATF's Cease and Desist Letter**

156.    RBT continued to sell FRT-15s after ATF served the July 2021 Cease and Desist Letter. Prelim. Inj. Hr'g Tr. 218:25-219:1-2.

157.    After receiving the July 2021 Cease and Desist letter, DeMonico participated in multiple interviews broadcast on social media stating RBT's decision to violate the July 2021 Cease and Desist Letter and to continue to sell the machinegun.

158.    In a September 29, 2021 interview broadcast on the TFB TV YouTube channel, DeMonico stated that only RBT "had the balls to" bring a device like the FRT-15 to market.   *See* Pl.'s Ex. 18, at USA_20379 (transcript of interview); Pl.'s Ex. 19 (video clip). DeMonico further stated that he and the other Defendants had "no hesitation" in their collective decision not to comply with the July 2021 Cease and Desist Letter because, according to DeMonico: "Fuck Them." Pl.'s Ex. 18, at USA_20386; Pl.'s Ex. 20 (video clip).

159.   DeMonico testified that sales of the FRT-15 increased after the RBT publicized its defiance of ATF, driving sales "through the roof."   Prelim. Inj. Hr'g Tr. 499:5-15; 549: 14-23. To the extent DeMonico's testimony is true, Defendants' customer base purchased the FRT-15s (at the cost of almost $400), not as a political statement but because Defendants increased their marketing massively, thereby getting out the word that RBT was selling something that operated very much like a machinegun.

## XVIII. Defendants Filed (and Abandoned) Two Lawsuits Against ATF

### A.   Defendants Abandoned Their First Lawsuit Against ATF

160.   On August 2, 2021, within a week of receiving the July 20, 2021 Cease and Desist Letter, RBT commenced a lawsuit against the ATF in the Middle District of Florida ("Florida Lawsuit"). *See* Compl., Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Aug. 2, 2021), ECF No. 1. RBT filed a complaint, and a motion for preliminary injunction and motion for a temporary restraining order. Compl., Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Aug. 2, 2021), ECF Nos. 2–3. The complaint challenged ATF's July 2021 Cease and Desist Letter and ATF's classification of the FRT-15 as a machinegun under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). Compl., Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Aug. 2, 2021), ECF No. 7, Compl. ¶¶ 78–85.   On August 5, 2021, the Court denied RBT's motion for a temporary restraining order. Order, Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Aug. 2, 2021), ECF No. 12.

161.   On August 16, 2021, RBT received a copy of ATF's classification report. Admin. Record, Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Aug. 16, 2021) ECF No. 26-30; *see also* Pl.'s Ex. 3 (ATF Classification Report No. 317388).

162. During the Florida Lawsuit, RBT sought to introduce their expert letters so that ATF would reconsider the final agency action, which was the July 2021 Cease and Desist Letter. Am. Compl., Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Aug. 27, 2021), ECF No. 32. The court in the Florida Lawsuit determined that RBT could not challenge ATF's final agency action by introducing expert letters because the administrative record had closed, and   reprimanded RBT for their efforts to do so during the hearing on the motion for a preliminary injunction. *See* Tr. of Prelim. Inj. Hr'g, Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Oct. 4, 2021), ECF No. 61; Tr. of Prelim. Inj. Hr'g, Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Oct. 6, 2021), ECF No. 66.

163. On October 6, 2021, the court in the Florida Lawsuit granted RBT leave to file a motion to remand to the ATF for consideration of RBT's arguments and submissions which the court in the Florida Lawsuit rejected. Tr. of Prelim. Inj. Hr'g, Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Oct. 6, 2021), ECF No. 66. RBT never filed a motion to remand.

164. On October 12, 2021, the court denied the motion for a preliminary injunction, again finding that RBT had not demonstrated irreparable harm. Order, Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Oct. 6, 2021), ECF No. 68, at 8.

165. On October 14, 2021, Maxwell sought an extension of time, to November 3, 2021, to file a motion for remand because of a COVID-19 diagnosis; the court granted the request. *See* Mot., Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Oct. 14, 2021), ECF No. 71; Order, Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Oct. 14, 2021), ECF No.72.

