UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

Plaintiff,

-against-

RARE BREED TRIGGERS, LLC; RARE
BREED FIREARMS, LLC; LAWRENCE
DEMONICO; KEVIN MAXWELL,

Defendants.

Case No. 1:23-cv-00369-NRM-RML

**DEFENDANTS' PROPOSED FINDINGS
OF FACT FOR THE HEARING ON
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

---

## DEFENDANTS' PROPOSED FINDINGS OF FACT

### The ATF's Role and Practices Regarding the Classification of Guns

1.      The Bureau of Alcohol, Tobacco, Firearms, and Explosives' ("ATF") Firearms Technology Division ("FATD") is responsible for analyzing devices submitted to it to determine its opinion of whether they are machineguns. Defs.' Prelim. Inj. Hr'g Ex. U1, Deposition of Anthony Ciravolo (July 14, 2023) ("Ciravolo Dep.") 185:19-186:07.

2.      Members of the public or the firearms industry may submit devices to the ATF to examine and opine on whether they are machineguns, but this process is voluntary and there is no requirement that manufacturers, sellers, or owners obtain the ATF's opinion before making, selling, or buying devices. Declaration of William Ryan (July 25, 2023) ("Ryan Decl.") ¶ 10. Even the ATF's own handbook suggests that its classifications are merely ATF's opinion that do not have the force and effect of law. DeMonico Dep. 108:6-12. ATF handbook section 7.2.4.1 states that the classifications may "generally" be relied upon, indicating that there are instances where they cannot be relied upon. Defs.' Prelim. Inj. Hr'g Ex. U1, Ciravolo Dep. 181:2-17. Only

devices that are machineguns within the meaning of the NFA are subject to registration, transfer, taxation, and possession restrictions. Defs.' Prelim. Inj. Hr'g Ex. U1, Ciravolo Dep. 83:21-84:1.

3.      The ATF will accept a member of the public's payment of the tax for making or transferring a machine gun made after 1986.  Deposition of David Smith ("Smith Dep.") 52:17 – 53:15. However, applications to make machine guns after 1986 are not approved (because it is illegal) and the tendered taxes are refunded. Smith Dep. 106:4-9.

4.      One branch of the FATD supports law enforcement efforts by providing examinations and opinions of devices submitted by law enforcement. Prelim. Inj. Hr'g Tr. 188:04-12; Ryan Decl. ¶¶ 8-11. Another branch of the division responds to requests for the ATF's opinion on devices from the public and firearms industry. Prelim. Inj. Hr'g Tr. 188:04-12; Ryan Decl. ¶¶ 12-14.

5.      The FATD's opinion regarding these determinations is reflected in examination reports prepared by its Firearms Enforcement Officers ("FEO"). Deposition of David Smith (July 25, 2023) ("Smith Dep.") 15:22-16:06. These examination reports are signed by the FEOs who examine the devices and prepare drafts of the reports and by the Chief of the FATD. Smith Dep. 24:22-25:03, 53:18-54:04; Ryan Decl. ¶ 14. The content of these reports is subject to review and contributions from a peer review team, ATF's legal counsel, and ATF's management. Smith Dep. 24:14-26:05. The FEO who examines a particular device for a report and prepares the initial draft of the report does not have the authority to determine ATF's policy regarding that device. Smith Dep. 19:19-23.

6.      The ATF's position is that it may publish letters determining a device is **not** a machinegun, but that it is prohibited by law from publishing classifications determining a device **is** a machinegun. Prelim. Inj. Hr'g Tr. 183:03-09.

**The ATF's Enforcement of the NFA**

7.      The ATF's personnel include special agents who wield the power of arrest. Prelim. Inj. Hr'g Tr. 237:20-21. The ATF also can obtain and execute search warrants. Prelim. Inj. Hr'g Tr. 238:05-06. As with any search warrant, and in keeping with the long-established prohibition against general warrants, the ATF's search warrants are limited to the places identified in the warrant and the court's approval of the warrant is subject to an expiration date. Def's Prelim. Inj. Hr'g Ex. Y3.

8.      For minor infractions, such as an individual improperly trying to sell an inherited gun, the ATF may choose to issue a simple cease and desist letter instead of severe measures such as executing a warrant or arresting the individual. Prelim. Inj. Hr'g Tr. 250:17-251:15. Aside from the underlying prohibition in the NFA against owning unregistered machineguns, there is no statute or agency rule that mandates compliance with an ATF cease and desist letter. *See* Prelim. Inj. Hr'g Tr. 212:05-11, 212:23-214:10.

**The ATF's Policy and Practices Regarding the Definition of a Machinegun**

9.      The ATF has rulemaking authority. *See* Def's Ex. V2. Rather than adopting a formal rule, in 1989, the ATF adopted an internal policy for interpreting and implementing the statutory definition of a machinegun—a firearm that can fire more than one round automatically from a single function of the trigger, or a device that converts an existing firearm into doing the same—by looking to whether the trigger *moved* for each shot fired, whether that movement was the pull of the trigger or its release. *See* Def's Ex. B4.[1] This policy was later incorporated in the ATF's publicly available, non-confidential classification letters, such as the ATF's letter from

---

[1] The United States has objected to this exhibit, and Defendants have responded to that objection, in the letter filed by the United States on behalf of all parties on August 9, 2023. (ECF No. 119.)

November 2, 2013, approving a device known as a binary trigger manufactured by a company called FosTech. *See* Def's Ex. O.

10.     In the ATF's training on machinegun identification for its agents at its academy, and in its teachings to Assistant U.S. Attorneys, the ATF has consistently taught that machineguns were classified strictly based on single movements of the trigger. Prelim. Inj. Hr'g Tr. 393:19-395:18. The ATF's materials used for these trainings and teachings on machinegun classification include no mention of standards based on continuous rearward pressure or shooter input on the trigger. Prelim. Inj. Hr'g Tr. 393:19-395:18. These other standards were also not reflected in materials or decisions available to ATF personnel outside the FATD, such as special agents. Prelim. Inj. Hr'g Tr. 328:25-329:11, 393:19-395:18. For decades, ATF personnel, from special agents to FATD managers, understood that a single function of the trigger meant a single movement of the trigger. Prelim. Inj. Hr'g. 328:25-329:11, 393:19-395:18.

11.     For example, when the ATF issued a letter regarding the Tac-Con 3MR forced reset trigger, the letter concluded that the trigger was not a machinegun because the trigger's forced reset serves only to "allow[] the trigger to reset rapidly" between shots. Def's Ex. P. The 3MR trigger, which is a competing product similar to the FRT-15 in every material respect, is still sold today and each trigger comes with a copy of the ATF's letter concluding the 3MR trigger is not a machinegun. Prelim. Inj. Hr'g Tr. 150:03-07; Defs.' Prelim. Inj. Hr'g Ex. A1 at 13-14, Defs.' Prelim. Inj. Hr'g Ex. P.

12.     On November 20, 2013, the ATF similarly concluded that the FosTech binary trigger was not a machinegun because it allowed "only a single shot to be fired with each movement of the trigger." Defs.' Prelim. Inj. Hr'g Ex. O (emphasis omitted). The FosTech binary trigger is a "modified trigger device (assembly) for AR-15 pattern firearms," which

4

"allow[s] one shot to be fired when the trigger is pulled, and another shot when the trigger is released." Defs.' Prelim. Inj. Hr'g Ex. O. The ATF made a point of noting that hammer-follow[2] does not occur. Defs.' Prelim. Inj. Hr'g Ex. O.

13.     In contrast to the "movement of the trigger" standard in the 1989 policy and 2013 FosTech approval, the ATF identified several determination letters concluding that particular devices were machineguns in which the ATF used language defining a machinegun based on the shooter's ability to fire multiple shots "as long as rearward pressure is applied to the trigger." Prelim. Inj. Hr'g Tr. 118:09-19, 125:21-127:06, 131:16-132:01, 132:20-133:08, 140:06-141:19. But, the ATF's position is that these classification letters/reports are tax return information and therefore the ATF was prohibited from publishing them. Prelim. Inj. Hr'g Tr. 183:03-09.

