

50 Park Place, Suite 1105
Newark, NJ 07102

Josiah Contarino
Phone: 917-423-7221
jcontarino@dhillonlaw.com

August 23, 2023

**Via ECF**
Honorable Nina R. Morrison
United States District Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:   *United States v. Rare Breed Triggers, LLC, et al.*
>        **Civil Action No. 1:23-cv-00369-NRM-RML**

Dear Judge Morrison:

  As Defendants have previously made clear, regardless of the outcome of the preliminary injunction proceeding, Defendants are prepared to continue refraining from any sales, transfers, or other dealings in forced reset triggers pending the final result of this lawsuit and all related appeals. But Defendants oppose the extraordinarily burdensome and intrusive additional relief requested by the Plaintiff, should the Court grant a preliminary injunction. The Plaintiff's proposed preliminary injunctive relief would not only continue the current temporary restraining order, but also (a) have Defendants surrender hundreds of thousands of dollars' worth of property to the ATF—property that they would certainly never get back or receive compensation for no matter the ultimate resolution of this lawsuit—and, (b) freeze assets and immediately implement a complicated and comprehensive refund program and a burdensome, expensive, and intrusive monitoring scheme despite the fact that the Plaintiff has not produced a single bit of evidence that customers are unhappy or seek refunds.

  Defendants object that the scope and severity of Plaintiff's proposed relief is unsupported by law, unwarranted by the facts of the case, would cause Defendants irrevocable harm that the Court could not undo if Defendants prevail, and would unfairly burden Defendants' ability to defend their interests and the interests of others in this litigation and in the multiple other lawsuits related to this litigation that are ongoing or shortly forthcoming. Should the Court decide to grant a preliminary injunction, the weight of the law and interests of justice weigh in favor of the Court continuing the status quo of the current temporary restraining order and no more.

### The Law Does Not Support the Plaintiff's Extraordinary Request for What is More Properly Post-Judgment Relief

  The Plaintiff's proposed relief is an extraordinary departure from the type of relief courts have granted in similar cases, including those cited by the Plaintiff. The Plaintiff's

letter (ECF No. 128) elides the difference between pre- and post-judgment injunctive relief granted by courts under 18 U.S.C. § 1345 to give the misimpression that the courts' "broad equitable authority" to "enter such a restraining order or prohibition, *or take such other actions*, as is warranted to prevent a continuing and substantial injury" has been used to grant the kind of extraordinary and sweeping relief the Plaintiff seeks here *at the preliminary injunction stage*. This is simply not true. There is not a single instance of a court granting relief in a § 1345 case at the preliminary injunction stage that involved the *permanent transfer* of money from a defendant to another. *None* of the cases cited by the Plaintiff in its motion for a temporary restraining order (ECF No. 5) or its reply in support of the motion (ECF No. 56) or in its letter (ECF No. 128) involved any injunctive financial relief greater than freezing a portion of the Defendants' assets.[1] And even such a limited asset freeze is certainly not a given.

The Plaintiff's cited examples of courts exercising their "broad remedial powers" are either preliminary injunctions that restrain fraudulent conduct and, at most, freeze the tainted portion of the defendant's assets, or post-judgment final remedies. The Plaintiff cites to *United States v. Cen-Card Agency/C.C.A.C.*, 724 F. Supp. 313 (D.N.J. 1989) as a prior example of an injunction ordering defendants to advise their customers they had a right to a refund, but that was post-judgment relief. A preliminary injunction was granted in that case and simply enjoined the defendant's "allegedly fraudulent solicitations, allow[ed] detention of [defendant's] mail, [froze] the company's assets, and order[ed] prompt compliance with government discovery requests." *Cen-Card Agency*, 724 F. Supp. at 315. The Plaintiff cites *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747 (S.D.N.Y. 2015) for an example of the courts' "flexibility to fashion relief that is necessary to protect the public," but the preliminary injunction in that case only involved mandating/prohibiting conduct by the defendant to prevent further fraud or the destruction of evidence and had nothing to do with the kind of restitution sought by the Plaintiff's proposed refund program. Similarly, the Plaintiff cites to *United States v. Fed. Record Serv. Corp.*, No. 99 CIV. 3290 (BSJ), 1999 WL 335826 for an example of an injunction compelling a defendant company to play a recording to callers directing them to the Social Security Administration and away from the company itself, but this was merely a sophisticated form of prohibiting the underlying fraudulent conduct that was otherwise ongoing, which in this case has already been accomplished by Plaintiffs' total compliance with the temporary restraining order.

