

50 Park Place, Suite 1105
Newark, NJ 07102

Josiah Contarino
Phone: 917-423-7221
jcontarino@dhillonlaw.com

August 28, 2023

**Via ECF**
Honorable Nina R. Morrison
United States District Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

          **Re:**    *United States v. Rare Breed Triggers, LLC, et al.*
                   Civil Action No. 1:23-cv-00369-NRM-RML

Dear Judge Morrison:

      Defendants hereby respond to the legal arguments raised by Plaintiff in its letter from August 23, 2023 (ECF No. 131). Plaintiff raised two points in the letter. The first addresses whether the fraud alleged by Plaintiff may be proven by recklessness. The second regards certain factual details about Defendants' sale of Wide Open Triggers ("WOTs"). Defendants offers necessary context and clarification to Plaintiff's points.

    **I.**    **Defendants Never Showed Reckless Indifference to the Truth Regarding the FRT-15's Legality**

      While Plaintiff is correct that "reckless indifference to the truth" is sufficient scienter for a fraud violation, Plaintiff leaves an incomplete picture of the intent required for a fraud violation and how that applies to the present case. The "recklessness" that must be proven for a fraud violation is subjective, not objective, as good faith is an absolute defense to fraud. *United States v. Dupre*, 462 F.3d 131, 139 (2d Cir. 2006) ("[G]ood faith constitutes a complete defense to charges of [] fraud."); *United States v. Alkins*, 925 F.2d 541, 550 (2d Cir. 1991) ("[A]n honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the statement may turn out to be.").

      Therefore, if Defendants believed in good faith that the information they presented to customers was true, or that information they did not present was not material, then they did not have the requisite intent to commit fraud. *See Ross v. A. H. Robins Co.*, 607 F.2d 545, 556 (2d Cir. 1979) (An omission is not a basis for fraud when it was made in good faith and without knowledge that it was false or misleading). This is true regardless of whether others in Defendants' position would have acted differently. The relevant question is what Defendants believed and intended, not what an objectively "optimal" course of conduct would have been.

It is hard to imagine how Defendants could be described as reckless regarding their statements about the FRT-15's legality before the July 2021 cease and desist. They hired an attorney and a firearms expert who were previously employed by the ATF to review the FRT-15 and sought their unvarnished, honest opinion about whether the design was a machinegun under the statutory definition before offering it for sale. They then sought the opinions of two additional firearms experts who were former ATF agents to ensure they had a complete view on the FRT-15's legality.

Defendants were not only deliberate about gathering information and forming their opinion on the FRT-15's legality, they were deliberate in disseminating the basis for their opinion so it would reach their consuming public effectively: they produced videos for their website 1) explaining with schematic diagrams how the FRT-15 worked and how it compared to a standard AR-15 trigger, 2) explaining their legal reasoning for why the FRT-15 complied with the law based on the statutory definition of "machinegun" and "single function of the trigger," and 3) interviewing one of their experts to explain his perspective on the FRT-15's legality as a former ATF special agent. Defendants were not "recklessly indifferent" to any of the ATF's prior machinegun classifications that used the "continuous rear pressure standard" because they did not have access to these non-public documents, nor did they otherwise have awareness of them, and their experts did not tell Defendants about them. Two of Defendants' experts have even testified that *they* had never heard of this standard in their multi-decade careers at the ATF.[1] And even after seeing the use of the "continuous rearward pressure" standard applied by FEO Smith to the FRT-15 (which the ATF also applied to the AR1), Defendant's legal expert, Kevin McCann stated that he still believed the FRT-15 was not a machinegun.[2]

Plaintiff has claimed that Defendants were recklessly indifferent to the truth by omitting information about the AR1's machinegun classification in their marketing of the FRT-15. The alleged materiality of this omission hinges upon Plaintiff's vague contention that the FRT-15 is a "predecessor" of the AR1 and therefore the AR1's classification as a machinegun dictated the FRT-15's legality. This argument is unavailing for several reasons.