166.    On October 28, 2021, the court dismissed the Florida Lawsuit without prejudice, because the parties had failed to comply with Local Civil Rule 3.02 requiring the parties to file a case management report. Order, Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Oct. 14, 2021), ECF No. 75, at 2. The court advised that "[RBT] may seek reconsideration" if the fault for not filing a case management report "lies entirely with [the government]." Order, Rare Breed Triggers, LLC v. Garland, No. 6:21-cv-1245-CEM-GJK (M.D. Fla. Oct. 14, 2021), ECF No. 75, at 2 n.1. Under the Middle District of Florida's local rules, a case management report is not required in "an action for review of an administrative record." M.D. Fla. R. 3.02(d)(2). RBT did not seek reconsideration of the dismissal.

167.    Although RBT could have moved to reopen or refile the Florida Lawsuit so as to file the motion for remand, RBT chose to abandon the Florida Lawsuit. But, by video statement directed to their customer base, DeMonico stated that the Court "booted the case" implying that RBT's Florida Lawsuit was decided on the merits. Defs.' Ex. F.

## B.    Defendants Abandoned Their Second Lawsuit Against ATF

168.    On November 2, 2021, Maxwell sent a letter to ATF asking the agency to "reconsider[]" the classification of the FRT-15 and attached several exhibits, including the opinion letters from ATF retirees, and a thumb drive. Defs.' Ex. X1. On November 15, 2021, on behalf of ATF, SAIC Saier responded via letter informing Maxwell that the FRT-15 had been classified as a machinegun, that the July 2021 Cease and Desist Letter was still in effect, and that the materials mailed by Maxwell had been forwarded to FATD. Pl.'s Ex. 35.

169.    RBT waited seven months to commence its second litigation against ATF. On May 16, 2022, EBT commenced an action against the ATF under the APA in the District of North Dakota (the "North Dakota Lawsuit") challenging, *inter alia*, ATF's determination that the FRT-

34

15 is a machinegun.  *See* Compl., Rare Breed Triggers, LLC v. Garland, No. 3:22-cv-85-ARS (D.N.D. May 16, 2022), ECF No. 1.

170.    On November 4, 2022, the court dismissed the North Dakota Lawsuit for improper venue. *See* Order, Rare Breed Triggers, LLC v. Garland, No. 3:22-cv-85-ARS (D.N.D. May 16, 2022), ECF No. 45; Clerk's J., Rare Breed Triggers, LLC v. Garland, No. 3:22-cv-85-ARS (D.N.D. May 16, 2022), ECF No. 46.

171.    But over a month later, in a December 6, 2022 email to an RBT customer inquiring into the legality of the WOT, Defendants misrepresented the litigation posture to this customer and said: "The ATF chose not to reconsider, so we filed a new lawsuit against the ATF, which is currently in litigation. It is important to note that there has been no ruling/determination regarding the FRT in a court of law." *See* Pl.'s Ex. 130.

**XIX.   Focused Exclusively On More Profits, Defendants Devoted Their Resources To Filing (and Pursuing) Five Patent Infringement Actions Against Their Competition**

**A.    Defendants Sued to Protect the '223 Patent**

172.    On September 15, 2021, RBT and ABC IP sued BDU and other parties in a patent infringement action filed in the Northern District of Florida. Compl., Rare Breed Triggers, LLC, et al. v. Big Daddy Enters., et al., No. 21-cv-149-RH-HTC (N.D. Fla. Sept. 15, 2021), ECF No. 1. According to the complaint, the "WOT Hard Reset Trigger" (also advertised as the "Wide Open Trigger") infringed on the '223 Patent. Compl., Rare Breed Triggers, LLC, et al. v. Big Daddy Enters., et al., No. 21-cv-149-RH-HTC (N.D. Fla. Sept. 15, 2021), ECF No. 1, ¶ 45.

173.    Litigation would continue for well over a year, and eventually culminated in a consent judgment and permanent injunction. Consent J. & Permanent Inj., Rare Breed Triggers, LLC, et al. v. Big Daddy Enters., et al., No. 21-cv-149-RH-HTC (N.D. Fla. Oct. 19, 2022), ECF No. 194. The parties in that action entered into a confidential settlement agreement which

contained agreed-upon terms regarding compensation for the '223 Patent infringement. Consent J. & Permanent Inj., Rare Breed Triggers, LLC, et al. v. Big Daddy Enters., et al., No. 21-cv-149-RH-HTC (N.D. Fla. Oct. 19, 2022), ECF No. 194, at 4. Defendants also secured a permanent injunction barring BDU and the other defendants in that action from making or selling any product that infringed on the '223 Patent. Consent J. & Permanent Inj., Rare Breed Triggers, LLC, et al. v. Big Daddy Enters., et al., No. 21-cv-149-RH-HTC (N.D. Fla. Oct. 19, 2022), ECF No. 194, at 6.