14.     In this case, the government required Defendants to agree to subject these classification letters to a protective order before providing them in discovery, but the government's witnesses discussed them freely in open court. Prelim. Inj. Hr'g Tr. 118:09-144:13. Neither of Defendants' experts, despite decades of experience in the ATF through 2020— including one who wrote the ATF's lesson plans for classification of machineguns that are still in use today and the other who served in top management in the FATD—had heard of or agreed with the standard stated in these particular letters. Prelim. Inj. Hr'g Tr. 328:25-329:11, 393:19-395:18.

15.     Accordingly, the ATF either did not change its interpretive policy and these classifications were mistaken aberrations, or it did change policy without informing either the

---

[2] "Hammer follow is simply the hammer following the bolt in its forward movement as it's not being retained by anything." Prelim. Inj. Hr'g Tr. 44:11-14. "What happens most of the time with firearms that are operating in the hammer follow condition is the weapon will continue to shoot automatically, as there's nothing retaining the hammer, or you will have a failure to fire, which, again, the user must manually clear." Prelim. Inj. Hr'g Tr. 44:18-23.

general public (through rule or other statement) or its own personnel – including a senior

manager of the FATD and a veteran special agent who literally wrote the training manual on

classification.

### The ATF's Controversial Bumpstock Rule

16.     Until 2019, the ATF did not have any published regulations regarding its

interpretation of the definition of a machinegun, which is otherwise defined by statute. Prelim.

Inj. Hr'g 316:04-15. In 2019, the ATF formally promulgated a regulation known as the

"bumpstock rule," and indicated formally and publicly for the first time that it would interpret

the definition of a machinegun as a device firing more than one shot automatically with a single

pull of the trigger. *See* Def's Ex. V2; Def's Ex. L2 at 2-3, 11-12.

17.     This rule was immediately challenged in courts throughout the country. The

courts analyzing the legality of the ATF's bumpstock rule can be divided into two groups: (A)

those whose analysis was constrained by judicial deference to the ATF; and (B) those whose

analysis was unconstrained by judicial deference to the ATF.

18.     In the former category were cases such as *Aposhian v. Barr*, 958 F.3d 969 (10th

Cir. 2020), *aff'g* 374 F. Supp. 3d 1145 (D. Utah 2019), *en banc reh'g order vacated as*

*improvidently granted*, 989 F.3d 890 (10th Cir. 2021) (en banc), *cert. denied*, 143 S. Ct. 84

(2022); *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1 (D.C. Cir.

2019) (per curiam), *aff'g* 356 F. Supp. 3d 109 (D.D.C. 2019), *cert. denied*, 140 S. Ct. 789 (2020),

which concluded, based on deference to the agency, that the bumpstock rule was valid.

19.     In the latter category were cases such as *Cargill v. Garland*, 57 F.4th 447 (5th Cir.

2023), *United States v. Alkazahg*, 81 M.J. 764 (N-M. Ct. Crim. App. 2021), *Gun Owners of Am.,*

*Inc. v. Garland*, 19 F.4th 890 (6th Cir. 2021) (en banc), *vacating by an equally divided court* 992

F.3d 446 (6th Cir. 2021), and *aff'g by an equally divided court Gun Owners of Am., Inc. v. Barr*, 363 F. Supp. 3d 823 (W.D. Mich. 2019), *cert. denied*, 143 S. Ct. 83 (2022), which concluded that the bumpstock rule was contrary to the NFA specifically because  "function of the trigger" in the NFA did not mean "continuous pull of the trigger."

20.      The Navy-Marine Corps Court of Appeals in *United States v. Alkazahg*, 81 M.J. 764 (N-M. Ct. Crim. App. 2021), issued its decision on September 7, 2021. The Fifth Circuit Court of Appeals issued its decision in *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), on January 6, 2023, and the Sixth Circuit Court of Appeals issued its decision in *Hardin v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 65 F.4th 895 (6th Cir. 2023) on April 25, 2023.

21.      Further, on August 1, 2023, during the evidentiary hearing on the MPI in this matter, the Fifth Circuit issued its decision in *Mock v. Garland*, No. 23-10319, 2023 WL 4882763 (5th Cir. Aug. 1, 2023), concluding that the ATF's rule imposing a particular classification scheme for prohibiting pistol braces was legislative rather than interpretive and finding that the plaintiffs were likely to succeed on the merits for seeking an injunction against the ATF's rule.

### Defendants

22.      Rare Breed Triggers, LLC ("RBT") is the company that sold the FRT-15. Prelim. Inj. Hr'g Tr. 529:15-19.

23.      Lawrence DeMonico is president of RBT and handled its day-to-day operations. Prelim. Inj. Hr'g Tr. 421:19-422:1. Mr. DeMonico served in the Navy from 1994 to 2004. Prelim. Inj. Hr'g Tr. 418:20-419:3. While in the Navy Mr. DeMonico was deployed numerous times—earning the Bronze Star—and became familiar with firearms, including those used during his time as a part of SEAL Team 6. Prelim. Inj. Hr'g Tr. 418:25-419:22. After spending time as a

private military contractor for another ten years and starting a design company, Mr. DeMonico

started RBT in 2020. *See* Prelim. Inj. Hr'g Tr. 419:23-420:10. In 2020 Mr. DeMonico had an

opportunity to buy the rights to the patent for the device that would eventually become the FRT-

15 (the '223 patent). Prelim. Inj. Hr'g Tr. 529:5-14. In other words, FRT-15 is the device that

was the subject of the '223 patent. Prelim. Inj. Hr'g Tr. 420:18-23.

24.     Kevin Maxwell is general counsel and owner of RBT. Prelim. Inj. Hr'g Tr. 588:3-

589:3. Before becoming a lawyer in 2002, Mr. Maxwell had 20 years of experience in the

military defense and aerospace industry. Prelim. Inj. Hr'g Tr. 587:8-15. Mr. Maxwell has about

40 years of experience with firearms and has his own gun range. Prelim. Inj. Hr'g Tr. 587:23-

588:2.

25.     Rare Breed Firearms is a design company. Prelim. Inj. Hr'g Tr. 468:20-25. Rare

Breed Firearms does not sell firearms; instead, it licenses ornamental designs for the lower

portion (the receiver) of AR-15s. Prelim. Inj. Hr'g Tr. 468:25-469:7. Rare Breed Firearms

originally had four owners: Mr. DeMonico, Cole Leleux, Michael Register, and Ben Thomas.

Prelim. Inj. Hr'g Tr. 469:12-14. Ben Thomas is no longer an owner after he embezzled money

from a company, Spikes tactical, owned by Michael Register and Run by Mr. Leluex as its CEO.

Prelim. Inj. Hr'g Tr. 470:25-471:7, 528:3-4, 531:5-6.

**Corporate Structure**

26.     Cole Leleux is not a defendant, but he was involved in RBT's formation and

operation. Mr. Leleux is the CEO of Spikes Tactical, an AR-15 manufacturer, where he has

worked for the last twelve years. Prelim. Inj. Hr'g Tr. 528:2-6. A former employee at Spikes

Tactical introduced Mr. DeMonico to Mr. Leleux. Prelim. Inj. Hr'g Tr. 528:24-529:4. Cole

Leleux was involved in RBT's business as a consultant, particularly with the manufacturing process. Prelim. Inj. Hr'g Tr. 528:15-23.

27.     Before incorporating RBT, Mr. Leleux spoke with a financial planner that Michael Register (owner of Spikes Tactical) used for other endeavors. Prelim. Inj. Hr'g Tr. 529:23-530:9. The financial planner had heard about the RBT endeavor and recommended a meeting. Prelim. Inj. Hr'g Tr. 530:2-9. The financial planner, Claudio Gambin, recommended multiple entities instead of a single entity (1) to limit liability in case of injury resulting from an FRT-15 malfunction and (2) to enable easier succession planning. Prelim. Inj. Hr'g Tr. 530:10-25; Prelim. Inj. Hr'g Tr. 424:11-22.