---

[1] *See United States v. William Savran & Associates, Inc.*, 755 F. Supp. 1165, 1182–83 (E.D.N.Y. 1991) (contemplating a restriction on conduct underlying the alleged fraud and a freeze of defendants' assets); *United States v. Palumbo*, 448 F. Supp. 3d 257 (E.D.N.Y. 2020) (same); *United States v. Fed. Rec. Serv. Corp.*, No. 99 CIV. 3290 (BSJ), 1999 WL 335826 (S.D.N.Y. May 24, 1999) (same); *United States v. Fang*, 937 F. Supp. 1186, 1202 (D. Md. 1996) (same); *United States v. Kahen*, No. CV 20-00474, 2020 WL 1697974 (E.D.N.Y. Jan. 28, 2020) (granting preliminary injunctive relief that solely constrained the defendants' ability to engage in further fraudulent conduct).

None of the cases cited by the Plaintiff support its position that it is entitled to the extraordinary *preliminary* relief it seeks. To the contrary, one of the Plaintiff's citations from its reply brief undermines the its argument entirely. The Plaintiff cited *Shamrock Power Sales, LLC v. Scherer*, S.D.N.Y. No. 12-CV-8959 (KMK) (JCM), 2016 WL 6102370, at *6 (S.D.N.Y. Oct. 18, 2016) to support its position that there "is a centuries-old practice in equity of requiring an accounting ill-gotten gains and restitution or disgorgement of those gains in favor a perpetrator's victims." ECF No. 56 at 14. But that statement in *Shamrock* referred only to *post-judgment* equitable relief, not a pre-judgment preliminary injunction. To the contrary, the court in *Shamrock* stated that pre-judgment equitable relief in a preliminary injunction must be limited and should not resemble post-judgment equitable relief: "[A] preliminary injunction under Rule 65 would be an inappropriate mechanism for seeking postjudgment relief, as the execution of judgments is governed by Rule 69. . . . *[S]ee also Unicon Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199, 204 (2d Cir. 1966) ('It is hornbook law that "the general purpose of a preliminary injunction is to preserve the status quo pending final determination of the action."' (quoting 7 James Wm. Moore et al., Federal Practice ¶ 65.04(1) (2d ed. 1955)))." *Id*. at *2 (internal citations omitted).

Simply put, there is no support for granting the type of extraordinary restitution sought by the Plaintiff in a preliminary injunction, particularly in a case like the present where the most important issue in dispute (the legal status of the FRT-15) is a complicated, undecided legal issue about the meaning of a technical term within a statute that will most likely need to be resolved by an appellate court or possibly the Supreme Court.

### The Factual Record Shows the Plaintiff's Proposed Refund Program Is Unnecessary

Nor do the facts of the case justify a preliminary injunction that would do anything more than continue the temporary restraining order. The purpose of a preliminary injunction is to "preserve the status quo pending final determination of the action." *Unicon Mgmt. Corp v. Koppers Co.*, 366 F.2d 199, 204 (2d. Cir. 1966). In a § 1345 case, a preliminary injunction has the added function of stopping or preventing an ongoing fraud that would occur absent the injunction. 28 U.S.C. § 1345(b). Here, the status quo is and has been maintained by the temporary restraining order that prohibits Defendants from manufacturing or selling any forced reset triggers. Defendants acknowledge that they were operationally defunct prior to the temporary restraining order, that they have no intention of violating or working around the temporary restraining order, and that they are willing to wait until there is a final determination on the legal status of forced reset triggers like the FRT-15 and WOT. Defendants have been true to their word, complying with the temporary restraining order without issue. There is simply no risk of a "continuing" or "imminent" fraud in the absence of Plaintiff's proposed injunctive relief. As such, the Plaintiff's proposed relief is wholly unnecessary for accomplishing the purpose of

§ 1345.