First, Defendants did not know anything about the AR1 prior to launching the FRT-15 that would have led them to believe or suspect it was relevant to the FRT-15's legality. As Defendants have attested, and Plaintiffs have no evidence showing otherwise, neither Mr. DeMonico nor Mr. Leleux were familiar with the AR1 beyond a very surface level from brief snippets of conversation about it with Mr. Cooper Rounds.[3] There is no evidence the design of the AR1 was ever made public and no product embodying it was ever offered or sold by Wolf Tactical. They knew it was a trigger that required the buyer to cut into his

---

[1] Prelim. Inj. Hr'g. Tr. 328:25-329:11, 330:23-331:14, 393:19-394:5.
[2] Prelim. Inj. Hr'g. Ex. Z at 4.
[3] *Id*. 428:21-430:16; 491:1-22, 494:7-495:3; Deposition of Cole Leleux (June 30, 2023) ("Lelux Dep.") 23:5-24:4.

AR-15's bolt carrier group to make room for the device.[4] The obvious technical issues and unmarketability of such an unwieldy and DIY-intensive design left Mr. DeMonico and Mr. Leleux completely uninterested in learning more about it.[5] They figured it was a boondoggle that could never catch on.[6]

Nor did Mr. Cooper Rounds informing them that the AR1 was classified as a machinegun by the ATF put them on notice of anything relevant to the FRT-15 because he told them the classification was based on a hammer-follow issue, and that was all they knew of it.[7] Mr. Leleux did not see the AR1's determination letter, at the earliest, until a dispute with Thomas Graves over a patent arose in early 2021.[8] Mr. DeMonico did not see the letter, or even learn much more about the AR1, until the present litigation.[9] While Mr. Rick Vasquez was involved in submitting the AR1 to the ATF for classification and was an expert Defendants consulted about the FRT-15, he did not raise the AR1 as an issue with Defendants.

The AR1 letter was sent to Defendants' experts as part of Defendants' due diligence in 2021,[10] but none of Defendants' experts raised any concerns about its bearing on the FRT-15's legality to Defendants. At worst, all that Defendants knew of the AR1 before selling the FRT-15 and until the present litigation was that it was a separate, over-complicated, and unsellable side project of Mr. Cooper Rounds' that was classified as a machinegun by the ATF because of a hammer-follow issue (even though ATF states that "hammer follow" is not dispositive for the classification).[11]

Second, at no point have Mr. DeMonico or Mr. Leleux understood or believed the AR1 to be a "predecessor" to the FRT-15.[12] This is because the FRT-15 was developed as a completely different product design and the two devices do not share essential design characteristics.[13] The story of each product's development shows this. The AR1 used pre-existing technology called Flex-Fire designed by Thomas Graves that Mr. Rounds adapted to the AR-15 platform.[14] The Flex-Fire technology was originally designed to work in its own stand-alone gun design.[15] The gun was designed from the ground up around the Flex-Fire concept of "rigid mechanical contact" directly between the trigger and the bolt carrier.[16] What later became known as the AR1 was Mr. Cooper Rounds' attempt to adapt

---

[4] Prelim. Inj. Hr'g. Tr. 536:8-15; Leleux Dep. 23:5-24:4.
[5] *Id*.; Deposition of Lawrence DeMonico (July 7, 2023) ("DeMonico Dep.") 120:3-121:24.
[6] Prelim. Inj. Hr'g. Tr. 491:5-15.; DeMonico Dep. 120:3-121:24.
[7] Prelim. Inj. Hr'g. Tr. 565:16-20; Leleux Dep. 32:2-34:2.
[8] *Id*. 579:9-20.
[9] DeMonico Dep. 124:8-125:3.
[10] Prelim. Inj. Hr'g. Tr. 579:5-15.
[11] *Id*. 536:8-25, 539:22-25.
[12] *Id*. 577:7-22.
[13] *Id*. 576:14-577:22.
[14] DeMonico Dep. 120:3-121:24; Leleux Dep. 21:22-22:24.
[15] DeMonico Dep. 120:3-121:24.
[16] *Id*.

the Flex-Fire concept to the AR-15.[17]

Because Flex-Fire was intended for a gun that would be designed and manufactured around the Flex-Fire concept, adapting the Flex-Fire idea to the AR-15 created a whole host of problems that made this design not cost-effective to pursue.[18] AR-15s are not all built identically; there are small differences in how individual manufacturers make their AR-15s that mean the fit between the parts can vary in significant ways across AR-15s.[19] These variations, coupled with the unique mechanics of the AR-15 that differ from the original Flex-Fire gun design, meant that the AR1 had problems, including but not limited to hammer follow, and requiring intensive modification to the bolt or bolt carrier to work.[20] After submitting a provisional patent application for the AR1, the concept was abandoned and Mr. Cooper Rounds came up with the FRT-15 ('223 Patent) as a wholly new idea for how to achieve a forced-reset trigger in the AR-15 that did not involve the headache and issues of attempting to use Flex-Fire technology in the AR-15 platform, where it did not make sense.[21]