### B. Defendants Sued Again to Protect the '223 Patent Again

174. On March 7, 2022, RBT and ABC IP sued again over infringement of the '223 Patent in the Northern District of Ohio. Compl., Rare Breed Triggers, LLC, et al. v. Strbac, et al., No. 22-cv-280-SO (N.D. Ohio Mar. 7, 2022), ECF No. 1. They alleged that a rival product called the "FRT-15-3MD" infringed on the '223 Patent. Compl., Rare Breed Triggers, LLC, et al. v. Strbac, et al., No. 22-cv-280-SO (N.D. Ohio Mar. 7, 2022), ECF No. 1, ¶ 44.

175. The parties litigated the matter for over half a year, and in October 2022 they entered into a confidential settlement agreement resolving the issues pled in the complaint, stipulated to dismiss the action with prejudice, and agreed that the district court would retain jurisdiction over enforcement of their settlement agreement. Joint Stip. & Order of Dismissal, Rare Breed Triggers, LLC, et al. v. Strbac, et al., No. 22-cv-280-SO (N.D. Ohio Oct. 11, 2022), ECF No. 30.

### C. Defendants Sued to Protect the '223 Patent Once More

176. On March 8, 2022, RBT and ABC IP filed another patent infringement lawsuit in the Northern District of Florida. Compl., Rare Breed Triggers, LLC, et al. v. Big Daddy Unlimited, Inc., et al., No. 22-cv-61-RH-GRJ (N.D. Fla. Mar. 8, 2022), ECF No. 1. This litigation concerned a device called the ALAMO-15 Trigger, which allegedly copied the invention protected by the

'223 Patent. Compl., Rare Breed Triggers, LLC, et al. v. Big Daddy Unlimited, Inc., et al., No. 22-cv-61-RH-GRJ (N.D. Fla. Mar. 8, 2022), ECF No. 1, ¶ 27.

177.    After more than six months of litigation, the parties resolved the matter on October 19, 2022 by way of a consent judgment and permanent injunction. *See* Consent J. & Permanent Inj., *Rare Breed Triggers, LLC, et al. v. Big Daddy Unlimited, Inc., et al*., No. 22-cv-61-RH-GRJ (N.D. Fla. Oct. 19, 2022), ECF No. 49. Among other things, the parties agreed to terms of compensation for infringement of the '223 Patent. Consent J. & Permanent Inj., *Rare Breed Triggers, LLC, et al. v. Big Daddy Unlimited, Inc., et al*., No. 22-cv-61-RH-GRJ (N.D. Fla., Oct. 19, 2022), ECF No. 49, at 4. A permanent injunction also issued that barred the defendants in that action from infringed on the '223 Patent going forward.

### D.    Defendants Sued to Protect the '223 Patent Yet Again

178.    In another lawsuit filed on March 8, 2022, RBT and ABC IP sued again for patent infringement in the Northern District of Oklahoma on March 8, 2022. Compl., Rare Breed Triggers, LLC, et al. v. Graves, et al., No. 22-cv-107-GKF-JFJ (N.D. Okla. Mar. 8, 2022), ECF No. 2. They claimed that multiple defendants infringed on the '223 Patent by selling the ALAMO-15 Trigger. Compl., Rare Breed Triggers, LLC, et al. v. Graves, et al., No. 22-cv-107-GKF-JFJ (N.D. Okla. Mar. 8, 2022), ECF No. 2, ¶ 29.