28.     Mr. Gambin proposed a company structure that would create a limited liability company ("LLC") for each of Messrs. Maxwell, DeMonico, Leleux, and Register, and an entity that connects those LLCs to the company responsible for sales to the public. Defs.' Prelim. Inj. Hr'g Ex. Z3. The sales presentation also included a distribution LLC, marketing LLC, and an intellectual property entity. Defs.' Prelim. Inj. Hr'g Ex. Z3:



29.     Mr. Gambin also recommended a meeting with a CPA. Prelim. Inj. Hr'g Tr. 531:12-17. The Defendants consulted an attorney and CPA, on whose advice Mr. Gambin's

proposal was modified to create the corporate structure that exists today. Prelim. Inj. Hr'g Tr. 531:18-25.

30.     RBT is the forward-facing company that sold the FRT-15 triggers. Prelim. Inj. Hr'g Tr. 532:4-19. ABC IP, LLC retained the intellectual property rights to the '223 patent and is owned by four entities that are each separately owned by Messrs. Maxwell, DeMonico, Leleux, and Register. Prelim. Inj. Hr'g Tr. 532:4-19. DEF Consulting LLC is a consulting entity that enabled Messrs. Maxwell, DeMonico, Leleux, and Register to consult RBT when necessary. Prelim. Inj. Hr'g Tr. 532:22-533:2.

31.     XYZ Distribution was intended to eventually manufacture the FRT-15 triggers. Prelim. Inj. Hr'g Tr. 533:3-5. Until land could be purchased and a manufacturing facility built, RBT used 3rd Gen. Machine for its manufacturing needs, which was paid by XYZ Distribution. Prelim. Inj. Hr'g Tr. 533:3-14. XYZ was paid by RBT for triggers sold and it then paid its own expenses, such as the payments to 3rd Gen. Machine for manufacturing the triggers, IP royalty payments to ABC IP, and consulting payments to DEF Consulting. Prelim. Inj. Hr'g Tr. 532:15-534-1. ABC IP and DEF Consulting would then distribute payments received to its owners, the four LLCs owned separately by Messrs. Maxwell, DeMonico, Leleux, and Register. Prelim. Inj. Hr'g Tr. 534:1-25.

### The Genesis of the FRT-15

32.     Before September 2017, an inventor named Jeffrey Cooper Rounds started to invent a trigger for which he would eventually receive patent number 10514223 (the "'223 patent"). Declaration of Jeffrey Cooper Rounds (July 25, 2023) ("Rounds Decl."), ¶ 3. On September 29, 2017, Mr. Rounds applied for the provisional patent that would become the '223 patent. Rounds Decl. ¶ 3. Mr. Rounds received the final patent—the '223 patent—on December 24, 2019. Rounds Decl. ¶ 3.

33.     Shortly before applying for the '223 provisional patent, Mr. Rounds had submitted a classification request for a different project he was working on that was based on a different patent, the flex-fire, patent # 9568264. Rounds Decl. ¶ 7; Pl.'s Prelim. Inj. Hr'g Ex. 134 at 21, USA_12746. The original design of the flex-fire was an entire firearm. Prelim. Inj. Hr'g 562:3-5. Mr. Rounds did not have a name for the project throughout its development, but at the time of submitting it to the ATF for classification named it AR1. Rounds Decl. ¶ 2. Mr. Rounds was attempting to put the flex-fire technology into the AR platform, but it was not meant for the AR platform. Prelim. Inj. Hr'g Tr. 544:10-545:17.

*34.*     The ATF letter's letter to Rounds stating that the ATF considered the AR1 to be a machinegun stated the AR1 was "designed to assist in preventing the hammer from positively resetting." Rounds Decl. ¶ 9; Pl.'s Prelim. Inj. Hr'g Ex. 134 at 13, USA_12738. The ATF letter also stated that on several occasions during testing "the hammer [of the AR1] was found to have followed the bolt into battery as it chambered a cartridge." Rounds Decl. ¶ 10; Pl.'s Prelim. Inj. Hr'g Ex. 134 at 13, USA_12738. The locking bar in the '223 solves both of those issues. Rounds Decl. ¶ 11.

35.     The flex-fire technology patent that the AR1 design was based on differed significantly from the '223 that would become the FRT-15. Rounds Decl. ¶ 4. First, the bolt carrier in the AR1 came into direct contact with the trigger during every cycle of operation. With the FRT-15, though, the bolt carrier comes into direct contact with the hammer and the hammer comes into direct contact with the trigger. Rounds Decl. ¶ 4. Second, the FRT-15 includes a locking bar that locks the trigger in its reset position, and while locked in the reset position, the trigger sear surface and the hammer sear surface are in direct contact – *i.e.*, the hammer is also in

its reset position. Rounds Decl. ¶ 5. Third, the FRT-15 is able to be used with a mil-spec bolt

carrier group, whereas with the AR1 the bolt carrier group had to be modified. Rounds Decl. ¶ 5.

36.     Mr. Rounds met Mr. DeMonico for the first time in early 2017 but did not see or

speak to him for the remainder of that year. Rounds Decl. ¶ 13.

37.     Although Mr. Rounds and Mr. DeMonico had very little contact between 2017

and the negotiation of DeMonico's purchase of the '223 patent in 2020, Mr. Rounds had

mentioned the flex-fire project. Rounds Decl. ¶ 14; Prelim. Inj. Hr'g Tr. 428:21-429:6. Mr.

DeMonico said he thought it was a bad idea because it required modified parts to work. Rounds

Decl. ¶ 14. Mr. Demonico considered the flexfire/AR1 and the '223 patent/FRT-15 to be

"completely different patents, different technologies, completely different items."  Prelim. Inj.

Hr'g Tr. 491:18-21. Similarly, Mr. LeLeux believed the AR1 and the FRT-15 were different

patents, different designs, and operated differently. Prelim. Inj. Hr'g Tr. 576:14-20.

38.     On May 7, 2020, Mr. DeMonico purchased the rights to the "'223 patent" from

Mr. Rounds. Prelim. Inj. Hr'g Tr. 529:5-14, 420:7-421:5; Pl.'s Prelim. Inj. Hr'g Ex. 77. The

commercial embodiment of the '223 patent is the FRT-15. Prelim. Inj. Hr'g Tr. 420:18-23.

39.     At the time he bought the '223 patent, Defendant DeMonico had limited

knowledge about whether the ATF had classified the AR1 as a machinegun and may have not

known of a device by that name at the time. Prelim. Inj. Hr'g Tr. 430:8-18. Mr. Leleux also

testified that they did not know the name "AR1" at the time. Prelim. Inj. Hr'g Tr. 536:2-3.

Rounds did not show them a prototype AR1. Prelim. Inj. Hr'g Tr. 563:6.

40.     Before DeMonico purchased the '223 patent, Rounds told Leleux that the ATF

classified what Defendants now know to be the AR1 as a machinegun because it had a problem

called "hammer follow" that could result in automatic fire. Prelim. Inj. Hr'g Tr. 537:10-11;

565:16-20. However, Round's '223 patent/FRT-15 design was different with significant changes to the parts of the trigger, including changes that prevented hammer follow.  Prelim. Inj. Hr'g Tr. 536:8-23; 537:12-13. The government's expert, Anthony Ciravolo, also testified that the ATF's classification of the AR1 addressed the issue of hammer follow in the AR1, though he disputed that this was the reason the AR1 was a machinegun. Prelim. Inj. Hr'g Tr. 114:16-25.  He agreed, however, that hammer follow was not possible in the FRT-15. Prelim. Inj. Hr'g Tr. 186:11-14.

41.     When the Defendants set up RBT to sell the FRT-15, they did not think they were selling a trigger that was based on a design for an illegal machinegun. Prelim. Inj. Hr'g Tr. 577:3-22.