Furthermore, the Plaintiff's proposed refund plan is not justified by any facts in the record. There is no evidence of aggrieved customers clamoring for refunds from Defendants, claiming that they were defrauded by any misleading statements from Defendants and unable to get their money back. Considering Defendants sold over 100,000 units, it is telling that the Plaintiff was unable to present testimony from even a single upset customer who felt defrauded or otherwise harmed by purchasing an FRT-15 or a WOT. There is no evidence of a class of supposed "victims"—or even one "victim"—who claims to have suffered harm as a result of Defendants' alleged fraud. The most the Plaintiff could offer are a handful of customer service emails.

The Defendants demonstrated that they granted refunds to customers who came to them with concern about the legal status of the FRT-15 despite their policy against refunds; and they refunded approximately $431,000 out of the approximately $40,000,000 in revenue—approximately 1%. Not only has the Plaintiff presented no testimony from a supposedly wronged customer, it has presented no evidence whatsoever that *any* customer who wanted a refund after learning about the FRT-15's disputed legal status was unable to get one. This is significant considering the lengths to which the Defendants went to publicize their dispute with the ATF. There is simply no evidence in the record of *any* unmet demand for refunds amongst Defendants' customers, much less the sort of massive unmet demand that would be required to justify the extraordinary relief sought here.

To the contrary, the record shows, and both the Court and Plaintiff have agreed, that the consuming public for Defendants' products are sophisticated firearms enthusiasts—people attuned to their Second Amendment Rights and the issues that concern them. This is a consuming public that *stepped up* their purchases of Defendants' products to record heights when the controversy over the FRT-15's legal status was publicized. Defendants' customers have demonstrated with their wallets that information about ATF's opinion of the FRT-15's legal status was either not material to them or in fact spurred them on to purchase the product.[2] Given Defendants' consistent efforts prior to the July 2021 cease and desist letter to publicize and inform consumers about their basis for believing the FRT-15 to be legal[3] and their extraordinary efforts to publicize the controversy with the ATF far and wide, including retaining a public relations firm to push a press release and video statement out to the media,[4] there was no possibility of

---

[2] *See* Prelim. Inj. Hr'g. Tr. 451:21-24 (Defendants' sales "exploded" at "[t]he moment [Defendant DeMonico] put out that [Defendants] were having this issue [with the ATF]"); Prelim. Inj. Hr'g. Ex. Q2 at 2 (Sales chart reflecting record spike in sales immediately following Defendants' publicity about the ATF controversy).

[3] Prelim. Inj. Hr'g. Exs. A, B, C, and D (videos featured on Defendants' website, rarebreedtriggers.com, explaining their legal position regarding the FRT-15's legality).

[4] *See* Prelim. Inj. Hr'g. Tr. 450:16 – 451:20 (Defendant DeMonico stating that he did television, podcast, and phone interviews and hired a professional public relations firm with the goal of being "as loud as

consumer fraud for customers who purchased FRT-15s in this context as there was no concealment of Defendants' reasons for believing the FRT-15 to be legal or the ATF's disagreement. An award of restitution would thus potentially be an unwarranted windfall, rather than necessary relief.

### Defendants Would Suffer Irreparable Harm from the Refund Program that Could Not Be Undone if They Prevail

The Plaintiff's requested refund program is especially extraordinary and unjust as pre-judgment relief because its harm to Defendants could not be undone if Defendants ultimately prevail. The Plaintiff's proposed refund program would have Defendants inform all of Defendants' customers, including those who purchased products from third parties, that they may seek a guaranteed cash refund from Defendants which Defendants would be compelled to provide. This would likely have the effect of scaring thousands or tens of thousands of FRT-15 purchasers into seeking refunds from Defendants under the misimpression that the FRT-15 is illegal or about to be declared illegal.

This would also cause irreparable harm to Defendants that could not be fixed even if Defendants prevail. Defendants would stand to lose millions of dollars in revenue that they could not reobtain upon success in this litigation. If Defendants prevail, the refunds would still have been issued. Accordingly, such an order would irrevocably alter the status quo instead of preserving it until final judgment. Rather, it is an objectively unfair and "guilty until proven innocent" pre-judgment punishment, particularly inappropriate and unnecessary considering the complete absence of *any* evidence that there is a pre-existing demand for such refunds.