The FRT-15 was purpose-built for the AR-15, unlike the AR1, which was based on the pre-existing technology.[22] Mr. Cooper Rounds went back to the drawing board when he created the FRT-15; he did not use the AR1 as starting point or branching-off point.[23] By adding a locking bar, the need for a customized bolt carrier was eliminated. That is why the FRT-15 is not a mere "improvement" on the AR1 in an iterative sense as if it were an evolution of the AR1 that further developed or refined its design. Instead, the FRT-15 is an improvement over the AR1 in the general qualitative sense that it is a better product – a different product based on different technology -- that avoids many of the issues with the AR1 (such as hammer follow).

The timeline for the FRT-15 patents and the ATF's AR1 classification reflect that the designs were broadly developed concurrently, not iteratively. The AR1 does not "predate" the FRT-15 in a meaningful sense because Mr. Cooper Rounds was working on the FRT-15 shortly after he submitted the AR1 to the ATF in August 2017 and he submitted the provisional patent application for the FRT-15 in September 2017, about a year <u>before</u> he received the ATF's determination on the AR1 in August 2018. Therefore, the FRT-15 was not developed based on the AR1's technology and clearly was not developed "in response" to the ATF's classification of the AR1. It was its own project by Mr. Cooper Rounds, an inveterate inventor who was working on the idea of forced-reset triggers generally and was always inventing something new. The independence of the designs is further reflected by the patent office's decision to issue a separate patent for the FRT-15 that was patentably distinct over the patent for the Flex-Fire technology, which

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* 125:4-121:24; Leleux Dep. 32:2-34:2.
[22] Leleux Dep. 32:2-34:2.
[23] DeMonico Dep. 125:4-127:19; Leleux Dep. 32:2-34:2.

the AR1 is based on.

Because the AR1 and the FRT-15 are completely distinct products that do not share the same technology, Defendants have held a consistent good faith belief that the AR1 is irrelevant to the FRT-15's legal status.[24] They held this belief when Mr. DeMonico and Mr. Leleux had heard only cursory snippets about the AR1's design and knew it was unsellable and unworkable due to the required bolt carrier modification.[25] They held this belief when Mr. Cooper Rounds later told them the ATF rejected it as a machinegun due to hammer follow.[26] And they held this belief when Mr. Leleux learned a bit more about the AR1 during the patent dispute with Mr. Graves.[27] Defendants' decision not to mention the AR1 in their marketing is directly attributable to a) their initial lack of information about the AR1 as anything other than an irrelevant other project Mr. Cooper Rounds had worked on to attempt to adapt a troublesome prior technology to the AR-15 platform in a way that did not sound like it would work well and that was eventually classified as a machinegun by the ATF due to hammer follow issues, and b) their good faith belief, once they were more familiar with the AR1 after the Graves patent dispute, that the AR1 had nothing to do with the FRT-15 because the two designs were so different and worked so differently that the AR1 had no bearing on the FRT-15.[28]

Even now, as Defendants have learned more about the AR1, their belief that it has nothing relevant to do with the FRT-15 has only been bolstered.[29] Defendants are additionally supported in their belief that the AR1 and its prior classification were essentially irrelevant to the FRT-15 because the ATF's own handbook on the National Firearms Act states that its classification letters apply only to the letter's recipient, not others. *See ATF National Firearms Act Handbook*, Office of Enforcement Programs and Services, Bureau of Alcohol, Tobacco, Firearms and Explosive, U.S. Dep't of Justice (April 2009), § 7.2.4.1; *see also Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 86 Fed. Reg. 30826, 30827 (June 10, 2021) ("an ATF classification of a firearm pertains only to the particular sample submitted because of the vast variations in submissions, the application of different relevant statutes and judicial interpretations of these statutes, the manufacturer's or maker's stated intent, and the objective design features supporting or undercutting that stated intent that may be legally and technically significant").