179.    RBT and ABC IP finally resolved their claims against several of the defendants in that action by way of a consent judgment and permanent injunction on October 27, 2022. Am. Consent J. & Permanent Inj., Rare Breed Triggers, LLC, et al. v. Graves, et al., No. 22-cv-61-RH-GRJ (N.D. Fla. Oct. 27, 2022), ECF No. 45. The agreement memorializes those parties' understanding that RBT and ABC IP lost profits and royalties from patent infringement in an amount over $1.3 million. Am. Consent J. & Permanent Inj., Rare Breed Triggers, LLC, et al. v. Graves, et al., No. 22-cv-61-RH-GRJ (N.D. Fla. Oct. 27, 2022), ECF No. 45, at 3. The defendants

in that action were permanently enjoined from making or selling any product that infringed on the '223 Patent. Consent J. & Permanent Inj., Rare Breed Triggers, LLC, et al. v. Graves, et al., No. 22-cv-61-RH-GRJ (N.D. Fla. Oct. 27, 2022), ECF No. 45, at 5. RBT and ABC IP also secured a default judgment against the remaining defendants who had failed to defend against that patent infringement suit. Judgment, Rare Breed Triggers, LLC, et al. v. Graves, et al., No. 22-cv-61-RH-GRJ (N.D. Fla. Dec. 15, 2022), ECF No. 58.

     **E.**    **Defendants Are Still Protecting Their Interest in the '223 Patent to This Day**

180.    RBT and ABC IP are still at it. On January 13, 2023 – less than two weeks before the Government filed the present action against Defendants – they filed yet another patent infringement suit in the Northern District of Oklahoma. Compl., Rare Breed Triggers, LLC, et al. v. Crawford, et al., No. 23-cv-21-CVE-JFJ (N.D. Okla. Jan. 13, 2023). The complaint alleges that a device called the PARA-15 Trigger infringes on the '223 patent. Compl., Rare Breed Triggers, LLC, et al. v. Crawford, et al., No. 23-cv-21-CVE-JFJ (N.D. Okla. Jan. 13, 2023), ¶ 74. Among the relief sought is a permanent injunction barring infringement of the '223 Patent, and an award for damages stemming from the alleged patent infringement. Compl., Rare Breed Triggers, LLC, et al. v. Crawford, et al., No. 23-cv-21-CVE-JFJ (N.D. Okla. Jan. 13, 2023), at 29.

181.    As of now, this litigation is ongoing, and the parties are in the midst of discovery. *See, e.g.*, Joint Status Report, Rare Breed Triggers, LLC, et al. v. Crawford, et al., No. 23-cv-21-CVE-JFJ (N.D. Okla. Mar. 17, 2023), ECF No. 59; Minutes of Proceeedings, Rare Breed Triggers, LLC, et al. v. Crawford, et al., No. 23-cv-21-CVE-JFJ (N.D. Okla. June 1, 2023), ECF No 69.

XX.    **DeMonico Traveled to 3ʳᵈ Gen and Took FRT-15s Belonging to the ATF**

182.    3ʳᵈ Gen Machine, Inc. ("3ʳᵈ Gen") manufactured FRT-15s for Rare Breed Triggers, LLC. Decl. of Jonathan Robinson ("Robinson Decl.")[11]  ¶ 3; *see also* Prelim. Inj. Hr'g Tr. 453:19-22.

183.    In January 2022, ATF served a cease and desist letter on 3ʳᵈ Gen. Pl.'s Ex. 37; Robinson Decl. ¶ 5. That cease and desist letter stated (among other things) that the FRT-15 was a machinegun regulated by the NFA and the GCA, and instructed 3ʳᵈ Gen to stop manufacturing the FRT-15 and surrender any FRT-15s in 3ʳᵈ Gen's possession. Pl.'s Ex. 37, at USA_20235-36; Robinson Decl. ¶ 5.

184.    After receiving the cease and desist letter, 3ʳᵈ Gen conferred with DeMonico and Maxwell, who assured 3ʳᵈ Gen that 3ʳᵈ Gen would be provided with expert opinions and assistance. Robinson Decl. ¶ 7; *see also* Prelim. Inj. Hr'g Tr. 455:11-23. 3ʳᵈ Gen continued to manufacture the FRT-15 for Rare Breed Triggers, LLC. Robinson Decl. ¶ 8.

185.    On March 26, 2022, ATF executed a search warrant at a 3ʳᵈ Gen facility in Logan, Utah, which was one of two facilities operated by 3ʳᵈ Gen, and recovered FRT-15s and FRT-15 components from the premises. Decl. of Jonathan Lee ("Lee Decl.")[12]  ¶ 2; Robinson Decl. ¶ 9; *see also* Prelim. Inj. Hr'g Tr. 455:23-456:24.