42.     When the purchase of the '223 patent was being negotiated, in addition to the purchase price of $10,000 for the '223 patent, Mr. DeMonico told Mr. Rounds if the FRT-15 actually sold he would ensure Mr. Rounds received $25 per FRT-15 sold. Rounds Decl. ¶ 16. Mr. Rounds is an inventor and traveler; he is not immersed in business or firearms. Prelim. Inj. Hr'g Tr. 538:22-539:18. Mr. Rounds did not want to deal with the '223 patent and sought to recover the expenses incurred for developing the patent, which was about $10,000. Prelim. Inj. Hr'g Tr. 493:18-23.

## Comparisons of the Operation of the AR-15, M16, and FRT-15

43.     Machineguns are firearms that are capable of automatic fire, which means they can fire more than one round per single function of the trigger automatically without manual reloading. 26 U.S. Code § 5845(b); Prelim. Inj. Hr'g Tr. 265:14-16. By contrast, a semiautomatic firearm is a firearm that fires only one round per single function of the trigger. Prelim. Inj. Hr'g Tr. 265:05-06. The AR-15 is a type of semiautomatic rifle and the M16 is a machinegun version of the AR-15. Prelim. Inj. Hr'g Tr. 266:03-19.

13

44.     A firearm's trigger is the part of the firearm that initiates the firing of a round. Prelim. Inj. Hr'g Tr. 266:22-23. In both an AR-15 and an M16, the trigger initiates the firing of a round by releasing the hammer so it will strike the firing pin. Prelim. Inj. Hr'g, 267:02-12. The trigger initially retains the hammer via a part of the trigger called the "sear." Prelim. Inj. Hr'g Tr. 169:09-16. In firearms, a sear is a surface on various components that is designed to allow them to retain or be retained by other components. Prelim. Inj. Hr'g Tr. 29:13-15.

45.     The trigger sear is at the top of the trigger and retains the hammer in its cocked position. Prelim. Inj. Hr'g Tr. 169:09-16. The hammer is a spring-loaded component that strikes the firing pin and causes a shot to fire when it is released by the trigger from its cocked position. Prelim. Inj. Hr'g Tr. 29:08-11. The shooter causes the trigger to initiate fire of a round by moving the trigger rearwards far enough that the trigger sear can no longer retain the hammer, which releases the hammer from its cocked position. Prelim. Inj. Hr'g Tr. 268:06-269:03.

46.     For both the AR-15 and M16, firing a shot causes the bolt carrier group to thrust backward. Prelim. Inj. Hr'g Tr. 35:14-21. Where the AR-15 and M16 differ is in what happens after the first round is fired.

47.     In an AR-15, the rearward thrust of the bolt carrier group pushes the hammer into the disconnector on top of the still-depressed trigger. Prelim. Inj. Hr'g Tr. 269:16-22. To re-cock the hammer for a subsequent shot, the trigger must first reset so that it once more retains the hammer. Prelim. Inj. Hr'g Tr. 270:04-21. This happens when the trigger moves forward, which causes the hammer to slip off the disconnector and be retained by the trigger. Prelim. Inj. Hr'g Tr. 270:04-21. At this point, firing an additional shot requires a new rearward movement of the trigger to release the hammer again. Prelim. Inj. Hr'g Tr. 270:16-21.

14

48.     In an M16 set to its automatic fire mode, the first shot in a sequence of multiple shots requires rearward movement of the trigger to release the hammer, just as with an AR-15. Prelim. Inj. Hr'g Tr. 276:01-09. After the first shot is fired, however, the bolt carrier group pushes the hammer down so that it is retained by a component called the auto sear. Prelim. Inj. Hr'g Tr. 271:07-13.

49.     The auto sear retains the hammer until the bolt carrier group moves forward and strikes the auto sear. Prelim. Inj. Hr'g Tr. 271:19-23. This causes the auto sear to release the hammer and fire another shot. Prelim. Inj. Hr'g, 271:19-23. The shooter need only hold the trigger back in its depressed position and the auto sear will automatically retain and release the hammer to fire subsequent shots continuously. Prelim. Inj. Hr'g, 273:04-274:24.

50.     The shooter can cease the M16's automatic fire by allowing the trigger to reset by moving forward, which causes the hammer to once more be retained by the trigger instead of by the auto sear. Prelim. Inj. Hr'g Tr. 275:11-20. When this occurs, a separate function of the trigger is required to release the hammer for another shot to be fired or a sequence of shots to be started. Prelim. Inj. Hr'g Tr. 275:22-276:04.

51.     For both the AR-15 and M16, the trigger resets forward due to constant forward pressure from a trigger-return spring. Prelim. Inj. Hr'g Tr. 279:02-20. To fire an initial shot with either weapon, the shooter must apply enough rearward pressure to the trigger to overcome the forward pressure by the trigger-return spring and move the trigger rearward enough to cause it to release the hammer. Prelim. Inj. Hr'g Tr. 268:06-17. To reset the trigger, the shooter may either remove all contact with the trigger or reduce their rearward pressure enough that the trigger-return spring can push the trigger and their finger forward to the reset position. Prelim. Inj. Hr'g Tr. 279:25-280:20.

52.     The FRT-15 is a forced reset trigger designed for drop-in use in the AR-15. Prelim. Inj. Hr'g Tr. 180:11-16. Forced reset triggers differ from traditional triggers because the trigger is reset by mechanical force that pushes the trigger and the shooter's finger forward to the reset position instead of by the constant forward pressure of the trigger-return spring. Prelim. Inj. Hr'g Tr. 277:05-11. The FRT-15 forces the trigger's reset by using the bolt carrier group's rearward movement after a shot is fired to strike the hammer down onto the trigger. Def's Ex. A1 at 4; Prelim. Inj. Hr'g Tr. 283:20-284:05. This causes the trigger to pivot forward to its reset position and causes the trigger sear to retain the hammer. Prelim. Inj. Hr'g, 283:20-284:05.

53.     A locking bar then moves into place, which prevents the shooter from moving the trigger rearwards until the locking bar is disengaged. Prelim. Inj. Hr'g Tr. 283:20-284:05. The purpose of the locking bar is to prevent the shooter from moving the trigger rearward to release the hammer until the bolt carrier group is back in-battery and the firearm is safe to fire. Prelim. Inj. Hr'g Tr. 288:23-289:01. The locking bar also prevents hammer follow. Prelim. Inj. Hr'g Tr. 403:24-404:5.

54.     As the bolt carrier group moves forward due to the buffer tube spring, the bolt carrier group strikes the locking bar and unlocks it, allowing the shooter to once more move the trigger rearward to release the hammer and fire a subsequent shot. Prelim. Inj. Hr'g Tr. 284:06-14.

55.     Like with a traditional AR-15 trigger, the FRT-15's trigger must move forward to reset and retain the hammer and then move rearwards to release the hammer between each shot. Prelim. Inj. Hr'g Tr. 284:24-285:08. By comparison, an M16 requires the rearward movement of the trigger to release the hammer for only the first shot in a sequence of automatic fire, after

16

which the auto sear is solely responsible for retaining and releasing the hammer for subsequent shots. Prelim. Inj. Hr'g Tr. 276:01-09.

56.     The purpose of the FRT-15 is to facilitate repeated movements of the trigger to reset and release the hammer faster and easier than a traditional semiautomatic AR-15 trigger. Prelim. Inj. Hr'g Tr. 280:22-281:06. For both the AR-15 and the FRT-15, each round fired requires a rearward movement of the trigger to release the hammer; and firing an additional round requires the trigger to first reset forward and retain the hammer. Prelim. Inj. Hr'g Tr. 284:24-285:08.

57.     The Government's expert, Anthony Ciravolo, defines "[f]unction" of the trigger as "an action or task completed." Defs.' Prelim. Inj. Hr'g Ex. U1, Ciravolo Dep. 86:18-21. The "action or task" to be completed is to "initiate the firing sequence." Defs.' Prelim. Inj. Hr'g Ex. U1, Ciravolo Dep. 86:2–87:2. And specifically for an FRT-15, or any AR-15 type firearm, he defines "initiat[e] [] the fir[ing] sequence" as pulling the trigger "to the point where" the "trigger sear surface" is "disengaged" from the hammer. Defs.' Prelim. Inj. Hr'g Ex. U1, Ciravolo Dep. 81:4-8.