### The Plaintiff Should Not Be Allowed to Hamstring Defendants' Ability to Defend their Rights Under the Guise of Preliminary Relief

Further militating against the Plaintiff's proposed refund program is its transparent purpose as a tool for hampering Defendants' ability to defend their rights in this litigation and in the other ongoing or forthcoming lawsuits with the Plaintiff over forced reset triggers. Defendants are currently funding litigation regarding the FRT-15's legal status in the 5th Circuit, which the Plaintiff all but invited them to do during the evidentiary hearing when the Plaintiff's counsel challenged why Defendants had not yet brought a declaratory action in Texas where the nerve center of Rare Breed Triggers, LLC's business is located. Defendants are also defending their rights in two asset forfeiture actions related to seized forced reset triggers, funding the experts for the legal defense of FRT-15 purchasers who are being prosecuted, and intend shortly to bring further legal action to defend their Second Amendment rights related to forced reset

---

possible" because he "was looking for people to hear [his] story and put [his] story out; the exact opposite of trying to keep it quiet"); Prelim. Inj. Hr'g, Ex. L1 (Email from James Judge of Judge PR with press release and report attached); Prelim. Inj. Hr'g. Ex. E (Defendant DeMonico's August 19, 2021, video statement about the ATF controversy).

triggers as well.

The Plaintiff's proposed refund program, or otherwise freezing Defendants' assets, would hamstring Defendants' ability to defend their rights and the rights of others in these actions. As previously discussed, there is no evidence of a mass of aggrieved customers clamoring for a refund or of any risk that Defendants would continue the "fraud" or work around the temporary restraining order absent this type of relief. The Plaintiff's refund program or an asset freeze would accomplish nothing additional to protect any consumers, but it would severely prejudice Defendants' ability to participate in the judicial process—including impeding Defendants' ability to defend the interests of its customers from the Plaintiff. As this is clearly all that the refund program or an asset freeze would accomplish, it appears that this prejudice to Defendants' legal rights is driving the Plaintiff's request for this extraordinary relief.

### Even if an Asset Freeze Is Ordered, It Should Be Limited

Should the Court decide that freezing any of Defendants' assets is appropriate in a preliminary injunction, the scope of the asset freeze should still be limited. As the Court acknowledged during closing arguments, there is no basis for claiming that customers who purchased the FRT-15 after the July 2021 cease and desist were defrauded, as Defendants took every action they could to publicize the controversy and inform the consuming public about the FRT-15's disputed legal status. Nor is there a basis for claiming Defendants defrauded purchasers of the WOT, as the very email Defendants used to market the WOT stated that Defendants intended to use all the proceeds from WOT sales to fund litigation against the Plaintiff over the legal status of forced reset triggers or to otherwise assist individuals wrongfully accused of a crime for possessing an FRT-15 or whose FRT-15s were wrongfully seized. Accordingly, any revenues from sales after July 2021 or from the sale of WOTS must be categorically excluded.

Additionally, Defendants' assets obtained from sales to customers in the 5th and 6th Circuits (Texas, Louisiana, Mississippi, Michigan, Ohio, Kentucky, and Tennessee) should be exempt from any asset freeze in light of the decisions from those Circuits rejecting the ATF's definition of "single function of the trigger" that the Plaintiff relies on for asserting the FRT-15 is a machinegun. *See Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023); *Hardin v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 65 F.4th 895 (6th Cir. 2023).

Furthermore, the Plaintiff has presented no evidence that Defendant Kevin Maxwell knew about the AR1, any connection between the AR1 and the FRT-15, or of the ATF's classification of the AR1, prior to the July 2021 cease and desist letter or prior to this action. Accordingly, the Plaintiff has no basis for claiming Defendant Maxwell had any fraudulent intent regarding sale of the FRT-15, based upon any AR1 theory, and thus none of Defendant Maxwell's assets should be subject to any potential asset freeze.

Finally, there is no evidence that Rare Breed Firearms engaged in any fraud. Therefore, its revenues should not be subject to any asset freeze.

## Conclusion

Based upon the foregoing, any potential preliminary injunction should be limited in scope to continuing the present temporary restraining order, which Defendants have complied with without issue and which has sufficed to prevent the underlying conduct complained of by the Plaintiff.

Defendants thank the Court for its consideration of this matter.

Respectfully submitted,

DHILLON LAW GROUP INC.

By: _____/s/_____

David A. Warrington (*pro hac vice*)
Michael A. Columbo (*pro hac vice*)
Josiah Contarino
Jacob W. Roth (*pro hac vice*)

cc: All Counsel of Record (via ECF)