Defendants' decision not to disseminate information about the AR1 was not borne from a "reckless indifference to the truth." Defendants' good faith belief in the AR1's irrelevance, to the extent they even knew about it when planning and launching their businesses, was unchanged even after Defendants obtained the ATF's classification letter

---

[24] Leleux Dep. 85:11-88:3; DeMonico Dep. 120:3-121:24, 125:4-127:19.
[25] Leleux Dep. 23:5-24:4, 85:11-88:3; DeMonico Dep. 120:3-121:24.
[26] Leleux Dep. 23:5-24:4, 28:11-30:24, 32:2-34:2.
[27] Leleux Dep. 85:11-88:3.
[28] *Id.*
[29] *Id.*; DeMonico Dep. 125:4-127:19.

of the AR1 for the reasons explained above. While Plaintiff might disagree about the AR1's relevance to the FRT-15, the good faith standard is not based on whether Plaintiff can second-guess Defendants' judgment.

For the foregoing reasons, Defendants believed in good faith that the AR1's classification, to the extent it was known and understood, was irrelevant to the FRT-15 and thus did not take further steps to mention it to their customers in the FRT-15's marketing.

## II. Clarifications to Plaintiff's WOT Timeline

Plaintiff's letter also provides a "timeline" on Defendants' sale of WOTs that contains several misleading insinuations. First, Plaintiff implies that Defendants were lying about the reason they used discreet shipping practices, that is, using the alternate label names of "Red Barn Tools" and "Red Beard Treasures," and that the true reason was to hide their shipping from Plaintiff. As explained in Mr. DeMonico's declaration, this is entirely untrue. Defendants switched to using USPS for shipping WOTs specifically because WOTs were a cheaper item and the economics of shipping them made more sense with USPS instead of UPS as USPS was a cheaper carrier.[30]

The issues with USPS were solvable with the discreet shipping practices Mr. DeMonico described in his declaration.[31] This explanation is supported by Mr. DeMonico's statement that he did not use discreet shipping for small-value items like springs because they were not worth the hassle as they could be replaced cheaply if lost or stolen.[32] This is consistent with Defendants' stated economic motivation, but would not make sense if Defendants' goal was to hide their activities from Plaintiff.

Additionally, Plaintiff implies that Defendants were dishonest with their customers in December 2022 by "informing their customers that they had depleted their WOT inventory" "despite having a significant inventory of WOTs in [their] possession. This is untrue and misleading. As explained in Mr. DeMonico's declaration, Defendants' website reflected that WOTs were "out of stock" because Defendants were not in a position to sell the product due to Chase Paymentech, LLC canceling their service.[33] Based on the way Defendants' e-commerce platform worked, the platform indicated that they had no WOTs available to sell on their "virtual shelf" because they were not a position to accept payment for them.[34] Because the "virtual shelf" for WOTs was empty, the e-commerce platform reflected the product as "out of stock" on the website.[35] To claim that this is evidence of fraud—an innocuous statement controlled by the e-commerce platform rather than by

---

[30] Declaration of Lawrence DeMonico (August 23, 2023) ¶ 4.
[31] *Id.* ¶¶ 7-10.
[32] *Id.* ¶ 12.
[33] *Id.* ¶ 17.
[34] *Id.* ¶ 17-18.
[35] *Id.* ¶ 17.

Defendants—is disingenuous in the extreme.

"Out of stock" is a generic term that applies whenever sellers like Defendants have no products ready to be sold for whatever reason.[36] It does not specifically mean that they have none of the item physically in their possession.[37] While this issue is immaterial to Plaintiff's fraud claims, Plaintiff's insinuation that Defendants lied to their customers in this way or any other is incorrect.

In sum, the Plaintiff offers no evidence of a reckless indifference to the truth or fraud and instead relies only upon mischaracterizations and conjecture. That this is the best the Plaintiff can come up with to support a fraud claim is telling. The parties have a real dispute regarding the meaning of the statute, but that is a far cry from a real dispute whether there was a broad ranging conspiracy to defraud. It is fair and just to litigate about the former, but given the complete failure of proof with respect to the latter, the Plaintiffs' motion for a preliminary injunction going far beyond what Defendants have voluntarily offered is unnecessary and unjustified.

Defendants thank the Court for its consideration of this matter.

Respectfully submitted,

DHILLON LAW GROUP INC.

By: _____/s/_____

David A. Warrington (*pro hac vice*)
Michael A. Columbo (*pro hac vice*)
Josiah Contarino
Jacob W. Roth (*pro hac vice*)

cc: All Counsel of Record (via ECF)

---

[36] *Id.* ¶ 18.
[37] *Id.* ¶ 18.