186.    3ʳᵈ Gen conferred with DeMonico and Maxwell after ATF executed the search warrant, and 3ʳᵈ Gen informed the two that 3ʳᵈ Gen was in possession of additional FRT-15s and FRT-15 components. Robinson Decl. ¶ 12. DeMonico and Maxwell demanded the return of these

---

[11]  This declaration can be found on the docket sheet in this action at ECF No. 105-5.

[12]  This declaration can be found on the docket sheet in this action at ECF No. 105-4.

items, but 3ʳᵈ Gen told them that the company intended to turn the items over to ATF. Robinson Decl. ¶ 12.

187.    On either the afternoon of April 13, 2022 or the morning of April 14, 2022, Special Agent Michael E. Minichino, who was assigned to ATF's Salt Lake City Field Office, learned from an Assistant U.S. Attorney in the District of Utah that 3ʳᵈ Gen's counsel wished to surrender additional FRT-15s in 3ʳᵈ Gen's possession. Lee Decl. ¶¶ 3-4.

188.    On April 14, 2022 at approximately 12:35 p.m., 3ʳᵈ Gen's counsel informed Special Agent Minichino that the FRT-15s were on a pallet in a parking lot on the site of the search warrant execution from the prior month, and that those FRT-15s were available for retrieval by ATF. Lee Decl. ¶ 5.

189.    That same day, DeMonico traveled to 3ʳᵈ Gen. Prelim. Inj. Hr'g Tr. 507:17-19, 508:4-6. He took a flight from his home to Salt Lake City, Utah, rented a U-Haul, and drove to the 3ʳᵈ Gen facility in Logan, Utah. Prelim. Inj. Hr'g Tr. 508:4-13.

190.    When DeMonico flew to Utah, he knew that 3ʳᵈ Gen intended to set aside FRT-15s for ATF's retrieval. Prelim. Inj. Hr'g Tr. 509:8-14. He also acknowledged, when questioned by the Court at the preliminary injunction hearing, that he had not confirmed that the search warrant had expired. Prelim. Inj. Hr'g Tr. 461:21-462:3. In fact, he had neither reviewed a copy of the warrant, nor conferred with Maxwell (or any other attorney) before going to Utah. Prelim. Inj. Hr'g Tr. 462:4-20.

191.    DeMonico arrived at the 3ʳᵈ Gen facility and walked into the office of Jonathan Robinson, the General Manager for 3ʳᵈ Gen. Lee Decl. ¶¶ 9, 13; Robinson Decl. ¶ 13; *see also* Prelim. Inj. Hr'g Tr. 460:9-13. He told Robinson: "I'm here for my shit." Lee Decl. ¶¶ 10, 13; Robinson Decl. ¶ 15; *see also* Prelim. Inj. Hr'g Tr. 460:14-15, 510:4-6. Robinson told DeMonico that ATF was scheduled to arrive the next day to retrieve the FRT-15s, and that Robinson was

going to notify ATF. Robinson Decl. ¶¶ 16-17. DeMonico said that he did not care, and instructed Robinson to give him a head start before calling ATF. Lee Decl. ¶¶ 13-14; Robinson Decl. ¶ 17; Prelim. Inj. Hr'g Tr. 510:22-24.

192.   DeMonico then loaded the property set aside for ATF into his U-Haul and drove off. Prelim. Inj. Hr'g Tr. 461:5-11; Robinson Decl. ¶ 19. By his own admission, he took nearly 2,000 FRT-15s from the 3rd Gen facility, along with more than 15,000 FRT-15 components that could be used to manufacture additional FRT-15s. Prelim. Inj. Hr'g Tr. 463:24-464:1, 511:10-22. A 3rd Gen employee recorded DeMonico absconding with the FRT-15s and the components. *See* Lee Decl. ¶ 15.

193.   Around 2:07 p.m., 3rd Gen's counsel informed Special Agent Minichino that an unidentified individual had just entered 3rd Gen's facility in Logan, Utah and was attempting to leave with property. Lee Decl. ¶ 6. After DeMonico left, Robinson also contacted ATF about this incident, and provided a description of DeMonico's U-Haul, along with DeMonico's phone number. *See* Lee Decl. ¶¶ 8-10; Robinson Decl. ¶ 20.