58.     The parties do not dispute that the FRT-15's trigger sear surface disengages the hammer for every shot fired. Defs.' Prelim. Inj. Hr'g Ex. U1, Ciravolo Dep. 122:12-19; 122:7-11.

59.     During this litigation, the Government submitted a new ATF classification of the FRT-15, prepared by Mr. Ciravolo.  Mr. Ciravolo acknowledged that his duties included being aware of relevant legal precedent. Prelim. Inj. Hr'g Tr. 163:19. And yet, Ciravolo's report, dated April 27, 2023, lists court cases supporting its interpretation of the NFA's "function of the trigger" standard, but omits any cases, including *Cargill* and *Hardin*, Prelim. Inj. Hr'g Tr.

164:17-23, which had been decided before the report was finalized and which rejected the ATF's interpretation. Mr. Ciravolo testified that at the time of his report, he was aware of the *Cargill* case but had not read it (though he had seen a summary), and that he was unaware of the *Hardin* case. Prelim. Inj. Hr'g Tr. 163:22-164:16.

60.     Mr. Ciravolo acknowledged that extensive portions of his report were largely copied from past reports prepared by other FEOs or drafted by ATF's lawyers.  Prelim. Inj. Hr'g Tr. 166:7-168:22; 172:19-176:16.

61.     The "conscious pull and release" standard Mr. Ciravolo applied to determine that the FRT-15 was a machinegun was not reflected in any materials published by the ATF, and Defendants' experts, O'Kelly and Luettke, who had served for decades in the ATF, were unfamiliar with it. Prelim. Inj. Hr'g Tr. 330:18-331:13, 393:19-394:05; see Def's Ex. O, Def's Ex. P.

62.     Mr. Ciravolo testified that a gun's rate of fire is not an element of its classification as a machine gun and that rate of fire is not indicative of how a gun operates. Prelim. Inj. Hr'g Tr. 153:07-19. Mr. Ciravolo conceded several key facts with respect to an AR-15 equipped with an FRT-15. The trigger initially retains the hammer. Prelim. Inj. Hr'g Tr. 169:09. When a person pulls the trigger, the trigger releases the hammer and causes the gun to fire. Prelim. Inj. Hr'g Tr. 169:17-22.  The hammer is then again retained by the trigger. Prelim. Inj. Hr'g Tr. 169:23-170:3. The trigger is forced forward and locked in place, at which time the user pulling on the trigger will have no effect, that is, the trigger will not move rearward and cause the gun to fire again. Prelim. Inj. Hr'g Tr. 170:4-14; 171:03-15. After the locking bar releases the trigger, the trigger must move rearwards for the trigger to release the hammer and make the gun fire again, and the force required to move the trigger rearwards is supplied by the user's finger, not the FRT-15.

18

Prelim. Inj. Hr'g Tr. 171:18-172:15. The operation of the FRT-15 differs from a machinegun,

like the M-16, where the hammer is not retained by the trigger sear after each shot is fired.

Prelim. Inj. Hr'g Tr. 178:07-15.

63.     Mr. Ciravolo agreed that, in practice, an FRT-15 requires a user to move the

trigger rearwards 5 times to fire five shots, whereas in a machinegun like the M-16, the user can

fire five shots by moving and holding the trigger rearward only once. Prelim. Inj. Hr'g Tr.

178:16-23. Indeed, if the user of an FRT-15 were to move and hold the trigger rearward and not

let it move forward and reset, the gun would only fire one shot and then malfunction. Prelim. Inj.

Hr'g Tr. 178:24-179:08; 191:10-21.

64.     As to the similarity between the FRT-15 and the ATF-approved TAC Con 3MR

trigger, the ATF concluded the 3MR "applies force to the trigger, forces the shooter's finger

forward, and allows the trigger to reset rapidly." [3MR letter]; Prelim. Inj. Hr'g Tr. 181:21-23.

Mr. Ciravolo testified that the same was true of the FRT-15. Prelim. Inj. Hr'g Tr. 180:1-10, 17-

19. As to differentiating the FRT-15 from the TacCon 3MR, Mr. Ciravolo acknowledged that

any distinctions he could draw between the FRT-15 and the TacCon 3MR relied on reasons that

were not stated in the ATF's letter approving the 3MR. Prelim. Inj. Hr'g Tr. 182:11-21; 183:10-

184:19.

**Defendant's Due Diligence In Advance of Making and Selling the FRT-15**

65.     Defendants had no subjective intent to sell an illegal product, defraud or

otherwise evade regulation by the ATF, or deceive customers. Prelim. Inj. Hr'g Tr. 424:23-8,

555:11-17. They invested significant funds ($170,000), purchased patents, and paid a

considerable sum ($1,000,000) to defend those patents, believing the FRT-15 to be legal, and

would not have done so if they believed it was illegal. Prelim. Inj. Hr'g Tr. 541:25-542:6,

543:12-16.

66.     In early 2020, before RBT's formation, Mr. Leleux approached Mr. Maxwell about providing legal advice to RBT. Hr'g Tr. 588:5-11. Mr. Maxwell provided an estimate for such advice and it appeared that a per-hour fee structure would be cost-prohibitive. Prelim. Inj. Hr'g Tr. 588:12-16. Mr. Leleux then offered Mr. Maxwell an ownership interest in what would become RBT instead of per-hour compensation. Prelim. Inj. Hr'g Tr. 588:16-18.

67.     Mr. Maxwell provided a legal opinion to the other Defendants that the forced reset trigger (the subject of the '223 patent) was not a machinegun. Prelim. Inj. Hr'g Tr. 589:4-17. But Mr. Maxwell did not stop there. Understanding that the ATF classification process is voluntary and perceiving that it produces unreliable results, Mr. Maxwell sought the expert technical and legal opinions of former ATF special agents instead. Prelim. Inj. Hr'g Tr. 590:8-19; Prelim. Inj. Hr'g Tr. 244:10-14; Declaration of Kevin McCann (July 24, 2023) ("McCann Decl.") ¶ 1. He sought the legal opinion of another expert in the industry, Kevin McCann, who is a practicing attorney after spending 25 years at the ATF first as criminal investigator (seventeen years) and next as a supervisory special agent (eight years). Prelim. Inj. Hr'g Tr. 589:16-25; McCann Decl. ¶ 1. Mr. McCann also introduced Mr. Maxwell to Dan O'Kelly, who was an ATF special agent for over twenty-three years. Mr. O'Kelly performed a technical evaluation of the forced reset trigger. Prelim. Inj. Hr'g Tr. 590:1-7.  Mr. Maxwell also engaged expert Richard Vasquez, the former acting chief of the ATF's Firearms Technology Branch, who also examined the FRT-15. Vasquez Decl. ¶¶ 9-11.

68.     When the defendants were negotiating the purchase of the '223 patent from Mr. Rounds, Mr. Leleux knew that the ATF had approved a trigger manufactured by TAC Con called the 3MR and he considered it similar to the design of the '223 patent. Prelim. Inj. Hr'g Tr. 540:1-10. Defendants' expert, too, testified that he did not see any material difference between the

20

approved 3MR and the FRT-15, and that he believed the approval letter for the 3MR could just as easily apply to the FRT-15. Prelim. Inj. Hr'g 304:10-25, 306:7-307:19. The 3MR trigger, which is a competing product similar to the FRT-15 in every material respect, is still sold today and each trigger comes with a copy of the ATF's letter classifying the 3MR trigger as not a machinegun. Prelim. Inj. Hr'g Tr. 150:03-07; Def's Ex. A1 at 13-14, Def's Ex. P.