194.   DeMonico drove the U-Haul from Logan, Utah for nearly 700 miles,[13] and made it to just outside Albuquerque, New Mexico before he was interdicted by ATF. *See* Lee Decl. Ex. 1; Prelim. Inj. Hr'g Tr. 511:12-22. ATF recovered the contraband and released DeMonico. *See* Lee Decl. Ex. 1 ¶ 9; Prelim. Inj. Hr'g Tr. 467:13-20.

---

[13] The United States relied on Google Maps to calculate the distance between Logan, Utah and Albuquerque, New Mexico. The Court may take judicial notice of this distance under Federal Rule of Evidence 201. *See, e.g., Rindfleisch v. Gentiva Health Sys., Inc.*, 752 F. Supp. 2d 246, 259 n.13 (E.D.N.Y. 2010) (Bianco, J.) (taking judicial notice of distance calculated by internet mapping tool under Fed. R. Evid. 201)

**XXI.  Defendants Were Still Selling Machineguns (i.e., WOTs) Over a Year After Receiving the Cease and Desist Letter**

195.    The WOT is identical to the FRT-15. Prelim. Inj. Hr. Tr. 278:5-15. It is also an illegal machinegun conversion device. Pl.'s Ex. 4. Unlike the Florida Lawsuit, Defendants did not abandon their patent infringement suit involving BDU; the parties settled this lawsuit in October 2022. Consent J. & Permanent Inj., Rare Breed Triggers, LLC, et al. v. Big Daddy Enters., et al., No. 21-cv-149-RH-HTC (N.D. Fla. Oct. 19, 2022), ECF No. 194. Defendants also obtained an undisclosed amount of WOTs from BDU. DeMonico Dep. 49:13-22. Defendants focused on bringing patent lawsuits to protect their pecuniary interest; they had no demonstrable interest in litigation against ATF.

196.    Defendants sold WOTs in November 2022. Prelim. Inj. Hr'g Tr. 475:18-20. Defendants used the U.S. Postal Service ("USPS") to mail WOTs to customers who purchased the machinegun conversion device throughout the United States. Prelim. Inj. Hr'g Tr. 475:20-22. Defendants chose to ship WOTs through USPS despite Defendants' contention that USPS is not a reliable carrier. Prelim. Inj. Hr'g Tr. 475:21-476:1.

197.    To ship the WOTs, Defendants used the names of two fake companies, "Red Beard Treasures" and "Red Barn Tools." Prelim. Inj. Hr'g Tr. 445:6-446:7; DeMonico Dep. 91:9-14, 92:18-23; *see also* Pl.'s Ex. 52.

198.    In an email to their customer lists dated November 22, 2022, Defendants stated that the money "raised by the sales of these WOTs will be used to fund litigation in the following order, based on availability of funds and the evaluation on a case by case basis: 1. Litigation by RBT against the DOJ/ATF . . . ." Pl.'s Ex. 133.

199.    RBT never filed any such lawsuit. Instead, as noted before, it filed yet another patent lawsuit on January 13, 2023. *See* Compl., Rare Breed Triggers, LLC, et al. v. Crawford, et al., No. 23-cv-21-CVE-JFJ (N.D. Okla. Jan. 13, 2023), ECF No. 1.

## XXII.  RBT Misled Its Customers About the Availability of WOTs

200.    RBT stopped selling WOTs in December 2022 because their merchant account provider – Chase Paymentech – refused to continue doing business with them. DeMonico Dep. 52:14-53:3, 53:18-54:4; 54:17-24. As DeMonico understood it, Chase Paymentech made that decision because RBT posed a reputation risk to the institution. DeMonico Dep. 53:22:54:4.

201.    RBT told its customers in December 2022 that it was "Out of Stock" of WOTs. Pl.'s Ex. 39, at USA_20229. That was not true; RBT had stock of WOTs available and, as of August 2, 2023, still had "a ton of Wide Open Triggers" in boxes in their offices in North Dakota. Prelim. Inj. Hr'g Tr. 475:3-16. And as of July 7, 2023, there were many more WOTs in storage units in North Dakota and Texas. DeMonico Dep. 46:4-18; 49:13-22; 50:10-14; 51:16-19.

202.    In other words, RBT led its customers to believe that WOTs were unavailable because of a lack of inventory when, in fact, they were unavailable because its merchant account provider had simply stopped doing business with the company because of reputational risk.