69.     The ATF classifications for the 3MR, as well as another trigger known as the FosTech binary trigger, are non-confidential and publicly available. Defs.' Prelim. Inj. Hr'g Exs. P and O. As noted previously, the ATF does not publish its classifications concluding that devices are machineguns, considering them to be confidential tax information, limiting public knowledge of the ATF's interpretation of the NFA that may be different from what is in approval letters.

70.     ATF's classification process has a history of inconsistent results. Prelim. Inj. Hr'g Tr. 426:7-11. The ATF's wavering positions on bumpstocks, pistol braces, and frame and receivers are examples of this. Prelim. Inj. Hr'g Tr. 426:12-17. For example, before starting RBT, Defendants saw the ATF's incompatible and competing (with itself) positions on bumpstocks. Prelim. Inj. Hr'g Tr. 427:2-9. Bumpstocks were sanctioned by the ATF for almost two decades before the ATF reversed course in 2019. Prelim. Inj. Hr'g Tr. 427:2-9.

71.     Mr. Leleux experienced the ATF's flip-flopping positions on suppressors at his job at Spikes Tactical. Mr. Leleux witnessed the ATF reject a suppressor design submitted by Spikes Tactical that included a screw on cap that could change the suppressor's size. Prelim. Inj. Hr'g Tr. 556:23-557:8. Now the ATF is allowing other companies to sell suppressors with screw on caps that can change the suppressor's size. Prelim. Inj. Hr'g Tr. 557:9-14.

**RBT's Business Operations**

72.     RBT's website was designed to sell one product—the FRT-15—and had

limitations that prevented it from selling replacement parts for the FRT-15. Prelim. Inj. Hr'g Tr.

526:20-527:4. Yet certain FRT-15 purchasers desired replacement parts. Prelim. Inj. Hr'g Tr.

527:4-7. With the limitations on RBT's website, Mr. DeMonico added FRT-15 replacement parts

to the Rare Breed Firearms website that could be purchased. Prelim. Inj. Hr'g Tr. 527:4-7.

73.     In a video posted to RBT's website, Mr. Maxwell described his opinion and the

opinions of Mr. McCann and Mr. O'Kelly as to why the FRT-15 was not a machinegun. Prelim.

Inj. Hr'g Tr. 590:20-591:1, 591:2-3, 591:6-592:3; Defs.' Prelim. Inj. Hr'g Ex. B.

74.     Customers purchasing a trigger on the RBT website were required to check a box

understanding that there were no returns or refunds, without exception. Defs.' Prelim. Inj. Hr'g

446:19-22.  However, RBT made exceptions and in fact refunded $431,000 for various reasons.

Defs.' Prelim. Inj. Hr'g 447:1-6.

75.     RBT used a feature on its website platform, WordPress, that protected customer

data after a certain period of time, approximately 7-10 days to allow for lost shipments and

defective products, by anonymizing the customers' data. Prelim. Inj. Hr'g Tr. 442:04-443:24.

This feature, which RBT called a "digital shredding policy," was not intended to obfuscate or

hide anything from the Government. Prelim. Inj. Hr'g Tr. 444:6-9. RBT told customers that it

protected their privacy in this way but, of course, it had no control over third parties, like UPS,

whose shipping records could be used to identify RBT's customers. Prelim. Inj. Hr'g Tr. 505:9-

23.

76.     When shipping by United Parcel Service ("UPS"), RBT put its name on its

packages to customers because it had confidence in UPS's delivery practices and UPS insured

them, no question asked. Prelim. Inj. Hr'g Tr. 445:02-05, 08-11. By contrast, the United Staes

Postal Service ("USPS") was less reliable because it would not necessarily knock on a person's

door to hand-deliver a package or even walk the package to a doorstep, and might just leave it by

a mailbox where it could be easily stolen. Prelim. Inj. Hr'g Tr. 445:15-19. They also were not

likely to pay an insurance claim for a lost package. Prelim. Inj. Hr'g Tr. 445:14-15. Accordingly,

for packages shipped by the USPS, RBT used another name comprising words that began with

R, B, and T, in an effort to reduce the risk that packages shipped by the USPS would be stolen.

Prelim. Inj. Hr'g Tr. 445:20-446:07. It also protected customers' privacy by not revealing they

were purchasing a gun accessory. Prelim. Inj. Hr'g Tr. 446:13-15. This was not done to hide

anything from the government. Prelim. Inj. Hr'g Tr. 446:08-10. The use of such pseudonyms

occurred more than a year after the ATF's cease and desist letter and there was no correlation to

the letter. Prelim. Inj. Hr'g Tr. 524:2-19.

### Defendants Learn the Details of the ATF's Classification of the AR1

77.     Soon after RBT was created and started selling FRT-15s. Thomas Graves, a

former associate of Cooper whom the Defendants did not know, contacted Defendants with a

claim that he had rights to the AR1's patent and that the FRT-15 infringed on that patent. Prelim.

Inj. Hr'g Tr. 544:12-16; 545:11-546:2. Mr. Graves owned the rights to the "flex fire" technology

behind the AR1, but only as to every other gun besides the AR-15, for which the AR1 as

exclusively designed. Prelim. Inj. Hr'g Tr. 561:17-21. (As found above, however, the AR1 and

'223 patent/FRT-15 were materially different devices.)

78.     At this time, Defendants obtained the ATF's classification letter determining that

the AR1 was a machinegun and forwarded it to their experts. Prelim. Inj. Hr'g Tr. 579:2-20.

79.     In addition to its videos on its website, RBT answered customer questions. One

such response in December 2020 to an emailed question about whether RBT would seek an ATF

classification stated:

> Thank you for reaching out. To answer your question ... We didn't ask the ATF for an
> approval letter for the FRT (Forced Reset Trigger) for several reasons. First,
> semiautomatic triggers are NOT a regulated item under the NFA or ATF. Second, the law
> that defines a machine gun (26 USC § 5845(b)) is very clear. The FRT was
> conceptualized, designed, and developed specially to meet the legal requirements of a
> semi-automatic trigger and NOT be classified as a machine gun as defined by the law.
> Further, we did our due diligence by consulting numerous attorneys and subject matter
> experts to ensure the FRT complied with the law. Have we created something innovative?
> Yes! Have we done anything illegal? No! We've found a way to bring a new semi-
> automatic trigger to market while staying within the parameters as set forth by the law.
> And lastly, this is America where you don't need to ask permission to start a business and
> sell a legal product.

Pl.'s Ex. 112.

**The ATF'S First Classification of the FRT-15 as a Machinegun**

80.     In a classification report dated July 15, 2021, the ATF concluded that the FRT-15

is a machinegun. Def's Ex. S.

81.     This July 2021 report asserted that the FRT-15 was a machine gun based on the

rationale that a user could maintain continuous pressure on the trigger to fire multiple rounds

without manually releasing the trigger. Def's Ex. S at 5. The need to manually release the trigger

to avoid classification as a machinegun is not the standard in the definition of the NFA or in the

ATF's public materials or known within the ATF outside of the FATD, or even widely within

the FATD. 26 USC § 5845(b); Prelim. Inj. Hr'g Tr. 328:16-329:11, 393:19-395:18.

82.     The report also misleadingly describes the FRT-15 as firing multiple rounds while

the trigger is held to the rear, implying that he held the trigger in place in its rearward position

and fired multiple rounds as would be the case with an M-16 machinegun. Def's Ex. S at 5;

24

Smith Dep. 89:08-91:16. This is a physical impossibility for the FRT-15 and would cause a malfunction if performed. Smith Dep. 83:02-24; Prelim. Inj. Hr'g Tr. 294:5-23. The ATF FEO who prepared the report, David Smith, clarified in his deposition that this section of his report meant that he maintained rearward pressure on the trigger to attempt to hold it to the rear, but not that he actually succeeded in holding the trigger in its rearward position. Smith Dep. 89:08-91:16.