## XXIII. RBT's Prototype Three-Position Trigger Shows That They Knew the FRT-15 Was a Machinegun

203.    Defendants were in the process of developing a three-position trigger. Robinson Decl. ¶ 22. They produced at least one prototype. Pl.'s Ex. 24 (video of DeMonico demonstrating three-position trigger). RBT publicly demonstrated the trigger on January 15, 2022, and had expected to offer it commercially by March 2022. Compl., Rare Breed Triggers, LLC, et al. v. Strbac, et al., No. 22-cv-280-SO (N.D. Ohio Mar. 7, 2022), ECF No. 1 at ¶ 38.

43

204.    The three-position trigger included the following settings: (1) safe, which would not allow a rifle to fire; (2) standard semi-automatic, which operated as traditional semi-automatic trigger would work; and (3) forced reset, which operated as the then available FRT-15 would operate. Pl.'s Ex. 24; Prelim. Inj. Hr'g Tr. 98:7-102:19.

205.    A reason for developing a three-position trigger stems from the fact that it takes great skill for a shooter to fire one round at a time from a rifle fitted with an FRT-15. Prelim. Inj. Hr'g Tr. 101:8-102:19. Put another way, the FRT-15 operated just like a machinegun unless a shooter was able, after firing one round, which would require great skill, to release the trigger to stop the weapon from firing within the one-fourteenth to one-tenth of a second before the weapon fired a second round. Prelim. Inj. Hr'g Tr. 75:2-14; 101:8-102:19.

206.    Controlling a rifle that fires repeatedly is difficult. Prelim. Inj. Hr'g Tr. 101:8-102:19. Users may want to fire the weapon one round at a time. Prelim. Inj. Hr'g Tr. 101:8-102:19. A three-position FRT-15 trigger would be attractive to such users. Prelim. Inj. Hr'g Tr. 101:8-102:19.

207.    That Defendants were working to develop such a trigger establishes that they knew that the general user would be unable to fire a rifle fitted with an FRT-15 one round at a time. They knew, in other words, that the normal functioning of an FRT-15 was such that it would operate as a machinegun.

## XXIV. Defendants Did Not Pay the Requisite National Firearms Act Taxes for the Sale of the FRT-15

208.    It is unlawful to make or sell a firearm under the National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended in scattered sections of 26 U.S.C.) ("NFA") without having paid the required taxes. *See* 26 U.S.C. § 5861. Such a violation carries criminal penalties. *See* 26 U.S.C. § 5871.

209. The Internal Revenue Code provides that the Attorney General shall administer and enforce the NFA. 26 U.S.C. § 7801(b). Congress and the Attorney General have delegated the responsibility for administering and enforcing the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (codified as amended in scattered sections of 18 U.S.C. and 26 U.S.C.) ("GCA") and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General. 28 U.S.C. § 599A(b)(1), (c)(1); 28 CFR § 0.130(a)(1)-(2).

210. Every person engaged in the business of manufacturing, importing, or dealing in firearms under the NFA must pay a Special Occupation Tax ("SOT"). 26 U.S.C. § 5851 and 27 C.F.R § 479.31. By operation of law, any person so engaged must also be licensed as a dealer, manufacturer, or importer under the GCA.

211. Defendants did not pay the SOT.

212. Under 26 U.S.C. § 5821, with exceptions not applicable here, a transferor of firearms must pay a $200 tax on each firearm transferred. Defendants did not pay this tax.

## XXV. Defendants Mislead the Court

213. Defendants have shown on at least two occasions that they have no qualms about misleading the Court.

214. Defendants initially represented to the Court, in the course of briefing on their motion to dismiss this action for lack of personal jurisdiction, that RBF "wasn't even involved in sales of the FRT-15 or WOT." Defs.' Mot. to Dismiss, United States v. Rare Breed Triggers, LLC, et al., No. 23-cv-369 (E.D.N.Y. Feb. 16, 2023), ECF No. 23, at 30. RBF, they claimed, only sold "swag," like t-shirts and hats. Mem. & Order, United States v. Rare Breed Triggers, LLC, et al., No. 23-cv-369 (E.D.N.Y. Feb. 16, 2023), ECF No. 48, at 12.

215. The Government later uncovered evidence, obtained from USPS and interviews with Defendants' customers, that RBF had in fact shipped FRT-15 parts directly to New York.