83.     Accordingly, the statement in Smith's report that the FRT-15 enables an AR-15 to fire continuously from a single pull of the trigger is based on a definition of "pull" that itself is based entirely on whether the shooter's finger can maintain constant rearward pressure on the trigger without the need for a change in "shooter input" or manually release the trigger – which are novel standards that do not appear in the ATF's published materials, regulations, and non-confidential classification reports/letters or in materials available to ATF personnel outside of the FATD. Prelim. Inj. Hr'g Tr. 328:25-329:11, 393:19-395:18; *see* Def's Ex. B4, Def's Ex. O, Def's Ex. P.

**The ATF's Issuance of a Cease and Desist Letter to RBT**

84.     In a meeting on July 27, 2021, ATF Special Agent in Charge of the Tampa Field Division Craig Saier and ATF counsel Amy Freyermuth met with Defendant Kevin Maxwell to serve him with a cease and desist letter regarding the FRT-15. Prelim. Inj. Hr'g Tr. 214:11-19, 215:12-15. The ATF's cease and desist letter effectively demanded that Defendants close RBT. *See* Def's Ex. C1; Prelim. Inj. Hr'g 232:21-24.

85.     After initially testifying that he wrote this letter, Saier immediately acknowledged that he signed and delivered the letter but that it was in fact written by the ATF legal department, Prelim. Inj. Hr'g 231:05-09, and he had never seen the FRT-15 or the ATF examination report

analyzing whether it was a machine gun. Prelim. Inj. Hr'g Tr. 214:16-19, 230:22-231:11, 216:18-21. ATF counsel Freyermuth also had not seen or read the report. Prelim. Inj. Hr'g Tr. 593:17-18.

86.     Although Saier's letter quoted the definition of a machinegun in the NFA, its stated reason for the ATF's classification of the FRT-15 as a machine gun (allowing more than one shot with a "single, continuous pull of the trigger") is not the standard in the NFA in the portion the letter quoted, or elsewhere. Def's Ex. C1 at 2.

87.     Upon reading this letter and its stated basis for concluding that the FRT-15 was a machinegun, Maxwell told Saier that he disagreed with its conclusion and asked to see the ATF's classification report. Prelim. Inj. Hr'g Tr. 216:12-217:2, 593:08-22.  Although Saier did not tell Mr. Maxwell, he knew that ATF policy prohibited him from giving Mr. Maxwell a copy of the classification report and, in any event, he did not have a copy. Prelim. Inj. Hr'g Tr. 233:21-18, 223:24-224:07; 234:6-19; 242:17-19.

88.     On August 2, 2021, Maxwell sent Saier a letter outlining why he could not comply with the cease and desist because he could not understand the basis of the ATF's decision and also explaining his own legal analysis. Prelim. Inj. Hr'g 594:1-4, 595:17-18; Ex. F-1. The ATF never responded. Prelim. Inj. Hr'g 594:21-22.

### RBT Sues the ATF in Florida, After the ATF Fails to Respond to RBT's Submission of Exculpatory Evidence, and Obtains ATF FEO Smith's Report

89.     Following his meeting with Agent Saier, Mr. Maxwell submitted a package of materials to the ATF on behalf of RBT that asked for the ATF to reconsider its position, but he received no response. Prelim. Inj. Hr'g Tr. 593:23-594:05, 594:3-22. RBT then filed suit against

the ATF in Florida on August 2, 2021, to challenge its classification of the FRT-15. Prelim. Inj. Hr'g Tr. 594:01-05.

90.     In the course of the lawsuit, RBT finally obtained Smith's examination report, which was included in the ATF's administrative record. Prelim. Inj. Hr'g Tr. 595:19-596:08.

91.     According to Mr. Maxwell, the evaluations of Defendants' four experts "so terribly destroyed" Smith's report. Prelim. Inj. Hr'g Tr. 598:12-14.

92.     Unfortunately, after a hearing at which the Defendants offered live testimony, the Florida case was dismissed without prejudice due to a missed filing deadline. Prelim. Inj. Hr'g Tr. 597:03-12.

93.     Upon the dismissal of the case, Mr. Maxwell again sent a package of information to Mr. Saier in November 2021 seeking the ATF's reconsideration of its position. Prelim. Inj. Hr'g 597:17-19. After not receiving a response, he also sent a follow up letter on December 28, 2021. Prelim. Inj. Hr'g 598:2-3.

**RBT Publicly Announces and Disputes the ATFs Position on the FRT-15**

94.     The Defendants did not try to conceal the ATF's opinion that the FRT-15 was a machinegun or their disagreement with that opinion.  In addition to publicly filing suit, defendants hired a public relations firm.  Declaration of James Judge (July 25, 2022) ("Judge Decl.) ¶ 3. They issued a press release. Judge Decl. ¶ 4.; *see* Def's Ex. L1. Mr. DeMonico engaged in multiple news and podcast interviews, one of which has been viewed 350,000 times. Judge Decl. ¶¶ 4-7; Prelim. Inj. Hr'g Tr. 450:23-24. Defendants also published additional videos to explain their position, one of which has been viewed a couple hundred thousand times. Judge Decl. ¶¶4-7; Prelim. Inj. Hr'g Tr. 450:19-20.

95.     Demand for FRT-15s soared after Defendants spread the news of the ATF's classification. Prelim. Inj. Hr'g Tr. 451:21-24; 549:15-17.

96.     Furthermore, Defendants used a lawyer-approved message to respond to customers concerned about the legality of the FRT-15 in the wake of the ATF's classification. Deposition of Lawrence DeMonico (July 7, 2023) ("DeMonico Dep.) 196:11-197:4.  That message, in an August 2022 email response to a customer's question, stated:

> Our position is that the FRT-15 is a fully legal semi-automatic trigger. And while the ATF has in fact served us with a cease and desist inaccurately claiming the FRT-15 is a machine gun, we made the decision to not comply and sued them in federal court as a result. To protect ourselves and our customers alike, we conducted a tremendous amount of due diligence before bringing the FRT-l5 to market. That due diligence includes legal opinion letters from four former ATF special agents that all agree the FRT-15 is not a machine gun. After our case was dismissed, we submitted additional supporting evidence and expert opinions and have requested reconsideration. They chose not to reconsider, so we filed a new lawsuit against the ATF, which is currently in litigation.

Pl's Ex. 89.

### RBT Sues ATF in North Dakota

97.     RBT again filed suit against the ATF in North Dakota after Defendants moved their office there in November of 2021. Prelim. Inj. Hr'g Tr. 516:17-20; Prelim. Inj. Hr'g Tr. 582:2-4. However, the ATF successfully moved for dismissal for improper venue. Prelim. Inj. Hr'g Tr. 468:12-14, 516:17-23.

### The Alleged Threat Against the ATF

98.     The United States alleges in this matter that, on August 27, 2021, "a caller from the office of Defendant Maxwell threatened to march down to the ATF offices. 'We are bringing the rocket launcher," he warned." ECF. No. 1, Compl. ¶ 12. In actuality, the call came from a fax machine that was in the common space of an office building where Mr. Maxwell was a tenant. Prelim. Inj. Hr'g Tr. 603:8-604:7.

99.     Mr. Maxwell, a professional attorney, testified that he did not place this call. Prelim. Inj. Hr'g Tr. 602:25-603:7, 604:25-605:3. Indeed, the Report of Investigation produced by the United States confirms that its "intel query revealed the phone number comes back to subscriber 'Private Counsel.'" Defs.' Prelim. Inj. Hr'g Ex. P3 at 1, ¶ 3. Private Counsel owns the office building, and its shareholder is Shon Douctre, an attorney that has represented clients adverse to the ATF. Prelim. Inj. Hr'g Tr. 604:8-17. Neither the ATF, the local sheriff's department, nor any law enforcement has ever contacted Mr. Maxwell about this phone call. Prelim. Inj. Hr'g Tr. 605:4-17. Special Agent in Charge Saier testified that Mr. Maxwell was not being accused of making the call, that it was understood the call came from a shared phone, that he had no idea how many people shared the phone, and that it was just an assumption (a "reasonable inference") the call had something to do with the ATF's treatment of RBT. Prelim. Inj. Hr'g 248:3-249:7.