Decl. of Dean Conigliaro I, United States v. Rare Breed Triggers, LLC, et al., No. 23-cv-369 (E.D.N.Y. Feb. 16, 2023), ECF No. 40-1, ¶¶ 5, 22, 26; Decl. of Dean Conigliaro II, United States v. Rare Breed Triggers, LLC, et al., No. 23-cv-369 (E.D.N.Y. Feb. 16, 2023), ECF No. 43-1, ¶ 9.

216.    Counsel for Defendants did not dispute the accuracy of the Government's factual assertions at a subsequent hearing. Civil Cause for Video Conf. Tr., United States v. Rare Breed Triggers, LLC, et al., No. 23-cv-369 (E.D.N.Y. Feb. 16, 2023), ECF No. 45, at 5:4-8.

217.    The Court observed that Defendants' admission by counsel contradicted many factual assertions made by Defendants in connection with their motion to dismiss for lack of personal jurisdiction, and provided evidence that RBF sold not just swag but also FRT-15 parts. Mem. & Order, United States v. Rare Breed Triggers, LLC, et al., No. 23-cv-369 (E.D.N.Y. Feb. 16, 2023), ECF No. 48, at 15-16.

218.    Leleux submitted a declaration in connection with that motion, in which he stated that "RBT is not aware of any instance where a dealer sent an FRT-15 or WOT to any person or address in New York." Decl. of Cole Leleux ("Leleux Decl."), United States v. Rare Breed Triggers, LLC, et al., No. 23-cv-369 (E.D.N.Y. Feb. 16, 2023), ECF No. 23-1, ¶ 14; *see also* Prelim. Inj. Hr'g Tr. 574:10-22.

219.    Leleux's declaration also represented that "RBT created a restricted shipping zone that would not allow the website to take orders from customers reporting addresses in or ship to addresses in California, Hawaii, New York, Puerto Rico, Washington, or Washington, DC." Leleux Decl., United States v. Rare Breed Triggers, LLC, et al., No. 23-cv-369 (E.D.N.Y. Feb. 16, 2023), ECF No. 23-1, ¶ 13.

220.    Leleux's declaration was submitted under penalty of perjury. Leleux Decl., United States v. Rare Breed Triggers, LLC, et al., No. 23-cv-369 (E.D.N.Y. Feb. 16, 2023), ECF No. 23-1, at 1; *see also* Prelim. Inj. Hr'g Tr. 573:23-574:9.

221.    Leleux's declaration was false.

222.    This representation to the Court directly contradicts statements that Leleux made on behalf of RBT. On January 11, 2021, Leleux sent an email to a customer confirming that BDU (their exclusive dealer) "has stated they plan to sell to all 50 states." Pl.'s Ex. 100; Prelim. Inj. Hr'g Tr. 570:11-571:24. He directed an RBT customer to purchase an FRT-15 from BDU; even though RBT would not ship into the customer's state, BDU would.    *Id.*

223.    This was not an isolated incident. On January 9, 2021, Leleux told another customer based in Washington (a state in RBT's apparent "restricted shipping zone") that BDU "has stated that they will sell in all states," and that "[t]he easiest method to acquire one will be to purchase through them." Pl.'s Ex. 101; *see also* Prelim. Inj. Hr'g Tr. 569:15-570:9 (confirming that "Charles" is an alias used by Leleux in consumer-facing emails).

224.    Nor was Leleux the only representative of RBT who understood that BDU would ship to prohibited states. Around this same time, on January 3, 2021, DeMonico told a customer from California (yet another state within the "restricted shipping zone") that the customer may have some luck purchasing an FRT-15 through BDU. Pl.'s Ex. 97.

225.    Leleux confirmed that Defendants had an understanding that BDU would ship FRT-15s to all fifty states, and effectively conceded that his earlier representation to this Court was false. Prelim. Inj. Hr'g Tr. 574:21-575:5.

BREON PEACE
United States Attorney

By: _____/s/_____
    Michael S. Blume
    David A. Cooper
    Paulina Stamatelos
    Assistant U.S. Attorneys
    (718) 254-6479 / 6228 / 6198
    michael.blume@usdoj.gov
    david.cooper4@usdoj.gov
    pauline.stamatelos@usdoj.gov

48