**The ATF Raids the Facilities of RBT's Vendor Who Manufactured the FRT-15**

100.     On March 22, 2022, ATF raided the premises of 3rd Gen, the RBT vendor who manufactured the FRT-15, with a tactical team equipped with machineguns, kicking in doors of the facility, detaining employees, and confiscating the employee's phones. Prelim. Inj. Hr'g Tr. 245:10-17, 456:06-15. The ATF team executed a search warrant and seized all of RBT's FRT-15 inventory located at the 3rd Gen facility. Prelim. Inj. Hr'g Tr. 600:04-13.

101.     The ATF's raid on 3rd Gen, which manufactured, held RBT's inventory, and drop-shipped the FRT-15 for RBT, thus terminated RBT's ability to sell FRT-15s. Prelim. Inj. Hr'g Tr. 584:01-12. It effectively put RBT out of business. Prelim. Inj. Hr'g Tr. 600.

102.     Since the ATF's raid on 3rd Gen and the sale of the remaining inventory, no more FRT-15s have been made or sold. Prelim. Inj. Hr'g Tr. 600:4-13. As a result of the ATF's claim

that the FRT-15 was contraband, other companies stopped doing business with 3rd Gen and it was sued by its subcontractors because it could no longer pay them. Robinson Dec. ¶ 23.

### ATF Publishes an Ambiguous "Open Letter" Announcing a Vague Extra-Statutory Standard for Forced Reset Triggers

103.    On March 22, 2022, and over 9 years after approving the 3MR, see Def. Ex. P, and 8 months after issuing its cease and desist letter to RBT, the ATF published an "open letter" announcing its policy with respect to forced reset triggers. The letter vaguely stated that "some" forced reset triggers are machineguns. Def's Ex. G1.  This extra-statutory standard, not issued through notice and comment rulemaking, contends that "some" forced reset triggers are machineguns because they "do not require shooters to pull and then subsequently release the trigger to fire a second shot," but instead "utilize the firing cycle to eliminate the need for the shooter to release the trigger before a second shot is fired." Def's Ex. G1. This letter flatly contradicts the ATF's prior approval, as a non-machinegun, a binary trigger that fires a second shot with the release of the trigger, on the grounds that it fired single shots with each "movement" (rearwards and forward, upon *release*) of the trigger. Def. Ex. O. Confoundingly, the ATF's Open Letter itself says that "Unlike . . .  binary triggers . . . the subject FRT's do not require shooters to pull and subsequently release the trigger to fire a second shot." Def. Ex. G1.

### DeMonico Retrieves RBT Inventory from 3rd Gen & ATF Seizes It from Him

104.    Following the ATF raid on 3rd Gen and its seizure of FRT-15 inventory there, 3rd Gen moved additional FRT-15s that were at a different location than the one specified in the warrant were moved to the 3rd Gen facility to avoid a search and seizure at the other location. Prelim. Inj. Hr'g Tr. 458:01-07, 459:06-13; Declaration of Jonathan Robinson (July 25, 2022) ("Robinson Decl.) ¶ 10.

105.    The ATF's warrant, however, expired on April 7, 2022. *See* Def's Ex. Y3.

106.     The Government produced no evidence indicating that 3rd Gen owned or claimed ownership of these triggers, and a declaration by the manager of 3rd Gen submitted by the Government was careful to only assert that 3rd Gen was in possession of the triggers. Though 3rd Gen was not the owner of the triggers, and the ATF's warrant had expired, 3rd Gen offered the triggers to ATF, in reliance on the Government's assertion that the triggers were "contraband." Robinson Decl. ¶ 12. 3rd Gen left the additional triggers sitting on a pallet in its parking lot. Prelim. Inj. Hr'g Tr. 458:01-07.

107.     On April 14, 2022, Mr. DeMonico traveled to the 3rd Gen facility and retrieved RBT's triggers. Prelim. Inj. Hr'g Tr. 459:25-461:15; Robinson Decl. ¶¶ 13-19. While traveling though New Mexico on his return drive with thousands of RBT's triggers in his possession, the ATF stopped Mr. DeMonico and seized the triggers from him but did not arrest him, Prelim. Inj. Hr'g Tr. 464:15-07, 467:14-21, despite its claim that they were illegal machineguns, indeed as illegal as an M-16 machinegun. Prelim. Inj. Hr'g 238:14-20.

108.     Though RBT sought to dispute the ATF's classification and seizure of the FRT-15s, the seizure proceeding was delayed. Prelim. Inj. Hr'g Tr. 602:04-24.

### RBT Obtains and Sells WOTS

109.     RBT obtained an inventory of triggers manufactured by another company that operated the same way as the FRT-15. RBT sold the triggers, called Wide Open Triggers or WOTS, using a message that specified that sales proceeds would be used to fund RBT's litigation against the DOJ and ATF, to assist individuals wrongly accused of a crime for possessing an FRT-15, and to seek the return of FRT-15s wrongfully taken from individuals by the ATF. Pl.'s Ex. 133.

**Summary Findings**

110.    Based on the evidence presented to the Court, summarized above, the Court finds:

(A) that there is no evidence of a conspiracy among Defendants to commit an offense against or

defraud the United States or any of its agencies; (B) the Defendants did not have a subjective or

specific intent to defraud the Unites States or violate its laws; (C) that the Defendants did not

have a scheme to defraud their customers; (D) that the Defendants did not have a subjective or

specific intent to defraud their customers; (E) the ATF issued inconsistent classifications of

firearms as machineguns and did not publish its analyses classifying guns as machineguns and

did not issue a public statement on forced reset triggers until March of 2022, more than two years

after RBT began its business and 9 months after it classified the FRT-15 as a machinegun and

issued its cease and desist letter to RBT; (F) given the Government's inconsistent classifications

and the discrepancy between its various claimed justifications and the text of the NFA, and the

recent decisions of two federal circuit courts of appeal rejecting the ATF's standard claimed in

this case, it was reasonable for Defendants to dispute the Government's claims and seek judicial

review of the ATF's actions; (F) Considering the totality of Defendant's actions and public

communications both before and after the ATF's cease and desist letter, including posting

videos, doing news interviews, social media posts, participating in popular pod casts, sending

emails, and initiating litigation that published their view of the law and dispute with the ATF, the

Defendants did not make material misrepresentations about its disagreement with the ATF's

opinion of the FRT-15; (G) more people appear to have wished to purchase FRT-15s following

publication of the ATF's view of the FRT-15, indicating the actual harm caused by any

consumer confusion was minimal, and RBT did, in fact, issue refunds to customers; (G) the

FRT-15 (and WOT) cannot fire more than one shot with a single function of the trigger, that is, a

32

movement of the trigger causing the release of the hammer and, after the initial shot, the user of

an FRT-15 must pull the trigger rearward to fire each subsequent shot after the trigger is forced

forward, locked, and reset; (H) the ATF knew of the Defendants' manufacture and sale of the

FRT-15 as of January 2021, did not issue its cease and desist to RBT until July 2021, never

executed a search warrant upon Defendants or arrested Defendants before filing suit in this case

in January of 2023, and did not file suit to stop Defendants until two years after first discovering

Defendants were selling the FRT-15; and (I) Given that RBT is no longer in business, has not

sold an FRT-15 in over a year, and has offered to stipulate to not selling any FRT-15s until a

court issues an order determining that it is not an machinegun, the government is not facing any

threat of irreparable harm.

Respectfully submitted,

DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION

*/s/ David Warrington*
JOSIAH CONTARINO
50 Park Place, Suite 1105
Newark, NJ 07102
jcontarino@dhillonlaw.com

DAVID A. WARRINGTON
(*pro hac vice*)
2121 Eisenhower Avenue
Suite 608
Alexandria, VA 22314
dwarrington@dhillonlaw.com

MICHAEL A. COLUMBO
(*pro hac vice*)
177 Post St., Suite 700
San Francisco, CA 94108
415.433.1700
mcolumbo@dhillonlaw.com
*Attorneys for Defendants*